1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                    MARSHALL DIVISION

 4   CENTOCOR, INC., ET AL.,  )(

 5                           )(   CIVIL DOCKET NO.

 6                           )(   2:07-CV-139-TJW

 7   VS.                     )(   MARSHALL, TEXAS

 8                           )(

 9                           )(   FEBRUARY 26, 2009

10   ABBOTT LABORATORIES      )(   9:00 A.M.

11

12                CLAIM CONSTRUCTION HEARING

13           BEFORE THE HONORABLE JUDGE JOHN WARD

14                UNITED STATES DISTRICT JUDGE

15

16   APPEARANCES:

17

18   FOR THE PLAINTIFF:   (See Attorney Sign-In Sheet)

19

20   FOR THE DEFENDANT:   (See Attorney Sign-In Sheet)

21

22   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
23                        2593 Myrtle Road
                          Diana, Texas  75640
24                        (903) 663-5082

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

```
 1                        I N D E X

 2

 3   February 26, 2009

 4                                              Page

 5       Appearances                           1

 6       Hearing                               3

 7       Court Reporter's Certificate          83

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                COURT SECURITY OFFICER:  All rise.

 2                THE COURT:  Please be seated.  Morning

 3    Counsel.

 4                All right.  We've got a claim construction

 5    hearing in 2:07-CV-139.  That's Centocor, Incorporated,

 6    versus Abbott.

 7                What says the plaintiff?

 8                MR. SAYLES:  May it please the Court, Dick

 9    Sayles for Centocor and New York University.  We are

10    ready.  And with the Court's permission, may I introduce

11    our team?

12                THE COURT:  Okay.

13                MR. SAYLES:  Seated at counsel table is

14    Dianne Elderkin, who will be our lead today and will be

15    presenting to the Court.  This is Barbara Mullin.

16                MS. MULLIN:  Good morning, Your Honor.

17                MR. SAYLES:  And this is Matt Pearson.  Each

18    of these lawyers is from the Woodcock Washburn law firm.

19    Mr. Ken Dow over in the corner is with Centocor.  He is

20    the vice president of intellectual property law.  And,

21    of course, Ms. Henson and Mr. Strachan from my office.

22                THE COURT:  Okay.  Thank you, Mr. Sayles.

23                Defendant Abbott Labs?

24                MR. RICHARDSON:  Good morning, Your Honor,

25    Michael Richardson.  We are ready to proceed.  With me
```

1  today is Bill Lee from Wilmer Hale.

2         MR. LEE:  Good morning, Your Honor.

3         MR. RICHARDSON:  He'll be taking the lead.

4  Amy Wigmore and Bill McElwain.  We also have here from

5  Abbott Peter Witty and Eric Martin, and also Jamaica

6  Szeliga.

7         THE COURT:  Thank you, Counsel.

8         Mr. Richardson, tell Mr. Beck that I'm a

9  little upset that he wasn't here.  I wanted to have his

10  views on chimeric antibodies today.  I'm sure that he

11  would have something valuable to say to all of us.

12        MR. RICHARDSON:  He would have something

13  very valuable.

14        THE COURT:  Okay.  Well, you tell him that I

15  noted that for the record.

16        MR. RICHARDSON:  He said to let you know

17  that he'd be teeing off at about 9:30 today.

18        THE COURT:  That's probably fortunate for

19  all of us.

20        All right.  We'll hear from -- we've got you

21  an hour and a half per side, and so we'll hear from the

22  plaintiff.  The Court has read the patents twice.  It's

23  very interesting.  I wish I understood.  And I've been

24  through, of course, your tutorials, and with staff, I've

25  been through all the briefing with their doing most of

1  the heavy lifting on that.  So it is a challenging

2  patent for the Court.

3            MS. ELDERKIN:  For all of us, Your Honor.

4            May it please the Court.  Again, I'm Dianne

5  Elderkin.  I'm here to present the argument for the

6  plaintiffs, Centocor and NYU.  I'll be referring to them

7  jointly as Centocor for the most part.

8            Of course, there are two patents involved in

9  the lawsuit here.  The '775 and '239 patent.  They are

10  co-owned by Centocor and by New York University, and the

11  inventions disclosed in these patents relates to certain

12  antibodies to a protein called tumor necrosis factor

13  alpha or what we refer to in shorthand as TNF.

14            And as you'll hear as this case proceeds,

15  Centocor and NYU contend that these patents cover

16  Centocor's commercial product, Remicade, and also covers

17  Abbott's commercial product, Humira.

18            I think it's fair to characterize both of

19  these products as wonder drugs because each of these

20  single antibodies can be used to treat a number of

21  chronic debilitating diseases as varied as rheumatoid

22  arthritis, Crohn's disease, which is a horribly

23  debilitating disease of the gastrointestinal system, and

24  psoriasis.

25            The common factor in each of these diseases

1    is that they result from an overproduction in the body

2    of the protein TNF.  TNF, of course, is a naturally

3    occurring protein.  It's involved in your immune system,

4    but when it's overproduced, it can cause problems.  The

5    invention disclosed and claimed in the two

6    patents-in-suit relate to a certain defined class of

7    antibodies that bind to TNF in a way that causes it to

8    lose its biological activity.

9            Now, just to step back for a minute about

10   how this invention came about.  It started with two

11   researchers at NYU, Dr. Le and Dr. Vilcek, who worked to

12   find a mouse or murine antibody that had this effect on

13   TNF that could bind to TNF and neutralize its biological

14   activities.  And doing that is sort of like looking for

15   a needle in a haystack because the body, whether it's

16   human or mouse, can make thousands of antibodies to a

17   particular target, but what they did is they finally

18   found an antibody that did bind to TNF, bound strongly

19   enough to TNF, bound to TNF in the right way that it

20   would neutralize the activity of TNF.  And the antibody

21   that Dr. Vilcek and Dr. Le found, this mouse or murine

22   antibody, is called A2.

23           Then the inventors at Centocor got involved

24   to make a recombinant antibody based on that A2 mouse

25   antibody.  They used genetic engineering techniques to

1   make a chimeric antibody that was based on A2.  So what

2   they did was they found a way to replace a portion of

3   the A2 antibody, the constant region, which is the --

4   you remember the Y structure of an antibody, the

5   constant region is the base of the Y and starts up on

6   the branches.

7          So the Centocor inventors found a way to

8   replace the constant region of the A2 antibody with a

9   portion of the antibody encoded by human DNA.  So the

10  resulting antibody is said to have a human constant

11  region.  And this genetically engineered body was called

12  cA2, C for chimeric, and A2 because it's based on the

13  original A2 murine antibodies.  And cA2 is the preferred

14  disclosed embodiment in the patents-in-suit.  It is also

15  the antibody that is in Centocor's commercial product,

16  Remicade.

17         Now, as I will explain, what Abbott is

18  attempting to do with its claim constructions is to

19  limit the scope of the two patents-in-suit to a single

20  embodiment, to the cA2 antibody, and that's the theme

21  that runs through almost all of the claim construction

22  disputes that the parties have.

23         I put up on the screen Claim 1 of the '775

24  patent.  It contains many of the claim terms that are in

25  dispute between the parties, but it also provides a nice

1    framework for just how are the antibodies of this

2    invention claimed.  Now, the inventors could have just

3    claimed cA2 antibody, but they didn't.  They claimed a

4    group of antibodies based on the characteristics of the

5    cA2 antibody.  And as an example, in the claim here,

6    some of the highlighted language is particularly

7    relevant.  The claim refers to an anti-TNF antibody.

8    That's a term in dispute that we'll discuss.

9              It says that the antibody has a -- comprises

10   a human constant region.  That's a term that is not in

11   dispute, and you'll recall that the cA2 antibody that I

12   just discussed does have a fully human constant region.

13   It is completely derived from human DNA, and there's no

14   dispute between the parties that human in the case of

15   the human constant region in the preferred embodiment is

16   fully human or includes fully human.

17             And then the rest of the claim talks about

18   how and in what way the claimed antibodies bind to TNF.

19   It talks about the competitive inhibition, which we'll

20   get to.  It also says that this antibody must bind to a

21   neutralizing epitope of the TNF and that it must have a

22   certain affinity.

23             So these are the ways that the claims

24   characterize the antibodies.  Not all of the claims --

25   for example, the claims in the '239 patent don't include

1    that -- don't all include the recitation of affinity,

2    but this claim fairly sets forth many of the terms in

3    dispute.

4            The first term that I'll address is just

5    what is the meaning of anti-TNF antibody?  And there are

6    three other terms that don't appear in Claim 1 which

7    Abbott, in its briefing, grouped with its discussion of

8    the anti-TNF antibody, and so we'll address them in that

9    grouping, as well.  And this slide, No. 6, shows all of

10   those terms.  Anti-TNF alpha antibody, but then these

11   other terms that appear in some of the dependent claims,

12   human variable region is, human light chain, and human

13   heavy chain.  And what we've shown in this slide is what

14   Centocor's proposed constructions are for these terms.

15           For Anti-TNF alpha antibody, very simply

16   that it is an immunological protein which, to be honest,

17   is another word for antibody that binds to TNF alpha.

18           For the human variable region, the human

19   light chain, and the human heavy chain, the parties

20   don't dispute what a variable region, what a light chain

21   is, what a heavy change is.  The dispute centers around

22   what does human mean?

23           Centocor's constructions require that the --

24   that human means that this particular region or chain

25   are encoded by a gene derived from human DNA.  And what

1    that means -- what encoded means is that the DNA -- the

2    DNA has the instructions for making an antibody, and if

3    the DNA which makes this particular antibody is derived

4    from human DNA, then this region is encoded by a gene

5    derived from human DNA.

6            Now, the common thread distinguishing

7    Centocor's constructions of these terms from Abbott's

8    constructions is that Abbott wants to insert limitations

9    that would exclude fully human antibodies from either

10   the discussion that the definition of anti-TNF antibody

11   or would exclude the possible -- possibility of a fully

12   human variable region, a fully human light chain, or a

13   fully human heavy chain.

14           I can explain why that is not appropriate,

15   but, first, there are a few places where there's some

16   agreement.  It's always nice to get to that.  This slide

17   shows the party's construction for anti-TNF antibody,

18   and, obviously, both parties agree that this antibody

19   needs to bind to TNF alpha, so there's no dispute about

20   that.

21           In Centocor's construction, it's referred to

22   as an immunological protein.  Abbott refers to it as an

23   antibody.  In that regard, there is really no

24   disagreement.  Those things are pretty much

25   interchangeable, but, of course, here's where the real

1    distinction is.  Abbott with its construction of

2    anti-TNF antibody is attempting to read extraneous

3    limitations into the claim.  It's attempting to limit

4    this claim not to any type of antibody but only to

5    murine, which is a mouse antibody, or chimeric, which it

6    defines as an antibody that has DNA sequences from

7    different species.

8              And if you recall, this is a screen shot

9    from Abbott's tutorial.  If you recall, they talked

10   about the different types of antibodies.  There is a

11   fully mouse antibody.  That was -- that's what they

12   depicted in green, a murine antibody, a type of chimeric

13   antibody, such as cA2.  Centocor's preferred embodiment

14   is shown in the middle in the top row here, and there

15   there is a constant region.  The human region is -- I'm

16   sorry, the constant region is human derived from human

17   DNA.  The variable regions are shown in green, and they

18   are still from a different species, from mouse.  The

19   next antibody on the top right is what is frequently

20   called a humanized antibody.  There it has a human

21   constant region.  The variable region is mostly human,

22   but the very tip of the variable region, the region that

23   binds to the antigen, also called the CDR, is mouse, and

24   then at the bottom you have a fully human antibody.

