```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  CENTOCOR, ET AL            *     Civil Docket No.
                               *     2:07-CV-139
 4  VS.                        *     Marshall, Texas
                               *
 5                             *     May 26, 2009
    ABBOTT LABORATORIES        *     9:00 A.M.
 6
                   TRANSCRIPT OF PRETRIAL HEARING
 7          BEFORE THE HONORABLE JUDGE T. JOHN WARD
                   UNITED STATES DISTRICT JUDGE
 8  APPEARANCES:

 9  FOR THE PLAINTIFFS:   MR. RICHARD SAYLES
                          MR. MARK STRACHAN
10                        Sayles Werbner
                          1201 Elm Street
11                        4400 Renaissance Tower
                          Dallas, TX   75270
12                        MS. DIANNE ELDERKIN
                          MR. STEVEN MASLOWSKI
13                        MS. BARBARA MULLIN
                          Woodcock Washburn
14                        2929 Arch Street, 12th Floor
                          Cira Centre
15                        Philadelphia, PA   19104

16  FOR THE DEFENDANTS:   MR. DAVID BECK
                          Beck, Redden & Secrest
17                        1221 McKinney Street, Suite 4500
                          One Houston Center
18                        Houston, TX   77010
                          MR. WILLIAM LEE
19                        Wilmer Cutler
                          60 State Street
20                        Boston, MA   02109

21

22  COURT REPORTER:       MS. SUSAN SIMMONS, CSR
                          Official Court Reporter
23                        100 East Houston, Suite 125
                          Marshall, TX   75670
24                        903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

```
 1                    P R O C E E D I N G S

 2             THE COURT:  Please be seated.

 3             Mr. Sayles, were y'all here earlier this

 4  morning?

 5             MR. SAYLES:  Yes, sir.

 6             MR. BECK:  We were, Your Honor.

 7             THE COURT:  I just wanted you to know

 8  that we've got a place for y'all.

 9             (Laughter.)

10             THE COURT:  Since I heard both of you

11  were going to be here, I told them to make sure to move

12  people around.

13             All right.  The pretrial in Centocor Vs.

14  Abbott, Cause 2:07-CV-139.

15             What says the Plaintiff?

16             MR. SAYLES:  May it please the Court, I'm

17  Dick Sayles with Sayles-Werbner.  The Plaintiff Centocor

18  and New York University are ready.  Seated with me at

19  the counsel table is Diane Elderkin, who will be doing

20  some of the presenting depending on what Your Honor

21  wishes to discuss.  Steve Maslowski, Barbara Mullin and,

22  of course, Mark Strachan from the Sayles-Werbner firm.

23             THE COURT:  Okay.  Defendants?

24             MR. BECK:  Your Honor, David Beck for the

25  Defendants in this case, and an additional speaking part
```

1  this morning will be Mr. Bill Lee.

2                    MR. LEE:  Good morning, Your Honor.

3                    THE COURT:  All right.  The Court's

4  schedule -- what I have got is we're going to pick a

5  jury this Friday, the 29th at 9:00 o'clock, and then

6  we're going to bring the jury back and start the trial

7  on June the 22nd.  And, you know, we work from 8:30

8  until not later than 5:30.  And the Court would plan on

9  getting all of the evidence in then by the close of

10  business, I guess, on Thursday of that week, and

11  hopefully conduct the preliminary Court's charge.

12                    The Court has a commitment to be in

13  Dallas, along with Mr. Beck, on the -- for presentation

14  of the remembrance about Franklin Jones, Jr. at the

15  American College of Trial Lawyers luncheon.  So, the

16  Court is going to keep that commitment and allow Mr.

17  Beck to keep that commitment also.

18                    Then we would come back and argue the

19  case on Monday, June the 29th at 8:30.

20                    Now, I know we had some -- I was going to

21  propose to you -- I haven't got all of these dates, but

22  I know we had some graduations and things that we wanted

23  to go to, but I have a date with Judge Everingham that

24  he could see y'all on June the 12th at 9:30 and he can

25  finalized any objections to any deposition cuts and get

1 your exhibits finalized, so that we would be able to

2 preadmit nearly all of the exhibits except those that we

3 might have to have some foundation testimony or

4 something.

5                Does that take care of everybody's

6 schedule though as far as attending all of the

7 graduations and things everybody wanted to attend?

8                MR. BECK:  It is certainly fine from our

9 end, Your Honor.

10                MR. SAYLES:  Judge, what day of the week

11 is that if you're looking at a calendar, the 12th?

12                THE COURT:  I'm not looking at a

13 calendar, but it better be Friday.

14                MR. SAYLES:  Okay.

15                MS. ELDERKIN:  That's fine for us, Your

16 Honor.

17                THE COURT:  Okay.  I know what the Monday

18 is, it is the 15th, so the 12th better be Friday or, Mr.

19 Sayles, I am really in trouble.

20                Does that schedule take care of

21 everybody?

22                With respect to getting a jury list, you

23 can get a jury list this afternoon with Ms. -- Ms.

24 Anderson has it or I assume that she does.  Does she,

25 Ms. Dupree?

