```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   CENTOCOR, INC., ET AL.,  )(

 5                            )(   CIVIL DOCKET NO.

 6                            )(   2:07-CV-139-TJW

 7   VS.                      )(   MARSHALL, TEXAS

 8                            )(

 9                            )(   JUNE 12, 2009

10   ABBOTT LABORATORIES      )(   9:20 A.M.

11

12                     PRE-TRIAL HEARING

13         BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

14             UNITED STATES MAGISTRATE JUDGE

15

16   APPEARANCES:

17

18   FOR THE PLAINTIFF:   (See Attorney Sign-In Sheet)

19

20   FOR THE DEFENDANT:   (See Attorney Sign-In Sheet)

21

22   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
23                        2593 Myrtle Road
                          Diana, Texas  75640
24                        (903) 663-5082

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

```
1                        I N D E X

2

3    June 12, 2009

4                                              Page

5        Appearances                          1

6        Hearing                              3

7        Court Reporter's Certificate         88

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    THE COURT:  Be seated.  Morning.

 3                    We've got a hearing on the pre-admission of

 4      exhibits and deposition designations in 2:07-CV-139.

 5      It's Centocor against Abbott Laboratories.

 6                    What says the plaintiff?

 7                    MR. SAYLES:  May is please the Court, Dick

 8      Sayles for the plaintiffs.  We're ready to proceed.

 9                    THE COURT:  Okay.  And for the defendant?

10                    MR. BECK:  Your Honor, David Beck and Amy

11      Wigmore for Abbott.  We're ready to proceed.

12                    THE COURT:  Okay.  All right.  I received in

13      chambers yesterday afternoon a letter outlining, I

14      guess, the larger categories of disputed exhibits.

15                    Tell me -- tell me what your agreements are

16      at this point and what y'all need me to rule on.

17                    Mr. Sayles, do you want to --

18                    MR. SAYLES:  Well, Your Honor, I'd like to

19      introduce our team.  I do have some that I'm going to

20      address, but the agreements have been kept up by

21      Ms. Verrechio, I believe, or Matt Pearson.

22                    THE COURT:  Okay.

23                    MR. SAYLES:  So we can tell you what those

24      are.

25                    THE COURT:  Okay.
```

```
 1              MR. SAYLES:  Steve Maslowski.
 2              THE COURT:  Okay.
 3              MR. MASLOWSKI:  For Centocor.  Your Honor,
 4    we've removed most of our objections to defendant's
 5    exhibits.  So in terms of addressing categories, I'll
 6    address both parties' exhibits.  There's nothing to deal
 7    with in that sense.  We have a large number of exhibits
 8    that are objected to.  We've categorized them ourselves.
 9    I'm not sure, the letter you're referencing, is that
10    from defendant's counsel?
11              THE COURT:  It is.
12              MR. MASLOWSKI:  Okay.  I'm not sure we've
13    seen a copy of that letter, so I'm not sure the
14    categorizations that they've given to the documents.
15              THE COURT:  Well, all it says is how
16    unreasonable you were being.
17              MR. MASLOWSKI:  That's to be expected, Your
18    Honor.  So like I said, we --
19              THE COURT:  It didn't say that.
20              MR. MASLOWSKI:  We have broken down our
21    exhibits to which they've objected to into different
22    categories that we're, of course, happy to talk about.
23    We've eliminated some objections this morning.
24              THE COURT:  Okay.  Why don't we do it this
25    way, I'd like to proceed through the -- get the
```

```
 1   plaintiff's exhibits pre-admitted, and then I'll go to
 2   the defendant's exhibits, get those pre-admitted to the
 3   extent -- to the extent I can, then we'll move on to
 4   deposition designations in the same order.
 5             So why don't -- from the plaintiff's
 6   standpoint, why don't you tell me what you want to
 7   pre-admit to which there's no objection being made?
 8             MR. MASLOWSKI:  We have a pretty lengthy
 9   list, Your Honor.  Would you like us to read it into the
10   record?
11             THE COURT:  Well, I don't need you to read
12   it in the record if it's all on the same list, and you
13   can just refer me -- refer it to me, and I'll just admit
14   those that are on the list.
15             MS. VERRECCHIO:  There -- Your Honor, there
16   were additions added to the list this morning from the
17   list that you received last night.
18             THE COURT:  Okay.
19             MS. VERRECCHIO:  I can tell you what the
20   additions are to the list from last night, and that
21   would be complete for our pre-admissions.
22             THE COURT:  Okay.  Well, for purposes of the
23   record, the list that I've got is entitled Plaintiff's
24   Trial Exhibit List With Defendant's Objections.  Is
25   that --
```

1              MS. VERRECCHIO:  No.

2              MR. MASLOWSKI:  You should have received two

3    lists.  There was one with objections and one without.

4    We will -- can we hand this up?

5              MR. STRACHAN:  Your Honor, if I may --

6              THE COURT:  Yes.

7              MR. STRACHAN:  -- I've got a clean copy.

8              MS. WIGMORE:  May we have a copy?  We

9    haven't seen that.

10             MR. STRACHAN:  It's what we sent last night.

11   Did we send that to you last night?

12             MS. WIGMORE:  I did not receive it if it was

13   sent.

14             MR. STRACHAN:  Your Honor, there's

15   plaintiff's list of trial exhibits for pre-admission to

16   which there's no objection, and that's what she's

17   referring to.

18             THE COURT:  Okay.

19             MS. VERRECCHIO:  And then there's a couple

20   of additions that we worked out this morning.

21             THE COURT:  Well, have -- has the defendant

22   been provided with --

23             MS. WIGMORE:  We have not, Your Honor.  We

24   would like to see that, and, actually, are there new

25   exhibits on that list that were not --

1          THE COURT:  Okay.  Tell you what, I'm going

2   to recess until 9:30, and y'all talk about what is not

3   objected to and make sure that you've got your lists in

4   order, and I'll see you in 10 minutes.  We're in recess.

5          COURT SECURITY OFFICER:  All rise.

6          (Recess.)

7          COURT SECURITY OFFICER:  All rise.

8          THE COURT:  Please be seated.  Mr. Sayles --

9          MR. SAYLES:  Yes, sir.

10         THE COURT:  -- which exhibits are y'all

11  offering to which there have been no objection made?

12         MR. SAYLES:  Your Honor, I have a list here

13  of objection -- of exhibits to which there is no

14  objection that consists of 31 pages, and I can provide

15  it to the Court or read them into the record, whichever

16  is preferable.

17         THE COURT:  Just provide it to the Court.

18  Has counsel for the defendant had the opportunity to

19  review it?

20         MS. WIGMORE:  Your Honor, we're making our

21  way through.  Thus far, it appears to be accurate.

22  We've discussed with the other side that to the extent

23  there are any discrepancies, that we would talk about

24  them afterwards.

25         The one question that I do have is their

1    number of physical exhibits and demonstratives toward

2    the end which are not agreed upon for pre-admission.

3              MR. MASLOWSKI:  Right.  Here, we can take

4    this off.  Here.

5              THE COURT:  What number do those start with?

6              MS. WIGMORE:  So they begin --

7              MR. MASLOWSKI:  825.

8              MS. WIGMORE:  Yeah, and, actually, starting

9    with 805.

10             MR. MASLOWSKI:  No, it's 825.

11             MS. WIGMORE:  Well, it's not demonstratives,

12   but 805, I just want to make sure that that matches up

13   with the list that we had.  We had objected to -- oh,

14   no, we didn't.  Never mind.

15             Yeah, it's starting with 812, and with

16   respect to demonstratives and physical exhibits, we have

17   no objection to working with our -- the other side to --

18   to share and perhaps agree in advance, but we have not

19   done that, so we would object to any pre-admission of

20   demonstratives.

21             THE COURT:  Okay.  Well, all right.  Subject

22   to your having the opportunity to complete your review

23   of plaintiff's list of trial exhibits for pre-admission

24   to which there's no objection, the Court will admit PX 1

25   through PX 805 contained on that list, and y'all meet

1  and confer and let me know of any agreements by, you

2  know, by -- does close of business Monday give you

3  enough time to -- to look at the demonstratives and the

4  physical exhibits that are on there, or do you need

5  until Tuesday?

6          MS. WIGMORE:  Well, we had a separate

7  arrangement with respect to demonstratives, so we

8  don't -- we don't actually have all of these

9  demonstrative physical exhibits.  We would object to the

10 concept of pre-admitting demonstratives since many of

11 them shouldn't go back to the jury in our view.  They're

12 simply just --

13         THE COURT:  Well, that's -- I mean, I agree.

14 I just didn't know -- well, I don't know what your

15 agreement is with respect to the demonstratives.  I

16 would not ordinarily pre-admit as substantive evidence

17 demonstratives or, you know, physical models or things

18 like that.

19         MS. WIGMORE:  And that is our position.  So

20 we think those should not be on the list at all, but by

21 the close of business Monday, we can certainly confirm

22 the accuracy of the list, probably even before that.

23         THE COURT:  Okay.  Well, then PX 1 through

24 PX 805 are pre-admitted subject to my statements

25 concerning your ability to review the list for its

1  accuracy.

2          MR. MASLOWSKI:  Your Honor, just to clarify,

3  I believe our list goes up to 853.  Does the copy you

4  have go up to 853?  We cut out the demonstratives, and

5  then, actually, there are a few exhibits that followed

6  the ones that we cut out.

7          THE COURT:  Well, my list does go to 853,

8  and I had assumed that the demonstratives were all at

9  the end.  So which -- where do the demonstratives stop?

10          MR. MASLOWSKI:  The demonstratives stop at

11  813, and the exhibits start back up at 841.

12          THE COURT:  Well, then, 841 through 853,

13  then, are also pre-admitted.

14          MR. MASLOWSKI:  Thank you.

15          THE COURT:  All right.

16          MR. SAYLES:  May it please the Court.

17          THE COURT:  Mr. Sayles.

18          MR. SAYLES:  I have two categories of

19  documents to which there are objections.  It covers

20  about 60 exhibits, but there are really only two

21  categories, and if -- if the Court please and if it's

22  the time that the Court wishes to do that, I'm ready to

23  address those specific exhibits and offer them into

24  evidence.

25          THE COURT:  I am, too.  So tell me what the

1   categories are and which exhibits.

2         MR. SAYLES:  All right.  The first one would

3   be Exhibit 328, which is from a publication called

4   Science Magazine.  I know it's in your book there, but I

5   have it for the Court so you don't have to dig through

6   it, if I may approach.

7         THE COURT:  Please.

8         MR. SAYLES:  This document is representative

9   of the first category, which would also include

10  Exhibit 408 and 409.  We offer these in evidence.  This

11  document, as you can see from the cover and the page of

12  the contents, is a publication from July of 1991.

13        The important part is the part on the last

14  page which is of the Cambridge Antibody Technology

15  Limited Company, and what this is, it is an

16  advertisement in this scientific journal that is saying

17  to the public that their technology is available for

18  licensing.

19        One of the defensive positions taken in this

20  matter is that there are only a handful of people in the

21  world that could make human antibodies back during the

22  time frame in question in this case.

23        We offer this to show that not necessarily

24  for the truth of the claims made by CAT Technology here

25  but to show that this was known and available to people

1   involved in this scientific field at the time of this

2   publication and was publicly available.  They have not

3   raised a relevance objection.  They claim that it's

4   prejudicial.  They claim that it is hearsay.

5          We submit that it meets the -- the condition

6   of 803.17 as a list or directory.  We also submit that

7   it's not offered for the truth and so the hearsay rule

8   doesn't apply.

9          THE COURT:  And what purpose are you

10  offering it for if not for the truth?

11         MR. SAYLES:  We are offering to show that

12  the technology was known and available in the industry,

13  two scientists who were involved in genetic engineering

14  and in building and replicating human antibodies.

15         THE COURT:  And how is that not for the

16  truth of what's stated in this article?

17         MR. SAYLES:  Well, their technology might or

18  might not work.  That would be the truth.  But that it

19  is being advertised as being available for licensing is

20  the point.  And they do cite in the footnote in those

21  references the references to their technology which is

22  contained in other documents that will be in evidence.

23  So that's -- that's the purpose of it.

24         Now -- and I will add too, Judge, no one in

25  this case claims that the Cambridge Antibody Technology

1    did not work actually.  But we're not offering this to
2    show that it did.  We're offering to show that it was
3    available and people who were knowledgeable in the field
4    would know that.
5              MS. WIGMORE:  Your Honor, may I respond?
6              THE COURT:  Yes.
7              MS. WIGMORE:  This is classic hearsay, and
8    it is being offered for the truth.  A key issue in this
9    case is whether human antibodies were enabled as of this
10   time period.
11             This is third-party statements.  They
12   haven't taken any discovery from CAT, which they could
13   have.  And a key issue in the case is how long it took
14   from this time to when an actual human antibody meeting
15   the scope of their claims was achieved.  Whether they
16   say it's being offered for the truth or not, that is the
17   purpose, and it will confuse the jury even if it were
18   offered for some limited purpose.
19             It's not a scientific article.  It's an
20   advertisement.  You know, you need to cross examine the
21   people who wrote this to see what was true and what was
22   untrue, and they haven't done that.
23             MR. SAYLES:  Judge, if I may respond to
24   that, the Cambridge Antibody Technology that has been
25   discussed by both technical experts, and, in fact, it

1  was the Cambridge Antibody Technology group that

2  actually made the accused product, Humira, here.  So

3  that all goes to the weight of this evidence.

4            MS. WIGMORE:  We have no objection to the

5  discussion of the technology.  What we have an objection

6  to is an advertisement that's from a third party who is

7  not in court to testify about it.

8            THE COURT:  Well, I tell you what I'm going

9  to do, Mr. Sayles, I'm not going to pre-admit these.

10  I'm not excluding them, but I'm just not going to

11  pre-admit them as exhibits.

12            MR. SAYLES:  All right.

13            THE COURT:  When the time comes to use them

14  with your technical expert or whomever you wish to use

15  them with, you can lay a foundation at that time for

16  their use that demonstrates that you're not offering

17  them for the truth.

18            You know, as I see it, based on the

19  argument, what you're offering it for is to show that

20  the technology was there and it was known, and that

21  seems to me to be offered for the truth.  So that's why

22  I'm not -- not pre-admitting it.  There may be a

23  different purpose for which you can offer it at the

24  time.

25            MR. SAYLES:  All right.  And, Your Honor, in

1   the effort for expediency, 408 and 409 are similar

2   advertisements from the NIH Magazine and from Nature

3   Magazine involving technology in this field from

4   Novagen, and I would assume naturally the Court is

5   handling those in the same way.

6           THE COURT:  I'll carry -- my same ruling.

7           MR. SAYLES:  All right.  The next category

8   of documents that -- that I wish to discuss are

9   attachments to our damage expert witness' report,

10  Dr. Richard Gering, and I offer in evidence Exhibits

11  493, 496 through 554 in evidence.

12          These are all of a similar nature.  These

13  are summaries of documents that were reviewed by

14  Dr. Gering.  And let me say that the testimony in this

15  case is that he reviewed approximately three million

16  pages of documents, so the documents are quite

17  voluminous.  They are both Abbott documents, and they

18  are Centocor documents, and they have all been produced

19  in this case and available to both sides.

20          These various documents, and I'll show you a

21  couple of examples in a moment, are a summary of Abbott

22  sales in the U.S., Abbott sells ex-U.S, a reasonable

23  royalty base calculation, lost profits by indication,

24  and by the way, I want to mention in this case, these

25  drugs address five different disease processes, so there

1    are five different indications, and the -- the approvals

2    and uses of these drugs for these indications are on

3    various dates, and so, consequently, it makes the volume

4    of data high to analyze each of these separately, and it

5    makes it very complex.

6            In addition, these documents show a summary

7    of Centocor's Remicade sales.  That's the plaintiff's

8    drug.  It's shows a summary of Abbott's Humira sales,

9    the accused product.  There are documents that show

10   calculations that are adjustments to the market assuming

11   that there's no Humira on the market, and that's by

12   indication.  There are calculations of the source of

13   patients, and I know that sounds a little unusual, but

14   source of patients is a concept that's very involved

15   here.

16           For each indication, one must ask if this

17   patient has ever been on any of the competing drugs,

18   they're called Bionaive, or if they are on, let's say,

19   Remicade as a result of a Humira failure because some

20   patients respond to each of these drugs better than

21   others.  All of that is analyzed and summarized in these

22   documents.

23           And there is a calculation of the Remicade

24   profit and loss.  There's a calculation of the Humira

25   profit and loss.  There's a calculation of -- of each of

1    these items and in detail, and I want to show you just a

2    couple of examples, and then I'll give you the legal

3    basis upon which we believe these should be admitted.

4            The first one is 493, which I'm putting up,

5    and I'll see if I can -- it's a summary of the damages

6    of reasonable royalty and lost profits.  The next one is

7    Exhibit 497, and I've marked on this in red pen and

8    highlighter, this is to show the Court in just

9    calculating the royalty base calculation, there are four

10   years involved.  There are five indications involved.

11   There is the United States, and there is international,

12   and so a summary of these voluminous documents would be

13   helpful.

14           The next example is Exhibit 500, which is a

15   summary of profits by indications, and as you can see,

16   it goes across the relevant years from 2006 to 2009 and

17   goes down for the five indications.

18           And then here is an example in Exhibit 502,

19   and 503 is second page of 502, taking one indication,

20   rheumatoid arthritis, which actually happens to be the

21   largest category, and this is the detail in summary

22   fashion of an analysis of the lost profit s and

23   reasonable royalty in the U.S. on rheumatoid arthritis.

24   This is done for each indication, and that's part of

25   these documents.

1          And then I mentioned the concept of

2    switching and what's the source of the patient.

3    Exhibit 544 is a good example of that, and that is --

4    shows percentages in the disease ankylosing and

5    spondylitis of where users of Humira come from.  46

6    percent under Remicade would be -- 46 percent would have

7    been Remicade failures, and 54 percent would have been

8    Enbrel failures.

9          So there are 60 of these documents.  We

10   submit under Federal Rule of Evidence 1006 that these

11   are calculations and summaries, and in a case of this

12   nature where the damages calculation is highly complex,

13   involves voluminous documents, that the Court can and

14   should permit the use of summaries which these are.

15          THE COURT:  Well, is it your representation

16   that the exhibits you wish to offer are summaries of

17   both the sales and P and L data in addition to the

18   opinions of your exhibit which are going to be offered

19   at the time of trial?

20          MR. SAYLES:  They -- it is his opinion as to

21   what the result is.  It's his calculation actually of

22   damages.

23          THE COURT:  In addition to the hard data

24   that's contained in the --

25          MR. SAYLES:  Yes.

