```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                  MARSHALL DIVISION

 3  CENTOCOR, ET AL           *    Civil Docket No.
                              *    2:07-CV-139
 4  VS.                       *    Marshall, Texas
                              *
 5                            *    May 29, 2009
    ABBOTT LABORATORIES       *    9:00 A.M.
 6
             TRANSCRIPT OF VOIR DIRE PROCEEDINGS
 7        BEFORE THE HONORABLE JUDGE T. JOHN WARD
              UNITED STATES DISTRICT JUDGE
 8  APPEARANCES:

 9  FOR THE PLAINTIFFS:    MR. RICHARD SAYLES
                           MR. MARK STRACHAN
10                         Sayles Werbner
                           1201 Elm Street
11                         4400 Renaissance Tower
                           Dallas, TX   75270
12                         MS. DIANNE ELDERKIN
                           MR. STEVEN MASLOWSKI
13                         MS. BARBARA MULLIN
                           Woodcock Washburn
14                         2929 Arch Street, 12th Floor
                           Cira Centre
15                         Philadelphia, PA   19104

16  FOR THE DEFENDANTS:    MR. DAVID BECK
                           Beck, Redden & Secrest
17                         1221 McKinney Street, Suite 4500
                           One Houston Center
18                         Houston, TX   77010
                           MR. WILLIAM LEE
19                         Wilmer Cutler
                           60 State Street
20                         Boston, MA   02109

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTER:        MS. SUSAN SIMMONS, CSR
                           Official Court Reporter
23                         100 East Houston, Suite 125
                           Marshall, TX   75670
24                         903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:    MR. WILLIAM MCELWAIN
                       MS. AMY WIGMORE
                       Wilmer Cutler
                       350 South Grand Avenue
                       Suite 2100
                       Los Angeles, CA   90071
                       MR. GIL GILLAM
                       Gillam & Smith
                       303 South Washington Avenue
                       Marshall, TX   75670

              *       *       *       *       *       *

                    P R O C E E D I N G S
              (Jury panel in.)

              COURT SECURITY OFFICER:  All rise.

              (Opening of Court.)

              THE COURT:  Please be seated.

              Good morning, Ladies and Gentlemen.

              Thank you for being here.  I know you've

been here a while and seen the film on patent cases.

              I'm John Ward.  I'm the resident judge

here in Marshall.  I handle the Marshall docket along

with Judge David Folsom from Texarkana.  He comes down

here twice a year, and I go up there twice a year.

              As you know, this is a civil case, and

we're going to -- I'm going to give you some dates that

we're going to try this case, and then I'll give you a

little outline of how we're going to proceed.

1              We're going to pick a jury today, and

2  we're going to be through here today before noon.  And

3  then you're going to come back and start this case on

4  Monday, June the 22nd.

5              We will try this case for four days that

6  week.  That takes us through the 26th.  And then we'll

7  come back -- we'll not try this case on that Friday.

8  And then we will come back on Monday and Tuesday the

9  29th and 30th.

10             So those of you selected will be -- need

11 to be here on the 22nd through the 26th and then on the

12 29th and 30th, and I believe we will be through with the

13 case not later than the close of business on June the

14 30th.

15             We work from 8:30 in the morning till not

16 later than 5:30 every day with a couple of breaks and a

17 lunch break.

18             With that schedule, is there anybody that

19 has -- that they know of at this time, like you have a

20 prescheduled surgery or something like -- you know, a

21 member of your family, or you've already got tickets

22 bought for a vacation, anything of that nature that

23 would prevent you from serving during the dates that

24 I've just given you?

25             If you do, would you raise your number at

