```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  CENTOCOR, ET AL           *    Civil Docket No.
                              *    2:07-CV-139
 4  VS.                       *    Marshall, Texas
                              *
 5                            *    June 22, 2009
    ABBOTT LABORATORIES       *    8:00 A.M.
 6

 7           TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE JUDGE T. JOHN WARD
 8            UNITED STATES DISTRICT JUDGE
                     AND A JURY
 9

10  APPEARANCES:

11  FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                           MS. BARBARA MULLIN
12                         MR. STEVEN MASLOWSKI
                           MS. ANGELA VERRECCHIO
13                         MR. MATTHEW PEARSON
                           Woodcock Washburn
14                         2929 Arch Street, 12th Floor
                           Cira Centre
15                         Philadelphia, PA   19104

16                         MR. RICHARD SAYLES
                           MR. MARK STRACHAN
17                         Sayles Werbner
                           1201 Elm Street
18                         4400 Renaissance Tower
                           Dallas, TX   75270
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDITH WERLINGER, CSR
22                         Official Court Reporters
                           100 East Houston, Suite 125
23                         Marshall, TX   75670
                           903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

1

2  <u>APPEARANCES CONTINUED</u>:

3

4  FOR THE DEFENDANTS:    MR. WILLIAM LEE
                          MS. AMY WIGMORE
5                         MR. WILLIAM MCELWAIN
                          Wilmer Cutler Pickering Hale
6                                and Dorr
                          1875 Pennsylvania Avenue, N.W.
7                         Washington, DC   20006

8
                          MR. DAVID BECK
9                         Beck Redden & Secrest
                          One Houston Center
10                        1221 McKinney Street
                          Suite 4500
11                        Houston, TX   77010

12
                 *      *      *      *      *      *
13

14
                      P R O C E E D I N G S
15

16              (Jury out.)

17              COURT SECURITY OFFICER:  All rise.

18              THE COURT:  Please be seated.

19              Good morning, counsel.

20              Okay.  I understand y'all have a

21  motion -- additional motion in limine or something you

22  want to talk to me about.

23              MS. ELDERKIN:  Yes, Your Honor,

24  Diane Elderkin for the Plaintiffs.  We have a paper

25  copy, but perhaps I could just make this orally.

1     It became apparent, as we saw these

2 opening demonstratives that Abbott wants to use, that

3 they may be trying to make an argument that Abbott's

4 inventors were the first to invent human anti-TNF

5 antibodies according to our claims.

6     Abbott, at one point, had 102(g) prior

7 invention defense.  They put that in their invalidity

8 contention.  They never pursued it.  Their expert didn't

9 render an opinion on it, and they don't have the witness

10 here -- witnesses here that could make or corroborate

11 that type of defense.

12     Although we recognize that they're going

13 to try to argue that the Salfeld patent is prior art and

14 that that type of evidence should come in, we don't

15 believe it's appropriate for them to try to imply to the

16 jury that the Abbott inventors were the first to invent

17 the antibodies that are covered by our patent.

18     And we're asking for a ruling from Your

19 Honor to preclude them from doing that.

20     THE COURT:  Well, your -- but the basis

21 of your ruling (sic) is, is saying that they abandoned

22 that defense at some point, when initially they employed

23 it, and then they dropped it?

24     MS. ELDERKIN:  Correct, Your Honor.

25     THE COURT:  And they have not ever

 1   identified an expert to present that.

 2              Is that what you're saying?

 3              MS. ELDERKIN:  Yes, Your Honor.

 4              THE COURT:  All right.  What's the

 5   Defendants' position on that?

 6              MR. LEE:  Well, Your Honor, Bill Lee.

 7   I told Ms. Elderkin this morning we're not pursuing the

 8   102(g) defense, but the question of whether --

 9              THE COURT:  Well then, if you're not

10   pursuing it -- what she's saying is it would be unfair

11   to let this evidence in.

12              MR. LEE:  No.  But, Your Honor, it's

13   relevant for four other reasons, one of which you've

14   ruled on already.

15              We argue that the in limine stage that

16   are patents, which specifically identifies e37 or Humira

17   in the claims would come in because it was prior art,

18   and the question of when that work got done that led to

19   the patent would be relevant under Your Honor's in

20   limine ruling.

21              The second thing is that because there is

22   an enablement defense, which requires the jury to

23   determine whether the patent could be practiced without

24   undue experimentation, the question of the people who

25   did the work, when they did it, who was first, how much

1  work they had to do is relevant to that issue.

2            And as we argued in the in limine, Your

3  Honor, it's also relevant to willfulness, and it's also

4  relevant to the license defense that they tend to

5  offer -- they tend -- the license issues that are

6  relevant to the issue of damages.

7            So while we did say we're not pursuing

8  the 102(g) defense, and I said to Ms. Elderkin that

9  we're not this morning, this evidence of when we did our

10  work, how hard it was, who was first is still relevant

11  to all four of those issues.

12            And that was specifically addressed in

13  connection with the motion in limine on the patent, Your

14  Honor.

15            THE COURT:  What do you say,

16  Ms. Elderkin?

17            MS. ELDERKIN:  Your Honor, I don't

18  disagree that the evidence of what they did and how hard

19  it may have been probably is relevant to enablement, but

20  in terms of who did it first, I don't believe that is at

21  all relevant.

22            THE COURT:  That's a matter of fact as to

23  when they did it, so that's before y'all -- before your

24  side did it or before your client did it, then your

25  motion in limine is denied.

1          Now then, there's a pending motion in

2   limine with respect to the witness -- Murphy, I believe,

3   his name is -- that was going to -- concerning the

4   Defendants filed a motion in limine; is that right?

5          MR. LEE:  That's correct, Your Honor.

6          THE COURT:  Well, the Court's looked at

7   that.  I'm inclined to deny it as long as -- because I

8   understand the Plaintiffs' position is that he's going

9   to just testify about the prosecution history as

10  revealed in his expert report, and they're not going to

11  offer -- as I understand their briefing, they're not

12  going to offer anything from Murphy about invalidity,

13  rebuttal on that.

14         Is that correct?  Ms. Elderkin, did I

15  misread it?

16         MS. ELDERKIN:  You haven't misread it,

17  Your Honor.  It's purely to talk about the prosecution

18  history.  He said plainly in his report that one of the

19  things he might testify about is the prosecution

20  history.

21         And he actually described it in an

22  exhibit to his report, which I think was not submitted

23  to the Court.  It has a detailed description.  He's not

24  going to be offering any opinions, any statements of

25  law; just what happened in the prosecution history.

1          THE COURT:  Well, I'm denying the motion

2  in limine.  I -- you know, we still entertain objections

3  on your feet in this Court.  We haven't -- I have not

4  restricted those.

5          The Court's got one other matter that was

6  raised, I guess in the Plaintiffs' response to your

7  motion -- to the motion in limine that raises the issue

8  of estoppel.

9          Exactly what are you saying,

10  Ms. Elderkin?  Do you recall that that was in one of

11  your replies or one of your pleadings?

12          MS. ELDERKIN:  Yes, Your Honor.  It had

13  to do with the issue of judicial estoppel.

14          Abbott propounded in its motion for

15  summary judgment on the acquiescence issue that you

16  granted, that objections had -- that objections had been

17  made to the 1992 application, because it wasn't

18  enabling, and that Centocor had basically acceded to

19  that by adding things to that application, and they

20  should be estopped now judicially, because they

21  prevailed on that motion.

22          And your opinion adopted some of those

23  same arguments.  They should be precluded now under

24  judicial estoppel from taking a contrary position.

25          THE COURT:  What do you say about that

```
 1  one, Mr. Lee?

 2              MR. LEE:  I'm sorry, Your Honor.

 3              THE COURT:  I understand.  We're a little

 4  tight in here.

 5              I'll tell you, I've been on the -- one of

 6  these committees, you know.  This courtroom is about 8

 7  foot more narrow than the suggested guidelines.  So this

 8  is what we've got.

 9              MR. LEE:  I'm going to try not to knock

10  Mr. Beck over.

11              THE COURT:  That's all right.  You have

12  permission.

13              MR. LEE:  Your Honor, I'm not sure what

14  she's asking you to estoppel us from saying.  We can't

15  be estopped from challenging enablement of the 1994

16  patent, because all that occurs under Your Honor's

17  acquiescence opinion is that they are estopped from

18  relying upon an earlier date.

19              The patent gets the filing date of '94.

20  It gets a presumption of validity, but then we're

21  entitled to attack enablement --

22              THE COURT:  I think where she's going is

23  not saying for the -- when the application was

24  originally filed, was that '91?

