```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
 2                  MARSHALL DIVISION

 3  CENTOCOR, ET AL          *   Civil Docket No.
                             *   2:07-CV-139
 4  VS.                      *   Marshall, Texas
                             *
 5                           *   June 22, 2009
     ABBOT LABORATORIES      *   1:35 P.M.
 6

 7         TRANSCRIPT OF TRIAL PROCEEDINGS
       BEFORE THE HONORABLE JUDGE T. JOHN WARD
 8           UNITED STATES DISTRICT JUDGE
                   AND A JURY
 9

10  APPEARANCES:

11  FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                           MS. BARBARA MULLIN
12                         MR. STEVEN MASLOWSKI
                           MS. ANGELA VERRECCHIO
13                         MR. MATTHEW PEARSON
                           Woodcock Washburn
14                         2929 Arch Street, 12th Floor
                           Cira Centre
15                         Philadelphia, PA   19104

16                         MR. RICHARD SAYLES
                           MR. MARK STRACHAN
17                         Sayles Werbner
                           1201 Elm Street
18                         4400 Renaissance Tower
                           Dallas, TX   75270
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDITH WERLINGER, CSR
22                         Official Court Reporters
                           100 East Houston, Suite 125
23                         Marshall, TX   75670
                           903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

1

2 <u>APPEARANCES CONTINUED</u>:

3

4 FOR THE DEFENDANTS:    MR. WILLIAM LEE
                        MS. AMY WIGMORE
5                       MR. WILLIAM MCELWAIN
                        Wilmer Cutler Pickering Hale
6                            and Dorr
                        1875 Pennsylvania Avenue, N.W.
7                       Washington, DC   20006

8
                        MR. DAVID BECK
9                       Beck Redden & Secrest
                        One Houston Center
10                      1221 McKinney Street
                        Suite 4500
11                      Houston, TX   77010

12
                *      *      *      *      *      *
13

14
                    P R O C E E D I N G S
15

16              COURT SECURITY OFFICER:  All rise.

17              THE COURT:  Please be seated.

18              Let's continue, Counsel.

19              MS. ELDERKIN:  Thank you, Your Honor.

20      <u>JOHN GHRAYEB, PLAINTIFFS' WITNESS, SWORN</u>

21          <u>DIRECT EXAMINATION (CONTINUED)</u>

22 <u>BY MS. ELDERKIN</u>:

23      Q.   Dr. Ghrayeb, before the lunch break, we were

24 talking about your patent, which is in the jury

25 notebook.  It's a rather lengthy document.

1          I wonder if you could just generally go

2   through the patent and tell the jury what the different

3   parts of a patent are in there.

4      A.   As you go through the patent, it starts by

5   putting name of the inventors and history of the patent.

6   Then it starts publications that may be relevant.

7          Then what you see are these figures here which

8   represent all the actual data that was generated by the

9   scientists in the lab.  And throughout the patent, they

10  will refer to these -- these figures.

11         Then when you get past that, you get to the

12  background of the invention.  And I'm not sure I can do

13  it as well as His Honor did, but the summary of the

14  invention, which tells you in general how -- what we're

15  claiming what this patent is about.

16         Then it goes through a -- you see starting in

17  the Columns 7 and 8, descriptions of those figures.

18  And then after that, they start talking about a detailed

19  description of the invention.  And this goes into great

20  detail on how we performed the work to create the

21  invention, and also, you know, gives information to

22  anybody who has skills in this field that work in labs

23  to be able to follow these instructions and be able to

24  reproduce exactly what we did.

25         And then you start on -- later on about giving

1  examples, detailed examples of what we did.  And then it

2  also later on talks about -- you know, includes what

3  other methods you can use to, you know, make the same

4  type of antibody.  Talks about how the product worked in

5  the clinic.  It gives a description of that.

6       So all these examples are meant to describe,

7  in great detail, what this invention is, what it's

8  capable of doing so that anybody who can read this, it's

9  almost like to be able to, you know, follow this and,

10 you know, be able to reproduce it.

11    Q.   Dr. Ghrayeb, let's look at some of the parts

12 of the patent in a little bit more detail now.

13      Can I refer you to Column 5; that's the column

14 that has a 5 at the top, under the heading, Summary of

15 the Invention, from about Lines 45 to 59.

16      MS. ELDERKIN:  Yeah, if you could blow up

17 49 to 59, Mr. Ficocello, and then particularly the third

18 paragraph there.

19    Q.   (By Ms. Elderkin) Can you tell the jury what

20 that third paragraph says?  Paraphrase it; obviously not

21 to read it.  Just tell them what that says.

22    A.   Sure.

23      What it says is that these anti-TNF

24 antibodies, the antibodies to TNF, includes many

25 monoclonal antibody that could be part rodent, part

1  human.  It can be fully rodent, like in a mouse; could

2  be human antibodies or any pieces of that antibody.

3  The key thing is it has at least one part of it that

4  binds, which is the variable region, which binds to TNF.

5      Q.   So is this part of your summary of the

6  invention saying that the antibodies could include

7  chimeric antibodies, rodent antibodies, and human

8  antibodies?

9      A.   That's correct.

10     Q.   And do you know when the reference here to

11 human antibodies was added to your applications in that

12 series of applications we talked about before lunch?

13     A.   I believe that was in -- sometime in '93, this

14 was included.

15     Q.   Let's look at -- if we could, look at the

16 first page of your patent.

17     A.   Yes.

18     Q.   Again, where it says the references or the

19 related family.

20     A.   Yes.

21     Q.   And you can see that there are --

22          MS. ELDERKIN:  If you could page down,

23 Mr. Ficocello, and highlight the related U.S.

24 applications.

25     Q.   (By Ms. Elderkin) You see, there was an

1   application filed in February of 1993, and then there's

2   also one filed in February of 1994?

3       A.   Right.

4       Q.   And do you remember when the reference to

5   rodent -- to human antibodies was added?

6       A.   I believe it's in 1993.

7       Q.   Would you look at your patent -- is there a

8   chance that it could be February of 1994, Dr. Ghrayeb?

9       A.   You know, there's so many patents that -- you

10  know, if I had that recollection, it could be, yes.

11      Q.   Okay.

12              MS. ELDERKIN:   I'll ask for somebody to

13  get the 1994 application out so we can show Dr. Ghrayeb,

14  please.

15      Q.   (By Ms. Elderkin) While we're doing that,

16  would you look at Figures 16A and 16B, please.

17              What do all those letters mean in that figure,

18  16A and 16B?

19      A.   These are the -- a sequence of the building

20  blocks for the light chain variable region and the heavy

21  chain variable region, which I showed you on the figure

22  earlier.

23      Q.   Okay.  And what does that mean?

24      A.   What -- what it means is we've identified in

25  great detail what the building blocks, the sequence of

1 the A2 -- cA2 antibody that is responsible for binding

2 to TNF.

3     Q.   And why is this of use to anybody?

4     A.   I think this is -- this is the ultimate way

5 you can -- if you wanted to replicate, you know, the

6 invention, you can see how close you can get to the --

7 you know, the actual invention.

8          It's really important for people, you know,

9 trying to replicate it to know exactly what the sequence

10 is.

11     Q.   Okay.  And was the sequence for the variable

12 region of cA2, how did that compare to the sequence for

13 the variable region of A2, the mouse antibody?

14     A.   It's identical.

15     Q.   Okay.  If we could look further on in your

16 patent to Column 16, the column that has the No. 16 on

17 top.  And going back a third of the way down Column 16

18 there's a heading, Recombinant Expression of Anti-TNF

19 Antibodies.

20          Can you explain for the jury, please, what's

21 described in this section under that heading starting at

22 Column 16?

23     A.   This describes how the -- you could produce an

24 express in the lab, an antibody, to -- that would bind

25 to TNF-alpha.  So -- I mean, it goes through, you know,

1  a lot of details about how you would obtain the DNA.

2       I mentioned earlier that you went into

3  the cell, how you obtain the DNA, what you do to

4  characterize it, and then, you know, how would -- you

5  would link it, then, with a human constant region to

6  make a full antibody.

7       And it talks about, you know, different

8  methods that you could use for that purpose.

9  Q.   So is it fair to characterize the discussion

10 starting at Column 16 in this section as disclosing

11 different ways of making antibodies according to the

12 invention?

13 A.   That's correct.

14 Q.   Okay.  Let's look at Column 18, please.  And

15 we're going to look at the paragraph that starts at

16 Line 29 and goes to the bottom of that page.

17      What is disclosed in this paragraph,

18 Dr. Ghrayeb?

19 A.   This talks about an alternate way to do the

20 cloning.  In other words, through the recombinant DNA to

21 find the antibody variable regions.  It talks about

22 getting the genes from the cells, making libraries,

23 screening libraries, different ways to do that.

24 Q.   And in simpler terms, is it fair to

25 characterize this as disclosing how to get the DNA

1   instruction booklet for the variable region of the

2   antibody?

3        A.   That's right.

4        Q.   Okay.

5             MS. ELDERKIN:  If we could blow up the

6   section that's at Column 19 -- at Column 18, Lines 48 to

7   53, please.

8        Q.   (By Ms. Elderkin) And what did you disclose

9   here?

10       A.   Here, we disclose yet another method that

11  people could use to achieve what we achieved, and that

12  is using what's known as phage display.  It's another

13  method that you can use to take the genes out of the

14  cells and then use that technique to then try to

15  identify which one of these is responsible, can be

16  identified as binding to a target like TNF.

17       Q.   Okay.  Now, one of the articles that's cited

18  here at Lines 52 to 53 is an article, Marks et al, and

19  it says October 1993.

20            Does that date refresh your recollection as to

21  when this was added to your patent application?  Was it

22  February '93 or February '94?

23       A.   Yes.  This was in February of 1994.

24       Q.   Okay.  Now, do you remember the Marks article

25  that you've cited here that we just highlighted?

1      A.   Yes.   I was following the field, you know, the
2  entire field, so I remember that paper.
3      Q.   Okay.   Could you please look at Defendants'
4  Exhibit 381?
5           Is this the Marks 1993 article that you cite
6  in your patent?
7      A.   Yes.
8      Q.   Okay.   What did this Marks 1993 article
9  disclose?
10     A.   What this paper describes is making -- using
11  phage library to make -- to identify antibodies that
12  bind to red blood cells.
13          So a library is made from DNA from human
14  source, and then this library is screened to look for
15  antibodies that are bound to, you know, those particular
16  cells.   And then the antibodies were characterized in
17  the paper.
18     Q.   A little bit more generally, what, if
19  anything, does this article disclose about whether or
20  not phage display technology could be used to create
21  human antibodies?
22     A.   Right.   In the introduction of the paper,
23  Dr. Marks and the others disclose that antibodies to --
24  human antibodies to self and non-self antigens have been
25  obtained, you know, in the past.

1            Now, what that means is that you can use these

2    libraries to look for antibodies that self means that

3    the -- your body normally thinks as one of their own,

4    not just foreign proteins.  So something like human TNF

5    would be considered as one of those targets where you

6    can find antibodies using this technique.

7        Q.   Now, the human variable region that is talked

8    here in the Marks article, that's not the whole

9    antibody, right?

10       A.   No, it's not.

11       Q.   So how does this relate, then, to making human

12   antibodies, full antibodies?

13       A.   This phage display cannot be used to make --

14   you know, find -- make full human antibodies.  You would

15   have to take that variable regions that you find in that

16   library and use the techniques that we did to then cut

17   and paste it to a human constant region to make, then,

18   an antibody that's complete, that will have a human

19   variable region and then a human constant region.

20       Q.   Now, in the -- on the first page of the

21   article, the first sentence of the second paragraph,

22   there's a sentence we're going to highlight.  It says:

23   Phage display has been used to produce human antibody

24   fragments against self and non-self antigens without

25   deliberate immunization.

1          Do you know what a reference to self and

2    non-self antigens means here?

3        A.   Yes.   A self-antigen -- and this is talking

4    about a particular species.   Let's take human.

5          So a self-antigen would be a protein that you

6    make yourself in your body.   And then when we give it to

7    you, you recognize it as self, and, therefore, don't

8    consider it to be foreign.

9          Non-self would mean if I gave you a --

10   injected you with a mouse antibody, that would be, you

11   know, a foreign protein.

12         So that's the self and non-self.

13       Q.   Okay.   How at all does that relate to TNF

14   antibodies?

15       A.   Well, what -- what that means is that using

16   this technique, you can make antibodies to proteins that

17   your body considers your own, self-proteins.   Like tumor

18   necrosis factor is a protein that you make normally.

19   So this technique has been shown to produce antibodies

20   against those proteins, even though, you know, they are

21   considered to be, you know, human proteins that you

22   normally wouldn't consider as foreign.

23       Q.   Let's go back to Column 18 of your patent,

24   please.

25              MS. ELDERKIN:   And if we can highlight

1 Line 60, 6-0, and a few sentences around it.

2     Q. (By Ms. Elderkin) At Line 60, there's a

3 reference to a human anti-TNF variable region.

4     Do you know when that language was added to

5 your patent application?

6     A. I believe it's '94.

7     Q. Okay. And what does that reference mean,

8 referring to human anti-TNF variable region there?

9     A. As I explained earlier, the business end of

10 the antibody is the variable region that's responsible

11 for the binding, and that is really the important part.

12 So this can be obtained from a human source, from human

13 DNA. It can be obtained from a mouse DNA. And it would

14 do the same -- the same final thing that an antibody

15 would do is bind to TNF. So it doesn't matter where it

16 came from, whether it's from human source.

17     If it has the right specificity, has the right

18 sequence, it will bind to the human TNF.

19     Q. Okay. Let's look at Columns 33 and 34 of your

20 patent, please, under the heading, Structural Analogs of

21 Anti-TNF Antibodies and Anti-TNF Peptides.

22     A. Yes.

23     Q. So what's described in this section of your

24 patent?

25     A. This describes a technique that you could use

1  to improve upon an antibody that you might have isolated

2  from some source, and you wanted to make it, you know,

3  bind to your target TNF, for example, much more tightly.

4  So you can use techniques to -- actually, it's almost

5  like having a microscope and being able to look at the

6  structure in three dimensions, and be able to look at

7  those building blocks where they are in the protein,

8  where they are in the target, and then what you can see

9  is how they're binding, how the antibody is binding to

10  the target.

11        Then using the computer modeling, you can then

12  change some of these building blocks to allow the

13  antibodies to bind even more strongly to the TNF or any

14  of the protein that you're interested in.

15    Q.    So if I were to get a human variable region

16  using the technology we just discussed that you cited in

17  Column 18, how would this disclosure at Columns 33 and

18  34 be relevant, if at all, to improving that -- the

19  binding of that variable region?

20    A.    Yeah.   That's -- I mean, the technique here is

21  used to accomplish what's known as affinity maturation,

22  which is, you know, to take an antibody and improve its

23  affinity, meaning its ability to bind.   So this is

24  one -- one technique described on how you could do that.

25    Q.    And does that have to do anything with the

1  amino acid building blocks in the variable region?

2      A.   Yes.

3      Q.   What does it have to do with that?

4      A.   What you are doing then is changing those

5  building blocks, the ones that, you know, naturally

6  occur in the DNA, and you actually can, you know, change

7  them, put amino acids that you think, or the computer

8  model helps you think would be better than the ones that

9  you had there originally.

10      Q.   Okay.

11           MS. ELDERKIN:   Could we look, please, at

12  Column 34, Lines 26 to 33?

13      Q.   (By Ms. Elderkin) What does this say about

14  affecting or not affecting the binding affinity, the

15  ability of the antibody to bind?

16      A.   Yeah.   So what this section is saying is using

17  the information that you obtain, you can then make

18  different what's known as analogs, or different versions

19  of your variable region, to substitute the building

20  blocks with different ones so that the -- the -- you

21  then increase the affinity or the ability of the

22  antibody to bind to TNF in this case.

23           So that's -- the whole point of this is to

24  change the way that the antibody interacts with TNF,

25  change those building blocks.  And the new ones you put

1 in allow the antibody to bind more tightly to TNF.

2     Q.   And --

3     A.   And that's the desirable thing.

4     Q.   And those techniques could be used with a

5 variable region, a human variable region, that you got

6 using phage display?

7     A.   There is no difference.

8     Q.   This section that we've been talking about in

9 Columns 33 to 34, when was that added to your patent

10 application?

11     A.   That was added in February '94.

12     Q.   Okay.  Let's move on to Column 36 of your

13 patent, please, Lines 3 through 12.

14         And what are you disclosing here in your

15 patent?

16     A.   What we're talking about is how, you know, we

17 actually can administer those -- those antibodies.  So

18 it talks about taking the antibodies and then injecting

19 them into a patient.  And then you can do it in

20 different ways.

21         I mean, you can give it -- I can't give it to

22 you as a pill, because, you know, your stomach would

23 destroy protein.  That's what it's supposed to do.  But

24 what you can do is give it by intravenous injection,

25 which is -- you know, most of you know what intravenous

1  is.

2           You can also give it by subcutaneous, which

3  means, you know, under the skin.

4      Q.    Giving you a shot?

5      A.    In a shot.  And then intramuscular, which is

6  usually how you take vaccine.

7           So there's different ways.  So it would be in

8  a liquid form.  There's different ways you can give it.

9  You can give it by IV.  You can give it subcutaneously

10 or intramuscular.

11     Q.    And that's where the anti-TNF antibodies of

12 your invention can all be administered to patients in

13 these ways?

14     A.    Absolutely.  Absolutely.

15     Q.    Okay.  A little bit further down, could you

16 look at the bottom of Column 42?

17           It's an example -- it's Example Roman

18 Number I.  It continues over to the next column then.

19 And just tell us what that example is, that Example No.

20 I.

21     A.    This example describes how the original A2

22 antibody was produced by Dr. Le and Dr. Vilcek.

23     Q.    Okay.  And could you look at examples, Roman

24 Numeral III through Roman Numeral IX at Columns 44 to

25 48?

1           What are these?

2     A.    These describe in great detail the steps that

3 we took to find the mouse variable regions from the A2

4 antibody doing all the recombinant DNA and the cloning

5 that I described to you earlier to finally make the

6 antibody cA2, which has the variable region and then a

7 human constant region attached to it.

8     Q.    Okay.  Dr. Ghrayeb, we've heard an awful lot

9 of talk about human antibodies.

10          Did you provide an example in your patent of

11 making a human antibody, an actual example of the lab

12 work for making a human antibody?

13    A.    We did not describe -- the work that we did,

14 is that your question?

15    Q.    Is there an example in your patent, just like

16 Examples III to IX that we just looked at, you said were

17 the examples that showed how you made the chimeric

18 antibody.

19          Do you have examples in here about actually

20 making a human antibody?

21    A.    No.

22    Q.    Why not?

23    A.    Because we -- it was never our intention to

24 make a human antibody.

25    Q.    It was not your intention to make a human

1 antibody, but you said in the summary of your invention

2 that your invention included human antibodies.

3       A.    I think the important thing to understand is

4 that, you know, we were trying to make a very effective

5 antibody that would block the effects of TNF.  And we

6 were -- our objective was to try and get that in the

7 clinic as quickly as possible.  So we did not deem it

8 necessary to make a human antibody.

9             However, all the techniques that we described

10 can be used to make a construct using a human variable

11 region just as well as a mouse variable region.

12      Q.    I want to make sure the jury understands.  You

13 said it wasn't your intention to make a human antibody.

14            Are you referring to what you were doing in

15 the lab then?

16      A.    Yes.

17      Q.    Or are you saying that that was not part of

18 your invention?

19      A.    No, I'm not saying that.

20      Q.    So maybe you could explain that a little bit

21 better --

22      A.    I'm just saying --

23      Q.    -- because I think they may be left with the

24 impression that you don't intend.

25      A.    Right.

1           In the lab, you know, when we were starting to

2   develop the antibody, we were focused on getting a drug

3   on the market.  And we could have made it in different

4   ways.

5           We decided to make it as a mouse antibody

6   attached to a constant.  It doesn't mean we could not

7   have made a human antibody or, you know, didn't want to

8   make a human antibody.  It's just we decided that it was

9   sufficient to, based on our experience, to make a

10  chimeric antibody.

11          But anybody who's experienced would realize

12  that that variable region that we cloned from a mouse

13  could easily have been found in a human, so you could

14  make it.

15      Q.   Now, you did come to work on a project for

16  making a human TNF antibody at a later date, correct?

17      A.   Yes, correct.

18      Q.   And that's the product that was just

19  introduced, Simponi?

20      A.   Yes.

21      Q.   And you had something to do with bringing that

22  product to market, correct?

23      A.   Yes.