25             So there's no dispute that these are all

1    antibodies.  The dispute is that Abbott wants to define

2    the term antibody in the claim as excluding the bottom

3    one there, the fully human derived antibody.

4              Now, again, since I said that the

5    constructions of these other terms are all interwoven

6    with the anti-TNF antibody, let me quickly look at the

7    party's different constructions for these other terms.

8              Human variable region, again, there's no

9    dispute between the parties as to what a variable region

10   is.  This is a diagram for Centocor's tutorial.  The

11   variable region is shown in blue, the constant region in

12   green, and the different depictions here -- the stick

13   figure is sort of an easy depiction, but a more

14   realistic slightly more three dementia figure of what an

15   antibody actually looks like is shown in the large

16   figure on the right.

17             So there's no dispute between the parties

18   about what a variable region is.  The dispute here is

19   that Abbott says -- I'm sorry, let me go -- this is a

20   screen shot from Abbott's tutorial.  And, again, the

21   same thing, they don't dispute that the variable region

22   is the top part of the Y going all the way out to the

23   end of the Y, and the constant region is below that.

24             The dispute between parties in this

25   construction, again, is that Abbott wants the human

1    variable region to actually have a nonhuman portion,

2    that the CDR, the binding region, must be grafted from a

3    nonhuman species.  You recall that the CDR, as depicted

4    in this figure from our tutorial, again, is just the

5    small part at the end of the variable region, and that's

6    the important region which binds to the antigen or the

7    TNF.

8              Much the same dispute exists with respect to

9    the construction of human light chain and human heavy

10   chain.  For both of these, there's no dispute between

11   the parties what human -- I mean, what heavy chain and

12   light chain mean.  As depicted in our tutorial, the

13   heavy chain is the portion of the antibody that forms a

14   Y structure.  The light chain are two chains that are

15   attached to the branches of the top of the heavy chain.

16             The only dispute between the parties is

17   whether the heavy chain and the light chain must also

18   have some nonhuman portions, even though the claim

19   refers to human heavy chain and human-human light chain.

20             So why are Abbott's attempts to incorporate

21   extraneous limitations wrong?  Well, first of all, it's

22   improper to limit the plain and ordinary meaning of the

23   claim language absent a clear intent to limit scope.

24   The claim refers to an antibody.  It doesn't limit it to

25   a murine antibody or a chimeric antibody.  The claim

1    refers to heavy constant regions -- I mean, to heavy

2    light -- heavy light -- sorry.  Human light chain, human

3    heavy chain, and human variable regions.  It doesn't say

4    partly human.  So the plain language is very clear.  So

5    there has to be some very clear intentions to limit the

6    scope, and that's very clear from the case law that's

7    cited in our brief.

8              And the cases that Abbott cites really are

9    not on point.  The SciMed case that they cite makes it

10   clear there has to be a very strong indication of

11   disavowal to depart from the plain meaning of the

12   language.  In the SciMed case, it was a medical

13   instrument that involved two lumens or tubes, and the

14   issue is whether the tubes could be coaxial, one within

15   the other, or whether they had to be side-by-side in the

16   instrument.

17             And the Court -- the Federal Circuit said

18   that the Court had properly construed the claims as

19   limited to coaxial because the patent described the

20   invention and all embodiments of the invention as having

21   a coaxial lumen.  This Court found that was the kind of

22   plain and clear disavowal that would allow you to read

23   in limitations to the claim.

24             Another case cited by Abbott that is also

25   not instructive for our fact situation is the

1    Astrazeneca case.  In Astrazeneca, the general summary

2    or description in the patent described a feature of the

3    invention and criticized other products that lacked that

4    same feature.  So that operated as a clear disavowal.

5    There is no clear disavowal here.

6              The best disclaimer or evidence -- purported

7    evidence of a disclaimer that Abbott can find that's

8    referenced in its brief is a statement that was made in

9    the first patent application that Centocor filed in

10   1991, which doesn't even appear in the patent anymore.

11   And that is a statement that was made in the originally

12   filed application, the '827 application, but

13   subsequently removed, and all that statement does is

14   note that a certain existing method for producing human

15   antibodies had some drawbacks.  But the '827

16   specification also described a solution to that problem

17   using certain recombinant DNA technology to isolate an

18   antibody gene from a human B cell, and that's at Exhibit

19   12 at 23.

20             Further the '827 patent also describes

21   potential advantages of using human antibodies instead

22   of mouse antibodies in terms of greater utility for

23   treating chronic conditions.  So this is far from the

24   kind of unequivocal statement that the cases like SciMed

25   and Astrazeneca need for disclaimer.

1               It's also apparent that there's no

2    disclaimer from the fact that the specification of the

3    patents actually discloses human antibodies, and here on

4    Slide 20 we show an excerpt from Column 5 of the patent

5    where it says, Anti-TNF antibodies are intended to

6    include a number of antibodies, and it mentions human

7    antibodies.

8               Abbott has cited no case where the Federal

9    Circuit has said it's okay to insert a narrowing

10   limitation where the patent itself says that something

11   is included.  Further, the patent discloses human

12   regions.  This is an excerpt from Column 12 of the

13   patent, and it talks about technique used to raise

14   antibodies of the present invention, and it says such

15   antibodies include human-human antibodies.

16               Now, what -- what Abbott is trying to argue

17   that when the patent refers to human-human antibodies,

18   generally, with this hyphenated nomenclature here like

19   murine-human, it's the murine variable region and a

20   human constant region.  So what Abbott is trying to say

21   is that when there's a reference human, hyphen, human,

22   the first human really means, well, not all human

23   because it has a mouse CDR region.

24               The problem with that is it's internally

25   inconsistent.  If the second part of the human in the

1  human, slash, human we know includes fully human as the

2  fully human constant region in the preferred embodiment,

3  how does it make sense, then, to construe human before

4  the hyphen to mean something different?  The answer is

5  it doesn't make sense.

6          THE COURT:  What do you say, though, about

7  where you define -- where the patent defines chimeric as

8  being from a different species, and then later on in the

9  patent, it says -- it talks about a chimeric antibody

10 including a human-human?

11         MS. ELDERKIN:  The patent is not entirely

12 consistent in that regard, and we admit that.

13         THE COURT:  I think that's a fair statement

14 that it's not consistent.  You think I can just

15 disregard that inconsistency or what?

16         MS. ELDERKIN:  No, no, we contend that when

17 someone skilled in the art reads the patent in its

18 entirety, that it would be apparent that the inventors

19 intended to include and that the patent describes fully

20 human antibodies.  Let me -- let me find the right

21 disclosure of that to point to you.

22         THE COURT:  Well, chimeric is defined at the

23 bottom of Column 10, it looks to me about Line 64.  And

24 then -- then I find conflicts over at Column 20 at about

25 Line 45.

1           MS. ELDERKIN:  May I go over and get my

2    copy?

3           THE COURT:  Absolutely.  I have a habit of

4    not trying to mark my patent up.  Whatever column you

5    throw up on the screen, make sure that I have at least

6    marked that as something I ought to be looking at.  So I

7    wanted to ask you about those.

8           MS. ELDERKIN:  And, I'm sorry, Your Honor,

9    you're looking at the bottom of Column 10.

10          THE COURT:  Yeah.  It says --

11          MS. ELDERKIN:  Right.

12          THE COURT:  That's where it defines in the

13   patent chimeric, correct?

14          MS. ELDERKIN:  Well, there is -- there is a

15   reference to chimeric antibodies there.  We will point

16   out --

17          THE COURT:  You don't think that's an

18   express definition of chimeric?

19          MS. ELDERKIN:  Actually, we would refer to

20   the top of Column 14.

21          THE COURT:  Column 14, all right.  Let me

22   get there.  Just a minute.

23          MS. ELDERKIN:  Okay.

24          THE COURT:  Okay.  There.  That's right.

25          MS. ELDERKIN:  And there the term is

1  actually used in quotes, as is the case in other parts

2  of the patent where definitions are being provided, and

3  at the top of Column 14 --

4          THE COURT:  Well, it says it includes

5  monovalent, divalent, and polyvalent, but that doesn't

6  seem that it's really defining it there.  That's a

7  characteristic.  It can include any one of those three

8  bondings, correct?

9          MS. ELDERKIN:  I'm sorry, Your Honor.  I'm

10  trying to find the...

11          THE COURT:  Well, I don't want to take up

12  too much of your time.  You told me -- you acknowledged

13  to me that there are some inconsistencies, and I'm

14  trying to determine how I'm going to handle that or how

15  you would suggest I'm going to -- what I'm going to say

16  that's going to end up in the Federal Circuit and pass

17  muster, you see.  That's what I'm -- I get down to sort

18  of that level.

19          How would you -- what would you think would

20  explain this inconsistency to the extent that I could

21  adopt your position?  That's what -- I mean, that's

22  really what I'm asking you.

23          MS. ELDERKIN:  Well, I think there are

24  several things, and I will -- I see that on my next

25  slide I get to the section I was looking for.  So I'm

1  sorry for the disarray here.

2          First of all, we would argue -- of course,

3  the term chimeric is not a claim term, so it's not in

4  the claim.  The claim talks about human regions, human

5  chains, and antibodies.  So whether or not a chimeric

6  antibody includes mouse parts -- must include mouse

7  parts are not is an interesting issue, but we're not

8  really defining what the term chimeric means.  We're

9  defining what the plain meaning of the terms in the

10  claim are and whether there is a clear disavowal based

11  on what's in the specification.

12          So even though we would grant that there are

13  statements in the patent that, frankly, we wish were not

14  there, there are other statements that support our

15  position that a chimeric antibody can include an

16  antibody that's completely from human sources but from

17  two different human sources.  The chimeric really

18  requires that you have two different sources of the DNA.

19  It's not necessary that they be from two different

20  species.

21          And an example of that is -- support for

22  that is what I show here on Slide 22.  This is a

23  statement from Column 14 -- bottom of Column 14 to the

24  top of Column 15 of the patent.

25          THE COURT:  Just a minute.  Let me make sure

 1    I've got that marked.

 2              MS. ELDERKIN:  Sure.

 3              THE COURT:  Okay.  It goes from 14, 64.

 4              MS. ELDERKIN:  Right.  To Column 15, Line 1.

 5    What this is saying is basically disclosing how you

 6    could make human constant -- human CDR as binding

 7    regions that would be in the variable region of the

 8    antibody.  It says that the antibody producing cell

 9    contributing the nucleotide sequences encoding the

10    antigen binding region, again, that's that CDR region,

11    can be produced by transformation of a nonhuman cell or

12    a human cell.

13              So this is saying that you can get those

14    binding regions.  The CDR region, which Abbott is

15    saying, oh, it has to be mouse, it has to be nonhuman.

16    This is saying, well, you can get it from a human cell.

17              Now, Abbott, we suspect, based on something

18    its expert said, may argue that you can contort the

19    reading of this to mean that, well, you would take mouse

20    DNA and put it into the human cell, but their -- their

21    expert never explained why one would go through that

22    kind of convoluted procedure to obtain a CDR region.

23              So we contend that this Column 14, which was

24    in the very first patent application filed, this

25    statement, is support that one reading the patent with

1    everything that's in there, good and bad, would look at

2    this and understand that, well, this is covering fully

3    human -- the claims have to encompass fully human

4    variable regions and fully human CDR regions.