```
 1              COURTROOM DEPUTY:  I will send her an
 2  e-mail.
 3              THE COURT:  Okay.  After lunch today.
 4              Let's see, the number of trees that I've
 5  killed just trying to stay up with all of y'all's
 6  filings.  I know that electronic filing is great, you
 7  just punch a button and you get to file it, but the
 8  Court has to try to get through it.
 9              Before we go any further, I would like to
10  inquire where we are in the -- in this last arbitration
11  award, I understand that Abbott filed to have that award
12  confirmed, is that correct?
13              MR. LEE:  That is correct, Your Honor, it
14  has been confirmed.
15              THE COURT:  It has now?
16              MR. LEE:  It's been confirmed.
17              THE COURT:  Okay.  Well, that is what I
18  didn't know, the second one has been confirmed.
19              MR. LEE:  Yes, Your Honor.
20              THE COURT:  All right.
21              Well, that having been confirmed, then
22  that takes care of the Motion for Summary Judgement No.
23  4, does it not?
24              MR. ELDERKIN:  Your Honor, Dianne
25  Elderkin.  We would argue that it does not.  That there
```

1 is still the issue about whether that order should have

2 collateral estoppel in this Court in this case, and our

3 issues that we raised in our opposition to Abbott's

4 motion about whether the issues were fully and fairly

5 litigated and actually litigated that we think raises a

6 serious issue about whether there should be collateral

7 estoppel effect.

8              THE COURT:  Well, I understand your

9 argument about that, but this Court does not believe

10 that it is the right place to collaterally attack that

11 award.  That is the other court, and the Second Court of

12 Appeals, I guess, is your next stop, not this Court for

13 a collateral attack on that award.

14              MS. ELDERKIN:  May I address that point

15 for a minute, Your Honor?

16              THE COURT:  I have pretty well made up my

17 mind on that, okay?

18              MS. ELDERKIN:  Okay.

19              THE COURT:  I think you have preserved

20 that point -- it is now preserved for the Federal

21 Circuit.

22              MS. ELDERKIN:  Thank you.

23              THE COURT:  Yes, ma'am.

24              I am denying the Defendants' Motion for

25 Summary Judgment No. 5 with respect to willful

1  infringement.

2              Now it appears to me that this motion of

3  the Defendants to exclude expert testimony and for

4  summary judgment on lost profits and Plaintiffs' Motion

5  in Limine No. 6 and Defendants' Motion in Limine No. 2

6  are all interrelated, and that as I understand it, the

7  Humira coadministered with methotrexate is a licensed

8  product or licensed combination.  That is licensed.

9              Now then, having said that, at the same

10 time Remicade -- I am saying factually what I -- if you

11 need to correct me, I will give you a chance to correct

12 me.  Remicade is not approved by the FDA by itself.  In

13 other words, any administration by Remicade solely is

14 what you have referred to as off-label use by a

15 physician or off-label prescription.

16             And so the argument that is being

17 presented to the Court in these various motions is that

18 the Plaintiff is seeking lost profits, and an element of

19 their lost profits is that they are saying --

20 Plaintiffs' position is that Remicade has a significant

21 amount of off-label use, and it is seeking lost profits

22 for the infringing loss of those sales by Humira, the

23 alleged infringing product being used.

24             I am not inclined to agree with the

25 Defendant that -- I don't know what -- y'all are going

Case 2:07-cv-00139-TJW   Document 235   Filed 06/03/09   Page 8 of 48

8

1  to have to talk to me about expert reports and what you

2  have actually got in there, but off-label use of

3  prescription drugs is, I think, well established.  Now

4  whether or not they can quantify it or whether that --

5  that is probably addressed in the expert report is --

6  that is one of the things that we're going to have to

7  talk about.

8           But the Defendant -- you're taking the

9  position that there shouldn't be any lost profits

10  because -- Number 1, your position is there shouldn't be

11  lost profits for off-label use, correct?  Is that what I

12  understand, Mr. Lee?

13           MR. LEE: That is correct.

14           Your Honor, the -- to be precise the

15  position is that Remicade's not approved as a

16  monotherapy, so to the extent that Humira was sold as a

17  monotherapy, they haven't lost profits.  So, that is the

18  argument.

19           THE COURT:  Well, I am not sure if I --

20  what does the Plaintiff say to that specific argument?

21           MR. MASLOWSKI:  Your Honor, Steven

22  Maslowski for Centocor.

23           In doing the lost profits analysis the

24  experts are tasked with reconstructing the but/for

25  market with the infringing products out of it.  So the

economic experts go back and look at the market, removed

the Humira monotherapy use from the market altogether.

It is not a choice at all.  They are then tasked with

figuring out what the doctors or patients would have

used.  They could have used Remicade with methotrexate,

that's an available choice in the but/for world.  The

analysis requires going back and removing the infringing

product out of the market and figuring out what patients

and doctors would have used.

So, it is not that we are saying that

Remicade would get lost profits for RA, again, we're

only talking about rheumatoid arthritis.  We are not

saying for Remicade you get lost profits for RA because

then all of the infringing sales would have had to use

Remicade off-label, and that is not what we're saying at

all.  But instead, proper lost profits analysis requires

taking the infringing product out and viewing the market

and what are the available choices.  And our expert said

in some circumstances or for a certain percentage of

those infringement sales, doctors and patients would

have, in fact, used Remicade.

So the off-label issue is somewhat of a

red herring in the sense that you take the monotherapy

uses out of the market and figure out what would

patients and doctors use.

1               THE COURT:  Mr. Lee, he just said you are

2  throwing me a red herring, are you?

3               MR. LEE:  I don't think so, Your Honor.

4  The argument is pretty simple, it is focused on

5  rheumatoid arthritis, he is correct.  Humira is

6  prescribed as a monotherapy.  There are other

7  alternatives out there in addition to Humira.  They

8  concede that and we concede that.  If Humira is not

9  available as a monotherapy, Remicade could not be used

10 to compete and capture that portion of Humira as a

11 monotherapy, that is all we're saying.

12              And their expert has pulled some numbers

13 out of the air, there is no basis for his quantification

14 of what would be prescribed off-label.  And I don't

15 quite understand how he can say that we're throwing Your

16 Honor a red herring because they talk about the fact

17 that Remicade is prescribed off-label.  But that -- it

18 is something of some controversy whether we should be

19 encouraging people to prescribe off-label, whether they

20 are.  But with all that set of circumstances floating

21 around, the idea that they can take the Humira in

22 monotherapy sales for rheumatoid arthritis and on any

23 disciplined analytically-sound basis say here is what

24 Remicade would have sold into this monotherapy market is

25 what we're claiming we're entitled to summary judgment

1 on.

2            THE COURT:  Well, I'm not going to grant

3 your summary judgment.  I am not going to grant that, I

4 am more interested now in what I'm going to do

5 evidence-wise.  I am going to deny you Motion for

6 Summary Judgment on that issue.

7            Well, let's talk about evidentiary-wise.

8 What is Centocor's position that -- are you -- for the

9 lost profits analysis are you saying that Remicade as a

10 monotherapy and the coadministered Remicade are

11 available for the lost profits analysis?

12            MR. MASLOWSKI:  Yes, Your Honor, we are.

13 If I could give you a simple example, I think will

14 explain the issue.

15            Both parties agree that there are three

16 major products that run in the RA market, Enbrel,

17 Remicade and Humira.  So, there were certain instances

18 in the but/for world where a patient failed Enbrel.

19 That is, the patient tried to use Enbrel and it didn't

20 work.  So, in the real world the patient used Humira

21 monotherapy.  So, if Humira monotherapy is an infringing

22 sale, that is no longer available, the choice then

23 becomes Remicade or if you believe the Defendants'

24 argument, Humira plus methotrexate.  So there is in fact

25 not even a realistic monotherapy choice available, and

1  that's what the economic -- our economic expert did.  He

2  went back and broke each of the indications down into

3  different categories.  Those being Enbrel failures,

4  patients that are bio-naive, for example, meaning they

5  have never taken a biologic product before or Remicade

6  failures.  And our expert says, for example, that with

7  respect to Remicade failures, we don't get any lost