```
 1                THE COURT:  -- the documents themselves.

 2                MR. SAYLES:  Yes, it is.

 3                THE COURT:  But you're going to -- okay.

 4                MR. SAYLES:  Yes, it is.

 5                THE COURT:  What's the response?

 6                MS. WIGMORE:  The response, Your Honor, is

 7    that that's precisely the problem.  These are opinion

 8    documents.  They should not be pre-admitted for the

 9    truth.  That's his position.  If he wants to use

10    demonstratives, we would have no objection upon review

11    in advance, but these are not just summary documents.

12    They are his using his methodology to calculate lost

13    profits and reasonable royalty.

14                So to pre-admit an exhibit that says this is

15    the lost profit is basically just allowing their

16    opinions to become evidence in the form of a written

17    document.

18                We think this should be used with the

19    witness as a demonstrative but not admitted in evidence,

20    and we would reserve the right to object to some of

21    them.  There are over 100 on their list, 56 of which

22    Mr. Sayles has just referenced.

23                MR. SAYLES:  We removed all but the ones

24    that I referenced, and I think you were advised.

25                THE COURT:  Well, but doesn't 1006, though,
```

1    allow the Court to admit summaries of both voluminous

2    documents as well as the testimony that's offered at the

3    time of trial?

4               MS. WIGMORE:  I don't believe that 1006

5    allows for an expert's opinion, including the underlying

6    calculations, which are not even revealed on these

7    documents to go back as an exhibit offered for the

8    truth.

9               THE COURT:  Okay.  Well, I'll carry that

10   objection.  Ordinarily, Mr. Sayles, I would let them be

11   used as demonstrative purposes, but I understand your

12   argument --

13              MR. SAYLES:  Yes, sir.

14              THE COURT:  -- that based on the -- the

15   complexity of this particular calculation, I'm going to

16   look at -- I'll look at 1006.  If I think they qualify

17   as summary under the Fifth Circuit case law, I'll let

18   them, okay?

19              MR. SAYLES:  All right, sir.  Yes, sir.

20              MS. WIGMORE:  Your Honor, just for

21   clarification, are they being let in or are we --

22              THE COURT:  I'm carrying the objection.

23              MS. WIGMORE:  Okay.  Thank you.

24              THE COURT:  Okay?  This wasn't one of the

25   categories that was revealed in the letter that you sent

 1  me last night, so I hadn't pulled --

 2            MR. SAYLES:  Well, Judge --

 3            THE COURT:  -- pulled my case law out yet.

 4            MS. WIGMORE:  Understood.

 5            MR. SAYLES:  I think for 63 documents, I'm

 6  in a tie on those, and so those are the ones that I'm

 7  prepared to address and that I've offered, and I will

 8  yield to my colleagues to address the other categories

 9  if it please the Court.

10            THE COURT:  Okay.  Thank you, Mr. Sayles.

11            MR. MASLOWSKI:  May it please the Court.

12  Steven Maslowski for Centocor.

13            Your Honor, I'd like to start by addressing

14  the marketing documents, and the first category of

15  marketing documents to which I'll refer to include

16  Exhibits 87, 579, 582 through 585, 587, 590, 591, 593

17  through 649 and 679 through 685.

18            These are all identical documents, and all

19  of the document exhibit numbers that I just read which

20  Centocor seeks to have admitted into evidence are market

21  research monthly reports of Abbott's, and they are

22  month-by-month reports that are prepared by Abbott's

23  marketing department to assess the competitive landscape

24  in this business.

25            Abbott has objected primarily on hearsay

1   grounds.  There were a few foundation grounds.  They're

2   clearly Abbott documents.  They're not hearsay.  They're

3   admissions by Abbott, and Centocor seeks to have them

4   admitted into evidence.

5           MS. WIGMORE:  Your Honor?

6           THE COURT:  What's the objection?

7           MS. WIGMORE:  The objection is that many of

8   these documents contain embedded hearsay and opinion.

9   We understand --

10          THE COURT:  Of whom?

11          MS. WIGMORE:  Of sometimes surveys that were

12  taken from physicians or customers.

13          THE COURT:  Who commissioned the surveys?

14          MS. WIGMORE:  It often was Abbott, or they

15  would attend a conference where material was discussed.

16          And we don't have an objection, per se, to

17  the use of these documents.  Our problem is that the

18  sheer volume and not knowing the purpose for which

19  they'll be used, what portion of the documents will be

20  used.  We've been trying with Centocor and NYU's

21  attorneys to narrow the group and reach some global

22  agreement since we have similar documents which we have

23  tried to narrow down.

24          As of last night -- and some have been

25  withdrawn, but as of last night, there were

1   approximately 172 of these types of documents, some

2   Abbott, some Centocor, on Centocor's list.  We had

3   narrowed ours down to approximately 21.

4           So our problem is to agree in the abstract

5   of these coming into evidence without any indication

6   they'll use them with a witness.  They'll just be dumped

7   into the record.  Who knows what purpose they'll be used

8   for.

9           So we'd prefer either that we narrow down

10  the list and reach a global agreement or require that

11  they be used with some witness so that we can cross

12  examine on those aspects that are hearsay, not just

13  Abbott statement hearsay, but third-party statement

14  hearsay.

15          THE COURT:  Well, can't you call a witness

16  that was involved in preparing your documents?

17          MS. WIGMORE:  Well, our problem is we don't

18  know which ones they're going to use.  There are more

19  than 100 of them.  If we can narrow down the list, we'd

20  be happy to reach an agreement, but it's just too long

21  of a list and too voluminous documents to agree in

22  advance to have these admitted into the record.

23          THE COURT:  Well, I'm going to overrule the

24  objection.  I'll pre-admit those, and I'm going to do

25  likewise with respect to your -- the documents that you

1    wish to pre-admit that fall under the same category.

2              Okay.  What's the next category?

3              MR. MASLOWSKI:  Your Honor, time -- well,

4    I'll address another category that are similar Abbott

5    documents, and I think they may fall into the same

6    category.

7              These are different types of studies.  These

8    are, again, Abbott business documents commissioned by

9    Abbott.  They do them routinely.  For example, this

10   document, which is Exhibit 379, is a -- what's called a

11   Gastro ATU whereby Abbott assesses the gastro views or

12   assesses the views that gastroenterologists in the

13   market understand the market and understand physician

14   perceptions.

15             A number of these documents, which include

16   Centocor, are Plaintiff's Exhibits 297, 299, 378, 379,

17   380 through 383, 386, 387, 389, 390, 458, 677, and 678.

18             Centocor seeks to have those documents

19   admitted into evidence.  As with the last category of

20   documents, Your Honor, again, these are not hearsay.

21   The objection stated is hearsay.  They're not hearsay.

22   They're Abbott documents.  Yes, they include third-party

23   studies, as well, but those statements as well as with

24   the previous documents do not qualify as hearsay because

25   Abbott has adopted a belief in their truth under 801

1    they're not hearsay, and these documents are admissions

2    by Abbott.  They should be admitted into evidence.

3             THE COURT:  Tell me what exhibit number

4    this --

5             MR. MASLOWSKI:  The one you're looking at,

6    379.

7             THE COURT:  -- this exemplar is.

8             MR. MASLOWSKI:  And to put these marketing

9    documents in context, Your Honor, their attack on our

10   damages/lost profits analysis is that their expert

11   opines that there's insufficient data in this case to

12   calculate lost profits in this market.

13            Our expert, in fact, relied on all of these

14   types of documents in calculating lost profits.  So,

15   unfortunately, the volume of the evidence is directly

16   relevant to the issues in this case.

17            THE COURT:  Is it your representation that

18   379 is representative of that category?

19            MR. MASLOWSKI:  That is correct, Your Honor.

20            THE COURT:  All right.  Same objection?

21            MS. WIGMORE:  Same objection.  This

22   Exhibit 379, I believe you'll see there are quotations

23   from physicians that appear in the document.  We

24   disagree that just because a statement appears in an

25   Abbott document it's an adoptive admission.

1          That is hearsay, and, again, we think this

2    needs to be addressed on a case-by-case basis so at the

3    very least, the hearsay nature of the -- the documents

4    or the portions of the documents we're concerned about

5    could be brought out.  Again, you know, a dump into the

6    record of hundreds of documents without any context

7    is -- we view that as a troubling concept and think they

8    should be used through a witness at trial.

9          THE COURT:  Okay.  I'll overrule the

10   objection, as well.  Those are pre-admitted.

11         MR. MASLOWSKI:  Your Honor, in the interest

12   of minimizing our time here, I'm going to yield the

13   floor to my colleagues to move a couple more categories

14   forward, and I'll be back up on other marketing issues.

15         THE COURT:  Okay.

16         MR. PEARSON:  Your Honor, I have three

17   categories of documents.  First, there are several

18   scientific publications, one of which I'm putting up

19   here, PX 48.

20         This is an article from the Lancet in 1993

21   that describes the use of the antibodies, anti-TNF

22   antibodies that treat disease.  In fact, this study is

23   one of the examples in the patent.  So that's -- we

24   submit that's its relevance.  It describes the use of

25   some of the antibodies that are part of the invention

1   for treating Crohn's disease.

2           THE COURT:  What's the objection?

3           MS. WIGMORE:  Our objection to this

4   category, Your Honor, is a relevance objection.  It

5   appears they're being used for the purpose of trying to

6   demonstrate commercial success which goes to the issue

7   of obviousness.

8           We have objections on two grounds.  One is

9   perhaps not quite ripe, and as we're reaching a

10  stipulation as to the chimeric claims and whether they

11  will be dropped from the case, to the extent that

12  occurs, this commercial success related to Remicade is

13  not a relevant issue in the case.

14          Secondly, this goes to the use of Remicade

15  and certain disease conditions.  Patents -- there are

16  separate patents on those uses that are not being

17  asserted in this case.  So to the extent the drug is

18  commercially successful because of its use, that is not

19  a proper analysis for this case.  It will confuse the

20  jury.

21          MR. PEARSON:  Your Honor, if I may, the --

22  as I said, the work that's described here is one of the

23  examples in the patent to describe --

24          THE COURT:  Well, why isn't it cumulative,

25  then?

```
 1              MR. PEARSON:  Well, I think it's -- it

 2     describes in more detail than the example that is

 3     admittedly briefed in the patent document itself, and

 4     this isn't submitted -- I submit it's not being offered

 5     for commercial success but only to describe the work

 6     that was actually done.  This reports medical results,

 7     not commercial success.

 8              MS. WIGMORE:  Your Honor, to the extent

 9     they're not asserting claims that cover Remicade, it's

10     not clear --

11              THE COURT:  Well, that's my question.

12     What -- I mean, I guess what's the status of the claim

13     that there's a discussion about whether or not it's

14     going to be removed from the lawsuit?  Does it have

15     relevance beyond that claim, and if so, how?  That's my

16     question.

17              MR. PEARSON:  I'm sorry.  I submit it does

18     have relevance, and we are going to have to discuss the

19     disclosure that's in the patent document that's coupled

20     to all the claims, and we're going to have one of the

21     inventors talking about the work that was done, and he's

22     going to talk about what's in his patent.