```
 1  this time.
 2              We'll talk about that in a little bit,
 3  but right now just give me -- I've got No. 10, 15, 21,
 4  and 26.
 5              All right.  We'll take that up later, but
 6  I wanted to mark that.
 7              All right.  I live over in Longview.
 8              I'll give you the -- my personal
 9  information.  I live in Longview.  I've lived there
10  since -- I've been in East Texas since 1968 and live
11  with my wife, Cissy.
12              And we have three children.  They're all
13  grown, which it's -- today is her birthday.  She was not
14  exactly happy when I said I had to get up at 6:00 this
15  morning to -- that I had business in the court to take
16  care of.
17              We've had -- she's been putting up with
18  me almost 45 years now.  Any our three children live in
19  Longview and are all still there, and we have five
20  grandchildren.
21              Before I took this job -- this is my
22  tenth year on the bench -- I was a practicing lawyer
23  doing what these lawyers do here in East Texas and tried
24  many cases in this courtroom for 31 years, and this is
25  my tenth year on the bench.
```

1                    I guess -- I went to Baylor Law School

2 and Texas Tech undergraduate.  I told you my wife's name

3 is Cissy.  She does not work outside the home.  We sort

4 of made a firm deal when I wanted to go to law school

5 after getting out of school the first time.

6                    And she -- I told her, if she'd put me

7 through law school, then she could stay home and take

8 care of the house, and I'd manage to keep that deal.  So

9 she's not worked outside the home since 1967, actually.

10                    Actually, I served on one civil jury.  I

11 never have quite understood why those lawyers -- two

12 lawyers agreed to take me on the jury.  They were both

13 disappointed.  So I have some appreciation for what

14 y'all are going to be doing.

15                    Now, at this time, let's talk a little

16 bit about this case.

17                    First, I'm going to call it for

18 announcements from the parties.  It's Centocor,

19 Incorporated, and New York University versus Abbott

20 Laboratories, Cause No. 2:07-CV-139.

21                    When you make your announcements,

22 Counsel, please introduce yourselves and all of those

23 present that will be participating in the case.

24                    For the Plaintiff?

25                    MR. SAYLES:  May it please the Court, I

1 am Dick Sayles.  I'm counsel for Centocor and New York

2 University.

3                    Seated with me is Dianne Elderkin, who is

4 our lead trial counsel.  She'll be presenting during the

5 trial.

6                    This is Steve Maslowski, an attorney who

7 will also be participating, Barbara Mullin, and also

8 seated at counsel table is Tara Trask, who is an

9 assistant with my office.

10                    THE COURT:  Okay.  Are you ready to

11 proceed, Mr. Sayles?

12                    MR. SAYLES:  We are ready to proceed,

13 yes, sir.

14                    THE COURT:  All right.  Thank you.

15                    For the Defendant, Abbott?

16                    MR. BECK:  Your Honor, David Beck for the

17 Defendants.  We're ready to proceed.

18                    I'd like to introduce my colleague,

19 Mr. Bill Lee; also, Mr. Bill McElwain; Amy Wigmore; and

20 Mr. Gil Gillam, who will be participating in the trial,

21 Your Honor.  And we are ready to proceed.

22                    THE COURT:  All right.  Ladies and

23 Gentlemen, let me tell you a little bit -- you're about

24 to -- this is the first step in the selection of a jury.

25                    What you're about to embark on is one of

1  the most important duties that ordinary citizens can

2  perform.  Now, it's the second most important duty in

3  this Court's view.

4            We just went through, Monday of this

5  week, observing Memorial Day and honoring those fallen

6  citizens who -- young men and young women who gave

7  their -- paid the ultimate price to guarantee the

8  freedoms that we all enjoy.

9            And those freedoms, of course, are

10  outlined and set forth in the Constitution of the United

11  States.

12            Well, one of the great rights that are

13  guaranteed by the Constitution to those people who

14  reside in the United States is the right to a trial by

15  jury in a civil case.

16            The United States is the only country in

17  the world that guarantees in the Constitution the right

18  to a trial by jury in civil matters.  That's by virtue

19  of the Seventh Amendment to the Constitution.

20            So those -- by being here and

21  participating today, you're doing nothing less than what

22  ordinary citizens can do, and that is, preserve, protect

23  and defend the rights guaranteed to you and to every one

24  of us by virtue of our citizenship under the

25  Constitution.

1                    So it's an important -- what we're about

2    to start up -- start to do is a very important thing.

3                    In order for these lawyers to properly

4    represent their clients, they need full and complete

5    answers to the questions asked.

6                    I can assure you that these lawyers are

7    not going to be trying to attempt to pry into your

8    personal matters unduly, but they will be asking

9    questions after each of you have stood in turn here in a

10   few moments and given the information that's found -- to

11   the questions that are on the screen the same as I did.

12                   And then they will each have -- after I

13   make some additional remarks, they will have an

14   opportunity to ask you questions for about 30 minutes,

15   and they'll tell you something about their case.

16                   What I want to encourage you to do is

17   give full and complete answers.  And if they ask

18   something that for some reason, it's -- you don't feel

19   comfortable about sharing that particular information in

20   front of the whole panel, I want to encourage you to --

21   all you have to say is, "That's something I want to talk

22   to Judge Ward about," and I can assure you that you

23   will.

24                   Now, I don't know whether that will occur

25   in this case, because it's a patent case, but to give

1  you an idea of what I'm talking about, it's -- the first

2  year I was on the bench, one of the first cases I tried

3  was a case involving a death that had occurred -- it was

4  a civil case for damages -- a death that had occurred in

5  the jail in one of our neighboring counties.

6           And, necessarily, the lawyers on both

7  sides of the case were very interested in all

8  experiences that the potential jurors had had with jails

9  since they were 16 years old.

10           Now, I'll tell you, we had a lot of bench

11 conferences that day.

12           (Laughter.)

13           THE COURT:  And rightfully so.  And

14 rightfully so.

15           But I -- I just -- I'm not suggesting

16 we'll get into anything like that today, but I wanted to

17 just give you a little perspective of the type of

18 question -- anything that you feel uncomfortable about

19 in sharing but you -- it would be necessary to share in

20 order to give a full and complete answer.

21           Do not withhold any information based

22 upon that, please, because this is very important.  This

23 case is very important.

24           Now, the case, as you know, you've seen

25 the film, is a patent infringement case arising under

1  the patent laws of the United States.  The Plaintiffs in

2  this case, Centocor, is claiming that their patents were

3  infringed by the Defendants.

4            The Defendants contend that its products

5  do not infringe the patents.  And further the Defendants

6  contend that the patents are invalid.

7            The Plaintiffs are seeking money damages

8  from the Defendants by reason of the alleged patent

9  infringement.

10           Now, one of the differences about this

11 case from most cases that we try is that the jurors who

12 are selected are ultimately required to apply different

13 burdens of proof on different questions.  And that's

14 unusual in civil cases.

15           But in patent cases, the jury applies two

16 different burdens of proof.  One burden of proof is

17 known as a preponderance of the evidence, and another is

18 known as clear and convincing evidence.

19           I'm going to instruct you that when

20 you're answering any questions about burden of proof, I

21 want to tell you that when a party has a burden of proof

22 of any claim or an affirmative defense by a

23 preponderance of the evidence, it means that you must be

24 persuaded by the evidence that the claim or affirmative

25 defense is more probably true than not true.

1              You see the scales of justice here on the

2  statue right here in front of us.  These -- at this

3  point, we start off even, because you've heard

4  absolutely no evidence.

5              And you won't hear any evidence today.

6  You won't hear any evidence in this case until June --

7  starting June the 22nd.  But at the close of the case

8  either on the 29th or 30th, when you get the case, those

9  of you selected, you'll have to weigh the evidence, and

10 that evidence that you believe is worthy of belief, that

11 credible evidence, you'll have to weigh it.

12             And if the scales tip ever so slightly in

13 favor of the person or the party with the burden of

14 proof, they will have been said to be -- have met their

15 burden of proof by a preponderance of the evidence,

16 because that would mean it was more probably true than

17 not true.

18             On the other hand, when the party has a

19 burden of proof of any claim or defense by clear and

20 convincing evidence, it means that you must -- when you

21 consider the credible evidence, that you must have an

22 abiding conviction that the truth of that party's

23 factual contentions are highly probable; that is, that

24 evidence -- it's a higher standard of proof than by a

25 preponderance of the evidence.

1                    If you visualize, as I have my hands

2  here, the scales of justice, that means they're going to

3  have to be tipped more heavily in favor of the party

4  with -- that has that clear and convincing burden of

5  proof.

6                    Now, that is not to be confused with a

7  third burden of proof that will not apply in this case,

8  but if you watch TV, you may hear -- you've heard a lot

9  about the burden of proof, or maybe you've been on a

10 jury involving a criminal case -- beyond a reasonable

11 doubt.

12                   In that case, the scales have to be

13 tipped even more heavily in favor of the State or the

14 Government, because a person's liberty is at stake.

15                   So I -- that's the highest burden of

16 proof.  That will not apply in this case.  And I only

17 mention it to you so that you will not be confused of

18 something that, more than likely, you've heard more

19 about than the other two burdens of proof.

20                   So if you'll keep those in mind -- those

21 instructions in mind, they may want to ask you about

22 applying those burdens of proof.  But that's what the

23 Court wants you to know that -- that the burden of proof

24 will be in this case.

25                   Okay.  At this time, I want to ask the

1  jurors -- we'll start off, I guess, at -- with Ms.

2  Williams.

3              Ms. Williams, if you'll stand.  If you'll

4  give us this information, these nine questions, and when

5  you do, then just pass it along to the next juror, and

6  we'll go until all of you have had the opportunity to

7  give your information.

8              Please do.

9              JUROR MAXINE WILLIAMS:  My name is Maxine

10  Williams, and I've lived in Marshall, Texas, for about

11  10 years.  I'm originally from Jefferson.  That's in

12  Marion County.  Born and raised there.  I have five

13  children, they all grown, and about seventeen

14  grandchildren.

15              I am retired.  I worked at -- my last

16  place of employment was at Magnolia Manor Nursing Home

17  in Jefferson, Texas, and I was a CNA.  And I worked

18  there for about several years.  And I'm a high school

19  graduate.  I am single now.  I'm divorced.

20              And I was on a prior jury, and it was a

21  criminal case.

22              THE COURT:  Okay.  Thank you, ma'am.

23  Pass it along.

24              JUROR MYRICK:  My name is Mary Diane

25  Myrick, and I live in Big Sandy, Texas, and I've lived

1 there for about 30 years.  I have one child and three

2 grandchildren.

3                    I started out as a secretary, and after

4 my child was born, I became a housewife.  I am a high

5 school graduate and have an associate's degree in

6 business from TJC.

7                    My husband's name is Kenneth L. Myrick.

8 He started out at GE and then owned his own

9 heavy-equipment company, which he sold in the '80s.  And

10 since then, he's been a consultant and is now retired.

11                    I was on a criminal case on May 11th.

12                    JUROR D. WILLIAMS:  My name is David L.

13 Williams.  I live in Atlanta, Texas.  I've been there

14 for 12 years.  I'm originally from Haynesville,

15 Louisiana.  I have one child.

16                    I'm employed at Good Shepherd Medical

17 Center of Linden, Director of Social Services.  Also,

18 employed at the Coleman Atlanta Funeral Home as an

19 assistant.  I've worked there for 10 years.

20                    Educational background, Bachelor of

21 Science from Southern Arkansas University.  And also I'm

22 a certified activity director.  Not married.

23                    No previous civil case or jury or

24 anything like that.

25                    JUROR MARNI WILLIAMS:  My name is Marni

1  Williams.  I live in Marshall, Texas.  I do not have any

2  children.  I work for Price T. Young Middle School in

3  the office.  I've worked there 11 years.

4           Two years of college, not married, and

5  I've never served on a jury.

6           JUROR RICHARDSON:  My name is Janice

7  Richardson.  I have four children.  I live in Marshall,

8  Texas.

9           I work for Verizon Wireless.  I've been

10  employed with them for about four and a half years.  I

11  am a store manager.  I have -- a high school graduate,

12  some college.

13          My husband is Stanley Richardson.  He is

14  a retired truck driver for over 30 years.

15          And I have not served as a juror, civil

16  or criminal.

17          JUROR GURLEY:  My name is Stanley Gurley.

18  I live in Omaha, Morris County.  Three children.  My

19  place of employment is at Rehkopf's.  I do the stocking

20  job there.

21          My wife's name is Darlene.  I've lived in

22  Omaha for four years.  Have a high school diploma.  Been

23  to ATI trade school.  My wife's name is Darlene, and she

24  does janitorial work at the church.

25          And I've been on a civil case.

1    JUROR GOLDMAN:  My name is Randy Goldman.

2 I am from Pritchett.  Worked for Sam's Club for 16

3 years.  I've been married for 16 years.  I have four

4 kids and a high school diploma in Oklahoma.

5    And I've never served on a jury.

6    JUROR STRAIT:  I'm Eric Strait.  I live

7 in Harleton, Texas, for about 15 years.  We've got a

8 combined of four kids and four grandkids.  I work for

9 Watco Mechanical Services on railroad cars.  I've been

10 there for four years.  I've got high school, trade

11 school, some college.

12    My wife's name is Linda.  She's retired

13 from AT&T.  She worked there for like 31 years.

14    And I've been on a couple of civil

15 juries.

16    JUROR BAESE:  My name is Duane Baese, and

17 I'm from Hallsville.  We have one daughter.  She was

18 adopted from the Baptist -- in Dallas, Buckner Baptist

19 (sic) Home.

20    And I worked at Texas Eastman for 34

21 years, and I'm retired now.  I worked as a draftsman in

22 engineering.  And I graduated from LaTourneau College.

23    My wife's name is Jackie, and she's also

24 retired.  She worked in daycare, child -- childcare and

25 also as a cook for a while.

1           And I was picked for a jury on a civil

2   case, but it was settled out of court.

3                    JUROR JONES:  My name is Ben Jones.  I'm

4   from Gilmer.  I've lived there somewhere around 28

5   years.  Got two kids.  I'm a firefighter for the City of

6   Kilgore.  I've been there just under eight years.  After

7   high school, I went to the Fire Academy and EMT school.

8                    My wife's name is Tiffany.  She works for

9   the Diagnostic Clinic of Longview in orthopedics.  And I

10  think she's been there about three years.

11                   And I've never served on a jury.

12                   JUROR YATES:  My name is H.J. Yates.  I

13  live in Pittsburg, Texas.  I got four daughters, three

14  grandkids.

15                   I work for the Texas Northern Railroad.

16  I've recently been laid off.  And before that, I worked

17  for Pilgrim's Pride for 12 years.

18                   My wife is Lisa Yates.  She's a preschool

19  teacher.  She's been there for about 18 years.

20                   I have -- I have never been on a -- on

21  any kind of jury before.

22                   JUROR MONTS:  I'm Debra Monts.  I live in

23  Pittsburg, Texas.  I have three kids, six grandkids.  I

24  work with the Upshur County Sheriff's Office.  I'm a

25  dispatcher.  Also, I'm a reserve deputy.  Been there

1  eight years.  I have high school and police academy

2  college type.

3                    My husband is Mike Monts.  He is a Gilmer

4  police officer.  He's been there five years.  He works

5  at the junior high school as the school resource

6  officer.

7                    And no jury experience.

8                    JUROR KEEL:  My name is Debbie Keel.

9  I've lived in Gilmer, Texas, for about 30 years.  I have

10 one son and one grandson.

11                    I've been self-employed for the past five

12 years as a freelance computer graphic artist, and I've

13 been in this field of work probably for the past 30, 35

14 years.  I have three years of college.

15                    My husband is John Keel, and he works for

16 Etex Telephone in Gilmer.  He's been there about 35

17 years.

18                    And I have served on one civil jury

19 trial.

20                    JUROR SCHANLEY:  My name is Alice

21 Schanley.  I have one son.  I live in Big Sandy, Texas.

22 I've work as a Director of Operations for Trinity Clinic

23 in Tyler.  I've been there about six years.  I have a

24 high school diploma, a little bit of college.

25                    My spouse's name is James.  He's semi

1  retired.  He's working at Brookshire's part time as a

2  courtesy clerk.

3                And I've never served on a jury.

4                JUROR KIZER:  My name is Carolyn Kizer.

5  I live in Big Sandy, Texas, in the country.  I was a

6  widow about five years and remarried in the last two

7  years, and between the both of us, we have six children

8  and eighteen grandkids.

9                I work part-time as city judge.  I've

10 been doing that for four years.  I'll retire as justice

11 of the peace, Precinct 3, of Upshur County, and I've

12 worked there eight years.  I'm a high school graduate

13 and then all the little seminars you have to go to to be

14 a justice of the peace or a city judge.

15               My spouse's name is Gary Kizer.  He is

16 retired now.  He did work for National Oilwell Services

17 out of Kilgore.

18               I have never worked -- I have never

19 served on a jury, a civil or criminal.

20               JUROR COLEMAN:  My name is Donna Coleman.

21 I live in Gilmer, Texas, and I've lived there for 20

22 years.  I have two living and one deceased child.  I

23 work as a teacher, and I have a bachelor's degree in

24 language arts.  I've worked there for 12 years.

25               I -- my husband's name is John Coleman.

1  He is also a teacher, and he teaches chemistry and

2  biology.  He has been teaching at that district for 20

3  years.

4              And I have never served as a juror.

5              JUROR MANNING:  My name is Gary Manning.

6  I live in Longview, Texas.  I've got two children and

7  one grandson.  I work as an independent real estate

8  landman for about the last 20 years.  I have a high

9  school education and some college.

10             My wife's name is Nancy.  She works as

11 the law librarian for Gregg County and Deputy County

12 Clerk.  She's only worked there a few months.

13             And I've never -- never served on a jury.

14             JUROR LITTLE:  I'm Linda Little.  I live

15 in Diana, Texas.  I've lived there 37 years.  I have

16 three grown children, seven grandchildren.  And I am

17 retired as a Chief Financial Officer for a home that

18 served disabled children.  I worked there seven years.

19             I have an associate's degree.

20             My spouse's name is Willie Little, and he

21 is laid off from U.S. Steel and recently disabled.  He

22 did engineering work for Lone Star for eight years.

23             And I have served on a criminal case.

24             JUROR NUNLEY:  My name is Patricia

25 Nunley.  I have seven children, numerous grandchildren

1  and great-grandchildren.  I have been privileged to be a

2  stay-at-home mom.

3              I'm married to W.H. Nunley.  He retired

4  from LaTourneau.  I have a high school education.  I

5  have lived in Gilmer for 35 years.

6              I served on a criminal case over 30 years

7  ago.

8              JUROR KENDRICK:  My name is Shannon

9  Kendrick.  I live in Jefferson, Texas.  I have two kids,

10  one grandbaby.

11              I work for Jordan Health Services.  It's

12  a home health agency there.  I've been there just over

13  five years.  I have a high school education.  I'm

14  divorced.

15              And I did serve on one civil case.

16              JUROR VAUGHAN:  I'm Donald Vaughan from

17  Atlanta, Texas.  I've got three children.  I work for

18  Texas Department of Transportation.  Been there for 15

19  years.  I have a high school education.

20              My wife works -- is -- her name is Linda.

21  She works for Texas Department of Transportation in the

22  Travel Division as a manager, and she's been there about

23  12 years.

24              And I've never served on a jury.

25              JUROR BRILEY:  My name is Carl Briley.  I

1   live in Longview, Texas.  I have two children.  I work

2   currently with the Longview Independent School District

3   as an elementary school principal.  I've worked there 11

4   years.  I have a doctorate's degree in education.

5              My spouse's name is Barbara.  She works

6   as a schoolteacher in Longview.  She has worked there 11

7   years.

8              I've had criminal and civil jury

9   experience in Dallas, and I've also had that same

10  experience here in Marshall.

11             JUROR RIDDLE:  My name is Barbara Riddle.

12  I live in Queen City, Texas, and we have lived in the

13  Atlanta/Queen City area for the past 30 years.

14             I have two adult children, four

15  grandchildren.  Two of those are adults.  My grandson is

16  a police officer in Atlanta, and my other grandson is

17  now going through basic training for the Air Force.  And

18  the other two grandchildren will be seniors next year.

19  And then we have three great-grandchildren.

20             We've been married 46 years.  And I am

21  employed with the Atlanta Independent School District as

22  a receptionist.  I've been employed with them for 25

23  years.  My husband is retired as a distribution manager.

24  And I have a high school diploma.  My husband's name is

25  Gerald Riddle.

1           And let's see, I have had no prior jury

2  experience.

3           JUROR ROBERTS:  My name is Thomas

4  Roberts.  I live in Hallsville, Texas.  And I got three

5  kids, three grandkids.  I work for Sabine Mining.  I've

6  been there for 24 years.  No high school education.

7           My wife's name is Martha.  Works at

8  Hallsville School District.

9           I've never served on a jury.

10          JUROR HICKERSON:  Margie Hickerson.  I

11 live in Gilmer, Texas.  I have four children and one

12 grandchild.  I'm the house manager for a restaurant

13 there in Gilmer.  And I have some college.  And I've

14 never served on a -- I'm not married, and I've never

15 served on a jury.

16          JUROR TURBEVILLE:  Paul Turbeville.  I

17 live in Atlanta, Texas.  I have one child.  I've worked

18 for International Paper in the Maintenance Department

19 for 16 years.  I have a high school diploma, some

20 college.

21          My wife's name is Karen.  She worked for

22 Postal Service for five years.  And I have served on a

23 grand jury.

24          JUROR GEORGE:  My name is Kathy George.

25 I live in Hallsville, Texas.  I have two children.  And

1  I've worked at First Baptist Church, Hallsville for two

2  years.  And I graduated high school.

3              My husband's name is James.  He works at

4  Aaon Coil in Longview.  He's worked there nine years.

5  And I've worked -- I've had -- I've been on civil and

6  criminal cases.

7              JUROR DURDEN:  Hi.  My name is Frank

8  Durden.  I live in Avinger, Texas.  I have no kids.  I

9  work at Sonoco Baker off of Highway 59.  I've worked

10 there for three years.

11             I have a high diploma.  After high

12 school, I enlisted in the Army reserve.  I'm stationed

13 in Tyler.  I'm not married, and I have never served as a

14 juror.

15             JUROR FLETCHER:  My name is Elaine

16 Fletcher.  I'm from Gilmer, Texas.  My -- I live at home

17 with my parents, who live in Pritchett, Texas.  I have

18 no kids.

19             I am a substitute teacher for several

20 different school districts, one including Longview ISD

21 and Gladewater.  And I've worked there on and off since

22 2000.

23             I moved to California in June of 2000 and

24 got married, and my husband came back from the Gulf War

25 in 2003, slapped me with a divorce, and I moved back

1  here and been -- went back to working for the different

2  school districts.  I went back to my maiden name, which

3  is Fletcher.  Like I said, he was in the Navy, so I have

4  no idea what he's doing now.

5             I have a BA in general studies from

6  Harding University in Searcy, Arkansas, with an emphasis

7  in physical education and health and religion and

8  philosophy.

9             And I've never served on either jury.

10 I've been to Judge Parish's court for jury duty, but I

11 didn't get selected at either time.

12            THE COURT:  All right.  Thank you very

13 much, Ladies and Gentlemen, for the information.

14            At this time, we will have the lawyers

15 ask you questions.

16            Mr. Sayles, you going to ask for the

17 Plaintiff?

18            MR. SAYLES:  May it please the Court.

19            THE COURT:  Yes, sir, from the podium.

20            MR. SAYLES:  Counsel, Ladies and

21 Gentlemen of the Jury Panel:  Your time is precious and

22 valuable, and Judge Ward runs this courtroom in respect

23 of your time.  So we're on a clock, and I'm going to

24 try -- for a man that grew up in the South, I'm going to

25 try to talk fast, but that's sometimes hard for me to

1    do.

2                    Judge Ward has told us that we may take

3    about five minutes to tell you what we contend in this

4    case and then ask questions, so I would like to do that.

5                    Centocor and New York University have a

6    patent issued by the U.S. Government at the Patent &

7    Trademark Office, and we contend that Abbott is

8    infringing that patent by the making and the selling of

9    their drug called Humira.

10                   You will hear evidence in this case about

11   Abbott's drug, Humira, but you're also going to hear

12   about another very important drug.  We contend that the

13   evidence is going to show that Centocor first came out

14   with a drug called Remicade.

15                   And Remicade was truly a wonder drug.

16   The evidence is going to show that this drug was used to

17   treat chronic, debilitating conditions that prior to the

18   invention of this type of drug basically had no

19   effective treatments.

20                   An example would be rheumatoid arthritis,

21   which can be a crippling disease.  Also, another disease

22   that these drugs address is Crohn's disease, which is a

23   terrible disease of the gastrointestinal tract that

24   prior to the invention of these drugs would require for

25   treatment just a series of surgeries removing a portion

1  of the GI tract.

2              But then along came Remicade, which is

3  Centocor's drug, which addressed these diseases and was

4  very, very helpful in the treatment of these diseases.

5              After that, Abbott came out with their

6  drug, Humira.

7              Now, the evidence is going to show -- and

8  I will acknowledge to you now that Humira is also a

9  wonderful drug.  They are used to treat rheumatoid

10 arthritis, Crohn's disease, and four or five other

11 diseases that I won't go into now, but you're going to

12 hear about those in the evidence later on.

13             These are special kinds of drugs.

14 They're not typical medicines that can just be made in a

15 factory or a laboratory, but rather these drugs are

16 actually antibodies.

17             Antibodies are typically made by our

18 immune system within our body to fight diseases.  But

19 under certain circumstances, the body won't produce the

20 right antibodies to fight a disease, and these drugs,

21 Humira, the accused product here, and Remicade are

22 antibodies that treat these diseases.

23             I'm going to give you a mouthful here

24 that I would be surprised -- I had never heard of this

25 myself, and I would certainly be surprised if anybody

1  else had.

2              These antibody drugs are made using a

3  complicated technology.  It's called recombinant DNA

4  techniques.  And you're going to hear more about that in

5  the evidence, but simply stated, that means that you

6  recombine DNA scientifically to make a drug.

7              This case is about two competing

8  companies that compete head to head:  Centocor on the

9  one hand, our client, and Abbott on the other hand.

10             Centocor and -- we contend is not afraid

11 to compete with Abbott.  They are.  It benefits patients

12 to have competition.  It benefits patients to have

13 choices of drugs.  It benefits doctors to have choices

14 of drugs.

15             But we contend that Abbott should pay for

16 the use of Centocor's property, which is in the

17 patents-in-suit here.  And they have used that, they

18 infringe the Centocor patent by making and selling

19 Humira.

20             It's like a trespass.  If I had the deed

21 to property and somebody comes on and cuts my trees,

22 they owe for it.  And that's what we have here.

23             I want to add we're not seeking to take

24 the Humira drug off of the market.  Rather, we're

25 seeking reasonable compensation for Abbott's use and

1  sale of their drug, Humira.

2              Every case has two parts.  This one does.

3  We contend in this case that the damages are

4  substantial.  Abbott has had sales, since July of 2006

5  projected through June of '09 when this case goes to

6  trial, in the neighborhood of $8-1/2 billion of Humira.

7  And we are seeking damages for their use of the patent

8  ideas that Centocor owns in this case and because the

9  sales are large, the damages are large.  The evidence is

10 going to show the damages here, we contend, are over $2

11 billion for the infringement that has occurred.

12              I also want to add that after -- we

13 contend that after this profit is taken into account

14 that Centocor should have a portion of because of the

15 infringement, that Abbott itself is left with a very

16 hefty and tidy profit that is in excess of the damages

17 that we seek in this case.

18              You're going to hear some evidence in

19 this case about defenses, of course.  Abbott claims that

20 the patent-in-suit, among other things, is invalid.  It

21 was issued by the Patent & Trademark Office.

22              You're going to be given the law that it

23 is -- the patent is presumed valid, and the bar is very

24 high to invalidate a patent.  It's the clear and

25 convincing standard.

1              THE COURT:  Mr. Sayles, I don't know what

2    clock you're using, but mine says you're at about six

3    and half minutes.

4              MR. SAYLES:  All right.  Let me go and

5    ask you about special training that you've had.  And in

6    doing this, let me say that if you already answered this

7    question --

8              Mark, you want to come up here and help

9    me with this?

10             If you've already asked -- answered this

11   question about yourself or your spouse, I don't want you

12   to answer it again.  But if a close family member or a

13   loved one has experience -- while they're working with

14   that -- this always happens -- we were doing this in the

15   interest of time.

16             THE COURT:  Well, I've stopped the clock.

17             MR. SAYLES:  All right.

18             THE COURT:  There we go.  There we go.

19             MR. SAYLES:  All right.  Now, if you've

20   already answered, you do not have to hold up your hand

21   or your number and answer again, because we've gone

22   through that.  But if a close family member that you

23   haven't answered about or someone that is a close friend

24   of yours has experience in biology, chemistry,

25   engineering patents, or law, we'd like to hear about it.

1                    So let me just see here on the first
2  row -- and you can just hold up your hand if you haven't
3  already answered about that.
4                    Yes, ma'am.  Would you tell us, please.
5                    JUROR RICHARDSON:  My little sister is an
6  engineer.  She has a degree in engineering.
7                    MR. SAYLES:  Okay.  What field of
8  engineering?
9                    JUROR RICHARDSON:  Architectural.
10                    MR. SAYLES:  Okay.  Thank you very much.
11                    Anybody else on the first row, going back
12  to the second row?  Okay.  That hasn't answered.
13                    Yes, sir.
14                    MALE JUROR:  My mother-in-law and my baby
15  girl are both nurses.
16                    MR. SAYLES:  Okay.  Thank you.
17                    And we've got one right here on the first
18  pew.
19                    JUROR LITTLE:  My husband was an engineer
20  in designing patents, four patents.
21                    MR. SAYLES:  What kind of products were
22  involved?
23                    JUROR LITTLE:  He was at U.S. Steel,
24  which was in the steel industry.
25                    MR. SAYLES:  And was he an inventor on

1  some patents?

2              JUROR LITTLE:  He was part of the design.

3  He was not in the -- he didn't have a degree in

4  engineering, but he did the designs, and another

5  engineer would -- a licensed engineer would sign off on

6  it.

7              MR. SAYLES:  All right.  Have you

8  yourself been involved in the patent process?

9              JUROR LITTLE:  No, I haven't.

10             MR. SAYLES:  By virtue of his involvement

11 in it, do you feel like you have gained any special

12 knowledge or expertise in the patent process, other than

13 knowing that he was, in fact, involved?

14             JUROR LITTLE:  He talked about it

15 extensively at home, and so I can't recall the

16 knowledge -- I can't give you callback on knowledge or

17 anything, but we did talk about it extensively.

18             MR. SAYLES:  Okay.  And did his company

19 seek to protect their patent rights from time to time?

20             JUROR LITTLE:  Yes.

21             MR. SAYLES:  Okay.  Thank you very much.

22             JUROR COLEMAN:  My husband teaches

23 chemistry; I have a sister-in-law who's an industrial

24 engineer; a sister-in-law who's an aerospace engineer;

25 and a brother-in-law who is a mechanical engineer.