25              MS. ELDERKIN:  '91, and then there was
```

1    this '92 application.

2              THE COURT:  Okay.  Where she's going is

3    to estoppel you from claiming that those filings were

4    anticipatory of the '94 filing.

5              MR. LEE:  And, Your Honor, I think -- I

6    think that --

7              THE COURT:  Am I correct in what

8    you're --

9              MS. ELDERKIN:  Yes.

10             THE COURT:  That and the foreign

11   application that was filed simultaneously.

12             MR. LEE:  Right.

13             THE COURT:  Those -- that's where we're

14   headed.

15             MR. LEE:  I think we're collapsing two

16   issues.  If I could just have a minute, I think I can

17   break them down.

18             Your Honor, in the acquiescence ruling,

19   the only question was, what did the Examiner say?  Was

20   there an enablement objection?  Did we acquiesce?

21   And that is a legal question that Your Honor has ruled

22   on, and it has consequences for the priority date.

23             Once we get to the second set of issues,

24   which is you have the 1994 priority date.  The 1992

25   published application is now, indisputably, prior art to

1 that.  It was published 18 months before the 1994 date.

2 What it discloses it discloses, right?  And if it

3 anticipates --

4         THE COURT:  There's no question it's

5 admissible as to obviousness, okay?

6         MR. LEE:  Right.

7         THE COURT:  But I think her -- the

8 argument is, is the question of whether your expert

9 should be entitled to express an opinion that those

10 earlier applications were anticipatory.  They rely on

11 one publication -- well, you know, anticipatory -- you

12 know it better than I do.  See, I can't even say it.

13 You know it much better than I do.

14         Everybody in this courtroom knows that,

15 so you know what I'm talking about.

16         MR. LEE:  Actually, Your Honor, I think

17 what they're saying is we're estopped from having our

18 expert take the position that those -- the 1992

19 reference is enabled, not just anticipatory, I think.

20         MS. ELDERKIN:  No.  Part of

21 anticipation -- for it to be an anticipatory, it has to

22 be --

23         THE COURT:  Well, that's what I said.

24 That's the issue.

25         MR. LEE:  Yeah.  And I think, Your Honor,

1 this is one of the things we've suggested we could take

2 up at a break.  It's not going to come up in the

3 openings, but I think we can show you in our expert

4 report precisely what our expert said, which is he said

5 the following:  He said, I don't believe that it's

6 enablement, but if their expert is correct and it's

7 enabled, then it anticipates.

8            And we'll show you the paragraphs before

9 we ever offer it to the jury.  We're not going to say

10 anything about it in the opening, Your Honor.

11            THE COURT:  Well, that takes care of it

12 then.  I would like some further briefing on it or have

13 some further argument, because all we've got was this

14 one line.  And I was out of town until Friday, and I

15 came in and I began to think about it over the weekend.

16 And so I'm a little -- I wanted to get some -- as long

17 as it doesn't come up here this morning in opening,

18 we're in good shape.

19            MR. LEE:  We're not going to open on -- I

20 actually think a couple of short pages may help, and

21 then I don't think it will come up before tomorrow.

22            THE COURT:  That's what I wanted to do

23 tonight.  Mrs. Ward didn't have anything, and she's out

24 of town, so that will give me something to do.

25            Thank you, Mr. Lee.

1               MR. LEE:  We'll keep you busy, Your

2  Honor.

3               THE COURT:  That's fine.  Thank you.

4               Anything else you need guidance from?

5               Have I got a current exhibit list up here

6  yet?

7               COURTROOM DEPUTY:  Just one.

8               THE COURT:  All right.  Y'all need to get

9  your exhibit lists.

10              Have y'all exchanged the exhibit list

11  this morning?

12              MS. ELDERKIN:  Yes, Your Honor.

13              MR. LEE:  Yes, Your Honor.

14              THE COURT:  Are there any disagreements?

15  Do we have one common list, or do we have two different

16  lists?

17              COURTROOM DEPUTY:  I just have the

18  Plaintiffs'.

19              THE COURT:  Okay.  I want to get them in.

20  But there's no objection to the list each side has been

21  furnished, is that correct, from the Plaintiff?

22              MS. ELDERKIN:  That's correct, Your

23  Honor.

24              THE COURT:  All right.  So those are

25  deemed admitted.  You can refer to them at anytime.

1  What about from the Defendants; is there any --

2              MR. BECK:  Your Honor, there were some

3  exhibits we talked to counsel about this morning, which

4  our hearsay objections were sustained by Judge

5  Everingham.  They're back on the exhibit list, but I

6  don't know whether they're going to use -- Mr. Sayles

7  says that they're not going to be using it with the

8  witness that he intends to put on.

9              So maybe the best way to do this, subject

10 to Your Honor's approval, is to just see whether or not

11 they're ever going to use these exhibits.  And if

12 they're not, then it's moot.  If they do, then the Court

13 can address them at that time.

14             THE COURT:  Those that are on the list

15 that are consistent with Judge Everingham's rulings are

16 deemed admitted.  And, you know, counsel are instructed

17 to use those in accordance with Judge Everingham's prior

18 rulings.

19             If you have something you want me to

20 reconsider, then you will approach.

21             MR. BECK:  Thank you.

22             THE COURT:  We need to get another list.

23 Yes, Mr. Sayles?

24             MR. SAYLES:  I don't think there's an

25 issue there.  I explained it to them this morning.  I

1 told them exactly what I'm going to use that's admitted.

2            THE COURT:  Got the jury notebooks.  What

3 do we have in the jury notebooks over there?

4            LAW CLERK:  You have one, Judge, there.

5            THE COURT:  Pardon me?

6            LAW CLERK:  You have one there.

7            THE COURT:  Oh, I've got one.

8            Any objections -- just for the record,

9 does anybody have any objections to what's included in

10 this?

11            MR. BECK:  We have none, Your Honor.

12            MS. ELDERKIN:  No, Your Honor.

13            THE COURT:  Just make one observation.

14 This claim construction, what's here and the amount of

15 work that went into producing this less than one page is

16 sort of a -- what I tell everybody about trying these

17 patent cases, I said it's claim construction that drives

18 the train and how quick you can do that.  I guess if you

19 look at that one page, I wonder what that judge does in

20 his spare time.

21            I'll see you back in here right at 8:30.

22 We'll have a formal opening of court.  I'll give some

23 preliminary jury instructions.

24            And 30 minutes a side on oral argument;

25 is that correct?

1          MS. ELDERKIN:  Yes, Your Honor.

2          THE COURT:  All right.

3          COURT SECURITY OFFICER:  All rise.

4          (Recess.)

5          (Jury in.)

6          COURT SECURITY OFFICER:  All rise.

7          THE COURT:  All right.  Please be seated.

8          Good morning, Ladies and Gentlemen.  I

9  have already visited with counsel, and so we are about

10  ready to go.

11          I appreciate so much you being here

12  timely.  I know it's not the most convenient thing, but

13  we've managed to dispose of some other cases that were

14  selected in the month ahead of you, and now then we're

15  going to take up this case.

16          For the record, before I give these

17  preliminary instructions to the jury, I want to ask that

18  the -- call on the parties for announcements and give

19  you the opportunity and request that you, once again,

20  introduce yourselves to the jury and those members of

21  your team that will be participating in this case.

22          This is Centocor, Incorporated, and New

23  York University versus Abbott Laboratories, Civil Action

24  2:07-CV-139.

25          What says the Plaintiffs?

1               MR. SAYLES:  May it please the Court.

2    Centocor Biotech, Incorporated, and New York University

3    announce ready to proceed.

4               I'm Dick Sayles, counsel for the

5    Plaintiffs.  With me is Diane Elderkin, my co-counsel;

6    Steve Maslowski, also co-counsel; Barbara Mullin,

7    co-counsel; and at head of the table, Mr. Eric Harris,

8    who is our client representative.

9               THE COURT:  Thank you, Counsel.

10              For the Defendants?

11              MR. BECK:  Your Honor, for the Abbott

12   Defendants, David Beck.  And with me are my colleagues,

13   Mr. Bill Lee, Mr. Bill McElwain, Ms. Amy Wigmore, and

14   Mr. Gil Gillam.

15              And may I also introduce our corporate

16   representative, Your Honor?

17              THE COURT:  Certainly.

18              MR. BECK:  I would like to introduce Dr.

19   Jochen Salfeld, who we'll be hearing from during the

20   trial.  He will be our corporate representative, Your

21   Honor.

22              THE COURT:  All right.  Thank you.

23              Members of the Jury, you have previously

24   been sworn as the jury to try this case.  As the jury,

25   you will decide the disputed questions of fact.

1          As the Judge, I will decide all questions

2  of law and procedure.  And from time to time during the

3  trial and at the end of the trial, I will instruct you

4  as to the rules of law that you must follow in making

5  your decision.

6          Now, I want to -- from jury selection, I

7  recall, according to my notes at least, that some of you

8  have previously served on state court juries.  And one

9  of the things I learned early on in my first year and

10 these last ten years was that jurors with that

11 experience sometimes rely on state court procedure as to

12 what might happen in this, the federal court.

13         In state court, at the end of the trial

14 after the lawyers have argued to you, what happens is

15 that all of the written instructions and rules of law

16 that the Court has instructed on, you're given a copy

17 of, to take it back to the jury room.

18         That will not be the case.  All my

19 instructions will be oral.  I ask you to pay close

20 attention, because now I will tell you my final

21 instruction, if there's something you need me to repeat

22 or something, we'll get to that.  But for the most part,

23 we will not have copies of these instructions.  So I

24 hope you will listen to them carefully.

25         You will recall on the date that you were

1  selected that you saw a film about patents.  I am going

2  to review briefly some of the things, highlights about a

3  patent and what it is and how one is obtained.

4              You have in your -- in your jury notebook

5  that's got a copy of the patent-in-suit.  But this case

6  involves a dispute relating to this particular United

7  States patent.

8              Now, before summarizing the positions of

9  the parties and the legal issues involved in the

10  dispute, let me take a moment to explain what a patent

11  is and how it is obtained.

12             The United States Constitution grants

13  Congress the power to enact laws, quote, to promote the

14  progress of science and useful arts by securing for

15  limited times the authors and inventors the exclusive

16  right to the respective writings and discoveries.

17             That's the end of the quote from the

18  Constitution.

19             With this power, Congress enacted the

20  patent laws.  Now, patents are granted by the United

21  States Patent & Trademark Office, referred to throughout

22  this trial generally, as the PTO.

23             The process of obtaining a patent is

24  called patent prosecution.  A valid U.S. patent gives

25  the patent owner the right, for up to 20 years from the

1  date that the patent application was filed, to prevent

2  others from making, using, offering to sell, or selling

3  the patented invention within the United States or from

4  importing it into the United States without the patent

5  holder's permission.

6           A violation of a patent owner's rights is

7  called infringement.  The patent owner may try to

8  enforce a patent against another -- against persons

9  believed to be infringers by a lawsuit filed in federal

10 court.

11          Now, to obtain a patent, one must file an

12 application with the PTO.  The PTO is an agency of the

13 federal government and employs trained examiners who

14 review applications for patents.

15          The application includes what is called a

16 specification, which must contain a written description

17 of the claimed invention, telling what the invention is,

18 how it works, how to make it, and how to use it so that

19 others skilled in the field will know how to make and

20 use it.

21          The specification concludes with one or

22 more numbered sentences.  These are the patent claims.

23 When a patent is eventually granted by the PTO, it is

24 the claims that define the boundaries of its protection

25 and give the notice -- and give notice to the public of

1  those boundaries.

2            Now, after the applicant files a patent

3  application, a PTO Patent Examiner reviews the patent

4  application to determine whether the claims are

5  patentable and whether the specification adequately

6  describes the invention.

7            In examining a patent application, the

8  Patent Examiner reviews records available to the PTO for

9  what is referred to as prior art.  The Examiner also

10 will review prior art if it is submitted to the PTO by

11 the applicant.

12            Prior art is defined by law, and at a

13 later time, I will give you specific instructions as to

14 what constitutes prior art.

15            However, in general, prior art includes

16 things that existed before the claimed invention that

17 were publicly known or used in a publicly accessible way

18 in this country or that were patented or described in a

19 publication in any country.

20            The Examiner considers, among other

21 things, whether each claim defines an invention that is

22 new, useful, and non-obvious in view of the prior art.

23            A patent lists the prior art that the

24 Examiner considered.  This list is called the cited

25 references.

1            Now, after the prior art search and

2   examination of the application, the Patent Examiner then

3   informs the applicant in writing what the Examiner has

4   found and whether any claim is patentable and thus will

5   be allowed.

6            This writing from the Patent Examiner is

7   called an office action.  If the Examiner rejects the

8   claims, the applicant then responds and sometimes

9   changes the claims or submits new claims.  This process,

10  which takes place only between the Examiner and the

11  patent applicant, may go back and forth for some time

12  until the Examiner is satisfied that the application and

13  claims meets the requirements for a patent.

14            The papers generated during this time of

15  communicating back and forth between the Patent Examiner

16  and the applicant make up what is called the prosecution

17  history.  All this material becomes available to the

18  public no later than the date when the patent issues.

19            Now, the fact that the PTO grants a

20  patent does not necessarily mean that any invention

21  claimed in the patent, in fact, deserves the protection

22  of a patent.

23            For example, the PTO may not have had

24  available to it all of the information that will be

25  presented to you.  A person accused of infringement has

1   the right to argue here in federal court that a claimed

2   invention in the patent is invalid because it does not

3   meet the requirements of a patent.

4                    Let's take a moment to look at the

5   patents in issue.  You've got -- after your glossary,

6   you've got PX -- you've got Plaintiffs' Exhibit 1.

7   Now, the cover page of the patent provides identifying

8   information.  That's the second page actually that we're

9   talking about.

10                    It has the date the patent was issued,

11  the patent number along the top -- this long number

12  here -- as well as the inventor's name and a filing date

13  and a list of the cited references considered by the PTO

14  that I mentioned to you just a moment ago.

15                    The specification of the patent begins

16  with this abstract, right down at the bottom of this

17  page.  And it is organized into two columns on each

18  page.  The specification ends with numbered paragraphs.

19  You've got to go all the way over here in this

20  particular patent -- let's see -- Column -- all the way

21  over to Column 107.

22                    Go right on over to next to the last two

23  pages, and it says what is claimed is.  Then it sets

24  forth those numbered paragraphs.

25                    Now, between the beginning abstract and

1 these claims are the drawings, and the drawings will

2 illustrate various aspects of the feature of the

3 particular invention.  Then there comes this written

4 description.  They're organized into two columns, and

5 then ending with these numbered claims.

6          The patent claims is what you will be

7 focusing on not exclusively, but it's very important

8 because it's the patent claims that determine the scope

9 of the invention.

10          Now, let me talk now to you a little bit

11 about position.  That's all I'm going to say about the

12 patent, but I wanted you to have some idea.

13          You will see that that has a real long

14 number, and, generally, like it's '7 -- this one is

15 7,070,775.  It will generally be referred to as the '775

16 patent, those last three numbers.

17          In order to help you to follow, I'm going

18 to give you a summary of the position of the parties.

19 And the Plaintiffs in this case are Centocor Ortho

20 Biotech, Incorporated, referred to in this case as

21 Centocor and New York University.

22          The Defendants are Abbott Laboratories,

23 Abbott Bioresearch Center, Inc., and Abbott

24 Biotechnology Limited.  Both the parties -- I may refer

25 to the Defendants collectively as Abbott or the

1  Defendants.  And sometimes they will refer to the

2  Plaintiffs collectively as the Plaintiffs.

3              As I -- I've given you the long number

4  and for -- as I've told you, generally, we will all

5  refer to this as the '775 patent.

6              The Plaintiffs filed suit in this Court

7  seeking money damages from the Defendants for allegedly

8  infringing the '775 patent by making, using, or

9  importing, selling, and offering for sale products that

10 the Plaintiffs argue that are covered by Claim No. 2, 3,

11 14, and 15 of the '775 patent.

12             Now, the product alleged to infringe is

13 Abbott's product Humira.  The Plaintiffs further argue

14 that Defendants' infringement was willful.

15             The Defendants deny that Humira infringes

16 any of the asserted claims of the patents at issue.  In

17 addition, the Defendants contend that the asserted

18 claims of the patent are invalid.

19             Your job, ultimately, will be to decide

20 whether Claims 2, 3, 14, and 15 of the '775 patent have

21 been infringed and whether those claims are invalid.

22             Now, if you decide that any claim of any

23 patent has been infringed and is not invalid, you will

24 then need to decide any money damages to be awarded to

25 the Plaintiffs to compensate them for the infringement.

1          You will also need to make a finding as

2    to whether or not the infringement was willful.  If you

3    decide that any infringement was willful, that decision

4    should not affect any damage award you give.  That is

5    for the use of the Court, and I will take willfulness

6    into account later.

7          Now, it is my job as Judge to determine

8    the meaning of any claim language that needs

9    interpretation.  You must accept the meaning I give you

10   and use them when you decide whether any claim of the

11   patents has been infringed and whether any claim is

12   invalid.

13         You have been furnished with a copy of

14   the meanings I have adopted on certain claim terms.

15   That's the very last page of your notebook.  It's

16   nothing to look at at this time, but it's there when the

17   time comes.

18         Now, I want to talk to you generally

19   about the trial.  Soon, the lawyers for the parties will

20   make what is called an opening statement.  Opening

21   statements are intended to assist you in understanding

22   the evidence.  What the lawyers say is not evidence.

23   After the opening statements, then the parties will

24   present to you the evidence in this case.

25         After all of the evidence is presented,

1 the Court will recess for the purpose of preparing final

2 instructions, and then the lawyers will again address

3 you and make final arguments.  And then I will instruct

4 you on the applicable law, and then you will retire and

5 deliberate on a verdict.

6             I want to say just a few words about your

7 conduct as jurors.  First, you are not to discuss this

8 case with anyone, including your fellow jurors, members

9 of your family, people involved in the trial, or anyone

10 else; nor are you allowed to permit others to discuss

11 the case with you.

12             If anyone approaches you and tries to

13 talk to you about the case, please let me know about it

14 immediately.

15             I want to say you've got to keep an open

16 mind during the trial of this case.  You've got to wait

17 until both sides get to present all of their evidence,

18 because, you know, if you make up your mind early on,

19 it's just not fair to either party.  So please follow

20 that instruction.

21             And that's why I will -- that's why we

22 instruct you not to discuss the case among yourselves

23 until you've heard all evidence, because we don't want

24 you deliberating among yourselves on partial evidence.

25             Secondly, do not read any news stories or

1  articles or listen to any radio or television reports

2  about the case or any -- about anyone who has anything

3  to do with it.  There may be something in the

4  newspapers; there may not.  It may be on some of the

5  local news channels, or it may not.

6              Another important thing is do not do any

7  research such as consulting dictionaries, searching the

8  internet, or using any other reference materials.  And

9  do not make any investigations about the case on your

10  own.

11              Now, there have been recent, tragedies in

12  a sense, for a trial judge, not that he was hurt, but

13  eight weeks in trial, it turns out the lawyers were

14  communicating with somebody outside in one case on their

15  cell phones about what some terms meant or didn't mean.

16  And then that's happened at another time.  So please do

17  not do anything like that.

18              Just remember that instruction:  Don't

19  talk to anyone about this case, and don't do any

20  research or try to learn anything.

21              Now, if you need to communicate something

22  with me, you need to just give a copy to the court

23  security officer in writing of what you want me to know

24  about, and I'll decide if there's anything I can do or

25  we will act on it.

1          Finally, do not -- this is what I've

2 already said to you once, but I want to emphasize it.

3 Do not make up your mind about what the verdict should

4 be until you have gone to the jury room to decide the

5 case, and you and your fellow jurors have discussed the

6 evidence.  Keep an open mind.

7          Now, during this trial, as in all trials,

8 it will probably be necessary that I consult with the

9 lawyers outside your hearing to conduct a part of the

10 trial outside your presence.  I will handle these

11 matters as briefly and as conveniently for you as I can,

12 but you should remember that this is a necessary part of

13 any trial.

14          With respect to evidence, I want to tell

15 you, the evidence you are to consider in deciding what

16 the facts are consist of the sworn testimony of any

17 witness, the exhibits which are to be received into

18 evidence.

19          Let me comment briefly to say that the

20 lawyers have worked extremely hard with myself and

21 Magistrate Judge Everingham to minimize the amount of

22 time talking about admissibility of exhibits.  We've had

23 numerous hearings, and so there won't be a lot of wasted

24 time.  These exhibits have been previously ruled on.

25          So they are to be complimented, both

1   sides, because it's going to make your job -- number

2   one, it's going to save you a lot of time, and it will

3   make your job easier.

4              Also, you are to consider any

5   stipulations that the parties agree to.  If the parties

6   stipulate something as to a fact, you are to consider

7   that fact conclusively proved.

8              Now, what is not evidence?

9              The following things are not evidence,

10  and you must not consider them as evidence in deciding

11  the facts of this case.  I've already said statements

12  and arguments of the attorneys; questions and objections

13  of the attorneys; testimony that I instruct you to

14  disregard, and anything that you may see or hear when

15  the Court is not in session, even if what you see or

16  hear is done or said by one of the parties or by one of

17  the witnesses.

18             Now, evidence, the type of evidence may

19  be direct or circumstantial.

20             Now, direct evidence is direct proof of a

21  fact, such as the testimony of an eyewitness about what

22  that witness personally saw or heard or did.

23             Circumstantial evidence is proof of one

24  or more facts from which you find another fact.

25             You should consider both kinds of

1  evidence.  The law makes no distinction between the

2  weight to be given either direct or circumstantial

3  evidence.  It is for you to decide how much weight to

4  give any evidence.

5           In deciding the facts in this case, you

6  may have to decide which testimony to believe and which

7  testimony not to believe.  You may believe everything a

8  witness says, part of it, or none at all.

9           In considering the testimony of any

10 witness, you may take into account the opportunity and

11 the ability of the witness to see, hear, or know the

12 things testified to, the witness' memory, the witness'

13 manner while testifying, the witness' interest in the

14 outcome of the case, and any bias or prejudice; whether

15 other evidence contradicted the witness' testimony; the

16 reasonableness of the witness' testimony in light of all

17 the evidence; and any other factors that bear on

18 believability.

19           The weight of the evidence as to a fact

20 does not necessarily depend upon the number of witnesses

21 who testify.  Remember, you are the exclusive judges of

22 the facts.

23           Now, you must consider only the evidence

24 in this case; however, you may draw such reasonable

25 inferences from the testimony and exhibits as you feel

1 are justified in light of common experience.  You may

2 make deductions and reach conclusions that reason and

3 common sense lead you to make from the testimony and

4 evidence.

5          With respect to common sense, folks, it

6 is your collective wisdom and your collective common

7 sense that separates you from everyone else in this

8 trial.  Do not leave your common sense outside the

9 courtroom.  Those are the best tools you have to resolve

10 the fact questions that you must.

11          The testimony of a single witness may be

12 sufficient to prove any fact, even if a greater number

13 of witnesses that may have testified to the contrary if,

14 after considering all the other evidence, you believe

15 the single witness.

16          Now, when a party has the burden of proof

17 on any claim or affirmative defense by a preponderance

18 of the evidence, it means that you must be persuaded by

19 the evidence that the claim or affirmative defense is

20 more likely true than not true.  You should base your

21 decision on all the evidence, regardless of which party

22 presented it.

23          I believe I gave you this example.  We've

24 got the scales of justice here.  We're going to start

25 this trial, we start off even.  We've heard no evidence.

1  At the close of the evidence, after hearing my final

2  instructions on preponderance of the evidence, if you

3  believe that the party who has the burden of proof by a

4  preponderance of the evidence is something more likely

5  true than not, that means the scales are tipped ever so

6  slightly in favor of that party.  That's the

7  preponderance of the evidence standard.

8              Now, you have another burden that you're

9  going to have to consider -- burden of proof.  That's

10 the clear and convincing evidence standard.

11             Now, when a party has the burden of

12 proving any claim or defense by clear and convincing

13 evidence, it means that the party must persuade you that

14 it is highly probable that the facts are as that party

15 contends.  Such evidence requires a higher standard of

16 proof than by a preponderance of the evidence.

17             Again, you should base your decision on

18 all the evidence, regardless of which party presented

19 it.

20             Thinking of the scales of justice again

21 rather than tipping ever so slightly, they've got to tip

22 more like something like this (indicates) for the clear

23 and convincing standard.

24             That is not to be confused nor will you

25 be required to apply the burden of proof we hear a lot

1  about on TV.  That's beyond a reasonable doubt in a

2  criminal case.  The scales have to tip all the way for

3  someone to meet that burden of proof.

4          Do not confuse the clear and convincing

5  standard with that.  It is a lesser burden than beyond a

6  reasonable doubt.

7          Now, you're going to hear in this case

8  from a number of expert witnesses.  I want to talk to

9  you.

10          When the knowledge of technical subject

11  matter may be helpful to the jury, a person who has

12  special training or experience in that technical field,

13  called an expert witness, is permitted to state his or

14  her opinion on those technical matters.  However, you

15  are not required to accept that opinion.

16          As with any other witness, it is up to

17  you, as exclusive judges of the facts, to decide whether

18  or not to rely on it and how much weight to give the

19  testimony.

20          Now, during this trial, certain testimony

21  will be presented to you by way of deposition.

22          Anything other than video depositions?

23          MR. SAYLES:  May it please the Court.

24  There's one deposition to be read in, and there's some

25  requests for admissions that will come up.

1               THE COURT:  Well, we'll deal with the

2   requests for admissions separately.

3               Nearly all the deposition testimony is

4   done by video, so you will get to see the witness