24      Q.   Now, I'm not sure if you were in the courtroom

25  when this was stated, if it was an argument or

1  testimony, but the work to discover the antibody for

2  Simponi began in 1997, right?

3       A.    That's about right.

4       Q.    Well, why did you wait until 1997 to start

5  that work?

6       A.    As I, you know, said earlier, we made

7  Remicade.  It was a very successful product.  We did

8  not -- I mean, as a scientist, I didn't feel the need to

9  do that.

10            Later on, there was, you know, a need to get

11  into sort of different ways to make antibodies.  So we

12  began to experiment with making -- we brought in a

13  technology that was able to make human antibodies.  And

14  one of those we tried to make was an antibody to TNF.

15       Q.    Did the fact that you didn't start a project

16  to make a human antibody until 1997 have anything to do

17  with the resources at the company at the time?

18       A.    Absolutely.

19       Q.    Could you explain that?

20       A.    Yeah.  I think what people don't always

21  appreciate is how long it takes to develop an antibody

22  after you invent it and how much money it costs.

23            So Centocor at the time had to make some

24  priorities.  A lot of new clinical trials using Remicade

25  were being sponsored, and the manufacturing was being

1 ramped up.  So the majority of the resources were going

2 into developing the product that's on the market.

3          And when you prioritize, just like you do your

4 budget at home, especially these days, you have to say I

5 can't afford to do that.

6          So the product was available.  I mean, we did

7 have Remicade.  A lot of resources were put on it, and

8 we were working on other projects that also, you know,

9 had to wait.

10     Q.    And I would like to clarify some terminology,

11 if we could, because a lot of people have been talking

12 about development of an antibody.

13          Do you distinguish between the discovery of an

14 antibody and the development of a commercial product?

15     A.    Absolutely.

16     Q.    And what is the difference?

17     A.    You know, the discovery of the antibody

18 involves, as I mentioned earlier, deciding, you know,

19 what disease you want to go after, what target you're

20 going to look for, and then actually physically making

21 the drug; in this case, an antibody.

22          So you can do all that discovery.  You can

23 have that drug available in your hand, but then the rest

24 of it, taking that drug, testing it for safety, spending

25 the money to build another factory to make it, doing all

1  these large clinical trials to get it to approval, that

2  is development.  That could take a really long time.

3  So as a scientist, you're always, you know, making these

4  discoveries, but you don't -- you can't always, you

5  know, push them into the clinic as fast as you would

6  like, because, again, the company has many other

7  priorities and you have a lot of time to wait in line

8  for resources to continue with a development.

9          So the discovery could be -- could take --

10  could be very quick.  The development, when it's

11  actually getting on the market, could be long, depending

12  when you start, how quickly you go, how much money

13  you're willing to spend, any issues you find along the

14  way that you have to solve.  So sometimes it takes a

15  long time.

16     Q.   Now, in the project to develop Simponi, once

17  you started that in 1997, about how long did it take

18  until you had actually discovered the antibody of

19  Simponi?

20     A.   I would say about a year or so.

21     Q.   So you had the antibody within a year after

22  you started the projects?

23     A.   I believe so.

24     Q.   And all the rest of that time, why did it take

25  so long to get it to market?

1    A.    I think in any company, you know, that's a

2  corporate business decision, to take a product into

3  the -- to spend the resources to take it into the

4  clinic.

5    Q.    And what was done during all those years

6  before it was brought -- what had to be done before it

7  could be brought to market?

8    A.    I think -- so once you get the go-ahead, you

9  know, you have to find out how to make it efficiently

10 and, of course, effectively.  You had to test it in

11 animals.  You had to work on it in the lab as well as in

12 different models to see that, you know, that's the

13 product you want.

14           And then you start very slowly, you know,

15 giving it to patients.  You know, small numbers first,

16 small doses increased to look at the safety.  And then

17 you increase the -- you start developing then.  If it's

18 successful in the early stage and is safe, you then give

19 it to more patients.  And then finally, you do a very

20 large clinical trial with a lot of patients to prove to

21 the FDA that you have a drug that is effective.

22           So that's a long process.

23           And in the case of Simponi, what we decided to

24 do was to go after three different indications at the

25 same time.  You saw earlier this morning, it talks about

1  when the drug was approved for Crohn's disease, when it

2  was approved for RA and other diseases.

3        In the case of Simponi, we decided to go for

4  more than one indication at the same time.  So that

5  involved many more trials, a lot more expense and time.

6     Q.   And so all the hundreds of millions of dollars

7  that it costs to bring Simponi to market, was an awful

8  lot of that doing the clinical trials, doing the patient

9  testing?

10    A.   I would say the majority of it was that.

11    Q.   Now, before I go to the last couple of

12 examples in your patent I want to talk about, I just

13 want to go back to one, revisit one issue.

14       We looked at some disclosure that you said was

15 added to your patent in February of '94, Dr. Marks'

16 article on phage display, the reference to human

17 variable regions, a discussion of some affinity

18 maturation techniques that you said were added in

19 February of '94.

20       Does that refresh your recollection that this

21 reference to human antibody in the Summary of Invention

22 was also added in February of 1994?

23    A.   I believe so, yes.

24    Q.   Okay.  Let's look at Example 21, please, at

25 Column 6 -- I'm sorry -- Example 20 -- beg your

1    pardon -- at Column 59.

2            I'm getting ahead of myself.

3            What is described in Example 20?

4        A.    Example 20 describes the first time we

5    actually gave the antibody cA to patients suffering from

6    rheumatoid arthritis.

7            Now, this -- when you first try a new drug,

8    you usually give it to the patients who are, you know,

9    most advanced and have, you know, failed a lot of

10   treatments.  The idea is that, you know, if there are

11   any issues, at least those patients can benefit from

12   them, and, you know, you try it on the most difficult

13   group of patients first.

14           So this was a study that was done in England

15   where patients were treated with Remicade over a

16   two-week period with the dose that is mentioned there.

17   And then a second group was treated with, you know, a

18   lower dose.

19           What happens after the patients were treated

20   is within 48 hours a lot of them were starting to feel

21   the effects of the antibody.  And I was fortunate enough

22   to actually visit the hospital in England when they

23   were -- the patients were being treated, and I met some

24   of them.

25           And to me, it was like the most humbling

1 experience, because they were starting to tell me how

2 well they felt after taking this one dose of this

3 antibody, how one of them was a psychologist who hadn't

4 worked in two years and then was now able to go back to

5 work.

6         So for me, I just began to appreciate how

7 important this drug is, how important, you know, my work

8 is.  So it was a great experience.  And it also showed

9 us that we really chose, you know, the right drug.  You

10 know, we spent the time; we chose a drug that was

11 incredibly effective.

12     Q.    And if you could look at Column 21, please.

13 That's Example 21, starting at Column 67.

14         And tell us what's described there.

15     A.    Okay.  So this describes the treatment of a

16 patient who suffered from Crohn's disease also with cA2.

17 So this researcher in Holland -- his name is Dr. Van

18 Deventer, who was working with us on another project,

19 and he is an expert on Crohn's disease.

20         Now, Crohn's disease, as you can see here, is

21 a very debilitating disease.  It's very difficult.  I

22 happen to know, because my sister has it.

23         And what this girl was facing is after all

24 these treatments that didn't work, the inflammation was

25 so bad that they were going to remove part of her

1  intestine or colon.  When Dr. Van Deventer was at

2  Centocor and he saw -- you know, he met Dr. Feldmann and

3  he saw the data that I described to you earlier.

4         And he had always a theory that TNF was also

5  involved in Crohn's disease.  So he wanted to test it.

6  And there's a process that where the FDA allows you to

7  supply, you know, one dose of drug for compassionate use

8  for a case where, you know, it's kind of either life or

9  death or something like this, or face surgery for a very

10 young child.

11        So the dose was sent to the Dr. Van Deventer.

12 He administered, and very quickly this patient started

13 the symptoms that you mentioned there.  Diarrhea, pain

14 and so on went away.  The inflammation was under

15 control, and there was no need for her to have surgery.

16 In fact, she started to eat.

17        That's a big thing about people with Crohn's

18 disease is, you know, they have to choose what type of

19 food.  It's really a very, very difficult disease.

20 So this patient recovered.  And, again, we had yet

21 another proof of how effective this drug would be.

22    Q.   What was your reaction to learning of these

23 clinical results?

24    A.   You know, as I said before -- I mean, you try

25 to be humble, but in those cases, you just think about,

1  you know, what you achieved and how important your work

2  is.

3       Q.   Thank you very much, Dr. Ghrayeb.

4            THE COURT:  Cross-examination --

5            MR. LEE:  Yes, Your Honor.

6            THE COURT:  -- Mr. Lee?

7            MR. LEE:  May I proceed, Your Honor?

8                     CROSS-EXAMINATION

9  BY MR. LEE:

10      Q.   Good afternoon, Dr. Ghrayeb.

11           I started a chronology.  I started to try to

12 write a little bit more clearly.

13           So that the jury can understand the

14 chronology, you said that in February of 1994 there was

15 a patent application filed, correct?

16           Is that right?

17      A.   Correct.

18      Q.   And that's the patent that you've just --

19 patent application that you've just been discussing with

20 Ms. Elderkin, correct?

21      A.   Correct.

22            THE COURT:  Counsel, y'all need to

23 approach just a minute.

24      A.   This was filed --

25            THE COURT:  Wait just a minute.  I need

1  to talk to the lawyers.

2              (Bench conference.)

3              THE COURT:  Is this your associate that's

4  sitting right here across from Mr. Beck?

5              MR. LEE:  Yeah, I think it is.

6              THE COURT:  Okay.  When she doesn't like

7  something the witness says, she rolls her eyes, does

8  these expressions.  She's got to stop that.

9              MR. LEE:  Okay.

10             THE COURT:  I mean, I think she's doing

11 it subconsciously.

12             MR. LEE:  I'll take care of it.

13             THE COURT:  I know you will.  I just

14 don't want it to get out of hand.

15             (Bench conference concluded.)

16             MR. LEE:  May I proceed, Your Honor?

17             THE COURT:  Yes, please do.

18     Q.   (By Mr. Lee) So February 1994 is the patent

19 application that you discussed with Ms. Elderkin,

20 correct?

21          Is that right?

22     A.   Yeah.  It's a continuation of that.

23     Q.   Now, before February of 1994, as you told us,

24 the scientists at NYU, Dr. Le, Dr. Knight, had made A2,

25 correct?

1    A.    Dr. Le and Dr. Vilcek, yes.

2    Q.    Right.  And Dr. Le and Dr. Vilcek had made A2

3 in 1990, correct?

4    A.    That's about right, I think.

5    Q.    So if we put 1990.

6          Now, A2 is a mouse antibody, correct?

7    A.    Correct.

8    Q.    And this is a Centocor mouse antibody, right?

9    A.    Yes, sir.

10   Q.    For NYU?

11   A.    Yes, that's right.

12   Q.    Let's put here NYU/Centocor.

13         Now, you know in 1986 Dr. Moller had made a

14 mouse antibody to TNF-alpha, correct?

15   A.    I don't recall.

16   Q.    You know it was done before 1990, don't you?

17   A.    There were other antibodies disclosed before

18 1990, I believe.  Mouse antibodies.

19   Q.    My question is very specific:  Did Dr. Moller

20 describe a mouse antibody to TNF-alpha before 1990?

21              MS. ELDERKIN:  Your Honor, can we

22 approach?

23              (Bench conference.)

24              MS. ELDERKIN:  This is not a prior

25 invention story.  These claims do not cover mouse

1  antibodies, who did what, when, where.

2           THE COURT:  You have gone into the

3  history of all this, ma'am.  You've gone into this.  I

4  don't know what we're going to do about argument, but

5  you developed this history, and he's entitled to

6  cross-examine the witness.

7           Now, where are you headed there, Mr. Lee?

8           MR. LEE:  I just want to get the date,

9  and I'm going to move right back --

10          THE COURT:  Well, okay.  I think he's --

11          MS. ELDERKIN:  It seems to me like it's a

12  prior invention defense, even if your opening

13  argument --

14          THE COURT:  Well, I ruled on that, and I

15  didn't see anything inappropriate in opening argument,

16  okay?

17          You still haven't gotten your young

18  woman's attention now.  I'm going to get her attention

19  in a minute.

20          MR. LEE:  I got it.

21          THE COURT:  You got it?  I'm telling you

22  that she's still doing this -- oh, like --

23          MR. LEE:  I told her to look at the

24  screen.

25          THE COURT:  Well, just -- she's going to

1   have to learn, if you're sitting in trial in a federal

2   courthouse, you can't argue your case to the jury

3   through your facial expressions.  It can get rough.

4              (Bench conference concluded.)

5      Q.   (By Mr. Lee) Okay.  Do you have my question in

6   mind?

7      A.   Yes.

8      Q.   Before 1990, when Centocor and NYU had A2, had

9   someone else not associated with Centocor, not

10  associated with NYU, come up with a mouse antibody to

11  TNF-alpha?

12     A.   If you look at the patent, it has several

13  references to --

14              THE COURT:  Doctor, that's not what his

15  question was.  Listen to what his question is.

16              THE WITNESS:  Okay.  I'm not sure what --

17              THE COURT:  Okay.  Let me finish, okay?

18              THE WITNESS:  Yes, sir.

19              THE COURT:  You listen to what his

20  question is and answer that question.  If you don't

21  understand his question, just tell him you don't

22  understand it.  And don't try to add to something,

23  because your counsel will have the opportunity to ask

24  you additional type questions, okay?

25              Let's move along.

1      Q.   (By Mr. Lee) I'll restate the question,

2  Dr. Ghrayeb.

3           Isn't it true that before Centocor and NYU

4  isolated or made a mouse antibody, other people in other

5  laboratories had already done it?

6      A.   Yes.

7      Q.   And isn't it true that Dr. Moller was one of

8  them, and he did it around 1986?

9      A.   I know Dr. Moller is one of the references we

10 cited in the patent, but I don't remember when he

11 actually made it.

12     Q.   But you remember that it was before 1990?

13     A.   Yes.

14     Q.   So we'll just write before 1990.

15          Now, would you tell the jury -- Dr. Moller is

16 associated with Abbott, is he not?

17     A.   I really don't know.

18     Q.   You don't know one way or another?

19     A.   No.

20     Q.   But what you do know is he made a mouse

21 antibody?

22     A.   Yes.

23     Q.   Now, let's skip up to 1997.  That's when you

24 told us the project that led to Simponi starting,

25 correct?

1       A.    Correct.

2       Q.    I'm just going to write Simponi project.

3  And I think you told us it took about a year to make it.

4       A.    That's my recollection.  It could be plus or

5  minus.  I can't remember exactly.

6       Q.    Let's take your best recollection.

7             So in 1998, you had made Simponi, correct?

8       A.    Correct.

9       Q.    And isn't it true that 1998 is the first time

10  that you had a high-affinity neutralizing fully human

11  antibody to TNF-alpha?

12             That's the very first time, correct?

13       A.    Yes.

14       Q.    Now, you sought a patent on Simponi, correct?

15       A.    I am not an inventor on that patent.  I don't

16  know all the details.

17       Q.    Well, you were the supervisor for the project,

18  correct?

19       A.    Correct.

20       Q.    And when you sought the patent for Simponi,

21  didn't you tell the Patent Office what you had or what

22  Centocor had was a fully human antibody?

23       A.    I would have to see the patent.

24       Q.    Have you seen the patent before?

25       A.    No.

1     Q.    So you've never seen the patent that Centocor

2  has that covers Simponi?

3     A.    Let me rephrase.

4           I mean, in all those years -- we're talking

5  ten years ago -- I've seen -- I'm sure I've seen a copy

6  of it, but I don't recollect, because it wasn't

7  something that I read every word, every line.  I knew it

8  was filed.

9     Q.    Okay.  Well, let me --

10           MR. LEE:  This is this evidence, Your

11  Honor.

12     Q.    (By Mr. Lee) Let me bring up DX27 on the

13  screen.  And let's look at the front page first, and

14  let's look at the date when this patent issued.

15  This is Centocor's patent that describes Simponi,

16  correct?

17           And it's in your notebook, so you can look at

18  the whole --

19     A.    Which number?  I'm sorry.

20     Q.    If you look at Tab 6, Dr. Ghrayeb.

21     A.    Thank you.

22     Q.    -- you'll find the full patent, and we're just

23  going to put the front page on the screen so the jurors

24  can see it and you can see it.

25           But you look at whatever is easiest for you.

1      A.    Yes.

2      Q.    This is the patent that issued in July 31,

3  2007 that covers Simponi, correct?

4      A.    Right.

5      Q.    And it was applied for on August 1, 2001.

6  Do you see that?

7      A.    Yes.

8      Q.    And I notice in the related U.S. application

9  dated -- do you see this where I'm pointing?

10     A.    Yes.

11     Q.    There are just a couple of other applications

12 there, aren't there?

13     A.    Okay.  I see it.

14     Q.    Now, let me show you Column 54, Line 11.  And

15 you can look at it on the screen, or you can look at

16 it on -- in the hard copy, whichever is easier.

17 Actually, let's go to Column -- I'm sorry -- Column 50,

18 Line 36, and I'm going to highlight the sentence that

19 begins at Line 36:  The unexpectedly high affinity of

20 these fully human monoclonal antibodies make them

21 suitable candidates for therapeutic applications in

22 TNF-related diseases, pathologies, or disorders.

23        Did I read that correctly?

24     A.    You read it correctly.

25     Q.    So in 2001, Abbott filed -- Centocor files a

1  patent application, right?

2          Is that right?

3      A.   Are you telling me that --

4      Q.   I'm asking you; isn't that true?

5      A.   You know, I -- I have not followed, you know,

6  the -- but -- I mean, it's got to be true, if you're

7  telling me that.

8      Q.   Well, it's on the cover of the patent.  Do you

9  have the patent?

10     A.   The first --

11     Q.   The very first page, it says:  Filed, August

12 1, 2001, correct?

13     A.   Correct.

14     Q.   And when you filed for this application in

15 2001, what you told the Patent Office is that the

16 unexpectedly high affinity of these fully human

17 monoclonal antibodies, that's the phrase that was used,

18 correct?

19     A.   That's -- that's what it says.

20     Q.   Right.  So this project that you were in

21 charge of, that started in 1997, that produced Simponi,

22 produced a patent that used the words fully human

23 monoclonal antibodies, correct?

24     A.   Correct.

25     Q.   And it's true, is it not, that until 1998,

1 Centocor had never developed -- strike that.

2          Before 1998, Centocor had never made a fully

3 human monoclonal antibody to TNF, correct?

4     A.   It's accurate to say we've never attempted to

5 make a fully human antibody to TNF.

6     Q.   Now, let's go back to your patent.  Ms.

7 Elderkin asked you for some -- asked you some questions

8 about the patents itself.

9          Let me bring up the first page of the '775

10 patent.  And the full patent, Dr. Ghrayeb, is in the

11 notebook before you at Tab 2.  Again, you use whatever

12 is best for you.

13          Do you have your patent before you?

14     A.   Yes.

15     Q.   Now, as you pointed out, on the first page,

16 there is a long list of prior applications, correct?

17     A.   Related to the patent, yes.

18     Q.   Now, let me go to Column 1 of your patent.

19 And when I say your patent, there were several other

20 inventors, correct?

21     A.   I'm not sure what -- what you're asking me.

22     Q.   There were several other people who are

23 identified as inventors of the '775 patent, correct?

24     A.   Yes.  I went through that, yeah.

25     Q.   Now, turn in the patent to Column 1.  I'm

1 going to highlight it, but I just want to focus you on

2 the last portion of the first paragraph.  It begins

3 about Line 26.

4 　　　　Do you see the sentence that says:  Each of

5 the above applications are entirely incorporated by

6 reference herein?  Do you see that?

7 　　A.　　I see that.

8 　　Q.　　One of the applications was filed in 1991,

9 correct?

10 　　A.　　Yes, that's listed there.

11 　　Q.　　Right.

12 　　　　All right.  So let's look at what the 1991

13 app -- you understand when you incorporate something by

14 reference, it means it's as if I set it forth in writing

15 here, correct?

16 　　A.　　I -- I'm not understanding.  I mean, I'm

17 assuming that that's right, since you're telling me.

18 　　Q.　　All right.  Let's turn, if we could, to the

19 1991 application that's incorporated by reference.

20 And at Tab 3, you'll find DX25.

21 　　　　　　MR. LEE:  Which is in evidence, Your

22 Honor.

23 　　Q.　　(By Mr. Lee) Do you have that before you?

24 　　A.　　Yes, I do.

25 　　Q.　　This is the March 1991 application, correct?

1          A.    Correct.

2          Q.    You've seen this before, have you not?

3          A.    Yes, I have.

4          Q.    And this is the application that -- one of the

5    applications you filed with the Patent Office, correct?

6          A.    Correct.

7          Q.    Now, let's see what you said to the Patent

8    Office about this issue of whether having some portion

9    that is mouse makes a difference.

10              In fact, you told the Patent Office back in

11   1991 that there were problems with an antibody that was

12   all mouse, correct?

13         A.    I would assume so, yes.

14         Q.    Right.  So let's turn, if we could, to Page 8

15   of the application.

16              MR. LEE:  And could I have the bottom

17   paragraph blown up?

18         Q.    (By Mr. Lee) Now, you have in mind that this

19   is what you said to the Patent Office about the

20   difference between mouse, chimeric, and human, correct?

21         A.    Correct.

22         Q.    And you start by talking about monoclonal

23   antibodies, correct?

24         A.    Yes.

25         Q.    And you say that monoclonal antibody