5              THE COURT:  Thank you.

6              MS. ELDERKIN:  Another thing that is telling

7    here is that Centocor could have claimed partially human

8    if it had intended to do so.  There is reference in the

9    patent, for example, Column 6, Lines 27-32, to chains

10   that have at least part human constant and at least part

11   of a variable region of nonhuman origin.  So it could

12   have claimed partly human if that's what it intended to

13   do, but it didn't use that language.  It used the

14   broader language, human, which it broadly, as we

15   construe it, means partially -- it means derived from

16   human DNA.

17             Now, Centocor -- Abbott in its brief also

18   pointed at 18 -- Page 18 of its brief, also pointed to

19   language in this specification that it says defines the

20   invention in places as limited to chimeric and murine

21   antibodies.  Again, we had the dispute over whether

22   chimeric must mean at least partially nonhuman.  We

23   disagree that it does.  But even if it did, we'd have

24   two other points in response to those arguments.

25             First of all, the statements in the

```
 1   specification that they refer to are not restrictive.
 2   The patent does disclose murine and murine-human
 3   antibodies, and those passages can be read simply as
 4   referring to those particular embodiments.  And the
 5   Anderson case that Abbott cites, I believe on Page 18,
 6   as support for limiting the claims to the particular
 7   embodiments disclosed, again, is not on point.  In
 8   Anderson, the claims were limited to certain features
 9   because the patent specification required -- made it
10   clear that those features were required, and that,
11   again, is not the case here.
12              So to try to summarize some of the reasons
13   why Abbott's attempt to incorporate extraneous
14   limitations into the claim is wrong, it's improper under
15   the law to limit the plain and ordinary meaning of the
16   claim terms absent -- absent clear intention to limit
17   the scope.  And there's no evidence that there was such
18   a clear intention -- a clear disavowal here.
19              Abbott's attempt to limit the recitation of
20   human when it refers to variable region or light chain
21   or heavy chain is inconsistent with the recitation of
22   human as defining the constant region of the claim.
23   Again, there's no dispute between the parties that a
24   human constant region can encompass a fully human
25   constant region.  So where the word human is used in
```

1  Claim 1 to refer to the constant region, no dispute, it

2  can be fully human.

3           On what basis, then, can Abbott say that the

4  term human, when it's used in Claim 2 or 3 to refer to

5  the variable region or light chains or heavy chains has

6  to mean something else?  When a term is used -- terms

7  are generally used consistently in claims, and there's

8  no good reason not to do so here.

9           Abbott's construction would exclude

10  disclosed embodiments.  We think maybe they backed away

11  from this position.  Their construction would exclude

12  murine antibodies.  I think that's right.  No, I'm

13  sorry, their construction would -- I'm sorry, yes, it

14  would exclude disclosed embodiments because, as I just

15  explained, there are embodiments disclosed or at least

16  mechanisms disclosed for making antibodies that have

17  human CDR regions.

18           And, finally, Abbott improperly seeks to

19  raise new matter issues.  They discuss in their brief

20  when certain points in statements in the specification

21  were added, and saying, well, because this wasn't in the

22  original application and wasn't added until such and

23  such a date, you can't rely on it.  I suspect that's an

24  argument we may have at a later date, but that's not an

25  issue here on --

1                  THE COURT:  I anticipate this will not be

2      the last time that I hear this.

3                  MS. ELDERKIN:  It's not an issue, though,

4      Your Honor, for claim construction.

5                  THE COURT:  I agree with you about that.

6                  MS. ELDERKIN:  Okay.  Then I'll say nothing

7      more on that.

8                  THE COURT:  I don't think it's an issue for

9      today, but it is obviously an issue.

10                 MS. ELDERKIN:  Great.  So, in summary,

11     Centocor's claim constructions, we think, are the

12     appropriate ones, that they are consistent with the use

13     of the terms in the specification with the plain

14     meaning, no extraneous limitations being brought in, and

15     we would ask the Court to adopt those constructions for

16     the terms anti-TNF antibody, human variable region,

17     human light chain, and human heavy chain.

18                 The next term I'd like to discuss, and

19     there's really not much dispute on this, but it's sort

20     of a predicate for discussing competitive inhibition

21     where there is a dispute, and that is the term binds to

22     a neutralizing epitope.  What is a neutralizing epitope?

23                 And, again, there's very little daylight

24     between the parties' constructions of this term.  We

25     both agree that there's some aspect of binding to TNF in

1    a way that there's a loss of biological activity.  The

2    real difference is that Centocor's construction defines

3    it as a noun.  Abbott's construction is more functional.

4    It's an important distinction only because the fact that

5    the patent does recite that there's binding to a

6    neutralizing epitope is going to be important when it

7    gets to discussing the next term, competitive

8    inhibition.  It's important that the patent does say the

9    antibody that's covered by this claim has to bind to --

10   has to bind to TNF.  It has to bind to a neutralizing

11   epitope.  So that's all I'll say about that.

12            I'll turn, then, to competitive inhibition

13   because there is substantial disagreement between the

14   parties on the construction of this term.  So, again,

15   this -- what the claim language is is competitively

16   inhibits binding of A2, and A2, again, is the mouse

17   antibody, to human TNF alpha.  And there's a

18   parenthetical expression there after A2, and it says,

19   ATCC Accession No. PTA-7045.  And what that is, it's a

20   reference to the cell line that expresses or makes the

21   A2 antibody that's been deposited with a nonprofit

22   organization, so it's available to the public.  So

23   there's no dispute between the parties over what that

24   means.

25            Centocor's construction quite simply is,

1    well, competitively inhibits just means that competes,

2    that whatever antibodies covered by this claim has to

3    compete with A2 for binding to human TNF alpha.  And the

4    patent discloses a method for determining competitive

5    inhibition.  This is in Column 12 at Line 16 to 23.  And

6    the patent says, preferred methods for determining

7    antibody specificity and affinity by competitive

8    inhibition can be found in Harlow, the Harlow manual, a

9    very established lab manual, which is actually

10   incorporated by reference into the patent.

11           So Harlow describes an affinity -- a

12   competitive inhibition test, and just that kind of test

13   was carried out for the A2 antibody, and it was

14   disclosed in the patent in Example X10 and in Figures 9A

15   and 9B.  And you might recall this figure from the

16   tutorial that Centocor submitted talking about

17   competitive inhibition.

18           This is a somewhat simplified version of the

19   graph that's shown in Figure 9A of the patent, and

20   what's happening here is TNF is the target.  It's the

21   antigen.  What you do is you put that in a plate, it's

22   adhered to a plate.  The particular test in Figure 9A

23   was carried out to determine if A2, the mouse antibody,

24   competes with cA2, the chimeric antibody based on A2.

25           So what happens is in the first test, they

1    took A2, the mouse antibody, and they labeled it so that

2    it could be detected, and they add it to the plate that

3    TNF is bound to, and they allowed time to bind to the

4    TNF, if it's going to do so, and then they wash off

5    what's left, and then they measure -- because that A2 is

6    labeled, they can measure how much of the A2 is bound

7    there to the TNF.  And that's the first point that you

8    see on this graph on the Y axis.  So only A2 is added,

9    and there's 1.4 units of antibody bound to the target,

10   so a lot of antibody bound to the target.

11          So then what they do is they take a mixture

12   of A2, and they add some of the cA2 to it, and they

13   apply that to a plate, allow time to bind, and wash it

14   off, and then we see, well, how much A2 is bound now?

15   And if it's less bound than was bound when there was no

16   cA2 there, that suggests the two antibodies are

17   competing.  And they run -- they continue the test and

18   run a series of tests with additional amounts of the

19   test antibody, cA2, added each time to see what happens.

20          You get a curve in this particular case that

21   looks like this.  This is not an uncommon curve for a

22   competition -- a competitive inhibition assay, and the

23   experts would say this shows two antibodies compete with

24   one another.

25          So Centocor's construction is that

1    competitive inhibition really means that the antibody

2    competes with A2 for binding to TNF alpha and that this

3    could be measured using a standard assay such as that

4    described in the patent.

5              Abbott's proposed construction, I presented

6    on this slide, Slide 32, and it's quite a mouthful.  I

7    can't get it all on a slide along with our construction.

8    It's quite complicated, but let's try to break it down.

9    The first part of Abbott's construction, there really is

10   no dispute, the part I've highlighted in red.  We agree

11   with the ATCC accession number means and then a product

12   of that self -- self line is the A2 antibody which binds

13   to human TNF alpha.

14             We agree that an antibody competitively

15   inhibits.  One way to determine that is using a standard

16   ELISA or equivalent assay.  And if you recall from

17   Abbott's tutorial, they describe a test much like I just

18   described with the Harlow test where you have TNF bound

19   to the plate and you add increasing amounts of the test

20   antibody and see what happens to the binding.  And they

21   refer to that in their slide as a competitive inhibition

22   experiment.  So there's no dispute between the parties

23   that that is a test for determining competitive

24   inhibition.

25             At the bottom of this slide or the bottom of

1    the end of their construction, Abbott includes a

2    definition of epitope, and we would merely note that

3    that definition is inconsistent with the definition of

4    epitope in the patent.  It's not the same as the

5    definition in the patent, which appears at Column 13,

6    Lines 15 to 17, which says that the term epitope, in

7    quotes, is meant to refer to that portion of any

8    molecule capable of being recognized by and bound by an

9    antibody at one or more of the antibodies' binding

10   regions, so there is some difference in that.

11          But the real meat of the dispute has to do

12   with Abbott's attempt to read in extraneous limitations.

13   They want to read in a limitation that the antibody, to

14   meet this competitive inhibition requirement, must bind

15   to the very same epitope as the reference A2 antibody

16   and also some quantitative limitations that it must

17   bind -- it must compete as strongly for binding to A2 as

18   does the A2 with itself.  And we contend that there is

19   no basis for doing this.

20          First of all, we contend Abbott is

21   improperly trying to read in the term same epitope into

22   this claim limitation.  For one thing, the claim already

23   defines the epitope to which the antibody binds.  As I

24   pointed out earlier, the claim says it binds to a

25   neutralizing epitope of TNF.  So if the claims have to

1    bind -- if the claimed antibodies have to bind to the
2    same epitope as A2, that makes this language,
3    neutralizing epitope, superfluous and unnecessarily
4    because we know that A2 binds to a neutralizing epitope.
5              Further, none of the evidence that's cited
6    by Abbott supports this same epitope limitation.  So
7    let's look briefly at what Abbott's relying upon.  First
8    of all, it's somewhat striking that Abbott's own expert
9    admitted that Abbott's construction requiring same --
10   same epitope binding is not consistent with the plain
11   meaning.  He was -- Dr. Marks was asked:  So setting
12   aside the patent specification here, in your opinion,
13   someone skilled in the art would define the term
14   competitive inhibition to require binding to exactly the
15   same epitope?  He said, No, not exactly the same
16   epitope.  Outside the specifications.  No.
17             So the plain meaning clearly does not
18   require what Abbott is trying to introduce into this
19   claim construction.  So is there something in the patent
20   that requires it?  Quite the contrary, the patent
21   actually distinguishes between competitive inhibition
22   and identical epitope.  Here on Slide 39, we have an
23   excerpt from the patent at Column 12, Lines 4 to 15.
24             There are two classes of preferred
25   antibodies disclosed in this paragraph.  And the first

1   said, There are preferred anti-TNF antibodies, and those

2   are those which will competitively inhibit binding to

3   human TNF alpha of the mouse antibody A2.  And that's

4   more or less paraphrasing what's in the claim.  Then it

5   says, well, there are -- other preferred antibodies are

6   those that bind the epitopes recognized by A2.  So it

7   talks about them not as being coextensive.  It mentions

8   them each as separate and distinct possibilities.  So

9   that does not support Abbott's suggestion that the claim

10   requires that the antibody bind to the same epitope as

11   A2.

12           Further, the Harlow manual, this is the

13   manual that discloses the competition assay, it's

14   incorporated by reference.  It talks about, well, if you

15   get this competition what it could mean.  It says, well,

16   if the sites of the interaction of the two antibodies

17   are identical or overlapping, the unlabeled antibody

18   will compete.  So Harlow says -- acknowledges it doesn't

19   have to be the same epitope, it could be overlapping,

20   and it could be other things, as well, as you will hear.