8  profits, the patients went to Humira after our product

9  didn't work.  So the answer, yes, we are seeking lost

10  profits where the patients would, in fact, use Remicade

11  with methotrexate or without, it doesn't matter.

12                  THE COURT:  What do you say to that, Mr.

13  Lee?

14                  MR. LEE:  Well, Your Honor, I would say

15  two things.  One is, if you listen to the set of steps

16  they went through, their expert never considered as a

17  other alternative Humira with methotrexate, which is a

18  licensed product as Your Honor has just held.  So how

19  can you do this analysis of what would happen to

20  Remicade if Humira as a monotherapy is not on the

21  market, if there is another non-infringing alternative,

22  Humira plus methotrexate.  And I think the one thing we

23  can agree upon is their expert didn't consider that at

24  all, made no allowance for it.

25                  And then I guess, not to revisit Your

1  Honor's ruling on the summary judgment, but I think as

2  we get to the evidence on this off-label use of Remicade

3  as a monotherapy occupying some portion, their expert

4  made no effect to quantify that at all.  So, he would be

5  giving -- I think this goes to the evidentiary point

6  Your Honor has raised, he would be giving an opinion,

7  and if there is a number, it would be the first time we

8  have heard of a number from him.

9             THE COURT:  Well, I am still not inclined

10 to grant the summary judgment.  I do know I have got

11 myself in a -- we have got a tough evidentiary, how we

12 are going to propose this evidentiary-wise, that is what

13 I'm trying to -- because I have got your -- what

14 testimony -- I mean, other than just saying Humira plus

15 methotrexate is a non-infringing -- I know it is a

16 non-infringing alternative under the arbitration.  What

17 evidence do you have that it is actually used in that

18 fashion?

19            MR. LEE:  Some portion, Your Honor, of

20 Humira that's sold is administered with methotrexate,

21 that is the portion that came out as a result of the

22 arbitrations.  It's, you know, in the neighborhood --

23 there was a dispute as to whether it was 30 percent, 40

24 percent, but somewhere in the neighborhood of 30 percent

25 is a co-administrative product, so that actually not

1 only is in the record, but also confirmed by the

2 arbitration, the second arbitration where it was

3 confirmed.

4            THE COURT:  So then your Motion -- then

5 we get down to your Motion in Limine No. 2 is that since

6 they don't -- if I have got it right in my head, which I

7 may not have, but your Motion in Limine is that it is a

8 non-infringing alternative, it just was not considered.

9            MR. LEE:  That is exactly right, Your

10 Honor.

11            THE COURT:  And so now you are trying

12 to -- you are back to trying to seek to exclude all of

13 the lost profits analysis?

14            MR. LEE:  That is correct, Your Honor.

15            Now, at -- Your Honor's question about

16 what to do with it, perhaps rather than our taking

17 positions on what Dr. Gering may or may not have said in

18 his report, maybe if Your Honor would be willing, the

19 right thing to do is to voir dire him before he goes on

20 before the jury and we can address those.

21            THE COURT:  I don't know about that.

22            Oh, are you going to jump in this, Mr.

23 Sayles?

24            MR. SAYLES:  Yes, sir, if you would hear

25 from me, I do want to jump into it.

1                    I want to point out that the combination

2    use of Humira and methotrexate into the future, assuming

3    no infringement, may not be available because

4    methotrexate is a separate drug made by a separate

5    manufacturer that is given on a separate dosing

6    schedule.  It is not -- the two drugs are not combined

7    together and they are not given together, and so the --

8    Abbott would be offering for sale and manufacturing

9    Humira.  And if there is infringement I would submit

10   that they -- you have to remove Humira from the market.

11   It is only the use after the fact by the patient that

12   gives them the implied license that they seek.

13                   It is not -- that is not the manner in

14   which it is manufactured, and it is sold as a single

15   drug.  So I think you can -- that there is a very

16   substantial --

17                   THE COURT:  Yeah, but the arbitration

18   award said that that combination is licensed.

19                   MR. SAYLES:  That's right, but that

20   combination is only determined by the usage of the

21   patient after the fact.  That usage is not determined at

22   the time of the manufacture and the sale of Humira.  And

23   I would submit that that would be prohibitive if there

24   is a finding of infringement.

25                   MR. LEE:  Your Honor, may I add two

1   thoughts in response.

2                   THE COURT:  Go ahead.

3                   MR. LEE:  There is no request for an

4   injunction in this case.  So the only question is

5   damages for the past and damages going forward.  In that

6   circumstance, any sales that we made that are

7   co-administration projects as determined by the

8   arbitrator are not going to be the subject of the past

9   damage, nor would we have to pay royalties on it going

10  forward because we're paying royalties on those sales to

11  the Kennedys which is as a result of the arbitration.

12                  So I think with respect to Mr. Sayles

13  argument is a collateral attack on what happened in the

14  arbitration where we have already been determined both

15  going back in time and going forward to have the right

16  to sell.

17                  THE COURT:  I will let you know before

18  the 22nd what we're going to do on those two motions, I

19  will carry those.

20                  MR. MASLOWSKI:  Your Honor, can I make

21  just one final note before we close on that.

22                  THE COURT:  Yes.

23                  MR. MASLOWSKI:  Just to point out for the

24  record, Dr. Gering did, in fact, consider the license

25  and did exclude the licensing of Humira plus

1  methotrexate -- methotrexate sales from his analysis,

2  and I just wanted to clarify to Mr. Lee's earlier

3  comments.

4                THE COURT:  Well, are you saying that his

5  expert report doesn't include that?

6                MR. MASLOWSKI:  It does not include

7  damages that -- where Humira was used in combination

8  with methotrexate, he excluded them from the analysis

9  and they are not in the lost profits, past sales where

10 Humira was used in combination methotrexate.

11               MR. LEE:  That wasn't the point I was

12 trying to make.  I apologize if that is what -- I said

13 that he did not -- there are two parts.  One is should

14 he exclude that which the arbitration award has already

15 had excluded because it was a co-administered product,

16 and he has made an effort to do that in the event that

17 Your Honor denied their motion.

18               The second though is a different

19 question, which is for the lost profit analysis should

20 he have considered a non-infringing --

21               THE COURT:  A non-infringing alternative.

22               MR. LEE:  -- a non-infringing

23 alternative, that's the second point.

24               THE COURT:  Okay.  I will give you a

25 ruling.  I will just -- okay.

1                  Why is it, Mr. Lee, that -- I am talking

2   about now the Plaintiffs' Motion in Limine, why is it,

3   Mr. Lee, that you really believe that the fact that

4   Humira is a patented product by itself is actually

5   relevant in this case?  I mean, usually it is just not.

6                  MR. LEE:  Your Honor, it is relevant for

7   three reasons in this case, which is a little different

8   than others.

9                  THE COURT:  Well, now you and I are going

10  to agree on that.

11                 MR. LEE:  The application date for the

12  patents-in-suit is 2002.  So until there is an earlier

13  priority proving our patent in 1996 is prior art, which

14  would invalidate the patent.  So as a starting point, it

15  is relevant for that reason.

16                 The second, Your Honor, since the Motion

17  for Summary Judgment has been denied as to willfulness,

18  the fact that we were, in our view, first to invent and

19  first to patent and had a patent well before their's

20  issued on human antibody is relevant to willfulness.

21                 And then the last thing, Your Honor, both

22  of us agree that the fact that we have a patent that

23  they have taken a license under our patent is relevant

24  to the issue of damages.

25                 So there are three different reasons why

1  in this case it would be relevant.  And the first really

2  goes to the validity issue of you start with 2002, we

3  have to demonstrate that that is the priority date, the

4  patent would be invalid.  This patent does it in 1996.

5  It then requires Centocor to assume the burden of

6  proving an earlier priority date, which is the subject

7  that Your Honor --

8                  THE COURT:  Well, let me hear from --

9                  MS. ELDERKIN:  Your Honor, we don't

10 dispute that the patent, the Salfeld patent can come in,