23              This is one of -- one of the things that's

24     described in the patent, but it's described in more

25     detail in this document.  So that's the relevance.
```

1              THE COURT:  Okay.  All right.  I'm

2     overruling the objection.  I think it's relevant.

3              MR. PEARSON:  I have one other technical

4     document.  This is actually a technical document relied

5     on by Centocor's expert, Greg Adams.  Again, I think

6     there's a relevance objection.

7              It's about the production of human

8     antibodies, which is a point of dispute between the

9     parties.  Our expert has listed it in his report and

10    relied on it in his report.  That's its relevance.

11             MS. WIGMORE:  We are willing to withdraw our

12    objection to this one, Your Honor.

13             THE COURT:  Okay.

14             MR. PEARSON:  Your Honor, so just to be

15    clear on the record, that was Exhibit 407.

16             THE COURT:  407 is pre-admitted.  What was

17    the exhibit number of the previous exhibit?

18             MR. PEARSON:  Your Honor, it was PX 48.

19             THE COURT:  48, okay.  48 is pre-admitted.

20             MR. PEARSON:  The second of the three

21    categories of documents that I have are witness

22    statements submitted on behalf of Abbott in a prior

23    litigation.

24             This is describing the development of the

25    accused product.  In fact, Dr. Salfeld will be a witness

1   in this case.  But this is a statement that's been

2   adopted by Abbott describing the process for developing

3   the accused product.

4           I'm sorry, for the record, that's PX 744,

5   and similar documents are PX 745, PX 416, and PX 443.

6           MS. WIGMORE:  Our objections here are

7   twofold, Your Honor.  First of all, this is an

8   out-of-court statement.  It is hearsay.  It's a foreign

9   court.  The witness will be here to testify.  If they

10  wanted to use something from this for impeachment,

11  that's an option, but to have this come in

12  independently, it's a different case involving different

13  issues.  We think it'd be irrelevant and prejudicial.

14          Also, to the extent they're trying to bring

15  in other litigation generally, both of these parties

16  have been involved in much litigation involving the

17  products in this lawsuit, and that can be very confusing

18  and prejudicial, and there are real relevance questions

19  about that.  So we would object generally to bringing in

20  the existence of or the facts surrounding other

21  litigation into this case.

22          MR. PEARSON:  Your Honor, I think what --

23  there are -- what's in these statements are very basic

24  descriptions of what was done to develop the product.

25          So there aren't -- I would submit we're not

1    offering it to provide details specific only to this

2    litigation, but they have made statements that have been

3    adopted by Abbott and submitted to a court in this

4    litigation about how their product was developed.

5                MS. WIGMORE:  And our position is the

6    witness will be here.  They can ask those questions.  If

7    he doesn't answer consistently, they can impeachment

8    him, but to put a statement from another litigation into

9    the record will be very confusing and perhaps

10   prejudicial because the fact that we've been involved in

11   other litigation, as have they, will be confusing and

12   prejudicial to the jury.

13               THE COURT:  Ordinarily, I would, and I think

14   Judge Ward would follow the same rule, is that before

15   you launch into other litigation, I mean, you can use

16   statements that are made in other litigation, but you

17   need to refer it, you know, like a prior statement made

18   under oath or something to -- to that effect.

19               I'm not going to pre-admit the declarations,

20   but, you know, given the representation that the

21   witnesses are going to be here at trial, you can cross

22   examine them just -- you know, you can impeachment them

23   with the statements that they've made, you know, at the

24   time they testify, and if for some reason they don't

25   show up at trial, then approach Judge Ward about

1  offering them as adoptive admissions, okay?

2            MR. PEARSON:  Understood.

3            THE COURT:  But I don't -- given that

4  they're -- that they were submitted in other litigation,

5  you can use them for impeachment if they say something

6  different here, but I'm not going to pre-admit them,

7  okay?

8            MR. PEARSON:  The third document that I

9  have, and it's just a single document of its type that

10  we're going to offer, is Plaintiff's Exhibit 854.

11            This is a laboratory notebook.  The first

12  page is here.  Essentially what this is is a Centocor

13  employee who did some experiments on the antibodies at

14  issue in this case.  This is just a contemporaneous

15  recording of the experiments that she did and the data

16  that she observed.  She's going to be testifying, so we

17  would want to admit this with her.  She can describe

18  what she did and describe that she recorded

19  contemporaneously with when she did it.

20            THE COURT:  Why isn't it admissible?

21            MS. WIGMORE:  Your Honor, we've had

22  communications about these documents, and I think we can

23  reach an accommodation.  We have similar documents that

24  they've objected to.

25            THE COURT:  Well, I'm going to admit those,

1    too, then, just like I'm admitting this one, okay?

2              MS. WIGMORE:  As long as all the lab

3    notebooks of the -- these are testing --

4              THE COURT:  If they're contemporaneous

5    testing that's done in the ordinary course of business

6    of the employees, then it's coming in.

7              MR. PEARSON:  So, Your Honor, I would submit

8    that some of these -- there are some differences between

9    the notebooks.  One of the difference is whether it's

10   done in the ordinary course.  The second difference is

11   whether a person is going to be able to testify this is

12   what they were doing, contemporaneously recording the

13   observations.  This particular witness will be in court

14   discussing the notebook results.

15             THE COURT:  Well --

16             MR. PEARSON:  And so I would submit this

17   document is different from the other notebooks, so we

18   are admittedly going to continue to discuss --

19             THE COURT:  Well, if I admit them as

20   business records, I mean, that's -- I mean, that's why

21   you're offering to admit this, right?

22             MR. PEARSON:  I'm admitting this as a

23   contemporaneous recording of what she's perceiving --

24             MS. WIGMORE:  I just want to clarify, this

25   was testing she did for litigation purposes.

1           MR. PEARSON:  This was done for the

2   litigation.

3           THE COURT:  Okay.

4           MS. WIGMORE:  And so our feeling is that can

5   come in as long as our testing for litigation purposes

6   comes in, as well, but it shouldn't be a one-way street.

7           MR. PEARSON:  And I would submit that it

8   should make a difference whether the witness can testify

9   about what they were doing and contemporaneously record

10  the results of the experiment.  That makes this notebook

11  different from the others.

12          MS. WIGMORE:  And our view is if it's not

13  hearsay and it comes in, there doesn't need to be a

14  witness --

15          THE COURT:  A sponsoring witness for the

16  same reasons -- not just allow in all of the marketing

17  documents.

18          That's -- you know, you can't have it both

19  ways.  You need to -- I mean, if you're going to have --

20  if you're going to require sponsoring witnesses for your

21  exhibit, then -- then I'm going to allow that rule

22  across the board, but if --

23          MR. PEARSON:  Well, I would -- I would

24  just -- I will submit that whatever happens with this

25  document, I don't think it should apply to the other

1   documents.

2            THE COURT:  Okay.  Well, I'm --

3            MR. PEARSON:  I don't know --

4            THE COURT:  I'm admitting this -- I'm

5   admitting this document, okay, and I'll take theirs up

6   separately.

7            MR. PEARSON:  Thank you.  That's all I have.

8            THE COURT:  Okay.

9            MS. VERRECCHIO:  Your Honor, Angie Verrechio

10  for plaintiff, Centocor.  I have a couple of categories

11  of documents that I'd like to discuss.  The first

12  relates to e-mails that appear on our list that are a

13  couple of different categories.  PX 40 through 47, PX

14  130 through 132, PX 155 through 161, PX 400 through 403,

15  and PX 80 through -- I'm sorry, 800 through 807.

16           There's two different types of e-mails here.

17  One type is e-mails written by Centocor employees to

18  other Centocor employees describing conversations that

19  they had with Abbott employees.  There are numerous

20  discussions that went on before this lawsuit was filed,

21  negotiations between the parties over various licensing

22  issues and business issues.

23           And at one point, Centocor learned about --

24  that their patent claims that are subject of this suit

25  were going to issue from the patent office, and Centocor

1    employees told that to Abbott, and there are e-mails

2    between Centocor employees referencing that those

3    discussions took place, and one of the issues in this

4    case is notice, that Abbott had sufficient notice.  So

5    we think that these e-mails are relevant and should come

6    in.

7              And I will show you an example.  This is PX

8    158.  This is an e-mail from Ken Dow, who is a Centocor

9    in-house counsel, to other Johnson and Johnson, Centocor

10   business people Bernie Plantz and Phil Johnson, saying

11   that he received a call from John Conway, who is

12   Abbott's in-house counsel, about the TNF patent claims

13   and whether any testing was done.

14             This is dated January 6, 2006, which is

15   shortly after Centocor learned about -- that their

16   claims were going to be allowed and formed Abbott.  So

17   we submit that these documents are business records

18   because this is the types of things that Centocor

19   people, how they record this kind of information and

20   share it with their fellow colleagues, and it's not

21   hearsay, so we think it should come in.

22             THE COURT:  How is it different -- how is it

23   different from a phone call?

24             MS. VERRECCHIO:  Because it's a recorded

25   recollection that's --

1            THE COURT:  What -- well, what --

2            MS. VERRECCHIO:  And I should say that

3    Mr. Dow will be at trial and could be cross examined on

4    these e-mails.  There are other e-mails that were

5    written by another Centocor employee named Joe Scodari

6    of a similar type, and he will also be at trial to

7    discuss them.

8            THE COURT:  Well, have y'all looked at Judge

9    Rosenthal's opinion on the Canatxx case against

10   Silverhawk about the admissibility of e-mails as

11   business records?

12           MS. VERRECCHIO:  I have not, Your Honor.

13           THE COURT:  Well, at least as I understand

14   the opinion, the touchstone is whether or not there

15   was -- the employer imposed a business duty on the

16   employees to make and keep e-mail records such as this

17   one.

18           So what's the -- what's Centocor's -- I

19   mean, is it a business requirement of Centocor that the

20   employees communicate like this?

21           MS. VERRECCHIO:  It's my understanding that

22   this is the way that business is conducted at Centocor,

23   that e-mails are exchanged among Centocor individuals to

24   keep everyone informed.  If we were able to elicit

25   testimony from Mr. Dow at trial to authenticate these

1  records as business records, we would be willing to do

2  that.

3        THE COURT:  Okay.

4        MS. VERRECCHIO:  If they could come in.

5        THE COURT:  I'll give you the cite.  It's

6  2008 Westlaw, 1999234.

7        MS. VERRECCHIO:  Okay.

8        THE COURT:  Canatxx Gas Storage against

9  Silverhawk Capital.  What I'll do is I've looked at the

10  e-mails before I came in here, and I agree that they can

11  qualify under certain circumstances as business records,

12  but -- and I'm going to -- I mean, you need to lay a

13  foundation or call a witness who can lay a foundation as

14  to what the employer's practices are insofar as making

15  and keeping e-mails.

16        They touch upon a business matter, they're

17  made by employees at or near the time that the matters

18  are recorded, and they're made with employees with

19  personal knowledge of what's recorded, I agree with all

20  of that, but I think there's -- you need to put on some

21  testimony about what the business requirements of

22  Centocor is, okay?

23        MS. VERRECCHIO:  Yes.  Thank you.

24        MS. WIGMORE:  Your Honor, just one other

25  issue with those e-mails, and that was our position that

1    they would need to lay the business record foundation.

2              THE COURT:  Right.

3              MS. WIGMORE:  But many of them contain also

4    embedded hearsay.  So we would want these to be handled

5    on a case-by-case basis to ensure that statements within

6    the e-mails, even if the e-mail itself overcomes the

7    hearings objection, do not come in unless there's

8    another exception or a foundation for those.