```
 1                    MR. SAYLES:  All right.
 2                    JUROR MYRICK:  My husband was a -- my
 3   husband worked in the Engineering Department at GE, and
 4   he was -- he had several patents that he developed for
 5   products that were in their name, not his.
 6                    MR. SAYLES:  Okay.  So --
 7                    JUROR MYRICK:  Like inventions for air
 8   conditioning and stuff like that.
 9                    MR. SAYLES:  All right.  From time to
10   time, were they involved in the enforcement of the
11   patents?
12                    JUROR MYRICK:  I don't know.
13                    MR. SAYLES:  Okay.  Thank you very much.
14                    JUROR RIDDLE:  I think I've already said
15   this, but my grandson is a law enforcement officer in
16   the Atlanta, Texas, Police Department.
17                    MR. SAYLES:  Okay.
18                    MALE JUROR:  My oldest son is a law
19   enforcement officer down south.
20                    MR. SAYLES:  Okay.  Thank you.
21                    THE COURT:  Mr. Garrett, No. 1.
22                    JUROR MAXINE WILLIAMS:  I have two
23   daughters who are LVNs, and they both work in various
24   rehabilitation homes.
25                    MR. SAYLES:  Okay.  Thank you.
```

1            All right.  Let me go on to the next

2  topic.  As you have heard several times already, this is

3  a patent case, and there are some folks that feel like

4  that we ought not to have patents, because patents give

5  the patent holder the exclusive right to use the

6  invention under certain circumstances.

7            But it is a fact -- and I think you may

8  have been taught this and shown this this morning --

9  that the only property right that is protected in the

10  Constitution of the United States is patents.

11            The Constitution gives Congress the

12  directive to make laws regarding patents, and that's so

13  that we can have innovation and development.

14            But is there anybody on the jury panel

15  that feels like that it's not right that a party should

16  be able to obtain a patent, and in effect, have a

17  monopoly under certain circumstances?

18            Anybody on the first row?

19            Anybody on the second row?

20            Let me go back to the pews.

21            Here's a little harder question.

22  Medicines and drugs, especially good ones, we want

23  people to have access to.  And a person might feel that,

24  you know, it's all right to have a patent on a better

25  mousetrap, but when it comes to drugs, I just don't