5   testify and hear the testimony.  But deposition is

6   testimony of a witness who for some reason cannot be

7   present to testify from the witness stand is usually

8   presented either in writing or by way of video under

9   oath.  One that will be read to you, the testimony will

10  be under oath.

11              Now, such testimony, whether it be read

12  to you out of a deposition or placed on the screen

13  through a video, when you hear the witness testify, such

14  testimony is entitled to the same consideration, and,

15  insofar as possible, is to be judged as to credibility,

16  weight, and otherwise considered by the jury in the same

17  way as if the witness had been present and had given

18  from the witness stand the testimony that is shown on

19  the screen or that is read to you from the deposition.

20              Now, we've got the lawyers in this case

21  that have worked extremely hard, and they're advocates

22  for their clients.  A lawyer is ethically and legally

23  obligated to zealously assert his or her client's

24  position under the rules of our adversary system.

25  And by presenting the best case possible on behalf of

1 their clients, the lawyers, hopefully, will enable you,

2 the jurors, to weigh the evidence and determine the

3 truth, and arrive at a just verdict based on the

4 evidence.

5          This adversary system of justice has

6 served us well for over 200 years.  And trial lawyers

7 have then and continue to be a critical part of the

8 process.  And in performing their duties, it is the duty

9 of the attorney on each side of this case to object when

10 the other side offers testimony or other evidence which

11 the attorney believes is not properly admissible.

12          Now, upon allowing testimony or other

13 evidence to be introduced over the objection of the

14 attorney, the Court does not, unless expressly stated,

15 indicate any opinion as to the weight or the effect of

16 such evidence.

17          As I've told you before, you, the jurors,

18 are the sole judges of the credibility of all the

19 witnesses and the weight and effect of all evidence.

20 However, when the Court sustains an objection to a

21 question addressed to the witness, the jury must

22 disregard the question entirely and may draw no

23 inferences from the wording of it or speculate as to

24 what the witness would have said, if permitted to answer

25 the question.

1          Now, the law of the United States permits

2  the judge to comment to the jury on the evidence in a

3  case, but such comments are only expressions of the

4  judge's opinions as to facts.  And the jury may

5  disregard them entirely, since the jurors are the sole

6  judges of the facts.

7          All right.  Is the Rule to be invoked in

8  this case?

9          MR. BECK:  It is, Your Honor.  We wish to

10  do so.

11          THE COURT:  All right.

12          MR. SAYLES:  We have agreed that experts

13  are excused from the implementation of the Rule.

14          THE COURT:  Well, that's the Court's

15  practice.

16          Are there witnesses in the courtroom at

17  this time that will be subject to the Rule?

18          MR. SAYLES:  Yes, sir, there are.

19          THE COURT:  All right.  If you'll have

20  them come forward and just stand right there, because I

21  want to give them some instructions.

22          MR. BECK:  Your Honor, do you wish

23  experts, also?

24          THE COURT:  No, not experts.

25  Non-experts, fact witnesses, non-experts.

1              MR. SAYLES:  Inside the rail, Your Honor?

2              THE COURT:  No, they're fine.  I just

3    want to make sure they can hear me.

4              The Rule has been invoked in this case,

5    and it applies to -- I've excused the expert witnesses,

6    but those who are non-expert witnesses, fact witnesses,

7    what that means is that from this point forward, you are

8    under the Rule.

9              And that means you cannot discuss your

10   testimony with anyone, other than the lawyers in this

11   case.  And when you're discussing your testimony with

12   the lawyers, you have the duty the same as the lawyer

13   does, to see to it that you are outside of earshot of

14   any other person so that they cannot hear these

15   discussions.  So that is your duty as well as the

16   lawyers'.

17             I'm sure there will be witnesses, maybe

18   perhaps other than these, but it's the duty of the

19   lawyer to make sure that any other witness not present

20   here at this time is aware that the Rule has been

21   invoked and what the Court's instructions are.

22             You may be seated.  You may remain in the

23   courtroom until opening statements are completed.  You

24   may hear the opening statements, but then you will be

25   required to place yourself outside the courtroom.

1                    Thank you very much.  You may be seated.

2                    All right.  At this time, we'll hear from

3  the attorneys for the Plaintiffs.

4                    I will give you a five-minute warning.

5                    MS. ELDERKIN:  I was going to ask for

6  that.  Thank you very much.

7                    May it please the Court, Counsel, Ladies

8  and Gentlemen of the Jury.

9                    If someone uses someone else's property

10  without permission, they should pay for it.

11                    My name is Dianne Elderkin, and along

12  with counsel at table who were introduced previously, I

13  represent the Plaintiffs in this case, Centocor Ortho

14  Biotech and New York University.

15                    This trial is about drugs, revolutionary

16  drugs, drugs that have changed the way that very

17  devastating diseases are treated, diseases such as

18  rheumatoid arthritis and Crohn's disease.

19                    You're going to hear that because the

20  U.S. Patent & Trademark Office, an agency of the U.S.

21  government, found that those drugs were new and useful,

22  it issued this patent, the '775 patent, that is in your

23  binders.

24                    It was issued on Independence Day, July

25  4th, 2006.

1            You heard that when the government issues

2  a patent, a valid patent under discovery, that means

3  that no one else can use the invention in that patent

4  that's claimed in that patent without permission for a

5  set period of years.

6            We're going to show you that Abbott chose

7  to disregard those rules.  They knowingly used this

8  patent, the invention, when they sold their drug,

9  Humira, without permission from Centocor.

10            This trial is about Centocor's claim for

11  damages for Abbott's use of our patented invention.

12            Now, you may not recognize the name

13  Centocor, but you probably recognize the name Johnson &

14  Johnson.  Johnson & Johnson companies make all kinds of

15  products like Band-Aids and Tylenol -- Tylenol,

16  Band-Aids, baby oil, baby powders.

17            But there are also Johnson & Johnson

18  companies that make prescription drugs, drugs that treat

19  things like cancer, infections, pain, and even

20  Alzheimer's disease.

21            Well, Centocor is a Johnson & Johnson

22  company, and it's a Johnson & Johnson company that makes

23  a special kind of drug called antibodies for treating

24  diseases.  And the patent in this trial, the '775

25  patent, was granted to scientists at Centocor and at

1  NYU, New York University, because they invented a

2  special kind of antibody that can be used to treat

3  diseases such as rheumatoid arthritis and Crohn's

4  disease.

5            You are going to hear that rheumatoid

6  arthritis is different from the kind of arthritis, the

7  more common arthritis that we often hear about where

8  your joints just sort of wear out.  Rheumatoid arthritis

9  is really much worse than that.

10           It's a disease where inflammation attacks

11 the joints in your body and can actually cause them to

12 deform.  So sometimes patients who have rheumatoid

13 arthritis can't accomplish the simplest of tasks or even

14 get out of bed.  And it affects over a million people in

15 the United States.

16           Another disease you're going to hear

17 about is Crohn's disease.  That's another terrible

18 disease, and it's a inflammation disease that affects

19 your intestines, your bowel, and can have devastating

20 and debilitating consequences, including sometimes the

21 need for repeated surgery to remove the intestine.

22           Now, rheumatoid arthritis and Crohn's

23 disease probably seem very different to you.  One

24 affects joints; one affects the bowels; but they really

25 have something in common.  They're both caused by

1 inflammation, and they're both caused by an inflammation

2 because our bodies overproduce a particular protein

3 called tumor necrosis factor.  You're going to hear a

4 lot about that.

5          Tumor necrosis factor alpha, which is

6 abbreviated as TNF.  The TNF is actually a good protein;

7 we all have it in our bodies, and it's a necessary part

8 of our immune system.  But sometimes the body can

9 overproduce it, and when it's overproduced, it can cause

10 the kinds of inflammation that leads to these horrible

11 diseases.

12          Now, in the 1980s and 1990s, there really

13 were not adequate treatments for diseases like

14 rheumatoid arthritis and Crohn's disease for a lot of

15 patients.  There simply was nothing that really worked

16 for everybody.

17          The inventors on the Centocor and NYU

18 patent theorized that one way to treat the diseases

19 would be to go into the body somehow and capture this

20 excess TNF that your body makes and somehow remove it

21 from your body.

22          Now, at the time, that probably seemed

23 like science fiction, but that's exactly what Centocor's

24 and NYU's scientists did.  They invented and made

25 antibodies that were able to get -- that when

1   administered into your body were able to find the TNF in

2   your blood, hook onto it, and then have it removed from

3   your body so that it couldn't cause the inflammation

4   that was causing problems.

5                   And, in fact, they discovered and were

6   awarded this patent on two types of antibodies for doing

7   that.  One's called chimeric and one is called human.

8   So what are antibodies?

9                   Well, antibodies are very different from

10  the kinds of drugs that we're mostly used to, the kind

11  of drugs that a pharmacist might be able to mix up

12  behind the counter at the drugstore.

13                  Antibodies are proteins, and they are

14  made in living organisms such as in our bodies.  Our

15  bodies make antibodies to protect us against germs,

16  things like bacteria and viruses.

17                  So, for example, if you had the chicken

18  pox, what happens is your body sees that foreign chicken

19  pox virus and makes antibodies to it, and eventually

20  those antibodies remove the virus and take it out of

21  your body and you get better.

22                  Also, those antibodies then stay in your

23  body.  So if you're ever exposed to the chicken pox

24  virus again, those antibodies are there to go find the

25  virus and remove it from your body, and you're better

1    possibly before you even knew that you had the virus.

2                    Centocor was one of the first companies

3    to develop man-made antibodies to treat diseases, and

4    the particular antibodies that Centocor and New York

5    University invented are antibodies that are specific to,

6    that bind to that TNF protein that's in our bodies.

7    One of the inventors of the patent, Dr. John Ghrayeb

8    will be here to tell you about the invention that is

9    described in the patent and the work that went into it.

10                   The work to develop these antibodies

11   began in the late 1980s.  Long before Centocor was a

12   Johnson & Johnson company, it was a pretty small startup

13   company at the time.  It didn't have a lot of money, but

14   it had some great inventors and great ideas.

15                   And so it needed some help, so it entered

16   into an agreement with New York University, NYU, to do

17   some research together.  And what happened is the New

18   York University scientists were charged with looking for

19   antibodies from mice that might bind to TNF.

20                   What they did, rather ingeniously, is the

21   NYU inventors took mice and they injected them with

22   human TNF-alpha, the kind of TNF-alpha that we have in

23   our bodies.

24                   Because that's a human protein and not a

25   mouse protein, it was foreign to the mice, and so the

1 mice produced antibodies to the TNF.  They did that and

2 the New York -- the NYU scientists were able to isolate

3 those antibodies that the mice made.  One of them was a

4 very special antibody, which is called A2.  You'll hear

5 a lot about that during the trial.

6           But finding A2 was really just the

7 beginning of the story.  Finding A2 was sort of like

8 finding a needle in a haystack, because the mice -- the

9 mouse made many, many more antibodies than that.  So

10 they had to first find the A2 antibody and determine

11 that it was the special one, that it was capable of

12 going in and binding to TNF tightly and holding onto it,

13 and also that it was capable basically of putting the

14 TNF out of business.  Neutralizing it is the term you'll

15 hear.

16           When the antibody bound to TNF, it was

17 able to keep the TNF from doing the bad things, causing

18 the inflammation that causes problems in the body.

19           Now since this A2 antibody that the NYU

20 scientists found was entirely made in a mouse and from

21 mouse cells, it wouldn't work very well for long-term

22 treatment in humans.

23           So then the Centocor scientists got

24 involved, and what they did is they took the A2 antibody

25 and made it work better as a drug for humans.

1                What they did is they took a large part

2   of the A2 antibody -- because these are very large

3   molecules -- they took a large part of it, and they

4   replaced it with a part of an antibody from a human.

5   The resulting antibody was called cA2.  The C stands for

6   the term chimeric.  Chimeric is a term that means that

7   it's an antibody that has pieces from two different

8   sources.  In the case of cA2, the two sources are mouse

9   and human.

10               So how did they do that; how did they

11  make an antibody that was part mouse and part human?

12               Well, you'll hear that all antibodies

13  have something in common.  Whether it's a mouse antibody

14  or a human antibody, all antibodies are made from the

15  same building blocks, 20 building blocks.  They are

16  called amino acids, and they are the same amino acids if

17  it's a mouse antibody or a human antibody or a goat

18  antibody or a rabbit antibody.  They are all the same.

19  The difference is only how those building blocks are put

20  together.

21               So how does one determine how the

22  building blocks are put together?

23               The instructions are in DNA.  You've

24  probably all heard about DNA.  It's the genetic material

25  that's in every cell in our bodies.  And DNA is like the

1  instruction booklet.  It has the instructions for how

2  the 20 different amino acid building blocks should be

3  put together to make any protein but including an

4  antibody.

5              So what the Centocor inventors did is

6  they took some of the DNA for making the mouse antibody,

7  an instruction booklet for making mouse antibodies, and

8  they combined that with some DNA from some human DNA, an

9  instruction book for making human DNA.  They combined it

10  into a new piece of DNA, a new instruction book for

11  making a new man-made antibody.  And that's what they

12  did.  That's how they made the cA2.

13              And Dr. Ghrayeb, one of the inventors,

14  will tell you how that was done, to make a new antibody.

15  The technology for doing this has a name.  It's called

16  recombinant DNA technology.  That's because you combine

17  two pieces of antibodies -- two pieces of DNA -- I'm

18  sorry -- to make a new piece of DNA, recombinant DNA.

19              Now, the Centocor/NYU inventors further

20  discovered that they could make another type of TNF

21  antibody that had the great characteristics of A2, that

22  initial mouse antibody that binds tightly and removes

23  the bad TNF from the system.

24              They thought that they could make a new

25  antibody, not necessarily a chimeric one, as the one I

1 just showed you, but they could also make a human

2 antibody.

3             The antibodies that are made this way

4 that we talk about as human antibodies are really not

5 existing naturally in our bodies at all.  We call them

6 human because they're both -- they're made solely from

7 human DNA, human DNA instruction booklets.  But they

8 don't exist anywhere naturally in our bodies.

9             And the inventors disclosed that they

10 could make human antibodies, according to their

11 invention, in an application that they filed in February

12 of 1994.  That will be an important date to remember,

13 February of 1994.

14             And you will see that right in their

15 patent in the summary of the invention section, which is

16 in Column 5 of the patent, they talk about how the

17 anti-TNF antibodies of their invention are intended to

18 include both chimeric antibodies; that's one where, for

19 example, part is mouse and part is human; and also human

20 antibodies.  And they added that reference to human

21 antibodies in February of 1994.

22             Now, the process of making an antibody

23 into a drug, once you have this great antibody in the

24 lab -- but the process of making it into a drug, testing

25 it on animals and humans and getting governmental

1   approval from the FDA takes a long time and costs tens

2   of millions of dollars.

3               Centocor was still small.  They didn't

4   have the money to explore both types of antibodies,

5   chimeric antibodies and human antibodies, and bring both

6   to market right away.  And they knew that their chimeric

7   antibody, cA2, was a really great antibody and showed

8   great potential.  They wanted to get that out into the

9   marketplace so that it could help patients right away.

10              So cA2 is the first antibody that they

11  pursued in clinical trials, testing with patients.  And

12  you're going to hear about some of the early tests,

13  especially with cA2.

14              Some doctors in Europe tested cA2 in

15  patients, patients who had rheumatoid arthritis and

16  Crohn's Disease, and the results were dramatic,

17  remarkable.

18              For example, you're going to hear about

19  one patient, a 16-year-old girl in Holland, who had

20  severe Crohn's Disease.  She was very, very sick, and

21  her doctor thought it was the point where he was going

22  to have to do an operation to remove her entire colon.

23  You can imagine how devastating that is, especially for

24  a 16-year-old girl.

25              The doctor heard about the work that was

1   being done with cA2 and rheumatoid arthritis, and even

2   though cA2 hadn't been approved yet by any governmental

3   agency for use in patients, he asked for a sample of it

4   on a compassionate use basis to give his patient.

5           He got it.  It was administered to the

6   girl, and you'll hear that within a week, after one

7   infusion of cA2, she felt better, she was gaining

8   weight, and they didn't need to do surgery on her.  The

9   cA2 worked in patients.

10          Now, in 1998, after many more years with

11  much larger tests in patients, Centocor received

12  approval from the Food & Drug Administration, the U.S.

13  governmental agency, to sell its product, cA2, which is

14  called Remicade, for Crohn's Disease.

15          A year -- about a year later, they got

16  approval to sell it for rheumatoid arthritis.  And as

17  you can see on the slide, you'll hear that there were

18  other approvals in subsequent years for other diseases,

19  and ankyloses, spondylitis, psoriatic arthritis, and

20  psoriasis.

21          For 10 years now since Remicade was first

22  introduced in 1999, it has safely and effectively

23  treated tens of thousands of patients who have these

24  horrible diseases.

25          Now, the remarkable results that Centocor

1  was getting with cA2 didn't go unnoticed.  Johnson &

2  Johnson, as we know, a big company with a big

3  pharmaceutical business, was very impressed with the

4  results of its hearing about the tests of cA2 in

5  patients.

6             And in 1999, it came in and acquired

7  Centocor.  It paid $5 billion for Centocor.  At that

8  time, that was the largest acquisition Johnson & Johnson

9  had ever made.

10             And in 2000, Remicade was awarded a very

11  prestigious prize.  It's called the Galien Prize or the

12  Prix Galien.  It's like the Nobel Prize, the equivalent

13  in the pharmaceutical industry, and it awards

14  pharmaceutical research and innovation.

15             Now, it turns out that Abbott, another

16  large pharmaceutical company, also wanted in on the

17  anti-TNF market anti-TNF antibody market.

18             So in 1999, after some of the great

19  results of the clinical testing of Centocor's cA2

20  antibody had been made public, executives from Abbott

21  actually talked to Centocor about making an offer to buy

22  Centocor, but they weren't willing to pay as much for

23  Centocor as Johnson & Johnson was, so those talks went

24  no further.

25             But Abbott didn't give up on acquiring

1  its own anti-TNF antibody.   In 2001, Noel, which was the

2  pharmaceutical arm of a giant German company, BASF, Noel

3  had a TNF antibody which it was developing.

4              Abbott bought Noel, and then beginning in

5  2003 started selling that antibody that Noel had started

6  to develop.   That antibody is called Humira, and that's

7  the product that's accused of infringement in this case.

8              Now, Abbott followed in Centocor's

9  footsteps.   Just as Remicade was introduced in 1999 and

10 got approvals for all these diseases, Humira, Abbott's

11 product, was introduced in 2003, and it got approval for

12 all the same diseases after Centocor had gotten those

13 approvals first.

14             The problem is -- and Humira is a great

15 product, and we don't deny it.   It has been a wonderful

16 product both for Abbott and for patients.   It is an

17 excellent, excellent product that has helped many

18 people, just as Remicade has.   The problem is, though,

19 it infringes Centocor's patent.

20             The next slide summarizes the claims that

21 are in issue in this case.   And as Judge Ward explained,

22 the claims at the end of the patent, those numbered

23 paragraphs, are what define what's protected by this

24 patent, and we're going to show you that Humira meets

25 every single one of the requirements of the claims.

1          In fact, for all the red checkmarks

2 there, Abbott doesn't even dispute that those

3 requirements are met by Humira.  The only dispute is

4 over the blue checkmarks, which is the requirement about

5 competitive inhibition, and you'll hear a lot about

6 that.

7          But you're going to hear from some

8 witnesses of Centocor.  You're going to hear from Susan

9 Tam, who is a Centocor scientist who did testing on

10 Humira with respect to that claim element.

11          And then you're going to hear from

12 Dr. Greg Adams, who's an expert in this field, who took

13 Susan Tam's test results, analyzed them, and concluded

14 that Humira does meet that claim element.  And he'll be

15 here to explain that to you.

16          And I want you to listen real carefully

17 as to whether you hear anything from Abbott, if they

18 present you any tests to rebut what Ms. Tam did and what

19 Dr. Adams will testify about.

20          Now, I want to explain one more thing to

21 you about the Centocor and the NYU patent.  I told you

22 the scientists worked on the antibodies that came -- or

23 led to this patent in the 1990s and that they filed

24 their first patent application in 1991.

25          The patent issued in 2006, but very

importantly, you'll hear that February 1994 is an important date for our patent. That's because the application which was filed with the Patent Office in February of 1994 expressly discloses human antibodies and how to make them.

You'll also hear that it's not uncommon that a patent can issue many years after the first patent application. So even though the first patent application was filed back in 1991, it's not uncommon that a patent might not issue, as this one, until 2006. So this patent did issue in July 2006, but Abbott knew it was coming at least six months earlier. The Patent Office told Centocor back in December 2005, six months before the patent issued, that it was going to allow the patent.

You're going to hear from Ken Dow, Centocor's patent lawyer, that when Centocor heard from the Patent Office that it was going to allow the claims in this patent, Centocor went to Abbott and told them, we're going to get a patent. You should look at these claims that the Patent Office is going to allow, and you can look at the claims on the -- on the website that's available to the public.

You're also going to hear from Joseph Scodari, who was a business executive at Centocor and

 1  Johnson & Johnson at the time.  You're going to hear him

 2  say that in early 2006, he told his counterparts at

 3  Abbott that Humira was going to infringe this patent.

 4  Centocor offered to let Abbott use the '775 patent.

 5  That's called a license.  But Abbott refused to pay a

 6  fair amount for that permission, so it didn't get a

 7  license.

 8          Instead, Abbott continued to sell Humira,

 9  and we allege they continue to infringe this patent

10  knowingly and willfully, and they haven't paid Centocor

11  or NYU a dime for doing so.

12          And that's why we're here.  We're asking

13  you to award Centocor fair compensation for Abbott's use

14  of our invention, of our property.  Centocor, as I said,

15  has been an enormously successful product for Abbott,

16  and it's been great for patients.

17          In fact, Humira also got the same prize

18  that Remicade had earlier gotten, the Galien Prize,

19  showing what a great product it is.  And that's not

20  surprising, because as we'll show you, Humira is also

21  part of the same groundbreaking invention that is

22  claimed and disclosed in this patent.

23          And Abbott even got some patents of its

24  own on Humira, but you're not going to hear a single

25  witness, you're not going to hear a single witness say

that because Abbott got its own patents, that it can't

also be infringing our patent.  That's an important

thing to remember.

Now, I'd like to tell you a little bit

about the damages that Centocor is seeking.

Since this patent issued in July 2006,

Abbott has sold over $11 billion worth of Humira, and

we're asking you to award damages for approximately 2.1

billion to Centocor.

That's a big number, folks.  But we're

going to show you that even if you were to award

Centocor the $2.1 billion we're asking for, Abbott would

still be left with more than that in profits.

You're going to hear from Rob Bazemore,

one of Centocor's marketing executives, about how Humira

and Remicade compete with one another in the

marketplace.

And you'll hear from Dr. Richard Gering,

a very experienced economist, that because Abbott has

been selling Humira, Centocor has lost some sales that

it would have made otherwise.

If Humira hadn't been on the market

infringing our patents, as we contend, Remicade would

have made more sales.  And we are asking you to award us

the profits we would have made had Abbott not been on

1 the market with its infringing Humira.

2 Dr. Gering is also going to explain to

3 you that Centocor should get a royalty from Abbott on

4 some of its sales of Humira.

5 In other words, a certain portion of the

6 money that Abbott has gotten for selling Humira should

7 come to Centocor. Those are the two numbers that add up

8 to the $2.1 billion that we'll ask you for.

9 Now, Abbott has its own damages expert,

10 and we expect that he's going to disagree with these

11 numbers. Dr. Gering -- he'll disagree with Dr. Gering.

12 We expect that he'll say that the drugs Remicade and

13 Humira, they don't really compete with one another.

14 Remicade doesn't lose any sales because Humira was on

15 the market, and therefore, he'll say that Abbott only

16 owes Centocor $250 million.

17 But you'll get to weigh the evidence on

18 that. You'll get to weigh the evidence about whether

19 there really is competition and whether Remicade has

20 lost sales to Humira in view of documents like this one,

21 Plaintiff's Exhibit 106.

22 This is an Abbott marketing document

23 talking about Humira where it says, Take share from

24 Remicade. Well, that wasn't a document created for

25 litigation, and you'll get to see those kinds of

1  documents and weigh the evidence.

2            Changing gears a little bit, I told you

3  that Abbott does not have permission from Centocor to

4  sell Remicade.  Well, there's a slight exception to

5  that.

6            You're going to hear that last year,

7  Abbott asked an arbitrator to decide whether Abbott had

8  permission to sell Humira under our patent.

9            THE COURT:  Five minutes.

10           MS. ELDERKIN:  Thank you.

11           What happened is the arbitrator ruled

12  that Abbott does not --

13           MR. LEE:  I object, Your Honor.  May we

14  approach?

15           THE COURT:  Yes.

16           (Bench conference.)

17           MR. LEE:  I understood that the rules

18  were that we could say that Abbott had a license, but we

19  weren't referring to any of the other proceedings or

20  what the arbitrators did because of the confidentiality.

21           MS. ELDERKIN:  There's agreed upon

22  stipulation that there is no license for sales that are

23  not co-administered and the arbitration award itself is

24  an admitted exhibit.

25           MR. LEE:  Right.  Right.  But just the

1 award.  We're not talking about what the -- I don't mind

2 them per se saying that there was an arbitration and we

3 have a license, but that's -- I understood that's as far

4 as we could go.

5           MS. ELDERKIN:  The award expressly says

6 that Abbott is not licensed for sales that are not

7 co-administered, but they are licensed for sales that

8 are administered.

9           MR. LEE:  That's the problem.  He didn't

10 find they were not licensed; he just found that under

11 the facts in that proceeding, we were licensed for

12 co-administration.

13           But there's no finding that we were not

14 licensed otherwise except under that license agreement

15 that was involved there.  That's the problem.

16           THE COURT:  I thought the award -- she

17 just -- what's correct about whether the award is an

18 exhibit?

19           MR. LEE:  Yeah.

20           MS. ELDERKIN:  The award is an exhibit.

21           MR. LEE:  What -- if she wants to say it

22 was in the reward, that's fine, Your Honor.

23           THE COURT:  Well, let's stay right now

24 with what's in the award.

25           MR. LEE:  Right.

1                    MS. ELDERKIN:  Yes, sir.

2                    (Bench conference concluded.)