```
 1  technology has spawned a revolution in biology equal in

 2  impact to that of a recombinant DNA technology.

 3            And then you refer to mABs.  Do you see that?

 4       A.   Yes.

 5       Q.   MABs, so the jury knows, is mouse antibodies,

 6  correct?

 7       A.   No.

 8       Q.   What is it?

 9       A.    It's monoclonal antibodies.

10       Q.   All right.  And the only ones that you had had

11  so far were either mouse or chimeric, correct?

12       A.   At the time?

13       Q.   Yes.

14       A.   Yes.

15       Q.   So in 1991 --

16       A.   If compared to TNF?

17       Q.    In 1991, the TNF were related to mouse and

18  chimeric.

19            And so you go on to say, Their success,

20  referring to these antibodies, in the treatment of human

21  diseases, including microbial infections, autoimmune

22  disease, and cancer, has yet to be established.

23            Despite their exquisite specificity, mouse

24  ABs, by their very nature, have limitations in their

25  applicability to human medicine.
```

1          Did I read that correctly?

2      A.   Yes.

3      Q.   Now, in that sentence, when you say mouse ABs,

4  you're referring to a mouse antibody, are you not?

5      A.   I'm referring -- I'm referring to a mouse

6  monoclonal antibody.

7      Q.   Fair enough.

8          And what you say is, by their nature, those

9  mouse antibodies have limitations when you apply them to

10  human medicine, correct?

11     A.   That's what I'm saying.

12     Q.   And then you go on to say, most obviously, due

13  to their murine origin, they are foreign proteins in

14  humans, induce anti-murine immune responses and tend to

15  be cleared more rapidly from the circulation, correct?

16     A.   Correct.

17     Q.   So when you wanted to get the patent from the

18  Patent Office, you explicitly described to them the

19  problems with a mouse antibody, correct?

20     A.   That's part of the introduction to the facts

21  at the time.

22     Q.   Right.  At the time that you were seeking your

23  patent, correct?

24     A.   At the time that this was written, yes.

25     Q.   Right.  And it was incorporated into this 1994

1  application by reference as we saw, correct?

2      A.   Yes.

3      Q.   All right.

4           MR. LEE:  Now, let's go to the next page.

5  And on the next page, I would like to blow up the full

6  paragraph, if we can.

7      Q.   (By Mr. Lee) And again, you can use the hard

8  copy or the screen, whichever is easier for you.

9           You then state to the Patent Office, The

10  development of human monoclonal antibodies could

11  circumvent the above problems.  Strike that.  I'm sorry.

12           It says, The development of human mABs that

13  could circumvent the above problems has encountered a

14  number of obstacles, correct?

15      A.   Correct.

16      Q.   That's what you say in your application,

17  correct?

18      A.   Correct.

19      Q.   And then if we go through the rest of this

20  paragraph, you identify three different barriers to

21  developing a human monoclonal antibody, correct?

22      A.   I'm just, you know, reading.

23      Q.   Sure.

24      A.   I think so, yes.

25      Q.   All right.  One of the problems was that the

1 method described to do it involved a virus, and it

2 didn't seem like such a good idea to have a method that

3 used a virus, correct?

4     A.   That's -- that's not the reason why it's

5 difficult.

6     Q.   Well, EBV refers to something that involves a

7 virus, correct?

8     A.   That -- that's correct.

9     Q.   All right.  And let me see if I can just get

10 through this quickly.

11          The three reasons were, there was no way to

12 make it commercially practical; you had to use this

13 Epstein Barr Virus; and there are just problems in

14 making human antibodies to human proteins.

15          That's, in general, what the paragraph says

16 and what you told the Patent Office, correct?

17     A.   In general, yes.

18     Q.   And in your application, the one that

19 Ms. Elderkin went through, you don't describe any

20 solution to these problems, do you?

21     A.   Not to my knowledge, no.

22     Q.   Right.  So back in 1994, what you do say about

23 a fully human monoclonal antibody is, there are lots of

24 problems -- or there are some problems, and you don't

25 describe a solution, correct?

1    A.    A solution that, you know, has been shown to

2  be predictable in solving that problem.

3    Q.    Right.  Now, you said that you might have told

4  people how to do it, and you referred to an article on

5  phage display --

6    A.    That's correct.

7    Q.    -- is that correct?

8         And you said that your patent mentioned this

9  article on phage display.

10         MR. LEE:  Could I have the article

11  brought up on the screen, which is DX381?

12         Also in evidence, Your Honor, and it's

13  Tab A.

14    Q.    (By Mr. Lee) Now, Dr. Ghrayeb, this article

15  was by someone named Dr. John Marks?  Jim Marks.  I'm

16  sorry.

17    A.    It's not -- I don't think it's John.

18    Q.    And Dr. Marks is actually Abbott's expert in

19  this case, isn't he?

20    A.    That's what I hear.

21    Q.    Yeah.  He's one of the pioneers of phage

22  display technology, correct?

23    A.    Correct.

24    Q.    Now, you told the jury just a few months

25  ago -- few minutes ago that you mentioned this concept

1  of phage display and that it could be used to make a

2  fully human monoclonal antibody, correct?

3      A.    Correct.

4      Q.    Now, the truth of the matter is, no one at

5  Centocor has ever used phage display to make a fully

6  human monoclonal antibody to TNF; isn't that true?

7      A.    Nobody has ever attempted to use phage display

8  to make a human antibody for TNF.

9      Q.    Right.  So the very thing that you told the

10 jury your patent taught someone to do if you want a

11 fully human antibody, Centocor has never done, correct?

12     A.    We have not done it, but Dr. Marks has.

13     Q.    Right.

14     A.    You know -- I mean, he's shown that there is a

15 technique you could use to make it.

16     Q.    So the one thing you would agree about in

17 terms of who could do what in 1994, Dr. Marks probably

18 knows better than anybody, correct?

19     A.    That I disagree.

20     Q.    All right.

21     A.    I mean --

22     Q.    Well, let me ask you this:  When you started

23 your project in 1997, did you just go use a phage

24 display that you taught the world about in 1994?

25     A.    We considered it --

1     Q.    Did you do --

2     A.    -- seriously.

3     Q.    Did you do it?

4     A.    We did not.

5     Q.    Right.  In fact, when you started in 1997, you

6  used something called transgenic mice, correct?

7     A.    That's correct.

8     Q.    And isn't it true, in your entire 1994

9  application, there is no mention of transgenic mice?

10    A.    That's correct.

11    Q.    So the method that you used when you went to

12  develop a fully human antibody is one that's not even

13  mentioned in your own patent, correct?

14    A.    Correct.

15    Q.    All right.  Now, let's talk about the work

16  that Centocor did do before 1994 with fully human

17  antibodies.

18         First, you told me that Cyntoxin was a fully

19  human antibody, correct?

20    A.    Correct.

21    Q.    And it was unsuccessful for a variety of

22  reasons, but in any event, it never became a product on

23  the market, correct?

24    A.    Correct.

25    Q.    But it was fully human, correct?

1    A.    Correct.

2    Q.    Now, you also had some experience with another

3  fully human antibody called 7.T.1, correct?

4    A.    You would have to jog my memory about that

5  one.

6    Q.    Isn't it true that in 1989, Centocor received

7  a human antibody called 7.T.1?

8    A.    I won't dispute that.  I didn't receive it,

9  but I won't dispute that.

10    Q.    Well, let me bring up DX140, if I could.

11  Do you have DX140 on the screen?

12    A.    Can you tell me what tab number that is?

13    Q.    Sure.  DX140 is a Tab 4.  I want you to tell

14  me when you've got it there.

15    A.    Okay.

16         MS. ELDERKIN:  Objection.  I believe that

17  exhibit is not admitted.

18         MR. LEE:  I have it's preadmitted.

19  Well, then don't put it on the screen.

20    Q.    (By Mr. Lee) Let me ask you this, and I'll lay

21  the foundation.

22         Do you have Exhibit 140 before you?

23    A.    Yes, I do.

24    Q.    This is a letter on Centocor letterhead,

25  correct?

1     A.    Correct.

2     Q.    And it is to Michael K. Hoffmann, correct?

3     A.    Correct.

4     Q.    From Hubert Schoemaker, correct?

5     A.    Yes.

6     Q.    And it's dated June 21, 1989, correct?

7     A.    Correct.

8     Q.    And you recognize Dr. Schoemaker, he was the

9 Chairman of the Board at Centocor, correct?

10     A.    Yes.

11     MR. LEE:  We offer it, Your Honor.

12     THE COURT:  Well, y'all approach.  You've

13 got all this handwriting nobody has talked to me about

14 yet.

15     (Bench conference.)

16     THE COURT:  It's Centocor's statement.

17 Why is it not admissible?

18     MS. ELDERKIN:  It's not on the

19 preadmitted list.  I don't know what --

20     THE COURT:  Well --

21     MS. ELDERKIN:  -- if it was --

22     THE COURT:  -- what is all this

23 handwriting you see?

24     MR. LEE:  That's just what was produced

25 to us, Your Honor.  We just need this portion with the

1  statement, and then there's a letter.

2          MS. ELDERKIN:  There's also no evidence

3  that this witness has ever seen this document or knows

4  anything about it.

5          THE COURT:  Overrule the objection.  He's

6  testified who this guy is.

7          Are you disputing the authenticity of

8  something y'all produced?  I overrule that.  It shows

9  that y'all produced it.

10          MS. ELDERKIN:  We did produce it, Your

11  Honor.  I don't know what the handwriting -- whose

12  handwriting it is.

13          THE COURT:  All right.  Well, it's

14  admitted.

15          (Bench conference concluded.)

16          THE COURT:  All right.  That exhibit is

17  admitted into evidence.

18      Q.  (By Mr. Lee) This is a letter that's dated

19  June 25th, 1989, correct?

20      A.  June 21st.

21      Q.  June 21st, 1989.

22          And this is from Centocor, right?

23          And the Chairman of the Board says, We are

24  very interested in human anti-TNF mABs, correct?

25      A.  As per the letter, which I -- we don't have in

 1  front of us.  So I don't know what would be in it.

 2      Q.   Well, let's now turn, if you would, to

 3  Exhibit -- Defendant's Exhibit 142, which is also in

 4  evidence.  This is from Jan Vilcek.  He's one of your

 5  co-inventors, correct?

 6      A.   Correct.

 7      Q.   He's at NYU, correct?

 8      A.   Correct.

 9      Q.   And you know who Jimmy Le is.  That's Dr. Le,

10  correct?

11      A.   Yes.

12      Q.   Also one of your co-inventors, correct?

13      A.   Correct.

14      Q.   And what happened in 1989 is, Centocor got a

15  fully human monoclonal antibody to TNF, and it didn't

16  work, and you couldn't make it work, correct?

17      A.   It -- what you can say is that this antibody

18  is just not -- wasn't good enough to satisfy our needs.

19      Q.   Well, Dr. Ghrayeb, the letter says, quote, The

20  results indicate that 7.T.1 has virtually no

21  neutralizing activity even at high concentrations,

22  correct?

23      A.   Right.

24      Q.   No neutralizing activity means it doesn't

25  work, correct?

1     A.    That particular antibody didn't work, correct.

2     Q.    Right.  So what we do know is, before 1994,

3  Centocor had actually explored one human monoclonal

4  antibody, and it didn't work, correct?

5     A.    Correct.

6     Q.    And it also had a fully human monoclonal

7  antibody product called Cyntoxin that didn't make it to

8  market for a variety of reasons, correct?

9     A.    Two different, you know, reasons for not

10  working.

11    Q.    Right.  But neither worked, correct?

12    A.    Neither -- neither of them was approved.

13    Q.    Right.  And that was it.  That was it for

14  Centocor until 1997 for fully human monoclonal

15  antibodies, correct?

16    A.    That was for looking for any antibodies to

17  TNF.

18    Q.    Right.  Now, just a couple more questions.

19  When you went through all of the patent specification

20  with Ms. Elderkin and we talked about the different

21  portions, you mentioned B-cells at one point, correct?

22    A.    I may have, yes.

23    Q.    Now, Centocor never tried to use B-cells to

24  produce a fully human monoclonal antibody, correct?

25    A.    There was a group at Centocor, which was

1  working at that time.

2       Q.    And they were unsuccessful, correct?

3       A.    No.  They produced human antibodies.

4       Q.    Fully human monoclonal antibodies that were

5  high affinity and neutralizing?

6       A.    They were antibodies that would be, you know,

7  similar or better than Cyntoxin.  So there was a program

8  to do that, and this whole approach was tried.

9       Q.    Did you try to use B-cells to produce fully

10  human monoclonal antibodies to TNF-alpha?

11      A.    No, we did not.

12      Q.    Did you try to use phage display to produce

13  fully human monoclonal antibodies to TNF-alpha?

14      A.    We did not even consider it.

15      Q.    Did you try to use any of the different

16  techniques that you've described to Ms. Elderkin to

17  produce a fully human monoclonal antibody to TNF-alpha,

18  sir?

19      A.    We did not.

20      Q.    No, you didn't.

21              MR. LEE:  Nothing further, Your Honor.

22              THE COURT:  Ms. Elderkin?

23              MS. ELDERKIN:  Okay.  Thank you.

24                    REDIRECT EXAMINATION

25  BY MS. ELDERKIN:

1       Q.   Dr. Ghrayeb, Mr. Lee asked you some questions

2   about the 1991 application, and I think it was

3   characterized as statements about barriers to making

4   human antibodies.

5            But in your 1994 application, what did you add

6   with respect to making human antibodies?

7       A.   We added, you know, information about how you

8   could make human antibodies and that it would be

9   possible to do that, to make antibodies to human TNF.

10      Q.   Okay.  Now, is it necessary -- you have

11  experience with a number of patents.

12           Is it necessary in your patent to disclose

13  every possible method for making the antibodies of your

14  invention?

15      A.   No.

16      Q.   Did the fact that Cyntoxin didn't get approval

17  have anything to do with the fact that it was a human

18  antibody?

19      A.   Not at all.  As I mentioned earlier, a mouse

20  antibody also failed in clinical trial.

21      Q.   There are lots of antibodies that don't bind

22  to TNF well enough to do anything, right?

23      A.   Exactly.

24      Q.   Did the fact that -- and 7.T.1, was that an

25  anti-TNF antibody?

1  A.  Based on, you know, the -- the -- this letter

2  that I saw, it must have been.

3  Q.  It must have been.  Okay.

4  A.  But --

5  Q.  I'm sorry.

6  A.  Let me just explain, and I explained this a

7  little earlier.

8  When you are looking for the right antibody,

9  you'll get ones that don't work, and you'll throw them

10  out.

11  So this was one of those antibodies that, you

12  know, was produced and just was clearly not effective.

13  So we threw it out.

14  I mean, we were not interested in an antibody

15  that didn't work.  It isn't even necessary to try and

16  improve it, because it had like zero activity.  So we

17  just moved on to, you know, the antibody that would

18  work.

19  Q.  And did the fact that the 7.T.1 antibody

20  didn't work have -- was that because it was a human

21  antibody?

22  A.  Absolutely not.

23  Q.  There are a lot of antibodies that could bind

24  TNF but weren't good enough to ever be made into a

25  therapeutic drug that could be used in patients, right?

1      A.   I would agree with that.

2      Q.   And you found the ones that were good enough,

3 correct?

4      A.   Correct.

5      Q.   And the ones that have special binding

6 characteristics like A2?

7      A.   Correct.

8                MS. ELDERKIN:  Thank you, Dr. Ghrayeb.

9                MR. LEE:  Nothing further, Your Honor.

10               THE COURT:  All right.  You may step

11 down.

12               MR. SAYLES:  May it please the Court.

13               At this time, we'd call Dr. Robert Kamen

14 by deposition, and I have a stipulation of the parties I

15 would like to read in advance of playing.

16               THE COURT:  Okay.

17               MR. SAYLES:  Dr. Ghrayeb might be called

18 in rebuttal.  May he stay in the courtroom, or will he

19 still be subject to the Rule?

20               THE COURT:  Still subject to the Rule.

21               MR. SAYLES:  All right.

22               THE COURT:  And just so counsel knows,

23 you know, unless I expressly excuse someone from the

24 Rule, it still applies to them.

25               MR. SAYLES:  All right, sir.

1                  This is an introduction to Dr. Robert

2   Kamen, as agreed by the parties in the introduction.

3                  Dr. Kamen has an undergraduate degree in

4   biophysics from Amherst College and received his Ph.D.

5   in molecular biology and biochemistry from Harvard

6   University in 1970.

7                  Beginning in 1991, Dr. Kamen was the

8   President of BASF.  Dr. Kamen oversaw the development of

9   the Humira product.

10                 (Video playing.)

11                 QUESTION:  Good afternoon.

12                 Before the break, we were talking about

13  Plaintiff's Exhibit 185, Dan Tracey's report on a

14  symposium that he had attended and learned about

15  Centocor's chimeric antibody.

16                 Do you recall that?

17                 ANSWER:  Yes.

18                 QUESTION:  Did this work by Centocor on

19  cA2 have any influence on BBC with respect to whether it

20  would continue to develop its own anti-TNF-alpha

21  antibody?

22                 ANSWER:  The exhibit talks about work

23  done by Marc Feldmann and Maini.  I guess there are

24  Centocor authors on it.  I've always thought of this as

25  the Feldmann work, not the Centocor work at this point.

1  I think the answer to your question is -- no.  Now I've

2  forgotten your question.  Please repeat it.

3                    QUESTION:  Okay.  Did the work by

4  Feldmann on the Centocor antibody cA2 influence BBC's

5  decision to proceed with the development of its own

6  anti-TNF-alpha antibody?

7                    ANSWER:  At the time that we became aware

8  of this, we were already working on a project to make a

9  fully human anti-TNF antibody.  We had a list of

10  potential indications, and this was exciting and

11  pointing us toward an indication which appeared to have

12  some clinical verification.

13                    QUESTION:  So did the work by Feldmann on

14  Centocor's cA2 antibody influence BBC's decision to

15  proceed with the development of an anti-TNF-alpha

16  antibody for an RA indication?

17                    MS. WIGMORE:  Objection to form.

18                    ANSWER:  As far as I know, this was the

19  first public disclosure of the efficacy of an anti-TNF

20  on RA that had an impact.

21                    QUESTION:  Can you look back at

22  Plaintiff's Exhibit 182, your deposition transcript?

23                    ANSWER:  Yes.

24                    QUESTION:  At Page 90 of the transcript,

25  starting at Line 22, you were asked at this deposition:

1                    "So did the work by Centocor on Remicade

2 on cA2 influence Abbott's decision to proceed with the

3 development of what became Humira?

4                    And you answered, Yes, it did.

5                    ANSWER:  Uh-huh.  Yes, I see that.

6                    QUESTION:  Is that -- were those

7 statements -- was that statement true at the time?

8                    ANSWER:  Yes.

9                    QUESTION:  And how did the work by

10 Feldmann on the cA2 antibody impact BBC's decision to

11 proceed with its own TNF-alpha antibody?

12                    ANSWER:  It made us think hard of RA

13 being an indication for the antibody which we were

14 making.  And we proceeded to, you know, learn more about

15 rheumatoid arthritis and proceeded down that thought

16 pattern.

17                    QUESTION:  Do you recall answering

18 questions from Ms. Verrecchio about antibody libraries,

19 phage display, and guided selection?

20                    ANSWER:  Yes.

21                    QUESTION:  And do you recall testifying

22 that those technologies were used by BBC and CAT in the

23 development of D2E7?

24                    ANSWER:  Yes.  Could you repeat which --

25 which three technologies?

1                    QUESTION:   Sure.   Were the antibody

2  library technology, the phage display technology, and

3  the guided selection technology together, in and of

4  themselves, enough for BBC to develop D2E7?

5                    ANSWER:   No, they were not.

6                    QUESTION:   What, if any, additional work

7  was needed?

8                    ANSWER:   The hardest part of a hard

9  project was the affinity maturation, which took a very

10  considerable proportion of the three-year time period.

11  And in the course of that work, we developed some

12  approaches which were not previously known to CAT.

13                    QUESTION:   And can you give us some

14  examples?

15                    ANSWER:   Well, the key was, the hope of

16  phage display, which, in my experience, has proved to be

17  incorrect, was that one could always select out an

18  improved version of an antibody from a population of

19  less desirable antibodies; in particular, that you could

20  mutate some sequences, keep a big pool, and do some sort

21  of selection amongst millions of phage to pull out one

22  of higher affinity.

23                    That, in fact, turned out not to work on

24  this project and other projects in that once one had

25  candidates of moderate affinity but still less affinity

1 than needed for a clinical candidate, you could no

2 longer do selections, because you always got the

3 parental version back.

4            So we had to switch into a mode of not

5 selecting but doing versions of medium throughput

6 screening.  We had to look one by one individually and

7 assess the properties of phage, which is very laborious.

8 And to simplify that, we started to do what was called

9 off-rate selections in which we tried to enrich

10 libraries for variants which formed more stable

11 complexes with TNF, and then we took significant numbers

12 of candidates and then individually analyzed their

13 off-rates by biophysical methods.

14            And that was an extremely laborious

15 process that took some time, and it really had not been

16 at all anticipated by the technologies that you're

17 talking about.

18            QUESTION:  Approximately how much time

19 did it take from the time that BBC decided to pursue a

20 fully human antibody to TNF and the time that D2E7 was

21 created?

22            ANSWER:  Well, I believe that D2E7 was

23 created in early 1995, and the project was started,

24 shall we say, beginning in '92, late '91.  So that's

25 three years?

 1                    (End of video clip.)

 2                    THE COURT:  Is there any other portions

 3  of this deposition?

 4                    MR. SAYLES:  Nothing from the Plaintiff.

 5  He played it all the way through, I believe.

 6                    MR. BECK:  Nothing from us, Your Honor.

 7                    THE COURT:  And was all of that time

 8  charged to the Plaintiff?  Or we'll talk about it during

 9  a break.

10                    MR. SAYLES:  We'll give you the

11  division --

12                    THE COURT:  Okay.

13                    MR. SAYLES:  -- on that.

14                    THE COURT:  Who will be your next

15  witness?

16                    MS. MULLIN:  May it please the Court,

17  Your Honor.

18                    Plaintiff's call Susan Tam.

19                    While Ms. Tam comes, may we approach the

20  bench for a moment, Your Honor?

21                    THE COURT:  Yes.

22                    (Bench conference.)

23                    THE COURT:  Okay.  What's up?

24                    MS. MULLIN:  Ms. Tam did some testing for

25  the litigation.  We have her laboratory notebook with

1  us.  It was not preadmitted by Judge Everingham.  He

2  indicated that it was not admissible under 803.6, and we

3  agree, but I would like an opportunity to lay foundation

4  to admit it under 803.1, which is really the appropriate

5  rule for it.

6              THE COURT:  Well, you can lay the

7  found -- you can ask the questions and move for its

8  admission.

9              MS. MULLIN:  That's what I wanted to do,

10  but when I brought it up with your clerk this morning,

11  he suggested that before I even hand the notebook to her

12  that I make sure I get permission from you since it was

13  not preadmitted.

14              THE COURT:  Well, just say this is

15  something I want to put in evidence.  I want to ask you

16  some questions about it.

17              MS. MULLIN:  Okay.  That's fine.  I

18  just --

19              THE COURT:  All right.

20              MS. MULLIN:  I don't want to get in

21  trouble.

22              THE COURT:  You're not going to get in

23  trouble.

24              MS. MULLIN:  Okay.  Thank you, Your

25  Honor.