21           Abbott's expert looked at a statement made

22   in the prosecution history to the effect that the

23   claimed antibodies must bind to the same or similar

24   antibody -- epitopes and concluded that same or similar

25   means the same.  I think I need to say nothing further

1    about that.

2              So there is no support in the specification

3    for reading in the same epitope limitation.  Let's look

4    at Abbott's attempt to read in a quantitative

5    limitation, a requirement that the antibody being

6    covered must compete with A2 as strongly as A2 competes

7    with itself.

8              The patent is silent about any kind of

9    quantitative limitation on the competition to begin

10   with.  Abbott has made a suggestion, well, the claim

11   would be invalid and indefinite if you don't put some

12   limitations on it.  We contend that invalidity is not an

13   issue here today on claim construction, but the outer

14   limits of the claim don't have to be precisely defined.

15   It's well established in case law that that's the case.

16             It will be an issue of fact for the jury

17   based on what they hear at trial to determine whether

18   the Humira antibody competes with A2 providing two TNF.

19   The Harlow reference, again, that lab manual, actually

20   has a section that says, well, if you want, you can make

21   this competition -- competitive inhibition assay

22   quantitative.  It's an option.  It's not something that

23   you have to do.  That's at Exhibit 17 at Page 1725901,

24   again, indicating to those skilled in the

25   art -- indicating that people skilled in the art would

1    not understand that a competitive inhibition assay must

2    be quantitative in order for it to be meaningful.

3              And, importantly, what Abbott's trying to do

4    here with its same epitope and same level of inhibition

5    construction is to effectively limit the claim scope to

6    a single cA2 antibody.  If it has to bind to the very

7    same antigen -- epitope and it has to bind the very same

8    way that A2 does and A2 has the same binding region as

9    cA2, in essence, they are limiting this claim to the

10   single disclosed embodiment which is improper under the

11   law, especially under the circumstances here.

12             A few arguments that Abbott made in its

13   brief that clearly invite error.  At Page 21, they say

14   the specification's only example of competitive

15   inhibition is testing between A2 and cA2.  These

16   antibodies bind to the same epitope.  Well, fine, but

17   there's nothing in the law that allows the Court to

18   limit the claims to just the examples in the patent,

19   absent extraordinary circumstances such as a disavowal.

20             Another argument that they make at Page 23,

21   that the specification does not describe or even suggest

22   any examples of antibodies that inhibit one another by

23   any method other than binding to the same epitope.

24   Again, we don't have to have claim scope coextensive

25   with the scope of the examples in the patent.  And the

1    last part -- point here is pretty much the same thing.

2    They say inhibits should be construed to require a level

3    of inhibition that is the same as the inhibition

4    exhibited by A2 against itself.  Again, there's no basis

5    for limiting these claims to preferred embodiments.

6            So for all these reasons, Centocor contends

7    that its construction, which very simply, in accordance

8    with the plain and ordinary meaning of the term,

9    construes the competitively inhibits clause to mean

10   competes with A2 for binding to human TNF alpha.

11           With that, let me turn to the subpart two of

12   Claim 1, which is a reference to the affinity with which

13   the antibody binds to TNF.  An affinity, of course, has

14   to do with the strength of the binding to the

15   antibody -- of the antibody to the target TNF, how much

16   energy is required to get the antibody on there and how

17   much energy is required to pull it off.

18           The parties essentially agree on part of

19   this construction, as I said before, in the binds to a

20   neutralizing epitope.  This is where we have a minor

21   disagreement about whether it's a noun or should it be

22   described functionally, but we depart on how affinity is

23   measured.  The language of the claim -- let me go --

24   here's the claim language.  It says, binds to a

25   neutralizing epitope of human TNF alpha in vivo with an

1   affinity measured as an association constant as

2   determined by Scatchard analysis.

3            And where the parties disagree is that

4   Abbott says that you have to use that Scatchard analysis

5   to measure the affinity in the living organism.

6   Centocor's construction, of course, doesn't require

7   that.

8            So let's talk a little bit about the

9   Scatchard analysis so you can understand why Abbott's

10  construction really doesn't make sense.  The Scatchard

11  analysis as described in the patent can involve labeling

12  the antibody with radioactive material and then

13  measuring affinity.  To carry out the Scatchard analysis

14  in the human body, in the organism, as Abbott contends,

15  you would have to insert radioactive material into the

16  body.  That simply isn't done.  In fact, Abbott's expert

17  admitted that he wasn't aware of a single instance where

18  a person was ever injected with a radio-labeled antibody

19  to measure affinity.

20           It's also undisputed that the Scatchard

21  result that can be carried out in the lab, not in the

22  body, correlates to the affinity with which the antibody

23  will bind in vivo.  That was like many tests that

24  scientists do in the lab to try to determine and

25  ascertain, well, what kind of activity will this

1    antibody have in the body?

2            So where the claim refers to binds to a

3    neutralizing epitope in vivo, we know that means the

4    antibody binds to TNF in our bodies, and that we measure

5    the affinity using this Scatchard analysis, and that

6    that will correlate to the strength with which the

7    antibody binds in the body.

8            This is another Abbott construction that we

9    contend invites error.  First of all, it's contrary to

10   the plain meaning to the skilled artisan and it's

11   nonsensical to suggest that this would be done with

12   radio-labeled compounds in the body.  It would also

13   exclude the disclosed embodiment from the scope of the

14   claims because the disclosed embodiment, the cA2

15   antibody, its affinity was measured using a Scatchard

16   analysis in a lab, not in a body.  That's the only

17   measurement that was made.  So there's simply no reason

18   to adopt Abbott's construction.

19           They cite the Chef America case, which

20   really is not on point here.  The Chef America case, as

21   you remember, there was claim language that required

22   that some -- dough is a baking thing -- that some dough

23   be heated to 400 to 800 degrees.  And the patentee said,

24   well, you know, we really didn't mean to.  We really

25   meant it should be heated at 400 to 800 degrees.  And

1  the Court said, I'm sorry, the only reasonable

2  construction of this claim, based on the language that

3  you've used, is that it's heated to 400 to 800 degrees,

4  so we're not going to rewrite your claim for you.

5          But here we're not asking anybody to rewrite

6  the claim.  There is a reasonable construction of the

7  claim that Centocor has proposed that's consistent with

8  the language of the claim and how people skilled in the

9  art would understand it.  So the Chef America case is

10 really not on point and does not compel Abbott's

11 construction.

12         So to summarize the -- Centocor's

13 construction does not require carrying out the Scatchard

14 experiment in the body, and our construction is

15 otherwise rather straightforward.

16         Now, we get on to some of the terms where I

17 think there are some less disputes, and we can probably

18 move somewhat quickly.  Recombinant, Claim 1 refers to

19 this as a recombinant antibody, and what does that mean?

20 Centocor's construction says that this means that it's

21 encoded by DNA made with recombinant DNA technology, for

22 example, encoded by a gene that was built by splicing

23 DNA.  So both parties agree that a recombinant antibody

24 is one that's made by manipulating or splicing DNA.

25 There's no difference between us there.

```
 1              But Abbott then inserts an element of

 2    indefiniteness in its construction by adding not

 3    substantially by natural immunization techniques.  And

 4    we've asked them what that means, and we really haven't

 5    gotten an answer to that, so we are troubled by the idea

 6    of putting something in the claim that would make it

 7    indefinite.

 8              The problem with this is that an antibody

 9    such as cA2, which is an embodiment of the patent, did

10    start with immunizing a mouse.  It was the mouse

11    antibody, A2, that started the whole process that led to

12    the chimeric antibody, cA2, was made by immunizing a

13    mouse and then collecting the antibodies and finding the

14    A2 antibody.  So we are concerned that the language not

15    substantially by natural immunization techniques adds a

16    level of uncertainty that is not called for, not

17    necessary, and will only cause problems.

18              Another term that the parties dispute is

19    specificity.  This is a term that's in Claim 9 of the

20    '775 patent.  It says that the antibody has specificity

21    for a neutralizing epitope of human TNF alpha.  So why

22    do we care about specificity?  Well, we want this

23    antibody, this therapeutic antibody to go in and bind to

24    the thing we care about, TNF, and hopefully not bind to

25    something that's going to cause a problem for us.
```

1           So how do we define, then -- well, how do we

2    determine whether it's specific or not?  Centocor

3    contends that specificity is clear -- it's clearly

4    defined in the patent as referring to the fact that the

5    antibody binds to TNF alpha but not to TNF beta.  Abbott

6    is inserting a species specificity aspect to the

7    definition instead.  But let me show you why Centocor's

8    construction is correct here.

9           The patent describes specificity in terms of

10   TNF beta quite clearly.  At Column 49, Lines 29 to 41,

11   it says the specificity of cA2, which is the preferred

12   embodiment, for TNF was confirmed by testing for cross

13   neutralization of human lymphotoxin, which is TNF beta,

14   and then when you get to the bottom of that paragraph,

15   it says, the results indicated that the antibody was

16   ineffective in inhibiting or neutralizing this human

17   lymphotoxin confirming the TNF alpha specificity of the

18   chimeric antibody.

19          There's another reference to specificity in

20   terms of whether or not the antibody binds to TNF beta

21   or not at Column 21, Lines 14 to 16, and that says much

22   the same thing as what I've shown here from Column 49.

23          THE COURT:  Well, also, you -- you're citing

24   from that Example 10, aren't you, started on Page --

25   Column 48?  Isn't that where that came from in the

1   patent?

2                MS. ELDERKIN:  Column 48, Example 10.

3                THE COURT:  I mean, the Example 10 starts on

4   Column 48.

5                MS. ELDERKIN:  Yes.

6                THE COURT:  It goes over in -- part of that

7   example is what you have cited to me over on Column 49,

8   Line 42 to 50, right?

9                MS. ELDERKIN:  Yes, exactly, that's part of

10  Example 10.  That's the reference --

11               THE COURT:  Doesn't that same -- doesn't

12  that same example talk about this limitation that

13  they're proposing?

14               MS. ELDERKIN:  The species specificity?

15               THE COURT:  Yes.

16               MS. ELDERKIN:  That's hard for me to say, so

17  I'm going to blow that.  Yes, and, actually, that's

18  further down in the same column.

19               THE COURT:  That's what I'm saying, it's in

20  the same example.  I just wondered why it -- yours is

21  correct and theirs -- I'm not saying theirs is correct,

22  but I'm wondering why both of them aren't -- shouldn't

23  be included in the limitation since they're found in the

24  same example?