11 the patent itself.  We don't dispute that the fact that

12 it discloses the antibody that is in Humira can come in

13 because that goes to their validity defense if we can't

14 get an earlier priority date.  But that is different

15 from arguing to the jury that Humira is patented because

16 that is just likely to confuse the jury about -- you

17 know, juries have a hard enough time understanding the

18 issues in these cases as it is, but the concept of

19 dominant patents such as ours and improvement patents

20 such as theirs is very confusing.  It does no good to

21 argue to the jury that Humira is patented.

22                  And I would submit that Mr. Lee's comment

23 about his -- his second point about why it is relevant

24 for willfulness is right on point because I don't see

25 how the fact that Humira is patented is at all relevant

1   to their willfulness defense.

2              The patent can come in, they can argue

3   that it discloses D2E7 which is the antibody in Humira,

4   but they should not be able to argue to the jury that

5   Humira is patented and confuse the jury about whether

6   there is an infringement issue or try to make it sound

7   that they are escaping from willful infringement because

8   they got their own patent.

9              THE COURT:  Well, I -- go ahead, Mr. Lee,

10  and then I am going to move on.

11             MR. LEE:  Your Honor, just one quick

12  point.  On this willfulness issue, the premise of Ms.

13  Elderkin's argument is that they had the pioneering

14  patent and we're an improvement.  Well, that is actually

15  the issue that we're going to try in the case, the

16  priority date that they have now identified, because if

17  they are not, then the fact that they had a patent that

18  covered something different, we got a patent that

19  covered D2E7 is relevant to willfulness.

20             And under Seagate --

21             THE COURT:  Do you think it could be a

22  relevant question as to whether or not your client was

23  objectively unreasonable?

24             MR. LEE:  That's exactly right, Your

25  Honor.

1          THE COURT:  Well, I do too.  I'm going to

2  deny the Motion in Limine.  I just -- you are asking me

3  to cut it too close.  It's denied.

4          MS. ELDERKIN:  Your Honor, may we request

5  an instruction to the jury then that they should not

6  take into consideration the fact that Humira is patented

7  in considering infringement.

8          THE COURT:  I think that is a proper

9  instruction on the question of infringement alone.

10          MS. ELDERKIN:  Thank you.

11          THE COURT:  We will have the jury

12  thoroughly as confused as you will have me, I am sure,

13  before it's over with.

14          What do you say, Mr. Lee, to No. 2 about

15  inherency, unknown --

16          MR. LEE: Your Honor, I think we state In

17  re:  Kubin which say that it doesn't need to be

18  recognized or acknowledged for it to be inherent, both

19  for anticipation and obviousness purposes.  It's -- we

20  would suggest that the law is, in our view, pretty clear

21  that whether it was recognized or appreciated is not

22  required for inherency purposes.

23          In Kubin, Your Honor, the inventor may

24  have recognized it, but there is no proof that one of

25  ordinary skill in the art would have recognized it.  And

1  I think the legal issue, Your Honor, is whether one of

2  ordinary skill in the art would have had to have

3  recognized the inherent property in order for it to

4  render something obvious.  And neither at the

5  anticipation level nor at the obviousness level is that

6  where the Federal Circuit is.

7              THE COURT:  Yes.

8              MS. ELDERKIN:  Well, Your Honor, the

9  Kubin case does not overturn 20 years of Hornbook patent

10 law, that obviousness must be predicated on what is

11 known.  And that inherent features of prior art

12 products, if they are unknown, cannot be relied upon in

13 considering obviousness.

14              The cases that we cite in our brief, the

15 Spormann case from the -- the predecessor court to the

16 Federal Circuit in 1966.  The Newell case from the

17 Federal Circuit, the Kloster Speedsteele case from the

18 Federal Circuit, they all specifically hold that.  Those

19 cases are no where even mentioned in the Kubin case.  If

20 Kubin were going to overturn 20 or 30 years of case law,

21 you'd think that they would mention it.

22              THE COURT:  Well, that is not unusual for

23 the Federal Circuit to decide to do that has been my

24 experience.

25              MS. ELDERKIN:  I will reserve comment on

1  that, Your Honor.

2           THE COURT:  Well, I'm just saying it

3  happens.  And he is citing the more recent -- well, what

4  do you believe the Kubin case says?

5           MS. ELDERKIN:  It is a different set of

6  facts.  There is also a long body of case law from the

7  Federal Circuit that -- and this is what Kubin goes to,

8  that it is not invention to perceive the product which

9  others have discovered have qualities they failed to

10 detect.  So if the antibody in our -- of our claims were

11 known, if it were precisely disclosed in the prior art

12 and our invention came along and discovered, oh, it has

13 this property, it turns green when you put something on

14 it, that discovery would not make it patentable, but

15 that's not the case here.  Our antibody is not known.

16 The specific feature that they are relying upon testing

17 to show inherent qualities, the fact that claimed

18 antibodies compete with A2 combined with the TNF is

19 simply not done in the prior art, and that is what's

20 different in Kubin.  In Kubin it was known -- the court

21 said that the polynucleotide sequence that was being

22 plagued was known and the fact that the claim

23 additionally said, and by the way, when you express this

24 protein according to this, it happens to bind to the

25 receptor P38, they said, well, your just taking an old

1 polynucleotide sequence expressing and getting a protein

2 and saying, it looks -- as far as the P38, it's a

3 different set of facts than we have here.

4            THE COURT:  I am going to carry it.  I

5 will give you a ruling before you pick the jury on

6 Friday.

7            No. 3 is agreed upon, so it is granted.

8            Now, No. 4, why, Mr. Lee, was it that

9 Baker Botts wasn't identified with the people with

10 knowledge?  Didn't they have the documents in question

11 ultimately?  Or who is going to address that?

12            MR. BECK:  David Beck for the Defendants,

13 Your Honor.

14            Your Honor, the answer is yes, but the

15 documents were produced before the deposition of the

16 witness whose deposition they took.  They had a full

17 deposition as I understand it, and had the opportunity

18 to use those documents during the deposition.  That

19 deposition was taken by agreement after the close of

20 discovery.  The point is that they got the information,

21 they got the discovery and if there is anything else

22 they need, we're willing to respond accordingly.

23            THE COURT:  How have y'all been

24 prejudiced?

25            MS. MULLIN:  The issue here, Your Honor,

1  is not just that the documents were produced after the

2  close of discovery, but also that this is an entirely

3  new theory that the Defendants are advancing about

4  whether or not they were able to do testing to determine

5  whether or not there was infringement.  And it's not

6  just the documents weren't disclosed, but this theory

7  and the idea that somebody from Baker Botts might have

8  relevant information was never disclosed during

9  discovery.  It didn't show up on any initial

10 disclosures.  Even the initial disclosure that we got on

11 the very last day of discovery didn't suggest that there

12 was anybody at Baker Botts who might have this

13 information.

14             So what we have is an incomplete string

15 of e-mails that were apparently generated at Baker Botts

16 about a single attempt to get a sample of A2 that

17 Abbott's going to argue was unsuccessful, that they

18 weren't able to get it, and we have had no ability to

19 probe with Baker Botts or even with anybody else at

20 Abbott as to whether they were later successful.

21             We would have -- we certainly would have

22 deposed earlier witnesses about this theory had we known

23 about it.

24             THE COURT:  Well -- yes, sir.  Go ahead.

25             MR. BECK:  It is not a theory, it's a

1  fact.

2           THE COURT:  Well, the problem is that you

3  know Mr. Beck we're talking about this case has been

4  pending, and somebody knew about these documents a long

5  time ago, and too much -- I'm not suggesting this is

6  trial counsel, but somebody is playing a game.

7           MR. BECK:  Well, as I understand the

8  facts, Your Honor, in preparing this witness for

9  deposition, they find out that these documents existed

10 and then they went ahead and made available the

11 documents for counsel.

12          THE COURT:  I am excluding the

13 documents.

14          Now, No. 5, there is a lot of things

15 about Abbott could consider about validity short of an

16 opinion of counsel.  I understand that Abbott is not

17 relying on opinion of counsel, is that correct?