9              THE COURT:  Well, which ones contain

10   embedded hearsay?

11             MS. WIGMORE:  There are several of them.

12   There are 36 documents that she just referenced, but

13   oftentimes it will be a witness from Centocor writing an

14   e-mail to Centocor people saying, you know, this is what

15   Abbott told us, but also this is what we told Abbott,

16   and that is another layer of hearsay.

17             So -- and there are also some relevance

18   issues that we have with some of the discussions in

19   these e-mails that we want to preserve the right to

20   object to.  We're not sure which ones they're actually

21   going to use, but there's a lot of detail, and these are

22   not all one of a kind.

23             THE COURT:  I tell you what, by close of

24   business Monday, identify for me which in the list you

25   say contain embedded hearsay.

1              MS. WIGMORE:  Okay.

2              THE COURT:  I want to get as many -- and the

3    reason I'm asking you to do that is I want to get as

4    many of these pre-admitted as I can.  That's my charge

5    from Judge Ward, okay, not to say let's do them all on a

6    case-by-case basis.  That's inconsistent for the purpose

7    for which these hearing is being held, okay?

8              MS. WIGMORE:  Understood.

9              THE COURT:  But I want to work through as

10   many of them as I can, okay --

11             MS. WIGMORE:  Okay.

12             THE COURT:  -- before y'all roll out on the

13   22nd.

14             MS. VERRECCHIO:  And I just want to address

15   one of the objections that had been lodged to the

16   e-mails.  There's an objection to -- an FRE 408

17   objection raised to several of the e-mails, which we

18   think has been addressed by Judge Ward in --

19             THE COURT:  I read the transcript.  I

20   thought it had been addressed, as well.

21             MS. VERRECCHIO:  Right.

22             THE COURT:  The negotiations, as I

23   understood it, went from the date that y'all learned

24   about the issued claims to at least April of 2007,

25   either the day of or the day after the case had been

1  filed.  Is that --

2            MS. VERRECCHIO:  Correct.

3            THE COURT:  Is my reading correct?

4            MS. VERRECCHIO:  It was not settlement

5  negotiations.  It was --

6            THE COURT:  It was licensing business

7  negotiations as I view it.

8            MS. VERRECCHIO:  Correct.

9            THE COURT:  And I think that Judge Ward held

10  the same thing.

11            MS. VERRECCHIO:  Okay.

12            THE COURT:  What I also need from you by

13  Monday is a representation that you -- think that you

14  think that you can offer testimony that's consistent

15  with the requirements that Judge Rosenthal laid out in

16  this decision, and I'll conditionally admit them based

17  on that representation if -- if I've worked through the

18  hearsay problems that your colleague opposing you has

19  identified for me, okay?

20            MS. VERRECCHIO:  Yes.  Thank you.

21            Another category of documents that we would

22  like to discuss include Exhibits 391 through 393, and

23  this is a representative document.  These are --

24            THE COURT:  Which exhibit is this?

25            MS. VERRECCHIO:  This is 392, PX 392.  These

1   are documents that lay out kind of a plan that Abbott

2   had to run its biological -- biologic business and to

3   seek IP opportunities, and there are statements made in

4   here -- I apologize for the scribbled highlighting.

5   This is Page 30 of the document.  This talks about

6   Abbott's IP business strategy that they would seek to

7   take a license, if necessary, to move into an IP space,

8   but, if not, if they could not seek a license, if a

9   license was not available, they would pursue an

10   aggressive risk management approach.

11          And the reason that we think these documents

12   are relevant and should be admitted is because one of

13   the issues in this case is willfulness, and in

14   evaluating willfulness, the jury is allowed to review

15   the totality of the circumstances and part of the

16   totality of the circumstances in this case can be

17   Abbott's approach to pursuing IP opportunities or moving

18   into additional space.  And the -- the strategy that

19   they take to pursue those goals could be relevant to

20   their willfulness in this case in not seeking a license.

21          MS. WIGMORE:  Your Honor, our objection here

22   is both a relevance and Rule 403 objection.  There's no

23   reference to Humira, the product at issue, in any of

24   these documents.  There's no foundation that a license

25   was available at the same time they're indicating

1    there's license discussions going on.

2             So this is just very confusing and

3    prejudicial.  There's no indication it has anything to

4    do with the facts of this case.

5             THE COURT:  Well, I overrule those

6    objections.

7             MS. VERRECCHIO:  And, Your Honor, the last

8    category of documents I want to talk about are Exhibits

9    184, 185, and 189.  And these are memos that were

10   written by BASF, which was the predecessor company to

11   Abbott.  It was a company that Abbott acquired that

12   actually developed the accused product in this case, and

13   they reflect BASF's knowledge of what Centocor was doing

14   to develop its product and -- and show that BASF

15   recognized that Centocor's product was a surprising

16   result in the field, that it showed remarkable results

17   in patients.  We think that these are business records.

18            THE COURT:  And which product is it that the

19   documents are referring to?

20            MS. VERRECCHIO:  They're referring to

21   Centocor's Remicade product.

22            MS. WIGMORE:  And our objection is similar

23   to one I've already raised about the relevance of

24   Remicade and the use as opposed to the actual antibody,

25   which they've got separate patents on that aren't at

1    issue here.

2            THE COURT:  Are the claims -- are these

3    Remicade claims, are they in or out in this case?

4            MS. VERRECCHIO:  Well, we're working on a

5    stipulation to that effect.  Without making a firm

6    representation on the record --

7            THE COURT:  If you were betting, if you were

8    me, would you bet that they'd be in or out?

9            MS. VERRECCHIO:  If I were you, I would bet

10   they would be out.

11           THE COURT:  Okay.  Now, then, okay.  I

12   appreciate this.  I'm not going to, but I just -- tell

13   me what the relevancy is if those claims are out of the

14   case.  I was having a hard time thinking of one, too, so

15   I'm not pre-admitting those.  I'll sustain the

16   objection.

17           What's the next category?

18           MS. VERRECCHIO:  That is all I have at the

19   moment, Your Honor.  I will turn it over to my

20   colleagues to address anything else that we might have.

21           MR. MASLOWSKI:  Your Honor, I have a couple

22   volumes of Centocor marketing documents that didn't make

23   their way to you yesterday.  I'm sorry, may I approach,

24   Your Honor?

25           THE COURT:  Yes, of course, if you're giving

1    me a choice.

2             MR. MASLOWSKI:  You know what, I will give

3    you 1 and 3 -- Volume 1 -- just Volume 1.  These two --

4    they're all identical.  I can address these pretty easy.

5             MS. WIGMORE:  Steve, could you tell me the

6    number -- the exhibit numbers or if you could read

7    them --

8             MR. MASLOWSKI:  Yes, I will read them into

9    the record.

10            MS. WIGMORE:  Thank you.

11            MR. MASLOWSKI:  Your Honor, I'd like to

12   address some more marketing documents.  The first

13   category of documents are Centocor market studies.

14   These are very similar to the Abbott documents which

15   have already been admitted into evidence.

16            The first cat -- the first specific category

17   we'll address, Plaintiff's Exhibits 247 through 253,

18   255, 256, 258 through 266, 454, 459, 710 through 718,

19   725 and 726.

20            THE COURT:  And what are these studies

21   generally about?

22            MR. MASLOWSKI:  These are very similar to

23   the Abbott studies.  These are studies of doctors'

24   perceptions in the marketplace for the drugs that are at

25   issue in this case, as well as what are called claims

1    data studies where Centocor pulls the claim charts of

2    actual patients and attempts to understand the physician

3    preferences in the market.

4              THE COURT:  These would have been written by

5    your client, then --

6              MR. MASLOWSKI:  That's correct.

7              THE COURT:  -- at the same time these

8    licensing negotiations were going on?

9              MR. MASLOWSKI:  Same time as the licensing

10   negotia -- yeah, these are done in the ordinary course

11   of business by the marketing documents.  These documents

12   are entirely separate from any of the --

13             THE COURT:  Okay.

14             MR. MASLOWSKI:  -- well, licensing

15   discussions.

16             THE COURT:  Okay.

17             MR. MASLOWSKI:  So in that sense, they

18   are -- they would qualify as business records under the

19   hearsay objection.

20             MS. WIGMORE:  Our position on these are

21   these are Centocor documents as opposed to the Abbott

22   ones we looked at previously.  Again, they have a lot of

23   embedded hearsay, but this is a case where they're

24   trying to use their own documents which contain some

25   third-party data without laying any foundation, and we

1   believe it's appropriate for them to have to lay one

2   before the documents get used.

3           THE COURT:  Well, I'm going to sustain the

4   objection to these documents.  You know, I don't -- you

5   know, I admitted the Abbott documents on the grounds

6   that they were admissions of Abbott that contained

7   material and that Abbott had -- studies that had

8   commissioned, and I've just got some concern with these

9   types of documents being created by the party that's

10  then going to offer them in evidence to use in

11  litigation, so I'm going to exclude those documents.

12          MR. MASLOWSKI:  Your Honor, will we have the

13  ability to introduce these documents through a witness

14  at trial subject to cross examination?

15          THE COURT:  Well, they're not pre-admitted,

16  so I'm sustaining the objection at this point.  If you

17  think something develops during the trial that you can

18  lay a proper foundation, get them admitted during trial,

19  you can attempt to do that.

20          MR. MASLOWSKI:  Okay.

21          THE COURT:  Okay?

22          MR. MASLOWSKI:  One particular exhibit that

23  does relate to the licensing negotiations is Plaintiff's

24  Exhibit 465.  Centocor seeks admission of Plaintiff's

25  Exhibit 465, and what Exhibit 465 is, this is an e-mail

1   from an Abbott employee, Susan Lebold, to John Poulos,

2   who is going to be a trial witness, and the subject of

3   the e-mail relates to the licensing discussions that

4   went on between the parties.

5              In particular, on Page 2 of the attachment

6   to the e-mail, it says, history of discussions with J&J,

7   and then it goes on to lay out bullet point-by-bullet

8   point the licensing discussions that occurred between

9   Abbott and Johnson and Johnson to which we've previously

10  discussed.

11             Mr. Poulos testified in his deposition that

12  he recognized the document.  In fact, he asked

13  Ms. Lebold to create the document.  And we submit that

14  it is not hearsay.  It is --

15             THE COURT:  Well, now, tell me again who the

16  author works for.

17             MR. MASLOWSKI:  The author of the

18  attachment, Suzanne Lebold, an Abbott employee.

19             THE COURT:  Okay.

20             MR. MASLOWSKI:  And she sent it to the --

21  the e-mail went to John Poulos, also an Abbott employee

22  and also on Abbott's witness list.

23             THE COURT:  And what's the objection?

24             MS. WIGMORE:  The objection to the document

25  has to do with a specific portion where there's a

1    statement about valuation which in Mr. Poulos's

2    deposition he made clear was incorrect.  So to the

3    extent this were used with a witness, we would have no

4    objection, but putting it in the record without that

5    context we believe would be inappropriate.  There's an

6    opinion of valuation which -- which we think is

7    misleading.

8            THE COURT:  Well, I'll overrule that

9    objection.  The document is admitted.

10           MR. MASLOWSKI:  Then two more broad

11   categories of Abbott marketing documents.  The first

12   relates to Plaintiff's Exhibits 211, 294, 296, 298, 385,

13   576, and 578.

14           These documents, and I will show you

15   Exhibit 211, all generally relate to marketing

16   competitive studies.  So this is -- it starts with an

17   e-mail from a Philip Yan to a Mr. Von Borcke, and cc'd

18   is Lori Taylor, Edward Scheidler and Thomas Filar.

19           Mr. Scheidler was deposed in this case,

20   testified about this document.  All of the documents in

21   this category are Abbott internal presentations that

22   relate generally to marketing competitive studies, et

23   cetera.  They were relied on by our expert and used in

24   his analysis.  They're not hearsay.  They're admissions

25   by Abbott.