```
 1  think that's right.
 2              Well, if you feel that way, we need to
 3  know it, because in this case, we have Centocor, which
 4  is a manufacturer and seller of pharmaceuticals and
 5  drugs, and Abbott Laboratories, which is as well, and
 6  they obtain patents on their various drugs.
 7              But if you feel like that's not right,
 8  that they shouldn't be able to, or have hesitation about
 9  it, please tell me now.  Anybody?
10              All right.  We're seeking damages, and
11  the law says that to enforce patent rights for damages,
12  you have to bring a suit in the United States District
13  Court, and here we are.
14              A lot of people feel like there are too
15  many darn lawyers and too many lawsuits.  But the law
16  says that if your patent rights have been violated, that
17  you complain about it by bringing a suit in federal
18  court.
19              Is there anybody that starts out thinking
20  that the courthouse doors ought to be a little tighter,
21  and maybe we ought not to be able to bring these type of
22  suits?
23              Anybody on the first row?
24              Second?
25              All right.  Now, in the interest of time,
```

1    I'm going to take your silence as a statement that

2    you're okay with what I'm saying.  You can see we just

3    don't have time to go person by person.

4                  I want to ask you about this burden of

5    proof idea.  The Court will instruct you again on that,

6    and naturally, you are to follow the instructions of the

7    Court just as the lawyers are to follow the instructions

8    of the Court.

9                  But simply stated, the burden of proof to

10   prove infringement and damages is the preponderance of

11   the evidence.  The burden of proof to prove invalidity

12   is clear and convincing evidence, a higher standard.

13   That's the standard that Abbott has for their defense of

14   invalidity.

15                 Some folks feel it's not fair that the

16   Plaintiff's side, with those issues, would have a lower

17   burden of proof than the defense side, but we must

18   follow the law.

19                 Is there anybody that has such a feeling

20   against that being fair that they ought to say so now?

21   Naturally, we want to know if you feel that way.

22                 Anybody on the first row?

23                 Second?

24                 Back in the pews?

25                 Another way to say it is, when the Judge

1  instructs you, as he has and as he will, as to the

2  burdens of proof, will you apply them?

3                     And I'm accepting your silence that you

4  will.

5                     All right.  Now, I want to ask you about

6  your knowledge of some of the drugs that are involved

7  here.

8                     Can you click to the next slide, please,

9  or can I?

10                     Humira is the accused product made by

11 Abbott.  Remicade is Centocor's product that you'll hear

12 about in the damage analysis.

13                     Enbrel is another product that you'll

14 hear about.  They're called the big three that compete

15 in the market for treating these various diseases.

16                     Enbrel is not involved in this case.

17                     And Methotrexate is another drug that is

18 sometimes used in combination with these three drugs.

19 It's a choice a physician makes.  Methotrexate is a

20 separate drug that is dosed separately, it's not

21 combined, and dosed at the same time.  It's little pills

22 that you take according to the doctor's instructions.

23                     Here's my question.  This gets a little

24 personal.  Is there anyone who has taken any of these

25 drugs that you know of or anybody in your family?

1                    Would you mind saying, ma'am?

2                    JUROR LITTLE:  As I stated, my husband

3     had gotten -- has been laid off from U.S. Steel, and the

4     week after he was laid off, he was diagnosed with

5     rheumatoid arthritis, chronic rheumatoid, and he is in

6     the process of -- with a rheumatologist.  He's taking

7     Methotrexate now.

8                    He is on appointment to see the doctor to

9     start taking one of the other -- Humira or Remicade or

10    one of the other drugs.

11                   MR. SAYLES:  All right.  Now --

12                   JUROR LITTLE:  He's in the process of

13    doing that.

14                   MR. SAYLES:  -- the fact that your

15    husband --

16                   JUROR LITTLE:  Uh-huh.

17                   MR. SAYLES:  -- is suffering from this

18    disease, do you think that would affect your ability to

19    impartially judge the issues that are being put forth in

20    this patent infringement case?

21                   JUROR LITTLE:  I can't convincingly say

22    that I can't some, and I have to say that it could.

23                   MR. SAYLES:  Okay.  All right.  Anyone

24    else -- I'm going to keep moving quickly -- that has

25    taken these drugs or a loved one?

1               Yes, 19.

2               JUROR NUNLEY:  I have a son-in-law that

3    has rheumatoid arthritis.  I have no idea what he takes

4    or what he does for it.

5               MR. SAYLES:  Okay.  Thank you very much.

6               Anybody else?

7               The next topic that I want to talk to you

8    about is the manner of administration of drugs.  The

9    manner of administration of drugs is not in the patent,

10   and it's not a part of the elements of the patent you're

11   going to hear about, but there's going to be evidence

12   about the mode of administration.

13              And Humira is injected, and Remicade is

14   by IV infusion about every two months.  It varies

15   according to the doctor's instructions but about every

16   two months.

17              Is there anyone on the jury panel that

18   has experience having to self inject a medication?

19              Yes, ma'am.  And, again, do you mind

20   telling us?

21              FEMALE JUROR:  I have to do injections

22   every evening with Lantus --

23              MR. SAYLES:  Okay.

24              FEMALE JUROR:  -- for diabetes.

25              MR. SAYLES:  All right.  Yes, ma'am.

1            FEMALE JUROR:  I've had to do injections
2  of insulin since 1990.  At the present time, I'm wearing
3  an insulin pump.
4            MR. SAYLES:  Okay.  Thank you.  I know
5  this is personal, but I sure do appreciate that.
6            FEMALE JUROR:  I am an insulin-dependent
7  diabetic.
8            MR. SAYLES:  All right.  Thank you.
9            FEMALE JUROR:  For several years several
10 years ago, I gave myself allergy shots.
11            MR. SAYLES:  Okay.  Judge, how much time
12 do I have?
13            THE COURT:  A little over 10 minutes.
14            MR. SAYLES:  All right.  Anybody else?
15            Now, let me bring us to a question that's
16 very important in this case.  The test of jury service,
17 which it sounds simple, but it's -- we know we're all a
18 product of our life's experiences, right, and it
19 influences the way we see things.
20            And the test of jury service is, will you
21 follow the law, as given to you by the Court, and will
22 you base your decision on the evidence?
23            And almost everyone, if we were just
24 talking, would say, well, sure, I'll do that.  But it
25 gets a little harder when you start getting down into

1   the specifics here.

2               In this case, on the damage side, you're

3   going to hear a lot of competing evidence about the mode

4   of administration and what that effect is on the sale of

5   products.  That's all taken into account in the

6   evidence.

7               And what I want to ask you if you can do

8   is, if you think that an IV infusion is less convenient

9   than giving yourself a shot at home or if you think an

10  IV infusion is safer by going to the doctor's office

11  every couple of months, will you, nevertheless, base

12  your decision on the basis of the evidence that takes

13  all of that into account and not your own personal

14  preference?

15              Because don't you see that if we present

16  evidence, and somebody says, well, I give myself a shot

17  at home, and I think that's the way it ought to be,

18  that's evidence that we don't know anything about.

19              So I'm asking you, will you decide the

20  case on the basis of the evidence you hear on that

21  subject when it comes around?

22              Everybody here?

23              Yes?  Okay.  All right.  I'm accepting

24  that no one is going to substitute their own personal

25  preference for the evidence.

1              Now, I have to address for a moment the

2   idea of damages.  We have heard a lot about the

3   courthouse rendering too much money.

4              It's usually in personal injury cases

5   that we hear about that, and, you know, that may or may

6   not be true.  I think every case is judged on its merits

7   and stands on its own.  But some people have very strong

8   feelings about that.

9              In this case, the sales figures on the

10  accused product are in the billions.  Therefore, the

11  damages that will be presented through evidence are also

12  over $2 billion.

13             Now, there might be some folks that say,

14  I don't care what your evidence is.  I can't go above

15  some amount of money, a million, 10 million, 100

16  million, 1 billion.

17             But my question is, will you base your

18  decision on the evidence regardless of the amount

19  involved, even though it's large?

20             Front row?

21             Mr. Williams, how do you feel about that?

22             JUROR D. WILLIAMS:  I'll agree.

23             MR. SAYLES:  Okay.  If I owe you a

24  hundred, I pay you a hundred; if I own you a billion, I

25  pay you a billion; is that right?

```
 1                    JUROR D. WILLIAMS:  That's right.

 2                    MR. SAYLES:  All right.  Does anybody

 3  feel differently than what Mr. Williams just said?

 4                    Okay.  All right.  I'm going to take it

 5  that nobody has preconceived limits, and if that's the

 6  evidence, you'll follow the instructions of the Judge on

 7  what the burden of proof is on proving it, which is by a

 8  preponderance of the evidence, and if it's large, that's

 9  the way it is, agreed?

10                    Okay.  Let me bring up a topic that I

11  want to cover very briefly.

12                    The car you drove to the courthouse

13  probably has a lot of patents that apply to many

14  aspects, from headlights to taillights, top to bottom.

15  And it's not unusual that products such Humira or

16  Remicade or Enbrel or Methotrexate, any product, is

17  subject to several patents, several different patents.

18  But because the accused product here, Humira, has some

19  patents that apply to it is no defense, in and of

20  itself, to a patent infringement case.

21                    Now, is there anybody that says, well,

22  you know, if they have some patents, they can't infringe

23  another patent?  Because that's not right.  That's not

24  what the law says.

25                    And so I'm telling you that now and
```

1    asking you if you can accept the law, as given to you by

2    the Court, in that regard?

3                    First row?

4                    Second row?

5                    Third row and on back?

6                    Thank you.  That -- that -- you know,

7    I'll give you an example to make this point, and then

8    I'm going to move on.

9                    A person could get a patent for a

10   three-legged stool, have it issued, and then someone

11   could come along and get a patent for a four-legged

12   stool.  But it still might infringe the patent on the

13   three-legged stool, you see.

14                   So the fact that they have patents is not

15   a defense to the patent claim.

16                   In this case -- and this is the next

17   question -- you must judge the infringement issue by

18   comparing the accused product, Humira, to the patent

19   claims that we haven't shown you yet and not our

20   products, Centocor's product, Remicade.

21                   But to the patent claims, will you do

22   that, if that's what the law says, compare it for

23   infringement purposes, compare the accused product,

24   Humira, to the patent claims that we'll show you later

25   on in the evidence?

1                    Second row?

2                    Back in the gallery?

3                    And not to Remicade.  There are

4    differences, but you have to judge infringement based on

5    looking at the patent claims.

6                    All right.  And I've taken it that

7    everybody will do that.

8                    The next idea that I want to ask you a

9    question about is FDA approvals.  There are a number of

10   diseases that are treated by these drugs, more than

11   rheumatoid arthritis and Crohn's that I've mentioned.

12   Here's a list of five that are addressed.  The most

13   prominent ones are rheumatoid arthritis and Crohn's, but

14   these others are serious diseases, and they respond to

15   these types of medicines.

16                   The FDA process -- that's the Food and

17   Drug Administration -- is different from the Patent &

18   Trademark Office.  And the fact that Abbott or Centocor,

19   either one, gets FDA approval says nothing about the

20   patent infringement or validity.  And I don't want you

21   to be confused about that.

22                   Is there anyone on the jury panel that

23   thinks, well, if you got FDA approval, it must be okay,

24   so there can't be infringement?  Because the two do not

25   connect.

1          Anybody have a problem with that on the

2 jury panel here?

3          Back here?

4          This is going to make more sense to you

5 when you hear more about it later, but I want to make

6 sure now.  Because, indeed, Remicade got FDA approval

7 for all of these diseases, and shortly behind it,

8 Humira, the accused product, got its approvals from the

9 FDA for these diseases.

10          All right.  I want to ask you for a show

11 of hands here.  On cirrhosis, cirrhotic arthritis, or

12 ankylosis spondylitis, is there anybody that is familiar

13 with those diseases?

14          Okay.  Yes, ma'am.

15          JUROR SCHANLEY:  I've managed quite a few

16 clinics that had patients with cirrhosis.

17          MR. SAYLES:  Okay.  All right.

18          JUROR SCHANLEY:  We had a rheumatology

19 clinic.

20          MR. SAYLES:  Okay.  Very good.

21          THE COURT:  Two minutes.

22          MR. SAYLES:  Two minutes.  All right.

23          I'm going to move quickly, so raise those

24 hands fast.

25          FEMALE JUROR:  I have a twin sister, and

```
 1  her husband has the cirrhotic arthritis and is being

 2  treated for that.

 3                 MR. SAYLES:  Okay.

 4                 FEMALE JUROR:  I have a granddaughter

 5  that was -- a great-granddaughter that was recently

 6  treated with cirrhosis.

 7                 FEMALE JUROR:  I have a best friend in

 8  England who has cirrhosis, and I had a -- my mom's

 9  grand -- well, my grandmother on both sides, I think,

10  had the rheumatoid arthritis, and my dad's grandmother

11  had it really bad, and she died from it --

12                 MR. SAYLES:  Okay.

13                 FEMALE JUROR:  -- before all these drugs

14  came out.