3                    MS. ELDERKIN:  Does that go against my

4     time, Your Honor?

5                    THE COURT:  No.  I stopped the clock.

6                    MS. ELDERKIN:  Thank you.

7                    What you're going to hear, you're going

8     to see the award that the arbitrator made, and what he

9     said is that only a portion of Abbott's sales are

10    licensed.

11                   And we're not asking for damages for that

12    portion of Abbott's sales of Humira -- for Humira.

13    That's only a fraction of their total sales.  You're

14    going to hear that Dr. Gering took that out of the pool

15    when he was determining what those damages should be.

16                   You're going to hear that Centocor has no

17    problem competing with Abbott in the marketplace.

18    Centocor believes that it's better for patients to have

19    a number of good effective drugs for treating these bad

20    diseases.

21                   In fact, in recent years, Centocor

22    developed another anti-TNF antibody that will compete

23    with both Remicade and Humira.  Just this past April,

24    Centocor introduced this new product.  It's called

25    Simponi, and it is an anti-TNF antibody.  It's a human

1  anti-TNF antibody.

2           And Centocor brought that to the

3  marketplace to reach those patients who might prefer a

4  drug that can be self-administered by a shot rather than

5  an IV infusion or for whom the other drugs, such as

6  Remicade and Humira, don't work.

7           You'll also hear that before selling

8  Simponi, Centocor went to Abbott and got a license to

9  use some of Abbott's patents that it might possibly need

10 for selling Simponi.  It went and got permission,

11 because that's the way it's supposed to be done.

12          Centocor's not seeking to take Humira off

13 the market.  All we want is to compete fair and square.

14 But it's not fair and square competition when Abbott

15 doesn't pay to use our property.  We're asking for fair

16 compensation for Abbott's use of our property, our

17 patent.

18          And finally, we're going to ask you to

19 determine that Abbott's infringement was knowingly --

20 was knowingly willful.

21          I don't know what Abbott's going to say

22 about this, but you're probably going to hear some

23 excuses for their conduct.  They might deny that they

24 infringe, but, again, watch for whether they show you a

25 single test where they tested Humira to rebut the

1  testing that we did.

2              And then they say that the patent is

3  invalid.  They may try to prove by the clear-and-

4  convincing standard that the Patent Office made a

5  mistake, but you'll get too weigh all the evidence on

6  that at the end.

7              Bottom line, if someone uses someone

8  else's property, they should pay for it.

9              This is an important case.  And we know

10  it's a real imposition for you to be away from your busy

11  lives for a week.  We really thank you for your

12  participation, and we look forward to presenting the

13  evidence to you.

14              THE COURT:  Thank you, Ms. Elderkin.

15  Mr. Lee.

16              MR. LEE:  Thank you, Your Honor.

17  Just a moment for the electronics.

18              (Pause in proceedings.)

19              THE COURT:  Proceed.

20              MR. LEE:  If it please the Court.

21              Good morning, Ladies and Gentlemen.  My

22  name is Bill Lee, and together with my colleague, David

23  Beck, Amy Wigmore, Gil Gillam, and Bill McElwain, I

24  represent Abbott.

25              As you now know, Centocor's accusing

1 Abbott of patent infringement, patent infringement based

2 upon Abbott's selling of its groundbreaking drug,

3 Humira, and it's asking you for literally billions of

4 dollars.

5 And if Ms. Elderkin's opening -- not

6 evidence nor is mine -- if her opening were an accurate

7 statement of all the facts, you might be asking

8 yourselves, well, why are we here?

9 Well, we're here, because there is

10 another side to the story, precisely the reason that His

11 Honor asked you to keep an open mind.  And this opening

12 is my opportunity, not to present you with evidence, but

13 to tell you Abbott's side of the story.

14 The evidence that we will provide you

15 will fill in many of the holes in the story Centocor has

16 offered you, and that evidence will demonstrate to you

17 that Centocor is asking you to give it billions of

18 dollars for a very important product that Abbott was

19 first to make, the first to bring to patients, the first

20 to get Food & Drug Administration approval, the first to

21 bring to doctors and the medical community.

22 That evidence will demonstrate that

23 Centocor cannot succeed in this case for two independent

24 reasons.

25 First, it will not be able to comply with

1  the requirements that His Honor described to you for a

2  valid patent.  It will not be able to demonstrate that

3  its patent satisfies those requirements.

4  And second, it will not be able to

5  demonstrate to you that it can carry its burden of

6  demonstrating that our infringement was -- that we

7  infringed or that any infringement was willful.

8  Let me begin by introducing you to our

9  client, to our company.  Abbott is one of the leading

10  healthcare companies in the world.  It is an innovator.

11  It is a creator.  It is an inventor.

12  It has developed drugs to treat diseases,

13  such as heart disease, cancer, AIDS, tools to treat

14  folks with diabetes.  It makes surgical devices.  It

15  makes test equipment.  It makes Similac infant formula.

16  Millions upon millions of people have

17  benefited from Abbott's inventions.  Just as

18  Ms. Elderkin had a story of someone who was successfully

19  treated with Remicade, their product, there are millions

20  of stories about Abbott.

21  And Abbott invests literally billions of

22  dollars every year in research and development to

23  develop those products and bring them to patients and to

24  doctors and to the medical community.

25  Now, Humira is one of those life-altering

1  products that Abbott has brought to patients.  Also is a

2  first-of-its-kind product, and this is something that

3  Centocor didn't tell you in its opening.  Centocor

4  didn't tell you that Humira was the first fully human

5  antibody therapy for a number of diseases, such as

6  rheumatoid arthritis and Crohn's disease.

7                    In fact, it was the first fully human

8  antibody of any kind, any kind ever on the United States

9  market.

10                    Now, as Ms. Elderkin said, these diseases

11  are serious and painful diseases.  They can result in

12  joint deformity, loss of function, chronic pain, and

13  complications in our digestive systems.

14                    What makes Humira a groundbreaking drug

15  is the fact that it is high affinity, meaning that it

16  sticks to the target; neutralizing, meaning it works;

17  and it's fully human.  There are no mouse parts; there

18  are no rabbit parts; there are no rodent parts, as the

19  patent, the '775 patent, describes.

20                    Now, to understand the importance of

21  Abbott's fully human antibody, it will be important to

22  understand the development of antibody treatments which

23  are used to treat what are called autoimmune disorders.

24                    In autoimmune disorders, our bodies,

25  which have a defense system, the defense system starts

1  to attack itself and attack our healthy cells.  Not what

2  the body is supposed to do.

3  So for folks who have rheumatoid

4  arthritis or Crohn's Disease, our bodies are not

5  functioning correctly, and the immune system is

6  attacking healthy cells.

7  In rheumatoid arthritis, for instance,

8  this TNF-alpha that Ms. Elderkin mentioned to you, a

9  protein that is part of our system becomes overly

10  active, and it starts attacking our joints, just as is

11  shown on the x-rays.

12  Scientists recognized that one way to

13  treat these diseases were with antibodies.  If you have

14  something like TNF-alpha that is attacking our joints,

15  what do you do?  And scientists recognized that you

16  could use what are called antibodies.

17  Antibodies are also part of our immune

18  system.  And what they are, are things, actual things,

19  that attach themselves to the bad things, to the virus,

20  to the bacteria, and then escort them out of our body or

21  make them not harmful.

22  Scientists thought that there was --

23  could be an antibody to TNF-alpha.  If we could develop

24  an antibody to TNF-alpha that doctors could inject into

25  patients, then we could address the problem created by

1   our own bodies attacking themselves.

2              Now, what the evidence will show you is,

3   as scientists approached this problem, the problem of

4   finding antibodies, there were different types of

5   antibodies that they explored.  And the different types

6   of antibodies become critical to the issues before you.

7   When scientists began, they started by making mouse

8   antibodies.  They are antibodies completely made from

9   mouse parts.  These antibodies were made, as Ms.

10  Elderkin described, by injecting mice with something

11  like TNF and extracting the antibodies.

12             But the effect of this -- of these mouse

13  antibodies was limited.  It was limited because they're

14  mouse parts.

15             And when you put a mouse part into our

16  bodies, our body say, Wait a minute; this is a foreign

17  substance; I don't want this foreign substance in me;

18  I'm going to generate antibodies to remove it from my

19  body, just like you would if you had a virus, just like

20  you would if you had the flu.

21             What does it mean?  It means that if you

22  had a mouse antibody, if you really had discovered a

23  mouse antibody that could attach itself to the TNF, it

24  couldn't work for very long, because pretty soon our

25  bodies would say, I know that doesn't belong in my body;

1  I know I want it out of here; and it would be

2  ineffective.

3              But equally important, because it came

4  from mouse or rabbit or rodent parts, it created the

5  risk of medical complications, which you've heard

6  referred to as side effects, unwanted effects that come

7  from taking the product.

8              So what happened?  This led to -- this

9  led scientists to develop new laboratory techniques to

10  combine genes from two different species, from mouse and

11  human, some portion from the human, some portion from

12  the mouse.  These are called chimeric antibodies.

13  And this is what Centocor made.  A chimeric antibody

14  comes from the Greek word chimera, which refers the

15  combination of a lion, a snake, and a goat.  But the

16  patent itself tells us that a chimeric antibody has

17  something that's part human but also part mouse, rabbit,

18  rat, or hamster.

19              Now, these antibodies were better.  They

20  were better because they were part human and part mouse.

21  But they still triggered unwanted responses by our

22  bodies.

23              Our bodies still recognized that there

24  was part of them that were not human, and as a

25  consequence, said, we don't want this here; we need to

1    get it out of our bodies, and generate an immune

2    response.

3                   So what did scientists do?  They went

4    further and said, well, then what we need is something

5    that is fully human.  We need something that when you

6    put it in our bodies, our bodies won't say it's foreign.

7    They won't reject it.  They won't have side effects.

8                   And what the evidence is going to

9    demonstrate to you is, on this critical step forward,

10   this critical step of creativity, it was Abbott, not

11   Centocor, that made the first fully human antibody.  And

12   that first fully human antibody was Humira.

13                  Humira was completely developed --

14   developed independently by Abbott.  You'll hear no

15   evidence that Abbott somehow had the chimeric antibody

16   of Centocor and used it to develop Humira.

17                  Humira was the first, the very first

18   fully human antibody, to treat diseases like rheumatoid

19   arthritis in the world until one month ago when Centocor

20   brought to market its first fully human antibody.

21                  Now, Humira is, as Ms. Elderkin said, an

22   award-winning medical treatment.  It has treated

23   thousands upon thousands of patients.  It received the

24   Galien Prize in 2007, the Nobel Prize in

25   pharmaceuticals.

1                    And I'm going to ask Mr. Beck to hold up

2    the prize, which is right behind him.

3                    This is the Galien Prize.

4                    Now, the irony or the interesting fact

5    here is that when Abbott was awarded the Galien Prize,

6    the Nobel Prize for pharmaceuticals, guess who was on

7    the committee that gave us the prize?  Their inventor.

8    The inventor of the patent they now claim is infringed

9    voted to give us the pharmaceutical Nobel Prize.

10                   Now, you may be asking yourselves, now,

11   if Abbott was first to make, first to patent, first to

12   bring to patients, why are we here?

13                   Well, we're here because Centocor is

14   saying, well, we have a patent that covers Humira.

15                   Now, Ms. Elderkin has told you that we

16   are challenging the validity of the four claims that are

17   before you.  We are.

18                   And you may ask yourselves, if the Patent

19   Office already decided that Centocor is entitled to a

20   patent, what is our role?

21                   The answer is that in our legal system,

22   the patent laws specifically make you part of the

23   process just for the reasons that His Honor told you.

24   The reason you are so important is that the process to

25   get a patent is a secret one.  Only Centocor and the

1  Patent Office participated.

2           If Abbott had dialed up and said, could

3  you tell us what's going on down there, we would have

4  been told, none of your business.  Abbott could not and

5  did not participate.

6           Now -- now, our Patent Office is a fine

7  Patent Office, but as the video and Your Honor's

8  instructions have demonstrated, it can only make

9  decisions based upon the information that it has before

10 it.

11          We are going to present to you evidence

12 that the Patent Office did not have and could not

13 consider, and that is the reason that we have an

14 opportunity to present our case, our side of the story

15 to you.

16          And as His Honor explained this morning,

17 it will be for you to decide those issues with a full

18 deck of cards for the first time.

19          Now, the key to this case will be the

20 chronology of events.  And I'm going to take some of the

21 things that Centocor mentioned to you and put them in

22 order.  Because at the end of the evidence on Thursday

23 or so, you're going to find that there's really no

24 dispute about what happened on what date.

25          Facts are really stubborn things.  Facts

1  are facts.  You can't move them, and you can't move the

2  dates on which they occur.

3                    That chronology, the order in which

4  events occurred, is going to demonstrate three really

5  important things to you.

6                    First, you're going to learn that there

7  were three important milestones in the development of

8  antibodies.

9                    Now, Ms. Elderkin suggested that it was

10 Centocor that came up with this mouse antibody -- you

11 remember at the beginning of her discussion -- that was

12 called A2?

13                   Well, mouse antibodies did come first,

14 but Abbott and its scientists had the first mouse

15 antibody in 1986.  Centocor did not make the antibody

16 that Ms. Elderkin described until three years later.

17 And I'll come back to that.

18                   You will also learn that chimeric

19 antibodies, part mouse and part human, came second, and

20 that was invented by Centocor but not until several

21 years later.

22                   But more importantly, the first fully

23 human antibody, no mouse parts, no rodent parts, was not

24 made until 1995, 1995, five years after Centocor made

25 its chimeric antibody, one year after this 1994

1　application that Centocor says told everybody how to

2　make a human antibody.

3　　　　　　　Now, the evidence will demonstrate to you

4　that this wasn't a simple progression.  This wasn't just

5　a natural series of events.

6　　　　　　　The discovery of a fully human anti-TNF

7　antibody required years of research, completely new

8　technologies, the development of new technologies, and

9　literally billions of dollar to discover and develop and

10　bring to market Humira.  It required real innovation.

11　It required real invention.

12　　　　　　　Now, the second thing the chronology will

13　demonstrate to you is that -- who was first on some of

14　the issues Ms. Elderkin described.

15　　　　　　　First, it will demonstrate to you, as I

16　said, that the first mouse antibody was actually made by

17　Abbott's predecessors and scientists who ultimately

18　worked for Abbott.  Centocor was second.

19　　　　　　　But most importantly, when we focus on

20　what's involved in this case, a fully human antibody,

21　Abbott was first.

22　　　　　　　After several years of trying, four years

23　of trying, with some of the greatest scientists in the

24　world, Abbott made what was called D2E7, the active

25　ingredient of Humira in 1995.

1                    In 1996, Abbott filed for a patent
2    application on its Humira.
3                    In 2000, before Centocor even applied for
4    the patent I'm going to show you in a second that's
5    involved here, Abbott had been granted a patent on
6    Humira by the Patent Office.
7                    In 2002, Abbott brought the product to
8    market, and it's been used to treat patients ever since.
9                    Now, third, the evidence is going to
10   demonstrate to you that what Abbott did to develop the
11   fully human antibody was really hard work that required
12   real innovation.
13                   The concepts of hard work and innovation
14   are really important to this case.  If you remember in a
15   portion of His Honor's instructions today, he said, when
16   you file a patent application, the patent application
17   has to tell the world how to do it, has to tell the
18   world you can do it, disclose it, but how to make it was
19   His Honor's instruction to you.
20                   Well, the question of whether you told
21   the world how to make it is directly related to how hard
22   was it to make a fully human antibody, how much
23   innovation was required.
24                   If it required an invention by Abbott, if
25   Abbott was first, if it required billions of dollars, it

1 required years of research, how could it be that

2 Centocor had already taught the world how to do it?

3             Here, you'll learn from Dr. Salfeld,

4 who's one of the scientists in the courtroom -- if you

5 could stand, Dr. Salfeld -- who's our corporate

6 representative but the scientist who led the team, that

7 our team began in 1991.

8             It began working with a scientist, a very

9 famous scientist called Dr. Casali.  And you'll hear

10 from Dr. Casali.  They worked for two years, and they

11 failed.

12            Then they worked with a different group

13 called Cambridge Auto -- Antibody Technologies for two

14 more years.

15            As a result of this collaboration, the

16 work that was done by these folks over two additional

17 years, the patent issued.  All of the hard work, all of

18 the innovation, all of the creativity is what led to

19 Abbott's patent.

20            Now, Centocor did decide to make a fully

21 human antibody.  Ms. Elderkin mentioned it at the end of

22 her opening.  But what she didn't mention to you is,

23 they didn't decide to do this until 1997, after Abbott

24 had been successful, after Abbott had filed its patent

25 application.

1            Centocor started its fully human project

2  in 1997.  And do you know when the product got to the

3  market?  Last month, 2009.  And I'll come back to that

4  in a second.

5            It came.  They began development after

6  Abbott had been successful.  They filed the patent

7  application that's involved in this case after Abbott

8  had been successful.  They came to market last month.

9  Now, Ms. Elderkin showed you a slide that compared FDA

10 approval dates.  I've added a column.  Because what Ms.

11 Elderkin did is, she compared for you approval dates for

12 Remicade, which is the chimeric antibody, and aren't

13 fully human antibodies.

14            Well, the right comparison is between the

15 two fully human antibodies.  And what you'll see is, we

16 were approved in 2002, 2005, 2006.  All of their

17 approvals came two months ago.

18            Now, you will not see or hear any

19 evidence indicating that anyone at Centocor made a human

20 antibody to TNF-alpha or taught anyone else how to do it

21 before Abbott had been successful in 1995.

22            In fact, what you'll hear is this:

23 You'll hear that Centocor actually tried once, tried

24 once in 1989.  It got itself an antibody.  Someone else

25 had made it.  They brought it in to test it.  In fact,

1  it came from NYU, the other Plaintiff in this case.  And

2  guess what?  It didn't work.  It didn't work.

3              So by 1994, when they filed this patent

4  application Ms. Elderkin talked to you about, their only

5  experience with fully human was failure.

6              Now, you may ask, and it's fair for you

7  to ask, if everything that Mr. Lee and Mr. Beck says is

8  true, why are we here?

9              We're here because Centocor got a patent

10 on Independence Day in 2006.  Now, it was filed on July

11 18, 2002.  That patent in your notebooks says right on

12 the face, that's the date that this application was, in

13 fact, filed.

14             But that date is a problem for Centocor

15 if you consider the instruction His Honor gave you this

16 morning.  That date's a problem, because you now know,

17 or you will know from the evidence, by that time, by

18 2002, Abbott had invented Humira, had made Humira, had

19 patented Humira, and had brought it to market.  It was

20 all prior art.  It was all prior art.

21             Now, to be sure, as you will see from the

22 evidence, Centocor was watching Humira very, very

23 carefully.

24             And you can't see this particularly well

25 now, but you'll see DX233, which will show you that

1  during this very period of time when Centocor did not

2  have a fully human antibody, it was watching everything

3  that Abbott and its predecessors were doing.

4           Well, if that's true, if the application

5  was filed in 2002 and Humira was already out there,

6  again, why are we here?

7           We're here because of what Ms. Elderkin

8  said to you.  We're here because Centocor says, well,

9  actually, this application relates back to something we

10 filed in February 1994.  It relates back to the

11 application.  That application had fully human anti-TNF

12 antibodies.

13          And so we actually were first.  We had it

14 in 1994.  But the evidence will show that in 1994, all

15 that Centocor had was chimeric.  The evidence will show

16 that all they described was chimeric.

17          Now, look, there is no dispute that they

18 came up with this chimeric antibody.  When you look at

19 the patent, you'll see 13 patent applications on the

20 cover.  You'll see that they got patents that cover

21 chimeric antibodies.

22          Their product is a great product.  No

23 one's trying to take that product away from them.  No

24 one's trying to take their patents away from them.  No

25 one's trying to take the $10 billion in profit that

1  they've made from it.

2              To the extent that someone is making a

3  chimeric antibody, they are using their patent, and they

4  should pay.  But the question is not about chimeric

5  antibodies.  This case is about human antibodies.

6  And I put on the screen Claims 1 and 2, which you're

7  going to hear more than you'll ever want to hear about

8  in the next four days.  But as His Honor said, this is

9  what defines what the invention is.  And for our

10 purposes right now, I just want to make two points to

11 you.

12              This claim, the claims that you're going

13 to be asked to focus on, 2, 3, 14, and 15, don't cover a

14 chimeric antibody.  They don't cover what Centocor had

15 done.  They cover humanized and human antibodies.

16              Now, as the Court has already instructed

17 you, for that 1994 application to be good, for the

18 patent to be valid, that application has to have

19 described a fully human anti-TNF-alpha antibody, and it

20 must have taught the world how to do it.

21              It must teach those of ordinary skill in

22 the art, scientists in the field, how to do it.  Just

23 sticking the word human antibody in isn't enough.  Any

24 lawyer can do that.  The specification has to describe

25 more.

1              Now, this concept of teaching those of

2  ordinary skill in the art will undoubtedly be new to

3  you.  It certainly was to me when I looked at my first

4  patent case.

5              THE COURT:  Five minutes.

6              MR. LEE:  What this concept is, is the

7  concept of -- it's probably determined by the old

8  proverb, give a man a fish, you feed him for a day;

9  teach a man how to fish, you feed him for a lifetime.

10 And all laws require that you teach them how to fish.

11 The evidence that you're going to hear on these critical

12 issues is that Centocor's patents have 28 examples.

13 None of them describe human.

14             Centocor tried to make human and failed.

15 Centocor did not describe how one of ordinary skill in

16 the art could make a fully human antibody.

17             And you won't have to wonder whether it

18 was hard, because you'll hear the evidence about

19 Abbott's work that led to a fully human antibody.  And

20 you're going to hear evidence that when Centocor decided

21 to make a fully human antibody, it took them years and

22 over $300 million.

23             If what Ms. Elderkin said is true, if

24 Centocor had the invention of a fully human antibody in

25 1994, why did it take 15 years to take it to market?

1  Why did it take $300 million?  Does that make sense?  We

2  will suggest no.

3              Now, I want to briefly just stress two

4  issues in my remaining two or three minutes.

5              First, on infringement, Ms. Elderkin

6  referred to tests.  What you're going to find on the

7  issue of test is this:  On issues on which Centocor had

8  the burden of proof, they did tests.  On issues on which

9  we had the burden of proof, we did tests.  And each

10 party commented upon the other's tests.

11             And what you're going to see from those

12 test results is, Centocor did tests in 2007, not under

13 the supervision of its expert.  And those tests were

14 done the wrong way, and those tests cannot sustain

15 Centocor's burden of proof.

16             Finally, on the issue of damages,

17 Centocor suggests to you that it's entitled to $2.2

18 billion in damages, because Remicade and Humira compete

19 with each other.

20             Let me just make these four points

21 quickly.

22             First, you're going to find out that the

23 products are really different.  Remicade is administered

24 intravenously.  Humira is administered subcutaneously.

25 It's a big difference.

1              Second, Remicade for rheumatoid arthritis

2    has to be taken with this really, really powerful other

3    drug called Methotrexate.  Humira doesn't.

4              Third, you're going to find from

5    Centocor's own documents that patients perceive Humira

6    as much safer.

7              And fourth, you're going to see that

8    notwithstanding what Centocor told you today, that fully

9    human antibodies and chimeric antibodies compete, you're

10   going to see that just two months ago, Centocor said to

11   the investing public the opposite.

12             Now, at the end of the day, we're going

13   to ask for you to find these four patent claims that

14   cover human antibodies invalid.  We're going to ask you

15   to find that there's no infringement.

16             If there's no valid claim, if there's no

17   infringement, then there are no damages.

18             At the end of the day, we're going to ask

19   you to conclude that Centocor is trying to compete in

20   the courtroom rather than the marketplace, and we're

21   going to ask you to send the parties back to the

22   marketplace where we can compete on innovation, price,

23   and quality.

24             Thank you.

25             THE COURT:  Thank you, Mr. Lee.

1                    All right.  Ladies and Gentlemen, we're

2     going to take a break here in just a few minutes.  I

3     want to give you just a few more instructions.

4                    First of all, the lawyers have correctly

5     used some of their exhibits that have already been

6     admitted into evidence.  If you see an exhibit that you

7     think you want to -- might want to see at the time when

8     you're deliberating, you need to make a note of that

9     number exhibit in your pad.

10                    Because there's boxes of exhibits, and

11    when I give you my final instructions, I will tell you

12    that I'm not going to send all of those boxes back to

13    you.  But I will send back anything you request.

14                    So I'm -- just make a note in your notes

15    if you see something that you think you might want to

16    see later.

17                    Now, ordinarily, we will always break at

18    noon, at 12:00 o'clock, but the Court has another matter

19    that I must take up at 1:00.

20                    So we're going to -- when you come back,

21    we're going to come back in here at 1:20 -- I mean at

22    10:20, and we will stay till 12:15 today and break from

23    1:15 till -- or 12:15 to 1:30.

24                    Otherwise, ordinarily, we always break

25    right at 12:00 o'clock.

 1                 Remember that this week, I remind you

 2 that we will be in trial four days this week, through

 3 Thursday, not later than 5:30, and then we'll come back

 4 and finish this case early next week.

 5                 So I just wanted to remind you of those

 6 items.

 7                 You may -- let me give you your first

 8 break.  Be ready to come back in the courtroom at 10:20.

 9 Remember the instructions.  Certainly, you haven't heard

10 any evidence, but don't start discussing this case among

11 yourselves during these breaks.

12                 You may leave the courtroom at this time.

13                 COURT SECURITY OFFICER:  All rise.

14                 (Jury out.)

15                 THE COURT:  Please be seated.

16                 The Court is formally in recess, but I

17 want to see counsel up here.  But the Court is in

18 recess.  I need to see counsel at the bench on the

19 record.

20                 (Bench conference.)

21                 THE COURT:  All right.  Has anybody got

22 a -- do y'all have -- either side have a shadow jury?

23                 MS. ELDERKIN:  We do not.

24                 MR. BECK:  We do not.

25                 THE COURT:  Oh, okay.  Well, I don't ever