```
 1                    THE COURT:  I'm not wanting anybody to
 2  get in trouble except him.
 3                    MR. BECK:  If you get in trouble, we all
 4  get in trouble.
 5                    (Bench conference concluded.)
 6                    COURTROOM DEPUTY:  Raise your right hand,
 7  please.
 8                    (Witness sworn.)
 9           SUSAN TAM, PLAINTIFFS' WITNESS, SWORN
10                     DIRECT EXAMINATION
11  BY MS. MULLIN:
12       Q.   Could you please state your name for the
13  record.
14       A.   Susan Tam.
15       Q.   And, Ms. Tam, could you please briefly
16  describe your education after high school?
17       A.   I received a bachelor's in biology at UC
18  Berkeley.  Then I received a master's in cell biology at
19  U.T. Riverside.  And I had -- I was in the Ph.D. program
20  at UCLA for three years, and then my husband, who
21  finished his postdoc, got a job offering on the east
22  coast.
23       Q.   And did you move with him to the east coast at
24  that time?
25       A.   Yes, I moved with him.
```

1      Q.   Are you currently employed?

2      A.   Yes, I am.  I work at Centocor.

3      Q.   How long have you been with Centocor?

4      A.   A little more than 26 years.

5      Q.   And what's your current position there?

6      A.   I am a principal research scientist.

7      Q.   Have you had that position for all 26 years?

8      A.   Yes.  I started as an entry-level scientist,

9  and through the years, I've been promoted to various

10  positions of increasing responsibility, but always in

11  research.

12      Q.   Does part of your job involve lab work?

13      A.   Yes.  I am primarily a bench scientist.

14      Q.   What does that mean to be a bench scientist?

15      A.   That means I design and perform the

16  experiments.

17      Q.   Okay.  What kind of experiments have you done

18  in the course of your normal duties at Centocor?

19      A.   I work with antibodies.  My job is to design

20  studies to study the physical properties of antibodies,

21  as well as the functional characterization of the

22  antibodies either on purified proteins or on cell

23  surfaces or on tissues in small animals.

24      Q.   Have you done any testing of antibodies in

25  connection with this case?

1    A.   Yes.  I have tested Humira and A2.

2    Q.   Did you make any records while you were doing

3 these tests?

4    A.   Yes.  All my testing and results are included

5 and documented in a laboratory notebook.

6              MS. MULLIN:  Permission to approach the

7 witness, Your Honor?

8              THE COURT:  Yes.

9    Q.   (By Ms. Mullin) Ms. Tam, I've handed you a

10 copy of what's been marked as Plaintiffs' Exhibit 854.

11 Do you recognize that?

12   A.   Yes.  This is my notebook in which I recorded

13 all my findings.

14   Q.   And what kinds of tests did you do for this

15 case that are recorded in that notebook?

16   A.   I was asked to do a Scatchard analysis on

17 Humira and also to do competition studies or a

18 competition assay.

19   Q.   And the assays that are recorded in your

20 notebook, were they assays that you actually performed?

21   A.   Yes.  I have performed all the studies in this

22 notebook.

23   Q.   And were you the one who actually put the

24 entries in the notebook?

25   A.   Yes.

1            MS. MULLIN:  Your Honor, at this time, I

2  move for admission of PX854 under 803.1.

3            MS. WIGMORE:  No objection.

4            THE COURT:  Pardon?

5            MS. WIGMORE:  No objection.

6            THE COURT:  Received.

7            MS. MULLIN:  Thank you.

8       Q.   (By Ms. Mullin) Okay.  Now, you've mentioned

9  that you did some testing of --

10           THE COURT:  What's going to be the number

11 of that exhibit for the record?

12           MS. MULLIN:  It's 854, Your Honor,

13 Plaintiffs' Exhibit 854.

14           THE COURT:  854.  Okay.  Thank you.

15           MS. MULLIN:  Thank you.

16      Q.   (By Ms. Mullin) Okay.  So at the time you did

17 the test -- I think you mentioned affinity and

18 competition test that are recorded in your notebook --

19 what did you know about the antibodies that you were

20 testing?

21      A.   I knew that one antibody was Humira.  That is

22 because we bought it.

23           The other two antibodies were given a

24 numerical code, the C code given by Centocor.

25      Q.   Did you know what those -- what the C code

1 antibodies were at the time you did your testing?

2     A.   All I knew was that they were antibodies

3 against TNF.

4     Q.   Do you know now what those antibodies were

5 that you used in your testing?

6     A.   Yes.   They are A2.

7         How I know is that I carefully looked through

8 trace notebooks of the scientists that produced the

9 antibodies from the cell line, and I -- not only did I

10 look through their notebooks, I talked to them

11 personally one on one, as well as their supervisor.

12     Q.   Now, you said they were given C codes in

13 plural.  Did you have different samples of A2 that you

14 used in your testing?

15     A.   I had two samples.  One was C134A and one was

16 C259A.

17     Q.   And what's the difference, if any, between

18 those?

19     A.   They are both A2.

20         One was obtained from the ATCC, which is a

21 public depository of cell lines, and the other was --

22 came from an internal cell bank at Centocor.

23     Q.   At the time that you did your testing, had you

24 ever seen the patent that's involved in this litigation?

25     A.   No, I did not see the patent.

1     Q.   Did anyone suggest to you what they expected

2  the outcome might be or could be or should be in

3  connection with the tests you were doing?

4     A.   No.  No one talked to me.

5     Q.   Okay.  So then I'd like to talk a little more

6  in detail about the experiments that you did.

7          The first one you mentioned was an affinity,

8  and I believe you mentioned the word Scatchard.  Can you

9  describe very briefly what was the protocol that you

10 used for that?

11    A.   Okay.  Very generally, what I did was, I took

12 TNF, and I coded it on a plastic plate.  And then I took

13 labeled Humira, and I added it to the plate, incubated

14 it, and then detected the Humira that was bound to the

15 TNF on the plate.

16         And the Humira is labeled with a radioisotope,

17 so the instrument that detects it is a gamma counter.

18    Q.   And who developed the protocol that you were

19 going to use in your affinity testing?

20    A.   I did.  It's standard procedure that I do.

21    Q.   And did you record the results of your

22 affinity test in your notebook --

23    A.   I did.

24    Q.   -- Plaintiffs' Exhibit 854?

25    A.   Yes, I did.

1      Q.    Would you like to look at a page of that

2 notebook?

3            MS. MULLIN:  And if Mr. Ficocello could

4 bring it up on the screen for us.

5      Q.    (By Ms. Mullin) Just very generally, what's

6 reflected on this Page 10?

7      A.    It's not very clear, but this is the printout

8 from the instrument that detects the radioactive Humira

9 that is bound to the plate.  So these are the raw

10 numbers as it appears.

11     Q.    And it's actually the machine that counts it

12 and provides you with the data?

13     A.    Yes.  And there is a date and -- for the

14 printout.

15     Q.    Okay.  I'd like to then turn -- and did you do

16 affinity tests with A2 or just with Humira?

17     A.    Just with Humira.

18     Q.    Okay.  And you also mentioned Scatchard.  What

19 does that refer to?

20     A.    Scatchard is a method -- it's a mathematical

21 method of analyzing the data.  And normally, you display

22 the data as a Scatchard plot.

23     Q.    I'd like to turn then to the other test that

24 you did, the competition assays.

25            Again, who came up with the protocol for the

1 competition assays that you did?

2      A.   I came -- I designed the protocol, and I

3 performed the experiments.  And again, this is standard

4 procedure for me.

5      Q.   Can you describe very generally what you did

6 for your competition test?

7      A.   Okay.  Again, I had coded TNF on a plate, I

8 had labeled Humira, and I also incubated that with

9 unlabeled antibody.  In this case, it's unlabeled A2.

10 I would do a series of these experiments with increasing

11 amounts of unlabeled antibody.  And the results of -- of

12 these types of tests could be used to determine

13 competition.

14      Q.   Could you turn please to Page 18 of your

15 notebook?

16           MS. MULLIN:  And Mr. Ficocello, if you

17 could bring that up on the screen, please.

18      Q.   (By Ms. Mullin) What's shown on Page 18 of

19 your laboratory notebook?

20           You do have a pointer, if you can -- I think

21 if you hit the top button.

22      A.   Oh.

23      Q.   There you go.

24      A.   Okay.  I always stage my experiments, the

25 purpose, the reagents, my -- the method that I use.  And

1  this is the plate layout or my concentrations.  This is

2  the plate.

3          This -- generally, scientists can follow this

4  type of protocol if they -- if they see it.

5      Q.   Okay.  So just going through, the C134A --

6              MS. MULLIN:  I'm sorry, Mr. Ficocello.

7  If you could bring that same piece up, so -- the middle

8  table, so that we can see a little bit bigger.

9              Thank you.

10     Q.   (By Ms. Mullin) Okay.  There's a reference

11 here to C134A.  What is that again?

12     A.   That is A2.

13     Q.   Okay.  And what is C259A?

14     A.   That is also A2.

15     Q.   Okay.  And underneath that, it says Humira.

16     A.   Correct.

17     Q.   And then there's a reference to CNTO -- I want

18 to say 62 --

19     A.   It's 6234.  This is a control antibody.  It is

20 a -- it is an antibody that does not bind to TNF.  And

21 we normally use that to show what the background is.

22 And it's just a negative control --

23     Q.   Okay.

24     A.   -- to verify that everything looks good in the

25 assay.

1      Q.    Can you turn then, please, to Page 19 of your

2   notebook?  Again, this is PX or Plaintiff's Exhibit 854.

3           What's shown on this page, Ms. Tam?

4      A.    This is the raw data for -- this is the -- a

5   printout from the instrument for the competition

6   experiment.

7      Q.    Okay.  And so is this data that actually comes

8   out of a machine --

9      A.    Yes.

10     Q.    -- that's doing something?

11     A.    Yes.

12     Q.    And what is the machine doing that's printing

13  out this data?

14     A.    The CPM is counts per minute, and this

15  measures the radioactivity in the well.  This is the

16  mount of Humira bound to the TNF.

17     Q.    And how many -- I know we only have a piece of

18  it up, but how many pieces of data do you have?

19     A.    Well, this is a 96-well plate.  So for each

20  sample, I would do it in duplicate, and each sample,

21  there is 12 data points or 12 concentrations of the

22  unlabeled antibody.

23     Q.    Did you do the competition assays once or more

24  than once?

25     A.    I did the competition assay twice.

1    Q.   Okay.  To start with, is that something

2  different than being in duplicate?

3    A.   Yes.  These are two separate experiments.  A

4  duplicate is a duplicate sample the same day.

5    Q.   So a duplicate is two simultaneous tests in

6  the same experiment, but you actually did a second set

7  of competition assays?

8    A.   Yes, I did.

9    Q.   Why did you do that?

10    A.   Well, to be accurate.

11         Now, the first time I did it, I had noticed

12  that in the duplicates, there was one column of numbers

13  that seemed to have like -- it was quite obvious to

14  me -- a pipetting irregularity.

15         And what a pipette is, it is the device that

16  picks up the volume of sample, and it's a very -- as

17  someone described, it's like a turkey baster.  So it's

18  picking up a drop, and there's an -- and if there's an

19  obstruction in the hole, then you're going to get, you

20  know, a different amount pipetted out.

21         So because the data looked like it was half

22  the value of the duplicate, I just did it again.

23    Q.   Now, you made a reference to a turkey baster.

24  Is the pipette you're talking about the same size as a

25  turkey baster?

1      A.    No.   No.   A pipette tip measures a very small

2  amount.   It's like less than a drop.   And the tip of

3  that pipette is like a pencil point, so it's very small.

4  So you can imagine, if you have an air bubble, it can

5  be -- very easily throw off your -- the volume that you

6  distribute.

7      Q.    Is there a standard way that you show this

8  kind of data that's easy to look at?

9      A.    The results for us, we normally display it as

10  a graph.

11      Q.    So if I can interrupt you.

12          MS. MULLIN:   Mr. Ficocello, if you could

13  please bring up Page 26 of Ms. Tam's notebook.

14      Q.    (By Ms. Mullin) And if you look at that.

15  Is this an example of one of the graphs of your

16  competition assay data?

17      A.    Yes.

18      Q.    Okay.   And can you just very briefly explain

19  what the points are that are represented on the graph.

20      A.    Okay.   This -- the x-axis is the concentration

21  of the unlabeled antibody.   And this on the y-axis is

22  the amount of labeled Humira bound or -- yea.   And

23  normally, this is a typical curve.   This here is the

24  negative control, and that's what we expect.

25          This curve is computer-generated.   It's a

1 nonlinear fit of the data point.  And again, there's 12

2 data points here.  Each data point is a duplicate.

3     Q.   Now, we've heard about C134A and C259A.  We

4 know what Humira is.  But what are the F105, C7E3,

5 et cetera?

6     A.   Okay.  I -- these are just control antibodies

7 that I -- that we sometimes include just to show that

8 there is no competition, because it does not bind to

9 TNF.

10     Q.   Have you ever talked to anyone about the tests

11 you did or just the data that's included in your

12 notebook?

13     A.   No.  At the time, I did not talk to anybody.

14 But since then, I have talked to Dr. Greg Adams on all

15 my testing and the results and my findings.

16     Q.   Thank you.

17          MS. MULLIN:  Pass the witness, Your

18 Honor.

19          THE COURT:  All right.  We'll take an

20 afternoon break here, Ladies and Gentlemen.  Be ready to

21 come back in the courtroom at 3:35, 3:35.

22               You may leave the courtroom at this time.

23               COURT SECURITY OFFICER:  All rise.

24               (Jury out.)

25               THE COURT:  Court's in recess until 3:35.

1              (Recess.)

2              COURT SECURITY OFFICER:  All rise.

3              (Jury in.)

4              THE COURT:  Please be seated.

5              All right.  Let's continue, please.

6                   CROSS-EXAMINATION

7    BY MS. WIGMORE:

8        Q.   Good afternoon, Dr. Tam.

9             Are you aware that this lawsuit was filed in

10   April of 2007?

11       A.   No, I was not.

12       Q.   Now, you described for us some testing that

13   you conducted involving Humira and A2.

14            When did you conduct that testing?

15       A.   In June of '07.

16       Q.   Thank you.

17            MS. WIGMORE:  I have no further

18   questions.

19            THE COURT:  Okay.

20            MS. MULLIN:  May the witness be excused,

21   Your Honor?

22            THE COURT:  Yes.

23            Any objections from the Defense?

24            MR. BECK:  No.

25            THE COURT:  Okay.

1          MR. SAYLES:  May it please the Court.

2          THE COURT:  Yes.

3          MR. SAYLES:  At this time, we will read

4 two stipulations and a few requests for admissions --

5          THE COURT:  All right.

6          MR. SAYLES:  -- before our next witness.

7          THE COURT:  Recall that the stipulations

8 are deemed to be conclusive -- conclusively established

9 and in the event a fact is admitted, that that is

10 conclusively established.

11          MR. SAYLES:  Stipulation No. 10:  A

12 person of ordinary skill in the art of the '775 patent

13 is a person having a Ph.D. degree or equivalent

14 experience in molecular biology or a related discipline

15 and having a few years' experience in the field of

16 antibody technology.

17          Stipulation No. 8:  The antibody in

18 Humira is known as D2E7 or adalimumab.

19          All right.  Request for Admission No. 19:

20 Admit that adalimumab is an isolated antibody.

21          Response:  Admitted.

22          Request for Admission No. 2:  Admit that

23 adalimumab is a recombinant antibody.

24          Response:  Admitted.

25          Request for Admission No. 1:  Admit that

1  adalimumab is an anti-TNF-alpha antibody.

2              Response:  Admitted.

3              Request for Admission No. 3:  Admit that

4  adalimumab has a human constant region.

5              Response:  Admitted.

6              Request for Admission No. 5:  Admit that

7  adalimumab binds to a neutralizing epitope of human

8  TNF-alpha in vivo.

9              Response:  Admitted.

10             Request for Admission No. 7:  Admit that

11 adalimumab has an affinity for human TNF-alpha of at

12 least 1 times 10 to the 8th power liters per mole

13 measured as an association constant, as determined by

14 Scatchard analysis.

15             Response:  Admitted.

16             Request for Admission No. 8:  Admit that

17 adalimumab has a human variable region.

18             Response:  Admitted.

19             Request for Admission No. 32:  Admit that

20 adalimumab has a light -- a light chain encoded by a

21 gene derived from human DNA.

22             Response:  Admitted.

23             Request No. 33:  Admit that adalimumab

24 has a heavy chain encoded by a gene derived from human

25 DNA.

 1              Response:  Admitted.

 2              Request for Admission No. 12:  Admit that

 3    adalimumab is of the IgG1 immunoglobulin class.

 4              Response:  Admitted.

 5              THE COURT:  Who will be your next

 6    witness?

 7              MS. MULLIN:  May it please the Court.

 8    Plaintiffs call Dr. Adams.

 9              THE COURT:  Okay.

10              COURTROOM DEPUTY:  Would you raise your

11    right hand, please.

12              (Witness sworn.)

13        GREGORY ADAMS, PLAINTIFFS' WITNESS, SWORN

14                  DIRECT EXAMINATION

15    BY MS. MULLIN:

16        Q.   Would you please state your name for the

17    record.

18        A.   Sure.  My name is Gregory Adams.

19        Q.   And could you briefly describe your

20    educational background starting with college?

21        A.   Definitely.  I received my bachelor's degree

22    from the University of California at Santa Cruz, and

23    then a Ph.D. in immunology from the University of

24    California at Davis in 1991.

25        Q.   And did you have any particular focus on your

1  subject matter when you were getting your Ph.D.?

2      A.   Yes.  My Ph.D. work focused on using

3  antibodies to target cancer and treat cancer,

4  characterizing the antibodies, looking at the way the

5  antibodies were eliminated from the body during

6  treatment, and targeting --

7                  COURTROOM DEPUTY:  Move your microphone.

8                  THE WITNESS:  Is that better?

9      Q.   (By Ms. Mullin) Would your kids be surprised

10 to hear that you can't be heard?

11     A.   Actually, sometimes I am a little louder with

12 my children.  That's true.

13     Q.   Have you had a chance to continue any of the

14 work that you did for your Ph.D. since you got that

15 degree in 1991?

16     A.   Yes.  After 1991 -- essentially, all of my

17 work since 1985 has focused on working with antibodies.

18 And since I got my degree in 1991, I continued to work

19 on developing antibodies and characterizing them for the

20 treatment of cancer.

21     Q.   Where do you do that work?

22     A.   I'm a scientist at Fox Chase Cancer Center.

23 And my position -- I'm a principal investigator, the

24 head of a research laboratory at Fox Chase Cancer

25 Center.  I'm a tenured member of the Department of

1  Medical Oncology.  I'm also the co-leader of the

2  Molecular and Translational Medicine Program, and I'm an

3  associate professor at the Temple University School of

4  Medicine as well.

5      Q.   I'm sorry.  How long have you been with Fox

6  Chase Cancer Center?

7      A.   In 1991, September '91, right out of graduate

8  school, I went to Fox Chase Cancer Center to something

9  called postdoctoral -- postdoctoral studies.  It's

10  additional training after you get your graduate degree,

11  your doctorate, to further expand your scientific

12  skills.

13           THE COURT:  Doctor, this lady here has to

14  take down everything you're saying, okay?  So if you

15  could slow down talking just a little bit, it would help

16  her and help the jury, too, I'm sure, okay?

17           THE WITNESS:  Thank you.

18           THE COURT:  Thank you.

19      Q.   (By Ms. Mullin) Can you describe some of the

20  responsibilities that you have as part of your job at

21  Fox Case -- Fox Chase Cancer Center?

22      A.   Yes.  As a laboratory principal investigator,

23  I supervise postdoctoral associates.  Like I was a

24  trainee in that role when I first came to Fox Chase.

25  I supervise graduate students, students who are studying

1  to get their own Ph.D.s or master's degrees.  I head a

2  research team.  I develop the protocols for the

3  experiments with the team.  I review the data that comes

4  from the studies, once again, with antibodies.

5        I help them develop strategies for engineering

6  new antibodies for expressing the protein -- protein

7  targets of the antibodies that we are making in my

8  laboratory.

9        I also am on a lot of committees.  I chair the

10 Radiation Safety Committee at Fox Chase Cancer Center.

11 And as I said, I'm in leadership of the Molecular and

12 Translational Medicine Program, which involves

13 establishing interactions between other members of the

14 faculty and heading -- developing new products.

15     Q.   Is any part of your job involving writing

16 articles for scientific journals?

17     A.   Yes.  I write articles.  I write grants to

18 fund my lab.  I have written over 75 articles that have

19 been published.

20     Q.   And very generally, what's the subject matter

21 of the articles that have been published?

22     A.   Essentially, all of them are on antibodies.

23     Q.   If you could turn, please, Dr. Adams, to what

24 has been marked as Plaintiffs' Exhibit 366.

25        MS. MULLIN:  And, Mr. Ficocello, if you

1    could please pull that up on the screen.

2        Q.    (By Ms. Mullin) What is this, Dr. Adams?

3        A.    This is my resume.

4        Q.    It goes on for quite a few pages.  What's

5    included in this resume?

6        A.    This is my complete resume, so this resume

7    actually includes my education and training, my

8    professional positions that I've had throughout my

9    career.

10            It includes a list of my talks, the major

11   talks that I've given at conferences that I've been

12   invited to speak at.  It discusses my grant-funding

13   history, the trainees that I've trained in the

14   laboratory, the publications that we've presented, and

15   the service I've done in terms of committee work or

16   acting as a reviewer of grants from other scientists for

17   the National Institute of Health, the Department of

18   Defense, the American Cancer Society, and a number of

19   other organizations.

20            MS. MULLIN:  Your Honor, at this time, we

21   proffer Dr. Adams as an expert in antibodies and

22   immunology.

23            THE COURT:  I will allow him to offer

24   opinions in keeping with his expert report.

25            Did you have anything else, Mr. Lee?

1          MR. LEE:  Nothing, Your Honor.

2      Q.   (By Ms. Mullin) Okay.  Dr. Adams, we've heard

3  already some discussion about antibodies, but since this

4  is going to be important to our discussion today, very

5  briefly can you describe the structure of an antibody

6  for the jury?

7      A.   I would be happy to.  I believe we have some

8  slides prepared for this.

9      Q.   I think you may actually be controlling the

10 slides yourself.

11     A.   Okay.  There we go.

12          So you've seen this structure before.  This is

13 a general illustration of an antibody structure.  And as

14 has been said before, antibodies are a Y-shaped

15 structure in general, composed of four chains.  The two

16 heavy chains are shown here in blue, and they are

17 identical to each other.  And then there are two light

18 chains shown in green that are also identical to each

19 other.

20     Q.   And is there another way that we refer to the

21 different parts of an antibody?

22     A.   Yes, definitely.

23          And they're particularly relevant to what

24 we're talking about today.  Antibodies can be divided --

25 their structures can be divided into variable domains

1    and constant domains.

2         The variable domains shown here in blue are

3    the parts of the antibody that are responsible for

4    interacting with the target protein or antigen that we

5    call.

6         The parts that are shown in green here are

7    called constant regions, and they are responsible for

8    interactions with the rest of the immune system in terms

9    of eliminating pathogens and stuff like that.

10        Q.   Is this what an antibody really looks like?

11        A.   No.  This is how -- that little Y-shaped

12   structure is how we as scientists often depict

13   antibodies in our own textbooks and in talks that we're

14   giving to each other for simplicity's sake.

15        The structure on the right is -- it's also

16   similarly coded in colors, is a much -- sorry -- a much

17   more accurate structure of an antibody.  It's a

18   molecular model of an antibody.

19        Q.   Can you describe how an antibody interacts

20   with an antigen?

21        A.   Definitely.  So --