25               MS. ELDERKIN:  Right.  Well, where they're

1    talking -- where the -- of course, the patent language

2    is -- the language in the claim is specificity, not

3    species, but specificity, and the patent at Column 49,

4    the portion I just referred to, says --

5          THE COURT:  But the title -- the title of

6    Example 10 on Column 48 is specificity of an anti-TNF,

7    chimeric antibody, and I'm just saying that both of

8    those examples -- within that example, you've got the

9    discussion of two different -- two different times about

10   specificity, it seems to me, and I'm asking -- what I'm

11   trying to find out is why you believe I should -- I

12   should include this but not include their species.

13         MS. ELDERKIN:  Because this, what I'm

14   referring to is Column 49 starting at Line 29, talks

15   about specificity of the antibody, and that's the

16   language in the claim, specificity.  Down further in the

17   column at the bottom of Line 49, and I have this up on

18   Slide 57, it talks about the species specificity.

19   Actually, I guess this is not on my slide here, but at

20   the bottom of Column 49, it says, therefore, cA2 appears

21   to share species specificity with the antibody A2.

22         So there is a distinction between

23   specificity, and where the -- this example talks about

24   specificity, it's talking about specificity with respect

25   to TNF beta, but then down below, talking about species

1    specificity, and since the claim does not say species

2    specificity, it just says specificity, the construction

3    relevant to TNF beta we contend is the appropriate one.

4              THE COURT:  You just want me to ignore the

5    title that the patentee gave to the entire discussion?

6              MS. ELDERKIN:  I think the term is used --

7    is used generally there because this example talks about

8    a number of things, but the -- the explanation of

9    specificity in the example breaks it down to specificity

10   and species specificity, and we contend that the TNF

11   beta example is the appropriate one.

12             THE COURT:  Okay.

13             MS. ELDERKIN:  That's also the example that

14   has therapeutic meaning.  If we're making an antibody to

15   TNF that they want to put in your body to treat

16   rheumatoid arthritis, we don't really care if it's going

17   to bind to monkey TNF or chimpanzee TNF.  We care if

18   it's going to bind to other proteins in your body that

19   might have -- where it might have a bad effect.  Maybe

20   it will turn on something good that you want to happen

21   in your body.

22             So from a therapeutic standpoint, what

23   really matters is whether the antibody is specific to

24   the proteins in your body, and that relevant connection

25   here is -- TNF beta is one of the proteins that's most

1 closely aligned to TNF alpha.  So if the antibody is not

2 binding to that, it indicates that it's likely not to

3 bind to any of the other proteins in your body, as well.

4          I'm sorry if I spoke over your question.

5          THE COURT:  No, no, I was just going to say,

6 I didn't mean to cut you off either.  I was just going

7 to say you want me to say that I'm going to look at this

8 strictly what is most therapeutic?  I mean, it seems

9 that would be your argument there, that I should be

10 looking only at this patent at the specificity as to

11 what's most therapeutic.  I mean, that's not exactly

12 what -- I'm just trying to figure out why you want --

13 think it would be appropriate for me to ignore this

14 example -- part of the example.  That's what I'm asking

15 you.

16          MS. ELDERKIN:  I think I would just

17 repeating my answer.

18          THE COURT:  Well, I think you would.  Okay.

19          MS. ELDERKIN:  Okay.

20          THE COURT:  Thank you.  Go ahead.

21          MS. ELDERKIN:  So, again, we contend that

22 the proper definition has to do with specificity of the

23 TNF beta and not to other species.

24          Claim 11 of the '239 patent talks about

25 inhibiting that -- the antibody inhibiting a

1    pathological activity of human TNF alpha, and, again,

2    there's not a lot of difference between the parties

3    here.

4              Centocor believes that since -- that you

5    can't ignore the term pathology.  It means something

6    different than biological activity because other claims

7    talk about biological activity, and that pathological

8    means associated with a clinical problem.

9              I think we're pretty much on the same -- at

10   the same place as Abbott.  Our one concern is the last

11   two words of their construction where they say that this

12   activity must be associated with a disease or damage,

13   and we're -- we're unclear about what damage means and

14   don't want any indefiniteness incorporated into the

15   claim construction.

16             '239 patent, Claim 14, talks about the

17   anti-TNF antibody being produced recombinantly.  This is

18   another construction where we submit that Abbott is

19   improperly trying to incorporate extraneous limitations.

20   Our construction is simply that produced recombinantly

21   means produced in a recombinant host cell, in other

22   words, produced from a source, an organism or a cell

23   line that includes a gene that was built by splicing

24   DNA.

25             Remember there's recombinant technology

1    involved, taking pieces of DNA that don't naturally

2    occur together and splicing them together to form new

3    instructions for making an antibody.

4            The problem that we see with Abbott's

5    construction is that we don't understand what the last

6    four lines or so of it means.  They talk about altering

7    the genotype and phenotype of the cell, and we don't

8    understand what that means.  And then they also require

9    that the inserted DNA be replicated along with the

10   natural DNA.  There's no basis for making that

11   requirement.  In fact, there is a reference in our

12   patent to a method where the host DNA is not replicated

13   along with the artificially-introduced DNA.  That's at

14   Column 30, Lines 23 to 25, and Dr. Marks also testified

15   about that in Exhibit 9 at 165, Lines 8 to 18.  So we

16   think it's improper and unnecessary to incorporate this

17   additional language which is not even that clear into

18   this otherwise straightforward claim construction.

19           And with that, Your Honor, I have completed

20   my presentation.  I would be happy to answer any

21   questions or --

22           THE COURT:  On this word of recombinant and

23   produced recombinantly, I mean, is there -- maybe this

24   Court's a little bit simple, but has this got anything

25   to do with -- this produced recombinantly, does this

1    have anything to do with produced in large quantities?

2    Is that an issue at all?

3              MS. ELDERKIN:  No.  We don't believe that it

4    does, Your Honor.  It just refers to being made in a

5    recombinant host cell as opposed to being made by

6    chemical synthesis or by using a hybridoma.

7              For example, I think this appears in Claim

8    14 of the '239 patent, and the next two claims in that

9    patent, one -- Claim 15 and 16, say rather than being

10   produced recombinantly, they say, well, produced by

11   chemical synthesis or produced by using a hybridoma.  So

12   I think that the language is just meant to, for one

13   thing, distinguish from those types of synthesis, but it

14   doesn't really go to quantity or ease of manufacturing.

15             THE COURT:  All right.  I don't have any

16   other questions.  Thank you.

17             MS. ELDERKIN:  Thank you.

18             THE COURT:  Mr. Lee?

19             MR. LEE:  It will take half a minute, Your

20   Honor, to change --

21             THE COURT:  I understand.  Mr. Lee, if you

22   have a point during your presentation that you think is

23   a natural breaking point, the Court would --

24             MR. LEE:  How about now, and we could get it

25   hooked up?  Is that all right?

1                THE COURT:  Well, that will -- that would

2    probably be as good idea as any.  Why don't we take

3    about a 15-minute break?

4                MR. LEE:  Thank you, Your Honor.

5                COURT SECURITY OFFICER:  All rise.

6                (Break taken.)

7                COURT SECURITY OFFICER:  All rise.

8                THE COURT:  Please be seated, except for

9    you, Mr. Lee.

10               MR. LEE:  Thank you, Your Honor.

11               THE COURT:  All right.  Let's proceed.

12               MR. LEE:  Your Honor, Centocor began its

13   presentation today by describing the story of the

14   invention, which in most claim construction hearings

15   it's not precisely relevant, but in this case, it

16   actually is and this is an issue on which we agree.

17               There was one claimed invention which was

18   this chimeric antibody cA2.  It was the only antibody

19   invention.  It was done in 1990 to 1991, and then, as

20   Your Honor knows, there have been a series of 14 or 15

21   applications that had followed that result in some of

22   the confusion that Ms. Elderkin and you discussed.

23               I think to answer one question Your Honor

24   asked Ms. Elderkin or at least to give you our answer,

25   there are inconsistencies and contradictions in the

1    specification.  There are particularly inconsistencies

2    if you give the incorporation by reference statements,

3    and I'll come to that very shortly, their full meaning.

4              I think the answer to the question that Your

5    Honor asked is in Section 112, which is the patent has a

6    public notice function to tell you and to tell the

7    public what's claimed, and those contradictions, to the

8    extent they exist, ought to be resolved against the

9    person who has the power of the pen, which is the

10   patentee, rather than the public.

11             Now, there are 10 disputed terms and phrases

12   in the Markman hearing, but there are really sort of two

13   fundamental issues, and I'm going to devote the vast

14   majority of my time to those, very quickly hit on three

15   others and two cases, I think, suggesting a resolution

16   that would actually leave less for the Court to resolve.

17   But I'm going to focus on the two issues because I think

18   that resolves most of the claim terms in dispute.

19             And those two issues are whether the claim

20   terms anti-TNF alpha antibody, human variable region,

21   human light chain, and human heavy chain cover fully

22   human antibodies and their components.  And then,

23   secondly, the competitively inhibits portion of the

24   claim.

25             What's on the screen now, Your Honor, on

1    Slide 3 of our presentation is simply the competing

2    claim interpretations which Ms. Elderkin put on separate

3    slides but accurately stated, and I think has fairly

4    characterized the dispute, although we suggest it should

5    be resolved in a different way.

6            On Slide 4, which I'll pass quickly, is just

7    a refresher on the material that was in our tutorial on

8    heavy chains, light chains, variable domains, and the

9    complimentary determining region.  The one thing I would

10   say is if I focused Your Honor on the circle in the

11   upper right-hand corner of the variable domain, the

12   variable domain has two parts.  There's a framework

13   region, and there's a complimentary determining region,

14   and that becomes important when we look carefully at the

15   portions of the specification upon which Centocor

16   relies.

17           Now, with a little color added to the

18   different types of antibodies, well, maybe a little

19   humor added to the different types of antibodies,

20   there's really no dispute between us that there are four

21   different types of antibodies developed in different

22   ways at different points in time that are relevant to

23   the Markman determination.

24           The first on the left are mouse antibodies

25   that have been made by infecting a mouse with an

1    antigen, harvesting the mouse spleen, and isolating the

2    B cells.  The second, the chimeric antibody, which is

3    the cA2, which Centocor claims to have invented, is

4    something made using recombinant techniques that has a

5    mouse variable region but a human constant region.  The

6    third category is humanized, and it becomes important

7    when we look carefully at what Centocor said in the

8    specification, and those are antibodies that have parts

9    of mice and parts of humans, but the human portion is a

10   very small portion at the complimentary determining

11   region.  And, finally, the last stage in development was

12   the fully human antibody created by recombinant

13   techniques.

14           The first fully human antibody that the FDA

15   approved for the treatment of humans was Humira.  I

16   think Ms. Elderkin fairly stated what our dispute is.

17   Our dispute is do these four claim terms and the claims

18   that have those claim terms cover fully human antibodies

19   as Centocor contends or does it require that there be

20   some element of something other than a human in the

21   antibody as we contend?  Stated differently, are the

22   claims limited to chimeric and humanized antibodies or

23   do they cover fully human antibodies?

24           Now, I think I can capture the core dispute

25   between us both legally and factually in the next four

1    or five slides, and I've moved to Slide 7.  Ms. Elderkin

2    proposed that the concept of disavowal was an

3    extraordinary circumstance.  We know from the many

4    Markman hearings you've had, the Court's very familiar

5    with the basic Markman principles.  I just want to

6    address two.  One is the concept of disavowal, and the

7    second is concept of the importance of the specification

8    post-Phillips to the disclosed and only embodiment in

9    this case.