18          MR. LEE:  That is correct, Your Honor.

19          THE COURT:  Well, outside of opinion of

20 counsel, there could be a lot of other things that they

21 could consider.

22          What are you actually trying to exclude

23 here, Plaintiff?  Y'all want to tell me that in your No.

24 5.

25          MS. MULLIN:  Centocor Motion in Limine

1  No. 5, Your Honor?

2            THE COURT:  Yes.

3            MS. MULLIN:  Having failed to produce any

4  opinion of counsel or to waive privilege, Abbott's

5  witnesses should not now be able to come in and say that

6  they considered the validity of the patent, and the

7  reason that they didn't take -- as you know from the

8  various motions, there is a long history of licensing

9  discussions that started even before the patent issued

10  and went all the way up to the time that this suit was

11  filed.  And it would be unfair for Abbott to say we're

12  not going to waive our opinions of counsel, we're not

13  going to tell you what our real analysis of the patent

14  was, but then to have a witness come in and say, oh, but

15  by the way, we actually didn't take a license because we

16  thought that the patents were not valid or we thought

17  that we did not infringe them.

18            THE COURT:  Well, what evidence do you

19  want to introduce that would violate this Motion in

20  Limine?

21            MR. LEE:  Your Honor, I am not quite

22  clear where the disagreement is.  I mean, as I

23  understand it Centocor agrees that they are not going to

24  argue any adverse inference under Knorr Bremse because

25  we have failed to produce an opinion.  We agree that

1 neither -- we agree that -- we believe that they are not

2 going to offer any evidence that an Abbott lawyer

3 evaluated the validity or the infringement of the

4 Centocor patents at any time after we got notice.  And I

5 think we have agreed that Centocor will not offer up the

6 privilege log in an attempt to get at it in a backdoor

7 way.  And that, I thought, was something we could agree

8 upon, and I am not quite sure what they are concerned

9 about beyond that.  Because that would cover both Your

10 Honor's first point about the opinion in an adverse

11 inference, and would cover either or both of us offering

12 the evidence that we evaluated the validity and would

13 cover the privilege log.

14             THE COURT:  Well, what evidence would you

15 be wanting to offer, Mr. Lee, that you did consider on

16 validity?  Because the way this is -- this is a little

17 broader than what you have said so far.

18             MR. LEE:  Your Honor, we -- during the

19 course of the meeting between Centocor and Abbott, we

20 told Centocor that the patent was in our view not

21 enabled and didn't have the appropriate Section 112

22 written description.  So, it is a conversation between

23 the two of us where we gave them our position on the

24 validity of the patent, that would be relevant to the

25 willfulness inquiry.  That is not our effort to say --

1  to introduce evidence through the backdoor about some

2  evaluation.  It was a communication from us to them, and

3  that is what we're seeking to omit.

4             THE COURT:  Well, do you agree with what

5  he said the agreement -- what Mr. Lee said about the

6  understanding of -- between the parties about -- with

7  respect to lawyers, privilege log and all of those

8  things?  Do y'all agree with that?

9             MS. MULLIN:  Well, actually I think he is

10 combining two motions.  I think that what he is talking

11 about there --

12            THE COURT:  Well, I understand that he is

13 combining two motions, that's what the Court is sort of

14 trying to do also.

15            MS. MULLIN:  Right.  So I don't actually

16 agree with that.  One of the issues that we have in this

17 case is that -- and Abbott filed a Motion for Summary

18 Judgment of no damages before the case was filed.  And

19 they based that in part on the fact that their witnesses

20 have said that they are unable to recall conversations

21 in which the Centocor witnesses say, we told them that

22 they were infringing, we told them that they needed a

23 license under this patent.  And so one of the things

24 that we can glean from the privilege log and from

25 actually asking one of the witnesses about it --

1          THE COURT:  Well, the privilege log is
2  not coming in, let me tell you that.
3          MS. MULLIN:  Okay.
4          THE COURT:  I haven't got to that one,
5  but I can tell you that that's this Court's view on
6  privilege logs.
7          MS. MULLIN:  Okay.  I think that's where
8  Mr. Lee was going.  But it's really -- it is not the
9  privilege log itself, but the fact that we can establish
10  that there was a communication, there is no dispute that
11  there was a communication, just what the content of it
12  was.  And within three days Abbott goes and seeks advice
13  from outside counsel.  And so the fact that they have
14  sought advice is something that we do think is
15  appropriate to admit because it is -- in part it goes to
16  the issue of notice because it goes to how much weight
17  is given to the fact that their witnesses can't recall
18  certain things.
19          THE COURT:  Well, you just told me that
20  y'all don't have an agreement then with Mr. Lee.
21          MS. MULLIN:  Right.
22          THE COURT:  Well, all right.  Here's what
23  the Court's ruling is:  The Court will allow Mr. Lee to
24  -- this Motion in Limine will not preclude any direct
25  conversations between the parties about enablement that

1  you have brought up.  They will be able to ask whether

2  or not you sought advise of counsel, but that's all you

3  can ask.  You can't argue any adverse inference from the

4  fact that they have not produced it, and you cannot make

5  any reference to the privilege log or anything that is

6  on that privilege log.

7           So, I don't believe we had quite the

8  agreement that you thought you had, Mr. Lee.

9           Do both sides understand that?  I believe

10 I have covered the points that you have made.

11           MR. LEE:  We do, Your Honor.

12           THE COURT:  All right.  Six is what I'm

13 going to -- No. 7, the Court has read that and studied

14 that and it is denied.

15           Okay.  We're done with the Plaintiffs.

16           All right.  Defendants' No. 1, I have

17 already ruled on it.  I am not going to make a change in

18 the claim construction as requested.  That is denied as

19 a Motion in Limine.

20           No. 2, all of that is all tied up in the

21 coadministration, I believe, so I will carry that.

22           Now, what is it exactly you are trying to

23 exclude here on No. 3, Mr. Lee?

24           MR. LEE:  Your Honor, we tried to narrow

25 the issue.  Your Honor had denied a summary judgment

 1  motion on notice, and we're just trying to narrow the

 2  issue too.  Without a doubt, if they prove that we have

 3  notice of the patent infringement, they have proven that

 4  period of -- we're talking about notice of a patent

 5  application for an allowed patent that has not yet

 6  become a patent, and just the legal question of whether

 7  that notice can kick off a damage period for a patent

 8  that has not even been issued yet, and we have tried on

 9  the in limine motion to narrow it just to that precise

10  legal issue because if their theory was correct, you

11  could give notice and start the damage period running

12  before the patent issued when damages began to run, and

13  as we have argued to Your Honor, we think that what the

14  case law supports is after the patent issues, you have

15  got to give a specific notice of infringement and that

16  kicks off the damage process.

17                THE COURT:  What is it that you want to

18  introduce that would violate this Motion in Limine?

19                MS. MULLIN:  I believe what they are

20  trying to keep out, Your Honor, are a series of

21  discussions that took place between the parties starting

22  with the time that Centocor found out that the patent

23  application that ultimately issued if the '775 patent

24  was allowed.  Pretty much as soon as Centocor got that

25  notice they told Abbott you need to take a look at this

1  patent because you're going to need a license.  And

2  those discussions continued for a period of time up

3  through the time that the patent issued.

4          THE COURT:  Well, it sounds like -- she

5  says from the date the patent application or the patent

6  was issued on the '775, isn't that right?

7          MS. MULLIN:  Now, Mr. -- I think Mr. Lee

8  is actually confusing -- we have not sought any damages

9  for the time period prior to the time that the '775

10 patent issued.  We're not seeking damages prior to that

11 time.  Okay.  So, that is not an issue.  What they want

12 to do though is exclude all of the communications about

13 that patent, the fact that it was coming out, the fact

14 that we told Abbott that they were going to need a

15 license under that patent.  It's part of the continuing

16 story that that started before the patent issued and

17 continued through the time that this suit was filed.

18          And on the one hand Abbott is saying, we

19 didn't know that we needed -- you didn't give us any

20 notice about the patent or that we would need a license