```
 1              THE COURT:  Is your objection the same --
 2              MS. WIGMORE:  It's the same.
 3              THE COURT:  -- with respect to the other
 4   Abbott --
 5              MS. WIGMORE:  It should follow the fortunes
 6   of the others.
 7              THE COURT:  Well, I'll -- they're
 8   misfortunes, right?  Okay.  Well, I'll overrule it for
 9   the same reasons that I overruled the other objections.
10              MR. MASLOWSKI:  And the last category of
11   Abbott documents in this area, Your Honor, are marketing
12   and strategic plans.  These are just a little bit of a
13   different form.  They're more official documents in the
14   sense that they are specific plans created by  Abbott.
15   This would be -- this would cover Exhibits 94, 216, 218,
16   300, 375, 376, 377, 574, 575, and 577.  Here is the
17   first page of Exhibit 94.  All of these exhibits are of
18   this nature.
19              They are Abbott internal marketing documents
20   where Abbott is assessing the competitive landscape as
21   well as the -- the competition going forward.  They're
22   all relevant.  They were all used by our expert or
23   considered by our expert in preparing these opinions.
24   They're clearly admissions by Abbott.
25              THE COURT:  Well, is there any different
```

1    objection to these.

2              MS. WIGMORE:  No, Your Honor.

3              THE COURT:  Okay.  I'll overrule the

4    objections.  I'll -- the record will reflect that the

5    same objections were made to these documents as were

6    made to the prior Abbott documents, and the Court

7    overruled them for the same reasons that it overruled

8    the other objection.

9              MR. MASLOWSKI:  And I think I will yield the

10   floor to my colleagues again.

11             THE COURT:  How many more categories have

12   y'all --

13             MR. PEARSON:  Your Honor I have one --

14             THE COURT:  -- created?

15             MR. PEARSON:  -- one category.

16             THE COURT:  Okay.

17             MR. MASLOWSKI:  And I may have one or two.

18             MS. VERRECCHIO:  And I have one.

19             THE COURT:  Okay.  Well, all right.

20             MR. PEARSON:  This is going to be, I hope,

21   short, Your Honor.  These are documents -- technical

22   documents written by employees -- currently employees of

23   Abbott Laboratories prior to when BASF Bioresearch

24   Corporation was acquired by Abbott Laboratories.

25   They're the kind of documents that describe experiments

1  both for the Humira antibody, that's the accused product

2  in this case, and, I'm sorry, I should say this is

3  Plaintiff's Exhibit 135.  There's a similar document

4  that's Plaintiff's Exhibit 136.  It is about experiments

5  done on the N195 antibody that's being asserted as prior

6  art.

7          So I submit these are just documents that

8  describe experiments done by BASF Bioresearch

9  Corporation, and these are now Abbott employees.

10          THE COURT:  And Abbott acquired BASF?

11          MR. PEARSON:  That's correct, Your Honor.

12          MS. WIGMORE:  We're willing to address -- we

13  don't think this is going to be relevant, particularly

14  if the chimeric claims are not pursued, but this witness

15  testified she didn't really have personal knowledge of

16  what was written.  We'll withdraw the objection just for

17  efficiency sake.

18          THE COURT:  Okay.  What were the numbers,

19  135 and 136?

20          MR. PEARSON:  That's correct.

21          THE COURT:  Those are admitted.

22          MS. VERRECCHIO:  I just have one other group

23  of documents, Your Honor.  PX 162, 163, and 164 are

24  documents that reflect conversations that employees at

25  BASF were having in the early '90ss before they decided

1    to partner with Cambridge Antibody Technology.

2              And this is a memo or minutes of a meeting

3    that BASF employees attended, as well as a CAT employee,

4    that indicates that Cambridge Antibody Technology had

5    already used its technology to make antibodies before

6    they partnered with BASF.  And the objection to this

7    document is -- this is PX 162, and the objection to this

8    document is for relevance, and we believe it's relevant

9    because it shows that the state of the art at this time

10   indicated that CAT was using their technology, and it

11   goes to show that there was an enablement of this

12   technology at the time.

13             There are two other documents that I would

14   include in this category.  This is PX 163, which are

15   some handwritten notes.  It says at the top JS and Jay

16   Mankovich.  We believe that JS is Jochen Salfeld, who is

17   going to be a witness in this case, and we would like to

18   question him about this document, and it relates to

19   whether other companies were partnering with CAT at the

20   time to make human antibodies and whether other

21   technologies were available.

22             It's this one that references a Genpharm

23   discussion, which is another company that was on the

24   scene offering services to make human antibodies, so

25   this all goes to enablement.

1          THE COURT:  Where was Genpharm referenced?

2          MS. VERRECCHIO:  Pardon me, Your Honor?

3          THE COURT:  Where was that referenced,

4    Genpharm?

5          MS. VERRECCHIO:  Genpharm, if you look at PX

6    164.  I'm sorry, at the top.

7          THE COURT:  Instead of 163.

8          MS. VERRECCHIO:  Yes, at the top in the

9    title, CAT, slash, Genpharm discussions.

10         THE COURT:  Okay.  Tell me what your

11   objection is.

12         MS. WIGMORE:  Our objection, it actually

13   should be a hearsay objection, as well, and for that, I

14   apologize, but what we have here is notes of

15   conversations with a third party, only portions of the

16   conversation.  So we have an objection for the documents

17   coming in for the truth of the matter asserted by the

18   third parties.

19         If they want to cross examine Dr. Salfeld

20   about whether he had conversation and was on notice of

21   certain things, we have no objection to that, but we

22   object to the documents coming in for the truth of the

23   third-party statements.

24         MS. VERRECCHIO:  And, Your Honor, I offer

25   that at least PX 162, which is the minutes of the

1   meeting that took place, should be -- should be --

2   should qualify as a business record which takes it out

3   of the hearsay objection.

4           MS. WIGMORE:  I actually disagree with that.

5   I think it takes the document out but not the statement

6   by CAT.

7           THE COURT:  I'm going to carry these.  Well,

8   let me -- first of all, have y'all deposed someone with

9   personal knowledge of all of these documents?  In other

10  words, is --

11          MS. VERRECCHIO:  We have deposed Jochen

12  Salfeld only, and he will be -- and he's authored --

13  he's -- I'm sorry, he's listed on these documents, and

14  he will be, as far as we know, will be a witness at

15  trial.

16          THE COURT:  With respect to these documents,

17  has he been questioned about them thus far?

18          MS. VERRECCHIO:  I'll have to --

19          MS. WIGMORE:  I believe they asked

20  Dr. Mankovich about these documents.  He will not be

21  testifying, and there are no deposition designations for

22  him.

23          THE COURT:  Well --

24          MR. PEARSON:  The answer, Your Honor,

25  Dr. Salfeld has not been asked about these particular

1  documents.

2            THE COURT:  My question is more just -- more

3  of a form question.  Is there question about

4  authenticity or the fact that they were done in the

5  ordinary course of business at all?  I mean, is there a

6  real question about it?

7            MR. PEARSON:  I don't think so, Your Honor.

8            MS. WIGMORE:  No, our issue is more about

9  the third-party statements.

10            THE COURT:  The nested hearsay issues as

11  opposed to --

12            MS. WIGMORE:  Right.

13            THE COURT:  Okay.  I'll look at those, and

14  I'll give you -- I'm going to carry the objections to

15  162, 163, and 164.

16            MR. MASLOWSKI:  Last time for marketing

17  documents, Your Honor, I promise.

18            The last category of marketing documents

19  we're seeking admission are Centocor's strategic plans.

20  This would include Exhibit 697 through 704.  Up on the

21  screen is Exhibit 697.

22            It's the 2007 Centocor strategic plan.  All

23  of these documents relate to strategy and planning.

24  They are internal Centocor documents.  They clearly

25  qualify as business records in our opinion.  We

1    therefore seek admission of 697 to 704.

2              THE COURT:  What's the objection?

3              MS. WIGMORE:  Our objection is the same as

4    for the Centocor marketing documents which Your Honor

5    sustained.  That these are -- and they are Centocor

6    documents, so they are hearsay, and there's a lot of,

7    again, embedded statements, so --

8              THE COURT:  I'm going to sustain the

9    objection to these, as well, with the same caveat, that

10   if you lay a proper foundation for them at trial,

11   then --

12             MR. MASLOWSKI:  Okay.

13             THE COURT:  -- you may attempt to do so.  Is

14   that it?

15             MR. MASLOWSKI:  One last document, Your

16   Honor, which is Plaintiff's Exhibit 464.  This is a

17   licensing -- the results of a licensing study

18   commissioned by the Licensing Executive Society, LES.

19             Abbott's stated document -- or Abbott's

20   stated objection is foundation and authenticity, which

21   our expert can lay the proper foundation and establish

22   that it's authentic, and, in fact, we have a declaration

23   from him would that be necessary.  Abbott also indicated

24   this morning that they are submitting a hearsay

25   objection on this, as well.  We submit that qualifies as

1    a commercial publication under 803.17.  It's a

2    publication that people in this field generally rely on,

3    publications of this type.

4              MS. WIGMORE:  And we do have an objection

5    primarily on hearsay grounds to the pre-admission of

6    this exhibit.  We have no problem with their expert

7    saying he relied on these types of documents, but we

8    object to it coming in for its truth.

9              THE COURT:  Are you maintaining an

10   authenticity objection?

11             MS. WIGMORE:  No.

12             THE COURT:  Tell me what the exhibit number

13   is again.

14             MR. MASLOWSKI:  It is 464, Your Honor.

15             THE COURT:  Why doesn't it qualify as any

16   type of market report under the hearsay exception?

17             MS. WIGMORE:  Well, just because it's a

18   market report doesn't make it not hearsay.  You know, I

19   don't think there's been a foundation laid as to who

20   relies on this and when.

21             So we wouldn't have an objection to them

22   trying to lay such a foundation with their expert, but

23   we don't think it -- in and of itself that it does.

24             MR. MASLOWSKI:  And that's precisely the

25   issue as to why we have a declaration here from our

1    expert so we could have it pre-admitted.  He states what

2    the document is, that people in his business normally

3    rely on these types of documents, what the document is,

4    what it purports to be, et cetera.

5                    THE COURT:  Well, do you have his

6    declaration?

7                    MR. MASLOWSKI:  Yes, sir.  If I may

8    approach.

9                    THE COURT:  Yes.

10                   MR. MASLOWSKI:  There is also an

11   exhibit reference, No. 465, which we're foregoing at

12   this point.

13                   THE COURT:  They're pre-admitted.  I think

14   it qualifies under 803.17, the exception based on what

15   the proffer is so I'm going to pre-admit it.

16                   MR. MASLOWSKI:  Your Honor, that is all of

17   our comments on their objections to our exhibits.

18                   THE COURT:  Okay.  We're going to take a

19   short break, 10 minutes, and then we'll take up the

20   defendant's exhibits.

21                   COURT SECURITY OFFICER:  All rise.

22                   (Recess.)

23                   COURT SECURITY OFFICER:  All rise.

24                   THE COURT:  Please be seated.

25                   All right.  With respect to the defendant's

1   exhibits?

2           MS. WIGMORE:  We just have a small handful

3   of disputed issues.

4           The first is Exhibit 337.  I believe we've

5   provided you a copy of that yesterday, and this is

6   correspondence between the then president of Centocor,

7   Hubert Schoemaker, expressing an interest in obtaining a

8   human antibody.

9           Now, the individual who wrote the letter is

10  deceased, but we did discuss it in a deposition with

11  Dr. Siegel, and we have that testimony designated.  So

12  we think this is a party admission.  It's relevant to

13  the question of enablement since Centocor expressed an

14  interest in this human antibody but did not make one

15  during the relevant time period.

16          THE COURT:  Tell me what exhibit number it

17  is again.

18          MS. WIGMORE:  Exhibit 337, Defendant's

19  Exhibit.

20          THE COURT:  Well, do you have a copy handy?

21          MR. PEARSON:  Your Honor, I have a copy.

22  May I approach?

23          THE COURT:  Yes.  Okay.  Now, tell me who

24  Mr. Hoffman -- or Dr. Hoffman is.

25          MS. WIGMORE:  He was an individual from

1   another company to whom the president of Centocor was

2   corresponding, expressing an interest in obtaining

3   human antibodies, which is the claimed invention in this

4   case.

5           THE COURT:  But he was the -- the letter is

6   from Dr. Hoffman to Dr. Schoemaker, correct?

7           MS. WIGMORE:  That's correct.

8           THE COURT:  Okay.  And you deposed

9   Dr. Hoffman.

10          MS. WIGMORE:  No, Dr. Siegel, who was a

11  Centocor employee, this document was in his files.

12          THE COURT:  Okay.  For what purpose is it

13  being offered?

14          MS. WIGMORE:  It's being offered with

15  respect to our non-enablement claim.  It tells the story

16  of how they were interested in making the antibody but

17  ended up creating a chimeric antibody.  They now claim

18  they created a human antibody which we made several

19  years later.

20          THE COURT:  Okay.  Okay.  What's the

21  objection?

22          MR. PEARSON:  That it's hearsay, Your Honor,

23  so it is being offered for the truth of what's asserted

24  in the document, and it's not written by a Centocor

25  employee.  It's written by a third party.  So it's

1   hearsay.  There's nothing been established to take it

2   outside of the hearsay rule.  It is being offered for

3   the matter asserted.

4           THE COURT:  Why is it not hearsay?  I'm

5   looking at --

6           MS. WIGMORE:  Well, we would be willing to

7   offer it for the limited purpose of just showing that

8   they were exploring this area and were on notice of

9   this.  We've got further evidence in the record of

10  testing of human antibodies, but we think it goes to the

11  context of that.

12          MR. PEARSON:  And, Your Honor, I would say

13  the only evidence this is of notice is that this third

14  party wrote a document that described a conversation.

15  That's hearsay.

16          MS. WIGMORE:  There are other exhibits on

17  the list that reveal testing of the human antibody.

18          THE COURT:  Okay.  I am sustaining the