15                 MR. SAYLES:  Ladies and Gentlemen, I have

16  some more questions, but I must respect your time, and I

17  appreciate it very much.

18                 We look forward to bringing you the

19  evidence and bringing you more detail, and we'll show

20  you that there's been infringement, and it's caused

21  damages and that these patents are valid, and we look

22  forward to doing that.

23                 Thank you, Your Honor.

24                 THE COURT:  All right.  Thank you,

25  Mr. Sayles.
```

```
 1                    Do you want to use these same slides?
 2                    MR. BECK:  Pardon me, Your Honor.
 3                    THE COURT:  Were you going to use these
 4  same slides?
 5                    MR. BECK:  It doesn't -- no, sir, I was
 6  not.
 7                    THE COURT:  Well, I'm just going to have
 8  her turn it off then.  Can we do that?
 9                    MR. BECK:  Your Honor, would you give me
10  a three-minute warning?
11                    THE COURT:  Three minutes.
12                    MR. BECK:  That will be all right, if not
13  before.
14                    THE COURT:  All right, Mr. Beck.  Let's
15  go.
16                    MR. BECK:  Ladies and Gentlemen, I was
17  introduced to you previously.  My name is David Beck,
18  and I represent what I'm just going to call Abbott, the
19  Defendants in this lawsuit.
20                    Now, Judge Ward has told you a little bit
21  about himself, and you all told us a little bit about
22  yourselves, and since we're going to be spending
23  probably about a week together, let me tell you a little
24  bit about me.
25                    I'm married.  Been married, I guess, most
```

1  of my life.  Been married 44 years to the same wife.  We

2  actually met in high school.  Started dating then.  And

3  after I got out of school, we got married.  And we have

4  three children.

5            Ms. Williams, you win the prize for the

6  most grandchildren with 17.  We've got four

7  grandchildren, four of the most beautiful grandchildren

8  you have ever seen.  I'm sure you all would fight me on

9  that a little bit.

10            But the reason that we talk a little bit

11  about things and ask you questions is because we all

12  come to this courthouse with experience.  And the

13  experience we have really has an effect on how we're

14  going to decide a dispute.

15            For example, because of my kids and

16  grandkids, I could never be a good juror when a child

17  has been injured or hurt or molested.  I just couldn't

18  do it.  I'd have to tell the Judge, Judge, I can't do

19  it.  I'm sorry.  My mind is made up before I ever hear

20  the evidence in the case.  I would not be a juror.  I'd

21  have to be a juror in another case.

22            So that's really why we're asking you

23  these questions.

24            Now, as I said, I've got three kids.  The

25  two girls were real easy to raise.  The son was a little

1  bit more difficult.  He went from high school to the

2  Marine Corps to Special Forces to Iraq.  Thank God he's

3  back.  I saw somebody else that had some experience with

4  the Iraq war.

5            And all the kids are out.  They're

6  supporting themselves.  They're out of the nest.  And so

7  my wife and I are absolutely delighted with how

8  everything is going.

9            Now, let me tell you a little bit about

10 our position in this case.  As you have heard, our

11 client is accused of infringing their patent.  That's

12 their argument.  They're entitled to come to this Court

13 and really put forward the case that they think that

14 they have.

15            Humira, as you have heard, is our

16 product.  It is a drug, it is a medication that is used

17 to -- what we will say the evidence will show, that has

18 literally brought relief to millions of people in this

19 country, and elsewhere, for that matter, on these

20 diseases that you have heard about, some very serious

21 diseases:  Rheumatoid arthritis, cirrhosis, and a

22 terrible stomach disorder called Crohn's disease, which

23 my secretary happens to have.

24            So it's a good product.  And I'm not

25 saying their product is not a good product as well, but

1 our product is a little bit different.  And that's

2 really what this dispute is about.

3           We will show you that Abbott is one of

4 the leading pharmaceutical companies, not just in our

5 country, but one of the leading pharmaceutical companies

6 in the world, which is something that the men and women

7 who work there are very, very proud of, and they're

8 proud of the products that they come forward with.

9           They spend billions -- you've heard the

10 term billions, and it's tough for me to get those in my

11 mind.  But Abbott spends billions of dollars on research

12 and development to bring new drugs to the market so that

13 people who need them can benefit from them with the

14 advice of their physician, such things as heart disease

15 and cancer and diabetes and things like that.  These are

16 all product areas that Abbott is involved in.

17           We will show you that Humira is one of

18 those products that resulted from that research.  And we

19 will tell you that our product, Humira, was what is

20 going to be called a breakthrough product.  And they won

21 what I'm going to call is the Nobel Prize of the

22 pharmaceutical industry for it.

23           And simply stated, our position is, we

24 don't owe anything to Centocor.  We don't owe anything

25 to Remicade, which is their product.

1              Our product is new; it's different; and

2    it's novel in the case.  It's the first human antibody

3    of its kind that was ever authorized to go on the market

4    by the Food and Drug Administration, the full -- first

5    fully human antibody.

6              The evidence is going to show that our

7    autoimmune system produces antibodies.  It's natural.

8    Well, our product is the first fully human antibody to

9    treat these diseases that you've heard about.

10             One major difference -- you're going to

11   hear a lot of differences, but one major difference that

12   you haven't heard about is ours is a fully human

13   antibody.  Their antibody is part human and part rodent

14   or mice.

15             That's a very big difference.  Ours is

16   the first fully human.  Their's is what is called a

17   chimeric, which is part rodent, part -- part mice, and

18   part human, a very, very important difference.

19             At the end of the day, we believe the

20   evidence is going to show that Abbott was the first to

21   make a human -- a fully human antibody, the first to get

22   FDA approval for a human antibody, the first to bring a

23   human antibody to market so that the patients in this

24   country that needed it could get it, and Humira has

25   certain advantages over their product, we say exists,

1   and we'll get into that in the evidence.

2                   And as you've already heard from Counsel,

3   we've got our own patents, and you're -- we'll get into

4   that more during the evidence in this case.

5                   So you may be saying, well, wait a

6   minute.  If all that's true, why are we here?

7                   Well, we believe and we're going to show

8   you that the reason we're here is because they are

9   trying to achieve something in the courtroom that they

10  cannot achieve in the marketplace.

11                  There is no question that the -- that our

12  product is producing billions of dollars in revenue.  No

13  question about it.  But their product is producing a lot

14  of revenue for them as well.  We believe in patient

15  choice.

16                  Now, let me get to some specific

17  questions that some of -- that we may have with respect

18  to some of the things you've told us.

19                  Is there anybody on this jury panel --

20  and I know you're going to think this is a dumb

21  question, and maybe it is, but is there anybody on this

22  jury panel who does not believe in competition?

23                  Let me state it another way.  All those

24  who believe in competition, would you raise your hand,

25  please.

1                  All right.  Mr. Strait, why do you

2    believe in competition?

3                  JUROR STRAIT:  It's better for the

4    marketplace.  It's better for everybody.  It's better

5    for the whole marketplace and industry, whatever it is,

6    and improvements to make everybody's lifestyle better.

7                  MR. BECK:  All right.  Mr. Goldman, what

8    about you?  Do you believe in competition?

9                  JUROR GOLDMAN:  Yes.

10                 MR. BECK:  Why?

11                 JUROR GOLDMAN:  Because it brings out the

12   best in other companies.

13                 MR. BECK:  All right.  Thank you.

14                 Is there anybody who disagrees with what

15   Mr. Goldman and Mr. Strait have said?  Is there anybody

16   who disagrees with that?

17                 All right.  I don't see any raise of

18   hands.

19                 Now, let ask a slightly different

20   question.  All those who believe in innovation, would

21   you raise your hand, please.

22                 All right.  Let me say it another way,

23   because there may have been some people that didn't

24   raise -- is there anybody here who does not believe in

25   innovation?

```
1                  All right.  Ms. Williams, I hate to keep

2  picking on you, but you're in the first row.  When

3  you're in the first row, you always get called on.

4                  Do you believe in innovation?

5                  JUROR MAXINE WILLIAMS:  Yes, I do.

6                  MR. BECK:  Okay.  And why is that?

7                  JUROR MAXINE WILLIAMS:  Because there's

8  always something bigger and better.  It's really not too

9  hard to --

10                 MR. BECK:  Okay.  Thank you.

11                 Let me call on Mr. Williams.  You

12 shouldn't have got on that front row.

13                 What about you, Mr. Williams?  Do you

14 believe in innovation?

15                 JUROR D. WILLIAMS:  Oh, yes, I do, sir.

16                 MR. BECK:  Why do you believe in

17 innovation?

18                 JUROR D. WILLIAMS:  Well, just like

19 Ms. Williams just mentioned, if there's more like

20 competition, things are usually better, because I work

21 for a funeral home, so I want to make sure our funeral

22 home service is better than the next one.