```
 1  want to make comments about -- you know, is there

 2  anything that you want to bring to my attention at this

 3  stage?

 4              MR. SAYLES:  I didn't hear the discussion

 5  at the bench when you were talking about -- excuse me --

 6  when you were talking about the arbitration, but there's

 7  a stipulation that I intend to read.

 8              THE COURT:  Well, the stipulation can be

 9  read.  What I instructed them on the bench was just to

10  stay with whatever the arbitrator's award said and, of

11  course, any stipulations you got.  I can't remember

12  everything that --

13              MR. SAYLES:  Yes, sir.

14              THE COURT:  If you knock him in the head,

15  that's okay, anytime you wish.  You have my permission.

16              MS. ELDERKIN:  Does that go for me, too?

17              THE COURT:  No.  That's just him.  We

18  don't let counsel -- co-counsel can get after it.

19              MR. BECK:  That's called getting my

20  attention, right?

21              THE COURT:  Just let you know that I

22  hadn't forgotten you.

23              All right.  I'll see y'all.

24              (Recess.)

25              COURT SECURITY OFFICER:  All rise.
```

```
 1                    (Jury in.)

 2                    THE COURT:  Please be seated.

 3                    Who will be the Plaintiffs' first

 4  witness?

 5                    MR. SAYLES:  May it please the Court.

 6                    At this time, we would call Mr. Joe

 7  Scodari as the first witness.

 8                    THE COURT:  All right.

 9                    COURTROOM DEPUTY:  Raise your right hand,

10  please.

11  (Witness sworn.)

12                    MR. SAYLES:  May it please the Court.

13          JOSEPH SCODARI, PLAINTIFFS' WITNESS, SWORN

14                       DIRECT EXAMINATION

15  BY MR. SAYLES:

16       Q.   Would you state your name, please.

17       A.   Yes.  My name is Joe Scodari.

18       Q.   Mr. Scodari, would you tell the jury a little

19  bit about yourself?

20       A.   Yes.  I'm married; have been married about 35

21  years.  And we have four adult children, two boys and

22  two girls.