22        Q.   Maybe before you do that, what's an antigen?

23   That might be a relatively new word.

24        A.   So an antigen is the target of the antibody.

25   It typically -- we've heard it described already today

1    as a pathogen, such as a bacteria.  It could be a flu

2    virus; it could be the surface of a tumor cell, some

3    marker on the surface of a cancer cell in the patient's

4    body.

5            But the antibody recognizes that antigen.  We

6    use the term antigen.  It's highly specific for the

7    antigen and recognizes it in its own manner.

8            And the way it recognizes the antigen is using

9    the very tips of the Y structure.

10           Let me see if I can get this working.

11           The tips of the Y-structure here that were the

12   equivalent of the very tops of the arms of the Y, and it

13   binds to the surface of the antigen here.

14       Q.   Okay.  Is there a particular name for that

15   very typical Y-structure?

16       A.   Yes.  We call that the complementarity

17   determining regions, or the CDRs of the antibody that

18   are shown here in yellow on the tips of the blue part of

19   the antibody.  They're also part of the variable region.

20       Q.   Now, we've also heard a very little bit about

21   affinity.

22           Generally, what does affinity refer to?

23       A.   So, generally, affinity refers to the strength

24   of the bond between the antibody and the antigen, how

25   tight that bond is, how is -- how well they hold

1    together.

2        Q.    And do different antibodies have different

3    affinities?

4        A.    Definitely.   Antibodies -- affinities of the

5    antibodies are dictated by the amino acids that make up

6    the complementarity determining regions shown in yellow

7    here.

8             So if you have amino acids that pair well with

9    the amino acids on the antigen, you'll get a nice,

10   strong affinity.   If they don't pair quite as well, the

11   affinity will be weaker, and the bond will often be more

12   transient and come apart faster.

13       Q.    How does the human body make antibodies, just

14   very briefly?

15       A.    Very briefly, the cells in the human body

16   known as B-cells or B lipocytes, and when antigens

17   present to those cells, they make antibodies.

18   And there's -- what's remarkable about the system is

19   that the B-cells in our bodies can make millions of

20   different antibodies.   It's really a remarkable system.

21       Q.    Now, we've heard the word recombinant used

22   already today.

23            Are recombinant antibodies generally made in

24   the same way as you just described for antibodies made

25   in the human body?

1      A.    Yes and no.

2           The general -- recombinant antibodies, like

3 natural antibodies, are made using DNA instructions that

4 come from inside the cell.

5           Recombinant antibodies are made in a way that

6 we've modified the DNA to give it new instructions to

7 make a somewhat different antibody.  But it's still

8 using the same type of machinery in the cell to make the

9 antibodies.

10          So it's still the cell producing it.

11     Q.    And does recombinant refer to generally

12 something done or that can be done in a laboratory?

13     A.    Yes, it can.  In fact, it's the basis of the

14 antibodies that we're talking about in this case, that

15 they have been -- they're using tools -- using tools in

16 the laboratory to connect the DNA in different ways to

17 make the antibody.

18          I think there are some slides here that might

19 help with that.

20     Q.    Maybe you can use the slides to explain very

21 generally how it is that antibodies are engineered or

22 with the process of engineering.

23     A.    Sure, in general terms.

24          A little bit earlier today, it was mentioned

25 that there are 20 amino acid building blocks to make

1  antibodies, and these have letter codes.  These are not

2  arbitrary codes.  They actually stand for the names of

3  the amino acids.

4       So, for instance, the A here is alanine.

5  There's valine, et cetera.  These are standard, accepted

6  names for the antibodies.

7       And when you make an antibody or any other

8  protein, whether it's fingernail or it's an ear of corn,

9  it's the order of these amino acids that dictate what

10  that protein is going to be.

11       And to make that, what happens is our body,

12  the cell, uses DNA, which is shown or illustrated here

13  as a double helix twisting ladder.  And that is really

14  the instruction booklet for the cell, telling the cell

15  what order to put these amino acids into to make this

16  protein.

17       And if you have a different instruction

18  booklet or a different sequence of DNA, you'll get a

19  different sequence of amino acids, which will make a

20  different protein.

21       But these amino acids are all the same amino

22  acids, as I said, whether it's making a tree or a

23  person.

24  Q.   So what does the word recombinant or the

25  genetic-engineering part?  Where does that come in?

1      A.   So recombinant, as I said, is putting together

2 two different pieces of DNA.  So if we have the white

3 double helix, the twisted ladder here, it would be the

4 Instruction Sheet No. 1.  It's what that piece of DNA is

5 equivalent to, while the yellow DNA would be a separate

6 instruction sheet.

7           If you cut the white piece of DNA and insert a

8 piece of the yellow DNA here, what you'll get is part of

9 the protein or antibody that was encoded for by the

10 white piece with a different piece inserted inside.  And

11 this is genetic engineering, or recombinant DNA

12 technology are the common names for this.

13      Q.   I would like, then, to move into the more

14 specifics of this case.  And I think maybe you could

15 bring up the next slide.

16           Yeah.  Do you recognize this?

17      A.   Yes.  This is the '775 patent.

18      Q.   This is -- I'm sorry.

19      A.   I'm sorry.  Go ahead.

20      Q.   Now, it's also been marked as Plaintiffs'

21 Exhibit 1.  I would like to point out.

22           Were you asked to review the '775 patent for

23 purposes of this case?

24      A.   Yes.  As an expert witness in this case, that

25 was one of my tasks.

1     Q.   And were you also asked to consider Abbott's

2 Humira product for purposes of this case?

3     A.   Yes, I was.

4     Q.   Now, we've been referring to Humira, but is

5 there a specific name for the antibody in Humira?

6     A.   Yes.   The name is adalimumab.   And the

7 antibody in Humira, well, I will refer to it as Humira

8 most of today just because it's much easier for all of

9 us if we call it Humira.

10     Q.   Now, I think you were here when Judge Ward

11 gave some instructions this morning.   But you recognize

12 that in terms of assessing infringement, what you're

13 really looking for is the -- is the -- its me speaking

14 up now.   I'm sorry.

15          What you're really looking for is to compare

16 the Humira antibody, or adalimumab, to the patent

17 claims, right?

18     A.   That is my understanding, yes.

19     Q.   Okay.   Now, does the '775 patent claim all

20 antibodies against TNF?

21     A.   No, it does not.   It claims antibodies that

22 bind to TNF in a certain manner with a certain strength

23 or affinity and with a certain composition.

24     Q.   Then I think we have a slide that has put

25 Claim 2 on it.

1      A.    Let's see if I can get that going.

2            For some reason -- that might do it.

3      Q.    There we go.

4            Claim 2 would be the first asserted claim in

5      the patent that we're going to be discussing today.  And

6      if you could just walk us through.

7            What are the different elements of Claim 2?

8      A.    I would be happy to.

9            Claim 2 is a dependent claim, which means that

10     it must include all -- it's dependent upon Claim 1.  It

11     must include the elements of Claim 1 as well as a

12     particular element of Claim 2.

13           And I'll explain that right here.

14           So the elements in Claim 1, what is claimed is

15     an isolated recombinant anti-TNF-alpha antibody.  It

16     must have a human constant region.  It must

17     competitively inhibit the binding of A2, which is ATCC

18     Accession No. PTA7045, to human TNF-alpha.

19           It must bind to a neutralizing epitope of

20     human TNF-alpha in vivo.

21           And it must have an affinity of at least 1

22     times 10 to the 8th liter per mole measured as an

23     association constant, or Ka, as determined by Scatchard

24     analysis.

25           And then the piece of Claim 2 or the element

1  in Claim 2 that's added on is it must have a human

2  variable region.

3      Q.   Dr. Adams, do you have an opinion as to

4  whether the Humira antibody includes each element of

5  Claim 2?

6      A.   Yes, I do.

7      Q.   And what is that opinion?

8      A.   My opinion is that it does and it infringes.

9      Q.   Let's walk through that, then, if we can

10 element by element.

11     A.   Sure.

12     Q.   I think if --

13     A.   So we'll start with the first element,

14 isolated recombinant anti-TNF-alpha antibody.  And I've

15 looked at the literature, the documents from Abbott, and

16 looked at it specifically to determine whether or not

17 it's an isolated recombinant anti-TNF-alpha antibody.  I

18 concluded that it was.

19          And as you recall from what was read into the

20 transcripts just before I came up, Abbott has also

21 admitted that fact.  So, in fact, we can check off that

22 box here, that it is an isolated recombinant

23 anti-TNF-alpha antibody.

24     Q.   Okay.  What's the next element in the claim,

25 Dr. Adams?

1     A.    The next element in the claim is that it must

2  have a human constant region.   And, again, I have

3  reviewed the literature, and I've come to the conclusion

4  that Humira has a human constant region.

5          And, in fact, again, Abbott was asked to and

6  has admitted that it has a human constant region.   So we

7  can check off that box.

8     Q.    And, again, the constant region is part of the

9  antibody structure?

10     A.    Yes.   If you'll recall when I was talking

11  about the Y-struct of the antibody, the constant region

12  was the bottom part of the antibody, not the part that

13  binds to the antigen.

14     Q.    And what is the third element of Claim 2?

15     A.    Okay.   The third element is competitively

16  inhibits binding of A2, ATCC Accession No. PTA7045, to

17  human TNF-alpha.

18     Q.    Okay.   Stop for a second, please.

19          There's a reference to ATCC Accession

20  No. PTA7045.

21          What is that?

22     A.    So let's start with ATCC.   ATCC stands for the

23  American Type Culture Collection.   It's essentially a

24  library of sorts where scientists deposit cell lines

25  that are of interest to other scientists.   Other

1 scientists can then request the cell lines for their own

2 experiments.

3        And then the accession number, PTA7045, is

4 just that; it's the name that ATCC has given the cell

5 line that expresses A2 antibody.

6    Q.    And do you have an understanding as to whether

7 the Court has provided us with some guidance as to what

8 the phrase, competitively inhibits binding of A2 to

9 human TNF-alpha means?

10    A.    My understanding is that it means competes

11 with A2 for human TNF-alpha.

12    Q.    Okay.  So let's start first -- you said

13 competes with, but can you first very briefly describe

14 what are noncompeting antibodies?

15    A.    Well, if you -- if you have an antigen,

16 noncompeting antibodies would be antibodies that can

17 bind at the same time.

18    Q.    But now let's talk about the reverse.

19        How do you know or how do you test whether

20 antibodies are competing antibodies, whether they

21 compete with each other?

22    A.    Well, what I'll do is I'll explain to you an

23 example of how scientists would test for this.  I think

24 it's shown on the next slide.

25        Susan Tam, a few minutes ago, talked to you

1    about 96 well plates, the plastic plates.  And what the

2    scientists will do is bind TNF in this case, which is

3    the target we're interested in, to the bottom of the

4    plastic plate.

5         Q.   I'm sorry.  Because of the way it's shown

6    there, is TNF really like a slab of cake icing?

7         A.   No.  This is -- once again, this is an

8    illustration for convenience.  TNF is -- it's a

9    globular -- it's like a ball-shaped protein.  It's

10   protein per trimer.  It's really three proteins brought

11   together.

12        But we can bind it to the bottom of the plate

13   and use that as a tool for measuring how the antibodies

14   compete with each other.

15        Q.   So if you could proceed with an example of the

16   way you test for competition, that would be great.

17        A.   Sure.

18        Q.   Thank you.

19        A.   So what we do is if this was anti-TNF-alpha

20   antibody, we would label it -- and, once again, we have

21   a Y-shape.  And we're labeling the antibody with a tag

22   or a tracer such as a radioisotope, which is shown by

23   this starburst color here.

24        Q.   I'm sorry.  Radioisotope is what?

25        A.   A radioisotope is a radioactive particle that

1  allows us to follow the antibodies that have the

2  radioactive particle on it.

3          So in this case, it could be Iodine-125, which

4  is a commonly employed radioactive particle.

5          And we put these in solution, in fluid, and

6  apply them to each well of a 96-well plate and allow

7  them to bind to the surface of the TNF-alpha on the

8  plate.

9      Q.    Okay.  I'm sorry.  You said a 96-well plate.

10  Is this one well or 96 wells being shown here?

11      A.    This is one well that's being shown.  You

12  could do it as individual wells, but it would just take

13  a long time and be a lot of work.  It's much easier and

14  much more consistent to be able to use a 96-well plate

15  and do the assay all at once.

16          So we allow the antibodies to bind to the

17  surface of the plates typically over the course of

18  something like two hours.  And then we wash off the

19  amount of -- the antibodies that have not bound and

20  measure the bound antibody.

21          Ms. Tam talked about measuring it in an

22  instrument called a gamma counter.  And if it's

23  Iodine-125, that's an appropriate tool to use.

24  And then we can -- with that measurement, we can

25  graphically indicate the amount of antibody that's bound

1  to each well of the plate in a graph.

2          So in this case, when we have just the one

3  antibody with the radio label bound to TNF, we get a

4  certain amount of radioactive counts on the graph.

5          If we add -- let's see if I can get this

6  going.

7          If we add some antibodies without a label that

8  we think that the antibodies may compete with each

9  other, the labeled antibody and the unlabeled antibody,

10  and we add them together and allow them to bind to the

11  TNF-alpha on the bottom of the plate, what you'll notice

12  is that there is less label being bound to the surface

13  of the plate.

14          And we wash off the unbound antibodies, and we

15  see a decrease in the amount of label that's measured in

16  the machine that we show on the graph.

17          If we increase the amount of unlabeled

18  antibody, what we get -- and, once again, incubated over

19  time, wash off the unbound, what we get is even less of

20  the radioactive tracer.  We call it a tracer, the

21  radioactive molecule being measured on the plate.

22          Now, we continue to do this through a number

23  of series of dilutions, and this leads to a situation

24  here where you can see that we're seeing a significant

25  decrease in the amount of radiolabel on the graph that

1  represents the amount of radio-labeled antibody being

2  bound to the plate.

3        This indicates to us that the antibodies are

4  competing with each other.

5        Q.    Is there a kind of characteristic curve or

6  something that you get in the graphs when there's

7  competition?

8        A.    Definitely.  Typically, you see something that

9  we often call an S-shape curve where you see a plateau,

10  a drop, and then another plateau.  And this is typically

11  the sign of an assay that's working well.

12        Q.    Now, were you in the courtroom when Ms. Tam

13  was testifying today?

14        A.    Yes, I was.

15        Q.    And before she testified today, had you had an

16  opportunity to talk with her about her work?

17        A.    Yes, I had.

18        In fact, I'd like to show you one more slide,

19  if you don't mind.

20        Q.    I'm sorry.

21        A.    I had one more, I believe.

22        And this one is what happens when you have an

23  antibody that does not compete.  And that we have two

24  antibodies that don't compete with each other.  And

25  we're just showing this with this U-shape instead of the

1   Y-shape, a U with a tail.

2          And in this situation, what happens is even if

3   we have a lot of the antibody that does not compete

4   present, we should get the labeled antibody binding

5   without -- without a decrease to competition.

6          And this will happen even if we increase and

7   decrease the amount of noncompeting antibody.  You'll

8   get a fairly straight line that represents

9   noncompetition.

10         Thank you.

11     Q.    Is there another slide, Dr. Adams?

12     A.    Hopefully, that's it.

13     Q.    Were you in the courtroom, then, when Ms. Tam

14  was describing her testing?

15     A.    Yes, I was.

16     Q.    Okay.  And before today, did you have a chance

17  to talk with her about what she had done and talked

18  through her results with her?

19     A.    Yes, I did.  I spent at least half a day with

20  Ms. Tam going through her results, going through her

21  notebook in detail, looking at the way she set up the

22  assay.  I had her walk me through it.

23         We went through the calculations she did, and

24  I looked at how she did them and had her do them for me

25  again.  And I did some of them as well.  I looked at the

1   results, the data that came from this assay.  I looked

2   at the graphs.  I discussed all aspects of the work with

3   her.

4       Q.   Did you do anything to verify that she was

5   using the right antibodies in her testing?

6       A.   I -- I did some -- it's really not detective

7   work, but I -- one of the assays she did was an affinity

8   measurement in something called a Scatchard analysis.

9   You've heard that the term before.

10          So I looked at the affinity that she measured

11  of Humira, the radio-labeled Humira.  And I compared it

12  with what Abbott reports as the affinity for Humira, and

13  I found them to be comparable, which led me to conclude

14  that she did, in fact, use Humira in that assay.

15          And then for the A2 antibodies that she was

16  using in the competition assays, I actually sequenced

17  those antibodies.  And I looked at the sequences and

18  compared them with the known sequences for A2 and was

19  able to conclude that she did use A2 as well.

20      Q.   Now, Dr. Adams, I believe you have a copy of

21  Plaintiffs' Exhibit 854, which is Ms. Tam's notebook in

22  front of you.

23          If you could please open that.

24      A.   Yes, I do.

25      Q.   And generally, what is shown on Pages 18

1 through 21 and 24 through 25 of her notebook?

2      A.   So on these pages, she describes the assay

3 set-up, the materials she used, the conditions she did

4 the assays under.  She also describes and provides the

5 data from these assays, the results, the calculations

6 that she performed on the assays, and then the graphical

7 representation of the results of the assays.

8      Q.   Okay.  If we can stop at Page 21 for a minute.

9 Can you describe what's shown on Page 21 of Ms. Tam's

10 notebook, PX854?

11      A.   Sure.  This is the data that comes out of the

12 machine, the gamma counter that counts the radioactive

13 antibodies in the microtiter plate, the 96-well plate.

14 And what this does is it gives us or gave her really the

15 counts per minute, cpm, the actual radioactivity that

16 was an indication of how much antibody was bound in each

17 well.

18          And if you scroll down, you'll notice that

19 there are counts in 96 rows.  Each row is one well going

20 across here.  So if we go all the way down, we'll see

21 that after 96 wells, the counts go away.

22          You will also notice that there are two sets

23 of columns, and that's because she did the assay in

24 duplicate as she said during her testimony.  And so this

25 assay was done with two sets of identical wells to

1 measure the competition.

2    Q.   Is this what she meant when she said she did

3 the assay twice?

4    A.   No.   This is the duplicate for one assay.   She

5 did it again in duplicate a second time.   So each time

6 she did the assay, she did the assay twice.   Each time

7 she did it, she had two identical sets of wells.

8              MS. MULLIN:   If Mr. Ficocello then could

9 please bring up a split screen, which would show us

10 Pages 23 and 26 of Ms. Tam's notebook side-by-side.

11    Q.   (By Ms. Mullin) What is shown here, Dr. Adams?

12    A.   So this is the graphical representation of the

13 results, and let me just talk you through it, because it

14 is a bit complicated.

15              What we have here in identical -- it's really,

16 once again, the layout is identical.   But we have on the

17 left going up and down, this line up and down shows us

18 the amount of counts per minute, or cpm, that are bound

19 to the plate.

20              And so the higher it is, the more

21 radioactivity, and, therefore, the more Humira is bound

22 to the plate.

23              And then on the bottom line that goes left to

24 right, what we have here is the amount of antibody

25 that's been added that is not labeled with

1  radioactivity.  This is the antibody that we're

2  measuring to see if Humira and that antibody compete

3  with each other in an assay like this.

4          So what you see, if you're going off to the

5  left to the right, is increasing concentrations,

6  increasing amounts of the antibodies that we are testing

7  against Humira.

8          And what we see here is that as you go out to

9  the right, the amount of bound counts, or the amount of

10  radio-labeled Humira that are binding to the TNF-alpha

11  on the plate decrease.

12          She did this twice, and we see it in both

13  situations.

14      Q.   Now, what we see here on this split screen,

15  this is not the duplicate data.  These are the two

16  different experiments, right?

17      A.   That is correct.  On the left is Experiment 1,

18  I believe; and on the right is Experiment 2.

19          And what you see actually here -- it's even

20  clearer on this one -- is the negative controls that are

21  not going down because there is no competition.

22          The negative controls do not -- and Humira do

23  not compete with each other, so there is no drop in the

24  counts for Humira.

25      Q.   So what conclusions, if any, could you draw

1  from the first duplicate competition assay experiments

2  Ms. Tam did with Humira and A2?

3     A.  So from the first duplicate, I concluded that

4  had Humira and A2 compete with each other.

5     Q.  And what conclusion, if any, did you have from

6  her second competition assays done in duplicate?

7     A.  And it's just as clear.  From her second

8  competition assay, it's very clear to me that Humira and

9  A2 compete with each other for human TNF-alpha.

10     Q.  Now, when you were describing generally how

11  competition assays were done, you talked about labeling

12  an antibody; is that correct?

13     A.  That's correct.

14     Q.  Okay.  Which antibody was labeled for purposes

15  of Ms. Tam's experiments?

16     A.  Humira.

17     Q.  Does it matter whether it was Humira-labeled

18  or A2-labeled when you're testing for competition in

19  this kind of assay with these kinds of antibodies?

20     A.  No, not at all.  I've been working in this

21  field, as I said, since 1995.  I've worked with many

22  antibodies.  I've been radio-labeling antibodies since

23  1995.

24          And in my experience, it does not matter.  I

25  have not, in my laboratory, that I recall, ever have

1  seen that it matters with two full-size antibodies in

2  measuring competition with each other for an antigen.

3      Q.   Could there be some very rare occurrence that

4  would cause a quirky result?

5      A.   Yes.   There are tens of thousands of articles

6  about antibodies and antibodies that bind to targets.

7  And I've seen over the years a handful, just literally a

8  handful of publications that when an antibody has some

9  strange properties -- for instance, it doesn't function

10 as well at low temperature or functions better at low

11 temperature or the antigen has quirky properties that

12 are not typical of other antigens, particularly very

13 large antigens or antigens on the surface of cells, you

14 might sometimes see a difference, but it's very rare.

15     Q.   Now, you know that Abbott has criticized what

16 Ms. Tam did and said she should have labeled the A2

17 instead of the Humira, right?

18     A.   Yes, I do know that.

19     Q.   So, again, in your experience, in your

20 opinion, does it make a difference which antibody was

21 labeled here?

22     A.   Not at all.

23     Q.   Do you have any -- anything that can back up

24 your opinion on that, any support for your opinion that

25 it doesn't matter here?

1      A.   Well, there's -- besides my experience,

2  there's a number of assays have been done at both Abbott

3  and Centocor with looking for the competition between

4  Humira and chimeric A2, the cA2 antibody that we've

5  talked about here today.

6           And in all of those experiments, they all