10              And let me say just these three things, Your

11   Honor, the extraordinary circumstance concept of

12   disavowal was a pre-Phillips concept.  There was a

13   case -- Your Honor will remember Texas Digital, which

14   suggested broad plain meaning, and out of Texas Digital

15   came two things, one, a lot of controversy, and, two,

16   some cases have said, well, I'm going to follow Texas

17   Digital.  The disavowal has to be clear, extraordinary.

18   Phillips has rejected that law and articulated a

19   protocol which Your Honor is very familiar with, but

20   it's made disavowal something less than extraordinary,

21   and it's made the specification more important as it was

22   with Vitronics.

23              And just to emphasize the point, there are

24   three cases we'd like to offer the Court for

25   consideration.  One is the Astrazeneca case, which is a

1   2004 case.  The claim term is solubilizer, and the claim

2   term itself was very broad, but the specification said

3   the solubilizer of this invention has specific features,

4   in this case, something called, if I pronounce it

5   correctly, Micelles, M-i-c-e-l-l-e-s, and criticized

6   solubilizers that didn't have that feature.  And the

7   Federal Circuit said, hey, look, the specification has

8   to mean something.  If you are criticizing something,

9   even if the broad term covers it, you cannot get claim

10  coverage for that which you have criticized.

11            The Honeywell case, which was two years

12  later, said the same thing.  That case, Your Honor,

13  which is at Slide 8 of our presentation, had a claim

14  term electrically conductive fibers.  The question was

15  whether that covered carbon fibers.  There is no doubt

16  that as a plain meaning general proposition, it would

17  cover carbon fibers, but the specification included a

18  portion that criticized carbon fibers.  And the Court

19  said, well, you can't cover that which you have

20  criticized.

21            The second concept is simply the concept of

22  the importance of the disclosed embodiment, here, the

23  only disclosed embodiment, and how it should be read

24  post-Phillips.  This goes directly to the Centocor

25  argument that an antibody is an antibody, and they're

1    entitled to that coverage.

2              Most recently, in 2009, the Federal Circuit

3    dealt with a case that had the broad term wound, and

4    it's a broad term.  It has a plain meaning, but the

5    Court said, no, the specification describes it more

6    narrowly.  It tells you that they're only dealing with

7    certain types of wounds, and as a consequence, that's

8    the only coverage that you're entitled to.

9              Why does this become -- why do those two

10   proposition, disavowal, not as an extraordinary event,

11   and the importance of the specification, the disclosure

12   to the claim interpretation become important?

13             Moving to the factual dispute between us.

14   Your Honor, in the patent at Column 1, Line 4 and then

15   Line 24 to 27, there is something that it appears from

16   Ms. Elderkin's argument we have fundamental disagreement

17   on.  Centocor argued here this morning that there was a

18   '91 application.  It did say things about chimeric

19   antibodies.  It did criticize human antibodies, fully

20   human antibodies, but that was taken out of the patent.

21   That's not true by our view, and at Column 1, Line 4 and

22   then down to 24 to 27, what Centocor said was the

23   earlier applications are incorporated by reference.

24   That's at Line 27.

25             We'd ask Your Honor to compare Centocor's

1   position on the '91 application with what it says at

2   Slide 30 when it talked about the Harlow reference, and

3   they said that reference is incorporated by reference

4   because of what's said at Column 12, Line 19 to 20.

5   Incorporated by reference has a meaning.  It has a

6   meaning in the patent law.  It means it's as if that

7   which is being incorporated by reference is set forth in

8   the specification.  And it's going to have the same

9   meaning in Column 1, Line 27, as it does in Column 12,

10   Line 19 to 20, and it means it's incorporated by

11   reference.

12            Now, that creates, I think, even more

13   confusion than if you just read the specification on its

14   own, but I think it demonstrates that our narrow claim

15   interpretation is correct, and I think it's correct,

16   Your Honor, for two reasons.  The first is that if we

17   look at what was incorporated by reference, you're going

18   to see that the invention is described as chimeric

19   antibodies and there is an explicit criticism of human.

20   That's one.

21            The second, I'm going to walk through the

22   portions of the file history that Centocor has -- I'm

23   sorry, portions of the specification that Centocor has

24   cited to Your Honor, and I think I can demonstrate to

25   you that all of them are consistent with the claim

1    construction we offer.

2              So let me turn to the first, which is at

3    Slide 11.  Slide 11 has a portion of the original

4    application, and this is now incorporated by reference,

5    and the manner in which the invention, the cA2, was

6    described in the original application is very

7    conventional, and it laid out the background of the

8    invention, it laid out the state of the art, and it

9    described mouse antibodies as well established

10   technology.

11             But what it said was mouse antibodies have a

12   problem, because they're from mice, when you put them

13   into a human being, the human being is going to

14   recognize them as not human and mice, and the human body

15   is going to do things to reject that foreign -- that

16   foreign substance.  That's going to limit the

17   effectiveness of the mouse antibody.  So they were

18   clear.  Here's a problem with the mouse antibodies.

19             But they had another section, and this

20   section, which is at Slide 12 from the '827 application

21   at Page 9, this is fully incorporated by reference as a

22   result of what's said in the patent.  And what they said

23   is, okay, we have a problem with mice.  One possibility

24   would be to consider fully human or human antibodies,

25   but human antibodies have problems.  The first thing is

1   you might like to get human antibodies that are

2   generated in the spleen of a human, but while we can --

3   we can take spleens out of mice and use them for

4   purposes of creating therapeutics, harvesting spleens

5   from human beings is not going to be something that

6   works.

7           As a consequence, to get it to work with

8   human antibodies, we need to use a virus as part of the

9   problem -- process.  This is that Epstein-Barr virus.

10   Well, that creates some problems, too.  It may not work,

11   and the second thing is, it's a virus.  If you put a

12   virus in, you could be creating a lots of problems.  And

13   then it says, but most importantly, anti-TNF alpha is

14   something that occurs in a human being.  So having the

15   human body create an antibody is something that's

16   naturally occurring, doesn't happen naturally.  This may

17   not work at all.

18           So they've said -- if you take my chart with

19   four different possibilities, they said, well, we've got

20   mice at the left-hand end, that works, but it's got some

21   limitations because it's all mouse.  We have human at

22   the other end, but human doesn't work.  The technologies

23   that are available to make it work could inject viruses

24   and other things into the process, and, ultimately, in

25   the end, it probably doesn't work.

 1            So what did they say?  They say, well, the

 2   solutions in the middle.  And, again, this is -- what's

 3   on the Slide 13 is taken directly from the application

 4   incorporated by reference -- I should say

 5   parenthetically.  The last slide on Slide 12 is the

 6   portion that Ms. Elderkin said had been removed from the

 7   '94 application.  That's true, it had been physically

 8   removed, but then you have the incorporation by

 9   reference which brings back which creates at least

10   infusion.  We suggest it brings it back and -- set forth

11   there entirely.

12            So what does the incorporated by reference

13   application say?  It said, well, here is the solution.

14   The solution is a chimeric antibody that has a nonhuman

15   portion and a human portion.  And chimeric antibody

16   technology such as that used in the present invention

17   bridges the gaps that we've talked about.  That's what

18   they invented.  That's what they described as the

19   invention.

20            And if you think about it, Your Honor,

21   the -- having had them describe the left-hand side and

22   the right-hand side of our antibody slide and say we're

23   in the middle makes some sense.

24            Now, after that '91 application, there is a

25   really complicated and confusing series of applications

1    which carry us right up to the point where we have the

2    patents that we have today.  And while we agree with

3    Your Honor that resolving priority issues today is not

4    the task, I'm actually going to go through the portions

5    of the -- the portions of the specification Centocor

6    relies upon and identify the application from which they

7    came, because if the Court considers the Federal

8    Circuit's decision in the PowerOasis case, there was a

9    claim construction process Judge Barbadoro in New

10   Hampshire identified the portions that he was relying

11   upon for his claim interpretation.  That then led to

12   resolution of the issue that Your Honor alluded to

13   further down the road.

14          So while it -- there was no resolution of

15   the priority date issue, there was some attention given

16   to just where the portions of the spec came from that

17   the Court was relying upon.  And that becomes important

18   in this case because of this complicated history.  The

19   interesting thing is even after Centocor tried to --

20   tried to take this chain of applications and move it in

21   the direction of more human still throughout the

22   preferred antibody is a chimeric antibody.

23          Your Honor, the Court might pause and say,

24   well, wait a minute, if you really had moved the

25   invention from chimeric to humanized to human and you

1    now had one that was entirely human, if they put human

2    being that would be fine, why would your preferred

3    embodiment be chimeric?  It wouldn't be.

4             And to go back one slide to Slide 13, here

5    is the reason.  I think as the Court knows from its

6    other cases and -- and your service on the Federal

7    Circuit, when someone has a series of applications

8    coming off a first one, you're trying to balance two

9    things that are competing considerations.  You're trying

10   to keep that early priority date so that you can

11   eliminate prior art, but you're also trying to get a

12   little bit broader and broader coverage.

13            Well, that's hard to do if you're trying to

14   keep that priority date, and what you see in this series

15   of applications is Centocor trying to just do that dance

16   which is we want to try to keep '91 as a priority date,

17   but we know we need to get more into the specification

18   if we want to try to cover what other folks are doing,

19   and that's where the confusion comes from.

20            So, Your Honor, on Slide 16 are the nine

21   portions of the specification which Centocor has either

22   cited to you in its briefs or in its claim construction

23   contentions.  And I would say this, I think I can

24   demonstrate to Your Honor that the original 1991

25   application and the original 1992 CIP are talking about

1    things other than fully human.

2              I would say fairly also that there's no

3    doubt that in 1994, the patent lawyers drafting that

4    application were trying to put in concepts that might be

5    a little broader.  But I think that I can demonstrate to

6    Your Honor that in doing so, in trying to strike this

7    balance of keeping the '91 priority date, they didn't

8    get to fully human.  So if I take them in that order,

9    Column 14, Line 12 to 20, which is on Slide 17, which is

10   the first one, refers only to the human constant region.

11   It's not talking about the fully human antibody.  It's

12   talking only about a human constant region which would

13   apply to a chimeric antibody, cA2, and I would say in

14   just a second, Your Honor, I think I'll come to the --

15   Your Honor asked a question to Ms. Elderkin about the

16   definition of a chimeric antibody.  It's actually quite

17   important, even though the claim itself doesn't have

18   chimeric because of the manner in which Centocor has

19   defined the term.

20             Now, this portion refers only to the human

21   H chain and says nothing about whether the antibody is

22   fully human or not.  Centocor says, well, there's

23   references in this patent to a human constant region,

24   and you can see that's all human.  The answer is that's

25   true, but we're not -- we're not construing the word

1    human in the abstract.  We're construing the word human

2    as part of phrases.  And a human constant region, we all

3    agree, is going to be fully human.  A human variable

4    region we actually all agree could be fully human or

5    could not.  And so the argument that was made with that

6    phrase doesn't really answer the question, and the fact

7    that this refers to a human constant region doesn't tell

8    you anything about the scope of the claim.

9         The second portion that Centocor relies upon

10   is Column 19, Line 1-8, and Column 19, Line 17 to 27.