21 or that we infringed the patent until the time the suit

22 was filed.  And on the other hand they are saying, we

23 didn't have notice because we want you to exclude all

24 the evidence of that notice.  And that is essentially

25 what they are trying to do through their Motion in

1 Limine is exclude the evidence that they had notice.

2     And there is an issue of law here, Abbott

3 has suggested that it's not possible to give notice

4 prior to the time that a patent issued, but there is no

5 Federal Circuit case that says that, No. 1.  And No. 2,

6 this isn't just an isolated point in time, this is a

7 continuous chain of events that started in December of

8 2005 and went all the way through April of 2007.  So it

9 makes no sense unless you have the entire chain of

10 events.

11     THE COURT:  Well, the Court is going to

12 deny the Motion in Limine, however if you will get an

13 instruction, Mr. Lee, if you request it, that damages

14 cannot ever begin to accrue until the date the patent

15 issued, then that will take care of it.  I think these

16 discussions for willfulness purposes, I think they are

17 admissible, to show what you knew and what your client

18 knew and when they knew it and those sort of things.

19 But just keep in mind that upon request I'll give you an

20 instruction.

21     It looks like you're trying to tie their

22 hands pretty good, Mr. Lee, in No. 4.

23     MR. LEE:  I think, Your Honor, No. 4 just

24 is that they don't contest the license, but I think

25 having Your Honor ruled on the Summary Judgment Motion

1  probably takes care of No. 4.

2          THE COURT:  Well, I am going to deny it

3  as a Motion in Limine, I believe.  I mean, if somebody

4  -- I have told you what my ruling is in this license and

5  that combination and if somebody tries to say something

6  different, well, I will then instruct the jury that's

7  incorrect, and it will probably be more punitive than

8  what I just said.

9          Is No. 5 moot in light of my ruling last

10  week?  Defendants' No. 5.

11          MR. LEE:  I actually think not, Your

12  Honor, because the priority dates that have been

13  specifically identified and gave testimony on were '91,

14  '92 and '92.

15          THE COURT:  Well, that's what I said, but

16  I granted and said that it couldn't possibly be any

17  earlier.  I mean, I gave you the February '94.

18          MR. LEE:  Right.  And so what we're

19  saying is having had him testify -- having had him

20  render his expert reports and not address '94, he ought

21  to be held to what he disclosed in his expert reports.

22          If I could just have two minutes, Your

23  Honor?

24          THE COURT:  Sure.

25          MR. LEE:  This is an issue that we've

1  raised with Your Honor a couple of times, and each time

2  you have said, yes, we will get to it.

3              THE COURT:  You mean I'm about to get to

4  it?

5              MR. LEE:  Yes.  And I think Your Honor

6  got to it in your order that said they can't have a

7  priority date earlier than 1994.  Our concern, and we

8  talked about it a little bit at Markman was that that

9  even before that, that that would put the experts in a

10 position of having to say, well, if '91 then, if '92

11 then, if '94 then.  But that is what we did and we

12 worked it through the point when Your Honor thought it

13 was appropriate to dissolve the issue.  Their expert did

14 not address '94.  Now, I am not going to argue here I

15 think there was a good reason that he didn't address '94

16 because of the intervening prior art, but I don't think

17 we have to argue that to Your Honor.  He addressed '91,

18 '91 -- no, I'm sorry, '91, '92 and that's it.  And he

19 never gave an explicit opinion on '94.

20             Now, they cite Your Honor to a paragraph

21 in his report, I think it is paragraph 197, but we would

22 just say, Your Honor, if you look at paragraph 197 and

23 198 in this very long report, they are talking about '91

24 and '92, and paragraph 198 makes that clear.

25             So, having lost the battle at different

1 points to get us to agree upon a priority date so that

2 everybody's expert could shoot at them.  Having had

3 Centocor prevail in that fight so that the experts tend

4 to pick a variety of dates, in fact, they didn't pick

5 '94 as one their expert would deal with is something

6 that was a tactical decision on their part.  But they

7 ought to be held to the dates that we specified, which

8 are the '91, '92 and '92 dates.

9              THE COURT:  Yes.

10             MS. MULLIN:  Well, if I can read to you

11 from paragraph 97 of Dr. Adams' report which was

12 submitted.

13             If the '775 and '239 patents are not

14 deemed to be entitled to the March 1992 or earlier

15 priority date, the Adair 1992 reference does not

16 anticipate the asserted claims for at least the

17 following reason, and then he goes on and gives them.

18 So there is one example where he specifically addressed

19 art that was not available to the earlier applications,

20 but would have been available to the -- or is available

21 potentially to the 1994 application.  And he

22 specifically addressed Abbott's 102 and 103 invalidity

23 contentions in that context.

24             In the context of enablement, he talked

25 about the breadth of the claims including claims that

1    were -- well, if the breadth of the claims that are

2    present in the issued applications which would apply

3    regardless of the priority application, the level of

4    skill in the art, and he also talks specifically about

5    what was available, for example, for enablement, what

6    was available to those skilled in the art in 1991, in

7    1992.  He referred to actually a chapter in a book that

8    was written by Dr. Marks, Abbott's expert, in 1995.

9             So there is a lot of information in Dr.

10   Adams' report, and he specifically says, look, whatever

11   was available in 1991 applies to 1991 application and

12   forward.  Whatever was available in 1992 applies to the

13   1992 application and forward.  I mean, that's the way

14   enablement works.  You get the benefit of everything

15   that's available prior to the date.

16            So, I think to suggest that Dr. Adams has

17   not addressed opinions that are relevant to the 1994

18   priority date is just wrong.

19            THE COURT:  Well, it sounds like I am

20   going to have to read the report to -- have y'all

21   submitted that?

22            MR. LEE:  We have, Your Honor, and if we

23   could just draw your attention when you consider it to

24   paragraph 157 and 198.  157 is the specific provision

25   that deals with his opinions on enablement.  And it

1  begins:  I have reviewed the March 1991 and March 1992

2  and September 1992 application and understand what is

3  disclosed therein, and then he gives his opinion on

4  those three.

5            Paragraphs 197 and 198 deals with written

6  description, and he says, I point to specific portions

7  of the 1991 and 1992 applications.

8            THE COURT:  Now which ones do you want me

9  to make sure I read?

10           MS. MULLIN:  At least paragraph 97 that I

11  think I just pointed out.  173, 162, 159, 174, 197.  And

12  one of the issues here is for purposes of written

13  description and for purposes of enablement even if for

14  example Dr. Adams had only opined and he had only

15  provided an opinion that all of the pieces were there in

16  1991 to enable somebody, a person of ordinary skill in

17  the art to make and use the claimed invention without

18  undue experimentation, even if that is his only opinion,

19  it applies to later points in time as well, and he said

20  that explicitly several places in his report.  It is not

21  just 1991, it's not just 1992, this body of knowledge

22  that is available to a person of ordinary skill in the

23  art, whatever is available in '91 is available in '94,

24  whatever is available in '92 is available in 1994.

25           THE COURT:  I am going to review the

1   report with your arguments and give you a ruling.

2                  I think I have given you the ruling on

3   No. 6, haven't I?

4                  MR. BECK:  Your Honor, our position is

5   that you did.  I think that their Motion in Limine No.

6   5, I think is the flip side of what you were saying

7   about --

8                  THE COURT:  Okay.  I was going to say, I

9   explained to you what you could and couldn't do.

10                  MR. BECK:  Yes, sir.

11                  THE COURT:  And I have told you on No. 7,

12   I am going to give you what was said between the parties

13   on pre-license.  I deny No. 7.

14                  Now, Mr. Beck, I wanted you to address

15   No. 8 if you could.

16                  MR. BECK:  Your Honor, may I defer that

17   to Mr. Lee?

18                  (Laughter.)

19                  THE COURT:  No, no, because I wanted you

20   to explain how a United States District Judge could

21   disregard all of the Federal Circuit opinions, that we

22   take the little language out of one U.S. Supreme Court

23   case and say, the Circuit has been wrong all of these

24   years, so I'm going to go with this interpretation here.

25                  MR. BECK:  Your Honor, my suggestion is