19  hearsay objection.  I view this very similarly to how I

20  view the statement in the advertisement to which Abbott

21  objected to.  When you started your argument, I assumed

22  that it was a Centocor, former president of Centocor who

23  had written the document.

24          MS. WIGMORE:  I apologize for that, Your

25  Honor.

1          THE COURT:  Well, I'm sustaining the

2    objection.  It's without prejudice to your ability to

3    offer it at the time of trial if you think you can lay a

4    foundation if it goes to what was going on in the field

5    at the time for some non-hearsay purpose, but I am not

6    going to pre-admit 337.

7          MS. WIGMORE:  Now, the next two exhibits are

8    450 and 470.  I don't know if Your Honor has the binder

9    we provided yesterday.  I apologize.  I do not have an

10   extra copy, but I want to make sure you have what you

11   need before I go any further.

12         THE COURT:  Before I tell you I don't have

13   one, I need to check my inventory.  You know what the

14   title of the binder was?

15         MS. WIGMORE:  I apologize, I don't.  It was

16   delivered locally.

17         THE COURT:  Is it 450?

18         MS. WIGMORE:  And it's a Defendant's

19   Exhibits --

20         THE COURT:  I've got it.

21         MS. WIGMORE:  Okay.  And I can explain the

22   context of these two.  There is an antibody, CDP 571,

23   that we are alleging is anticipatory prior art.  We

24   subpoenaed that antibody from the third party who made

25   it, had testing done by our expert, provided a sample of

1    the antibody produced through the subpoena to Centocor

2    for their own evaluation.

3            They are challenging the authenticity of

4    that antibody.  We're not actually putting the antibody

5    in evidence, so whether or not there's a legitimate

6    authenticity objection is a question.  We have obtained,

7    just because of that challenge, a declaration from the

8    people who produced this pursuant to a subpoena

9    indicating that it is what it purports to be.  And under

10   902.11 of the Federal Rules, we believe that's

11   sufficient.

12           We don't believe you necessarily offer that

13   declaration into evidence, but to the extent they're

14   going to challenge our expert's ability to rely on

15   testing of this antibody, we have both that declaration

16   and the certificate of analysis that accompanied the

17   production of the antibody just to show that he was

18   reasonable and relying on testing of this antibody that

19   was produced by a third party.

20           THE COURT:  Well, let me clarify something

21   for the record, you know, I admitted the document the

22   plaintiffs had offered based on the declaration of their

23   expert, Dr. Gering.

24           MS. WIGMORE:  Yes.

25           THE COURT:  Okay?  Part of the reason for

 1  this hearing is so y'all don't have to go through and

 2  teach the jury an evidence class on the predicates of

 3  admissibility when everybody knows that 900 in the

 4  series foundation questions can be laid, and, likewise,

 5  the hearsay objection foundations can be laid.

 6          So what is the -- I understand you've got a

 7  declaration stating that -- at least the statement of

 8  the facility from which you got the antibody that is

 9  what it purports to be.  So what's the objection on that

10  ground?

11          MR. PEARSON:  So the objection to DX 470 is

12  that unlike the Gering declaration, this has been

13  obtained from someone who has not been deposed, who's

14  not going to be a witness in this case, and wasn't

15  produced to us until after the close of discovery.

16          So under Rule 902, the declaration to

17  support the authenticity of the document, needs to be

18  disclosed to us with sufficient time to explore the

19  bases for the declaration.  So the declarant in this

20  case is in the United Kingdom.  She's made some

21  statements here that it's her understanding that certain

22  things are true.  We haven't had the opportunity to

23  explore the basis for her understanding of the

24  authenticity of the document, and without an

25  authenticity and an establishment that the document is a

1  business record, Exhibit 450 remains hearsay.

2          MS. WIGMORE:  And I just want to be clear,

3  we don't want these documents to come into evidence if

4  we can agree that our expert's testing on the antibody

5  comes in.  So these are just backups.  To the extent

6  they're saying this antibody that you obtained through a

7  subpoena and had a declaration and provided us a copy of

8  or a portion of, if they're going to say our expert's

9  testing can't come in because that antibody is not

10  genuine, then we have this to overcome that objection.

11          MR. PEARSON:  And, Your Honor --

12          THE COURT:  When was the declaration

13  tendered to you?

14          MS. WIGMORE:  The declaration was not

15  tendered to us until after -- like one day after the

16  close of discovery.  We did everything --

17          THE COURT:  Not to you, but to --

18          MS. WIGMORE:  The day we received it.

19          THE COURT:  Okay.

20          MR. PEARSON:  So it's --

21          THE COURT:  The date -- give me the date.

22          MR. PEARSON:  April 20th, okay.

23          MS. WIGMORE:  April --

24          MR. PEARSON:  So, Your Honor, what's at

25  issue here is not the admissibility of the testing.

1    There was a motion in limine before Judge Ward about the

2    testing.  We're not seeking to exclude testimony from

3    their expert describing the testing, but to the extent

4    they're trying to offer these exhibits, that's what I

5    understood we're here to talk about.

6              THE COURT:  I want to make sure that I have

7    an appreciation of what Judge Ward ruled.  Well, I'm

8    going to overrule that objection -- those objections.

9              You have a list -- is it 4 --

10             MS. WIGMORE:  450 and 470.

11             THE COURT:  450 and 470 are pre-admitted.

12             MS. WIGMORE:  So the next exhibit is 759,

13   Defendant's Exhibit 759.  And what this is is a brochure

14   relating to the Galen Prize, which was a prize that was

15   awarded to Abbott and Humira.

16             We think that the fact that that prize was

17   awarded is relevant to the question of enablement since

18   they're claiming through documents offered earlier today

19   that they came first and that it was a success of

20   Remicade that inspired everything.

21             In addition, one of the named inventors on

22   their patent that they're asserting in this case, Jan

23   Vilcek, was on the committee who awarded that prize to

24   Humira, and we think that's highly relevant to the

25   question of whether, in fact, we made our invention or

1  simply, you know, whether they had enabled our invention

2  before we made it.

3         THE COURT:  What's the objection?

4         MR. MASLOWSKI:  That it's hearsay, Your

5  Honor.  It's not clear to us actually what this exhibit

6  is.  We have no problem with the testimony of their

7  witnesses talking about the Galen Prize and what it is

8  and if Humira won it or not.  But the document itself,

9  it's not clear exactly what it is.  To be honest, it

10  looks similar to an advertisement which we've addressed

11  earlier today.

12         THE COURT:  I'm going to admit the exhibit.

13  759 is admitted.

14         MS. WIGMORE:  The next one, just to discuss

15  briefly, I think it may already be resolved by the

16  discussions we had earlier about their commercial

17  success documents, but we have Exhibit 840, which is a

18  discussion between Centocor and some individuals from

19  the Kennedy Institute.  It's basically a dispute over

20  who came up with the use of -- of Remicade for

21  rheumatoid arthritis.

22         We would only propose to offer this if they

23  bring in the documents relating to whether Remicade was

24  successful in those areas and whether that inspired us

25  to create Humira.  So this is in the same category, and

1   we're happy to have the same approach applied with

2   respect to Exhibit 840 as with the defendant's Remicade

3   use documents we discussed, Your Honor.

4              THE COURT:  Plaintiff's -- well --

5              MS. WIGMORE:  Plaintiff's, excuse me.

6              THE COURT:  Okay.  Speak to that for me.

7              MS. VERRECCHIO:  Well, irrespective of what

8   Ms. Wigmore just said, this document itself is hearsay.

9   It's similar to the document that Ms. Wigmore showed you

10  earlier that was written by Dr. Hoffman to Dr.

11  Schoemaker.  This is authored by a third party, someone

12  at the Kennedy Institute to Dr. Schoemaker, and

13  everything that is said in this document is hearsay, so

14  it should not come in.

15             THE COURT:  Okay.  I'm going to sustain the

16  hearsay objection with the same instruction that I gave

17  you previously.  If it comes to a point where you think

18  you've got a purpose for it other than the truth, then

19  you can offer it at that time, okay?

20             MS. WIGMORE:  Yes.  The -- only two more,

21  Your Honor.

22             No. 842, Defendant's 842, is a Centocor

23  presentation titled Human Anti-TNF Project Preliminary

24  Financial Analysis, and this relates to the investment

25  Centocor was making in the creation of its own human

1   antibody which is now called SIMPONI.

2            We think the investment in the project that

3   they engaged in to create a human antibody after they

4   have already claimed to have invented one is highly

5   relevant to their question of enablement.

6            THE COURT:  And which is -- which Exhibit

7   No. 842, and what else --

8            MS. WIGMORE:  No, there's one more category,

9   and then we're done, but this was the only one on that

10  topic.

11           THE COURT:  But it's a Centocor document?

12           MS. WIGMORE:  Yes.

13           THE COURT:  Okay.  What's the objection to

14  that?

15           MS. VERRECCHIO:  We believe we've withdrawn

16  that objection, Your Honor.

17           THE COURT:  842 is admitted.

18           MS. WIGMORE:  And then the last category I

19  have relates to Exhibits 877 and 878.  These are both

20  reports on a Deutsche Bank Healthcare Conference in

21  which Johnson and Johnson, the parent company of

22  Centocor, participated where one of their executives

23  make statements about how this new human antibody

24  product Centocor has launched will be complimentary to

25  and not compete with Remicade.

1              We believe that's highly relevant to the

2    damages issues in this case since they're claiming lost

3    profits that Humira has allegedly taken from Remicade.

4              THE COURT:  So it's 877 and --

5              MS. WIGMORE:  And 878.

6              THE COURT:  -- 878.

7              MS. WIGMORE:  And to the extent there's a

8    hearsay objection, these are statements made by a

9    company officer in the context of a company-sponsored

10   presentation.

11             MS. VERRECCHIO:  Your Honor, the problem

12   with the transcript document is that we don't know

13   whether it's authentic or accurate.  Having read the

14   transcript, I did notice that there were multiple places

15   that there are typos or indications that the testimony

16   was not clear and so could not be accurately recorded.

17             So we have a problem with the transcript

18   itself.  It's not something that was prepared by

19   Centocor or a Centocor document.  We would be willing to

20   withdraw the objections to the presentation, which is

21   878, but not to the transcript, 877.

22             THE COURT:  The transcript released -- was

23   released for the market to rely on?

24             MS. WIGMORE:  That is my understanding.

25             MS. VERRECCHIO:  But there's been no witness

1   that has testified to that.

2           THE COURT:  I'm going to overrule those

3   objections.  877 and 878 are admitted.

4           MS. WIGMORE:  And then just one other issue,

5   Your Honor.  We had talked earlier about lab notebooks,

6   and you had admitted the exhibit -- the laboratory

7   notebook of Susan Tam who performed infringement testing

8   for Centocor.

9           It's not on our current list that we

10  provided, Your Honor, but we have on our exhibit list

11  the lab notebook of Dr. Randall Kincaid who performed

12  similar testing.  He actually performed invalidity

13  testing for Abbott.  And our position is that if the Tam

14  notebook is pre-admitted, then the Kincaid notebook

15  should also be pre-admitted.

16          MR. PEARSON:  Your Honor, I would submit --

17  actually, I'm not sure which exhibit we're talking about

18  that's the notebook.

19          MS. WIGMORE:  285 is the report, and it's an

20  exhibit to that report.

21          MR. PEARSON:  So if I understand correctly,

22  we have an exhibit that has -- admittedly has hearsay

23  because it's his report, and I understand that they took

24  that exhibit off their list.

25          MS. WIGMORE:  That's correct, Your Honor.

1    I'm asking that it be added, and not the whole report

2    but just the laboratory notebook which would be -- would

3    make a separate exhibit.

4              THE COURT:  The notebook is where, a copy of

5    it is where?

6              MS. WIGMORE:  We actually don't have that

7    here today.  I apologize, Your Honor.  This is a new

8    development based on our discussions this morning.

9              MR. PEARSON:  And I don't have it actually

10   here.  I actually don't recall whose notebook it is.

11   There are multiple employees at the company that did the

12   testing.

13             We submitted a notebook where the declarant,

14   the expected witness is the person who wrote the

15   notebook.  I don't have the notebook here to actually

16   determine that myself.

17             THE COURT:  And you're not going to bring

18   the person that did the test to trial?

19             MS. WIGMORE:  That's correct.  He was

20   deposed, and the defendants have made ample deposition

21   designations, I believe, about the notebook as well as

22   other things.

23             MR. PEARSON:  I don't think that's correct

24   that it's about the notebook.  And, in fact, I don't

25   think the notebook was -- the notebook that we're

1    talking about I don't think was an exhibit at the

2    deposition.

3              MS. WIGMORE:  A copy of it was.

4              THE COURT:  Why don't you send me a copy of

5    the deposition designations that you want to admit along

6    with the notebook?

7              MR. PEARSON:  I actually -- my

8    understanding, Your Honor, is that Abbott does not have

9    deposition designations for this person either.

10             MS. WIGMORE:  That's correct, we did not.

11             MR. PEARSON:  They've withdrawn those

12   deposition designations.

13             MS. WIGMORE:  We did, and this is a new

14   issue that arose based on our discussions with Dr. Tam,

15   but we would like to pursue the admission of this

16   particular lab notebook in light of the admission of the

17   Tam notebook, and we are willing to provide Your Honor

18   with a copy of it and any relevant deposition testimony

19   to the extent that would be helpful.

20             MR. PEARSON:  And, Your Honor, it's

21   difficult for me to respond --

22             THE COURT:  Well, hold on a second, okay?

23   We're not going to do this back and forth, okay?

24             I've already asked her for the deposition