23                 MR. BECK:  All right.  Thank you, sir.

24 Is there anybody who disagrees with Ms. Williams and Mr.

25 Williams?
```

```
 1                    All right.  I don't see any raise of
 2   hands.
 3                    The next question I want to ask you is,
 4   is there anybody here who believes that if some company
 5   has a patent and another company comes along later -- or
 6   earlier for that matter, but let's talk about later --
 7   comes along later and comes up with something different,
 8   something better, something that has advantages, that
 9   somehow there's got to be infringement there, because
10   they treat the same diseases?
11                    In other words, somebody's got a patent,
12   somebody comes along later with a product that's new,
13   it's different, and -- but it treats the same diseases,
14   and somebody here says, well, they must infringe because
15   they treat the same diseases?
16                    Is there anybody here who believes that?
17                    If so, let's raise your hand, if you
18   wouldn't mind, and let's talk about for just a minute.
19                    All right.  I don't see any raise of
20   hands.
21                    In other words, as part of this
22   competition and intervention, is there anybody here who
23   does not believe that we want our companies, we want
24   people, we want professions, we want people in garages
25   tinkering to try to make things better and different?
```

1  Is there anybody here who doesn't believe that?

2              All right.  I don't see any raise of

3  hands.

4              A couple of you have had members of the

5  family -- I know that you have -- that have been

6  involved in the patent system.  Anybody here who has a

7  patent or a member of their immediate family has a

8  patent who hasn't already told us about it?

9              All right.  I don't see any raise --

10 anybody here have a -- any working knowledge of the

11 patent system?

12             Because Judge Ward's going to tell us

13 about what the law is and what the claims in this patent

14 really mean, and he's going to give us some -- give

15 you-all instructions, lawyers, too, but he's going to

16 certainly give you-all instructions.

17             Anybody who has any working knowledge of

18 the patent system that you think, well, wait a minute,

19 and I know how this works.  I don't need anybody to tell

20 me.  Anybody who has that working knowledge of the

21 patent system?

22             All right.  I take it by your silence

23 that there is no one.

24             Now, you-all saw the film that Judge Ward

25 showed you.  At the end of the evidence in this case, we

believe that you're going to be asked about, among other

things, whether this patent is valid or invalid.

Is there anybody here who cannot, if you

believe the evidence justifies it, determine that their

patent on this Remicade product is invalid, if you

believe the evidence shows it?

In other words, the flip side of that

questions is, Well, wait a minute.  The Patent Office

gave them a patent, may have given us patents, but the

Patent Office gave them a patent, so there's no way I

could ever declare that invalid.

Is there anybody here who, after hearing

the evidence, if you believe the evidence justifies it,

cannot say, I believe that patent is invalid?  Is there

anybody here who cannot do that?

I take it by your silence that there is

no one.  I want to ask you some specific questions.

Other than Ms. Keel, has anybody here

ever owned your own business?

All right.  Mr. Strait?  And your

business was what, sir?

JUROR STRAIT:  Shoeing horses, setting up

mobile homes, pushing my own welding rig.

MR. BECK:  Sounds --

JUROR STRAIT:  Whatever it takes to make

1  a dollar.

2              MR. BECK:  Sounds like you had a lot of

3  businesses.  Thank you, sir.

4              JUROR STRAIT:  A lot of fun.

5              JUROR MANNING:  Yes, sir.  I've been

6  self-employed as a landman and real estate agent most of

7  my adult life.  My only stock in trade is my time.

8              MR. BECK:  Okay.  Thank you, sir.

9              Was there another hand up?

10              Yes, ma'am.  That's No. 25.

11              JUROR HICKERSON:  Yes.  I used to have

12  the Hub Steakhouse in Gilmer, so...

13              MR. BECK:  Okay.  Let me ask you a

14  question.  Do you know a man in Gilmer by the name of

15  Todd Parish?

16              JUROR HICKERSON:  I know of him, yes.

17              MR. BECK:  All right.  There are a couple

18  of people nodding their heads, and I wanted -- and could

19  we identify those who know Todd Parish and -- he's an

20  investigator, I think as most people here know, and he

21  may be assisting one of the parties in this case, and I

22  just need to make sure that we know if there's any

23  relationship there.

24              Let's start first with No. 13, and that's

25  Ms. Keel.

1          JUROR KEEL:  I've lived in Gilmer for 30

2  years.  I know of Todd, and I've -- I don't -- I mean,

3  I'm not really good friends with him, but a really good

4  friend of mine is a good friend of his, so...

5          MR. BECK:  Okay.  If it comes out during

6  the evidence that he's somehow assisting the other side,

7  would that make any difference to you in this case?

8  Was there a slight hesitation there on your part?

9          JUROR KEEL:  No.

10          MR. BECK:  Okay.  Was there anybody else

11  in the jury box?

12          All right.  I believe Ms. Kizer, did you

13  have your hand up?  Yes, ma'am.

14          JUROR KIZER:  Yes.  I know him through

15  the courts.  He's Judge Parish's brother.

16          MR. BECK:  Okay.

17          JUROR KIZER:  And he used to work for the

18  Sheriff's Office, I believe, on the public nuisance.

19          MR. BECK:  Okay.  Would the fact that you

20  know him or know of him, would that affect you in any

21  way in this case if it comes out that he's assisting the

22  other side?

23          JUROR KIZER:  No.  Because whatever he

24  says, I would believe it would be honest, you know.

25          MR. BECK:  Okay.

1            JUROR KIZER:  I mean, I wouldn't make it

2 one way or the other.

3            MR. BECK:  Okay.  That's fine.  Thank

4 you.

5            And Mr. Manning?

6            JUROR MANNING:  Yes, I know of him.  I've

7 worked with -- with Judge Parish as my father did some

8 appraisal work for her, and he assisted in some of the

9 investigation work.

10            MR. BECK:  All right.  Would that affect

11 you in any way in this case at all if you find out he's

12 somehow working with the other side?

13            JUROR MANNING:  I don't believe so.

14            MR. BECK:  Okay.  All right.  Anybody

15 else?

16            All right.  25.

17            JUROR HICKERSON:  You had asked me, but,

18 yes, I've known him through the years for --

19            MR. BECK:  Okay.  But that wouldn't

20 affect you at all?

21            JUROR HICKERSON:  No.

22            MR. BECK:  Okay.  And then I guess the

23 last person was Ms. Fletcher.  Would that affect you in

24 any way at all?

25            JUROR FLETCHER:  No, sir, it wouldn't.  I

1   know Judge Parish better than I do her brother, but I

2   have heard of him.

3                    MR. BECK:  Okay.  Thank you, ma'am.

4                    Is there anybody here who has ever filed

5   a lawsuit before against anyone?

6                    All right.  Mr. Strait, I see you've

7   raised your hand.  How long ago was that, sir?

8                    JUROR STRAIT:  It was just a real minor

9   civil suit, settled out of court a month ago.

10                   MR. BECK:  Anything from that experience

11  would cause you to lean one way or the other in this

12  case?

13                   JUROR STRAIT:  No, sir.

14                   MR. BECK:  It's a business dispute?

15                   JUROR STRAIT:  Yes, sir.

16                   MR. BECK:  Okay.  All right.  Anybody

17  else that may have filed a law -- all right.  We've got

18  No. 10 up here.  That's Mr. Jones.

19                   When was it, and what was the nature of

20  the suit?

21                   JUROR JONES:  Well, it's still pending.

22  It will be -- actually, this month -- next month we'll

23  go to court on it.  It's a vehicle accident.

24                   MR. BECK:  Okay.  Is it going to trial in

25  this court?

```
 1                    JUROR JONES:  No, sir.  No, sir.

 2                    MR. BECK:  Okay.

 3                    JUROR JONES:  It will be Upshur County.

 4                    MR. BECK:  And what's the nature of the

 5   dispute again?

 6                    JUROR JONES:  It was a vehicle accident.

 7                    MR. BECK:  Okay.  And were you hurt at

 8   all in that accident?

 9                    JUROR JONES:  It was very minor.

10                    MR. BECK:  Was this in your role as a

11   fireman that the accident happened?

12                    JUROR JONES:  No, sir.  No, sir.  I

13   was --

14                    MR. BECK:  Okay.

15                    JUROR JONES:  -- in a personal vehicle.

16                    MR. BECK:  All right.  Is there any --

17   and you've filed a lawsuit, so you're a plaintiff.

18   They're, obviously, a plaintiff suing our client.  Would

19   you -- do you think that would in any way cause you to

20   maybe lean towards their way in this case?

21                    JUROR JONES:  No.

22                    MR. BECK:  You know that they're totally

23   different?

24                    JUROR JONES:  Doesn't matter.

25                    MR. BECK:  Thank you.  Appreciate that.
```

```
 1                    Anybody else?

 2                    All right.  That's Ms. Coleman?

 3                    JUROR COLEMAN:  Yes.  One 30 years ago,

 4   an insurance claim, and one about 15, 20 years ago, also

 5   an insurance claim in a vehicle.

 6                    MR. BECK:  Well, I hope -- hope those

 7   matters came out all right as far as your concerned.

 8                    JUROR COLEMAN:  Yes, sir.

 9                    MR. BECK:  Okay.  Anything about that

10   experience which would cause you to be affected one way

11   or the other?

12                    JUROR COLEMAN:  No, sir, not at all.

13                    MR. BECK:  Thank you.

14                    All right.  Ms. Nunley, did you have your

15   hand up?

16                    JUROR NUNLEY:  Yes.  I had a personal

17   injury case about three years ago, four years ago.  It

18   settled out of court.

19                    MR. BECK:  And was that disposed of to

20   your satisfaction, ma'am?

21                    JUROR NUNLEY:  Yes.

22                    MR. BECK:  Thank you.

23                    Anybody else?

24                    JUROR HICKERSON:  Okay.  I have two

25   pending with Weinstein Law Firm out of Tyler.
```

1                    MR. BECK:  It's Ms. Hickerson.

2                    JUROR HICKERSON:  Yes.

3                    MR. BECK:  Okay.  And you say there are

4  two pending?

5                    JUROR HICKERSON:  Yes.

6                    MR. BECK:  And what are the nature of

7  those two, please?

8                    JUROR HICKERSON:  It's a -- with a car

9  dealership.

10                   MR. BECK:  This is over an automobile you

11 purchased?

12                   JUROR HICKERSON:  Yes.

13                   MR. BECK:  And are both suits over the

14 same matter?

15                   JUROR HICKERSON:  Well, there's two

16 different vehicles, yes.

17                   MR. BECK:  Two different vehicles.

18                   And both -- and who's representing you in

19 the matter?

20                   JUROR HICKERSON:  Weinstein Law Firm out

21 of Athens, Texas.

22                   MR. BECK:  Okay.  And is that matter

23 currently -- or set for trial?

24                   JUROR HICKERSON:  No.  You know, those

25 things take years.

```
 1                    (Laughter.)
 2                    MR. BECK:  Okay.  Don't let Judge Ward
 3  hear you say that.
 4                    All right.  Is there anything from that
 5  experience -- you heard me ask a question a while ago.
 6  You're a plaintiff in two cases.  They're a plaintiff.
 7  Is that going to cause you to think, well, you know,
 8  they came into this court; they're accusing somebody --
 9                    JUROR HICKERSON:  No.  I think this
10  actually will be pretty interesting, because I study a
11  lot of stuff on medical and drugs and stuff like that,
12  so I think it would be really interesting.
13                    MR. BECK:  Great.  Thank you very much,
14  ma'am.
15                    Anybody else who's filed a lawsuit?
16                    Anybody here know any of the lawyers
17  involved on this side?  Mr. Sayles and his colleagues
18  that he introduced, anybody know them?
19                    Okay.  Anybody own any stock in Centocor?
20                    Anybody had any member of their family go
21  to New York University?
22                    Don't see any raise of hands.
23                    I've got a few specific questions of some
24  of you.  If I skip you, that doesn't mean anything.
25  It's just that we only have so much time.
```

1                    Now, some of you have been on a criminal

2 jury, and some of you have been on a civil jury.  Those

3 of you who were on the civil jury -- those of you who

4 were on the civil jury, and you reached a verdict, could

5 you raise your hand or your number, please.

6                    Mr. Strait, you might as well just hold

7 that card up the whole time.

8                    JUROR STRAIT:  That calls for a --

9                    [Laughter.]

10                    MR. BECK:  Mr. Williams, did you have

11 your card up?

12                    JUROR D. WILLIAMS:  No, sir.

13                    MR. BECK:  All right.  Mr. Strait, you

14 reached a verdict; is that right?

15                    JUROR STRAIT:  It was over a car

16 accident.

17                    MR. BECK:  Okay.  And were you the

18 foreman?

19                    JUROR STRAIT:  No, sir.

20                    MR. BECK:  Okay.  All right.  Anybody

21 else who served on a jury?

22                    All right.  I think we've got -- that is

23 Mr. Briley.

24                    JUROR BRILEY:  Yes.

25                    MR. BECK:  And how long ago was that,

1  sir?

2              JUROR BRILEY:  About 15 years ago.

3              MR. BECK:  And the type of case, please?

4              JUROR BRILEY:  It was a lawsuit between a

5  trucking company and a bank.

6              MR. BECK:  Did y'all reach a verdict?

7              JUROR BRILEY:  Yes, we did.

8              MR. BECK:  Were you the foreman?

9              JUROR BRILEY:  No, I was not.

10              MR. BECK:  Okay.  Anything from that

11  experience which would affect you any way at all in this

12  case?

13              JUROR BRILEY:  None whatsoever.

14              MR. BECK:  Thank you, sir.

15              Anybody else?

16              All right.  That's Ms. Kendrick?

17              JUROR KENDRICK:  Uh-huh.

18              MR. BECK:  And how long ago was it?

19              JUROR KENDRICK:  It was three or four

20  years ago.  It was a civil case involving theft of

21  timber, and we did reach a verdict.

22              MR. BECK:  Nothing like this?

23              JUROR KENDRICK:  No.  No.

24              MR. BECK:  Were you the foreman?

25              JUROR KENDRICK:  No.

```
 1                    MR. BECK:  Okay.  Thank you, ma'am.

 2                    Anybody else?

 3                    Ms. Nunley?

 4                    JUROR NUNLEY:  It was a criminal case,

 5    and it's been over 30 years.

 6                    MR. BECK:  Okay.  Thank you, ma'am.

 7                    Anybody else?

 8                    All right.  Oh, I'm sorry.  Ms. Williams?

 9                    JUROR MAXINE WILLIAMS:  This was a

10    criminal case.  You know, I was a juror, and we reached

11    a decision.

12                    MR. BECK:  Okay.  Thank you, ma'am.

13                    Mr. Williams, I got to pick on you again.

14                    Now, you said that you're a Director of

15    Social Services, is this at the present time?

16                    JUROR D. WILLIAMS:  Yes, sir.

17                    MR. BECK:  Okay.  And just generally,

18    what do you do in that position?

19                    JUROR D. WILLIAMS:  Home health

20    referrals, nursing home placements, assist patients with

21    medication assistance, court committals for mental

22    health patients.

23                    MR. BECK:  It sounds like you're a busy

24    man.

25                    JUROR D. WILLIAMS:  Very.
```

```
 1                    MR. BECK:  Do you have people working

 2  under your supervision?

 3                    JUROR D. WILLIAMS:  Director of Nursing.

 4                    MR. BECK:  Okay.  Thank you.

 5                    Ms. Williams?  This is the other

 6  Ms. Williams.  The first Ms. Williams; this is the

 7  second Ms. Williams.

 8                    You said that you had two years of

 9  college.  Where did you go to school?  I didn't catch

10  that.

11                    JUROR MARNI WILLIAMS:  I went to Panola

12  and --

13                    MR. BECK:  Oh, Panola.

14                    JUROR MARNI WILLIAMS:  -- and Sam Houston

15  State.

16                    MR. BECK:  Okay.  In Huntsville?

17                    JUROR MARNI WILLIAMS:  Yes.

18                    MR. BECK:  And what were you studying

19  there?