23       Q.   And what is your current occupation?

24       A.   Well, currently I'm retired.  I retired from

25  Johnson & Johnson a little bit over a year ago in March
```

1  of 2008.  And I'm currently serving on some Boards of

2  Directors.

3      Q.   Before your retirement, how long did you spend

4  in a career in the pharmaceutical industry?

5      A.   Well, I started at an entry level, as a sales

6  representative, with the industry about 35 years ago.

7  And over the course of the next 35 years, worked my way

8  up to eventually run the pharmaceutical business for

9  Johnson & Johnson.

10      Q.   Your entry-level job, was it what's commonly

11  called a drug rep?

12      A.   Yes, that's correct.  My role was to

13  essentially help physicians and nurses and other

14  healthcare professionals about our products, answer any

15  questions that they might have.

16      Q.   And from there, you worked your way through

17  positions to what position when you retired from Johnson

18  & Johnson?

19      A.   Well, I worked my way up over that 35-year

20  period through various management roles, and,

21  ultimately, I was named the Worldwide Chairman of the

22  Johnson & Johnson pharmaceutical business.

23          As Ms. Elderkin mentioned earlier, Johnson &

24  Johnson is the largest and most diversified healthcare

25  manufacturer in the world, and it's organized in three

1 sectors:  Consumer and personal care.  Products that you

2 would know there would be the baby products, shampoo,

3 powder, Tylenol, for example.

4          Medical devices and diagnostics, and

5 pharmaceuticals.

6          I was responsible for the pharmaceutical

7 segment in my last position at Johnson & Johnson.

8      Q.    And what was your relationship to Centocor?

9      A.    Well, along the way, as my career developed,

10 in fact, early in 1996, I joined Centocor as its

11 President of the pharmaceutical business.  I later was

12 named President and Chief Operating Officer for

13 Centocor.

14      Q.    You mentioned that Johnson & Johnson acquired

15 Centocor.  When did that happen?

16      A.    Johnson & Johnson first approached senior

17 management at Centocor about the possibility of

18 acquiring the company in early 1999, and the transaction

19 eventually did close in the fall of that year, 1999.

20      Q.    And most folks have heard of Johnson &

21 Johnson; it's been mentioned.

22          Just tell us a little bit about Johnson &

23 Johnson.

24      A.    Sure.  Well, Johnson & Johnson, as I

25 mentioned, is the largest, most-diversified healthcare

1   manufacturer in the world.  It has a presence in most

2   markets around the world, most countries around the

3   world.

4           And as I said, has a very diversified

5   business in the sense that there are many consumer

6   products that you would be familiar with, but also is a

7   leading innovator in many areas of -- areas of medicine.

8   And, you know, with respect to the pharmaceutical sector

9   specifically, that segment of the business is involved

10  in the development and commercialization of drugs that

11  really cut across a wide gamut of diseases, from

12  Alzheimer's disease, schizophrenia, infectious disease,

13  autoimmune diseases, cancer.

14          So it's a very, very diversified business.

15  And, in fact, in pharmaceuticals, Johnson & Johnson is

16  about the fifth largest of all pharmaceutical companies

17  in the industry.

18      Q.   When did you join Centocor?

19      A.   I joined Centocor in April of 1996.

20      Q.   So you were with them before they were

21  acquired by Johnson & Johnson in 1999?

22      A.   Yes, I was.

23      Q.   And then continued on with Johnson & Johnson.

24  And did you have affiliation with Centocor throughout

25  that time?

1        A.    Yes.   I decided, as did many members of the

2    management team at Centocor, to stay with the company,

3    even after it had been acquired by J&J.   Ultimately, I

4    stayed with the company for about eight years.

5              There was a period in 2001 to 2003 where my

6    responsibilities did not encompass Centocor.   But other

7    than that period, I remained involved with Centocor up

8    to my retirement from Johnson & Johnson last year.

9        Q.    If you could briefly just tell the ladies and

10   gentlemen of the jury what the business of Centocor is.

11       A.    Well, by way of background, Centocor really

12   was amongst the first biotechnology companies ever

13   founded anywhere in the world.   The company was founded

14   in 1979, and the real focus of Centocor was to do

15   pioneering work in the area of engineering antibodies to

16   address diseases that the human body would not

17   necessarily on its own create antibodies against.

18              So from the very beginning, it was that

19   platform, that antibody platform, that served as the

20   focal point for all the R&D, all the commercial

21   activity, all the manufacturing activity that the

22   company did throughout its life and, of course,

23   continues today as a wholly-owned subsidary of Johnson

24   & Johnson.

25       Q.    When you joined Centocor in 1996, what was

1  going on in its business at that time?

2       A.   Well, it was a pretty small company at the

3  time.  We had a very small diagnostics business which

4  used this antibody technology as well.

5            And at the time I joined, it had gained its

6  first approval about a year earlier for the first

7  therapeutic use of an antibody.  So I joined, as I say,

8  about a year after that product was approved.

9       Q.   And was there a drug in development called

10 Cyntoxin?

11      A.   Well, Cyntoxin actually had failed in

12 development a few years before I joined the company.

13 Cyntoxin was an antibody that was developed to target a

14 very, very serious blood-borne infection called sepsis

15 or septic shock, a very serious disease typically occurs

16 in hospitalized patients.

17           And at that point and even continuing to

18 today, there are few, if any, treatments that really

19 effectively manage that disease.

20           So Centocor's first effort to develop a

21 therapeutic antibody was Cyntoxin, and, unfortunately,

22 as often occurs in R&D and in our industry, in the

23 pharmaceutical industry, that product failed in the

24 early '90s.

25      Q.   Are you familiar with that history?

1      A.    Yes, I am.

2      Q.    Let me ask you a specific question.

3            Are you familiar with the amount of money that

4  was spent in that effort that was not successful?

5      A.    Yes.  I would estimate, based on what I know

6  of the history, that the company would have invested

7  somewhere between 4 and $600 million in the development

8  of Cyntoxin before it eventually failed.

9      Q.    And after Cyntoxin failed, what did Centocor

10  do next historically?

11     A.    Well, that led to a pretty tough time for the

12  company, because that was the lead asset that was being

13  developed, and it led to the company substantially

14  restructuring, cutting down the size of the

15  organization.  It led to the necessity to make some very

16  difficult resource deployment decisions.

17           In other words, we had to be very selective,

18  or the company -- before I got there, the company had to

19  be very selective about where it invested its money.

20  The idea being that we wanted to eventually succeed in

21  bringing therapeutic antibodies to the market.

22     Q.    Since you are the first witness, I want to

23  develop a few things that the jury has heard about.

24  First, let's start with what is Remicade.

25     A.    Well, Remicade is the antibody that you heard

1  previously that was designated as cA2 in its very early

2  development.  It is a chimeric antibody, as that has

3  already been described.

4           And it was designed at a point in time when

5  there was a belief -- there was a belief that this

6  naturally occurring protein, TNF, when it raised or

7  occurred in raised levels in human beings, might be a

8  culprit in a wide range of autoimmune diseases.

9           It wasn't absolutely clear at the time that

10 Centocor began its work in this area that, in fact, that

11 was a valid target to address those diseases.  But there

12 was some good scientific support for believing it might

13 be useful there.

14          And as a result of that belief, Centocor made

15 the decision to invest in the development of that

16 molecule for those diseases.

17     Q.   And to this day, is Remi -- Remicade an

18 important drug for Centocor?

19     A.   Yes.  I must say I am personally particularly

20 proud of Remicade.  This drug literally has changed the

21 lives -- and this class of drugs, I have to say, has

22 changed the lives of patients affected by a wide range

23 of autoimmune diseases.

24          We have heard about two of them already this

25 morning:  Crohn's disease and rheumatoid arthritis.

1  As of today, Remicade has really helped benefit

2  literally hundreds of thousands of patients.  And, in

3  turn, it's also created a very attractive and successful

4  business for Centocor and for Johnson & Johnson.

5      Q.   Has it received approvals for the treatment of

6  specific diseases?

7      A.   Yes, it has.  In fact, its first approval was

8  in the fall of 1998 for Crohn's disease, and then about

9  a year later was approved for rheumatoid arthritis.

10     Q.   And we say approval.  Are we talking about the

11 Food & Drug Administration, the FDA?

12     A.   Yes.  Any drug that is developed for ultimate

13 commercial sale in the United States goes through a very

14 rigorous process.  And there are very specific defined

15 guidance that is provided by an agency of the federal

16 government called the Food & Drug Administration.  I

17 will refer to that by FDA -- or shorthand, FDA.

18          And the FDA typically works to regulate

19 sponsors who wish to bring new therapies into the

20 market.  That work really starts with the discovery of

21 the molecule, will involve laboratory testing in the

22 early days, can involve animal testing.  And eventually,

23 with the consent of the Food & Drug Administration, a

24 sponsor can begin what's called clinical testing or

25 testing of the molecule in human beings.

1            And only after those tests have determined

2   that the molecule is effective for the indication that's

3   being studied and safe for that indication does the FDA

4   grant an approval for that sponsor to bring that

5   molecule into the marketplace.

6        Q.   I want to stop for a moment and ask you if you

7   saw Plaintiffs' Exhibit 254 that was shown during the

8   opening, which was the Centocor marketing document

9   relating to the rating of overall safety.

10           Did you see that?

11       A.   I did.

12       Q.   First of all, based on your knowledge,

13  experience, and background, is Remicade a safe drug?

14       A.   It certainly is.

15       Q.   You saw Plaintiffs' Exhibit 254.  From where

16  did that statement come that was shown to the jury in

17  opening?

18       A.   Well, what the exhibit was speaking to was

19  perceptions of customers or potential customers,

20  physicians in the marketplace, about the various

21  anti-TNF agents that compete in that market.

22           So that information is strictly that; it's

23  perceptions.  The reality is that the FDA --

24       Q.   Let me stop you right there.

25           Was that a Centocor market research report?

1  A. Yes, it was.

2  Q. All right.  And with respect to safety, does

3 the FDA have any requirements that they impose before a

4 company can make a claim about safety of one drug over

5 another or any safety?

6  A. Yes, they do.  In fact, it would be

7 inappropriate at this point in time to suggest that

8 there's any comparative difference between Humira and

9 Remicade with respect to either efficacy or safety,

10 because the FDA provides very specific guidance to the

11 industry with respect to what needs to be done before a

12 statement like that can be made.

13  And very specifically, what they require is

14 that there need to be what are called two; so two

15 separate studies, adequate, and well-controlled.  So

16 well-designed studies that meet certain statistical

17 requirements that demonstrate, in fact, that there are

18 some differences, whether they be the effectiveness of

19 the drug or the safety of the drug.

20  No such studies have ever been conducted

21 involving both Humira and Remicade, and, therefore,

22 neither company can make a statement of comparative

23 efficacy or safety at this point in time.

24  Q. You indicated earlier that Remicade was

25 approved for the treatment of rheumatoid arthritis, and

1  I would like you to tell the jury what that disease is

2  briefly, please.

3      A.    Well, I think actually the Abbott legal

4  representative showed an x-ray, which I think does a

5  reasonable job of depicting what can happen in this

6  disease.  As has been mentioned earlier today, there are

7  two different types of arthritis.

8          Osteoarthritis, you can think about -- that's

9  the one we commonly think about.  You can think about

10  that as being more of a mechanical disease.  It's sort

11  of the wearing of the joints that eventually leads to

12  pain and inflammation.  And that disease can be treated

13  with antiinflammatories to reduce the pain.

14          Rheumatoid arthritis is an autoimmune disease.

15  So this is a situation where a naturally occurring

16  substance in the body that should be there -- TNF in

17  this case -- begins to appear in human beings at much

18  higher levels than are normal.

19          And when that occurs, it begins to attack the

20  host, attack the human being who has that elevated

21  level.  So in rheumatoid arthritis, what happens is TNF

22  levels get very escalated.  It begins to attack the

23  joints, and over a period of time, patients with

24  rheumatoid arthritis can eventually become substantially

25  physically disabled.

1    There's tremendous -- and you can see that in

2  that x-ray.  You can see tremendous damage to the

3  joints.  So a very, very debilitating disease; a disease

4  that dramatically negatively affects patients and their

5  ability to live a normal and high-quality life.

6    Q.   Were there other early clinical results with

7  cA2, which became the antibody known as Remicade?

8    A.   Yes.  The early work that was done, again, in

9  this very resource-constrained environment after

10  Cyntoxin failed, focused in two disease areas.  One was

11  Crohn's disease, and I would say there were two subsets

12  under that umbrella.  One was the severity of the

13  disease, moderate to severe Crohn's disease, and also a

14  subset called fistulizing Crohn's disease.

15    Now, fistulizing Crohn's disease is a really,

16  really terrible disorder.  It's -- as I say, it's a

17  subset of Crohn's, which is an inflammatory bowel

18  disease.  But when a patient develops fistulizing

19  Crohn's disease, open lesions from the bowel to the

20  outside world can occur, and you can imagine how that

21  can impact a patient's quality of life.

22    Before Remicade was studied in that

23  indication, the only solution to that disease was

24  surgical.  To our tremendous surprise, when we studied

25  the drug in that application, it was the first drug ever

1    demonstrated to close fistula non-surgically.

2            So those were two indications that we

3    developed in addition to rheumatoid arthritis.

4        Q.   So in short, Crohn's disease is a very serious

5    bowel disorder?

6        A.   That's correct.

7        Q.   And after getting these initial results in the

8    testing of cA2 that became Remicade in rheumatoid

9    arthritis and Crohn's disease, what did Centocor do?

10       A.   Well, we were challenged, I would say, from

11   the standpoint of available resources at this time,

12   because, again, this was while Centocor was still an

13   independent company.  We had very limited resources, but

14   we did make the decision at that time to invest some of

15   those limited resources in the investigation of the

16   drug's potential utility in Crohn's disease and in

17   rheumatoid arthritis.

18       Q.   What investment was needed?

19       A.   Well, similar to what happened with Cyntoxin,

20   actually.

21            By the time Remicade was initially approved by

22   the FDA here in the United States, in the fall of 1998,

23   the company would have invested by that point somewhere

24   between 4 and $600 million in that drug, in R&D, in

25   manufacturing capability, and in getting ready to bring

1  that product to the marketplace.

2      Q.   Is the process for getting FDA approval

3  lengthy?

4      A.   It can be.  As I say, the FDA outline some

5  very specific guidance that pharmaceutical company or

6  biotechnology company sponsors must follow.  Those

7  guidelines are very rigorously determined to ensure that

8  before a drug becomes available in this country, to the

9  extent that it's possible, that we understand as much as

10  possible about its potential benefits and its potential

11  risks.

12      Q.   Can it take years?

13      A.   It can take many years.

14      Q.   And is there ever any assurance along the way

15  of the FDA approval process that you will indeed get

16  approval at the end?

17      A.   No.  And, in fact, the best example of that,

18  quite frankly, is Cyntoxin.  That drug was in very, very

19  late-stage clinical development.  Hundreds of millions

20  of dollars had already been invested in it, and,

21  ultimately, it failed in late-stage clinical

22  development.  And that product goes away after that

23  failure.

24          So this underscores how risky it is to be an

25  innovator and a pioneer when developing a new technology

1  for a very difficult-to-treat disease.

2      Q.   You told us about these early clinical results

3  with cA2.  That was before FDA approval; is that right?

4      A.   That's correct.

5      Q.   And once you got those early clinical results

6  that you've mentioned in Crohn's and RA, wasn't this a

7  safe investment?

8      A.   No, not really.  Again, we -- we were excited,

9  because what we were seeing in these early studies,

10 early human studies, was remarkable efficacy.  But it

11 was understood that these were very early studies,

12 typically in very small numbers of patients.

13        And we understood that it was a very long road

14 to meet the FDA's requirements to bring such an

15 interesting possibility, let's say, to the marketplace.

16 So absolutely no assurance at any point along the way

17 that we would, in fact, you know, gain FDA approval.

18     Q.   Here we are in June of 2009.  Did it turn out

19 to be a good investment?

20     A.   Well, it did.  And obviously, a lot of things

21 look really good in retrospect.  And I have to say it's

22 one of the areas that I take great pride in in my

23 career, to look back and say we made some very difficult

24 decisions when we didn't have a lot of data or facts.

25 But we did invest appropriately in Remicade, and it has

1 been a very, very successful treatment for hundreds of

2 thousands of patients.  It's literally changed their

3 lives.  And I would often get phone calls from patients

4 thanking us for what we did to develop Remicade.

5 And it's also turned out -- now, I always used to say

6 that our business was about doing well as a business as

7 a result of doing good for patients.  And I can't,

8 frankly, think of a better example than Remicade of

9 that -- of that idea.

10       We have dramatically benefited patients, but

11 we've also built a very successful business as a result

12 of that.

13       Q.   You were on board with Centocor in 1998 when

14 it received its first approval for Crohn's.

15       A.   That's correct.

16       Q.   And you were on board with Centocor in 1999

17 when it received its first FDA approval for

18 rheumatoid arthritis?

19       A.   That's correct.

20       Q.   Was there publicity surrounding those

21 approvals of that drug?

22       A.   Yes, there was.  There was very substantial

23 publicity.  And I should also mention that when the drug

24 was approved initially for Crohn's disease, in 1998, one

25 of the major patient advocacy groups here in this

1  country called the Organization for Rare Disorders --

2  National Organization for Rare Disorders awarded

3  Remicade its prize in that year as the most innovative

4  new medicine for a rare disease.

5        So there was tremendous publicity both at the

6  time it was approved for Crohn's disease, which

7  acknowledged the fact that this was a breakthrough drug,

8  and also a year later, when it was approved for

9  rheumatoid arthritis.

10    Q.   And to the extent that you haven't already,

11  what was the reaction of the pharmaceutical industry to

12  these approvals?

13    A.   Well, as I mentioned, it's often uncertain

14  whether or not a given target, in this case TNF, can be

15  successfully treated with a given drug, such as

16  Remicade.

17        So when a company in the industry, in this

18  case Centocor, is able to demonstrate in human trials

19  that the drug has dramatic benefits for patients and

20  also has an acceptable safety profile, the industry

21  typically takes notice of that, and, you know,

22  recognizes that, you know, that there may be an

23  opportunity to bring other competitive agents into that

24  area, once it's understood that that target, in fact,

25  can be positively impacted by the first drug in that

1    category.

2        Q.    You saw during the opening that counsel held

3    up the Galien Prize that they received in 2007.

4        A.    Yes.

5        Q.    Did Remicade receive the Galien Prize?

6        A.    Yes, we did.

7        Q.    When?

8        A.    It was several years before that.  I don't

9    remember the exact year.  I think it was around 2004,

10   but it was a number of years before Humira received the

11   award.

12            And, truthfully, both products deserve that

13   award.  They were both dramatic innovations that have

14   really benefited patients around the world.

15       Q.    Does the Galien Prize have anything to do with

16   patents and patent rights?

17       A.    No, it doesn't.

18       Q.    Approximately how much did Centocor spend to

19   develop Remicade and conduct clinical trials through FDA

20   approval?

21       A.    Up until that initial approval, right?  So

22   this is now 1998.  We would have invested somewhere in

23   the range of 4 to $600 million to get Remicade to

24   that -- to that position.

25            We've invested substantially more than that

1  since 1998.

2      Q.    You were with Centocor when it was bought out

3  by Johnson & Johnson?

4      A.    Yes, I was.

5      Q.    Would you tell the ladies and gentlemen of the

6  jury how it came about that Johnson & Johnson purchased

7  Centocor?

8      A.    Yes.  A Vice Chairman of Johnson & Johnson,

9  one of the most senior people in the firm, approached us

10  in early 1999, approached our CEO, Chief Executive

11  Officer, in early 1999, indicating that they were very

12  enthusiastic about the early results that had been seen

13  with Remicade, and that they believed that they could

14  provide substantially more investment capital to advance

15  that product and subsequent products to the market.

16          So, in essence, they made a proposal that they

17  would acquire the company with the idea that they could

18  invest more than what we might be able to invest as an

19  independent company.

20      Q.    Were you directly involved, on behalf of

21  Centocor, in the process that led up to Johnson &

22  Johnson purchasing Centocor?

23      A.    Yes, I was.

24      Q.    And what was the purchase price that Johnson &

25  Johnson paid to acquire Centocor?

1    A.    It was just under $5 billion, which at the

2 time, was the largest single acquisition Johnson &

3 Johnson had ever made.

4    Q.    Were there any other companies expressing an

5 interest in Centocor at that time?

6    A.    What happened was around the spring of 1999,

7 so as the discussions were still underway with Johnson &

8 Johnson, some rumors surfaced that Centocor might be the

9 subject of a takeover.

10        When that appeared in the public press, other

11 companies did, in fact, express interest in acquiring

12 the company.

13    Q.    Was Abbott one of those?

14    A.    Yes, it was.

15    Q.    Did you personally have discussions with

16 Abbott personnel about acquiring Centocor?

17    A.    Yes, I did.

18    Q.    And with whom did you meet and discuss the

19 possible acquisition of Centocor by Abbott?

20    A.    There were two people involved in those

21 discussions on both sides.  In the case of Centocor, it

22 was Mr. Holveck, Dave Holveck, the CEO, and myself.

23 And for Abbott, it was Miles White, who was the CEO of

24 Abbott at the time and remains their CEO, and Arthur

25 Higgins, who ran their pharmaceutical business at that

1  time.  He has since left Abbott.

2      Q.    And were you personally involved in discussion

3  with those Abbott gentlemen?

4      A.    Yes, I was.

5      Q.    Did Abbott's Chairman tell you why they were

6  even interested in acquiring Centocor in the first

7  place?

8      A.    Well, their interest essentially was the same

9  as Johnson & Johnson's interest.  They recognized, based

10 on the early data and the initial approval of Remicade

11 and Crohn's disease, that this could be a very, very

12 interesting opportunity, could tremendously benefit

13 many, many patients, and, in turn, generate a very

14 interesting business opportunity.

15     Q.    Did Abbott get to the point of actually making

16 a formal offer for Centocor?

17     A.    To my recollection, there was never a formal

18 offer made.  However, they did float numbers that were

19 substantially below what Johnson & Johnson was willing

20 to pay and what we believed represented fair value for

21 the company.

22     Q.    All right.  And once the acquisition was made

23 by Johnson & Johnson, you stayed on board?

24     A.    I did.

25     Q.    And did you continue to, in your job, watch

1   the competition, see what they were doing?

2       A.   Absolutely.

3       Q.   Do you keep up with Abbott?

4       A.   I do, absolutely.

5       Q.   Did you keep up with Abbott at the time?

6       A.   Absolutely.

7       Q.   And did Abbott make an acquisition based on

8   your knowledge after Johnson & Johnson acquired

9   Centocor?

10      A.   Yes.   About 18 to 24 months after we had been

11  acquired, Centocor had been acquired by J&J, the

12  chemical company called BASF, which had a pharmaceutical

13  business under its broad umbrella, called Noel, made the

14  decision to exit the pharmaceutical business and

15  determined to seek a buyer for that business.

16           Abbott was the company that eventually

17  acquired that business.

18      Q.   And they were working on the TNF antibody?

19      A.   That's correct.

20      Q.   Now, you know that in this case Centocor is

21  charging that Abbott's Humira product infringes the

22  patent-in-suit.

23      A.   That's correct.

24      Q.   And just tell the ladies and gentlemen of the

25  jury briefly your understanding of what is Humira.

1       A.    Well, Humira is also a monoclonal antibody.

2   Its intent or its objective is identical to Remicade's

3   objective.   In other words, to bind to TNF in the

4   patient's bloodstream, remove that TNF from the body,

5   and as a result of reducing TNF levels in the body, have

6   a beneficial effect in treating autoimmune diseases,

7   such as Crohn's and RA and others.

8       Q.    And giving credit where credit is due, has

9   Humira been a successful product in the marketplace?

10      A.    Yes, it has.

11      Q.    Can these drugs that we're talking about in

12  this case, these antibody drugs, be expensive to the

13  patient?

14      A.    They can be.   You know, the biggest contrast

15  between biotechnology-derived drugs, drugs that are

16  typically derived at their outset from living cells, and

17  most of the drugs that we think about commonly, pills or

18  tablets, is that pills or tablets are based on

19  chemicals.

20          Whereas these drugs, these biotechnology

21  drugs, are the outgrowth of bioengineering, living

22  cells, to eventually create a drug from them.

23  That process of getting to that point can be very

24  expensive.   And, very importantly -- and this is a big

25  distinction of biotech products and chemically based

1  drugs.  The manufacturing investments to bring these

2  products to the market can be very, very, very

3  significant.

4      Q.  Does Centocor have any programs to assist

5  patients who can't afford these drugs?

6      A.  Yes, we do.  We recognize that we have a

7  responsibility to patients who may have a difficult time

8  paying for these very expensive medications.  And, in

9  fact, we offer -- Centocor offers two programs.

10         One is a program that makes the drug available

11  for free to patients that have household earnings level

12  below a certain number.  And we also offer a program to

13  patients that do have drug benefits but have benefits

14  such that they have to, out of their pocket, pay a very

15  large co-pay.  So we have a co-pay assistance program

16  that helps defray that expense for those patients.

17      Q.  And based on your knowledge in the industry,

18  does Abbott have similar programs?

19      A.  Yes, they do.

20      Q.  Now, I want to shift gears with you for a

21  moment.

22         Did there come a time when Centocor focused on

23  commercially developing a human anti-TNF antibody to

24  treat rheumatoid arthritis and Crohn's disease?

25      A.  Yes, we did.

1    Q.   And what is that drug?

2    A.   That drug, in fact, was just recently approved

3 a couple of months ago.  The generic name is golimumab

4 and the brand name is Simponi.

5    Q.   Can we just stick with Simponi?

6    A.   We certainly can.

7    Q.   All right.  And whose decision was it to

8 develop Simponi?

9    A.   Well, I actually led that decision when I was

10 the President and Chief Operating Officer at Centocor.

11    Q.   And when did work on Simponi begin?

12    A.   We made the decision to begin the early work

13 on that molecule in 19 -- late 1997.

14    Q.   Now, from 1997 -- and you said it came out a

15 few months ago in 2009.

16         What took so long?

17    A.   Well, I mean, I think the Simponi example

18 really underscores how much time, how much effort, how

19 much investment, and how much risk a company must take

20 to successfully bring a molecule such as this to the

21 marketplace.

22    Q.   And whose decision was it to focus those

23 resources on Remicade in commercial development before

24 focusing on Simponi?

25    A.   Yeah.  Again, let's remember this is all

1 happening in the period before Johnson & Johnson had

2 acquired the company.

3       We were very resource-constrained.  I should

4 mention the company didn't make its first profit --

5 although it was founded in 1979, we didn't make our

6 first profit as a company until the fourth quarter of

7 1997.

8       So as you might imagine in that environment,

9 we had to be very careful about where we invested

10 resources.  And although we recognized that a human

11 antibody could be interesting, the cA2 antibody was

12 further advanced, and we made the decision at that time,

13 because of resource constraints, to focus our investment

14 there.

15    Q.  All right.  I want to change topics with you

16 again at this point.

17       Based on your business experience of 35 years

18 in the pharmaceutical industry, how important are

19 patents to pharmaceutical companies?

20    A.  The truth is that without patents, it would be

21 very difficult for the -- for the industry to be

22 successful.  These are products, again, that take many,

23 many years and literally hundreds of millions of dollars

24 to develop.

25       And if one goes back to the comments His Honor

1    made at the beginning of the trial, patents are issued

2    in order to protect the innovator for a period of time,

3    not forever, but for a period of time, so that they are

4    incented to make those big investments, take those big

5    risks.

6         Q.   And was it Centocor's practice, while you were

7    there, to ever engage in licensing discussions with

8    actual competitors?

9         A.   Yes.

10        Q.   Why would you do that?

11        A.   Well, you know, when -- when one is making

12   these decisions to invest these hundreds of millions of

13   dollars, one wants to be certain that when that product

14   eventually does arrive on the market, there is, in fact,

15   the ability to have the freedom to commercialize those

16   products.

17             And so in those circumstances -- and they do

18   occur from time to time -- where competitors may have

19   intellectual property or patents that we believe are

20   either critically necessary or possibly necessary, we

21   will typically seek out a license to that patent.  And

22   we will pay fair value when we license those patents.

23        Q.   And sometimes you'll license the company's

24   technology, Centocor's or Johnson & Johnson's, to

25   another competitor.

1      A.   Yes, that's correct.

2      Q.   Why do you do that?

3      A.   Well, again, you know, the circumstances in

4  the development of biotechnology products often lead to

5  multiple patents being required in order to advance the

6  development of a drug.

7           And sometimes the reason that those kinds of

8  decisions are made is that both companies in those

9  discussions need something from the other company.  So

10  it's not infrequent that those kinds of negotiations can

11  lead to what's called cross-licensing, where each

12  company provides a license to each other's technology.

13      Q.   Is it fair to say that as a company you're

14  willing to do that because what goes around, comes

15  around?

16      A.   To some extent.

17      Q.   Now, in this case, Plaintiffs' Exhibit 1 is

18  the '775 patent, which is in the jury's book.  And

19  they've seen it, and I'm going to put it up on the

20  screen here.

21           Do you recognize this as the '775 patent?

22           We're not going to go through all the terms, I

23  promise you.

24      A.   Thank you.

25           Yes, I do.

1    Q.    Were you made aware of the official

2 notification by the Patent & Trademark Office that the

3 claims of the '775 were going to be allowed?

4    A.    Yes, I was.

5    Q.    And about when did that official notice come?

6    A.    That was in December of 2005.

7    Q.    Did Centocor ever offer to license the '775

8 patent to Abbott?

9    A.    Yes, we did.

10    Q.    When?

11    A.    In December of 2005.

12    Q.    In what context?

13    A.    Well, we anticipated -- of course, you can't

14 absolutely predict these things, but we did anticipate

15 that the Patent Office would eventually advise us that

16 they would allow the patent and ultimately grant the

17 patent.

18         So in the period before that occurred, we did

19 a couple of things.  Number one, we took a look at

20 whether or not products in the marketplace, including

21 Humira, might infringe that patent.  And we did certain

22 experiments to determine whether or not Humira infringed

23 the patent.

24         Those experiments documented that, in fact, it

25 does.

1           And so as a result of that, we also discussed

2  extensively how we might tell Abbott about that.  And a

3  decision was made to communicate to them essentially,

4  immediately after we received this notice of allowance,

5  that we were going to be granted this patent and that we

6  believed it read on Humira; in other words, that Humira

7  would infringe it, that we had tested that and confirmed

8  it infringed.

9           And as a result of that, we believed that

10  Abbott should consider taking a license to it.

11      Q.   Tell us who participated in those discussions.

12      A.   The people that were involved in those

13  discussions were two from the Abbott side and two from

14  the Johnson & Johnson side.

15           On the J&J, or Johnson & Johnson side, there

16  was myself and my head of Business Development, a

17  gentleman by the name of Tom Heyman.

18           And for Abbott, it was two individuals on

19  their side; one is a Mr. Bill Dempsey.  He was, if you

20  like, my direct counterpart at Abbott.  He was

21  responsible for the pharmaceutical business at Abbott.

22  And as well, his business development person, a

23  gentleman by the name of John Poulos.

24      Q.   Did you personally have discussions with

25  Mr. Dempsey at Abbott about this patent?

1       A.   Yes, I did.

2       Q.   How long did those discussions -- how long a

3  period of time did those discussions span?

4       A.   From the time that we first advised Abbott

5  that we had received this notice of allowance until the

6  time that we ultimately made the decision to file suit,

7  that period ran from December 2005 until April of 2007.

8  And we had a number of meetings.  From time to time,

9  there would be periods where we'd have a number of

10 successive meetings.  Then there would be periods where

11 there were very few meetings.  But over that period from

12 time to time, we had meetings on the topic.

13      Q.   Did you ask Abbott to pay for its use of the

14 '775 patent?

15      A.   Yes, we did.

16      Q.   At any time did they ever agree to pay for

17 their use of the '775 patent?

18      A.   No, they did not.

19      Q.   In your discussions with Mr. Dempsey, did you

20 say to him that it was Centocor's belief that Abbott

21 infringed the '775 patent on the claims that had been

22 officially allowed?

23      A.   Yes, I did.

24      Q.   I want you to look at Plaintiffs' Exhibit 161

25 in evidence.  I've actually put a copy on the podium for

1  you there to save some time.  And the first thing I want

2  to do, when I get this up here, is make it bigger.

3  And let's -- it's from you, Joe Scodari, and it's dated

4  March the 12th of 2006, right?

5       A.   That's correct.

6       Q.   And this is to a list of people.  I'm not

7  going to ask you to name them, but just tell the jury

8  who you were sending this communication to.

9       A.   So, generally speaking, when I was involved in

10  these kinds of discussions with a third party, I would

11  typically write notes that would inform other members of

12  my staff or of management of the progress of those

13  discussions.  And this is what this e-mail was intended

14  to do.

15       Q.   Let's highlight the first sentence that says:

16  I received a call late Friday from Bill Dempsey.

17            So is this memorializing an actual telephone

18  call between you and Mr. Dempsey of Abbott?

19       A.   Yes, it is.

20       Q.   Now, let's go down to the third paragraph, and

21  I want to focus on this sentence that says:  He

22  characterized the discussion as one in which our view

23  was not fully recognizing the value enforceability of

24  their patents, and, once again, raised the

25  non-enablement argument on the TNF patent.

1          Let me stop right there.  In the context of

2  your discussion with Bill Dempsey, what was the TNF

3  patent that's referred to in your memo?

4      A.   This is the TNF patent that we just discussed