7  clearly show that these two antibodies compete with each

8  other.   There is no evidence that I've ever been shown

9  that they do not compete with each other.

10     Q.   Dr. Adams, you're now talking about assays

11  involving chimeric A2 or cA2 for the antibody in

12  Remicade rather than assays involving A2, Humira.

13  So how can you equate or relate assays using cA2 to

14  assays that use A2?

15     A.   So if you recall, when we talked about the

16  Y-shaped antibody structure, that the constant domains

17  are on the bottom and the variable domains are on the

18  top.

19           The variable domains are the tips of those

20  arms -- or the top of the arms of the antibodies are the

21  parts that actually dictate the specificity of the

22  antibody for the antigen.   They're the part that

23  interacts with the antigen or TNF-alpha in this case.

24  Since chimeric A2 and A2 have identical variable

25  domains, and one of the inventors from Centocor earlier

1  today said those domains were identical, they will bind

2  to the same spot in the same manner.

3       So if chimeric A2 and Humira compete with each

4  other, A2 and Humira will also compete with each other.

5       Q.   Dr. Adams, I believe in your binder of

6  exhibits, you have what's been marked as Plaintiffs'

7  Exhibit 137.  If you could find that in your binder,

8  please.

9            MS. MULLIN:  And perhaps Mr. Ficocello

10  could bring that first page up on the screen that's been

11  preadmitted.

12            Thank you.

13       A.   Yes.

14       Q.   (By Ms. Mullin) What -- what is this document?

15       A.   So this is one of the tests that I told you

16  about that have been happening at both Abbott and

17  Centocor.  And the tests that I'm referring to were

18  performed before the lawsuit, before the litigation.

19  And to be honest, I was not privy to them.  I don't know

20  why they were performed.  I just have seen the results

21  of these tests.

22            The document here is showing a test that was

23  done at Abbott by Zehra Kaymakcalan.  I'm sure I

24  mispronounced her last name; I always do.

25            And this test was competition assays where she

1  was showing competition between chimeric A2, or Remicade

2  is the other name, and for the Humira.

3      Q.   Okay.  Was this lawsuit filed before July 1st,

4  2005?

5      A.   No.

6      Q.   If you can turn, then -- and perhaps

7  Mr. Ficocello could help us again bringing up the pages

8  that end in 451 and 452 as a split screen.

9          Can you describe what's been depicted here in

10  this Abbott document?

11      A.   Sure.

12          Now, these are, once again, competition

13  assays.  And what we're seeing here is that on the left,

14  the Humira antibody has been labeled with Iodine-125,

15  and on the right, Remicade, the chimeric A2, was labeled

16  with Iodine-125.

17          And these are very similar to what I described

18  a few minutes ago and described the competition assays,

19  except that in this case, instead of going down, now we

20  have percent inhibition on the up-and-down side on the

21  left here.

22      Q.   Okay.  I'm sorry.  So can you explain that a

23  little more, because before we were talking about

24  something that looked kind of like a 2, and now we're

25  looking at something that looks kind of like an S.

 1       A.    Exactly.

 2            So what's happening here is, since we're

 3  measuring competition, it's sort of the inverse.  The

 4  more competition, the less counts it would be.

 5            So if we measure the amount of counts instead

 6  of the competition, it would be a curve going this way.

 7  But since we're measuring how much of the labeled

 8  antibody is prevented from being bound when they're

 9  competing with each other with the unlabeled antibody,

10  if the unlabeled antibody is causing competition with

11  the labeled antibody and vice versa, which you will get

12  an increase in inhibition with the antibodies.

13            And if you look closely here, you'll see that

14  Remicade causes inhibition with Humira.  Humira causes

15  inhibition with Humira, et cetera.

16            And on this side, Remicade causes inhibition

17  with Remicade, and Humira causes inhibition with

18  Remicade.

19       Q.   Again, there are some other substances that

20  were being tested here, right?

21       A.   Yes.  There are controls and there is

22  something else called an Enbrel, which is another

23  molecule that targets -- it's not antibodies, but

24  something else that targets TNF-alpha.

25       Q.   Okay.  But in each one of these tests, Humira

1  and the chimeric A2, the Remicade antibody, were used?

2      A.   Yes.  And in each one of these tests, they

3  compete with each other.

4      Q.   Okay.  And is there any difference between

5  these other than whether it's the Humira or the cA2

6  that's labeled?

7      A.   I'm sorry.  Any difference between the two

8  tests or --

9      Q.   Yes.

10      A.   Between the test on the left and the test on

11  the right, they are really identical assays, except that

12  we're labeling Humira or cA2.

13      Q.   And what do those assays demonstrate?

14      A.   Well, what they demonstrate to me is that

15  Humira and chimeric A2 compete with each other and,

16  therefore, demonstrate to me that A2 and Humira would

17  compete with each other as well.

18              MS. MULLIN:  If you can go back, then, to

19  the slides that Dr. Adams controls.

20      Q.   (By Ms. Mullin) And so we started this, and I

21  think if we go maybe one or two more slides, we'll come

22  back to where we started.

23        We started this conversation talking about the

24  element competitively inhibits binding of A2, ATCC

25  Accession No. PTA7045, to human TNF-alpha.

1          Dr. Adams, do you have an opinion as to

2   whether Humira meets this element of Claim 2?

3       A.   So based on what I just showed you, I conclude

4   that Humira does meet this -- this claim.

5          So we can check that off.

6       Q.   What is the next element, then, in Claim 2?

7       A.   So the next element in Claim 2 is that it must

8   bind to a neutralizing epitope of human TNF-alpha in

9   vivo.  And I looked at the data and the results or at

10  the publications.  I concluded that it does.

11         And, in fact, once again, Abbott has admitted

12  that it does as well.  So we can check that box off.

13      Q.   I'm sorry.  And when it's talking about

14  binding in vivo, what's that referring to?

15      A.   So binding in vivo is referring to the

16  function.  In vivo means antibody in a mouse, in a

17  human.  It means that it is functional in a living

18  creature, really.

19      Q.   And what's being specified here, though, is

20  binding to human TNF-alpha in vivo, right?

21      A.   That's correct.  So it means that we're not

22  talking about binding to mouse TNF-alpha or rhino

23  TNF-alpha; we're talking about human TNF-alpha, which is

24  a critical component of this claim.

25      Q.   And did Mr. Sayles read something in before

 1  you started relevance to --

 2      A.    Yes.  I'm sorry.  He did also read in that

 3  Abbott has admitted that Humira binds to human TNF-alpha

 4  in vivo.

 5      Q.    So what does -- I'm sorry.

 6      A.    Let me check that off.

 7      Q.    Okay.  So what is the next element of Claim 2?

 8      A.    So the next element is that it has an affinity

 9  of at least 1 times 10 to the 8th liter per mole,

10  measured as an association constant, or Ka, as

11  determined by Scatchard analysis.

12          And once again, I've looked at the literature

13  on Humira.  I have looked at Susan Tam's testing data,

14  and I've concluded that it meets this claim that it has

15  at least an affinity of 1 times 10 to the 8th liter per

16  mole.

17          And, in fact, Abbott has also been asked to

18  and has admitted that fact.  So we can check that off as

19  well.

20      Q.    Really briefly, what does association constant

21  or Ka refer to?

22      A.    So when we were talking about affinity before,

23  association constant is a measurement of the affinity,

24  measurement of the strength of binding.

25          And in this case, as that number goes up, the

1 antibody and the antigen have a stronger bond for each

2 other than if the affinity number was lower.

3      Q.    And the reference there is Scatchard analysis.

4 If you can explain that just very briefly.

5      A.    Very briefly, a Scatchard analysis is a type

6 of analytical study that's done on these binding

7 studies.  It's a way of looking at the data to conclude

8 what the affinity is, the strength of binding of the

9 antibody for the antigen.

10      Q.    Then what is the element that is added by

11 Claim 2?

12      A.    The element added by Claim 2 is a human

13 variable region.  And, once again, I've looked at the

14 documents, and I've concluded that Humira has a human

15 variable region.

16           Abbott was asked to and has admitted that it

17 has a human variable region, so we can check that off as

18 well.

19      Q.    So, Dr. Adams, what is your opinion as the to

20 whether the Humira antibody infringes Claim 2 of the

21 '775 patent?

22      A.    It's my opinion that it does infringe.

23      Q.    Can we move to Claim 3 then?  That's the next

24 asserted claim in this patent.

25      A.    Definitely.

1    Q.   Can you describe -- what are the parts of

2  Claim 3?

3         We've got a lot of underlining already up

4  there.

5    A.   Well, the reason we have a lot of underlining

6  up there already is Claim 3 is also a dependent claim.

7  Just like Claim 2, Claim 3 also depends on Claim 1.

8         And since we already went through Claim 1 in

9  detail, what we've seen is we've checked off -- gone

10  through and underlined a lot of these points that we've

11  already checked off for Claim 1 when it was a dependent

12  claim, when it was being used by Claim 2.

13         And now what we're focusing on is this

14  additional two components in Claim 3, or these

15  additional two elements, the human light chain and the

16  human heavy chain.

17    Q.   And does Humira have a human light chain and a

18  human heavy chain?

19    A.   Yes, it does.  Once again, I've looked at the

20  documents, and Abbott has also admitted it.

21         So we can check off that it has a human light

22  chain and a human heavy chain.

23    Q.   So do you have an opinion as to whether the

24  Humira antibody infringes Claim 3 of the '775 patent,

25  Dr. Adams?

1     A.    Yes.   It is my opinion that it does infringe

2 Claim 3.

3     Q.    The next asserted claim in this case is Claim

4 14.   Now, you have a lot of things up there.

5          What's -- what are the elements of Claim 14?

6     A.    So, once again, the elements of Claim 14 are

7 the same as the elements of Claim 2.   So when we've

8 already gone through and checked off the elements of

9 Claim 2, and it's sort of a stacking game.   We keep

10 adding more things in, but we've checked off those

11 elements.

12          But with Claim 14 adds -- I'm underlining here

13 in blue -- is a human IgG1 constant region.

14     Q.    I'm sorry.   What is IgG1?

15     A.    So IgG1 is a class of antibodies.   There are

16 five classes of antibodies that are in human bodies.

17 There is IgG, IgA, IgD, IgM, and IgE.   And IgG1 is one

18 of these classes.

19          And I've looked at the documents and have

20 concluded that Humira is a human IgG1 or has an IgG1

21 constant region.   And Abbott has also been asked to

22 admit that and has admitted that it has a human IgG1

23 constant region.

24     Q.    Now, Dr. Adams, do you have an opinion as to

25 whether Humira or the Humira antibody infringes Claim 14

1  of the '775 patent?

2      A.   Yes.  It is my opinion that it infringes Claim

3  14.

4      Q.   And just to be clear, other than the human

5  IgG1 constant region that's referenced here, the

6  analysis that we walked through before for all the other

7  elements, is it all the same for these elements of the

8  claim?

9      A.   That is correct.  This is the only new element

10 that is added on to all the other elements that I walked

11 you through already.

12     Q.   Okay.  Claim 15, I believe, is the next

13 asserted claim.  And, again, we have it lined up next to

14 Claim 3.  Why is that?

15     A.   Because once again, Claim 15 -- we've already

16 gone through all those elements in Claim 3, a dependent

17 claim.  And we have concluded, once again, that all

18 these elements were satisfied by Claim 3 when we walked

19 through that.

20          And what's added here again is a human IgG1

21 constant region for the reasons that I just stated and

22 for Abbott's admission that it is an IgG1 constant

23 region.  And we can go ahead and check that one off as

24 well.

25     Q.   So, Dr. Adams, do you have an opinion as to

1  whether the Humira antibody infringes Claim 15 of the

2  '775 patent?

3      A.   Yes.  It is my opinion that it infringes Claim

4  15 as well.

5      Q.   So maybe we can -- I think there's a summary

6  slide.

7      A.   Yes.

8          So this slide shows all the checked boxes that

9  I've just gone through showing you that Humira infringes

10  these claims.  And, in fact, everything in red are the

11  checked boxes that Abbott has already admitted that

12  Humira infringes on the '775 patent.

13          And then in blue is the part about

14  competitively inhibits, which I walked you through in

15  the studies that were done at Abbott and Centocor.

16      Q.   To make sure I didn't miss any, then, what is

17  your opinion as to whether Humira infringes Claims 2, 3,

18  14, and 15 of the '775 patent?

19      A.   It is my opinion that Humira infringes Claims

20  2, 3, 14, and 15 of the '775 patent.

21      Q.   Dr. Adams, other than the conversations and

22  time spent working on this case, do you have any

23  financial interest in any of the parties in this

24  litigation?

25      A.   No, I do not.

1    Q.   Does the compensation that you receive for

2  your time depend in any way on the content of your

3  testimony?

4    A.   No, it does not.

5    Q.   Does it depend on your conclusions?

6    A.   No, it does not.

7    Q.   Does it depend on the outcome of your

8  analysis?

9    A.   No, it does not.

10    Q.   Thank you.

11         MS. MULLIN:  I pass the witness.

12         MR. LEE:  May I have a minute, Your

13  Honor?

14         THE COURT:  Certainly.

15         (Pause in proceedings.)

16         THE COURT:  Proceed, Mr. Lee.

17         MR. LEE:  Thank you, Your Honor.

18              CROSS-EXAMINATION

19  BY MR. LEE:

20    Q.   Good afternoon, Dr. Adams.

21    A.   Good afternoon.

22    Q.   Dr. Adams, you work at the Fox Chase Cancer

23  Research Center, correct?

24    A.   The Fox Chase Cancer Center is the name,

25  that's correct.

1     Q.   And the center specializes in cancer research,
2  correct?
3     A.   That is the major focus of the cancer center.
4  If you'd like, I can tell you about the additional
5  focus.
6     Q.   No.  That's okay.  But that's the major focus
7  of the --
8     A.   It's the major focus, though we have a very
9  strong immunology group as well in the Basic Science
10 Division.
11    Q.   Now, this case is about anti-TNF-alpha
12 antibodies, correct?
13    A.   That's correct.
14    Q.   You have never made a mouse anti-TNF-alpha
15 antibody, have you, sir?
16    A.   That's correct.
17    Q.   You have never made a chimeric anti-TNF-alpha
18 antibody, have you, sir?
19    A.   That is correct.
20    Q.   You have never made a fully human
21 anti-TNF-alpha antibody, correct?
22    A.   That is correct.
23    Q.   In fact, Dr. Adams, before you got hired to
24 work in this case, you have never worked at all with
25 anti-TNF-alpha antibodies, correct?

1     A.    That is correct.

2     Q.    The first time that you were asked to work

3 with anti-TNF-alpha antibodies is when a lawyer called

4 you to work in this case, correct?

5     A.    Well, actually, I've never worked with

6 anti-TNF-alpha antibodies.

7     Q.    Fair enough.

8           Now, when is the first time you heard of the

9 '775 patent?

10     A.    When I was asked to serve as an expert witness

11 on this case.

12     Q.    And when was that?

13     A.    It would have been September of last year.

14     Q.    Okay.  So September of 2008, correct?

15     A.    That's correct.

16     Q.    So before September 2008 -- September of 2008,

17 even though you've worked in the field since 1990 --

18 1985, correct?

19     A.    That is correct.

20     Q.    So 23 years, correct?

21     A.    That's correct.

22     Q.    You've never heard of the '775 patent,

23 correct?

24     A.    Not of the patent, that is correct.

25     Q.    And before you were asked in September of 2008

1 to work with Centocor's lawyers, you had never made any

2 analysis of any kind of an anti-TNF-alpha antibody,

3 murine, chimeric, or human, correct?

4     A.   That is correct.

5     Q.   Now, your testimony today concerned the issue

6 of infringement, correct?

7     A.   Correct.

8     Q.   You haven't provided any testimony on the

9 issue of validity, correct?

10     A.   That's correct.

11     Q.   You mentioned --

12     A.   Not to -- not right now.  Not up till now.

13     Q.   Not today.

14     A.   Not today, that is correct.

15     Q.   You may come back to provide that testimony,

16 correct?

17     A.   Correct.

18     Q.   So I'm going to confine my questions just to

19 the question of infringement and leave validity for a

20 later day, okay?

21     A.   That's fine.

22     Q.   Now, I'm going to put on the screen Claims 1

23 and 2, which you just had on the screen.  In the

24 notebook before you is -- are also the hard copies of

25 the exhibits.

1        A.    Correct.

2        Q.    And you use whichever one is most comfortable

3  for you, okay?

4        A.    Okay.  That's fine.  Thank you.

5        Q.    Now, you've explained that Claim 2 is the

6  claim that's in issue in this case, correct?

7        A.    That is my understanding, yes.

8        Q.    And to figure out what Claim 2 requires, the

9  jury needs to look at both Claim 2 and Claim 1, correct?

10       A.    Because it is a dependent claim, correct.

11       Q.    Claim 2 is dependent on Claim 1.

12       A.    Correct.

13       Q.    And to figure out what Claim 2 requires, you

14  have to figure out what all the requirements are of

15  Claim 1 and Claim 2, correct?

16       A.    Correct.

17       Q.    And to infringe, as you've used that term, the

18  accused product has to have each and every element of

19  the claim, correct?

20       A.    Correct.

21       Q.    If it's missing only one, the jury finds that

22  it's missing only one, then there's no infringement.

23       A.    That is correct.

24       Q.    And that's the judgment -- that's the standard

25  you've brought to bear in your analysis, correct?

1        A.    Correct.

2        Q.    Now, you understand that Centocor has the

3   burden of proving infringement, correct?

4        A.    Correct.

5        Q.    You understand that Humira is the accused

6   product, correct?

7        A.    Correct.

8        Q.    And you understand that that means that Humira

9   needs to satisfy each and every limitation of Claims 1

10  and 2, correct?

11       A.    That is my understanding, yes.

12       Q.    If there is a single limitation missing, there

13  would be no infringement, correct?

14       A.    Correct.

15       Q.    Now, in Claim 2, there is a requirement of a

16  human variable region, correct?

17       A.    That is correct.

18       Q.    And you understand what that means, correct?

19       A.    Yes, I do.

20       Q.    So Claim 2 does not cover a chimeric antibody,

21  does it?

22       A.    That is correct.

23       Q.    It only covers a human antibody, correct?

24       A.    That is correct.

25       Q.    And the same is true for Claims 13, 14, and

15.   They all require a human variable region, correct?

A.   Correct.

Q.   They don't cover a chimeric antibody, correct?

A.   Correct.

Q.   And cA2 that you referred the jury to, cA2 is a chimeric antibody, correct?

A.   That is correct.

Q.   Now, looking at Claims 1 and 2, there is a requirement, competitively inhibits binding of A2, ATCC Accession No. PTA-7045, to human TNF-alpha.

A.   Correct.

Q.   It's true, is it not, sir, that before you got involved in this case, you had never reviewed any test results to determine competitive inhibition for TNF-Alpha, correct?

A.   That is correct.

Q.   The first time you ever looked at any test results to try to figure out whether something was competitively inhibiting was when you got hired in this case, correct?

A.   Specifically through this case, correct.

Q.   Right.   And in fact, by the time you were retained in September 2008 -- correct?

A.   Correct.

Q.   Ms. Tam had run her tests almost a year

1  before, correct?

2      A.   Correct.

3      Q.   So by definition, you had no involvement in

4  how they determined how she was going to run her tests,

5  correct?

6      A.   Correct.

7      Q.   You had no involvement with the protocol she

8  used, correct?

9      A.   Correct.

10     Q.   You had no input into the manner in which she

11 was going to do them, correct?

12     A.   Correct.

13     Q.   In fact, a year and a half after she did them,

14 the lawyers gave them to you and said, here's what we

15 got, correct?

16     A.   They asked me to analyze it, correct.

17     Q.   Now, for the issue of infringement on which

18 you bear -- on which Centocor bears the burden of proof,

19 you have some testing, and you've testified about it,

20 correct?

21     A.   That is correct.

22     Q.   You understand that on the issue of validity,

23 Abbott has the burden of proof.

24     A.   That is my understanding.

25     Q.   Right.  And Abbott, on that -- on those

1   issues, has done some testing, correct?

2        A.   That is correct.

3        Q.   But you haven't done any testing on validity,

4   correct?

5        A.   I don't --

6                  MS. MULLIN:  Objection, Your Honor.  What

7   is this?

8                  THE COURT:  Well, y'all approach, please.

9                  (Bench conference.)

10                 THE COURT:  Well, Mr. Lee, let me tell

11  you where you're headed.  You're heading -- I'm going to

12  tell you where you're headed for the record.  Where

13  you're headed for the record is, I'm going to let them

14  start talking about, giving opinions about validity,

15  because you're opening the door to it.

16                 MR. LEE:  I'll move off of that until he

17  comes back.

18                 THE COURT:  Well, that's -- either that

19  or you're not going to like what's going to happen, I

20  tell you.

21                 MR. LEE:  Yeah.  I'd prefer to like what

22  happens.

23                 MS. MULLIN:  I'd like it the other way,

24  Your Honor.

25                 (Bench conference concluded.)

1          THE COURT:  Let's move along now.

2     Q.   (By Mr. Lee) The testing that you did was

3 testing on which you had the burden of proof, correct?

4     A.   The testing I reviewed, you mean?

5     Q.   Yes.  I'm sorry.  The testing that you

6 reviewed was testing on which you had -- issues on which

7 you had the burden of proof, correct?

8     A.   On which Centocor had the burden of proof,

9 correct.  I'm an expert witness.  I'm not really a party

10 on either side here.

11     Q.   Right.  Now, Dr. Adams, Claims 2, 3, 14, and

12 15 all require competitive inhibition, correct?

13     A.   That is correct.

14     Q.   So if the testing doesn't prove that Abbott

15 competitively inhibits for Claim 2, there's no

16 infringement of Claim 2, correct?

17     A.   That would be my understanding, yes.

18     Q.   And the same would be true for Claims 3, 14,

19 and 15, correct?

20     A.   That would be my understanding.

21     Q.   And let's start with Claim 1.

22          Claim 1 begins with the phrase:  An isolated

23 anti-TNF-alpha antibody -- I'm sorry.

24          An isolated recombinant anti-TNF-alpha

25 antibody.

1      A.    That is correct.

2      Q.    That would be Humira in your analysis,

3 correct?

4      A.    That is correct.

5      Q.    And the claim requires that an isolated

6 recombinant anti-TNF-alpha antibody competitively

7 inhibits something, correct?

8      A.    That is correct.

9      Q.    So Humira has to interfere with the binding of

10 A2 and TNF-alpha, correct?

11      A.    They need to interfere with each other.

12      Q.    Well, it says -- the words say:  An isolated

13 recombinant anti-TNF-alpha antibody competitively

14 inhibits binding of A2, correct?

15      A.    So speaking as a scientist --

16      Q.    Is that what -- is that what the words say?

17      A.    If you want me to read the words, I'd be happy

18 to read the words to you.

19      Q.    Well, you were here this morning when His

20 Honor said it's the claims that define the metes and

21 bounds for infringement purposes, right?

22      A.    So my understanding is the Court has construed

23 that claim to mean competes with A2 for human TNF-alpha.

24      Q.    Fair enough.

25            Now, let's use the standard the Court's

1  articulated, which is in the jurors' notebooks.

2  You've relied on different sets of tests to support your

3  opinion, correct?

4      A.   That is correct.

5      Q.   Now, first, only one set of those tests

6  involve Humira and A2, correct?

7      A.   That is correct.

8      Q.   That's Dr. Tam's test, correct?

9      A.   Correct.

10      Q.   Now, three of the tests you relied upon

11  involved Humira and cA2, correct?

12      A.   That is correct.

13      Q.   Now, you know, sir, do you not, that at one

14  point in time, Centocor had claims pending before the

15  Patent Office that required competitive inhibition with

16  either A2 or cA2, correct?

17      A.   To be honest, I cannot recall that.