11   This is exactly the same, Your Honor.  This is the human

12   constant region which is human and says nothing about

13   the variable region.  And if I were to pause just for a

14   second on these two, that makes perfect sense.  As

15   Ms. Elderkin described the invention, the invention was

16   a chimeric antibody, cA2, that had a human constant

17   region.  The fact that the specification would describe

18   that is completely commonsensical.

19        The next portion that Centocor relies upon

20   from the original application is at Page -- Slide 19,

21   and it's Column 14, Line 64, to Column 15, Line 9.  This

22   says nothing, Your Honor, about whether the antibody is

23   fully human or not.  It's referring to a chimeric

24   antibody of the present invention.  And then the portion

25   that they cite is talking about transformation of a

1    human cell.  That's -- the portion they're relying upon

2    is that line at Line 69 we just talked about, a process

3    of transformation, not about a fully human antibody.  So

4    those are the three that they rely upon from '91.

5              Then if you get to '92, the concept of

6    human-human is to be sure introduced, and it's

7    introduced in the '92 application.  And on Slide 20,

8    we've identified the three places they've identified

9    references to human-human.  But this is where Your

10   Honor's question becomes important about the definition

11   of a chimeric antibody, because if I move to Slide 21,

12   which has quotations from Column 20, Lines 45 to 48, and

13   Column 10, Lines 64 to 67.

14             What the patent says in 1992 is a chimeric

15   antibody, such as mouse-human or human-human.  So they

16   themselves in the patent have said a human-human

17   antibody, which our expert has said is not a phrase that

18   scientists use in the normal course, there are other

19   ways to describe it, such as humanized, this phrase that

20   was coined and introduced in 1992, Centocor says this

21   human-human antibody is a chimeric antibody.

22             Then if you go down to I think the portion

23   of the specification that Your Honor was discussing with

24   Ms. Elderkin, which is definition of chimeric antibody

25   or one definition, chimeric antibodies are molecules

```
 1    different portions of which are derived from different
 2    animal species.  So if we put these two things together,
 3    the bottom portion from Column 10 is an accurate
 4    definition of a chimeric antibody.  It's particularly
 5    accurate given the invention as Ms. Elderkin described
 6    it as cA2, and then they go on 10 columns later and say,
 7    okay, now we're introducing the concept of human-human.
 8    A human-human antibody is a chimeric antibody.
 9             That takes us to 1994, and on Slide 23 --
10    Slide 22, we have just put a quotation from the
11    PowerOasis case because it's analogous.  Now, to be
12    sure, Your Honor, the decision that was on appeal and
13    affirmed was one that is the event you described as
14    further down the road, but the decision is instructive
15    in that the manner in which the Court identified the
16    portions of the spec it relied upon became important to
17    that decision down the road, and we think that's
18    important because if you move to the '94 spec, if you
19    move to the specification which they rely upon, the real
20    question is are the things that they added enough to
21    broaden the concept of fully human?
22             We actually still say no if you read it in
23    the full context, but if it does and that's what drives
24    the result, it could become important down the road.
25             Now, Column 5, Line 55 to 59, does inject
```

1    the word human antibodies.  If the Court compares the

2    original summary of the invention from the incorporated

3    by reference application and this summary of invention

4    that inserted this word human antibodies, it's like

5    they're from two different patents, literally like

6    they're from two different patents, but the

7    incorporation by reference we say give us -- gives us

8    the answer.

9            So now we have the word human antibodies.

10   The question is not just what is the ordinary meaning.

11   The question is what is a human antibody as these folks

12   have used it over a period of three, four, five years

13   before the patent office.  And the answer can be found

14   in the file history.

15           On Page 24, Your Honor, we have the original

16   claims of the application that led to the '775 patent.

17   Dependent Claim 3 claims an antibody that has at least

18   one human light chain and one human heavy chain, that

19   dependent claim is dependent on Claim 1, which claims a

20   human anti-TNF alpha antibody.  So we have Claim 1 that

21   says we're claiming a human anti-TNF antibody.  We have

22   Claim 3 that says that human antibody has at least one

23   human light chain and one human heavy chain, but then

24   when you go to Claim 6, Claim 6 says the light chain and

25   the heavy chain can contain complimentary determining

1    regions from A2 or cA2.

2              What does that mean?  Well, A2 is a murine

3    antibody disclosed.  CA2 is a chimeric antibody

4    disclosed.  Claim 6 is telling us that the manner in

5    which these folks have used human antibodies includes

6    antibodies that have mouse at the end.  It may be

7    different portions of mouse, but mouse at the end.  It's

8    completely consistent with what the invention was and

9    completely consistent with the concept of a humanized

10   antibody.

11             In Dr. Mark's declaration, he reviewed with

12   the Court some of the different scientific references

13   that use the human antibodies to refer to the humanized

14   antibodies that had been discovered, researched, and

15   reported on in the 1990s.  So if we take their first

16   1994 portion of the spec, human, we look at their very

17   claims, we can see that they're talking about something

18   that is humanized.

19             Let me take the second, this is the second

20   part of the '94 application, which is at Column 10,

21   Lines 32 to 41.  I think probably the most important

22   thing here is, Your Honor, we're not quite sure what the

23   point is.  There's nothing about human antibodies.  The

24   word human doesn't appear in this portion of the spec.

25   This tells you nothing differently about what the patent

1    covers.

2            And then the last portion they rely upon is

3    at Column 18, Line 53 to 62, and I think, Your Honor,

4    this demonstrates the tension that arises when you're

5    trying to keep your priority date and add some material.

6    They rely upon something that says human anti-TNF

7    variable region which contains a framework residue

8    having complimentary determining residues which are

9    responsible for antigen binding.  It makes no scientific

10   sense.

11           When I look -- when I went quickly through

12   our tutorial slide, I said the one point we'd like to

13   make is that that variable region has two parts, the

14   framework region and the CDR.  Those are two separate

15   and distinct parts.  And their expert, Dr. Adams, said

16   they are distinct.  So the portion of the spec that

17   Centocor relies upon actually makes no scientific sense.

18           So, Your Honor, what that leaves us on this

19   first primary dispute is this, it leaves us with one

20   single disclosed embodiment.  It leaves us with an

21   early -- early applications that are incorporated by

22   reference that criticize fully human antibodies.  It

23   leaves us with later applications that put the word

24   human in, but in the form of human-human or human, which

25   is described in the claims as including humanized

1   antibodies.

2            Against that background, if you look at the

3   full scope of what's disclosed and we consider the

4   public notice function of the claims, the fair

5   interpretation of these claims, we would suggest, the

6   correct interpretation is something that covers

7   chimeric, humanized, but does not cover fully human.

8            Now, the second issue, whether the phrase

9   competitively inhibits binding of A2 to human TNF alpha

10  requires antibodies to bind to the same epitope of TNF

11  alpha at a defined level of inhibition -- you know,

12  fundamentally, Your Honor, this is a question of are we

13  just going to let the jury sort of try to figure this

14  out on their own or are we going to give this some

15  definition.

16           And as I sort of struggled with this as we

17  prepared the argument, I thought of a claim that assumed

18  that -- say Ms. Elderkin had invented the jet airplane

19  but decided to claim the jet airplane as a plane with a

20  jet engine that goes fast or that goes faster.  That's

21  actually what we're dealing with here is it

22  competitively inhibits.  The question is how and to what

23  extent, and what we're urging is that we give the jury

24  some definition of just how and to what extent.

25           On the screen now on Slide 30 is our claim

1    interpretation, and, actually, if you take them in

2    reverse order, if you take the second portion, we are

3    describing the cause.  We're describing the fact that

4    it's the binding to the same epitope that causes the

5    inhibition.  Then we're saying in the first paragraph,

6    and here's the effect.  Here's how much.  Here's how

7    much faster it has to be.  It needs to be at least as

8    well.  Now, parenthetically, at the very end on the

9    Slide 30, we have a sentence that says an epitope

10   consists of Amino acid residues on the antigen to which

11   an antibody binds.  Centocor suggested that that was

12   inconsistent with what's in the specification.  We would

13   just ask the Court to consider the words because it's

14   not inconsistent at all.

15            On Slide 31 is Centocor's definition, which

16   we would suggest fundamentally just tosses the issue up

17   in the air to the jury with no guidance.  So if we take

18   our construction in the order that I've suggested, which

19   is cause and then effect, the bottom portion deals with

20   cause and the causes binding the same epitope of TNF

21   alpha.

22            As the Court knows from the tutorial, two

23   antibodies can inhibit each other in a number of

24   different ways.  They can bind to the same epitope in

25   this overly simplified version, and that would be, in

1   our view, competitive inhibition, but also one epitope

2   can bind to a site and block the other from getting in,

3   and that's called steric hindrance.

4            On Slide 34, another way that inhibition can

5   occur is if one binds and when it binds it causes a cell

6   to change its shape so that the antibody can't get to

7   the antigen binding site or to the epitope binding site,

8   and that's called allosteric hindrance.  And the last,

9   which may be the most predictable is the antibodies just

10  bind to themselves and make themselves useless.

11           Which of these different things is the

12  patent talking about?  And, again, the answer is in the

13  words of the specification.  In the specification

14  itself, they say Figure 9A and 9B, which Ms. Elderkin

15  put up on the screen, is an example of a cross blocking

16  epitope.  And they say -- I'm trying to eliminate that

17  red arrow, but I can't.  You did.  Thank you.  They say

18  themselves that this cross blocking epitope is what

19  they're talking about as competitive inhibition,

20  competing for the same site is what they're talking

21  about.

22           And the patent at Column 13, Line 15 to 26,

23  defines what the epitope is.  So we suggest it's pretty

24  clear, but if the Court was concerned and thought that

25  there was ambiguity in what they said themselves, the

1   file history answers the question by saying, thus, the

2   same -- claimed monoclonal antibodies, in their ability

3   to inhibit A2 binding, must also bind to the same or

4   similar epitope.

5           Now, we also suggest in addition to cause,

6   there has to be some way to quantify the effect, and I

7   think this becomes important not just in the abstract,

8   Your Honor, because the Federal Circuit says we ought to

9   tell the public when their jet airplane is going fast

10  enough to be fast or fast enough to be faster.  We need

11  to tell them what the scope of the right to exclude is.

12  I'm going to come back to this one.

13          A key here is that Centocor's expert gave

14  testimony during the Markman depositions which

15  demonstrates that just the phrase itself, competitively

16  inhibits, doesn't tell you a whole lot.  He said, well,

17  you know, it's sort of like the United States election.

18  If it's a landslide, you know it's a landslide.  If it's

19  close and the balance is in Florida, then it's close.

20          I can tell you on each extreme what it is,

21  but I can't tell you what it is in the middle.  He said

22  it's a matter of degrees.  5 percent would be enough --

23  would not be enough.  65 percent, 75 percent, 35

24  percent, I don't know.  And we suggest that that would

25  create an indefiniteness problem.

1            Now, Ms. Elderkin said that indefiniteness

2    is not something the Court considers at Markman.  I

3    would suggest that also is old law.  As Markman came

4    into being, it was this old law that said indefiniteness

5    was a question of fact.  Markman became a question of

6    law.  Post-Markman and post-Phillips, the question of

7    whether something is definite has to be become a legal

8    issue for Your Honor.  And if it is indefinite, it is

9    indefinite.  If it's capable of being given a

10   definition, it's capable of being given a definition.