```
 1   that the Court not do that.
 2              THE COURT:  All right.  It is denied.
 3   Thank you.
 4              But it is preserved for the record.
 5              I understand what you are doing, I just
 6   -- I just couldn't pass up that opportunity.
 7              MR. BECK:  That is all we're trying to do
 8   is to preserve our point, Your Honor.
 9              THE COURT:  Let's see, I have given you
10   see -- do y'all still believe we can do this in
11   12-and-a-half hours per side, correct?
12              MR. ELDERKIN:  Yes, Your Honor.
13              MR. LEE:  Yes, Your Honor.
14              THE COURT:  All right.  I have given you
15   your time.  What else do you --
16              Okay.  We pick a jury on Friday.  You
17   know, we're going to seat ten jurors, you will get four
18   strikes each.  We have got both sides who have picked
19   juries in here before, so you know what the procedures
20   are.
21              You can use -- 30 minutes per side.  The
22   Court will give them a few preliminary instructions.  I
23   have changed my procedure a little bit, you can use up
24   to five minutes of that time to tell them what you
25   believe the case is about.  That means that Mr. Beck
```

```
 1   would like to make his first opening statement, but
 2   don't go -- don't get too overboard, I can just stand so
 3   much.  You know, Judge Steger still comes back and
 4   haunts me since I have changed my rule about that.
 5              MR. BECK:  And I understand you have to
 6   stay pretty close to the podium, is that correct?
 7              THE COURT:  Arm's length, you have got to
 8   be able to touch the podium.  So, don't come in here
 9   with any trick up your sleeve to slide out some fake
10   arm.
11              (Laughter.)
12              THE COURT:  What else do we need to talk
13   about today?
14              MR. BECK:  Judge, I don't know if the
15   Court was just planning on ruling this, but the
16   Plaintiffs' Motion in Limine No. 7 which raises an
17   authenticity issue.
18              THE COURT:  Well, maybe I missed it.
19              MR. BECK:  And as I understand their
20   motion, they are trying to preclude us from presenting
21   evidence regarding the testing of the samples.
22              THE COURT:  I denied that motion.
23              MR. BECK:  Okay.  I just wanted to make
24   sure.  Thank you.
25              MS. ELDERKIN:  Your Honor, part of that
```

1 motion, if I may.  I understand your ruling that the

2 sample testing will come in.

3            There was a declaration that Abbott

4 produced to us, again after discovery, from a third

5 party from UCB, a British company, who had purportedly

6 provided the sample that Abbott's witness tested.  The

7 declaration has more in it than just, yes, we sent them

8 a sample.  It has information in the declaration about

9 how this antibody, which apparently was created in the

10 early '90s, was stored over this period of 15 years, how

11 it was shipped, under what conditions it was shipped.

12 All information that is very relevant to the legitimacy

13 of the testing.  And again, this declaration was

14 produced to us after discovery.  We have objected to it

15 on the witness list -- I mean, on the exhibit list, but

16 since it is mentioned in our opposition to their -- or

17 mentioned in our Motion in Limine with respect to the

18 sample, I just wanted to clarify whether your ruling

19 subsumes that as well, and if you are ruling that that

20 declaration comes in.

21            THE COURT:  No, I am not ruling at all

22 that the declaration comes in, but I'm allowing them to

23 say what testing they did.

24            MS. ELDERKIN:  Okay.  Thank you.

25            THE COURT:  The rule in this Court is

1  that experts may rely on hearsay, but experts cannot

2  then start reciting hearsay that they have relied on.

3  That is not a catch-all.  That only applies -- that rule

4  is only lax in the National Trial Competition because

5  the problem we had this year, they would block out any

6  evidence in that the expert -- they hadn't been able to

7  regurgitate everything.  Mr. Beck knows about that

8  problem, so I was just looking at him.

9             But anyway, this Court's general rule is

10  that they don't get to regurgitate the hearsay from the

11  witness stand.  It is still hearsay, but they can rely

12  on it.

13             Yes, sir.

14             MR. LEE:  The declaration was offered

15  under Federal Rule of Evidence 902-11, so it is an

16  exception to hearsay rule to make -- just for the

17  limited purposes that 902-11 allows.

18             THE COURT:  Well, I have just given you a

19  general statement, now if it's admissible on its own as

20  a separate exhibit, y'all are going to take that up with

21  Judge Everingham on the 12th.

22             So, I am not -- I am denying your Motion

23  in Limine as far as the testing, I am not ruling on the

24  admissibility of the affidavit or the declaration,

25  whether or not 907 or -- what, 907?