25   designations and the lab notebook.  I'll -- I'll rule on

1   it, you know, consistent with what I've ruled on already

2   today, okay?  That's -- I mean, we pre-admitted a lot of

3   things without sponsored witnesses.  Admittedly, the lab

4   notebook that I've admitted for Centocor was done with

5   the representation from counsel that the person that

6   performed the test is going to be here to testify.

7            I'll take a look at this lab notebook, the

8   deposition designations, and see if the exhibit is

9   admissible.  If it is, I'll let it in.  If it's not, I

10  won't.

11           MS. WIGMORE:  And that's all that we have,

12  Your Honor.

13           I'm sorry, one additional thing.  We have

14  not yet handed up the revised list of pre-admitted

15  exhibits, but we can provide Your Honor with the version

16  of all those that we wish to pre-admit are circled, and

17  we'll provide you with a more formal list after we

18  conclude the hearing.

19           THE COURT:  Well, has the plaintiff's team

20  had sufficient opportunity to review the list that was

21  provided that included both non-objectionable exhibits

22  as well as those to which you had lodged objections?

23           MR. MASLOWSKI:  Your Honor, I think they're

24  actually going to hand you up a copy of the list that

25  we've been working from, so I think we are okay with the

1   exhibit, but we will double check just to be sure.

2         THE COURT:  Well, those that are included on

3   the list to which y'all hadn't voiced an objection up

4   until now, I'm going to admit those, and I'll rely on

5   counsel to put together a -- a list of exhibits that are

6   pre-admitted as having not been objected to and those

7   that are pre-admitted over the objections, okay?

8         MS. WIGMORE:  Thank you.

9         THE COURT:  Can y'all get that to me by

10  Wednesday or so of next week?

11        MS. WIGMORE:  Sure.

12        THE COURT:  I've carried some.  I'll have

13  your rulings on those that I've carried before next

14  Wednesday or, I guess, close of business Tuesday, and

15  then if y'all can put something together for me that

16  memorializes what we've done here today, then I'll have

17  to go ahead and get that issued before you roll out on

18  the following week.

19        MR. MASLOWSKI:  That sounds fine.

20        THE COURT:  Okay.  Where are you on your

21  deposition cuts?

22        MR. MASLOWSKI:  Your Honor, my understanding

23  is Abbott has objections to our -- a few of our

24  designations, and they have objections to some of our

25  counter designations, and I believe we have a few to

1   their designations.  We have --

2              THE COURT:  Okay.  All right.  Y'all need --

3   have y'all submitted all of your excerpts and a list of

4   what your objections are?  I've got notebooks with

5   deposition cuts in them, but those have been marked and

6   everything.  I'm not going to go through and read

7   depositions here.

8              MR. MASLOWSKI:  Right.  Yes, I believe we

9   have submitted everything.  There was some agreements

10  this morning, I believe.

11             MS. WIGMORE:  Yeah, I think we've worked out

12  a couple of issues so we can provide an update to Your

13  Honor.

14             MR. MASLOWSKI:  Right.

15             THE COURT:  Why don't y'all send me a letter

16  so I have a copy of the letter in front of me?

17             MS. WIGMORE:  Sure.  And then there are four

18  of our designations that are witnesses that Centocor has

19  indicated that will appear live, so we're happy to defer

20  any discussions of those objections if the witness

21  appears live.

22             THE COURT:  Okay.  Well, send me a summary

23  of what you've agreed to and what's --

24             MS. WIGMORE:  We do -- I'm sorry.

25             THE COURT:  Well, just tell me what's still

1   at issue in the deposition, and I'll read them.

2           MS. WIGMORE:  The process is still in

3   dispute, I believe.  We have taken the position that

4   given the disparity between the length of the

5   designations, that the way it should be handled is that

6   one side plays its affirmative designations, the other

7   side, to the extent they have counters, would

8   immediately play those, but they should not be combined

9   in one presentation because then we have examples of

10   where the counters will completely outweigh in terms of

11   time the discreet portions of affirmative designations.

12           So that's the process we've suggested.  We

13   have agreed for completeness or context purposes to add

14   certain portions and so that things don't have to be

15   replayed for context.  But we would like for our

16   designations to be played separately from their counters

17   with those exceptions.

18           MR. MASLOWSKI:  And, Your Honor, I don't

19   believe we have total agreement on the context issue.

20   It's Centocor's position that all the designations

21   should just be read from start to finish.  We can

22   represent to the jury beforehand that there are

23   designated portions from both parties you're going to

24   hear from the witness.  Play the entire videotape.

25           Otherwise, as Ms. Wigmore indicated, there

1   are issues with going back and having to play the same

2   portions to give counters context.  Otherwise, there's

3   going to be random questions that show up without any

4   context, and it's going to be pretty confusing to the

5   jury.

6           MS. WIGMORE:  And we've actually agreed in

7   those situations to play their counters, but just to

8   give an example of the concern we have, just taking a

9   couple examples, we have a designation of 37 seconds for

10  a particular portion of Bazemore's testimony.  Their

11  counters are four minutes and 52 seconds.  Similarly,

12  for Mr. Dow, there's one portion we've designated that's

13  19 seconds.  Their counters are four minutes and five

14  seconds.  For Dr. Shealy, we have a designation of one

15  portion that's one hour -- one minute -- one -- one

16  minute and 10 seconds, and their counters are 10 minutes

17  and 20 seconds.  So there's a real issue of --

18          THE COURT:  Okay.  Well, what I'm going to

19  do, ordinarily, you play the deposition straight

20  through, counters and -- the regular initial

21  designations and counters.

22          In light of what you told me about the

23  length of the counters, I assume what your concern is

24  that they're trying to bury your important stuff with --

25  and bracket it with stuff that you don't feel is very

1   important.  I'll look at the designations and see if

2   there's over-designations.  If I want to deviate from

3   the rule, then I'll -- I'll do it, okay?

4              MS. WIGMORE:  Okay.  Thank you.

5              THE COURT:  But what I need, though, I

6   assume I have it here, is that something that shows what

7   you've designated versus what they've designated, okay?

8              MS. WIGMORE:  You have color-coated

9   versions.

10             THE COURT:  Good.

11             MS. WIGMORE:  And we'll let you know of

12  additional objections or counters that have been

13  withdrawn.

14             THE COURT:  Okay.  Okay.

15             MR. MASLOWSKI:  Your Honor, would it be

16  helpful by, say, Monday midday we just send you a letter

17  that identifies these are the only issues we want ruled

18  on?

19             THE COURT:  Yes.

20             MR. MASLOWSKI:  Okay.  We will come up with

21  a joint letter and submit it to you.

22             THE COURT:  That will help me a great deal

23  actually.

24             MR. MASLOWSKI:  Okay.

25             THE COURT:  Okay.  And I'll -- it's not a

1    warranty that I'll get it to you by -- your rulings by
2    Wednesday, but I'll get it to you -- you know, certainly
3    by the end of next week, you'll have all of the rulings
4    that you need to roll out the following week.
5              Okay.  Y'all are starting the 22nd, right?
6              MR. MASLOWSKI:  That's correct.
7              THE COURT:  Okay.  All right.  Well, that
8    will be plenty of time to make whatever cuts you need to
9    make before you start.
10             Anything else we can do here today?  I've
11   carried some issues, and I've got the deposition cuts,
12   but from the plaintiff?
13             MR. SAYLES:  Not from the plaintiff, Your
14   Honor.  Thank you.
15             MR. BECK:  Judge, we have a couple of issues
16   we just need some guidance on.
17             One, there's an issue with respect to
18   exchange of exhibits and demonstratives, and I think
19   Mr. Sayles and I have worked that out, and we don't need
20   to bother the Court with that, but I know that was, I
21   think, on the agenda, and I just wanted to let the Court
22   know that we think we've worked that out.
23             Also, there's an issue with respect to how
24   we should approach Judge Ward with respect to an issue.
25   As the Court has heard this morning, there's already --

1   and both -- both of these parties have had litigation

2   and a lot of litigation, and there may be some documents

3   that -- and testimony for that matter that might be --

4   either party may try to get in with respect to this

5   other litigation, and I don't know if the Court -- I

6   guess what I'm seeking is should we just raise that with

7   Judge Ward on the first day of trial, or should Your

8   Honor deal with that issue?

9           THE COURT:  Well, what I can do is this,

10  I'll give you the knowns, what I -- or at least what I

11  expect he'll ask you to do, and that is with testimony

12  and things that are given in prior litigation, he's

13  going to, I think, require you to refer to it as prior

14  testimony of a witness or a party or something and not

15  refer to the fact that it was prior testimony given in a

16  separate proceeding.  Okay.  You see the distinction?

17          MR. BECK:  Yes, sir.

18          THE COURT:  Just say in prior sworn

19  testimony, you've said this or you've previously given a

20  witness statement that says this and not allude to the

21  fact -- if something comes up and you've -- you find

22  yourself in a position where you need to offer a

23  document that has -- you know, that's in another

24  proceeding or a transcript from another proceeding, to

25  the extent it can be redacted, I think he's going to

1    want it redacted, but to the extent it's not, I'd

2    encourage you to approach the bench first before you --

3    certainly before you blow it up on a projector in front

4    of the jury, okay?

5              MR. BECK:  Okay.

6              THE COURT:  That'd be how I would do it, and

7    I'd do it on a -- you know, I hate to do it piecemeal,

8    but I think that that's about the only way to handle it

9    on an exhibit-by-exhibit basis.

10             MR. BECK:  Your Honor, another issue has to

11   do with one of their witnesses, a Mr. Gerald Murphy, and

12   the parties have done a good job, frankly, of working

13   together to pare down the witness list.

14             My understanding is they're going to be

15   calling a Mr. Murphy as a witness in the case, as a

16   rebuttal witness, and I understand that he's a patent

17   law expert.  And our position is that the issues that he

18   might be testifying to really are not going to be before

19   the jury, acquiescence the Court's already ruled on as a

20   matter of law, and then as far as laches is concerned or

21   any of the other defenses, that's really going to come

22   up later as opposed to during the case we're going to be

23   trying.

24             So I guess my question is, should we just

25   raise that with Judge Ward, as well, and just alert

1   it -- alert him to it on the day of trial?

2            THE COURT:  Well, what's he going to testify

3   about that the jury's going to be addressing?

4            MR. MASLOWSKI:  He's going to testify about

5   factual information related to prosecution history in

6   rebuttal.  He's on our rebuttal list.

7            THE COURT:  Okay.  Well, is it going to

8   go -- it's going to go to laches or anything --

9            MR. MASLOWSKI:  It will not go to -- to the

10  inequitable -- or the equitable issues.

11           THE COURT:  Well, is there a motion in

12  limine that's been granted related to equitable issues?

13           MR. BECK:  Yeah -- well, the Judge has

14  separated it.

15           THE COURT:  I mean, that's -- I assumed he

16  had.

17           MR. BECK:  He said that will be dealt with

18  later.

19           THE COURT:  Well, what I would suggest is --

20  I don't want to -- I don't have context for what he's

21  going to try to testify about here today.  If you've got

22  some -- something in mind that you think he's going to

23  do that would either run afoul of an order in limine or

24  his bifurcation ruling, I'll -- go ahead and file a

25  motion in limine on that point and allow them the

1   opportunity to respond and, you know, at least flesh out

2   what the issue is.

3           He may rule on that either during the trial

4   or -- or before the trial, or he may refer it to me to

5   rule on.  That's -- but I hadn't been asked to do -- to

6   rule on those issues at this time, so --

7           MR. BECK:  And the last -- Thank you, Your

8   Honor.  And the last issue really has to do with the

9   charge because there have been claims that have been

10  dropped and so on, and I'm sure they're going to want to

11  make some changes in their proposed jury questions and

12  instructions, and I know we're going to do that, and

13  just to refresh my recollection, does Judge Ward

14  typically have a charge conference at some point so that

15  the parties can discuss these various issues with the

16  Court?

17          THE COURT:  He will.  It's a pretty fluid

18  process depending on what the claims -- I mean, what

19  claims and defenses are really pressed in front of the

20  jury.  Those often diverge from what's in -- what all is

21  in the pretrial order, but toward -- I would suspect

22  that toward the end of the plaintiff's case-in-chief or

23  some time between the beginning and the middle portion

24  of your case-in-chief, he will have his briefing

25  attorneys provide you with a draft charge or he may have

1   me work with you-all on that draft charge that I'll

2   furnish to you or that his clerks will furnish to you,

3   and then y'all have a chance to look at it.  He'll have

4   an informal charge conference after hours or before

5   hours one day and get your main areas of heartburn, as

6   he calls it.

7           MR. BECK:  Okay.

8           THE COURT:  He and staff will then confer

9   about those, make an updated change to the charge, and

10  supply you with that.  That will be most likely the

11  charge to which you need to be prepared to make your

12  formal objections on the record, but you'll have at

13  least two drafts before you have to make your formal

14  objections, and those drafts will track generally what

15  is going on in front of the jury, the questions he

16  decides to submit to the jury, okay?

17          MR. BECK:  Okay.  Thank you, Your Honor.

18          THE COURT:  And then, you know, obviously --

19  you know, probably after -- after the evidence is closed

20  before he brings the jury back for argument, he'll

21  reserve a half-hour or an hour on the record to allow

22  you to present formal objections and make your final

23  motions for judgment as a matter of law, all right?

24          MR. BECK:  Yes, sir.

25          THE COURT:  Anything else?