20                    JUROR MARNI WILLIAMS:  Undecided.

21                    MR. BECK:  Okay.  That's a good --

22                    JUROR MARNI WILLIAMS:  That's the reason

23  I didn't finish.

24                    MR. BECK:  That's a good major to have.

25                    Thank you, ma'am.
```

```
 1                    Ms. Richardson, was it your sister that
 2   is the architectural engineer?
 3                    JUROR RICHARDSON:  Yes.
 4                    MR. BECK:  Okay.  And where does she
 5   live?
 6                    JUROR RICHARDSON:  Desoto.
 7                    MR. BECK:  Thank you, ma'am.
 8                    Mr. Gurley, no questions.
 9                    Mr. Goldman, I think we've covered the
10   question I wanted to ask you, but there -- I did have
11   one more thing.
12                    I couldn't hear what you were saying
13   about where you're currently employed.
14                    JUROR GOLDMAN:  Sam's Club.
15                    MR. BECK:  Okay.  Thank you, sir.
16                    Mr. Strait, I'm not asking you anything
17   else.
18                    Mr. Jones, your wife works at the
19   Diagnostic Clinic at Longview; is that correct?
20                    JUROR JONES:  Yes.
21                    MR. BECK:  And what does she do there?
22                    JUROR JONES:  She works as a medical
23   assistant in orthopedics.
24                    MR. BECK:  Okay.  Thank you.
25                    All right.  Mr. Yates, no questions.
```

```
 1                    Ms. Monts, no questions.

 2                    Ms. Keel, no questions.

 3                    Ms. Schanley, no questions.

 4                    Ms. Kizer, did you say that your husband

 5  is retired?

 6                    JUROR KIZER:  Yes.

 7                    MR. BECK:  All right.

 8                    JUROR KIZER:  Yes.  Out of National

 9  Oilwell Services.  He was an outside salesperson.

10                    MR. BECK:  Okay.  Thank you, ma'am.

11                    Ms. Coleman, no more questions.

12                    Mr. Manning, no questions.

13                    Ms. Little, I think we've asked you so

14  many questions that we're going to leave you alone.  I

15  did have one question.  I'm sorry.

16                    If I heard you correctly, your husband

17  designed patents, and he was part of a design that

18  eventually ended up in being a patent?

19                    JUROR LITTLE:  Yes.

20                    MR. BECK:  And am I --

21                    JUROR LITTLE:  Yeah.  He worked closely

22  with the engine -- he's an engineer, but an undegreed

23  engineer.

24                    MR. BECK:  Oh, I see.

25                    JUROR LITTLE:  And he worked closely with
```

1  the degreed engineers.

2              MR. BECK:  And it sounds to me like he

3  did a lot of the work --

4              JUROR LITTLE:  He did.

5              MR. BECK:  -- but didn't get any of the

6  credit; is that right?

7              JUROR LITTLE:  Underpaid, overworked.

8              MR. BECK:  Okay.  Thank you, ma'am.

9              Ms. Nunley, no more questions.

10             Ms. Kendrick, I think we've asked you

11 everything.

12             Mr. Vaughan, no questions.

13             Mr. Briley, no questions.

14             Ms. Riddle, Mr. Roberts, Ms. Hickerson.

15 I think that's pretty much all of the individual

16 questions that I have.  I've got a couple of more

17 general questions to ask everybody.

18             Is anybody here a member of a union?  If

19 so, would you raise your hand?

20             All right.  No. 10.  Is this -- this is

21 the firefighters union, I take it.

22             JUROR JONES:  (Nods head.)

23             MR. BECK:  Okay.  Anybody else?

24             All right.  That would be --

25             JUROR TURBEVILLE:  Turbeville.

1                MR. BECK:  Mr. Turbeville.  And which

2   union is that, sir?

3                JUROR TURBEVILLE:  United Steel Workers.

4                MR. BECK:  Okay.  And are you still a

5   member?

6                JUROR TURBEVILLE:  Yes, sir.

7                MR. BECK:  Okay.  I used to be a member

8   of the OCAW, and they say once you're a member, you're

9   always a member, even if you don't pay your dues, so...

10               Anybody else who's a member of the union?

11               All right.  I don't see any raise of

12  hands.

13               How about the ACLU?  Is anybody a member

14  of the ACLU?

15               All right.  I don't see any raise of

16  hands about that organization.

17               The last question I always ask, and

18  sometimes I don't like the answers, and sometimes I

19  think what a dumb question, but I'm going to ask it

20  anyway.

21               This lawsuit is important to both sides.

22  There's a lot of money at stake, but that's not the real

23  reason.  You know, there's a lot of -- well, let me just

24  say that there's -- there's a lot of money at stake.

25               And we'll get into the other issues

1   during the course of the trial.

2               But what I need to know is, sometimes

3   lawyers don't ask the right questions.  And is there

4   anybody here who thinks, you know, he ain't a very good

5   lawyer, because if he would just ask this one question,

6   he would find out that, you know, I know something, and

7   I've got some experience, and he would never want me on

8   this jury if he would find that out?

9               So I'm going to -- the question I'm going

10  to ask you, is there anything that I haven't asked you

11  that you're kind of thinking, you know, if old Beck

12  would just ask the right question, he would really be

13  surprised at the answer?

14              Is there anything you-all think that I

15  need to know and the Judge needs to know that might

16  affect your ability to be a fair and impartial juror in

17  the case as you presently understand it?

18              All right.  Ladies and Gentlemen, thank

19  you very, very much for your time, and I look forward to

20  spending a week with some of you.

21              Thank you.

22              THE COURT:  Thank you, Mr. Beck.

23              All right.  If counsel will approach.

24              (Bench conference.)

25              THE COURT:  We've got scheduling problems

```
 1  with 10, 15, 21, and 26.
 2            Now, do y'all -- do y'all have any
 3  individual voir dires that you're requesting?
 4            Plaintiff?
 5            MR. SAYLES:  Judge, I may.  I would
 6  challenge Linda Little for cause based on her statements
 7  that she's already made about her husband's working with
 8  patents.  She could not say that it would not affect
 9  her.  And she also --
10            THE COURT:  Well, we'll take her up.
11            MR. SAYLES:  Okay.
12            THE COURT:  On individual voir dire, I'll
13  let you pursue that.
14            MR. SAYLES:  Yes, sir.
15            MR. BECK:  10 is the one -- he's the
16  firefighter, isn't he, Your Honor?
17            THE COURT:  10 is the firefighter.
18            MR. BECK:  Yeah.  I -- I mean, I'd be
19  willing to let him go.
20            MR. SAYLES:  I would, too.
21            MR. BECK:  He's got a scheduling problem.
22  If that's okay with you.
23            THE COURT:  Well, I'll need to get him --
24  I'll talk to him and see what his scheduling problem is
25  before I let him go.
```

1              Do you have any requests for individual

2   voir dire?

3              MR. BECK:  Not really, Your Honor.

4              THE COURT:  Well, let's see.  Let's

5   assume, if we lost 10 -- if we lost everybody that had a

6   problem, that would be 10, 15 -- assuming that we lost

7   18, that would be three, 21 would be four.

8              MR. BECK:  We're still in pretty good

9   shape.

10             THE COURT:  Yeah.  We don't need to talk

11  to 26, actually.  I'll let her by.  I'll call her

12  number, and I'll explain that we just can't get down to

13  her.  If we lost all of them, we'd still get down to 22,

14  because I'm going to give you four strikes apiece, and

15  we're going to seat 10, so that would be as far as we

16  would get.

17             Okay.  Let me get them out of here,

18  and -- okay.

19             (Bench conference concluded.)

20             THE COURT:  All right.  I'm going to ask

21  that the following jurors remain in the courtroom:

22  No. 10, No. 15, No. 18, No. 21, and 26.

23             The remainder -- I'm going to excuse the

24  rest of you at this time.  Be prepared to come back in

25  the courtroom at, oh, 11:30.  I'll get you out of here

1  before noon, all of you.  We've got some matters to take

2  up individually, and I've got some matters to take up

3  with the lawyers.

4              And so I'll see you back in here -- be

5  ready to come back in at 11:30.  Just leave your numbers

6  in your seats, if you will, please.  You may leave the

7  courtroom at this time.

8              (Jury panel out.)

9              THE COURT:  All right.  Mr. Jones, why

10 don't you come on up here, if you would, and counsel.

11              (Bench conference.)

12              THE COURT:  How are you doing today?

13              JUROR JONES:  All right.

14              THE COURT:  Good.

15              You indicated you would have trouble with

16 the schedule.

17              JUROR JONES:  Yes, sir.  The vehicle

18 accident I was talking about, the pretrial hearing is

19 set for the 23rd of June.

20              THE COURT:  What court is that in?

21              JUROR JONES:  In Upshur County.

22              THE COURT:  In front of Judge Parish, I

23 guess?

24              JUROR JONES:  I believe so.

25              THE COURT:  Do you know when that case is

```
 1  going to trial or scheduled?
 2                  JUROR JONES:  The 13th of July.
 3                  THE COURT:  That's the pretrial schedule
 4  then.
 5                  All right.  Let me take this up with the
 6  lawyers.  Be ready to come back in the courtroom, and
 7  I'll discuss -- did y'all have any further questions?
 8                  MR. SAYLES:  I have no questions.
 9                  THE COURT:  Okay.  Thank you.
10                  MR. BECK:  Thank you very much.
11                  THE COURT:  Thank you.  We'll see you
12  back in here at 11:30.
13                  (Juror Jones leaves the courtroom.)
14                  THE COURT:  Y'all had indicated to me
15  y'all want to jointly excuse this juror?
16                  MR. BECK:  I would.
17                  MR. SAYLES:  I would, too.
18                  THE COURT:  Okay.  He's excused.  Okay.
19                  (Open court.)
20                  THE COURT:  Judge Kizer?
21                  (Bench conference continued.)
22                  THE COURT:  How are you?
23                  JUROR KIZER:  I'm fine.
24                  The reason why I came -- all right.  I
25  won't -- I hope you'll excuse me -- is that I'm
```

1  protesting my property taxes, and the Upshur County

2  Appraisal's Office has set that date for my hearing

3  date.  I just got the letter this week.

4              THE COURT:  What -- on the 22nd?

5              JUROR KIZER:  Uh-huh, at 1:00 o'clock.

6              THE COURT:  Any questions?

7              MR. SAYLES:  No, sir.

8              THE COURT:  All right.  Be ready to come

9  back at 11:30.  I'll need to discuss this with the

10 jury -- with the lawyers.

11             JUROR KIZER:  Okay.  Thank you.

12             THE COURT:  Okay.  Thank you, ma'am.

13             (Jury Kizer leaves the courtroom.)

14             THE COURT:  Y'all both don't know what to

15 do with her, so you're going to --

16             MR. SAYLES:  I'd let her go.

17             MR. BECK:  Me too.

18             THE COURT:  15 is excused.  All right.

19             (Open court.)

20             THE COURT:  Ms. Little?

21             (Bench conference continued.)

22             THE COURT:  Ms. Little, in answering some

23 questions to -- one of the lawyers presented to you --

24 well, both of them discussed with you about your

25 husband's involvement with design patents and some of

1  the things that went on.

2            And you indicated that that was something

3  y'all talked about a lot from time to time, and you

4  weren't -- had some real hesitancy about whether you

5  could set that aside as far as your -- that

6  experience --

7            JUROR LITTLE:  Uh-huh.

8            THE COURT:  -- and actually, that might

9  affect your judgment in this case; is that right?

10           And I understand your --

11           JUROR LITTLE:  That came before the drugs

12 were submitted.  I think I'm going to have more of a

13 hard time with the recent diagnosis with my husband with

14 rheumatoid, because Humira is one of the drugs that they

15 are looking at for him.

16           In all honesty, I don't know if I

17 emotionally am going to be able to set that aside.

18           THE COURT:  Any questions, Mr. Beck?

19           MR. BECK:  No, sir.

20           THE COURT:  Any questions?

21           MR. SAYLES:  No, Your Honor.

22           THE COURT:  Okay.  Be -- come on back in

23 at 11:30 --

24           JUROR LITTLE:  Okay.

25           THE COURT:  -- will you, please?

```
 1                    JUROR LITTLE:  Yes.

 2                    THE COURT:  Okay.  I'll see you then.

 3                    JUROR LITTLE:  Uh-huh.

 4                    (Jury Little leaves the courtroom.)

 5                    THE COURT:  I believe she disqualified

 6  herself.  I've excused her, also.

 7                    (Discussion off the record.)

 8                    (Open court.)

 9                    THE COURT:  Mr. Vaughan?

10                    (Bench conference continued.)

11                    THE COURT:  Well, we could -- yeah.  We

12  would -- he would be -- I've excused three, correct?