5  that was granted to Centocor.

6      Q.   It says:  Once again, he raised the

7  non-enablement argument.

8          Had you discussed this with Mr. Dempsey

9  before?

10     A.   From the very beginning of our discussions

11  back in December of 2005, once their patent people had

12  taken a look at this patent, their feedback to us was

13  that they believed -- or they did not believe -- let's

14  put it that way -- that the patent was enabled.

15     Q.   Did you consistently tell him that you

16  believed that they infringed?

17     A.   Yes, we did.

18     Q.   And did you say that to Mr. Dempsey?

19     A.   Yes.

20     Q.   I want to go to the sentence that says:  I

21  told him that we felt strongly about the quality of the

22  TNF patent, and given the fact that Humira is in the

23  market is an issue they needed to take seriously.

24          In context of your discussion with

25  Mr. Dempsey, would you tell us what this means?

1     A.    Well, what it means is that we believed that

2  our invention, the reference to the human antibody and

3  the methodology for producing that antibody, was a very,

4  very valuable piece of intellectual property.

5           And as a result of that value, we had

6  indicated to Abbott on numerous occasions that we needed

7  to be appropriately, fairly compensated for their use of

8  that technology.

9     Q.    Then the next sentence that begins he

10  indicated:  He indicated that they were taking the

11  patent seriously and recognized that they can be

12  challenged on infringement but felt their position was

13  defensible.

14           Do you see that?

15     A.    Yes, I do.

16     Q.    In context, tell us what was being discussed

17  between you on the one hand and Mr. Dempsey on the

18  other.

19     A.    Well, during the course of these

20  conversations, which, again, occurred on and off between

21  December 2005 and April 2007, we were never able to

22  really get a specific proposal from Abbott as to how

23  they would compensate us for their use of this patent or

24  this intellectual property.

25           So in this particular telephone conversation,

1  which was one of a number of either telephone

2  conversations or meetings, I made the point to him that

3  since we had not really gotten any feedback that

4  suggested they were oriented toward compensating us for

5  that patent, that they needed to take it seriously.  And

6  he acknowledged that, in fact, they were taking it

7  seriously.

8           He also acknowledged that they could be

9  challenged with respect to infringement of the patent

10  but reinforced that their issue with the patent was

11  non-enablement.

12      Q.   Now, we have an e-mail here that's dated March

13  of 2006.

14           Did you have discussions of this nature with

15  Mr. Dempsey before this?

16      A.   Yes.

17      Q.   Did you have discussions with Mr. Dempsey

18  after this?

19      A.   Yes.

20      Q.   And in any of those conversations you had with

21  Mr. Dempsey up until the time that this suit was filed,

22  did Abbott ever offer to pay anything for the use of

23  these patents?

24      A.   No, they did not.

25      Q.   Did Abbott continue to sell Humira anyway?

1        A.    Yes.

2        Q.    And has Centocor or Johnson & Johnson ever

3    received a nickel for the sales of Humira that infringe

4    this patent?

5        A.    No, we have not.

6                  MR. SAYLES:  I'll pass the witness.

7                  Your Honor, I'm going to offer the

8    version of 161 into evidence that we displayed.  We have

9    agreed with counsel that it is admissible.

10                 It's got unredacted portions following

11   our pretrial conference, but it is agreed.  And that was

12   the proper exhibit that I showed him.  It's all in.  And

13   I offer it.

14                 MR. BECK:  That is correct, Your Honor.

15   We have no objection.

16                 THE COURT:  All right.  That's 171?

17                 MR. SAYLES:  161.

18                 THE COURT:  161 is received.  Thank you.

19                 MR. LEE:  Your Honor, we have a notebook

20   of the actual exhibit for the witness in case he'd like

21   to see it in addition to what's on the screen.

22                 May we provide it to the witness?

23                 THE COURT:  Certainly.

24                 MR. LEE:  And we have a copy for the

25   clerk and for Your Honor, if you want it.

1          MR. SAYLES:  Mr. Lee, do you happen to

2    have one for me?

3          MR. LEE:  Yeah, we have one for you as

4    well.  I'm sorry, Mr. Sayles.

5          THE COURT:  Give that to the clerk.

6    Thank you.

7          MR. LEE:  May I proceed, Your Honor?

8          THE COURT:  You may.

9                    CROSS-EXAMINATION

10   BY MR. LEE:

11        Q.   Good morning, Mr. Scodari.

12        A.   Good morning.

13        Q.   Mr. Scodari, I want to help the jury with the

14   chronology of events a little bit.

15             You were here this morning when Ms. Elderkin

16   did her opening, correct?

17        A.   Yes, that's correct.

18        Q.   And you were here when she said February 1994

19   is a very important date in this case, correct?

20        A.   Yes, she said that.

21        Q.   Now, you didn't even join Centocor until 1996,

22   correct?

23        A.   That's correct.

24        Q.   So to the extent that February 1994 was an

25   important date, and we need to know what was going at

1  Centocor then, we're going to ask someone else, correct?

2      A.   I would say it would be appropriate to do

3  that.  I would also say that in order to effectively

4  conduct my duties as Chief Operating Officer, I had to

5  understand the history of the company.

6      Q.   But you weren't there.

7      A.   I was not there.

8      Q.   Now, you're not trained as a scientist,

9  correct?

10     A.   That's correct.

11     Q.   Have you yourself ever made a mouse

12  anti-TNF-alpha antibody?

13     A.   I have not.

14     Q.   Have you yourself ever made a chimeric

15  anti-TNF-alpha antibody?

16     A.   I have not.

17     Q.   Have you yourself ever made a fully human

18  TNF-alpha antibody?

19     A.   I have not, but I should add that over the

20  many years of managing businesses, high-technology

21  businesses, one needs to really take seriously the

22  on-the-job training that comes along with those roles

23  and those responsibilities.

24     Q.   Mr. Scodari, my question was, did you ever

25  make one.

1       A.   I said no.

2       Q.   And you surely have never made a fully human

3   high-affinity neutralizing anti-TNF-alpha antibody,

4   correct?

5       A.   I have never personally done that.

6       Q.   Now, you mentioned the '775 patent a few

7   minutes ago, correct?

8       A.   Yes.

9       Q.   Have you read it?

10      A.   I have not read it in detail.

11      Q.   Well, you haven't even read the patent itself?

12      A.   I said I hadn't read it in detail.  I have

13   read it, not in detail.

14      Q.   Have you read the claims that the jury is

15   going to be asked to make a decision on?

16      A.   Yes.

17      Q.   All right.  So you've read Claims 2, 3, 14,

18   and 15, correct?

19      A.   That's correct.

20      Q.   Now, you've testified at length today about

21   Remicade, correct?

22      A.   That's correct.

23      Q.   Remicade is a chimeric antibody, correct?

24      A.   That's correct.

25      Q.   By the time you arrived at Centocor, Remicade

1  had been developed, correct?

2      A.    No, that's not correct.  It was in

3  development, but it had not been developed.

4      Q.    Fair enough.

5            The antibody, A2, had been developed before

6  you arrived at Centocor, correct?

7      A.    A2 had been identified as a promising antibody

8  candidate, yes.

9      Q.    A2 was a mouse antibody, correct?

10     A.    That's correct.

11     Q.    And it was made in 1989, was it not?

12     A.    I don't know the exact date, but if you're

13  saying that's when it was, I'll support that.

14     Q.    Does that sound about right to you?  I mean,

15  you said you familiarized yourself with what had been

16  going on before.

17     A.    Absolutely, but I don't remember the specific

18  date.

19     Q.    But you know it happened before you arrived in

20  1986 (sic), correct?

21     A.    I arrived in 1996.  Yes, correct.

22     Q.    And you know that before Centocor identified

23  the mouse antibody, whenever it did it, someone named

24  Dr. Moller had already made a mouse antibody and

25  published on it, correct?

1    A.    I do not know that.

2    Q.    You have no idea whether that's true or not?

3    A.    I don't.

4    Q.    Okay.  But you do know that cA2, a chimeric

5 antibody, was in development when you arrived in 1996,

6 correct?

7    A.    That is correct.

8    Q.    And you do know that the chimeric antibody had

9 human parts, correct?

10    A.    Yes.

11    Q.    And you do know that the chimeric antibody had

12 mouse parts, correct?

13    A.    That's correct.

14    Q.    And, in fact, Remicade is about 25 percent

15 mouse, is it not?

16    A.    I don't know the exact percentage.

17    Q.    All right.  Well, can you tell the jury this:

18 I want you to focus on Claims 2, 3, 14, and 15 in their

19 notebooks.

20          You said you've read those claims, correct?

21    A.    Yes.

22    Q.    Those claims don't even cover Remicade, do

23 they?

24    A.    I can't tell you that without looking at the

25 document.

1          Would you like me to look at that?

2     Q.   Sure.

3          Turn in your notebook to PX1, and we'll put it

4 on the screen.

5          MR. SAYLES:  Excuse me, Your Honor.  I am

6 going to object to that on two grounds.  One is, he's

7 asking a question that I did not go into on direct; and,

8 second, he is attempting to compare the Remicade product

9 of Centocor in defense of the claim of infringement as

10 opposed to comparing it to the claims.

11          So I object to it on that basis.

12          THE COURT:  Well, I'll overrule your

13 first objection.

14          What do you say about that, Mr. Lee?

15 You're trying to compare different products.  I mean,

16 that's not what the jury is going to be asked to do.

17          MR. LEE:  I agree with that fully, Your

18 Honor.  I think that the jury just heard about 40

19 minutes about Remicade and the chimeric antibody, and

20 the question of whether that's covered by the claim or

21 not --

22          THE COURT:  I disagree with you.  I don't

23 see the relevancy here, so I'm going to sustain that

24 objection.

25          MR. LEE:  All right.

1      Q.   (By Mr. Lee) You have read Claims 2, 3, 14,

2  and 15, correct?

3      A.   Yes, that's correct.

4      Q.   And you understood them, correct?

5      A.   To the extent that a non-patent attorney can

6  understand them, yes.

7      Q.   Sure.

8      A.   I knew enough about them to ask the right

9  questions.

10     Q.   Now let's get us all on the same page.

11 If cA2 was in development in 1996, when did you have

12 cA2?  What's the date?

13     A.   I don't know what you mean by that question.

14     Q.   Well, when is the first time Centocor had made

15 chimeric antibody?

16     A.   Well, the initial chimeric antibody occurred

17 after the work that was done in conjunction with

18 Centocor by NYU.

19     Q.   Okay.

20     A.   I don't know exactly what that date was.

21     Q.   Well, can you help us fill out the chronology?

22 When is it that NYU or Centocor first had cA2?

23     A.   I can't.  I don't know that date.

24     Q.   Okay.  And you can't tell us whether it was

25 before 1994 or after?

1      A.    I cannot.

2      Q.    All right.  Now, you did know that -- you did

3  tell the jury that Centocor started a project involving

4  a fully human antibody, correct?

5      A.    That's correct.

6      Q.    Now, that did start after you arrived,

7  correct?

8      A.    That's correct.

9      Q.    That was 1997?

10      A.    I believe it was late 1997, correct.

11      Q.    Let's put up here late 1997, Centocor starts

12  fully human anti-TNF-alpha antibody, right?

13      A.    Correct.

14      Q.    Now, before late 1997, Centocor had not had a

15  project to make a fully human anti-TNF-alpha antibody,

16  correct?

17      A.    Not to my knowledge.

18      Q.    But before 1997 -- in fact, before 1994,

19  Centocor had had this product called Cyntoxin, correct?

20      A.    Correct.

21      Q.    Cyntoxin was a fully human antibody, correct?

22      A.    I don't think that is correct actually.

23      Q.    You don't know -- do you know one way or

24  another?

25      A.    I'm not positive, no.

1     Q.   In any event, Cyntoxin was an antibody,

2  correct?

3     A.   That's correct.

4     Q.   And it had failed, correct?

5     A.   That's correct.

6     Q.   At any time -- based upon the information you

7  acquired through the company, at any time before

8  February of 1994, had Centocor made a fully human

9  anti-TNF-alpha antibody?

10     A.   I don't know what happened before 1994, but my

11  understanding is no.

12     Q.   Okay.  At any time before 1997, had Centocor

13  even made a fully human anti-TNF-alpha antibody?

14     A.   No.

15     Q.   So the first time it started was in 1997.  And

16  when were you successful?

17     A.   I don't remember exactly when the decision was

18  made as to which antibody would move into clinical

19  development, but it would have been a number of years

20  after 1997.

21     Q.   And how many more years?

22     A.   I don't know.

23     Q.   But you do know it came to market; it got FDA

24  approval in 19 -- in 2009, correct?

25     A.   That is correct.

1          Q.    All right.  So let's just be sure that we have

2    this portion correct.

3                If I ask you to focus on Centocor's chimera

4    antibody projects, that was underway when you arrived,

5    correct?

6          A.    If you're referring to cA2, yes.

7          Q.    All right.  And it continued after you

8    arrived, correct?

9          A.    That's correct.

10         Q.    And you were successful in bringing a product

11   to market when?

12         A.    In the fall of 1998.

13         Q.    So the fall 1998 is when cA2, or Remicade,

14   comes to market, right?

15         A.    That's correct.

16         Q.    Now, if we focus on the fully human antibody,

17   as far as you know, nothing was done before 1997,

18   correct?

19         A.    Not by Centocor.

20         Q.    Right.  It had been done by others, correct?

21         A.    I'm not sure of that.

22         Q.    Well, you told Mr. Sayles that you followed on

23   what was going in the industry, correct?

24         A.    Yes.

25         Q.    You knew that BASF had a project involving

1  anti-TNF-alpha antibodies, didn't you?

2      A.   Yeah, I did.  Yes, that's correct.

3      Q.   And you know that before 1997, BASF had been

4  successful, correct?

5      A.   I don't know exactly when BASF, or Noel, had

6  actually achieved or made the decision to advance the

7  antibody that later became known as Humira.

8          I do know that Noel was, in fact, working in

9  this space during my tenure at Centocor.

10     Q.   You know that Noel was working on

11  anti-TNF-alpha antibodies before you even started your

12  project, correct?

13     A.   Yes, that's correct.

14     Q.   And the general community, people interested

15  in these products, knew before you started your project

16  that Noel was working in this area, correct?

17     A.   Yes, that's correct.

18     Q.   And you knew that they had successfully made a

19  fully human anti-TNF-alpha antibody before you started

20  your project, correct?

21     A.   Again, I don't remember the exact timing of

22  when the decision was made to advance the molecule that

23  later became Humira.

24     Q.   But I'm not asking you about the exact time,

25  and I apologize if I was unclear.

1           Was it before or after you started your

2   project?

3       A.   It was before we started our project.

4       Q.   Right.  So before you had ever started your

5   project, you knew that BASF had been successful in

6   making a fully human antibody, correct?

7       A.   That's correct.

8       Q.   And, in fact, that occurred after 1994 and

9   before 1997, correct?

10       A.   Again, I can't be specific on the dates,

11   because I just don't know the specific dates.

12       Q.   All right.  Fair enough.

13           Now, when the project started in 1997, you

14   were at Centocor, correct?

15       A.   That's correct.

16       Q.   And you had a group of scientists working on

17   the project, correct?

18       A.   That is correct.

19       Q.   And you invested a substantial amount of money

20   in developing Simponi, correct?

21       A.   Over a period of time, yes.  In the early

22   days, somewhat limited, but later, substantially more.

23       Q.   Well, if we take the numbers you were talking

24   about with Mr. Sayles, over a period of time, you

25   invested about $300 million in developing and bringing

1  to market Simponi, correct?

2      A.   I don't know where you got the 300-million

3  number.

4      Q.   Does that sound low or high?

5      A.   I don't know.  It's probably in the ballpark

6  from the start of the project until the initial FDA

7  approval, but I don't actually know exactly what that

8  number is.

9      Q.   Well, let me ask you to apply the same

10  standard you applied when you gave Mr. Sayles estimates

11  of what it costs to bring some of your drugs to market.

12          Judging by the same standards, about how much

13  did it cost to bring Simponi to market after you started

14  it in 1997?

15      A.   I couldn't guesstimate the exact number.  The

16  only thing I would say is because it was then known that

17  this was a viable target, much of the early work that

18  would have been done with Remicade would not have been

19  necessary with a successor molecule, such as Humira

20  or -- or the human antibody project that was started at

21  Centocor.

22      Q.   So the answer is, you can't give me an

23  approximate amount.

24      A.   I would say it's probably in the range of 4 to

25  $600 million, but I don't know where in that range the

1  number is.

2      Q.   All right.  Now, we can agree that however

3  much was spent was spent between 1997 and 2009 to bring

4  a fully human antibody to market, correct?

5      A.   That's correct.

6      Q.   And you were here in the opening when

7  Ms. Elderkin said that you actually had the invention of

8  a fully human antibody back in 1994, correct?

9      A.   That's correct.

10     Q.   So it took you 15 years after the date on

11 which you had the invention of a fully human antibody to

12 bring it to market; is that correct?

13     A.   That's correct.

14     Q.   Okay.  Now, you talked about some licensing

15 discussions with Abbott, correct?

16     A.   Yes, I did.

17     Q.   Now, the first set of discussions you talked

18 about were discussions that you had with Abbott at about

19 the time that Johnson & Johnson purchased you, correct?

20     A.   That's correct.

21     Q.   And those occurred around 1999, correct?

22     A.   In the spring of 1999, yes.

23     Q.   Right.  And what happened is, Abbott talked to

24 you, a company that had a chimeric antibody, correct?

25     A.   That's correct.

1     Q.   And it talked to BASF, a company that had a

2  fully human antibody, correct?

3     A.   Not at the same time.  They spoke to us in the

4  spring of '99.  The discussions they would have had with

5  Noel would have happened sometime in 2001.

6     Q.   Right.  And after having talked to both

7  companies over a period of a couple of years, they

8  decided to acquire a company that had developed the

9  fully human anti-TNF-alpha antibody, correct?

10    A.   I think that's a characterization of what

11 happened.

12         What actually happened was that they were

13 extremely interested in acquiring Centocor.  They were

14 not willing to be competitive with respect to how much

15 to pay for the company, and later, when they didn't

16 successful acquire Centocor, remaining very interested

17 in this target area, blocking TNF, when the Noel

18 opportunity became available, they then moved to acquire

19 that company.

20         It wasn't a decision they made to pick one or

21 the other, because the timeframes were very, very

22 different.

23    Q.   In any event, what they did is, they acquired

24 the company that had developed already a fully human

25 anti-TNF-alpha antibody and brought it to market,

1  correct?

2      A.    That's actually not correct.  If my memory

3  serves me correctly, Humira was approved after they

4  acquired Noel.

5          So it wasn't fully --

6      Q.    That was what I said.  I apologize if it was

7  unclear.

8          I said they had decided to acquire the company

9  that had developed a fully human anti-TNF-alpha antibody

10 and then bring that product to market; is that correct?

11     A.    Yell, I guess where I'm getting hung up is the

12 word develop.  And I should say that the process of drug

13 discovery and develop starts with discovery, early

14 development.

15         Developed means you've successfully finished

16 all the human trials and brought it to them.  So

17 developed in the past tense means it's done.

18     Q.    Okay.

19     A.    It wasn't done when they acquired the company.

20     Q.    Well, let's use a different -- let's use a

21 different set of words.

22         They decided to acquire a company that had

23 made a fully human anti-TNF-alpha antibody, correct?

24     A.    That is correct.

25     Q.    They decided to invest in that fully human

1  anti-TNF-alpha antibody, correct?

2      A.   That is correct.

3      Q.   They decided to bring it to market, correct?

4      A.   That's correct.

5      Q.   And they did, correct?

6      A.   That is correct.

7      Q.   And to quote you, you described Humira as a

8  dramatic innovation, correct?

9      A.   That's correct.

10     Q.   And it was, was it not?

11     A.   What I said was that all of the drugs that

12 block TNF were and are dramatic innovations, because

13 before those drugs became available, these patients had

14 incredible difficulty trying to manage disease, and

15 they've made a tremendous difference.

16     Q.   Remicade is a dramatic innovation, correct?

17     A.   That's correct.

18     Q.   Humira is a dramatic innovation, correct?

19     A.   Humira is an innovation that built on the

20 innovation that had already been established by Centocor

21 with the chimeric antibody.

22     Q.   Mr. Scodari, weren't your words just 20

23 minutes ago, it was a dramatic innovation?

24     A.   I don't -- you'll have to read the record to

25 me.  I don't remember exactly what I said, but I don't

 1 dispute the fact that these are both very innovative

 2 molecules.

 3          However, I think it's also important to

 4 understand that in the realm of drug development, when

 5 one sponsor effectively blazes the path --

 6                    MR. LEE:  Your Honor, could we ask the

 7 witness to answer --

 8                    THE COURT:  Sustained.  What you need to

 9 do is answer the question that he asks.

10                    THE WITNESS:  Okay.

11                    THE COURT:  You got to realize,

12 Mr. Sayles, if he wants to clear something up for the

13 jury, he gets to come back and ask questions to clear up

14 anything.

15          So try and limit your answers to the

16 question asked, okay?

17                    THE WITNESS:  My apologies.

18     Q.   (By Mr. Lee) Now, Mr. Scodari, let's go to

19 these discussions you had with Abbott at about the time

20 you found out you were going to get a patent.

21          Do you have those in mind?

22     A.   Now, which discussions?  We're talking about

23 the TNF patent discussions.

24     Q.   The TNF patent discussions.

25     A.   Yes.  Yes.

1    Q.   And you said they occurred between a period of

2  2005 and 2007, correct?

3    A.   December 2005 to April of 2007, correct.

4    Q.   Now, let me ask you about some specifics.

5  You told the jury that you had test results that would

6  indicate that Abbott was infringing, correct?

7    A.   That's correct.

8    Q.   Abbott asked you for those test results,

9  correct?

10    A.   That's correct.

11    Q.   You refused to give Abbott those test results,

12  correct?

13    A.   As far as I know, that is correct.

14    Q.   Right.  So that when you accused Abbott of

15  infringing and Abbott said, show us the proof, you said,

16  not going to show it to you, right?

17    A.   That was the decision that our patent

18  department made, yes.

19    Q.   Right.  And that's a decision that you abided

20  by, correct?

21    A.   That's correct.

22    Q.   Now, Johnson & Johnson is a big company, as

23  you told us, correct?

24    A.   That is correct.

25    Q.   It gets many letters from patent-holders that

1 say, We have a patent; we think you're infringing; you

2 should pay us, correct?

3    A.   I don't know.  I'm not in the Patent

4 Department, so...

5    Q.   Do you know whether Johnson & Johnson gets

6 letters from patent owners that say Johnson & Johnson

7 needs to take a license from it?

8    A.   I don't know that personally.

9    Q.   It's never happened to you during the time

10 that you were the head of the Pharmaceutical Division?

11    A.   I've never gotten a letter from an inventor

12 saying, I have this invention; we want you pay us for

13 it, no.

14    Q.   All right.  Well, then Mr. Dow is going to

15 testify.  He's one of the patent lawyers, correct?

16    A.   That's correct.

17    Q.   When Johnson & Johnson gets a letter from

18 another company saying that there is a patent and you

19 should take a license, what you do is, you ask your

20 folks to look at the patent, correct?

21    A.   Yes.

22    Q.   You make a decision as to whether the patent

23 is valid, correct?

24    A.   Yes.

25    Q.   You make a decision as to whether the patent's

1  infringed, correct?

2       A.   Yes.

3       Q.   And if you decide that Johnson & Johnson is

4  not doing anything wrong, the patent's invalid, the

5  patent's not infringed, you decide -- you tell them

6  we're not going to pay you, right?

7       A.   That's correct.

8       Q.   And that's what a responsible company should

9  do.  It should decide -- it should look at the patent,

10 it should decide what it covers, and then it should make

11 a decision as to whether it should pay, correct?

12      A.   That's correct.

13      Q.   Simply because someone comes and says, I have

14 a patent; you should pay, wouldn't lead you to pay,

15 correct?

16      A.   No, not without digging into the patent.

17      Q.   Right.  Let's bring up PX161, could we, which

18 is the exhibit that Mr. Sayles asked you about earlier.

19 Do you have that?

20      A.   Yes.  Yes, I do.

21               MR. BECK:  Can y'all see that with this?

22               MR. LEE:  We can move this.

23               MR. BECK:  You want to move it?

24               MR. LEE:  Now, could we blow up the third

25 sentence of the third paragraph?

1    Q.    (By Mr. Lee) Now, this paragraph, this third

2 sentence refers to the non-enablement discussion that

3 the parties had, correct?

4    A.    Yes, that's correct.

5    Q.    And you discussed this with Mr. Sayles,

6 correct?

7    A.    Discussed it with Mr. Sayles?

8    Q.    The discussions between the two of you about

9 the issue of enablement, correct?

10    A.    You mean Mr. --

11    Q.    Mr. Sayles asked you -- I apologize.

12    Mr. Sayles asked you some questions about

13 discussions you had with Abbott, correct?

14    A.    That's correct.

15    Q.    And during those discussions, you discussed

16 the question of enablement, correct?

17    A.    The issue of enablement was raised by Abbott

18 as --

19    Q.    Right.

20    A.    -- or the lack of enablement was raised by

21 Abbott as the reason they didn't believe that they

22 needed a license to the patent.

23    Q.    Right.  So from the beginning, Abbott said to

24 you, This patent is not enabled, correct?

25    A.    That is correct.

1    Q.   And you understood what -- in general terms,

2 what enablement is, correct?

3    A.   Yes, that's correct.

4    Q.   Enablement is the requirement that the patent

5 teach people of ordinary skill in the art how to make

6 the invention, correct?

7    A.   That's correct.

8    Q.   And what Abbott told you is, since you're

9 accusing fully human antibodies of infringing, you

10 didn't teach people how to make and use fully human

11 antibodies.

12         That's what they were telling you, correct?

13    A.   That was Abbott's position, correct.

14    Q.   And that has been consistently Abbott's

15 position since 2005, correct?

16    A.   That's correct.

17    Q.   Now, you disagree, correct?

18    A.   That is correct.

19    Q.   Right.  And the purpose of this proceeding is

20 to determine who's correct, right?

21    A.   Not on the question necessarily of enablement,

22 but primarily on the question of whether there's

23 infringement.

24    Q.   Well, you understood that Abbott contended the

25 patent was not enabled in 2005, correct?

1    A.    That is correct.

2    Q.    And you were here for my opening in 2009,

3 correct?

4    A.    That's correct.

5    Q.    And I said it's not enabled today, correct?

6    A.    That's what you said.

7    Q.    Now, at any time prior to filing this lawsuit,

8 did you ever send anybody a letter at Abbott -- did you

9 ever send anybody at Abbott a letter that said, You're

10 infringing our patent?

11    A.    I don't know whether Johnson & Johnson, as a

12 company, ever did that.  I did not personally do that.

13    Q.    Did you ever send to Abbott a letter that

14 says, Your Humira product infringes the claims of these

15 patents?

16    A.    No.  But we personally discussed that with

17 both Mr. Dempsey and Mr. Poulos.

18              MR. LEE:  Well, Your Honor --

19              THE COURT:  Sustained.  Please limit your

20 answers to the question asked.

21    Q.    (By Mr. Lee) At any point, after doing these

22 test results you discussed and before filing a lawsuit,

23 did you say, Abbott, we'll share with you the reasons

24 why we think that you infringe this patent?

25    A.    Not to my knowledge.  I certainly did not do

1   that.  I don't know whether Ken Dow did that.

2        Q.   At any -- but that's a decision that your

3   lawyers made, correct?

4        A.   That's correct.

5        Q.   All right.

6              MR. LEE:  Nothing further, Your Honor.

7              THE COURT:  Mr. Sayles?

8                  REDIRECT EXAMINATION

9   BY MR. SAYLES:

10       Q.   As a businessman with Centocor and Johnson &

11  Johnson, did you have access to the Legal Department?

12       A.   Yes, I did.

13       Q.   And in the context of these discussions, did

14  Abbott's lawyer call your lawyer?

15       A.   Yes.

16       Q.   All right.  You were asked a number of

17  questions by Mr. Lee about the development of the fully

18  human antibody.

19            Do you recall that line of questions?

20       A.   Yes, I do.

21       Q.   When you were answering him, would you tell

22  the ladies and gentlemen what you meant by development?

23       A.   Well, development really begins from the

24  selection of the antibody.  So that's sort of in the

25  early discovery phase right through the eventual FDA

1    approval of the drug for its intended use.

2        Q.   And you were asked a number of questions about

3    whether you had a project on fully human antibodies.

4            Do you remember that line of questions?

5        A.   Yes, I do.

6        Q.   And when you talk about a project as a

7    businessman, are you talking about commercializing a

8    product?

9        A.   Eventually, yes.  That would be the goal.

10       Q.   And when you were talking to Mr. Lee about a

11   project, is that what you were talking about, the

12   commercial development of an item, in this case,

13   Simponi?

14       A.   Yes.

15       Q.   As a businessman, are you aware that companies

16   can obtain patents on inventions for which they never

17   have a commercial product?

18       A.   Oh, absolutely.  It happens all the time.

19       Q.   You were asked some questions about FDA

20   approval.  As a businessman, is it your understanding

21   that FDA approval has anything to do with the

22   governmental agency, the PTO, in the issuance of patents

23   on inventions?

24       A.   No, not at all.

25       Q.   You were asked some questions about -- from --

1  on Simponi, that it took 15 years to bring Simponi to

2  the market.

3       A.   Yes, that's correct.

4       Q.   Do you recall that?

5       A.   Yes.

6       Q.   In answering Mr. Lee, did your answers have

7  anything to do with whether Simponi had been invented at

8  an earlier date?

9       A.   No.

10      Q.   What were you talking about?

11      A.   I was talking about the development of the

12 molecule.

13      Q.   A commercial development?

14      A.   That's correct.

15      Q.   That does seem like a long time.  In the

16 pharmaceutical industry, is 15 years a long time to

17 commercialize a product?

18      A.   It's not unusual in our industry to have that

19 length of time from the start of a project to the

20 eventual commercial availability of that product in the

21 marketplace.

22      Q.   And you were asked some questions about

23 whether you ever caused a letter to be sent to

24 representatives of Abbott charging them with

25 infringement.

1          Do you remember that line of questions?

2     A.   I do.

3     Q.   Did you personally say to Mr. Dempsey, the

4 head man at Abbott, that you thought they were

5 infringing the '775 patent?

6     A.   I did.

7     Q.   Did you personally say to Mr. Dempsey that you

8 expected them to pay for that use?

9     A.   Yes, I did.

10              MR. SAYLES:  I'll pass the witness.

11              MR. LEE:  Your Honor, just one question.

12              THE COURT:  All right.

13                   RECROSS-EXAMINATION

14 BY MR. LEE:

15     Q.   Mr. Scodari, whatever your definition is of

16 development, what is the date on which you first made

17 Simponi; you first had it as a compound?

18     A.   I don't know.  The only thing I can tell you

19 is it was after 1997 when we started the project.

20              MR. LEE:  Nothing further, Your Honor.

21              MR. SAYLES:  I have nothing further of

22 this witness, Your Honor.

23              THE COURT:  You may step down.

24              THE WITNESS:  Thank you.

25              MR. SAYLES:  May he be excused, Your

1    Honor?

2                    THE COURT:  Any objection to excusing the

3    witness?

4                    MR. LEE:  None, Your Honor.

5                    THE COURT:  Okay.  You're -- you may be

6    excused.

7                    Who will be your next witness?

8                    MR. SAYLES:  May it please the Court.

9                    At this time, we would call Mr. William

10   Dempsey by deposition.  And this is the only one that

11   has to be read, and it's very short.

12                   THE COURT:  All right.

13                   MR. SAYLES:  And, Your Honor, may I read

14   the questions and the answers, since it is short, rather

15   than having a reader?

16                   THE COURT:  However you would like to do

17   it.

18                   MR. SAYLES:  All right.  We've agreed on

19   an introduction of William Dempsey, and it's as follows:

20                   Mr. Dempsey is a former business

21   executive for Abbott.  Mr. Dempsey worked for Abbott

22   from April of 1982 through August of 2007.

23                   In 2005, Mr. Dempsey was Senior Vice

24   President for Abbott's pharmaceutical operations and was

25   responsible for the U.S. pharmaceutical business.  He

1   was responsible for the commercial aspects of Humira.

2             Beginning in 2006 and until retired from

3   Abbott in 2007, Mr. Dempsey was the Executive Vice

4   President of the Global Pharmaceutical Products Group.

5             And I will read the questions and the

6   answers.  After Mr. Dempsey was duly sworn, with counsel

7   for both parties present, he testified as follows:

8             QUESTION:  I'll take you to the February

9   2006 timeframe.

10            Do you recall anyone from J&J or Centocor

11  telling you that Centocor had a recently allowed patent

12  that covered TNF-alpha antibodies?

13            ANSWER:  Yes.

14            QUESTION:  What do you recall about that

15  conversation?

16            ANSWER:  That particular meeting, John

17  Poulos and I had a meeting with Tom Heyman and Joe

18  Scodari to advance in negotiations we had going on with

19  a variety of issues, some of which, maybe all of which I

20  previously referenced.

21            The purpose of the meeting was to work

22  out a proposal to try and find a mutually acceptable --

23  acceptable resolution of the issues.

24            We got to the meeting, and this was at

25  the J&J, New Brunswick, if I remember correctly, and we

1  went up to the conference room, and Joe started out the

2  meeting by saying something along the lines of, gee, I

3  hate to blindside you, or I'm sorry I didn't give you a

4  heads-up or something like that, but we just had a TNF

5  patent allowed.  You may want to consider or evaluate

6  the context of what we're discussing here.

7             That's my recollection.

8             QUESTION:  Did Mr. Scodari say anything

9  else about the TNF patent?

10            ANSWER:  Not that I can recall

11  specifically, no.

12            QUESTION:  Do you recall him saying that

13  he thought that Abbott's Humira product infringed the

14  claims of the TNF patent?

15            ANSWER:  I don't recall that.

16            QUESTION:  Do you recall if he said

17  anything -- if you said anything to Mr. Scodari about

18  the issue?

19            ANSWER:  My recollection is, I said we'll

20  have to evaluate this and take a look at it.

21            QUESTION:  Do you recall anyone from J&J

22  or Centocor ever telling you that they viewed the TNF

23  patents as strong patents or as valuable technology?

24            ANSWER:  The way it was characterized to

25  me is, this is something that they thought was important

1  that we needed to consider.

2             QUESTION:  Did you disagree with that?

3             ANSWER:  I have no basis for making any

4  sort of judgment.  I wasn't familiar with it.

5             QUESTION:  Did you ever express to anyone

6  at Centocor and J&J that you disagreed with their

7  assessment?

8             ANSWER:  Yes.

9             QUESTION:  What did you tell them?

10            ANSWER:  I thought the patents weren't

11  very strong, and we weren't concerned about them.

12            QUESTION:  And who specifically did you

13  tell that to?

14            ANSWER:  Joe Scodari.

15            MR. SAYLES:  That concludes Mr. Dempsey.

16            THE COURT:  Who will be your next

17  witness?

18            MR. SAYLES:  At this time, our next item

19  of proof, Your Honor, would be to read to the jury

20  Abbott's response to Request to Admission No. 13.

21            And may I tell them or ask the Court to

22  tell them what a request for admission is?

23            THE COURT:  Well, a request for admission

24  is one party, such as, in this case, Centocor sent to

25  the Defendant, Abbott, and requested them to admit or