18      Q.   Well, let me see if I can show you.

19           MR. LEE:  If I can just have a second

20  here, Your Honor.

21           Could we bring up DX777, which is in

22  evidence, Your Honor.

23      Q.   (By Mr. Lee) It's at Tab 3 of your notebook.

24      A.   Tab 3?  Thank you.

25      Q.   Yeah.

1           And we'll start with this.  Now, I want you to

2   have in mind so that we're all on the same page, we're

3   talking about tests that compare Humira and cA2.

4           Do you have those in mind?

5       A.   I'm just looking at this a little bit more

6   carefully.  So this is -- this is a different patent.

7   This is the '845 patent, not the '775 patent, correct?

8       Q.   It's part of the '777 (sic) file history.  Let

9   me ask you --

10      A.   I'm sorry.  Patent No. 7.  I'm sorry.  I was

11  looking at the wrong number there.  It was the

12  application number.

13          So it is part of the '775, that's correct.

14      Q.   Dr. Adams, we'll have to try not to talk over

15  each other, or the reporter is going to kill us both,

16  okay?

17      A.   Okay.

18      Q.   So --

19      A.   I'd rather that that doesn't happen.

20      Q.   -- if you let -- if you let me finish --

21              THE COURT:  And then if she gets upset,

22  you know, then I really get red in the face, and that's

23  not good.

24      Q.   (By Mr. Lee) So you're going to have --

25      A.   Let's avoid that.

1    Q.   Let me finish, and I promise you that I'll let

2  you finish, okay?

3              THE COURT:  Y'all are doing a good job of

4  trying --

5              MR. LEE:  All right.

6              THE COURT:  -- so that's why I'm not

7  getting involved.

8              So let's continue.

9    Q.   (By Mr. Lee) Now, Dr. Adams, you understand

10 what the file history is, do you not?

11   A.   Yes, I do.

12   Q.   You've reviewed the file history of the patent

13 and patent applications leading to the '775 patent, have

14 you not?

15   A.   As you noted earlier, it's an extensive file

16 history, so I went through things and tried to know

17 where the changes were as best as I could.

18   Q.   And the file history is the back and forth

19 between the Patent Office, and in this case, Centocor,

20 correct?

21   A.   That is correct.

22   Q.   All right.  Now, at -- in DX777, I'm going to

23 put on the screen a page, which in the bottom right-hand

24 corner says 1339.  It's an office action summary.

25              Now, you were here this morning when His Honor

1  described office actions, things the Patent Office did?

2      A.   Hold on one second.  I'm going to try to find

3  that page.

4      Q.   The bottom right-hand corner, you'll find the

5  numbers that end 1339.

6      A.   Yes.  Thank you.

7      Q.   Now, in this office action summary -- this is

8  an office action by the Patent Office, correct?

9      A.   Give me a moment, please.

10          That is correct.

11     Q.   And if you go down to the line that's numbered

12 6, you will see that what the Patent Office has said is

13 all the claims listed there are rejected.

14          Do you see that?

15     A.   That is correct.

16     Q.   Now, Centocor responded to that rejection, did

17 it not?

18     A.   That is my understanding.  That is typical.

19 It's what my laboratory -- what de do with the patents

20 that my laboratory is filing as well.

21     Q.   Okay.  When you get a rejection, you respond

22 and you try to change -- amend your claims so that you

23 can satisfy the Patent Office, correct?

24     A.   You try to be responsive to the Examiner, yes,

25 that is --

1      Q.   All right.

2      A.   That's your task.

3      Q.   So let's look at what Centocor did.

4           MR. LEE:  Can I have first Page 1339 --

5  oh, I'm sorry.  1369.

6      Q.   (By Mr. Lee) Do you have that in front of you?

7      A.   I will in just a moment.

8           Now, once again, I glanced at these a long

9  time ago, and so now I'm just doing my best to follow

10 you.

11     Q.   That's great.

12     A.   Okay.  Now that it is in front of me, yes.

13     Q.   All right.  You have it before you.

14          And this is an amendment that Centocor filed,

15 correct?

16     A.   Yes, that is correct.

17     Q.   All right.

18          MR. LEE:  Could we have Page --

19     Q.   (By Mr. Lee) Get you to the right page.

20          MR. LEE:  Could we have the page with the

21 amended claims on it, please.

22          And could we blow up amended Claim 1.

23     A.   Can you tell me which page?  Oh, it's Page 12?

24     Q.   (By Mr. Lee) Can you see it?

25     A.   Okay.  I see that, yes.

1    Q.   So just so the jury understands, when -- and

2  you know this from your experience -- when you have a

3  claim and you're amending it, you cross out what you're

4  eliminating, correct?

5    A.   That is -- that is my understanding, yes.

6    Q.   So here's what happened.  Centocor had a claim

7  pending that would have allowed infringement to be

8  determined by competitive inhibition to either A2 or

9  cA2, correct?

10   A.   That would be the way I would read this.

11   Q.   Right.  But then in order to get the patent

12  out of the Patent Office, they eliminated the reference

13  to cA2, correct?

14   A.   That is what it looks like.

15   Q.   So the three sets of testing that you

16  compared, which were Humira with cA2, is precisely the

17  testing that Centocor told the Patent Office was no

18  longer part of the claims, correct?

19   A.   That is -- that is what it looks like.

20   Q.   Right.  And when you formed your opinion about

21  competitive inhibition, did you consider the fact that

22  Centocor had said, comparing cA2 to an isolated

23  recombinant anti-TNF-alpha antibody is not what part of

24  what we claim as our invention?

25   A.   I'm sorry.  Can you please repeat that?

1     Q.    Sure.  When you formed your opinion about

2  infringement, did you consider that in order to get this

3  patent, Centocor had said we're not going to include a

4  claim that involves comparison of the competitive

5  inhibition of a TNF-alpha antibody and cA2?

6     A.    I don't believe that's something that I -- I

7  cannot, to be honest to, remember whether I considered

8  that, but I do not believe that I have.

9     Q.    Would it be fair to say that you have made --

10  that the test you relied upon involving cA2 made

11  precisely the comparison that Centocor said it would not

12  make?

13     A.    I don't know if it said it would not make.

14  I'm not sure that that's what that language is.  To be

15  honest, I would not know if that's -- if that is what --

16  is the appropriate language here.

17     Q.    Fair enough.

18          What we can agree is they eliminated any

19  reference to cA2 in the claim, right?

20     A.    I see that cA2 was crossed off as part of

21  their response to the Examiner's -- the process of give

22  and take with the Patent Examiner, correct.

23     Q.    Now, let's go to the other tests, which were

24  Ms. Tam's tests, correct?

25          And those tests did involve Humira and A2,

1  correct?

2      A.   That is correct.

3      Q.   And A2 is referred to specifically in the

4  claims, correct?

5      A.   That is correct.

6      Q.   Now, the test was run by Ms. Tam, who has been

7  a Centocor employee for a long period of time, correct?

8      A.   Correct.

9      Q.   There are independent labs that you have

10  worked with before who could have run the test, correct?

11      A.   That I've worked with or that I know of?

12      Q.   That you know of.  I'm sorry.

13      A.   I know of independent labs that can run the

14  test.

15      Q.   And they could have run the test independently

16  as an expert in the same way that you have given your

17  opinions here, correct?

18      A.   That is correct.

19      Q.   Now, as you said, you reviewed the test for

20  the first time about two years after they were done,

21  correct?

22      A.   And the first time they were done in 2006 or

23  2007?  I don't recall.

24      Q.   2007.

25      A.   So about a year -- just over a year after they

1 were done.

2     Q.   Right.  Now, Ms. Tam testified that her

3 experiments involved showing that A2 affected the

4 binding of Humira, correct?

5     A.   She testified that they competed with each

6 other for TNF-alpha.

7     Q.   Well, one of them was labeled, correct?

8     A.   That's correct.

9     Q.   She labeled Humira, correct?

10     A.   That is correct.

11     Q.   And then she figured out, if she added

12 increasing amounts of A2, what happened to Humira,

13 correct?

14     A.   She figured out how many of the Humira counts

15 were read at the end of the experiment by the gamma

16 counter, correct.

17     Q.   She didn't label A2 and then put Humira in to

18 see what happened if you ran the experiment in the

19 reverse, correct?

20     A.   That is correct.  She did not do it that way.

21     Q.   Now, the patent actually has a competitive

22 binding test in it, doesn't it?

23     A.   It -- I think I know where you're going.  I'm

24 not sure if it -- if -- it's not quite used in the way

25 you're talking about it, but there is a competitive

1   binding test in it, that is correct.

2        Q.   So -- and that test is shown at Figures 9A and

3   9B, correct?

4        A.   That is correct.

5                  MR. LEE:  And let's bring up Figures 9A

6   and 9B.

7        Q.   (By Mr. Lee) Now, this is the patent itself,

8   correct?

9        A.   That is correct.

10       Q.   This is the patent describing the concept of

11  competitive inhibition, correct?

12       A.   This is the patent that is showing the binding

13  of, in this graph, A2 and chimeric A2, looking at them

14  in terms of binding to TNF-alpha, that is correct.

15       Q.   And the patent is trying to demonstrate that

16  there is competitive inhibition between cA2 and A2,

17  correct?

18       A.   My understanding is this figure is trying to

19  demonstrate that chimeric A2 and A2 have identical -- or

20  very, very much the same binding properties for

21  TNF-alpha.

22       Q.   Are these competitive binding tests or not?

23       A.   They are competitive binding tests showing

24  that the secondary antibody that's being used doesn't

25  matter.

1    Q.   Right.  And when the -- when the submission

2 was made to the Patent Office -- let's take it in part,

3 so we're clear about it.  Let's look at Figure 9A.  Do

4 you have that in front of you?

5    A.   That's fine.

6    Q.   In Figure 9A, they've labeled with this

7 radioisotope A2 and then added increasing amounts of

8 cA2.

9    A.   No, that is not correct.  They did not use

10 radio labels in this assay at all.

11    Q.   Oh, let's do it then -- let's be precise.  A2

12 was labeled, correct?

13    A.   No.  A2 was not labeled.

14    Q.   So --

15    A.   A2 was not modified.

16    Q.   -- is it your testimony that there was no

17 label at all on A2?

18    A.   It is my testimony that neither of these

19 antibodies in these assays were labeled.  I've studied

20 this in detail.

21    Q.   Okay.

22    A.   And, in fact, what they did -- and as I said,

23 they were using this assay to demonstrate the -- that

24 the secondary antibodies that were being used to detect

25 A2 and chimeric A2 were working equivalent, because A2

1  is a mouse antibody, and chimeric A2 is a chimeric

2  antibody.

3       Q.   Let's just look at what the curve says.  So

4  let's put up 9A and 9B side by side.

5            In 9A, the axis at the bottom --

6                 MR. LEE:  May I approach the screen, Your

7  Honor?

8                 THE COURT:  Certainly.

9       Q.   (By Mr. Lee) In 9A, the axis at the bottom is

10 chimeric A2, correct?

11      A.   Correct.  That means that they were increasing

12 amounts of --

13      Q.   Dr. Adams --

14      A.   I'm sorry.

15      Q.   -- does it say chimeric A2?

16      A.   It does say chimeric A2, yes.

17      Q.   And then at the top, it talks about what's

18 being added, and it's A2, correct?

19      A.   So --

20      Q.   Is that right?

21      A.   That is a fixed amount of A2 being added and

22 increasing amounts of chimeric A2 being added as you go

23 to the right across the bottom of the curve.  I just

24 want to be clear on what we're talking about here.

25      Q.   Right.  And then we get to 9B, and it's run in

1   the reverse.  You have A2 on the bottom axis, correct?

2       A.   Increasing concentrations of A2 being added,

3   that is correct.

4       Q.   And a fixed ailment of cA2, correct?

5       A.   That is correct.

6       Q.   So when the inventors wanted to describe to

7   the Patent Office what it was doing -- what they were

8   doing, they ran the tests in both directions, correct?

9       A.   So when I spoke with Dr. Ghrayeb about this

10  earlier today --

11      Q.   Dr. Adams, my question is, when the inventors

12  applied to the Patent Office and wanted to tell them

13  what they did, what they gave the Patent Office was two

14  sets of tests, one running it in one direction, and the

15  other running it in the other --

16      A.   Well, when they --

17      Q.   -- is that correct?

18      A.   -- when they wanted to show that there was no

19  difference in the secondary antibody, that is precisely

20  what they did, yes.

21      Q.   All right.  Now, you're also familiar with an

22  article by Dr. Moller, correct?

23      A.   That is correct.

24              MR. LEE:  Could I have DX112, which is in

25  evidence, Your Honor?

1    Q.   (By Mr. Lee) And it's at Tab 2.

2    A.   Tab 2?  Thank you.

3    Q.   And I'm going to ask you about that

4 competitive test that Dr. Moller did.

5         You're familiar with DX112?

6    A.   Yes, I have read this article.

7    Q.   Right.  And DX112 is an article that concerns

8 what happens in murine anti-TNF-alpha antibodies,

9 correct?

10   A.   That is correct.

11   Q.   It's an article by Achim Moller, correct?

12   A.   Yes.

13   Q.   It was published in 1990, correct?

14   A.   Correct.

15   Q.   Dr. Moller is a scientist who works for

16 Abbott, correct?

17   A.   That is what I heard.

18   Q.   And the article back in 1990 referred to two

19 different antibodies, one called mAB 195 and one called

20 mAB 114 --

21   A.   Correct.

22   Q.   -- right?

23        And the article describes competitive

24 inhibition testing or how one would influence the other,

25 correct?

1     A.    Those are two different things, but that is

2  correct.

3     Q.    All right.  Now, let me bring up DX112 at Page

4  843.

5     A.    Oh, I'm sorry.  The Abbott number 843.

6     Q.    Yes.  I'm sorry.

7           You see there are some figures?

8     A.    Yes, I do.

9     Q.    Now, the conclusion that Dr. Moller reaches in

10  1990 about these tests involving an anti-TNF-alpha

11  antibody is, mAB 114 has an influence on mAB 195 binding

12  site but not vice versa.

13     A.    But that's not a conclusion.  That's in the

14  results section.

15     Q.    Is that what it says?

16     A.    In the result section, not his conclusion.

17     Q.    Okay.  So the result that's reported is that

18  mAB 114 has an influence on mAB 195 binding site but not

19  vice versa, correct?

20     A.    And then he concludes that there is no

21  competition.

22     Q.    Well, actually, let's see how one of ordinary

23  skill -- how one would read this.

24           You testified that you have relied upon

25  Dr. Tam's testing, correct?

1     A.   I relied upon Dr. Tam's testing, that is

2   correct.

3     Q.   Right.  And did you know that Dr. Tam

4   concluded that these charts and this data demonstrate

5   that the two antibodies compete in one direction but not

6   the other?

7     A.   Dr. Tam was shown the figure without given

8   time to read the article, and then based on that, in a

9   two-minute span or something like that during her

10  deposition, under those limited conditions, which she

11  then corrected later on in the deposition, said that it

12  seems like it concludes, yes.

13    Q.   Right.  So when Dr. Tam, who had run

14  competitive inhibition testing, was shown Dr. Moller's

15  article, she looked at the article at the deposition --

16  correct?

17    A.   She looked at the figure at the deposition.

18  She did not have time to read the article.

19    Q.   And she testified under oath that what was

20  shown was competitive inhibition in one direction but

21  not the other, correct?

22    A.   That in that brief review, that would be the

23  way she would conclude.

24    Q.   Right.  Now, if you had run the test in both

25  directions, how much additional time would it have

 1  taken?

 2      A.   Are you talking about Moller?

 3      Q.   No.  I'm sorry.  Let's go to Dr. Tam's test,

 4  which you agree with me were only run in one direction,

 5  correct?

 6      A.   That is correct.

 7      Q.   How much time would it have taken to run the

 8  test in the other direction?

 9      A.   A few more days.

10      Q.   Right.  How much would it have cost to run the

11  test in the other direction?

12      A.   That would be minuscule.

13      Q.   Right.  Now, if you had run it in the other

14  direction, you then would have known whether there was a

15  difference in the testing if you went in direction A

16  from the testing if you went in direction B, correct?

17      A.   That could have given you that result, yes.

18      Q.   Right.  If you had done the testing that the

19  patent describes, going in both directions, you would

20  have had that information, correct?

21      A.   I disagree that the patent describes that,

22  sir.

23      Q.   But in any event, if you had done the testing

24  both directions, you could tell us whether there was

25  competitive inhibition in both directions, correct?

1      A.    Yes, that is correct.

2      Q.    All right.  But you can't tell us that today,

3   can you, sir?

4      A.    In a one-word answer, no.

5      Q.    Right.  Thank you.

6           MR. LEE:  Nothing further, Your Honor.

7           THE COURT:  Redirect?

8           MS. MULLIN:  A few questions, Your Honor.

9                   REDIRECT EXAMINATION

10   BY MS. MULLIN:

11      Q.    Dr. Adams, I think Mr. Lee asked you a few

12   questions about whether you had ever done any

13   experiments with the particular -- with TNF in

14   particular.  I forget -- I'm sorry.  I forget the

15   precise questions.

16           In terms of competition assays, do you have to

17   develop a different assay for each different antigen or

18   for each different antibody and each different time that

19   you're testing?

20      A.    Not typically.  There's a few very, very

21   strange targets, which are very large, heavily

22   glycosylated molecules, such as mucins, where this may

23   become a factor but not with molecules like this, no.

24   There's very standard testing that's done.

25      Q.    Prior to the time that you were asked to

1  consider information in this litigation, have you had

2  any experience with interpreting data in competition

3  assays?

4      A.    Yes.   I've been interpreting this data since

5  1985.

6      Q.    And did you consider the protocol that Ms. Tam

7  used before you relied on her data?

8      A.    Of course.

9      Q.    And did you consider the quality of her data

10  before you relied on it?

11      A.    Of course.

12      Q.    And was there anything in there that suggested

13  to you that there was anything unreliable about the data

14  that was generated by Ms. Tam or the protocol or

15  procedure that she used for her tests?

16      A.    No.    In fact, it was all very clear.    The

17  protocol was clearly laid out.    The data was clear.    It

18  came from the instrument that read it, so there was no

19  manipulation of the data.    The calculations were there.

20  It was beautiful.    I wish my lab worked that way.

21      Q.    As part of your job, do you have any

22  experience -- or as part of any of the work you do, not

23  even necessarily directly for Fox Chase Cancer Center,

24  do you have any experience reviewing other people's

25  work?

1    A.   Yes, extensive experience.  I'm a sitting

2  member of the National Institute of Health study section

3  that reviews grant applications from scientists from

4  universities and cancer centers around the country.

5  I review those grants.  I decide -- help decide the

6  National Institute of Health decide whether or not to

7  fund the research.

8         Before that, I was a sitting member of the

9  American Cancer Society's clinical cancer and

10  immunopathology study section.  I did the same thing

11  there.

12         I've reviewed for the California Breast Cancer

13  Program.  I review articles that scientists submit to

14  journals.  My -- if you look in my CV, I've reviewed for

15  probably 25 different journals over the years.

16         And I'm also on the editorial board of a

17  couple of journals as well, where I'm involved in that

18  process as well.

19    Q.   And generally, do scientists -- are they in a

20  position to rely on data that's generated by other

21  people, even if they didn't do the tests themselves?

22    A.   When you -- when you critically review it,

23  yes, you have to look at it.  If there's a problem with

24  the data, we send it back.  We reject the article or we

25  don't fund the grant.

1          And so I'm very used to looking at this sort

2   of stuff.

3      Q.   Okay.  I'd like then -- Mr. Lee asked you some

4   questions about what's been marked as Defendant's

5   Exhibit 777.

6              MS. MULLIN:  Mr. Ficocello, can you bring

7   up Defendant's Exhibit 777?

8      Q.   (By Ms. Mullin) I'm going to point you to some

9   specific pages, because this is the prosecution history,

10  and there's a -- it's a big chunk of documents, Dr.

11  Adams, okay?

12     A.   Thank you.

13     Q.   Mr. Lee asked you some questions about some

14  changes that were made to the specification concerning

15  testing with A2 or cA2?

16     A.   That is correct.

17     Q.   To the best of your recollection, was there

18  ever any suggestion by the Examiner or by someone at

19  Centocor that that change was being made because the

20  testing for competition made a difference, whether you

21  used A2 or cA2?

22     A.   No, not at all.

23     Q.   Okay.  If I can refer you then to what has

24  been marked as Page ABT01371343.

25     A.   Okay.

1          MS. MULLIN:  I don't think we have the

2   right exhibit.

3      A.   I do.

4      Q.   (By Ms. Mullin) Okay.  I'm not sure that he'll

5   be able to bring it up on the screen, so maybe I can --

6          MS. MULLIN:  Oh, he did.  One, two,

7   three -- fourth paragraph down, can you enlarge that for

8   us on that page?

9      Q.   (By Ms. Mullin) Now, this is part of what the

10  Examiner was talking about in terms of the claims

11  that -- and issues that had come up with respect to A2

12  and cA2.

13         And do you understand what this is referring

14  to here?

15     A.   Yes, I do.  This is part of what I was asked

16  to consider.

17         So what this means is that -- and if I'm

18  misinterpreting it, it's just possible that I don't see.

19     Q.   Well, at the very least, just to start with,

20  just read, what did the Examiner say here?

21     A.   So what the Examiner said is, Amendment of the

22  specification to recite the date of deposit and the

23  complete name and address of the depositor is required.

24  "As an additional means for completing the record,

25  applicant may submit a copy of the contract with the

1  depository for deposit and maintenance of each deposit.

2          And what this means is that, once again --

3  remember, I mentioned the ATCC, the American Type

4  Culture Collection, which is that library that

5  scientists put cell lines into that other cells -- other

6  scientists can then request the cell lines.

7          So it's my understanding that Centocor

8  deposited the cell line that makes A2 into this library

9  so other scientists could get it back for testing.

10  It is my belief, if I'm recalling correctly, that the

11  cell line for chimeric A2 was not deposited in that

12  repository.

13          So, therefore, it would not be easy for

14  somebody else in the field to get chimeric A2, as easy

15  as for it to get A2 to test the antibodies.

16          So the Examiner, in my opinion was saying,

17  look, you only deposited A2 in the ATCC.  That should be

18  your test for the purpose of the words in the patent.

19      Q.   So if you could turn then to what's been

20  marked as ABT01371371.

21      A.   Okay.

22      Q.   The paragraph that starts with as examples of

23  antibody.  This is part of the response that Centocor

24  gave to the Examiner, and this is part of the

25  explanation for why the reference to cA2 was changed in

1  the claim language during -- in this application, right?

2       A.   That is correct.

3       Q.   And I think this is what you were just talking

4  about, right?

5       A.   That is exactly what I was just talking about.

6       Q.   So in your review and in your opinion, was

7  there any substantive decision about whether or not A2

8  and cA2 was interchangeable in assays, or is this a

9  paperwork kind of issue with respect to a depository?

10      A.   So in my opinion, the Examiner was not stating

11  that cA2 is not appropriate.  He was just talking about

12  whether it had been deposited.

13      Q.   Okay.  Now, I'd also like to pull up -- I

14  believe Mr. Lee pointed you to a specific part of

15  Defendant's Exhibit 112, which is the Moller reference.

16  And if you could look --

17            MS. MULLIN:  Mr. Ficocello, a page that

18  ends in 843, just the next page.

19            And if you can just keep going a little

20  bit more down.

21            Okay.  Stop, okay?  Actually, if you can go a

22  little bit more down, that would be great.

23            Stop.

24            May I walk over here -- more than arm's

25  length, Your Honor?