11           And all we've tried to do is say, okay, if

12   it's going to be given a definition, let's give it a

13   definition.  And that's why we explained to Your Honor

14   in the tutorial the cross blocking epitope test, the

15   need for a positive control, the need for a negative

16   control, and then the test antibody.  And if the Court

17   considers Slide 39, what ought to happen, if you're

18   binding to the same or similar epitope, the positive

19   control, which is our green line, when you put the test

20   body in, it ought to get pretty close to the same, and

21   that is what the patentee was talking about, because if

22   we move to Slide 43, at Column 12, Line 4 to 15, they

23   say, it's having substantially the same specific binding

24   site.

25           Now, Your Honor, very quickly, let me say

1    this on the four remaining terms.  On recombinant or

2    produced recombinantly, having heard the argument, I'm

3    not sure that there's a difference more than words, and

4    if -- you can take something off the Court's plate if

5    what Ms. Elderkin represented to be their definition of

6    recombinant and produced recombinantly means that claim

7    interpretation is fine with us.

8            As to specificity, as I think we said in our

9    brief, Example 10 does describe both.  We think probably

10   the right descrip -- the right definition includes both.

11           And then as to inhibits pathological

12   activity, I'm going to leave it to the briefs.

13           But the final one I'm going to talk about is

14   this binding to a neutralizing epitope of human TNF

15   alpha in vivo.  Your Honor, this is one where I think

16   looking at this, looking at what occurred answers the

17   question.  The asserted claims of the '775 patent

18   include this claim limitation with the word in vivo.  In

19   vivo means in a living thing as we've suggested.  The

20   '239 patent, which came out second and the second patent

21   before Your Honor, eliminated that claim term.

22           Now, if the definition is as broad as in

23   vivo, which is a series of calculations that are made

24   outside of all living things, if it's as broad as

25   Centocor says, why bother to take the claim term out in

1   the '239 patent?  The fact they took the claim term out

2   I think answers the question.  The word in vivo is

3   there.  The word in vivo has a meaning.  It is a test

4   that measures something in a living organism, and to the

5   extent that Centocor's argument is you can't do this

6   measurement in a living organism, our answer is three

7   things.

8              One is, well, if you can't, you shouldn't

9   have put it in your claim term, and Chef America says we

10  take it isbut.  The second is it's in the claim term,

11  and it's a requirement, and if Abbott doesn't do it,

12  Abbott doesn't do it, or if you can't prove it, you

13  can't prove it.  And, lastly, the fact that you took it

14  out in the '239 patent is the answer to the question of

15  whether the interpretation is broad as we suggest today.

16             So with that, Your Honor, unless there are

17  any questions, we would rest on the briefs as to the

18  remaining issues.

19             THE COURT:  I don't believe I have any.

20  Thank you, Mr. Lee.

21             MR. LEE:  Thank you, Your Honor.

22             THE COURT:  Rebuttal?

23             MS. ELDERKIN:  Just a few comments, Your

24  Honor.

25             THE COURT:  Yes.

1              MS. ELDERKIN:  Mr. Lee pointed to a slide

2       where we had the claims that were originally presented

3       in the '775 patent application, and those claims did say

4       human antibody.  I think the point that we'd like to

5       make clear is that the term human antibody -- again, as

6       the term human is construed by Centocor, and we think

7       properly, human means derived from human DNA, but human

8       just as a human antibody can include a humanized

9       antibody.  The term human antibody as used in that claim

10      wasn't limited to a fully human antibody.  So the claim

11      didn't say fully human antibody.  It said a human

12      antibody.  So it was not inconsistent that there was a

13      subclaim that referred to there being CDR regions that

14      were of nonhuman origin.

15             And I guess the only other thing I'd like to

16      mention is Mr. Lee used the example of the jet engine

17      and how the competitive inhibition would be unclear

18      because we don't know if it's faster-faster like the jet

19      engine.  And I would submit that that's really not the

20      proper analogy.

21             Both experts have testified in their

22      depositions of excerpts have been provided in the briefs

23      that those skilled in the art know from the result of a

24      competition assay whether there's competition or not,

25      and what Abbott is trying to do is to incorporate into

1    the claim the reason for the competition or the reason

2    the jet engine is going faster, not that it is going

3    faster or not, and that's not -- that's an improper

4    thing to do with these particular claims.

5            Those skilled in the art would know when

6    there's competition, and if they wanted to quantify it

7    so that they compare one antibody to another, they could

8    do so by mechanism by assays described in the Harlow

9    reference, but it's not necessary to do so to know

10   whether two antibodies compete.  In fact, Dr. Marks,

11   Abbott's expert, well, you look for a trend.  If you

12   don't see any competition at 15 percent or 5 percent, we

13   look for a trend.  We add more antibody and see if

14   there's a trend.  So it's not necessary to quantify it

15   to know whether there's competition.

16           That's all I have.

17           THE COURT:  What do you say about Mr. Lee's

18   argument -- he cited me, I think, three or four cases

19   about you can't criticize something in your -- and then

20   claim it, I believe was basically what he was arguing to

21   me about a couple of cases or three cases, and he's

22   saying that in your original application, which you have

23   reincorporated by reference, what do you say about that?

24           MS. ELDERKIN:  Okay.  A couple of things.

25   First, I didn't mean to imply that we disagree that it's

1    incorporated by reference.  It certainly is.  It's just

2    the text that was in the original application no longer

3    appears in the patent, and I think there is relevance to

4    that.  I'm not aware of any cases that have ever

5    addressed this issue.

6              THE COURT:  I'm not either.  I was hoping

7    somebody was going to cite me one that said that exact

8    thing.  He did cite me three cases, I believe, that

9    talked about, though, that you can't criticize something

10   and then claim that which you have criticized was, I

11   believe, what the principle was that he was arguing to

12   me.

13             MS. ELDERKIN:  There are cases about that,

14   and I think that those particular cases are very

15   different from what we have here.  The criticism, so to

16   speak, if you want to call it that, of human antibodies

17   that appeared in the '827 application, the original

18   application, was not that human antibodies are bad or we

19   can't have human antibodies.  That certainly wouldn't be

20   part of our invention.  It really wasn't criticism.  It

21   was saying, gee, it would be difficult to make these

22   using the technology that Mr. Lee referred to, or you

23   have to use a virus in a human and everything.

24             But elsewhere in the -- in the '827 spec,

25   and I referred to this in my slides this morning, and,

1    I'm sorry, I don't have it in the top of my mind,

2    elsewhere in the spec there is a disclosure of a way

3    that one could use to make human antibodies.  It's --

4    it's in there in the original one.

5            So the -- we would disagree that it was

6    criticism of human antibodies in the original

7    specification.  It was a reference to the fact that,

8    gee, these would be hard to make, and there was another

9    way to make them, and then, of course, when the

10   application was refiled, there was even more information

11   provided of all that of what was already known in the

12   art.

13           I think the other thing that we would have

14   to point out about this incorporation by reference, I

15   agree it's incorporated by reference, but I think if we

16   took everything that was incorporated by reference and

17   laid it all out along with everything that's actually in

18   the printed patent now, it would not lead to a clear

19   conclusion that there was criticism and that anything

20   was disavowed, because even if there were some criticism

21   of human antibodies, and, again, we don't say that there

22   was, elsewhere, there's reference to the human-human

23   antibodies and to human antibodies.  And looking at it

24   all in total, one skilled in the art wouldn't walk away

25   from that and say, oh, they've criticized human

1   antibodies, so this patent certainly can't encompass

2   them.

3              THE COURT:  Thank you.

4              MS. ELDERKIN:  Thank you.

5              THE COURT:  All right.  I should -- this

6   case is set in -- for jury selection on May the 29th,

7   which is a Friday.  We put this on -- jury selection on

8   the 29th because counsel on one side or the other had

9   some problems the first part of June, and I gave you a

10  firm trial setting that we would go to trial on the week

11  of the 15th.

12             That's before the Court had a judicial

13  conference committee that's been scheduled for the week

14  of the 15th.  So the earliest you'll go to trial is June

15  the 22nd.  I just want -- I know y'all -- I just hadn't

16  picked up I had it specially set for the 15th, and I

17  also had this later set matter that I had -- since those

18  committees are reported by the Chief Justice, I try to

19  attend those committees.

20             Yes?

21             MR. SAYLES:  May it please the Court --

22             THE COURT:  Now, wait a minute.  Have you

23  got another problem you want to tell me about?

24             MR. SALES:  No.

25             THE COURT:  I want to talk to you about

1   chimeric antibodies.

2              MR. SAYLES:  Well, Judge, now, my job is to

3   translate that into East Texas English language.

4              THE COURT:  Well, let's -- you want to talk

5   about that today, or you're not prepared?

6              MR. SAYLES:  I'm working on that.

7              THE COURT:  Okay.  All right.  What do you

8   want to talk about, Mr. Sayles?

9              MR. SAYLES:  Judge, in this case, as the

10  Court knows from the file, we're not seeking an

11  injunction, and I wanted to inquire if we can get some

12  guidance on whether we would be expected to present the

13  future damages to the jury or whether that will be a

14  matter that will be handled depending on the verdict and

15  post verdict.

16             THE COURT:  Well, Judge Folsom is -- which

17  case did he have where he tried to set the future

18  damages and he did it wrong or something?  What we have

19  done in the past two cases is not take on the future

20  damage questions just until the time of trial, and then

21  try the future -- try them -- once we got the royalty

22  rate, then we try them later.

23             MR. SAYLES:  All right.

24             THE COURT:  We direct -- at the time I enter

25  a judgment, I generally direct the filing of a second

```
1   case, sever that.

2              MR. SAYLES:  We knew that was the way that

3   it had been done.

4              THE COURT:  If y'all have got something

5   better --

6              MR. SAYLES:  No.

7              THE COURT:  You know, I'm not wanting to try

8   the case the second time.  Don't get me wrong.  I'm not

9   looking for another case.  I'm just -- that's what Judge

10  Davis has done, I believe, and Judge Folsom has -- and I

11  haven't gotten any clear direction from the Circuit

12  to --

13             MR. SAYLES:  And that's why I inquired.  No,

14  with 12 and a half hours a side to try a case involving

15  recombinant chimeric antibodies --

16             THE COURT:  Have I already set your hours

17  per side?

18             MR. SAYLES:  You did say 12 and a half, but

19  we'll --

20             THE COURT:  Why did I give you that many?  I

21  mean, since like I gave you an hour and a half -- were

22  you saying that was too much Mr. Sayles?

23             MR. SAYLES:  No, sir.  I was not.  I was

24  saying that the way you normally handle future damages

25  will be just fine.
```

```
 1              THE COURT:  Well, we can -- I mean, you
 2    know, if y'all think you're going to really need more
 3    than 12 and a half, you're going to need to tell me why.
 4              MR. SAYLES:  Yes, sir.
 5              THE COURT:  If you can't do it in -- you
 6    know, if you really can't, but up until now, I have yet
 7    to have anybody run out of time.  The only case that
 8    came close, somebody actually went over about a minute
 9    and a half, but it was an antitrust case.  It was not a
10    patent case.
11              MR. SAYLES:  Well, we're planning 12 and a
12    half, Judge.
13              THE COURT:  What do you think about that,
14    Mr. Lee?
15              MR. LEE:  I think we should be able to do
16    that, Your Honor.
17              THE COURT:  Okay.  Agreement.  I'm out of
18    here.
19              COURT SECURITY OFFICER:  All rise.
20              (Hearing concluded.)
21
22
23
24
25
```

```
 1                        CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of my ability.

 7

 8

 9
      SHELLY HOLMES                           Date
10    Deputy Official Reporter
      State of Texas No.: 7804
11    Expiration Date:     12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```