```
 1                    MR. LEE:  902, Your Honor.
 2                    THE COURT:  I thought it was 902, but I
 3 wasn't going to challenge you.
 4                    MR. LEE:  I apologize.
 5                    THE COURT:  That's all right.  Okay.
 6                    MR. BECK:  Just to make sure that I'm
 7 clear on what the Court's ruling is.
 8                    We want Dr. Marks, who will be our
 9 expert, to be able to rely on the testing, he may not go
10 into all the way it was done and so on, but we just want
11 to make sure that he can do that because otherwise we're
12 going to have to try to get another witness from
13 Washington.
14                    THE COURT:  I said he could rely on the
15 testing.
16                    MR. BECK:  Okay.
17                    THE COURT:  That is the way I understood
18 the Motion in Limine.
19                    MR. SAYLES:  And, Judge, I would assume
20 that we would --
21                    THE COURT:  Now be careful about assuming
22 anything.
23                    MR. SAYLES:  Well, I'm asking.  We would
24 be able to challenge the expert on the weakness in the
25 hearsay that that expert has chosen to rely on, if they
```

1 are not going to bring the person here that can support

2 it.

3             THE COURT:  Absolutely, but, you know,

4 what the -- you have got to be careful about once you do

5 that, Counsel, you have not only opened the door, you

6 have kicked it open.

7             MR. SAYLES:  That is right, but if it's

8 weak enough, it may be worth it.

9             THE COURT:  Well, that is your choice in

10 life, that is not my choice.  I don't have to make those

11 choices any more.

12             MR. SAYLES:  Yes, sir.

13             I have two points that I wanted to raise,

14 Your Honor.

15             First, and I know that the Court may not

16 get involved in this, but since Abbot has 14 may-call

17 witnesses, we had hoped that we could get 24 hours

18 notice of who they would actually call off of that may-

19 call list before they are called.  They proposed to give

20 us a much shorter time, like 7:00 o'clock the night

21 before.  And I don't know if we're just left to our own

22 devices to work that out?

23             THE COURT:  I think that the Court --

24 yes, sir, Mr. Beck.

25             MR. BECK:  Judge, just to try to short

1  circuit this, I always work out an agreement with

2  counsel where we give advance notice of who is going to

3  be called.  Maybe the night before is too late, but I

4  think 24 hours is too long because as the Court knows

5  schedules change and there are problems.  I really think

6  we can work out some kind of an agreement between the

7  two respective positions, and I will certainly commit to

8  do that.

9              THE COURT:  Well, if you can't, I will

10  work it out for you.  Why don't y'all see if you can't.

11              MR. BECK:  Yes, sir.

12              MR. SAYLES:  And, Judge, the final thing

13  is, I know we're on a clock and we intend to abide by

14  if, of course, but in the order of proof, it's our

15  expectation that we'll prove infringement and damages

16  and until the defense puts on an invalidity case, that

17  we won't be required to rebut it in our case-in-chief.

18              THE COURT:  Well, not only will you not

19  be required, I won't allow you to do it, to start

20  attacking their validity case in your case-in-chief.

21              MR. SAYLES:  Very good.

22              THE COURT:  You don't get to muddy the

23  water, in other words, any more than it is already

24  muddied by me.  Anything else?

25              MR. BECK:  Not from our side, Your Honor.

1          MS. ELDERKIN:  That is all.

2          THE COURT:  All right.  I would like to

3    see Mr. Sayles and Mr. Beck in chambers.

4          COURT SECURITY OFFICER:  All rise.

5          (Court adjourned.)

6

7

8

9

10

11

12                    CERTIFICATION

13

14          I HEREBY CERTIFY that the foregoing is a

15   true and correct transcript from the stenographic notes

16   of the proceedings in the above-entitled matter to the

17   best of my ability.

18

19

20

21   _____          _____

     SUSAN SIMMONS, CSR                         Date
22   Official Court Reporter
     State of Texas No.:  267
23   Expiration Date:  12/31/08

24

25