```
 1              MR. SAYLES:  Judge, the only thing I would

 2   ask is housekeeping, and it's definitely housekeeping.

 3              Would you like us to remove any of the

 4   notebooks or leave them with you for the time being

 5   until, say, Wednesday or so?

 6              THE COURT:  I need them until Wednesday,

 7   okay?

 8              MR. SAYLES:  Yes.

 9              THE COURT:  And then I may ask you to come

10   get them after that, okay?

11              MR. SAYLES:  All right.  Yes, sir.  Yes,

12   sir.

13              THE COURT:  Appreciate the offer.

14              MR. SAYLES:  Yes, sir.

15              THE COURT:  Thank y'all.

16              MR. SAYLES:  Thank you, Your Honor.

17              MR. BECK:  Thank you, Your Honor.

18              THE COURT:  Have a good weekend.

19              COURT SECURITY OFFICER:  All rise.

20              (Hearing concluded.)

21

22

23

24

25
```

```
 1                    CERTIFICATION

 2

 3          I HEREBY CERTIFY that the foregoing is a

 4  true and correct transcript from the stenographic notes

 5  of the proceedings in the above-entitled matter to the

 6  best of my ability.

 7

 8

 9
    SHELLY HOLMES                          Date
10  Deputy Official Reporter
    State of Texas No.: 7804
11  Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```