13  He's in the mix.

14                    JUROR VAUGHAN:  Yes, sir.

15                    THE COURT:  How are you?

16                    JUROR VAUGHAN:  I'm good.

17                    THE COURT:  What's the scheduling

18  problem?

19                    JUROR VAUGHAN:  My wife and I have

20  scheduled a two-week vacation starting the 12th.  We

21  won't be back till the 29th or 30th.

22                    THE COURT:  How long have y'all had this

23  planned?

24                    JUROR VAUGHAN:  Since January.  We both

25  work for the state, so we have to schedule it about
```

```
 1  three months in advance.  She runs a tourist information
 2  center, so she has to schedule hers around her
 3  employees.  I sure would like to go with her.  And --
 4                  THE COURT:  Where are you going?
 5                  JUROR VAUGHAN:  The first week, we're
 6  going to the Bahamas.  And then the second week, we're
 7  going up into Arkansas on a camping trip that we've
 8  already got money invested.
 9                  If it was after the 30th, I'd be happy to
10  stay here with y'all, but...
11                  THE COURT:  Any questions Mr. Sayles?
12                  MR. SAYLES:  No questions, Your Honor.
13                  MR. BECK:  No questions, Your Honor.
14                  THE COURT:  I'm not even going to ask
15  them.  You're excused.
16                  JUROR VAUGHAN:  Thank you, sir.
17                  THE COURT:  But be back at 11:30.  Be --
18  come on back in here at 11:30.  And I'm going to excuse
19  you.  Just -- just don't tell anybody out there that
20  you've been excused.
21                  JUROR VAUGHAN:  Okay.  Thank you, sir.
22                  THE COURT:  All right.  Have a nice one.
23                  JUROR VAUGHAN:  Thank you.
24                  (Juror Vaughan leaves the courtroom.)
25                  THE COURT:  I guess I could make him
```

stay.  I don't know who he'd take it out on.  But one of

y'all believes that.

                    Okay.  All right.  So I excused those

four.  That means that -- you're going to take four

strikes apiece, and we're going to go seat 10 jurors, so

that means you need to take your strikes down through

No. 22.

                    Let me tell this gentleman --

                    (Bench conference concluded.)

                    THE COURT:  Mr. Turbeville,

mathematically, we will not reach you, but if you would,

be back in here at 11:30, and I'll excuse you after

that, okay?

                    Thank you.

                    (Juror Turbeville leaves the courtroom.)

                    (Bench conference.)

                    THE COURT:  Okay.  Why don't y'all get

your strikes back here at 11:25.  I don't see this

happening, but after you turn your strikes in to

Ms. Dupree, then exchange your numbers, and then if --

immediately notify me if there's any other type of

challenge so that I can rule on that before I get the

jurors back in here --

                    MR. SAYLES:  All right.

                    THE COURT:  -- okay?  But get them back

```
 1   there -- I gave you a long time.  I don't why I'm so
 2   generous, but --
 3               MR. SAYLES:  Seemed like his 30 minutes
 4   was longer than my 30 minutes.
 5               THE COURT:  There's the clock, my boys.
 6               (Discussion off the record.)
 7               (Recess.)
 8               COURT SECURITY OFFICER:  All rise.
 9               (Jury panel in.)
10               THE COURT:  Please be seated.
11               All right.  Ladies and Gentlemen, if
12   you'll listen carefully.  As Ms. Dupree calls your name,
13   please come forward and take a seat in the jury box.
14               Ms. Dupree?
15               COURTROOM DEPUTY:  Maxine Williams; Mary
16   Myrick; Marni J. Williams; Stanley L. Gurley; Randy M.
17   Goldman; Duane D. Baese; Debra J. Monts; Deborah A.
18   Keel; Donna F. Coleman; Gary Don Manning.
19               THE COURT:  All right.  Ladies and
20   Gentlemen, those of you who were not selected, I'm about
21   to excuse you with the thanks of the Court.
22               I've already told you this morning how
23   important it is that you be here.  We need to have a
24   larger number of jurors present than are going to serve,
25   and I appreciate your being here.  I'll say to you again
```

1 that you do a great service to your country by being

2 here and participating.

3                    And I only have one final instruction to

4 you, and that is, that you come with the same great

5 attitude you did this morning the next time you win my

6 lottery.

7                    (Laughter.)

8                    THE COURT:  Thank you.  You may leave the

9 courtroom at this time.

10                    (Remaining jury panel leaves.)

11                    THE COURT:  I guess I better stop using

12 that line about a lottery.  Somebody is going to be

13 asking me for a check, I heard somebody say.

14                    All right.  Ladies and Gentlemen, those

15 of you who have been chosen, if you would stand at this

16 time and take the oath as jurors.

17                    COURTROOM DEPUTY:  Raise your right hand,

18 please.

19                    (Jury sworn.)

20                    THE COURT:  Please be seated.

21                    Ladies and Gentlemen, you now constitute

22 the jury in this case.  You've taken the oath as jurors.

23                    As I told you, we will start the trial in

24 this case June the 22nd at 8:30 a.m., two weeks from

25 this coming Monday, and -- or three weeks really from

1 this coming Monday, and you need to make sure, though,

2 and leave your phone numbers.

3                I'm 95 percent certain that I'm going to

4 be ready to take you that morning, but I'm going to pick

5 an additional three juries next Monday, and I'll try

6 four cases during the month of June.

7                And I've got them lined out, and I try to

8 keep -- I've got this clock that I sort of keep lawyers

9 on the timeframes.  So, I think I can predict with some

10 accuracy after 10 years, and we'll be ready to start

11 promptly at 8:30 on the 22nd.

12                But make sure that we have your phone

13 numbers so that -- if some unlikely event occurs that

14 would prevent us from starting, so we could contact you.

15                Now, since you constitute the jury in

16 this case, you've heard absolutely no evidence, so you

17 should not have any preconceived notions now about who's

18 right and who's wrong, because you need to base your

19 decision in this case based solely upon the evidence

20 that you receive here in the courtroom, the documents

21 and the exhibits that constitute evidence that I allow

22 to be admitted into evidence.

23                And so it's very important that you not

24 be influenced by anything other than the evidence.

25                Keeping with that general idea, it's

1 important that you not attempt to do any research about

2 these parties or this case or these pharmaceuticals.

3 In other words, don't get on the internet and start

4 searching for anything or -- you know, there may be

5 something in the newspaper about this case.  Do not read

6 any newspaper articles about this case.

7                    There could be something on TV.  If you

8 hear something on the TV, I ask you to walk -- I'm

9 instructing you you should walk out of the room.

10                    And the reason there would be something

11 about this case is, the lawyers have already told you

12 that they'll be talking about two drug companies, and

13 there's a lot of money being talked about.  So that

14 sometimes catches news stories, you know, those kind of

15 things.  But do not -- do your very best not to let any

16 information enter your ears.

17                    Now, what's real important, when you go

18 home today, tonight, and the next few weeks and you talk

19 to your spouse and your friends, they're going to ask

20 you, as we all do, well, what are doing these days, or

21 what's going on, and you're going to say that -- there's

22 nothing wrong with saying, I'm on a jury down in federal

23 court.

24                    The first question that's going to be

25 asked of you most likely is something like, what kind of

1  case is it?  Do not answer that question.  Do not

2  discuss this case or your jury service or what this case

3  is about with anyone.

4              Because as soon as you do, the person

5  you're talking to is going to offer you some opinion

6  about they know something about the drug or they know

7  something about a case like that or -- I can assure you

8  that through 40-something years of being involved in

9  litigation as a lawyer and as a judge, that's what

10  always happens.

11              And that would be improper, and it might

12  cause us to have to start all over, you know.  So please

13  avoid that.

14              Now, in my years of experience, I've

15  never had anyone try to contact a juror.  It has

16  happened in other jurisdictions.  Should anyone try to

17  contact you to discuss this case, of course, do not

18  discuss it, but report that immediately to the Court.

19  I don't believe that will happen, but I'm required by

20  law to give you that instruction and forewarn you that

21  that would be improper should some third party try to

22  talk to you.  I'm talking about somebody other than your

23  friend that's asking you what you're doing.

24              So do not, of course, discuss it, but

25  should any contact like that occur, you need to report

 1  that immediately to the District Clerk's Office so I can

 2  deal with it.

 3                   With that, I have no further

 4  instructions.

 5                   Anything requested by the Plaintiff?

 6                   MR. SAYLES:  The Plaintiff has nothing

 7  further at this time, Your Honor.

 8                   THE COURT:  Okay.  Defendant?

 9                   MR. BECK:  No, sir.

10                   THE COURT:  Okay.  Thank you.

11                   All right.  I'm going to excuse you.

12  Travel safely.  Have a good three weeks, and we'll see

13  you back here on the 22nd.

14                   Thank you very much.  You may leave the

15  courtroom.

16                   (Jury out.)

17                   THE COURT:  Y'all be seated.

18                   All right.  If -- I know y'all are going

19  to meet with Judge Everingham, I believe, correct, next

20  week?  Y'all have got that arranged?

21                   MR. SAYLES:  I think he said the 12th,

22  Judge.

23                   THE COURT:  Okay.  Whatever -- if it's

24  not next week, the next.  Here's a -- with respect to

25  the patents-in-suit and the claims that I have -- I

1  mean, the terms that I have defined, I'd like for you to

2  get a notebook for each one of the jurors that contains

3  the patents themselves and then take and pull out the

4  actual claims (sic) that I defined and the actual

5  definitions, but nothing else out of the order, so that

6  would -- they would have that in their jury notebook.

7                  Now then, those -- any questions about

8  what I'm talking about there?

9                  Mr. Beck, you've done that before.  You

10  know what I'm talking about.

11                  MR. BECK:  Yes.

12                  THE COURT:  Okay.  And y'all do have --

13  get that together.

14                  Now then, the Court's view is, if

15  y'all -- if you can agree upon any other exhibits that

16  you think would be -- that the jury -- should be in the

17  jury notebook, if you agree upon them, then they can be

18  in there.

19                  But I do not conduct hearings about what

20  goes into the jury notebook.  If you can't agree upon

21  them, then that means they're not going to be in the

22  jury notebook, and you'll have to just emphasize them in

23  your case-in-chief.

24                  Is -- does anyone anticipate -- I don't

25  want to give up any strategy, but I'd like to know -- I

1  don't need an answer to this question today, but make

2  sure, if you're going to have a shadow jury present

3  during the trial of the case, that you notify me that

4  morning.

5           The reason I do that is so that I don't

6  make some comment in front of that shadow jury that -- I

7  try to make sure that the shadow jury doesn't hear

8  anything that this other jury isn't.  I don't to want to

9  influence them.

10          I think, other than that, that's the only

11 other instructions I had.  Does -- do y'all have

12 anything further at this time?

13          From the Plaintiff?

14          MR. SAYLES:  The Plaintiff has nothing

15 further at this time.

16          THE COURT:  Mr. Beck?

17          MR. BECK:  Judge, we have two very quick

18 questions.

19          One is, what is the Court's inclination

20 on trial on inequitable conduct and laches?  Does the

21 Court plan to do it right after --

22          THE COURT:  No, I will not do it right

23 after.  We'll schedule that.

24          MR. BECK:  Okay.

25          THE COURT:  Because I've got another

1  jury -- I will have another jury starting on the morning

2  of the 1st of July unless it settles.

3              MR. BECK:  And then the second issue, in

4  the opinion that Your Honor just sent out, we just need

5  a little bit of clarification.  Because on the first

6  order, it talked about the priority date.  It said no

7  earlier than.  And then in the opinion, it said no later

8  than.

9              THE COURT:  Well, it should --

10             MR. BECK:  I just want make sure we

11 knew --

12             THE COURT:  Well, it should have -- it

13 should have said no earlier than.

14             MR. BECK:  Okay.  That's what we thought,

15 too, but -- okay.

16             THE COURT:  I guess I didn't read it as

17 carefully as I thought I had.

18             MR. BECK:  I --

19             THE COURT:  We'll correct that.

20             MR. BECK:  Okay.

21             THE COURT:  All right.  Nothing further?

22             Thank you very much.

23             (Discussion off the record.)

24             (Court adjourned.)

25             *      *      *      *      *      *

1
2
3                    CERTIFICATION
4
5          I HEREBY CERTIFY that the foregoing is a
6  true and correct transcript from the stenographic notes
7  of the proceedings in the above-entitled matter to the
8  best of my ability.
9
10
11
12  _____        _____
    SUSAN SIMMONS, CSR                         Date
13  Official Court Reporter
    State of Texas No.:  267
14  Expiration Date:  12/31/10
15
16
17
18
19
20
21
22
23
24
25