```
 1  deny certain facts.

 2              And if they admit certain facts, those

 3  are deemed conclusively proven.

 4              So you may go ahead.

 5              MR. SAYLES:  This is Request for

 6  Admission No. 13.

 7              Admit that on or about December 13th,

 8  2005, a representative of Johnson & Johnson and/or

 9  Centocor informed Abbott that a notice of allowance was

10  received from the United States Patent & Trademark

11  Office for the claims that issued as the '775 patent.

12              Response:  Admitted.

13              That concludes this portion of the

14  request for admissions, Your Honor.

15              THE COURT:  Okay.  Have you got a

16  witness?

17              MS. ELDERKIN:  May it please the Court.

18  The Plaintiffs call John Ghrayeb.

19              COURTROOM DEPUTY:  Raise your right hand,

20  please.

21              (Witness sworn)

22              MS. ELDERKIN:  Set to go?

23              THE WITNESS:  Yes.

24      JOHN GHRAYEB, Ph.D., PLAINTIFFS' WITNESS, SWORN

25                  DIRECT EXAMINATION
```

1  BY MS. ELDERKIN:

2      Q.   Would you please introduce yourself to the

3  jury.

4      A.   My name is John Ghrayeb.  I'll give you a

5  little --

6      Q.   Tell them a little bit about yourself.

7      A.   -- background about myself.  You may be

8  wondering about my accent.  I was born in Israel to a

9  Christian Arab family.

10         When I was 16 years old, I was offered a

11  scholarship to finish my high school in England, which I

12  did.  Then I went to Oxford University, got my first

13  Bachelor of Science degree in chemistry.

14         Then came to the United States, went to Kent

15  State University in Ohio and received my Ph.D. in

16  biochemistry.  That's where I met my wife, also.

17         Then I spent two years supported by a National

18  Institute of Health grant on a first doctoral training

19  where I learned many techniques in molecular biology.

20  And then I joined Centocor in 1984.

21      Q.   And are you still at Centocor?

22      A.   No, I'm not.

23      Q.   When did you retire?

24      A.   I retired in September of 2006, and I've, you

25  know, been sort of active in the field since then.

1      Q.   Okay.  What is your relationship to the patent

2  in this lawsuit?

3      A.   I am an inventor on this patent.

4      Q.   Okay.  So what kind of work did you do for

5  Centocor while you were employed there?

6      A.   When I was hired by Centocor, they were

7  looking for somebody with expertise in recombinant DNA

8  protein expression, and I spent my entire career working

9  on antibody engineering and antibody production and

10  different aspects of that technology.

11      Q.   How many different products did you work on

12  while you were at Centocor?

13      A.   I worked at many projects while I was at

14  Centocor, but I was -- I'm happy to say by that -- to

15  date, four of these products have been approved.  So I'm

16  sort of very happy to have made that achievement.

17      Q.   And when you say approved, you mean approved

18  by the Food & Drug Administration?

19      A.   That's correct.

20      Q.   So they --

21      A.   Or -- or -- or the European authorities.

22      Q.   So there are four different products that you

23  worked on that either are on the market now for patients

24  or shortly will be?

25      A.   Yes.  Yes.

1      Q.    Just briefly, since you said you worked in the

2   field of antibodies during your career, can you explain

3   to the jury, what is an antibody?

4      A.    Okay.  An antibody is a natural substance,

5   it's a protein, that your body produces to defend itself

6   against foreign invaders, if you like, in your body.

7   Every day while even you're sitting, you know, your skin

8   is exposed to halogens, to all kinds of things,

9   bacteria, and the body has this great system called the

10  immune system that is always looking for these things

11  that are not supposed to be there.

12          So among their defenses are these proteins

13  known as antibodies.  So if you were to get a vaccine,

14  you know, you -- they give you a version of that virus

15  or the protein that you might be exposed to, and your

16  body then makes antibodies against it.

17          And the beauty of it is, it remembers.  So the

18  next time you get that same infection, it quickly gets

19  rid of it.  And as was said earlier, you might not even

20  realize that you got the flu or whatever it was because

21  you had the immunity to it.

22     Q.    Did you work with us to prepare a slide to

23  help explain the structure of antibodies?

24     A.    Yes, I have.

25     Q.    Okay.

1              MS. ELDERKIN:  Can we put that up,

2  please?

3      Q.   (By Ms. Elderkin) And I think you have a laser

4  pointer there with you.

5              Could you explain for the jury what's depicted

6  on this slide, please?

7      A.   Okay.  These are two representations of what

8  an antibody may look like.  I have to say that, you

9  know, nobody's seen it inside the human, so these are

10  based on structural analysis.

11              The one on the right is a very complex version

12  of the antibody protein, but what it tells you is that

13  it's made up of those building blocks called amino acids

14  that you heard about earlier.

15              So to make it easier -- and by the way, that's

16  how all scientists represent antibodies when they do

17  publications.

18              We'll concentrate on this picture.  So you see

19  they've been color coded for clarity.

20              So each antibody has what's known as a light

21  chain.  You see here it's light, because it's small.

22  And it's also made up of a heavy chain, which is called

23  heavy because it's bigger.

24              What up here -- I think it's in purple --

25  represents what are known as the variable regions.  Now,

1  these compromise the part of the antibody that is

2  responsible for binding or latching on to whatever

3  target.  If it's a virus, whatever it is that it's

4  trying to find, that's the business end, if you like, of

5  the antibody.

6         It's not to say that the rest of this, which

7  is known as a heavy chain, is not important.  It has

8  many other functions to help the immune system get rid

9  of whatever is there.

10        So the important thing to remember is that the

11  variable regions are really what determines what the

12  antibody is.

13        The other parts are often known as constant

14  regions, because many antibodies have the same

15  so-called, as mentioned, heavy chain or constant

16  regions.

17        But every one of the millions of antibodies

18  that may be in your blood at this point, you know, will

19  have a different set of variable regions.  That's how

20  you can recognize so many different proteins.

21    Q.   Dr. Ghrayeb, you mentioned amino acid building

22  blocks.  Can you explain what you mean by that?

23    A.   Now, the power proteins made in your body -- I

24  mean, DNA, which is present in all of us, is the way

25  that the body can remember what type of proteins to

1  make.  So in that DNA, there is instructions on how to

2  make the proteins.

3         And the proteins, when you look at them, it

4  looks very complicated, but it's really very simple,

5  because it's all made of 20 different building blocks

6  known as amino acids.

7         The way they are put together, the way the DNA

8  instructs the cell to make the protein is simply how

9  these amino acids are put together, what order, and how

10 many of them are there.

11        So you have small proteins, large proteins.

12 But these are very important.  And it doesn't matter

13 what organism, whether it's mouse, human, rabbit, these

14 same building blocks are used.

15     Q.   So how does a mouse antibody differ from a

16 human antibody?

17     A.   The mouse antibody is based on DNA that is

18 found inside the mouse.

19        The human antibody is based on DNA that may

20 have been obtained from a human.

21     Q.   But they're all made from the same 20 amino

22 acids.

23     A.   Absolutely, yes.

24     Q.   There's nothing different in a mouse antibody

25 than is different -- than is in a human antibody with

1   respect to the building blocks that they're made of.

2        A.   The chemical composition would be the same.

3        Q.   Now, before we get back into the technology,

4   let's go back to Centocor when you joined it in 1984.

5   What was the company like then?

6        A.   I mean, what attracted me to Centocor was --

7   compared to a larger company that I interviewed with,

8   was that it was small.  When I joined, there were about

9   a hundred people.

10            It was very focused on this technology, and

11   there was a lot of energy and excitement.  The main

12   drive is to get things into humans and -- as quickly as

13   possible.

14            So it was a very exciting time to, you know,

15   start a career at Centocor.

16       Q.   Now, there was some previous testimony -- I

17   don't think you were in the courtroom -- about a drug

18   that Centocor was developing called Cyntoxin.  What was

19   Cyntoxin?

20       A.   Cyntoxin was a human IgM antibody.

21   If -- as I mentioned on this slide, these constant

22   regions come in different varieties.  So there is one

23   variety called IgM.  This antibody was developed to

24   treat a very complex disease called septic shock.

25   Now, the cause of sepsis shock is usually a bacterial

1 infection in the blood.  These are the worst kind of

2 infections that you can get.  And it's often -- in a

3 large percentage, it could lead to death, because you

4 get organ failure and so on.

5          So this drug was developed to try and fight

6 this disease.

7     Q.   Okay.  And by what date did Centocor have

8 Cyntoxin, the human antibody for sepsis?

9     A.   I want to say before 1990.  It was in the

10 '80s.

11     Q.   Okay.  Why didn't Centocor take Cyntoxin to

12 market?

13     A.   This is the -- what people don't usually

14 appreciate about developing products, is you can invent

15 a new product; you can find it; you spend all this time

16 putting in the clinic; but until you treat human

17 patients with it, you won't know how good it's going to

18 be.

19          So with Cyntoxin, what the company did is, it

20 took it into clinical trials, and we did do one

21 reasonably large but not very large clinical trial where

22 the results were very promising.

23          So we went to the FDA and asked for approval.

24 The FDA, upon looking at the data, said, you know, it

25 looks really promising, but we would like you to do

1  another larger trial.

2        So we did that.  Unfortunately, we could not

3  replicate the results.

4        And this is a very common feature of

5  development.  I mean, you can go so far, and then at the

6  end, you may not be able to get approval, because that's

7  how it is.

8        Q.   Did Cyntoxin harm anybody?

9        A.   No.

10       Q.   Was it a bad antibody?

11       A.   No.

12       Q.   Was it a failure, as a scientific endeavor, to

13  develop a human antibody, to discover a human antibody?

14       A.   Absolutely not.  I think the -- it's really

15  the science that -- wasn't applied correctly to the

16  human.  In fact, there was a mouse antibody that was

17  being developed by a competitor of ours that also failed

18  in the clinic.

19       So it really was the target that -- or the

20  understanding of the disease.  Not the reagent, not the

21  drug that caused the antibody -- I wouldn't want to call

22  it failure -- not to be approved.

23       Q.   Right.  And Cyntoxin was not an antibody for

24  TNF, right?

25       A.   No, not at all.

1    Q.   And to this day, years later, has anybody been

2    able to develop an antibody to treat sepsis?

3    A.   Not to my knowledge.

4    Q.   So what was your work at Centocor towards

5    developing antibody therapeutics or antibody drugs?

6    A.   Right.  Our mission -- and, you know, the

7    management was very clear.  The company started in the

8    field to develop antibodies.  Our mission is to try and

9    make antibodies that would be suitable for use in humans

10   as quickly as we can.

11        So we -- we use any available, you know,

12   technology that's available to take antibodies, like

13   mouse antibodies or whatever antibodies were available,

14   and make them suitable so we can use them in humans.

15   Q.   Okay.  And did you sometimes start your

16   projects with mouse antibodies?

17   A.   Yes, we did.

18   Q.   And what did you do with the mouse antibodies?

19   A.   So the -- with the mouse antibody, we used

20   what are called recombinant DNA techniques, and you got

21   an introduction to it this morning.

22        Basically, what you do is, you know, you look

23   at the mouse antibody.  We already knew at the time that

24   giving that to a human multiple times may not cause

25   harm, but it makes the immune system look at this as a

1  foreign protein and then try and get rid of it.  So the

2  drug won't be any use after a few doses.

3         So the -- what we tried to do is make the

4  antibody, you know, as human as possible.  And in that

5  figure again that's still on the screen, what you can do

6  is substantially change a large part of this protein to

7  make it human.

8         So, in essence, what you do is you go and

9  find, using the recombinant techniques, you find those

10  parts of the antibody that, as I said, are called the

11  business end.

12         And then what you do is you cut and paste, you

13  know, just to describe something you're all familiar

14  with.  You take these pieces that came from the mouse

15  DNA, and then you splice it to pieces of DNA that came

16  from a human.

17         So you've now formed something that is much

18  more acceptable when you inject it into a human being.

19     Q.   And do those techniques of being able to cut

20  and splice different pieces of DNA, do they apply

21  whether it's mouse DNA and human DNA or DNA from any

22  other sources, including two sources of human DNA?

23   You know -- right.  The technique of splicing DNA is,

24  you know, just taking one DNA from one source and then

25  attaching it to DNA of another source.  It doesn't

1  matter, you know, which -- what species they came from.

2      Q.    And is there a name for an antibody like this

3  where you have DNA that's partly from one source and DNA

4  partly from another source?

5      A.    Yes.  That antibody is called a chimeric

6  antibody.

7      Q.    And, Dr. Ghrayeb, in the notebook in front of

8  you, there's a copy of Plaintiff's Exhibit 1.  That's

9  also in the juror notebooks.  That's the '775

10  patent-in-suit.

11      A.    Yes.

12      Q.    And you are an inventor on this, correct?

13      A.    Yes.

14      Q.    Okay.  And would you tell us, please --

15          MS. ELDERKIN:  And we'll ask

16  Mr. Ficocello to highlight the title of the patent.

17      Q.    (By Ms. Elderkin) What is the title of your

18  patent, please.

19      A.    The title of the patent is recombinant

20  A2-specific TNF-alpha-specific antibodies.

21      Q.    Okay.

22          MS. ELDERKIN:  Then if we can highlight

23  the inventors on the front page, please.

24      Q.    (By Ms. Elderkin) And could you tell the jury,

25  please, who are the other people who are listed as

1  inventors with you on this patent?

2      A.   They're Junming Le known to his friends as

3  Jimmy Le, Jan Vilcek -- they're both from New York

4  University -- Peter Dadonna, of course, myself, David

5  Knight, and Scott Siegel.  They're all -- were at

6  Centocor at the time.

7      Q.   Okay.  Perhaps the jury might be curious about

8  the order of the names on that patent.

9          Is there any rhyme or reason to why they're

10  listed in this order?

11      A.   No.  They're listed by institution first, so

12  the NYU was listed first, and then it was alphabetical,

13  and then the Centocor inventors were listed in

14  alphabetical order.

15      Q.   There's somebody else who's not listed here,

16  who I think the jury may hear from -- about later in the

17  trial, Han Trinh.  Who is Han Trinh?

18      A.   Han was a technician that worked in the lab

19  that I was responsible for, and her job was to follow

20  instructions given to her by supervisors to work on, you

21  know, different projects, different recombinant DNA

22  cloning projects as directed by her supervisor.

23      Q.   Did she have a Ph.D. degree?

24      A.   No, she did not.

25      Q.   Okay.  Now, David Knight is listed as one of

1  the inventors.  What was David Knight's role in this

2  invention?

3       A.   David Knight reported to me, and Dave Knight

4  and I worked on the strategy on the invention of -- of

5  this product by, you know, designing the way we were

6  going to make the final product.

7       Q.   And did he take direction from you with

8  respect to what projects he would work on?

9       A.   Yes, he did.

10      Q.   And during the time period in the early '90s,

11 say up until February of 1994, did you ever direct

12 Mr. Knight to work on a project to make a human

13 antibody --

14      A.   No.

15      Q.   -- in the lab?

16      A.   No.

17      Q.   Why is that?

18      A.   Based on our experience -- two years before we

19 started working on this, we had made other chimeric

20 antibodies.  One of them we actually gave to patients.

21 Now, the background is that the mouse version of this

22 antibody was given to patients, and just as predicted --

23 these were cancer patients -- just as predicted, after

24 multiple doses, the antibody wasn't effective.

25           So we made a mouse/human chimeric version of

1  it, and it was given to patients.  And the -- there was

2  no immune response measured in the trial.

3          In other words, the antibody given to the

4  patient even multiple times behaved as you would expect

5  it to.  It didn't get removed by the immune system, and

6  it really, to us, said that this was sufficient to make

7  that change.

8          The body has been -- whatever you want to

9  call it -- adaptive enough to think -- to see that the

10  major part of the protein is human, and it accepted it

11  and -- without clearing it from the circulation or

12  treating it as, you know, some foreign protein.

13      Q.   So your prior work had shown that chimeric

14  antibodies could work very well as drugs for long-term

15  treatments?

16      A.   Correct.

17      Q.   Now, was there a particular project that led

18  to the work that's described in your patent?

19      A.   Right.

20      Q.   What was that work?  What was the project?

21      A.   Right.  Now, tumor necrosis factor, which is

22  the target for the antibody, you know, has been reported

23  to be important in a variety of diseases, infectious

24  diseases, inflammatory diseases.

25          And we were very interested in looking for the

1 right type of antibody, the right type of product that

2 we can use to treat those different diseases.  So that

3 was the impetus is, you know, we needed to find a drug

4 to treat those diseases.

5      Q.   Okay.  And I take it you worked with New York

6 University on this project?

7      A.   That's right.  We had fine experience working

8 with Dr. Le and Dr. Vilcek on other projects where they

9 have -- they made mouse antibodies.  And they also --

10 Dr. Vilcek is very well known -- both of them are known

11 in the whole cytokine field.

12           So we went and asked them to make an antibody

13 for us that would bind to TNF.

14           It's important to note that, you know, we were

15 a very small group, and, you know, we often collaborated

16 with the outside in order to get to where we went --

17 where we wanted to get, you know, as quickly as

18 possible.

19      Q.   So did you follow what Dr. Le and Dr. Vilcek

20 were doing on the project?

21      A.   Yes.

22      Q.   Okay.  What was their role in the project,

23 this TNF project?

24      A.   Right.  So what Dr. Le and Dr. Vilcek, what

25 they did is they took the human TNF, injected it into

1  mice.  So, obviously, the mice see this human TNF as a

2  foreign protein, and they make antibodies to it.

3          The project was made, you know, more

4  challenging because TNF is harmful, as you've heard, and

5  even to mice, if you give human TNF, I mean, they can

6  get sick.  They can also die if you give too much.

7  So it took, you know, some skill to make the antibody

8  and, you know, not harm the mice at the same time.

9  So once the mice started making antibodies to TNF, using

10  a variety of techniques, they were able to take those

11  cells inside the mouse that are like the factories

12  making antibodies, and then take them -- strip them out

13  of the mouse and allow them to be -- stay alive in a

14  test tube in the lab.

15          Now, these cells now are producing many, many

16  different antibodies, because in your blood, you are

17  making millions of antibodies.  The task then is to find

18  that needle in the haystack and get those cells that are

19  producing the antibody that you want.

20          So they succeeded.  They found different

21  antibodies that bound to TNF and then chose what they

22  perceived to be, you know, the best one.

23      Q.    And what was the best one?

24      A.    The best one they designated as A2.  And

25  that -- that -- that one, and I think we looked at

1    others, were sent down to Centocor for us to evaluate

2    further in many different assays to confirm that, you

3    know, what we really wanted.

4        Q.    And once Dr. Vilcek and Dr. Le at NYU isolated

5    A2, did they have any further role in the project?

6        A.    I would say after that, the development,

7    making the antibody more suitable for human use, was all

8    done exclusively at Centocor.

9        Q.    All right.

10       A.    Now, we kept in touch, but they did not

11   contribute themselves.

12       Q.    Okay.  And could you explain again to the

13   jury, how did you make the A2 antibody more suitable for

14   human use in long-term treatment?

15       A.    So what we did is, we took those cells that

16   were sent to us by Dr. Vilcek, and then we isolated, we

17   took the DNA out of these cells.  And then for the same

18   reason there is -- the DNA can make millions, thousands

19   of proteins.  We have to find the one that is

20   responsible for making the antibody we want.

21            So we use a variety of techniques, and we

22   isolated that part of the DNA -- that part of the DNA

23   from the A2 cell line that's responsible for the

24   binding, the variable region of the light chain and the

25   heavy chain as I showed you earlier.

1            Once we identified those, we used more

2  recombinant DNA techniques to attach those variable

3  regions to human constant regions to make -- and then we

4  put those DNA back into another cell.

5            And the cell now use that new book, if you

6  like, to make an antibody based on that new piece of DNA

7  that we combined and it started making the cA2, which

8  was the antibody that became, eventually, our drug.

9        Q.   So in summarizing that, is it correct to say

10  that you took DNA from a mouse, the instruction booklet

11  part of the mouse and part of the instruction booklet

12  from the human DNA, and you made a new instruction

13  booklet combining those two pieces of DNA, put that DNA

14  in a cell, and that cell then started as a factory to

15  make the new cA2 antibody?

16        A.   I couldn't have said it better.

17        Q.   Ah, I got it from you, Doctor.

18            Now, there's been some -- there's been some

19  testimony or statements about mouse parts in chimeric

20  antibodies.  Would you explain to the jury, is it really

21  a mouse part in the chimeric antibody?

22        A.   I think the -- the key part of the antibody is

23  the part that it binds to.  And I think we have to keep

24  remembering that that's the real invention, is finding

25  the antibody that, you know, is -- binds to that TNF in

1 such a way it never lets it go, and it stops it from

2 working.

3          Now, that -- that binding side, that variable

4 region, could come from any source.  It happens that

5 we -- we made that from a mouse DNA source.

6      Q.   Okay.  But if we used the term -- if somebody

7 were to use the term mouse part, it's only because the

8 amino acid building blocks are arranged in a way that

9 the mouse DNA says to arrange it, not because there's

10 anything other than --

11     A.   Oh, no, no.  That is not the -- no.

12     Q.   I'm sorry.  Don't let me put words in your

13 mouth here.

14     A.   Sorry.  No.  There's no part of the mouse in

15 the antibody.

16     Q.   Okay.  And we -- and there's also been

17 reference to a fully human antibody.  Is there such a

18 thing as a recombinant fully human antibody?

19     A.   You know, again, my opinion is -- you know,

20 what's a fully human antibody?  A fully human antibody

21 is -- one, if I took your blood right now, and I took

22 some of it out, to me, that's a fully human antibody.

23 If you have to manipulate, you know, the antibody that

24 you make, even though originally it came from a human

25 source, from DNA.

1          You have to spend some time, years maybe, you

2    know, manipulating it because it wasn't as good as you

3    want.  To me, that no longer is a fully human antibody,

4    and that's my opinion.

5          Q.    So the recombinant human antibodies that we're

6    talking about in this lawsuit are made from different

7    pieces of human DNA, correct?

8          A.    Yes.

9          Q.    But the recombinant human DNAs we're talking

10   about in this lawsuit don't appear in nature in

11   anybody's body, right?

12         A.    The original source of the DNA may have come

13   from a volunteer's blood, but the -- in many cases, the

14   researchers have to then manipulate it.  They have to

15   mutate it to make it what they want it.

16         So now they change some of those building

17   blocks in the -- in the sequence.  And, you know, to me,

18   how can you say it's fully human?  I mean, you have

19   engineered something artificially into those sequences.

20   It will still be a great drug, but I don't see it as

21   fully human.

22         Q.    Okay.  How did cA2, the chimeric antibody that

23   you made, compare to A2, the mouse antibody from NYU, in

24   terms of how it bound to TNF?

25         A.    It was identical.

1    Q.   Okay.  Let's go back and look at your patent,

2  if we could.

3         What role did you play in writing this patent?

4  It's a pretty long document.

5    A.   Right.  The way, you know, these documents are

6  put together is -- obviously, the inventors or

7  scientists know all the work that went into making the

8  invention.

9         So it's up to us, all the people on the

10  invention, to put together in writing in great detail

11  their part in that invention.

12        So what we -- what we did is, we all

13  collaborated to write what eventually became a

14  manuscript and was published as our description in great

15  detail of how we made the cA2.

16        Then this was given to the lawyers, and then,

17  you know, the lawyers put it together in the right

18  format and figured out what needs to be done and then

19  filed it with the Patent Office.

20    Q.   Did you review and sign off on this, though,

21  before it was filed in the Patent Office?

22    A.   Yes, I did.

23    Q.   Okay.  Do you have other patents in addition

24  to this '775 patent-in-suit?

25    A.   I think the last time -- I may have about 60

1  different patents on various subjects.

2      Q.   So in your patents, generally, is it unusual

3  that your patent covers an invention that's broader than

4  what you actually did in laboratory experiments?

5              MR. LEE:  I object, Your Honor.  What

6  these other patents have -- what these other patents --

7              THE COURT:  Overruled.  I'm going to

8  allow it.

9              MR. LEE:  Okay.

10     Q.   (By Ms. Elderkin) Would you like the question

11 again, Dr. Ghrayeb?

12     A.   Yes.

13     Q.   In your experience with your other patents, is

14 it common or uncommon that the patent may actually claim

15 or cover something that's broader than what you actually

16 did in the lab, the experiments that you actually did?

17     A.   Yeah, that's correct.

18     Q.   And do you know why that's the case?

19     A.   It -- I think what was -- when you first make

20 the discovery, as the time goes by, you make more

21 discoveries.

22          And then as a scientist, you don't always see

23 all the value of what you -- I mean, we can -- some of

24 us tend to be humble, and then, you know, with the

25 advice of others and good patent attorneys, we can also

1  understand that, you know, what we have is much broader

2  than what we even had dreamt of.

3         But I do believe that the invention that we

4  made, the key part of it is, you know, we discovered the

5  drug that was extremely effective and, you know, can be

6  applied to any sort of -- any drug that would, you know,

7  target the same TNF.

8      Q.   Okay.  Now, on the first page of your patent

9  here, there's a section that says related U.S.

10 application data.

11         MS. ELDERKIN:  And you might need to pull

12 up the page to get the whole section in there, if you

13 would, Mr. Ficocello.

14         If you could highlight that, please, or

15 enlarge it.

16     Q.   (By Ms. Elderkin) Do you have an understanding

17 of what this is, this related U.S. application date, Dr.

18 Ghrayeb?

19     A.   Yes.  This goes through all the applications

20 that were filed from the first date to, you know, the

21 current date and all the individual applications that

22 were sent to the Patent Office to amplify, to, you know,

23 increase the information about the invention.

24     Q.   Okay.  And are these all related in some way?

25     A.   Yes, they are.

1        Q.    How are they related?

2        A.    Well, they're all continuations on, you know,

3   other patents with more information to make it, you

4   know, current and then to expand, you know, the scope

5   of, you know, the information that was provided.

6        Q.    Okay.  And why?  Why did you do that?  Why did

7   you file so many applications?

8        A.    I think it was important to -- as more

9   information was -- was -- became available on the

10  invention, that you disclose it.  And as more techniques

11  became available for other people to use to make the

12  invention, that you make sure that it's disclosed to the

13  Patent Office.

14       Q.    How many patents have issued on this series of

15  patent applications, in addition to the patent-in-suit?

16       A.    I think there are about six.

17       Q.    Six?  Okay.

18             And in your personal experience with your

19  other patents or patents that you've overseen as a

20  research director at Centocor, how unusual is it to have

21  a series of applications that might span over 10 or more

22  years like this, a series of related applications?

23       A.    It's not unusual.

24       Q.    And it's not -- why is it not unusual?

25       A.    Because it -- you know, the whole process of

1 providing all the necessary information and then keeping

2 it updated and, you know, working with the Examiner of

3 the Patent Office, that -- that's a long process, and

4 it's not unusual for it to take that long.

5         MS. ELDERKIN:  Your Honor, before we get

6 into the meat of the patent, would this be a good time

7 to break?

8         THE COURT:  Sounds good to me.  You can

9 talk me into about a minute-early lunch.

10         Ladies and Gentlemen, if you recall, I

11 told you earlier this morning we were going to break

12 now, and I want you to be ready to come back in the jury

13 room at 1:30, 1:30.

14         And keep in mind my instruction about not

15 discussing the matter.

16         You may leave the courtroom.

17         COURT SECURITY OFFICER:  All rise for the

18 jury.

19         (Jury out.)

20         THE COURT:  You can step down.

21 Everyone step down.

22         I've got a sentencing matter to take up

23 at 1:00 o'clock, so you might fold everything up.  You

24 don't have to remove it from the courtroom, but, you

25 know, just sort of stack it, because we're going to take

1  up a matter at -- a criminal sentencing at 1:00 o'clock,

2  and hopefully, I'll be through by 1:30.

3              Got anybody in the audience that needs

4  to -- that's sensitive to matters, you might not even

5  want to stay to hear what this criminal -- this thing is

6  about.  It might be disturbing, shall I say.

7              I'll see you back here, though, to start

8  this matter, hopefully, at 1:30.

9              COURT SECURITY OFFICER:  All rise.

10             (Recess.)

11       *      *      *      *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATION

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10

11   /s/_____                _____

     SUSAN SIMMONS, CSR                        Date
12   Official Court Reporter
     State of Texas No.:  267
13   Expiration Date:  12/31/10

14

15

16   /s/_____                      _____

     JUDITH WERLINGER, CSR                      Date
17   Deputy Official Court Reporter
     State of Texas No.:  731
18   Expiration Date  12/31/10

19

20

21

22

23

24

25