```
 1                    THE COURT:  Yes.

 2                    MS. MULLIN:  Okay.  Thank you.

 3                    THE COURT:  It's not quite that strict.

 4                    MS. MULLIN:  Okay.

 5                    THE COURT:  I haven't shot anybody yet

 6  for moving to the screen.  But Mr. Beck hasn't got up

 7  yet, so...

 8                    MS. MULLIN:  Okay.

 9      Q.   (By Ms. Mullin) Now, in his questions to you,

10  Mr. Lee pointed to something over here that says mAB 114

11  has an influence on the mAB 195 binding sites but not

12  vice versa, right?

13      A.   That is correct.

14      Q.   That doesn't say competition, does it?

15      A.   No.  In fact, when I was reading -- oh, okay.

16  Go ahead.

17      Q.   Well, let's look over here and see what was

18  actually said by the authors about competition.

19                    MS. MULLIN:  Mr. Ficocello, if you could

20  highlight those two sentences in this paragraph, please,

21  starting there.

22      A.   I suggest that the epitopes are not in close

23  proximity, and mAB 195 could not compete with the other

24  mABs tested suggesting -- is that what you mean?

25      Q.   (By Ms. Mullin) Right.  So let me just stop.
```

1   There's a difference here between talking about whether

2   or not there's an influence in an assay done one way but

3   not the other way and whether there's competition,

4   right?

5        A.   That's what I told Mr. Lee.  The authors did

6   not conclude that those were the same things.  They were

7   using those words to mean very different things.

8        Q.   Okay.  And then you were talking about the

9   '775 patent, Plaintiff's Exhibit 1, and specifically

10  about Figures 9A and 9B.

11       A.   That is correct.

12       Q.   And I think there was a suggestion that there

13  was a reason that in the patent, the assay was done -- I

14  think Mr. Lee was trying to suggest in both directions,

15  right?

16       A.   That is correct.

17       Q.   But you mentioned something about secondary

18  antibodies, and can you just explain, were these assays

19  done both ways because it was necessary to show

20  competition or for some other reason?

21       A.   So I read this in detail.

22            I also spoke with the inventor about this to

23  ask precisely why it was done this way, and what he said

24  was, once again, as I pointed out to Mr. Lee, these

25  antibodies were not tagged.  They were not labeled with

1  radioisotopes or any other tag.  So they had to use a

2  different antibody to detect them, to detect them on the

3  plate.

4          And the way scientists do that is they take --

5  they use what we call a secondary antibody, often made

6  in a goat.  It's a polyclonal antibody, which means that

7  it binds to many spots.  And the quality can differ from

8  a goat anti-mouse polyclonal antibody to a goat

9  anti-human polyclonal antibody.

10          So the authors of the patent felt it was

11  necessary to show that the detection done with the goat

12  anti-mouse polyclonal antibody gave a reliable result,

13  but they also felt that they needed to show that the

14  detection done with the goat anti-human polyclonal

15  antibody also gave a reliable result, because they had

16  not directly labeled the antibodies used.

17      Q.   And finally, I think Mr. Lee tried to suggest

18  that Ms. Tam drew some kind of conclusions based on the

19  Moller reference that are not consistent with what you

20  just said.

21          And since you referred to her deposition, I

22  think a copy's been provided to you.

23      A.   Yes, I have a copy here.

24      Q.   Okay.  And if you can look at Ms. Tam's

25  deposition at Page 209.

1        A.    Okay.

2        Q.    About Line 7, and it continues on to Page 210

3  to Line 5.

4             Now, she was asked a series of questions about

5  the Moller reference, Figure 1, in particular, right?

6        A.    That is correct.

7        Q.    And what were the circumstances under which

8  she was asked to draw conclusions?

9        A.    So as part of doing -- preparing for this,

10 I've lived through two depositions myself.  And I can

11 tell you that it's not unusual to be shown a document

12 you've never seen before, and then you say, I've never

13 seen it before, and the attorney says, well, take a

14 quick look and make a conclusion, and you say, well, I'm

15 doing my best.

16            So what -- she was asked:  Have you ever seen

17 this paper before?

18            And she said:  I have not.

19            Have you had a chance to consider all the data

20 that's presented in this paper?

21            No.  This is -- no.  I just barely got through

22 Figure 1.

23            So I mean, I'm not sure how somebody can

24 conclude that she's properly reviewed a paper -- as a

25 scientist, you don't make a conclusion based upon one

1  picture.

2          You read how it was done; you weigh the

3  methods that were used; you look at the results; and

4  then you look at the conclusion that the scientist who

5  wrote the paper did.

6          And we haven't even gone to the conclusions of

7  the paper in all these discussions.  That's not the

8  proper way to treat a scientific paper.

9      Q.   So after the questions that you were asked by

10 Mr. Lee, Dr. Adams, has your opinion changed at all --

11     A.   No.

12     Q.   -- about whether or not the Humira antibody

13 competes with A2 for binding to human TNF-alpha?

14     A.   To me, it's obvious that they compete.  It's

15 not even clear; it's obvious.  They compete.

16              MS. MULLIN:  Thank you, Your Honor.  Pass

17 the witness.

18              THE COURT:  Mr. Lee?

19              MR. LEE:  Just a few questions, Your

20 Honor.

21              Could I have the '775 patent up?

22              I'm sorry.  We have to switch, Your

23 Honor.

24              THE COURT:  Certainly.

25              MR. LEE:  Could we bring up the '775

1 patent at Column 48, Line 58, at the bottom?

2                    RECROSS-EXAMINATION

3 BY MR. LEE:

4     Q.   Now, you've just described to us what the

5 inventors told you or what Mr. Ghrayeb told you about

6 Figures 9A and 9B.  Let's see what the patent says and

7 what Centocor told the public about Figures 9A and 9B.

8 So you'll see at the bottom of Column 48 something

9 called Example 10, correct?

10     A.   That is correct.

11     Q.   And if you turn to the top of Column 49,

12 there's a specific reference in the first four lines to

13 Figures 9A and 9B.

14          Cross competition for TNF antigen was observed

15 in this solid-phase ELISA format, Figures 9A and 9B,

16 correct?

17     A.   That is correct.

18     Q.   This finding is consistent with the expected

19 identical epitope specificity of cA2 and murine A2,

20 correct?

21     A.   That's right.  That's exactly what I was

22 saying, yes.

23     Q.   Right.  That's what the patent says, correct?

24     A.   Yes.  That's very clear.

25     Q.   Right.  And when you told us what Dr. Moller

1 concluded, the one thing we can agree is this:  He

2 conducted the test in both directions, correct?

3      A.   He did conduct them in both directions, yes,

4 that is correct.

5      Q.   And you did not, correct?

6      A.   I did not conduct any tests.

7      Q.   Okay.

8      A.   I already told you that.

9                MR. LEE:  Nothing further, Your Honor.

10               THE COURT:  Anything further?

11               MS. MULLIN:  No, Your Honor.  Thank you.

12               THE COURT:  Okay.  All right.  You may

13 step down.

14               THE WITNESS:  Thank you, Your Honor.

15 Should I give these to somebody?

16               THE COURT:  Just leave everything right

17 there, Doctor.  You're fine.

18               All right, Ladies and Gentlemen.  We're

19 going to -- I know that you want to hear another witness

20 and go to 5:30, but I'm not going to let you do that.

21 I'm going to release you until in the morning.

22               Now, this is the first day of trial, and

23 I know that you've heard some technical things and --

24 but what you don't want to do tonight when you go home

25 and you talk to some friend or your spouse or someone

1    that you're talking to, and they say what are you doing,

2    and well, of course, your spouse knows you're down here

3    and down on a jury in the federal court in Marshall.

4    The most likely question that follows from the person

5    you're talking to is, what kind of case is it?  Don't

6    answer -- don't ever answer that question.  You're

7    instructed not to discuss the case.  Because after some

8    43 years of doing this -- it's not quite as many as Mr.

9    Beck, but --

10                   MR. BECK:  Thank you, Your Honor.

11                   THE COURT:  Got to pick on somebody here

12   who knows it's all in good fun.

13                   They're going to say, you know, I read

14   something about antibodies, or I know something about

15   that, or I talked to somebody, and you're beginning to

16   hear something you don't need to hear.

17                   And we got to decide this case solely

18   upon the witness testimony and the exhibits and the

19   admissions and stipulations that you have had read to

20   you.  So please don't do that.

21                   And again, I caution you about making any

22   type of internet search, looking at dictionaries.  Don't

23   do that.  And have a nice evening, and I'll see you in

24   the morning.  Drive safely.  8:30.

25                   COURT SECURITY OFFICER:  All rise.

```
 1                    (Jury out.)

 2                    THE COURT:  All right.  Please be seated.

 3                    Anything we need to take up from the

 4   Plaintiff at this time?

 5                    MR. SAYLES:  Your Honor, I don't know of

 6   anything we need to take up.

 7                    THE COURT:  Okay.  Anything over here?

 8                    MR. BECK:  No, Your Honor.

 9                    THE COURT:  All right.  Mr. Sayles,

10   tomorrow will be your day to be picked on.  I mean, I

11   can remember when you had dark hair, but you were

12   actually younger than either one of us.  It's just the

13   work's been harder on you.

14                    MR. SAYLES:  Well, you said he's been

15   around a lot longer than you have.  I've been around a

16   whole lot less.

17                    THE COURT:  I know.  I know.  But I just

18   thought I'd just forewarn you.

19                    Mr. Beck knew I was going to pick on him

20   today, so I'll just forewarn you, tomorrow is your day

21   in the box.

22                    MR. SAYLES:  Yes, sir.

23                    THE COURT:  Let's see.  I don't think I

24   have anything for you either.

25                    So as you know, if something comes up in
```

1  your exchange of whatever you're going to do tomorrow on

2  the witnesses, I try to be in chambers by 8:00 o'clock

3  every morning.  So if you need to see me, let's try to

4  make sure we raise any matters, you know, then rather

5  than slow down our progress.

6           And in case you're interested, the

7  Plaintiff has used 3 hours and 29 minutes, and the

8  Defendant has used an hour and 27 minutes.

9           COURT SECURITY OFFICER:  All rise.

10          (Court adjourned.)

11      *      *      *      *      *      *

1

2

3

4                        CERTIFICATION

5

6           I HEREBY CERTIFY that the foregoing is a

7  true and correct transcript from the stenographic notes

8  of the proceedings in the above-entitled matter to the

9  best of my ability.

10

11

12

13 /s/_____        _____
   SUSAN SIMMONS, CSR                 Date
14 Official Court Reporter
   State of Texas No.:  267
15 Expiration Date:  12/31/10

16

17

18 /s/_____            _____
   JUDITH WERLINGER, CSR              Date
19 Deputy Official Court Reporter
   State of Texas No.:  731
20 Expiration Date  12/31/10

21

22

23

24

25