```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  CENTOCOR, ET AL          *    Civil Docket No.
                             *    2:07-CV-139
 4  VS.                      *    Marshall, Texas
                             *
 5                           *    June 23, 2009
    ABBOTT LABORATORIES      *    8:30 A.M.
 6

 7            TRANSCRIPT OF TRIAL PROCEEDINGS
         BEFORE THE HONORABLE JUDGE T. JOHN WARD
 8              UNITED STATES DISTRICT JUDGE
                       AND A JURY
 9

10  APPEARANCES:

11  FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                           MS. BARBARA MULLIN
12                         MR. STEVEN MASLOWSKI
                           MS. ANGELA VERRECCHIO
13                         MR. MATTHEW PEARSON
                           Woodcock Washburn
14                         2929 Arch Street, 12th Floor
                           Cira Centre
15                         Philadelphia, PA   19104

16                         MR. RICHARD SAYLES
                           MR. MARK STRACHAN
17                         Sayles Werbner
                           1201 Elm Street
18                         4400 Renaissance Tower
                           Dallas, TX   75270
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDITH WERLINGER, CSR
22                         Official Court Reporters
                           100 East Houston, Suite 125
23                         Marshall, TX   75670
                           903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

```
 1
 2   APPEARANCES CONTINUED:

 3

 4   FOR THE DEFENDANTS:    MR. WILLIAM LEE
                            MS. AMY WIGMORE
 5                          MR. WILLIAM MCELWAIN
                            Wilmer Cutler Pickering Hale
 6                               and Dorr
                            1875 Pennsylvania Avenue, N.W.
 7                          Washington, DC   20006

 8
                            MR. DAVID BECK
 9                          Beck Redden & Secrest
                            One Houston Center
10                          1221 McKinney Street
                            Suite 4500
11                          Houston, TX   77010

12
                  *      *      *      *      *      *
13

14
                     P R O C E E D I N G S
15

16             COURT SECURITY OFFICER:  All rise.

17             THE COURT:  Please be seated.

18             Good morning, Ladies and Gentlemen of the

19   Jury.  Appreciate you being here timely.

20             Good morning, Counsel.

21             Who will be your next witness for the

22   Plaintiff?

23             MS. ELDERKIN:  Your Honor, may it please

24   the Court.  The Plaintiffs call Ken Dow.

25             COURTROOM DEPUTY:  Raise your right hand,
```

1  please.

2                    (Witness sworn.)

3                    MS. ELDERKIN:   Good morning, Ladies and

4  Gentlemen of the Jury.

5           KENNETH DOW, PLAINTIFFS' WITNESS, SWORN

6                    DIRECT EXAMINATION

7  BY MS. ELDERKIN:

8       Q.   Mr. Dow, would you please introduce yourself

9  to the jury.

10      A.   My name is Kenneth Dow.  I am a patent

11 attorney with the Johnson & Johnson Law Department and

12 Vice President of Patent Law for Centocor.

13      Q.   So you are a patent lawyer?

14      A.   Yes.

15      Q.   Okay.  You're familiar with the

16 patent-in-suit, the '775 patent, correct?

17      A.   Yes, I am.

18      Q.   Okay.  Who owns this patent?

19      A.   It's co-owned by New York University and

20 Centocor Ortho Biotech.

21      Q.   And has that been the case since this lawsuit

22 started?

23      A.   Yes.

24      Q.   Okay.  And what rights, if any, did NYU, New

25 York University, grant to Centocor under this patent?

1          A.    Centocor has an exclusive license from New

2    York University to their interest in the -- in the

3    patent.

4          Q.    Okay.  I'd like to change gears a little bit.

5    Have you ever been a party to a license negotiation with

6    Abbott?

7          A.    Yes.

8          Q.    When did that happen?

9          A.    Well, the first one was in 2002.  We had a

10   license negotiation where Abbott had approached us about

11   getting a license under a patent that we had exclusive

12   rights to from the Kennedy Institute of Rheumatology.

13   And so we executed a non-exclusive license agreement

14   with them for that -- those patent rights.  And in

15   return, we received a license under some patents that

16   Abbott owned.

17         Q.    And what were those patents?

18         A.    Those were patents that related to anti-TNF

19   antibodies.

20         Q.    Do you recognize -- in your binder, there's a

21   copy of Plaintiffs' Exhibit 669.

22               Do you recognize that exhibit?

23         A.    Yes.

24         Q.    And what is that?

25         A.    This is the non-exclusive license agreement

1  from Abbott to Centocor relating to the TNF-alpha

2  patents.

3       Q.   Did Centocor ask for that license?

4       A.   Yes.

5       Q.   Why?

6       A.   We were -- we had a product in development at

7  the time, which was referred to as CNTO148, which later

8  became Simponi.  And at the time, it was in development,

9  and we were aware -- when Abbott approached us about

10  getting a license under the Kennedy patent, we were

11  aware that Abbott had rights to these -- to these

12  patents, and we were -- we knew that they were relevant

13  at least to the -- to the TNF antibody field.

14            And we thought that we -- they had a whole

15  family of patents on -- on file, and it was possible

16  that one -- a patent might issue sometime that would

17  cause a problem for us.  So we decided to ask them for a

18  license in return for the license that we gave them.

19       Q.   Was it sort of an insurance policy in case you

20  might ever need them?

21       A.   Correct.  It was just in case we needed a

22  license in order to bring the product to the market, we

23  would have the rights.

24       Q.   Okay.  Could you look at Exhibit 1.02 in that

25  license agreement, please?

1           MS. ELDERKIN:  And, Mr. Ficocello, if you

2    could put that up on the screen.

3           I'm sorry.  It's Exhibit 1.02.  It's

4    about three pages from the back.

5           THE WITNESS:  Got it.

6           MS. ELDERKIN:  There you go.

7       Q.   (By Ms. Elderkin) Could you explain what this

8    exhibit is?  This is part of the license agreement,

9    correct?

10      A.   Right.  This is a listing of all the patents

11   that we received rights to.  There's a whole family of

12   patents here that were filed in different countries.

13   And it also lists some U.S. patents; some that had

14   issued and some that were still pending.

15          MS. ELDERKIN:  Could you scroll down,

16   please, Mr. Ficocello?

17          There you go.

18      Q.   (By Ms. Elderkin) Are these the U.S. patents

19   you're talking about?

20      A.   Right.

21      Q.   And some of them say pending?

22      A.   Some of them were still pending.

23      Q.   So what does that mean?

24      A.   It means there were still applications that

25   were on file in the Patent Office, and we didn't know at

1  the time what kind of claims they were going to get out

2  of those patents.  So we decided, as an insurance

3  policy, we would take this license.

4       Q.   So Abbott had filed an original application,

5  but then filed a number of applications subsequent to

6  that that related, and some of those were still pending?

7       A.   Right.

8       Q.   In 2002?

9       A.   Right.

10      Q.   Okay.  Thank you.

11           Let's change gears one more time.  Before this

12  lawsuit was filed, did you have any discussions with

13  John Conway at Abbott?

14      A.   Yes.  Well, before the lawsuit --

15      Q.   Before the lawsuit, uh-huh.

16      A.   -- was filed?

17           Yes.  Shortly after Mr. Scodari notified

18  Abbott that we had allowed claims in the '775 patent

19  family, I received a call from John Conway, who was a

20  patent attorney for Abbott.

21           And in the first phone call, we identified the

22  patent, and then there was a second phone call shortly

23  thereafter where he asked us whether we had any -- any

24  data, any competition testing data that would support

25  our claim.

1      Q.   So competition testing for Humira, their

2 product?

3      A.   Right.

4      Q.   And did you have such results?

5      A.   Yes.  I told him we had the results and that,

6 in fact, it did compete with -- Humira did compete with

7 Remicade for binding with TNF.

8      Q.   Did you give him those results?

9      A.   No.  We -- when he asked me for the results, I

10 said we would take it under consideration.  And I went

11 back to talk to my supervisors about it.

12      Q.   Did you feel any pressing need to give them

13 the results?

14      A.   No.  At the time, we were -- you know, we were

15 in talks, and we had some discussions internally, but,

16 you know, I -- we never really got back to them on it.

17 And we figured that they would have -- they would do

18 their own testing.

19      Q.   Okay.  And those test results, do you know if

20 they have been produced to Abbott in this litigation?

21      A.   Yes.

22      Q.   Okay.  Changing gears one more time, last

23 time.

24           Did there come a time when Abbott sought an

25 arbitration ruling on whether it had a license or

1  permission from Centocor under the patent-in-suit?

2      A.   Yes.

3      Q.   How did that happen and when?

4      A.   Well, sometime after the lawsuit was filed, we

5  received a letter from Abbott, indicating that they

6  thought they already had a license to this -- to the

7  '775 patent, and they requested arbitration on that

8  issue.

9      Q.   Okay.  Would you look at Exhibit DX509 in your

10 binder, please?

11          MS. ELDERKIN:  And you can put that up,

12 Mr. Ficocello, the first page.

13     Q.   (By Ms. Elderkin) What is DX509?

14     A.   This is the results of that arbitration.  It's

15 the award from the arbitrator.

16     Q.   Okay.

17          MS. ELDERKIN:  Let's look at the last

18 page of this, Mr. Ficocello, under the heading, Award,

19 and the numbered paragraph, 1, if we could highlight

20 that.

21     Q.   (By Ms. Elderkin) So what does this award say,

22 Mr. Dow?

23     A.   It says that Abbott does not have a license to

24 take any action with respect to Humira that would

25 constitute an infringement of the '775 patent, except

1  that with respect to Humira that qualifies as

2  co-administration product under the license agreement,

3  they would have a license.

4      Q.    Okay.  Just so the jury understands, did the

5  arbitrator decide that Humira infringed?

6      A.    No.

7      Q.    Did the arbitrator decide that Centocor's

8  patent was valid?

9      A.    No.

10     Q.    What was he saying here?

11     A.    All he said was that to the extent there was

12  infringement of the '775 patent, they did not have a

13  license, except for this co-administration product.

14     Q.    So they didn't have permission, if they needed

15  it, except for that co-administration product?

16     A.    That's right.

17     Q.    And do you have an understanding as to what

18  proportion of Abbott sales are co-administration

19  product?

20     A.    My understanding is that there was a second

21  arbitration, and as a result of that arbitration, they

22  determined that it was about one-third of Abbott sales

23  that were licensed.

24     Q.    And did they ever get permission for the rest

25  of the sales?

1      A.   No.

2            MS. ELDERKIN:  Pass the witness, Your

3   Honor.

4            THE COURT:  Mr. Lee.

5            MR. LEE:  Thank you, Your Honor.

6                 CROSS-EXAMINATION

7   BY MR. LEE:

8      Q.   Good morning, Mr. Dow.

9      A.   Good morning, Mr. Lee.

10     Q.   Just give us a minute, and we'll give you a

11  notebook that will have the exhibits that I might ask

12  you about, but you'll also see them on the screen.

13     A.   Okay.

14            MR. LEE:  If I can have a second, Your

15  Honor.

16            THE COURT:  Certainly.

17            COURTROOM DEPUTY:  Sir, give me just a

18  moment, and let me see if I can override.

19            THE TECHNICIAN:  It's not moving.

20            THE COURT:  I have a technician here that

21  hopefully can solve the problem.

22            Steve, just go ahead and stay back there.

23  We will call you if we need you, Steve.  Thank you.

24            Proceed.

25            MR. LEE:  Mr. Dow, you all set?

1                    THE WITNESS:  I'm ready.

2                    MR. LEE:  Okay.  May I proceed, Your

3    Honor?

4                    THE COURT:  Certainly.  Please do.

5        Q.   (By Mr. Lee) Mr. Dow, I want to start by

6    asking you the questions I've asked every Centocor

7    witness so far, just so the jury understands exactly

8    what you've done and what you haven't done.

9             You said you're a patent lawyer, correct?

10       A.   Correct.

11       Q.   Not a scientist, correct?

12       A.   I have a scientific background, but I am not a

13   scientist.

14       Q.   Right.  So you have not yourself done any work

15   to isolate an anti-TNF-alpha antibody, correct?

16       A.   No.

17       Q.   Never isolated a mouse antibody, correct?

18       A.   Correct.

19       Q.   Never isolated a chimeric antibody, correct?

20       A.   Correct.

21       Q.   Never isolated a fully human antibody,

22   correct?

23       A.   Correct.

24       Q.   Now, you are, as you told us, a patent lawyer,

25   and you've been at Centocor for some time, correct?

1      A.   Yes.

2      Q.   Since 2001, you have been supervising patent

3  work at Centocor, correct?

4      A.   Correct.

5      Q.   That includes both litigation against the

6  parties and prosecution, correct?

7      A.   Correct.

8      Q.   And in 2001, you were supervising the

9  prosecution of the patent that became the '775 patent,

10 correct?

11     A.   Not directly.

12     Q.   You were supervising someone named Kevin

13 Townsend, correct?

14     A.   Correct.

15     Q.   And he was the patent lawyer within Centocor

16 who decided to file the application in 2002 that led to

17 this patent, correct?

18     A.   The patent application was filed by outside

19 counsel.  Kevin was working with them.

20     Q.   So the person who was supervising Mr. Townsend

21 at Centocor, when the decision was made to file the 2002

22 patent application, was you?

23     A.   Correct.

24     Q.   All right.  Now, let's go to the conversations

25 that you had with Abbott.

1        You had three conversations with Abbott before

2   the commencement of this litigation, correct?

3        A.   Right.

4        Q.   And you understand that Ms. Elderkin and I are

5   exploring this, because there's a question of whether

6   Centocor has given notice to Abbott of its charge of

7   infringement, correct?

8        A.   Yes, I understand.

9        Q.   So let's see what you said during these

10  conversations.

11        All three were telephone conversations,

12  correct?

13        A.   Yes.

14        Q.   Two were with a man named Mr. Conway, correct?

15        A.   Right.

16        Q.   And one was with a Mr. Deberadine, correct?

17        A.   Deberadine, yes.

18        Q.   Let's start with the conversation with

19  Mr. Conway.  Now, this occurred around December 13th,

20  2005, correct?

21        A.   December 2005, correct.

22        Q.   That was right after the claims had been

23  allowed by the United States Patent Office, correct?

24        A.   Right.

25        Q.   The patent hadn't actually issued yet,

1  correct?

2       A.   Correct.

3       Q.   You didn't give Mr. Conway a copy of the

4  patent, did you?

5       A.   No.  I referred him to -- I gave him the

6  patent application number, and I referred him to the

7  Patent Office website where he could pull up the entire

8  file.

9       Q.   Do you know whether the entire file was

10 available on December 13th of 2005?

11      A.   I believe it was.

12      Q.   And other than telling Mr. Conway you can go

13 to the website and get the patent for yourself, you had

14 no discussion with him on the substance of the '775

15 patent in that first conversation, correct?

16      A.   That's right.

17      Q.   And you didn't tell him that Humira infringes,

18 correct?

19      A.   Not in that conversation.

20      Q.   Now, let's go to the second conversation.

21 That occurred on January 6th, 2006, correct?

22      A.   Correct.

23      Q.   This is a telephone conversation again,

24 correct?

25      A.   Yes.

1       Q.   Mr. Conway said to you:  Do you have any

2  testing that shows competitive analysis with Humira,

3  correct?

4       A.   Correct.

5       Q.   Now, you told Ms. Elderkin that you had

6  testing.

7            That testing was with cA2 and Humira, correct?

8       A.   At that time, yes.

9       Q.   It was not testing with A2, correct?

10      A.   Correct.

11      Q.   But you did tell him you had testing, correct?

12      A.   Right.

13      Q.   Mr. Conway said to you:  Would you give us the

14  testing so we can evaluate the testing, correct?

15      A.   He asked us -- yes, he asked if we would give

16  it to him.

17      Q.   And you said you would take it under

18  advisement, and you would get back to him, correct?

19      A.   Correct.

20      Q.   But you never got back to him, did you, sir?

21      A.   No.

22      Q.   So what happened was, you had a conversation

23  with Mr. Conway; he asked you for the testing; you said

24  you would get back to him; and then you sued, correct?

25      A.   It was quite some time after that that the

```
 1   lawsuit --

 2        Q.    So when Ms. Elderkin referred you to Abbott

 3   getting access to the tests, it was only after Abbott

 4   had been sued, correct?

 5        A.    Right.

 6        Q.    And it was only as part of the formal

 7   discovery process that's guided by His Honor's rules,

 8   correct?

 9        A.    Right.

10        Q.    Now, let's talk about the third conversation

11   with Mr. Deberadine; is that correct?

12        A.    Yes.

13        Q.    Also by telephone, correct?

14        A.    Right.

15        Q.    That occurred in February of 2006, correct?

16        A.    Correct.

17        Q.    And he told you that he had looked at the '775

18   patent, and he thought and Abbott thought it was not

19   valid, because it wasn't enabled, correct?

20        A.    He said he thought it was a weak patent and

21   wasn't worth very much.

22        Q.    And he said it was not enabled, correct?

23        A.    He said it had enablement issues.

24        Q.    Right.  You disagreed with him, correct?

25        A.    I disagreed.
```

1      Q.   When he asked you why you disagreed, you never

2  told him, did you?

3      A.   I told him we disagreed; we thought it was

4  enabled.

5      Q.   Right.  And beyond that, there was no

6  substantive discussion between you and Mr. Deberadine,

7  correct?

8      A.   That was about the length of the conversation.

9      Q.   All right.  And I've now covered all of your

10  conversations with anybody, other than Abbott -- at --

11  strike that.  I'm sorry.

12           I've now covered your conversations with

13  anyone at Abbott concerning the '775 patent before the

14  lawsuit was filed.

15      A.   Those were the only conversations I had,

16  although there were a lot of discussions going on at

17  another level.

18      Q.   I understand that.  But you can only tell us

19  about what you participated in.

20      A.   That's correct.

21      Q.   And I have now covered what you participated

22  in, correct?

23      A.   Yes.

24      Q.   Now, let's go to the licensing issue that

25  Ms. Elderkin asked you about.

1            You actually supervised patent licensing on

2   behalf of Centocor, correct?

3        A.   Yes.

4        Q.   You have since 2001, correct?

5        A.   Yes.

6        Q.   You have participated in many different

7   licensing negotiations, correct?

8        A.   That's correct.

9        Q.   And as part of that, you're familiar with a

10  concept called a royalty offset, correct?

11       A.   Yes.

12       Q.   Royalty offset means that if I take a license

13  from Ms. Elderkin, but I happen to be paying Mr. Sayles

14  and Mr. Beck royalties, I can offset those against what

15  I owe Ms. Elderkin, right?

16       A.   Can I have that question back again?

17       Q.   Sure.

18       A.   I lost my train.

19       Q.   Fair enough.  Let me start over, and I'll

20  break it down.  It may have been too complicated.

21  Let me ask you to assume that I have a license to Ms.

22  Elderkin and I owe her 2 percent.

23            Do you have that in mind?

24       A.   Yes.

25       Q.   But there's a royalty offset provision.

1  You know what that is, correct?

2       A.   Yes.

3       Q.   And it says that I can offset royalties that

4  I'm paying others.

5       A.   Right.

6       Q.   Do you have that in mined?

7       A.   Right.

8       Q.   So I'm paying Mr. Sayles 1/2 percent.

9  Do you have that in mind?

10      A.   Right.

11      Q.   I'm paying Mr. Beck 1/2 percent, correct?

12      A.   Yes.

13      Q.   A royalty offset means that I can take those

14  two, which equal 1 percent, and reduce what I owe

15  Ms. Elderkin into 1 percent, correct?

16      A.   That's generally the concept.

17      Q.   Now, you talked about a negotiation you had

18  with Abbott in which Abbott agreed to take a license to

19  you, to an NYU patent, correct?

20      A.   To a Kennedy patent.

21      Q.   I'm sorry.  To a Kennedy patent, correct?

22  And that patent is not involved in this case, correct?

23      A.   Correct.

24      Q.   But it's another patent that concerns TNF

25  antibodies, correct?

1      A.   Right.   It concerns these -- of them with

2   Methotrexate.

3      Q.   And when identified this patent owned by

4   Kennedy, licensed to you, it went and sought a license,

5   didn't it?

6      A.   That's right.

7      Q.   Right.   So when Abbott thinks there's

8   someone's patent out there and that they need to use

9   that patent, based upon your experience, they come and

10  say we'd like to negotiate a license, and that's what

11  they did with Kennedy, correct?

12     A.   They did that with the Kennedy patent.

13                MR. LEE:   Nothing further, Your Honor.

14                MS. ELDERKIN:   A few more, Your Honor?

15                THE COURT:   Yes, ma'am.

16                REDIRECT EXAMINATION

17  BY MS. ELDERKIN:

18     Q.   Mr. Dow, I want to make sure the jury

19  understands the concept of the claims being allowed.

20  When the claims of the '775 patent, when you received

21  notification that they were allowed in December of 2005,

22  was that some kind of official notification from the

23  Patent Office?

24     A.   Yes.   The Patent Office issues what they call

25  a notice of allowance, and that is a paper from the

1  Patent Office that tells you that your patent is

2  basically going to issue.

3      Q.   And why did it take six months for it to issue

4  then?

5      A.   Well, after that, you have to pay an issue fee

6  to the Patent Office, and then they have to issue the

7  patent.  It takes some time for them to print it and

8  format it.

9      Q.   And did -- the claims issued in the patent,

10 were they identical to the ones that were allowed in

11 December of 2005?

12     A.   Yes.

13     Q.   Okay.

14          MS. ELDERKIN:  Thank you very much, Your

15 Honor.

16          MR. LEE:  Nothing further, Your Honor.

17          THE COURT:  You may step down, Mr. Dow.

18          MS. ELDERKIN:  May the witness be

19 excused, Your Honor?

20          THE COURT:  Any objection?

21          MR. LEE:  None, Your Honor.

22          THE COURT:  All right.  You're excused.

23          Who will be your next witness,

24 Mr. Sayles?

25          MR. SAYLES:  May it please the Court.

1               At this time, we would read into the

2   record and for the jury the Stipulated Fact No. 18.

3               THE COURT:  Okay.

4               MR. SAYLES:  This is stipulation between

5   the parties.

6               On March 5th, 2008, an arbitrator ruled

7   that Abbott does not have a license to take any action

8   with respect to Humira that would constitute an

9   infringement of the '775 patent.  Except that with

10  respect to Humira that qualifies as co-administration

11  product under the license agreement, Abbott has a

12  license to take any action that would constitute

13  infringement of the '775 patent.

14              That concludes Stipulation 18.

15              Our next witness is John Conway by

16  deposition, and I will read the agreed-upon introduction

17  of Mr. Conway.

18              John Conway.  Mr. Conway is a former

19  in-house patent attorney for Abbott.  Mr. Conway worked

20  first for BASF, starting in 1999, as an in-house patent

21  counsel.  Abbott eventually purchased BASF, and

22  Mr. Conway continued to work for the company through

23  July of 2008.

24              During his tenure with BASF and Abbott,

25  Mr. Conway had some responsibility for Abbott's Humira

1 product.  Mr. Conway now works for another

2 pharmaceutical company.

3                    (Video playing.)

4                    QUESTION:  As part of your

5 responsibilities at Abbott, were you part of a team, or

6 did you give input to a team that came up with a

7 strategy for dealing with IP issues in connection with

8 biologics?

9                    ANSWER:  Yes.

10                    QUESTION:  Plaintiffs' Exhibit 391 is a

11 copy of a document bearing production numbers

12 ABT00332668 through 332792.

13                    If you can turn, then, to Page 41, which

14 is ABT00332708.  Tell me when you're ready for a

15 question.

16                    ANSWER:  Uh-huh.  Okay.

17                    QUESTION:  So the conclusion refers to a

18 number of biologics projects that Abbott has at

19 different stages of research and development, right?

20                    ANSWER:  Right.

21                    QUESTION:  And if we look at the next

22 page, one of those is Humira, right?

23                    ANSWER:  Right.

24                    QUESTION:  And one of the conclusions

25 with respect to -- or one of the conclusions that's set

1  forth in this document is that Abbott can make the best

2  use of this resource by identifying the most attractive

3  targets from a commercial, clinical, and scientific

4  perspective and using an aggressive risk management

5  strategy to obtain freedom to operate, right?

6           ANSWER:  Right.

7           QUESTION:  And that conclusion applies to

8  the biologics projects at different stages of research

9  and development that are identified on the next page,

10 right?

11          MR. MCELWAIN:  Objection.

12          ANSWER:  Generally -- in general, you

13 would read that as applying to all of these.

14          QUESTION:  So it would apply to Humira,

15 right?

16          MR. McELWAIN:  Objection.

17          ANSWER:  It could.

18          QUESTION:  So on December 15th, 2005, you

19 asked Zehra Kaymakcalan for data for the purpose of

20 rendering legal advice about the Centocor patent, right?

21          ANSWER:  Right.

22          QUESTION:  And you gave her the patent

23 claims that were going to issue as the '775 patent,

24 right?

25          ANSWER:  Right.

```
1               QUESTION:  And on the 16th of December of

2  2005, Zehra Kaymakcalan provided you with the technical

3  information that you wanted so that you could provide

4  legal advice regarding the Centocor patents, right?

5               ANSWER:  Right.

6               QUESTION:  Within a week or two after you

7  were notified by Ken Dow that the '775 patent was going

8  to issue, you started getting legal advice from Larry

9  Pope about that application, right?

10              ANSWER:  Okay.  Yes.

11              QUESTION:  At least by February 13th of

12 2006, you realized that it was possible that Centocor

13 was going to sue you for infringement of the '775 patent

14 when it issued, right?

15              ANSWER:  Yes.

16              QUESTION:  And within two days after

17 that, meaning after February 13th, 2006, you started

18 also receiving advice from Winston & Strawn, outside

19 counsel, concerning the Centocor patent, right?

20              ANSWER:  Right.

21              QUESTION:  And by October of 2006, you

22 sought advice from yet another outside counsel, right?

23              ANSWER:  Are you referring to Edwards

24 Angell?

25              QUESTION:  Correct.
```

```
 1                    ANSWER:  That's correct.

 2                    QUESTION:  So in October of 2006, you

 3  went to at least a third outside counsel to ask for

 4  advice concerning the Centocor patents and Humira,

 5  correct?

 6                    ANSWER:  Correct.

 7                    (End of video clip.)

 8                    THE COURT:  Does that end the offer on

 9  this?

10                    MR. SAYLES:  It does, Your Honor.

11                    And may it please the Court.

12                    Mr. Conway's deposition played 4 minutes

13  and 53 seconds, and it all goes to our side of the

14  ledger.

15                    THE COURT:  Okay.  I got it.

16                    MR. BECK:  We have no objection to that,

17  Your Honor.

18                    MR. SAYLES:  Your Honor, at this time, we

19  would call, as our next witness, Cheryl Lubbert.  And I

20  will read the agreed-upon introduction of Ms. Lubbert.

21                    Cheryl Lubbert is currently the

22  Divisional Vice President of Abbott's immunology

23  franchise.  Ms. Lubbert is responsible for making all

24  marketing decisions for Humira in the U.S.

25                    Ms. Lubbert testified at her deposition
```

1  as a corporate representative on behalf of Abbott

2  regarding the date on which Abbott became aware of the

3  Centocor patent and the facts and circumstances

4  surrounding such awareness.

5                   (Video playing).

6                   QUESTION:  Focusing strictly on the

7  manufacture of the bulk drug substance, also known as

8  D2E7, can you identify all entities that are involved in

9  the manufacture of the bulk drug substance at Abbott?

10                   ANSWER:  All entities that are involved

11  in bulk drug substance include ABL Puerto Rico branch

12  and also ABC.  They're not on the list.

13                   Oh, yes, they are; ABC.

14                   QUESTION:  So for any Humira that's sold

15  anywhere in the world, the bulk drug substance is either

16  produced at Abbott Bioresearch Center in Massachusetts,

17  or Abbott Biotechnology Limited in Puerto Rico, correct?

18                   ANSWER:  Yes.

19                   QUESTION:  What is -- what is your

20  current title?

21                   ANSWER:  Divisional Vice President,

22  Immunology.

23                   QUESTION:  Who at Abbott is ultimately

24  responsible for all marketing matters related to Humira?

25                   ANSWER:  Could you clarify your question?

```
 1  Are you talking about international, or are you talking
 2  about the U.S.?
 3                QUESTION:  Let's focus on the U.S.
 4                ANSWER:  In the U.S., ultimately for
 5  Humira, I would be.
 6                QUESTION:  When did Abbott first become
 7  aware of the Exhibit 1 patent, which is United States
 8  Patent 7,070,775?
 9                ANSWER:  My understanding is that we
10  became aware when it was issued.
11                QUESTION:  On the day it was issued?
12                ANSWER:  I don't know if it was the exact
13  day, but I believe it was in the time period of when it
14  was issued, around July of 2006.
15                QUESTION:  Was it the day after it
16  issued?
17                ANSWER:  I don't know.
18                QUESTION:  Do you know who at Abbott was
19  the first person to become aware?
20                ANSWER:  I believe that it was Paul
21  Yasger.
22                QUESTION:  Is Mr. Yasger an attorney at
23  Abbott?
24                ANSWER:  Yes, he is.
25                QUESTION:  Did you speak to Mr. Yasger in
```

 1 | preparation for today's deposition?

 2 |         ANSWER:  Yes, I did.

 3 |         QUESTION:  Did you ask him how he became

 4 | aware of the '775 patent?

 5 |         ANSWER:  Yes, I did.

 6 |         QUESTION:  What did he tell you?

 7 |         ANSWER:  He told me that he became aware

 8 | when it was issued and that was really the extent.  He

 9 | didn't say how he became aware.

10 |         QUESTION:  Sure.

11 |         Was Abbott aware of the '775 patent

12 | application when it was pending in the Patent Office

13 | prior to its issuance?

14 |         ANSWER:  My understanding is that Abbott

15 | personnel became aware during a meeting at J&J in

16 | December of 2005, where J&J told Abbott personnel that

17 | they had obtained an allowed application that could

18 | affect Humira.

19 |         QUESTION:  Did Abbott obtain the allowed

20 | application prior to its issuance in July of 2006?

21 |         ANSWER:  My understanding is that the

22 | application was given at the time that that discussion

23 | occurred.  I'm not sure what patent it was for, though.

24 | I can't -- they didn't say, because at the time, there

25 | was obviously no number.

```
 1                    QUESTION:  But it's your understanding
 2  that at a meeting between Johnson & Johnson and Abbott,
 3  Johnson & Johnson provided Abbott with a copy of the
 4  application that became the '775 patent?
 5                    ANSWER:  My understanding is that J&J
 6  told Abbott that they had obtained an allowed
 7  application that could affect Humira.
 8                    QUESTION:  And they also provided a copy;
 9  is that right?
10                    ANSWER:  That's -- that's the best of my
11  knowledge.  I think they did.
12                    (End of video clip.)
13                    MR. SAYLES:  That concludes the Cheryl
14  Lubbert deposition.  It was 4 minutes and 5 seconds, and
15  that will go to our ledger as well.
16                    THE COURT:  Thank you.
17                    Still no objection to that, Mr. Beck?
18                    MR. BECK:  Still no objection.
19                    MR. MASLOWSKI:  May it please the Court,
20  Your Honor.  Plaintiffs call Rob Bazemore.
21                    THE COURT:  Okay.
22                    COURTROOM DEPUTY:  Would you raise your
23  right hand, please.
24                    (Witness sworn.)
25                    MR. MASLOWSKI:  Your Honor, before we get
```

1  started, Plaintiffs would like to offer into evidence

2  PX251, 261, and 704.  They are not on the preadmitted

3  list.

4          We understand that Abbott has withdrawn

5  their objections to those exhibits.

6          THE COURT:  Is that correct?

7          MR. LEE:  That's correct.

8          THE COURT:  All right.  Those three

9  exhibits are now received into evidence.

10         Did you get those numbers, Ms. Dupree?

11         Okay.

12    ROBERT BAZEMORE, PLAINTIFFS' WITNESS, SWORN

13           DIRECT EXAMINATION

14 BY MR. MASLOWSKI:

15    Q.  Good morning, Mr. Bazemore.

16    A.  Good morning.

17    Q.  Can you please tell the jury a little bit

18 about yourself.

19    A.  I can.  My name is Rob Bazemore.  I grew up in

20 a little town outside of Savannah, Georgia.  Ultimately

21 went to the school at the University of Georgia where I

22 received a degree in biochemistry, a bachelor's degree

23 in biochemistry.

24         I went from there to work with Merck &

25 Company, where I worked for about 11 years.  During that

1   time, I lived in New Orleans and worked on my MBA

2   degree, a master's in business, at Tulane University.

3   I now live just outside Valley Forge with my wife and

4   two kids, and work for Centocor Ortho Biotech.

5       Q.   Mr. Bazemore, are you currently employed?

6       A.   I am, yes.

7       Q.   You just said you worked for Centocor Ortho

8   Biotech; that's right?

9       A.   That's correct.

10      Q.   And we'll call it Centocor today?

11      A.   That's fine.

12      Q.   And what is your current title at Centocor?

13      A.   I am the Vice President of Marketing for the

14  immunology franchise.

15      Q.   And can you please tell us what is the

16  immunology franchise?

17      A.   Immunology is a therapeutic area, and it means

18  that I have responsibility for the two products,

19  Remicade and Simponi.

20      Q.   And in your work in that respect, what exactly

21  do you do?

22      A.   Well, I have overall promotional

23  responsibility for those two products, which means that

24  I have responsibility for all the promotional efforts,

25  the educational efforts, how we educate physicians about

1  the compounds.

2          In order to do that, we develop marketing

3  strategies that's based on lots and lots of market

4  research.  We spend millions of dollars a year

5  understanding our customers, understanding how these

6  products are used, understanding the disease states, and

7  how the product can best be used to treat those disease

8  states.

9          So we really spend a lot of our time doing

10 analytics in best understanding how to address the needs

11 of our customers.

12     Q.   Now, how long have you had responsibilities

13 related to the marketing of Remicade?

14     A.   Since I joined Centocor in January of 2002.

15     Q.   And Centocor is the entity that sells Remicade

16 in the United States, correct?

17     A.   That's correct.

18     Q.   How does Centocor market and sell Remicade in

19 the U.S.?

20     A.   Well, our primary audience is the physicians,

21 because these are drugs that treat very serious

22 diseases.  So we primarily target the physicians.

23 We use professional representatives as well as medical

24 affairs, people that work in the field.  We also use

25 other media, like journal advertising, the internet, et

1  cetera.

2       To a lesser degree, we sell Remicade directly

3  to patients through TV advertising, print advertising,

4  and that kind of thing.

5     Q.    So you indicated that your primary audience is

6  physicians.  Are there particular types of physicians

7  that you market and sell Remicade to?

8     A.    Most of our efforts are directed at the

9  rheumatologists, the gastroenterologists, and the

10  dermatologists.

11    Q.    And why is that?

12    A.    Because those are the physicians' specialties

13  that treat the diseases that Remicade is approved by the

14  FDA to treat.

15    Q.    And can you please explain what you mean a

16  little bit further, please?

17    A.    I can.  In fact, I prepared a slide.  I'm not

18  sure -- here we go.

19    Q.    You should have the ability to click through

20  right there.

21    A.    Okay.  So I prepared this just to explain the

22  three disease areas that we cover and the specialists

23  that we currently sell Remicade to.

24       The first on the chart is the

25  gastroenterologists.  They, of course, do a lot of

1  things, but one is that they treat a group of diseases

2  called inflammatory bowel diseases.  Two of those are

3  Crohn's disease, or CD, and ulcerative colitis, or UC.

4  Remicade is approved to treat both of these indications.

5          The second specialty that I mentioned that we

6  call on is the rheumatologists, who, again, they do a

7  lot of things, but one is that they treat rheumatic

8  conditions, namely rheumatoid arthritis, or RA,

9  ankylosing spondylitis, or AS, and psoriatic arthritis,

10 or PsA.

11         Again, these are all three diseases that

12 Remicade is indicated by the FDA and approved to treat.

13         And then the final specialty is the

14 dermatologist, who treats a number of cosmetic

15 conditions, but also medical conditions like psoriasis,

16 or PsO.

17     Q.   Are you familiar with Humira, the product

18 accused of infringing Centocor's patent in this case?

19     A.   I am, yes.

20     Q.   Just in general, how do you understand that

21 Humira works?

22     A.   Humira works essentially the same way as

23 Remicade.  It targets TNF; it targets tumor necrosis

24 factor.  It's a monoclonal antibody much like Remicade.

25     Q.   Now, looking at your chart, do you know which

1  of the diseases identified in your chart that Humira is

2  approved to treat?

3      A.    Yes.  Abbott, more or less, followed the same

4  kind of development path that Amgen followed for Enbrel

5  and we followed for Remicade.

6          Humira is approved to treat all the same

7  diseases that are on this chart, with the exception of

8  ulcerative colitis.  Humira is not approved to treat UC.

9      Q.    So if we remove ulcerative colitis from your

10 list, this shows all the diseases where Remicade and

11 Humira have overlapping approvals; is that right?

12     A.    That's right.

13     Q.    Now, let's focus on the five diseases that are

14 identified in your chart.

15     A.    Okay.

16     Q.    And let's start with the approval dates for

17 each product.

18     A.    Okay.

19     Q.    Each of the products.

20          Do you have a slide that summarizes that?

21     A.    I do.  And this may be one that's been used

22 already, but this essentially shows the five disease

23 states that both products are indicated and are approved

24 by the FDA to treat.

25          There are two things that it shows.  The

1 approval dates for both products.  Remicade was first

2 approved in August of 1998, followed by Humira about

3 four and a half years later, on December 2002.

4        The other thing it shows is the approval dates

5 and the indications that Humira has for all the same

6 indications; essentially came after Remicade had been

7 approved and the same indications.

8      Q.   Are you generally aware of the manner in which

9 Abbott sought approval for indications?

10      A.   I am, yes.

11      Q.   And have you followed Humira's approvals for

12 these indications?

13      A.   Very closely.

14      Q.   How, if at all, were Abbott's attempts

15 different from Remicade's attempts to seek approval for

16 these diseases?

17      A.   Well, I think if you look at the clinical

18 trials that Abbott did with Humira, they more or less

19 were the same types of trials that Enbrel did and

20 Remicade did for the same approvals.

21        And so the claims that they have in these

22 specific indications are very similar to the claims that

23 Remicade and Enbrel have.

24        To my knowledge, there weren't any different

25 types of studies that they did that would give them

1   access to different types of patients than those that

2   had already been labeled for Remicade and/or Enbrel.

3       Q.   If we can, let's go back to your first slide.

4       A.   Okay.

5       Q.   And I'd like to take a closer look at each of

6   the diseases identified for which Humira and Remicade

7   have both been approved.

8            Let's start with the first one, Crohn's

9   disease, identified in the blue box there.

10      A.   Okay.

11      Q.   Yesterday we heard some testimony about what

12  Crohn's disease is all about, but can you briefly remind

13  us, please?

14      A.   Crohn's disease is a disease that's

15  characterized by inflammation of the colon, of the

16  bowel.  These are patients -- I don't know if you know

17  anyone with Crohn's disease, but it is characterized by

18  nausea, vomiting, intense pain.  Patients have flares

19  and have intense pain.

20           These are patients who are frequently up and

21  going to the bathroom.  In fact, many of these patients

22  have to map out routes to go to work in the morning, or

23  if they're leaving their home, where they can find

24  bathrooms in case they have an urgent attack and have to

25  find a way to go to the bathroom.  So it really is a

1  disabling disease in terms of patients' quality of life.

2      Q.   And there are different types or versions of

3  Crohn's disease, correct?

4      A.   There are.  There is the chronic Crohn's

5  disease of which physicians may characterize that as

6  mild, moderate, or severe in severity.

7          And then there's a particular type of Crohn's

8  disease known as fistulizing Crohn's, which is a very

9  severe form of the disease.

10      Q.   Can you please explain just a little bit

11  further what fistulizing Crohn's is?

12      A.   Fistulizing Crohn's is a special -- like I

13  said, a severe version of the disease where the patients

14  not only have inflammation of the bowel, but it actually

15  forms tunnels or fistulas -- that's the name -- from the

16  bowel out to the outside of the body.

17          And so you actually -- these tunnels can

18  actually emerge in the abdomen, in the groin, in the

19  thigh.  And it basically causes the contents of the

20  bowel to spill outside the patient's body.  So as you

21  can imagine, it's a very serious disease in terms of

22  quality of life.

23      Q.   Are Remicade and Humira both approved to treat

24  both types of Crohn's disease?

25      A.   Remicade is approved to treat both types of

```
 1  Crohn's, both chronic Crohn's as well as fistulizing
 2  Crohn's.
 3          Humira is approved to treat chronic Crohn's
 4  disease but not fistulizing Crohn's.
 5      Q.  Now, let's take a step back for a moment.
 6          Do you have an understanding based on your
 7  work at Centocor how a patient comes to end up having to
 8  take biologics, such as Remicade and Humira, for the
 9  treatment of Crohn's?
10      A.  Yes, I do.
11      Q.  Can you please explain that to the jury?
12      A.  Okay.  I'll put a schematic up that may help
13  explain this as well.  The slide will advance one.
14          Okay.  So a patient may be diagnosed as having
15  Crohn's disease either by their primary care physician
16  or they may be diagnosed by a gastroenterologist, if
17  they get referred.
18          What typically happens is these patients have
19  flares of the disease, and the physician may attempt to
20  manage it with bursts of steroids, especially if they
21  have an acute bout of the disease.
22          For many patients, that will be enough and the
23  disease kind of goes away.  But for many patients, it's
24  not.  And so the physician will move on to chronic
25  therapy with a group of drugs known as immunomodulators.
```

1   There are several examples of immunomodulators, and I

2   have listed two of them here.   5-ASA, and azathioprine.

3   These are both drugs that have been around for a long

4   time.   They're typically cheap, and so insurance

5   companies usually require that those be used first to

6   see if they will manage the patient.

7        If a patient doesn't respond to these drugs or

8   if they respond and lose response over time, the next

9   class that would be used would be the biologics, like

10  Remicade and Humira.

11       Q.   Now, have your responsibilities in

12  marketing -- let me get my note.

13       Have your responsibilities in marketing at

14  Centocor involved assessing competition?

15       A.   That's a primary part of my responsibility in

16  marketing.

17       Q.   And prior to the approval of Humira in

18  February of 2007 for Crohn's disease, what products did

19  Remicade compete with for the treatment of Crohn's?

20       A.   In Crohn's disease prior to the approval of

21  Humira, there were no other biologic products approved

22  for Crohn's disease.   So there were no other products

23  that Remicade competed with.

24       Remicade had -- I would say, 95 percent of the

25  patients were treated with Remicade.   There were some

1 patients that were being treated with Humira.  Humira

2 had already been approved in rheumatoid arthritis, and

3 so there was some off-label use of Humira.  But for the

4 most part, almost all patients were treated with

5 Remicade.

6     Q.    Did Remicade compete with the compounds

7 identified near the top of your chart, like steroids and

8 immunomodulators?

9     A.    Remicade doesn't really compete with those

10 products.  As I indicated before, insurance companies

11 many times will require those products to be used before

12 Remicade because they're inexpensive.

13          And, in fact, when a biologic is given,

14 Remicade or Humira, oftentimes those products are not

15 discontinued.  They continue to be used.  So they're

16 precursors to biologics.  They're not necessarily

17 competitors.

18     Q.    Now, once Humira was approved for treating

19 Crohn's in February of 2007, did Remicade and Humira

20 begin to compete?

21     A.    Very much so.  I would say Humira is

22 Remicade's only competitor in Crohn's disease.

23     Q.    Now, you indicated that the two products

24 compete in Crohn's disease.

25          What gives you that understanding?

1      A.    Well, as I said, when you asked me about my

2  marketing responsibilities and what I do as a Vice

3  President of Marketing, a big part of what we do is

4  gather competitive intelligence.  We do lots of market

5  research with our physicians and patients to understand

6  how these products are being used and why, why they're

7  making the decisions that they are.

8           So that kind of data tells us how Humira is

9  being used, how Remicade is being used, and how they

10  compete with each other.

11      Q.    Now, based on that data, are there particular

12  product features or attributes that patients and doctors

13  look at when deciding which of these products to use?

14      A.    I think there are probably a number of factors

15  that come into play when a physician and patient are

16  deciding what's right.

17           The first is, of course, the drug has to be

18  effective.  They have to think that the drug is going to

19  work in that particular patient and is safe for use in

20  that patient.

21           The second oftentimes is affordability,

22  whether the product is affordable to the patient that

23  he's seeing.

24           The third may be the route of administration.

25  If it's an IV or a subcu and if the patient has a

1    preference for one versus the other.  Frequency of

2    administration oftentimes comes into play.  Would the

3    patient rather give a drug to themselves more frequently

4    or come into the office and get it less frequently.

5    These are factors that all play into -- I think probably

6    play more strongly if it's the first biologic the

7    patient has ever been given.

8           There's another group of patients, though,

9    who's already been on one of these drugs and is

10   switching for some reason.  Maybe it didn't work, or

11   they had a safety issue around it.  And I would say in

12   that case, the main issue was whether or not the drug

13   works.

14          And so those factors probably play more on a

15   first-line patient, a patient who's never been on a

16   biologic than in a patient who's switching and really is

17   just trying to find a drug that works well for them.

18       Q.   Let's look at each of those features a little

19   bit more closely.

20          First, with respect to efficacy, what, if any

21   differences, are there in terms of perceived efficacy

22   between Remicade and Humira for treating Crohn's

23   disease?

24       A.   Specifically for Crohn's?

25       Q.   Yes.

1      A.    In Crohn's disease, so we gather a lot of

2   research, as I said, that looks at perceptions.  I think

3   that there are two things that make Remicade perceived

4   by gastroenterologists as being a more effective drug in

5   Crohn's disease.

6           One of those is the fact that it's approved to

7   treat both Crohn's and ulcerative colitis, both of which

8   are inflammatory bowel diseases, as I showed at the

9   beginning.

10          Humira is only approved to treat Crohn's

11  disease.

12          I think the second is that, because Remicade

13  is approved and has shown effectiveness in treating

14  fistulizing Crohn's, which is that very severe form of

15  Crohn's, and Humira is not.  I think that there is a

16  perception amongst physicians that Remicade is a more

17  potent drug, a more effective drug in treating Crohn's.

18      Q.    Can you please take a look at PX261, which I

19  believe is in the book there?

20      A.    Okay.

21          MR. MASLOWSKI:  Joe, if you can put it on

22  the screen, please.

23      Q.    (By Mr. Maslowski) What is Exhibit 261?

24      A.    Exhibit 261 is an example of a market research

25  study that we do on an ongoing basis called PhysPulse.

1  This is done amongst physicians, and we basically ask

2  them questions about their perceptions of different

3  drugs.

4          We try to understand how they're using them,

5  why they're using them, why they make the decisions that

6  they are, and how they perceive the different products.

7                  THE COURT:  We have to slow down.  Let me

8  call you back to your days of your youth when you were

9  raised in Georgia.  She just cannot stay up with you.

10                  THE WITNESS:  I have to say this is the

11  first time I've been asked to slow down.

12                  THE COURT:  Please do.  Thank you.

13      A.    One other thing I'll point out on this chart

14  is that you see that in the subtitle it says W32.  That

15  means Wave 32.  We do these studies between one and

16  three times per year, depending on how quickly the

17  market is evolving so that we can see how things change

18  over time.

19          So that means that this is the 32nd

20  consecutive wave of this study that we've done in

21  gastroenterology.

22      Q.    (By Mr. Maslowski) And is this the type of

23  data you mentioned before that indicates to you that

24  Remicade and Humira are competing in Crohn's disease?

25      A.    It is.

1     Q.    Can you please turn to Page 9?

2          Is there anything on this page which will help

3 you explain to the jury the differences in perceived

4 efficacy?

5     A.    Yes.  So if we're talking about efficacy, if

6 you go to the right-hand side where it says product

7 performance, there are two charts that are featured

8 there.

9          And there we're looking at two separate

10 things:  Efficacy, that is, the effectiveness of the

11 drug, how it works, and safety.

12          The way the study works is that we essentially

13 ask physicians to rate compounds on a scale of 1 to 10,

14 where 1 means poorly satisfied with that particular

15 attribute; 10 means it's very effective in satisfying

16 that attribute.

17          Then what we do is we score the number of

18 physicians who rate it an 8, 9, or 10.  And that's

19 what's written on the left-hand side, percent of

20 physicians rating it 8, 9, or 10.  So these are the ones

21 who say that product does a very good job on that

22 attribute.

23          And it's hard to see the line, the light blue

24 line at the top, but it's the one where you see the

25 numbers that say 53, 63, 56.  The line is very faint,

1 but that's essentially Remicade.

2          And you can see that they rate Remicade higher

3 than Humira or the other products that are clustered

4 down lower in terms of perception of efficacy.

5          The other thing I will note about that is you

6 see the starburst out beside the numbers 41 and 37.

7 Those are the other compounds:  Humira,

8 immunomodulators, et cetera.

9          What that means is that that number is

10 statistically significantly different, and so physicians

11 significantly ranked Remicade higher on efficacy than

12 Humira or immunomodulators or steroids or the other

13 products in the class.

14                MR. MASLOWSKI:  Joe, maybe you could

15 trace the top line.  It's kind of hard to see on the

16 exhibit.  Just to help the jury.

17    Q.   (By Mr. Maslowski) You also mentioned this

18 exhibit shows safety data as well.

19          What, if any, differences in perceived safety

20 are there between Remicade and Humira for treating

21 Crohn's disease?

22    A.   Well, I think that physicians regard all of

23 these products as being safe amongst the patients that

24 they treat or they wouldn't choose that drug for that

25 patient.

1          If you look at the labels between Humira and

2    Enbrel in terms of the label is what the FDA will allow

3    us to actually say or promote in terms of safety, the

4    labels between Humira and Remicade are actually very

5    similar.  And the language in the kinds of adverse

6    events that are included in them are almost the same.

7          And so I think amongst gastroenterologists,

8    the perception is that there aren't any differences

9    between them in terms of safety.  So I can go to this

10   chart, and this kind of illustrates my point, if I go to

11   the bottom of the chart instead of the top.

12         Now we're looking at overall safety.  Same

13   thing; this is a 1-to-10-point scale, and we pull those

14   physicians out who say the product is an 8, 9, or 10.

15         So it's very satisfactory on that parameter.

16   Now all the products -- and it's, again, hard to see

17   with the colors of the lines -- but you see the numbers

18   to the right:  29, 29, 28.  That's where Remicade and

19   Enbrel and Humira, they're all there together.  And

20   there's no starburst amongst them.

21         So it basically says there's no significant

22   differences perceived by physicians on the parameter of

23   safety.

24         The only one that's significantly worse is the

25   red line on the bottom, which is steroids, and you see

1  the starburst by the steroids.

2      Q.    Another feature that you mention that doctors

3  look at when prescribing these products is the route of

4  administration, correct?

5      A.    That's correct.

6      Q.    Do Remicade and Humira have different routes

7  or modes of administration?

8      A.    They do.  Remicade is given by an intravenous

9  infusion, and Humira is given by subcutaneous injection

10  to the patient.

11      Q.    Let's focus on Remicade's route of

12  administration for a moment.

13      A.    Okay.

14      Q.    Can you please explain a little bit further

15  what you mean by IV infusion?

16      A.    Sure.  So to get a dose of Remicade, the

17  patient would go to a physician's office or to some

18  other kind of infusion center.  Remicade is mixed in a

19  bag and the needle is put in their arm.  And they

20  essentially sit while the drug is administered over a

21  period of about two hours.

22      Q.    You mentioned infusion centers.  What's an

23  infusion center?

24      A.    Well, an infusion center can take a number of

25  forms.  Many physicians set these up in their offices so

1 the patient just goes directly to the physician's

2 office.

3        It could also be an infusion center that's set

4 up specifically for doing that, or there are some

5 infusion centers that are set up in hospitals.

6        Essentially, what they're like, when the

7 patient goes there, is there will be -- in most cases,

8 there will be a comfortable chair for the patient to

9 sit.  It may be a reclining-type chair.  They usually

10 have televisions available so that they can watch

11 television or read magazines.

12        Many patients like to talk with each other

13 while they're getting the infusion.  But the whole

14 process is overseen by a nurse.  So there is, you know,

15 care given to the administration of the drug.

16        Oftentimes, as I said, the infusion center is

17 actually in a physician's office, and so they'll

18 schedule the infusion around their regular physician

19 follow-up.  So they'll get to see their physician,

20 assess how well the disease is doing and how well the

21 drug is doing in terms of treating their disease.

22    Q.    Now, what is the mode of administration for

23 Humira again?

24    A.    Humira is a subcutaneous injection that the

25 patient gives to themselves.

1      Q.   Can you explain that a little further, please?

2      A.   I can.  So, basically, the way a patient would

3 go about doing that is instead of coming to see the

4 physician in their office, the physician writes a

5 prescription for Humira, and the patient takes that with

6 them.

7           The drug is either shipped to them from a

8 specialty pharmacy, or they can actually take it to a

9 retail pharmacy that they use, and they will get the

10 product filled.

11          Usually, what they do is they'll give them

12 several doses at once, meaning several months' worth of

13 the supply.  So they'll take those home and they'll put

14 them in the refrigerator, because the products -- both

15 products have to be kept cold.

16          When it's time to administer it, they will

17 oftentimes take the Humira out of the refrigerator and

18 let it warm up a bit.  It hurts a little if it goes in

19 too cold.  And they essentially just inject themselves.

20 And once they're done, the needle is essentially a

21 sharps at that point, so they have to dispose of them

22 appropriately.  So patients will have some sort of a

23 sharps disposal container.  You've probably seen these

24 red plastic boxes in a hospital.

25          They put them in there so that children or

1    pets or whatever can't get into them.  And then when the

2    box is full, they find some compliant way to dispose of

3    the syringes.

4        Q.   Can you just throw them in the garbage?

5        A.   No, you can't.  It's illegal.

6        Q.   Let's compare the two modes of administration.

7    Are there benefits associated with the IV infusion route

8    versus the subcutaneous administration?

9        A.   I would say there are a number of advantages

10   to IV.

11           The first is that the procedure is done and

12   overseen by a nurse or other healthcare practitioner, so

13   there's very few chances of messing it up in any way or

14   the patient not getting the appropriate dose.

15           Also, because they're in a physician's office,

16   they have an opportunity to interact with their

17   physician.  The physician can check their disease state.

18   They can also oversee the procedure and make sure that

19   there's no adverse events that occur when they're

20   getting the drug.

21       Q.   Are there benefits associated with

22   subcutaneous administration versus IV infusion?

23       A.   Yes, there are.

24           For patients who choose to self-administer,

25   the advantage is that they have the drug at home; they

1    don't have to schedule a follow-up visit with the

2    physician; and they can choose just to inject the drug

3    to themselves whenever they want to at home at their own

4    leisure.

5        Q.    So there seem to be benefits to both.  What do

6    patients and doctors prefer, which one?

7        A.    Well, I think what we find in all of our

8    market research is that that's an individual preference.

9    What works best for me may not work best for you.

10   Some patients would prefer to go to their physician's

11   office and have the entire thing done by a nurse.  Some

12   patients would prefer to inject the drug themselves.

13   We follow this very closely, of course, because it's one

14   of the ways that we analyze the marketplace.  And what

15   we see is that about 15 to 25 -- 15 to 20 percent of

16   patients have a strong preference for the infusion.

17   They would rather go and have the physician give the

18   drug to them.

19            If you look at this as kind of a sliding scale

20   or a spectrum, it's about 15 to 20 percent on one side.

21   There's about another 40 percent on the other side, who

22   actually prefer the subcutaneous, and they would much

23   rather have the convenience of giving the product to

24   themselves at home.

25            But then there's a group in the middle of

1  about 40 percent that don't have a strong bias one way

2  or the other, and there are usually other factors that

3  will come into play in terms of deciding which drug they

4  get.

5         Subcutaneous or IV is one, but it's probably

6  not the most important factor.

7     Q.   So in terms of the way that Centocor actually

8  sells Remicade, does Centocor segment the market and

9  only target the people that like IV infusion as compared

10 to the people that like subcutaneous?

11    A.   No.  I think we think of the market as there's

12 two types of patients that we sell Remicade to.

13        There are patients who have never been on a

14 biologic before, and they're making their decision for

15 the first time to go a biologic, and then there are

16 patients who have been on a biologic, and maybe they

17 failed or they didn't respond as well.

18        We sell Remicade to both types of patients.

19 The reason each of those would choose a drug, of course,

20 are a little bit different, but the fact that it's IV or

21 subcu doesn't mean that we only sell to a group of

22 patients that prefer subcu, because as I said before,

23 not all patients have a really strong bias one way or

24 the other.

25    Q.   Have you heard the term compliance used with

1    respect to these biologic products?

2         A.    I have, yes.

3         Q.    And what does compliance mean?

4         A.    Compliance just means whether or not a patient

5    takes the drug as it was prescribed by the physician or

6    as the label indicates that it should be taken.

7         Q.    Are there any compliance issues with respect

8    to the different modes of administration?

9         A.    There could be.  I mean, for a patient who's

10   getting an infusion in the physician's office, there's a

11   higher chance they're going to be compliant because the

12   drug is actually being given by a nurse.  So there's a

13   higher likelihood that it will be given as instructed.

14   Oftentimes, if a patient misses an appointment or they

15   miss their infusion, the office staff will call them,

16   they'll follow up, remind them, and get them back in, if

17   something happened or they just missed their

18   appointment.

19        With a subcutaneous product, you all know that

20   when you have a drug at home, sometimes you can forget a

21   dose.  You take it a day after you should have, or, you

22   know, there's sometimes that you just forget to do it

23   exactly the way that the label had indicated.

24        So there can be differences between the

25   products on compliance.

1    Q.   And you also mentioned frequency of

2  administration as another fact that goes into the

3  prescribing decision.

4         What did you mean by that?

5    A.   The frequency of administration just has to do

6  with how often the patient has to take a given drug in a

7  month.

8    Q.   And can you explain the dosing frequencies of

9  Remicade versus Humira for treating Crohn's disease?

10    A.   So for Crohn's disease, after getting through

11  the initial set of doses, Humira's given every two

12  weeks.  The patient injects themselves at home every two

13  weeks.

14         Remicade is given every eight weeks.  So they

15  would essentially go to the doctor's office once every

16  two months, and there's no other drug administration of

17  Remicade in between the two doses -- in between those

18  doses.

19    Q.   So what does that mean over the course of a

20  year?

21    A.   Well, if you averaged that out over the course

22  of a year, it means that a patient will essentially get

23  between 6 and 7 doses of Remicade over a year compared

24  to 26 doses that they inject themselves with Humira over

25  a given year.

1      Q.    Is the cost to the patient a factor that goes

2 into the prescribing decision?

3      A.    It's a very important factor.

4      Q.    And can you please explain that a little bit

5 further.

6      A.    Well, there are -- I guess there are two

7 components of cost.

8           The very first one is whether or not a

9 patient's insurance company will even cover the drug.

10 If you are a patient and your insurance company didn't

11 cover Remicade, you would be not likely to take that

12 drug because it would be very expensive if you had to

13 pay 100 percent of the cost.  And so that can drive you

14 to one or the other.

15          If your insurance company covers both,

16 sometimes the insurance companies will actually prefer

17 one drug over the other, and they'll assign an

18 out-of-pocket co-payment.

19          You all know, if you've gone to pick up a

20 prescription at the pharmacy, usually, you have to write

21 a check for 15 or 25, $30, some amount as a co-payment.

22 That amount is set by the insurance company, and it

23 usually is based on which drugs they prefer.

24          And so one drug can be more expensive from a

25 co-payment standpoint than the other.

1      Q.   Let's look specifically at Remicade versus

2  Humira.  Which costs more to the patient?

3      A.   Well, I think to answer that, it's important

4  to separate out Medicare patients versus patients who

5  are on a commercial insurer.

6          For Medicare, Medicare used to not cover

7  prescription drug benefits up until about the mid-2000s.

8  There was a law passed then, and now all prescription

9  drugs are covered by Medicare.

10          There are differences in the amount of

11  out-of-pocket that a patient has to pay for a

12  prescription drug versus an infused drug.  And on an

13  annual basis, Remicade tends to be cheaper for Medicare

14  patients, which is sometimes important for patients who

15  are on a fixed income.

16          On the commercial side, again, as I said,

17  insurers may favor one drug or another based on which

18  ones they have a preference that the patients use.  And

19  some plans, Humira's more expensive to the patient; in

20  some plans, Remicade is more expensive to the patient.

21  So overall, I would say, from a commercial insurer

22  standpoint, it's roughly equal.

23      Q.   Now, let's take a step back.  We've looked at

24  a lot of factors here that go into the prescribing

25  decision.

1          Which of those factors is the most important

2  factor when deciding between Remicade versus Humira?

3      A.   Well, as I said before, I don't think that any

4  one of those is the most important factor.  It depends

5  on the particular patient.

6          If -- you know, if I'm a patient and my plan,

7  my insurance company, doesn't cover Humira, and I want

8  Humira, it would be irrelevant that I prefer subcu,

9  because I'm not going to pay the full cost of the drug

10  out-of-pocket.  And so in that case, cost would be the

11  major factor.

12          And if I'm a patient who's already failed on a

13  particular drug, my most important concern is that the

14  next drug work, particularly given the severity of these

15  diseases.

16          And so, again, depending on the patient, each

17  of these factors can play more or less a different level

18  of importance.

19      Q.   Is the same true for doctors; some doctors

20  look at certain features as more important as compared

21  to others?

22      A.   I think that's generally true, but if you look

23  at the prescribing, most physicians write both products.

24  Most physicians, regardless of the specialty, write both

25  Remicade and Humira in their practices.

1        Q.    Now, we've been talking about how Humira

2   competes with Remicade in Crohn's disease.   Are there

3   other biologic products in Crohn's disease?

4        A.    There are two other products that currently

5   compete in Crohn's disease.   The names of those are

6   Tysabri and Cimzia.

7        Q.    Can you briefly tell us what Cimzia is,

8   please?

9        A.    Again, Cimzia is always an anti-TNF product.

10  It is not a monoclonal antibody.   It's actually built a

11  little bit differently.   It's a molecule.   But it does

12  target the same tumor necrosis factor.

13       Q.    And how is it administered?

14       A.    In Crohn's disease, the indication that was

15  approved by the FDA was -- it was in a syringe, much

16  like Humira, but the patient had to go into the

17  physician's office and have the physician give it to

18  them.   They couldn't self-administer.

19       Q.    So a patient can't self-administer Cimzia at

20  home like he or she could with Humira, correct?

21       A.    They could not.

22             Now, Cimzia was just approved in rheumatoid

23  arthritis, which we'll talk about later.   When they got

24  that indication, they got the ability to be

25  self-administered by the patient.

1          But everything up until about a month ago, the

2     patient had to go into the gastroenterologist and have

3     them give the drug.

4          Q.    And when was Cimzia launched?

5          A.    Cimzia was launched in April of 2008.

6          Q.    And that was for Crohn's disease?

7          A.    For Crohn's.

8          Q.    Based on your experience, can you describe the

9     impact that Cimzia had when it was launched in Crohn's

10    disease?

11         A.    Again, I said -- as I said earlier, I think

12    Remicade and Humira really are the primary competitors

13    in Crohn's.  Cimzia has had a very minor impact on the

14    market overall, and their market share is a relatively

15    modest one.

16         Q.    And you mentioned a product called Tysabri.

17         A.    Yes.

18         Q.    What is Tysabri?

19         A.    Tysabri is also -- it's a different mechanism

20    entirely.  It does not target tumor necrosis factor.

21    It's a product that was launched, and it was actually

22    pulled off the market because of a safety concern and

23    then relaunched back in Crohn's disease but with a lot

24    of restrictions.

25              And so it's a product that's not really been

1 used that much in Crohn's disease.

2    Q.   Now, have you prepared a slide to show the

3 market shares of these various products in Crohn's

4 disease?

5    A.   I have.  Okay.

6    Q.   Can you please explain what is shown here?

7    A.   So this is showing -- and as I said before,

8 there are two types of market research that we do.

9 One is we track physicians' perceptions, and I explained

10 some of that data.  We also track the actual

11 prescriptions, though, so that we can understand how

12 products are being used.

13        This shows the actual shares or how often our

14 product's being used.  Looking at the end of 2005, which

15 was before Humira was approved, compared to the end of

16 2008, which is just the end of last year, in 2005, as I

17 said, even though Humira was not approved for the

18 treatment of Crohn's disease, it was approved in the

19 market for RA, and so there was some off-label use,

20 about 3-1/2 percent of patients.

21        By the end of 2008, you can see that Humira

22 now is used to treat about a fourth of the patients in

23 this disease.  And as their share has grown over time,

24 Remicade's share proportionately has declined by about

25 the same amount.

1          And I indicated Cimzia as a relatively small

2   player.  You can see that here at only 2 percent share

3   of the patients.

4      Q.   So based on your experience in marketing at

5   Centocor, what impact did the approval of Humira for

6   Crohn's disease have on Remicade's sales for Crohn's

7   disease?

8      A.   Well, I think, based on this chart, it's had a

9   rather significant impact.  About 25 percent of the

10  market that Remicade used to compete for by itself,

11  Humira now competes for.

12          I think that the primary place that Humira has

13  taken some of that share is in the use in new patients.

14  When Humira was first introduced, the first types of

15  patients that were treated with Humira were those who

16  had already been treated with Remicade and it didn't

17  work for whatever reason.

18          But what we see how is that actually about 60

19  percent of the patients being treated with Humira have

20  never been treated with Remicade.

21          So these are these biologic naive patients

22  that I spoke of earlier who are picking a drug, a

23  biologic drug, for the first time.

24      Q.   Now, let's go back to your first slide, if we

25  can, to keep track of where we're going here.  Well,

1 that's not your first slide.  That's okay.

2          Actually, if you can describe what's on this

3 slide.

4      A.   Okay.  So because there are a lot of drugs

5 that we're going to be talking about this morning and a

6 number of diseases, and they're not all the same

7 diseases that the drugs treat, I thought I would just

8 lay out who the primary competitors are in each of the

9 disease states.

10          So we've just been talking about Crohn's

11 disease.  Remicade and Humira really are the only two

12 major players in terms of the drugs that work and are

13 approved in Crohn's disease.

14          I've put a checkmark under the small players.

15 That's to describe Tysabri and Cimzia, the other two

16 products.  They each have, respectively, 5 percent or

17 less of the market.  And that's how I'm characterizing

18 smaller players.

19      Q.   So just to be clear, the green checks

20 represent products that compete for the identified

21 indication on the left?

22      A.   Right, with an FDA-approved indication.

23      Q.   Okay.  We're going to use this scorecard to

24 keep track as we go along today, correct?

25      A.   I think it will just organize it and make it

1  all a little more clear.

2      Q.   Okay.  Good.

3           So if we can, let's go back to your first

4  slide.  Hopefully, we can do that.

5           All right.  We're in business.

6           So we've just talked about the blue portion of

7  your slide.  Let's focus on the middle orange section.

8      A.   Okay.

9      Q.   There are three diseases there, and they're

10 all a mouthful.  Can you briefly describe what those

11 diseases are?

12     A.   I can.  They all are autoimmune inflammatory

13 diseases that attack different parts of the body.

14 So in rheumatoid arthritis, the inflammation largely

15 attacks the joints of the fingers and the hands.  You've

16 seen patients who have rheumatoid arthritis, their hands

17 are sometimes curled; they'll have very large knuckles.

18 It can also attack the joints of the knees.

19           Ankylosing spondylitis is a disease where the

20 inflammation largely attacks the joints of the spine and

21 the hip, and these patients oftentimes are hunched over.

22 They have no movement of their head.  They can't turn

23 their head from side to side.

24           Psoriatic arthritis largely attacks the

25 joints, like rheumatoid arthritis, as well as the skin.

1 Usually, there's a skin component, and they'll have

2 psoriasis on their skin.

3     Q.   Now, you've mentioned arthritis a couple of

4 times.  Are these diseases similar to the common form of

5 arthritis called osteoarthritis?

6     A.   They're not related at all.

7          Osteoarthritis is usually characterized by

8 the -- the cartilage in between the joints erodes away,

9 and the bone scrubs on bone.

10          So it's very painful, but it's very different.

11 This is an inflammatory condition that causes swelling

12 of the joints.  It actually can cause loss or erosion of

13 the bone itself.

14     Q.   Now, before we leave this slide, it would be

15 okay to refer to some of these diseases by their

16 two-letter abbreviations or three-letter abbreviations,

17 correct?

18     A.   I think that will be easier, yes.

19     Q.   Okay.  Let's do that.

20          Do you have an understanding, based on your

21 work at Centocor, as to how patients come to take

22 products like Remicade and Humira for the treatment of

23 these gastro -- or rheumatology diseases?

24     A.   I do.  In fact, I've prepared a chart that was

25 similar to gastroenterology.  And again, these patients

1  may be diagnosed as having rheumatoid arthritis by their

2  primary care physician, or they could be diagnosed by a

3  rheumatologist.

4          But, essentially, the way they're treated is,

5  they'll first be given a drug that helps with the pain.

6  That's an NSAID or a nonsteroidal anti-inflammatory.

7  These are drugs like Naprosyn, like Celebrex, aspirin

8  even, that really don't do anything to the underlying

9  disease state.  They just help with the pain that the

10 patient feels.

11          If that's not enough, then the second step

12 that would be taken would be a disease-modifying

13 anti-rheumatic drug or a DMARD.  These are drugs that

14 actually do begin to work on the underlying inflammation

15 of a disease.  And a common example of a DMARD is

16 Methotrexate, used very commonly.

17          And then the final -- if that doesn't work or

18 the patient doesn't respond, the next step would be to

19 go to a biologic.

20     Q.   Let's focus on the middle box there, if we can

21 there, the DMARDs.  How are DMARDs taken?

22     A.   DMARDs can either be given orally, by a pill,

23 or they can sometimes be injected, if the patient's not

24 able to take the pill.

25     Q.   Is there a particular DMARD that's used more

often than others?

    A.    The most commonly used is Methotrexate, which

is the example I've listed here.

    Q.    How is Methotrexate administered?

    A.    Most commonly, Methotrexate is given as a pill

by mouth.

    Q.    Now, do patients ever use the biologic

products in combination with a DMARD?

    A.    Patients are frequently administered both

biologics and Methotrexate together.

    Q.    And why is that?

    A.    Well, I think for a couple of reasons.

In most of the clinical studies that have ever been done

with all of these products, Humira, Remicade, and

Enbrel, those studies suggest that biologics actually

work better when they're given in conjunction with

Methotrexate than when given by themselves.

    Q.    So products like Remicade and Humira, when

used with Methotrexate, actually work better than if

used by themselves?

    A.    That's correct.

 What does Remicade's label state about using Remicade

with Methotrexate for treating RA?

    A.    For treating RA, the FDA-approved indication

for Remicade suggested it should be given in combination

1  with Methotrexate.

2      Q.   Now, that was just one of the three diseases

3  that rheumatologists treat.  The two others, PsA and AS,

4  does Remicade's label indicate that the drug should be

5  used with Methotrexate for treating those two

6  rheumatology diseases?

7      A.   No, it does not.

8      Q.   And what does Remicade's label say about use

9  with Methotrexate for treating the first column, the

10 gastroenterology diseases, or the last column, the

11 dermatology diseases?

12     A.   Well, Methotrexate is not used at all as a

13 drug in gastroenterology, so there's no use -- or

14 requirement for the use of Methotrexate in the

15 gastroenterology diseases.

16          And the same would be true for psoriasis.

17 It's not required that Methotrexate be given with

18 Remicade in psoriasis.

19     Q.   So the only indication that Remicade's label

20 says it should be used with Methotrexate is RA, correct?

21     A.   That is correct.

22     Q.   So let's focus on RA, if we can, for a moment.

23 Do you have an understanding as to whether Remicade is

24 always used with Methotrexate for treating RA?

25     A.   In the majority of patients, Remicade is used

with Methotrexate, but, again, from our market research,

we understand that about 15 to 20 percent of the time,

Methotrexate is not given with Remicade.  So Remicade is

essentially given as a monotherapy.

Q.   Is there a specific term that's used to refer

to a drug in a manner that's different than the way it's

described on its label?

A.   We typically call that off-label use of a

drug.

Q.   Does Centocor promote Remicade for off-label

use?

A.   No, we do not.  That's not allowed.

Q.   Is off-label use by a doctor or patient

illegal in any way?

A.   It is, because physicians will always --

they'll always use their clinical judgment in

determining the right way to prescribe a drug to each of

their individual patients.

Q.   Let me ask the question again.

A.   Okay.

Q.   Is off-label use by a doctor or patient

illegal?

A.   No, it's not.

Q.   Is it unethical for a doctor to prescribe

Remicade without Methotrexate for treating RA?

1    A.    No, it is not.  There are -- and there are

2  reasons for that.

3          Methotrexate, because it is a

4  disease-modifying drug, it's also a drug that in some

5  patients -- not all patients will respond to all of

6  these drugs.

7          And so there may be patients who have been on

8  Methotrexate and didn't respond, and so it doesn't make

9  sense to continue Methotrexate in that patient if they

10  had no clinical response to it.

11          There are also patients who have adverse

12  events with Methotrexate, or they can't tolerate it very

13  well.  And so in that case, the physician may decide he

14  doesn't want to continue Methotrexate, and he wants to

15  use Remicade by itself.

16          Essentially, the reason that we don't have a

17  monotherapy claim for Remicade in rheumatoid arthritis

18  is, we just never studied the drug that way.

19          So there's nothing unethical about using

20  Remicade as a monotherapy.

21    Q.    Still focusing just on RA, the first of the

22  rheumatology diseases we identified before, do you have

23  an understanding of what products Remicade competes with

24  for the treatment of RA?

25    A.    In rheumatoid arthritis, I would consider the

1  primary competitors Humira and Enbrel.  Probably to a

2  lesser degree, Orencia.  And then there are a couple of

3  other smaller products.

4      Q.  Let's focus on Enbrel for a moment.  What is

5  Enbrel?

6      A.  Enbrel is a product that also targets tumor

7  necrosis factor, but it is not a monoclonal antibody.

8  It's a fusion protein.  So it's a different type of

9  molecule.

10      Q.  And when was Enbrel launched?

11      A.  In 1998, the same year as Remicade.

12      Q.  And how is Enbrel administered to a patient?

13      A.  Enbrel is also self-administered by the

14  patient through an injection.

15      Q.  And you mentioned Enbrel as a competitor in

16  RA, but you didn't mention them as a competitor in

17  Crohn's disease, correct?

18      A.  That's correct.

19      Q.  Why is that?

20      A.  One of the earlier studies that Enbrel did was

21  in Crohn's disease, and they were doing it with the

22  intent of getting an indication.  And the study actually

23  failed.  So it showed that Enbrel was not effective in

24  treating patients with Crohn's disease.

25      Q.  I believe you also mentioned a drug called

```
 1  Orencia; is that right?
 2       A.   Yes.
 3       Q.   What is Orencia?
 4       A.   Orencia is a different mechanism.  It doesn't
 5  target tumor necrosis factor.  It actually targets CTLA4
 6  and is a drug that is -- it's administered by an IV
 7  infusion, much like Remicade.
 8       Q.   Let's just be clear.  Is Orencia an anti-TNF
 9  antibody like Remicade and Humira?
10       A.   It's not.
11       Q.   And how is Orencia administered?
12       A.   Through an intravenous infusion.
13       Q.   Is the infusion of Orencia similar to the
14  infusion of Remicade?
15       A.   It's given in the same way, but it's given
16  over a shorter period of time.  Orencia infusions take
17  about 30 minutes.
18            It's also given more often.  A patient needs
19  to get Orencia every four weeks, as opposed to Remicade,
20  which is every eight weeks.
21       Q.   Now, if you would please take a look at PX251,
22  which should be in your book.
23                 MR. MASLOWSKI:  Joe, if we can put that
24  up?
25       A.   Okay.
```

1      Q.    (By Mr. Maslowski) What is PX251?

2      A.    PX251 is another example of the same type of

3  study we were referencing earlier called PhysPulse.

4  PhysPulse is a study that we do on a regular basis to

5  monitor physicians' perceptions and attitudes about

6  certain drugs and how they're using them.

7            This particular document is Wave 28 meaning

8  the 28th successive wave of this research that we

9  fielded, and this is now specifically looking at the

10 disease, rheumatoid arthritis.

11     Q.    Can you please turn to Page 21 of the exhibit?

12     A.    Okay.

13     Q.    Now, this looks like a pretty complicated

14 chart.  Can you please help us understand what is shown

15 here?

16     A.    I can.  And maybe the first thing -- is this a

17 laser pointer?

18            If you look at the legend at the bottom,

19 you'll see what this is showing.  This is the way

20 products are used in what succession.

21            So first line, second line, third line, or

22 fourth line.  So it's just when and the progression of

23 treatment a particular drug is being given.

24            If I look at the two products, Remicade and

25 Humira -- I think I can illustrate what's going on here.

1  So the green boxes on the bottom, these two

2  (indicating), in wave 28, for Humira --

3      Q.   Hold on one second, Mr. Bazemore, if you

4  wouldn't mind.

5      A.   Yes.

6      Q.   Which two --

7      A.   Let's look at Remicade and Humira.

8      Q.   And these two right there are Remicade

9  (indicating), correct?

10     A.   Those are Remicade.  Wave 27 is 2007.  Wave 28

11  is 2008, okay?

12              MR. MASLOWSKI:  Thank you, Joe.

13              THE WITNESS:  Yeah, that's better.

14     A.   So, basically, what this is saying is, in the

15  last wave of this research, which is what I'm showing,

16  Wave 28, 22 percent of the total prescriptions for

17  Remicade in this dark green box were -- it was -- it was

18  the first time a biologic had been prescribed to that

19  particular patient.  So Remicade was being chosen as the

20  first anti-TNF or first biologic.

21              Similarly, for Humira, 25 percent of their

22  total use was also as a first-line drug.

23              So you can see that the two products are

24  competing very effectively for first-line patients, and

25  it accounts for roughly the same portion of their total

1  sales.

2          The other thing that you can see is that from

3  Wave 27 to Wave 28, which is, again, 2007 versus 2008,

4  the amount of first-line use actually increased both for

5  Remicade and Humira.

6          So this suggests that there's more and more

7  comfort or growing willingness to use both drugs as a

8  first-line drug in the treatment of rheumatoid

9  arthritis.

10          The other thing that it shows is that there

11  are -- both green -- these lighter green bars

12  (indicating), remember, that's second-line use for a

13  patient who's going on to their second drug, as well as

14  this white bar here (indicating), which is third-line

15  use, patients who are going on the third drug.  You see

16  that amongst all three products.

17          So, basically, that means that as drugs don't

18  work or patients are switching back and forth, they're

19  really trying all of these products.  They don't

20  perceive them as being necessarily different in any way,

21  just they keep -- they keep trying to find a drug that's

22  going to work best for that patient.

23          So all three of these products are used as

24  first-line, second-line, and third-line choices.

25                  MR. MASLOWSKI:  Joe, if you can back out.

1      Q.    (By Mr. Maslowski) You mentioned the three

2   products.  The three products you're referring to are

3   Enbrel, Remicade, and Humira; is that right?

4      A.    That's correct.  I'm primarily referring to

5   the anti-TNFs at this point.

6      Q.    And by the dark green and the light green

7   boxes on the graph, that shows that those three products

8   get the majority of the first- and second-line use,

9   correct?

10      A.    Almost all first- and second-line use is

11   anti-TNF.  I think in rheumatoid arthritis, that is

12   regarded as being the gold standard class of treatment.

13   And so you usually don't start use of other mechanisms

14   until third and fourth line.

15      Q.    Now, if patients and doctors preferred only

16   the subcutaneous products or if that was the most

17   important prescribing decision or factor, what would you

18   expect to see in your chart?

19      A.    Well, if subcutaneous was the most important

20   factor and they all preferred subcutaneous use, I think

21   you would not see first-line use of Remicade first.

22          The other thing I think you would not see is

23   that light green bar, which is second-line use, because

24   if they picked Enbrel first, they would all go to Humira

25   as the second drug, being the only other subcu.

1       If they picked Humira first, they would all go

2 to Enbrel.  And so you really would see little to no

3 second-line use of Remicade.

4    Q.  So is the fact that there's a substantial

5 number of numbers in the middle portion there for

6 second-line use, does that indicate that some patients

7 are going Enbrel, Remicade, Humira, or Humira, Remicade,

8 Enbrel?

9    A.  We had very detailed analysis that show that

10 patients switch across all of these products.  So

11 patients who are originally treated with Enbrel will

12 switch to both Remicade and Humira.

13       Patients who are originally treated with

14 Humira will switch to both Enbrel and to Remicade.

15 Patients who are originally treated with Remicade will

16 switch to either of the subcu products.

17       So, yes, there is that phenomena occurring.

18    Q.  So can you please summarize for us, just for

19 RA, the level of competition among these products?

20    A.  Well, I think you can see that they all

21 compete for both first-line use, as well as for patients

22 who are switching, which is the two large categories of

23 patients that we talked about before.

24    Q.  Do you have a slide that summarizes the level

25 of competition among these products?

1          A.   I do.

2               So this is a similar chart to the one that I

3  showed before, which is looking at the percentages of

4  patients that are treated with each of the various

5  drugs.

6               Again, starting at the end of 2005, you can

7  see that Remicade's share the RA market was about

8  43-1/2 percent; Humira 16 or 17.

9               Over time, Humira's share has continued to

10 increase.  Now, at the end of 2008, about 21, 22 percent

11 of patients are being treated with Humira compared to 30

12 percent of Remicade.

13              So you can see that number is down

14 substantially compared to 2005.

15         Q.   Have you added these products to what I call

16 the scorecard before?

17         A.   I have.

18              MR. MASLOWSKI:  Can we go to that slide,

19 please?

20         A.   Okay.  So -- and the reason I'm doing this is

21 just to make it clear, because now this looks very

22 different in rheumatoid arthritis.

23              You can see that the three major competitors

24 still now here are Enbrel, Remicade, and Humira, the

25 anti-TNF products.  And together they account for about

1  85 percent of the total use of biologics in patients

2  with rheumatoid arthritis.

3       Orencia, I'm categorizing as a major player,

4  because they have more than 5 percent of the market.

5  And then there are a couple of other smaller products

6  that also are used here, like Kineret and Rituxan.

7       Q.   (By Mr. Maslowski) Let's focus on those small

8  products for a moment, Kineret and Rituxan.

9       A.   Okay.

10      Q.   How are they administered?

11      A.   Kineret is given through a subcutaneous

12 injection in the same way that Humira is given.

13 And Rituxan is given through an intravenous infusion in

14 the same that way that Remicade is given.

15      Q.   So the small players on your chart include

16 both subcutaneous products and IV products?

17      A.   That's correct.

18      Q.   Mr. Bazemore, in the end, what are Remicade's

19 primary competitors in RA?

20      A.   Our primary competitors in rheumatoid

21 arthritis are Enbrel and Humira.

22      Q.   Now, let's take a look at the other two

23 rheumatology diseases, what I'll just call PsA and AS.

24 Based on your work, do you have an understanding of what

25 products Remicade competes with for those diseases?

 1       A.    So in psoriatic arthritis and ankylosing

 2  spondylitis, the two primary competitors are Humira and

 3  Enbrel.

 4            Orencia --

 5       Q.    I'm sorry?

 6       A.    Orencia and the smaller players that are

 7  listed under rheumatoid arthritis are not indicated for

 8  those diseases.

 9       Q.    And do you have a slide that summarizes the

10  level of competition there?

11            Just to back up one, we're talking about the

12  last two in the orange box, correct, PsA and AS?

13       A.    Yes, that's correct.

14            And so these are market share graphs.  And

15  I've only used 2008 here so that I can get them both on

16  a single slide, but you can see that in both cases,

17  Enbrel was approved in both of those disease states

18  before either Remicade or Humira.  And so Enbrel still

19  holds the majority of market share.

20            But when you look at Humira and Remicade, you

21  can see that Humira does have a substantial portion of

22  both markets, almost a third.  And, in fact, in

23  ankylosing spondylitis, they're used more frequently

24  than Remicade.

25       Q.    Let's go back to your scorecard, if we can.

1  Can you tell us what you've done here?

2     A.   So I'm just adding these two disease states,

3  ankylosing spondylitis and psoriatic arthritis and

4  showing the competitors.

5         And so, again, now you can start to see that

6  there are differences amongst these products in terms of

7  their overall indications.

8         Humira and Enbrel, as well as Remicade are all

9  approved to treat these two disease states.  Orencia and

10  the other smaller players are not.

11     Q.   Okay.  Let's focus on all three of the

12  rheumatology diseases, if we can, as a whole.

13     A.   Okay.

14     Q.   All three of the orange boxes there, RA, AS

15  and PsA.

16         Again, are there particular features that

17  doctors and patients look at when prescribing these

18  drugs for those three diseases?

19     A.   There are.  And I would say it's probably no

20  different than the ones that we discussed when we were

21  talking about Crohn's disease.  It is efficacy and

22  safety first.  They have to make sure that -- they want

23  to make sure the drug is going to work in that

24  particular patient, that it's safe for that patient.

25         Affordability, mechanism of action, the route

1  of administration, it's the same factors that we

2  described before.

3      Q.   Let's briefly take a look at them.

4      A.   Okay.

5      Q.   In terms of perceived safety, how do Remicade,

6  Humira, and Enbrel compare in terms of treating the

7  rheumatology diseases?

8      A.   In rheumatology -- so, again, the labels,

9  which is what the FDA has said we can actually promote

10 to our physicians, the labels don't read that

11 differently between the three products.  They're all

12 fairly similar.

13         And I think physicians all perceive that these

14 products are safe amongst the patients that they choose

15 to treat with them.

16         This is an area that's a little bit different

17 than Crohn's.  And there's always been a perception

18 among rheumatologists that Humira -- or Enbrel and then

19 later Humira are slightly more -- or they're more safe

20 than Remicade.  That is the perception and has been that

21 way over time.

22     Q.   So you mentioned that there's a slight

23 difference in terms of safety perception.  Can you

24 explain a little bit further what that means or what

25 it's based on?

1      A.    Well, I think there are probably a couple of

2 reasons.  This is the -- the one RA specifically is the

3 one disease where there's been direct competition

4 between a subcutaneous product and an IV product since

5 the beginning, because they were both approved in 1998

6 and 1999.

7           Going back to that, I think that Centocor

8 always took a more conservative view towards our label,

9 and there were certain safety adverse event signals that

10 we saw that we chose to be more upfront with in terms of

11 how we warned physicians.

12           And there's a section of a warning section on

13 the label that's called a black box.  It calls specific

14 attention to those particular adverse events.  And there

15 were things that we put in our black box in agreement

16 with the FDA, like risk of infections, risk of

17 reactivation of tuberculosis.

18           Enbrel had some of the same types of warnings,

19 but they chose not to put them -- and they agreed with

20 FDA not to put them in the black box.

21           So there was some perception that there were

22 differences between the products on some of these safety

23 signals.

24           I think the other thing is that Remicade has

25 been used more than any other anti-TNF in the market.

1  There have over 1.2 million patients treated with

2  Remicade.  It's the most used anti-TNF.

3           And so just by chance, if a new safety signal

4  is going to emerge on one of these products, you'll

5  usually see it first on Remicade, because it's been used

6  in more patients than the others.

7           So many times, the signal would be seen first

8  with Remicade.  We would update our label.  We would

9  send a dear-doctor letter out telling the physician that

10  we had updated the label.

11           And so it created a perception over time that

12  there were safety issues associated with Remicade that

13  may not have been the case with Enbrel or Humira.

14           If you look at our labels now, though, they

15  are essentially all the same in terms of the way the

16  language is constructed around safety.  So there really

17  aren't that many differences in the label.

18           And as -- and over time, as that's happened,

19  you've seen the gap between Humira and Remicade or

20  Enbrel and Remicade narrow in terms of the perception of

21  safety.

22      Q.   Now, we've been discussing perception of

23  safety.  Are you aware of any studies that show that

24  Remicade is actually less safe than any of these

25  products?

1      A.   No.  I think in order to do that, you would

2  actually have to do a head-to-head study where you're

3  studying them in the same patients and prove that one is

4  safer than the other.

5           And to my knowledge, there have been no

6  well-controlled head-to-head studies between the two

7  products.

8      Q.   So do doctors and patients actually view

9  Remicade as an unsafe product?

10     A.   No, absolutely not.  I think they wouldn't use

11  the product in a patient if they thought it was unsafe.

12  And as I said before, it's been used in more patients

13  than either Enbrel or Humira.

14     Q.   In terms of perceived efficacy in treating the

15  rheumatology diseases, are there any differences between

16  Enbrel, Remicade, and Humira in terms of perceived

17  perceptions?

18     A.   Overall, if you look at the way

19  rheumatologists would categorize these products, if

20  you're thinking about -- like that chart I showed you

21  earlier with the 8, 9, and 10, the degree to which they

22  meet or satisfy efficacy, I think they would say that

23  all three of these products are about the same.  They

24  don't perceive that any one is better or more superior

25  to the other.

1        There are certain types of patients that they

2   may think you would get better efficacy with Remicade;

3   patients who may be heavier weight, because with

4   Remicade, you can adjust the dose for the patient's

5   weight; patients who have rapidly progressing disease

6   where you would want a quick onset of action.

7        But other than that, if you look overall at

8   efficacy, they don't perceive these products to be any

9   different.

10       Q.   And how important is mode of administration in

11  treating the three rheumatology diseases?

12       A.   It is a factor that they consider.  As I said,

13  with Crohn's, it's a factor amongst a number of other

14  factors, and it depends on the individual patient.

15       Q.   And how does the issue of cost affect the

16  patient's decision with respect to rheumatology?  Is it

17  the same as with Crohn's?

18       A.   It's the same as with Crohn's.

19       Q.   And can dosing frequency also be a factor

20  that's considered with respect to the rheumatology

21  diseases?

22       A.   It can, exactly.

23       Q.   And can you explain generally how Remicade

24  compares to Humira and Enbrel in terms of dosing

25  frequency over the course of a year, for example?

1      A.   Sure.  So we've already described the fact

2  that Enbrel and Humira both are given by themselves at

3  home.

4           Enbrel is given either once or twice a week,

5  depending upon whether the patient wants to divide the

6  dose or give it all at once.

7           Humira is given every two weeks.  They have an

8  option of giving it every week if they're not using

9  Methotrexate.

10          And Remicade is given every eight weeks as a

11 starting dose.

12     Q.   I'd like to switch gears for a minute.

13          As we've discussed, Remicade is an IV infusion

14 product; Humira is a subcutaneous product.

15          Does Centocor have a subcutaneous anti-TNF

16 product?

17     A.   We do, yes.

18     Q.   And what's it called?

19     A.   The technical name is golimumab.  It's

20 marketed under the name Simponi.

21     Q.   And it was just launched a month or two ago,

22 correct?

23     A.   About two months ago.

24     Q.   And just to be clear, it's a monoclonal

25 antibody like Remicade and Humira, correct?

1      A.    That's correct.

2      Q.    And it's a fully human monoclonal antibody?

3      A.    It is.

4      Q.    Does Centocor rely on the fact that Simponi is

5 a fully human antibody when marketing the product?

6      A.    No.   In fact, the fact that it's fully human

7 is featured very little at all in any of our promotional

8 materials.

9      Q.    Why is that?

10      A.    Well, I think that physicians would only care

11 about whether it's fully human to the extent that there

12 is a benefit or some advantage to being fully human.

13 And the FDA has expressly said that we can't connect

14 being fully human to any clinical efficacy or safety

15 advantage of the product.

16            And so if you can't say that that has an

17 advantage in a patient, it's really hard to make that a

18 core part of your promotional campaign for the drug.

19      Q.    What indications is Simponi approved to treat?

20      A.    Simponi is approved to treat all the

21 indications on this slide in yellow, rheumatoid

22 arthritis, ankylosis spondylitis, and psoriatic

23 arthritis.

24      Q.    And what features does Centocor rely on when

25 marketing Simponi?

1      A.    Well, Simponi, as I mentioned, it's a

2   subcutaneous product like Humira, but there are a number

3   of advantages, I think, which make it distinct.

4           One is it's dosed less frequently.  So it's a

5   product that's only given every four weeks as opposed to

6   every two weeks.

7           We launched it with an auto injector that was

8   designed specifically for patients with rheumatoid

9   arthritis or rheumatic disease, so it's easy to

10  activate.

11          Many RA patients don't have good dexterity

12  with their fingers, and it's hard to activate.  You have

13  to press a syringe.  This one you just squeeze the tube

14  and it injects.

15          We've also found that the rate of -- the

16  irritation that you see on the skin, injection site

17  reactions, are fairly low with this drug.  So it's a

18  fairly comfortable drug for a patient to give.

19          So those are the features that make it unique

20  in the market.

21     Q.    Is Centocor going to stop selling Remicade now

22  that it has Simponi?

23     A.    Absolutely not.  In fact, our business plans

24  for this year and next year indicate that both Remicade

25  and Simponi will continue to grow in use.

1          Q.    How does Centocor market and sell Simponi?

2          A.    We market and sell Simponi exactly the same

3    way that we market and sell Remicade.

4                We look at those two large buckets of patients

5    I described earlier, those who have never been on a

6    biologic and those who have been treated and are

7    switching for some reason, and we sell both Remicade and

8    Simponi for both types of patients, and they each have

9    their own distinct advantages.

10               We sell both, in fact, through the same sales

11   force, because most physicians tend to use both IV and

12   subcu products, and they'll choose what's right for an

13   individual patient.

14               So we've not split a sales force and had one

15   selling one and one sell the other.

16         Q.    What types of patients does Centocor believe

17   will be appropriate for Simponi?

18         A.    We believe that both types, both the biologic

19   naive patients as well as patients who have been treated

20   previously with Remicade or another anti-TNF.

21               One of the studies that we did in our Phase 3

22   program for Simponi was to look at patients who had

23   previously been treated with one or more other biologics

24   and showed that Simponi worked very well in those

25   patients.

1          And so we have data suggesting that it works

2     even in a patient switching from another biologic.

3       Q.   And how has Simponi fared on the market since

4     it was launched?

5       A.   Well, it's kind of early to say.  It's only

6     been out for two months.  So some of the data that we

7     get lags in terms of understanding.  But I would say, so

8     far, both Remicade and Simponi are exceeding our

9     expectations for the year.

10      Q.   Now, let's take a step back, and looking at

11    the rheumatology diseases, all three of the orange boxes

12    that are shown there, what impact did the approval of

13    Humira have on Remicade's business for those three

14    diseases?

15      A.   Well, I think if you go back to the pie charts

16    that I showed earlier, the impact was fairly

17    significant.  Humira has anywhere between 25 and 30

18    percent of the total share in each of those three

19    markets.

20          If you look at where we compete directly, we

21    compete for the first-line patient, we compete for the

22    switching patient, and so we're all kind of competing

23    for the same patients in each of those three disease

24    states.

25      Q.   Let's go back to your Slide 1, if we can, and

1  quickly talk about the last box, which is the

2  dermatologists box.

3      A.   Okay.

4      Q.   Psoriasis, can you just briefly tell us what

5  psoriasis is?

6      A.   Psoriasis is also an autoimmune disease, like

7  all the ones that we've been talking about.  The

8  manifestation of it is largely on the skin.  So these

9  are patients who will get plaques on the skin.  They'll

10 get scales.  They'll get scabs.

11      Sometimes they form in areas where they can't

12 be seen, and the patient can cover it up with their

13 clothing.  Sometimes it happens on the hands or the face

14 or the neck, and it's really hard to expose -- or to

15 keep from being exposed.

16      Q.   And there are different levels of psoriasis,

17 mild, moderate, severe, correct?

18      A.   That's correct.

19      Q.   And which of these levels is Remicade approved

20 for?

21      A.   Remicade is indicated to treat severe

22 psoriasis.

23      Q.   Is there anything that prevents a doctor from

24 using Remicade to treat moderate psoriasis?

25      A.   No.  Again, I think that goes back to clinical

1 judgment.  And, in fact, the designation of mild,

2 moderate, severe is largely a -- it's a -- it's a score

3 that's done by the physician, and it's fairly

4 subjective.

5          Some patients, mild, moderate, and severe is

6 usually determined by how much of their body surface is

7 covered with the disease.  But a patient can have a

8 relatively small amount of disease but have it somewhere

9 where it's visibly, like on the face or the neck, and he

10 may consider that patient as having severe disease.

11          So there's nothing that would prevent a

12 physician from using Remicade in a moderate patient.

13     Q.   Can we go to your next slide, please?

14 Can you briefly tell us what's shown here?

15     A.   This is a similar example of the way that

16 drugs are used in succession to treat patients with

17 psoriasis, very similar to the other therapeutic areas

18 that we talked about.

19          So usually what will happen is, with a parent

20 who comes in, they're initially diagnosed.  They may --

21 a physician may try to use a topical treatment.  This

22 could be a topical steroid or some other type of cream.

23 If that doesn't work, they may be given light

24 phototherapy.  This is kind of the equivalent of

25 standing in a tanning bed to see if the UV light

1 sometimes will make the psoriasis go away.

2 If not, they may prescribe systemic drugs, some of the

3 same types of products that we've talked about before,

4 like Methotrexate and steroids.

5            And if those don't work -- and they don't

6 always go through all of these.  Sometimes they'll try

7 one and then go directly to the biologic class.  But

8 that would ultimately be where they ended up, if they

9 didn't respond to the other drugs.

10     Q.   Now, have you added psoriasis to your chart

11 summarizing the competition?

12     A.   I have.

13     Q.   Can you please explain what is shown here?

14     A.   So this chart, again, just goes back and

15 says -- shows who are the major competitors that compete

16 for this space.

17            The majority market share in psoriasis is,

18 again, the same three drugs, Remicade, Enbrel, and

19 Humira.  There are a couple of other smaller players,

20 namely, Amiveve.  There was another product that was

21 just withdrawn by the FDA -- or the company removed it

22 because of FDA concerns over safety named Raptiva.

23     Q.   Now, Remicade has approval for severe

24 psoriasis, and Humira and Enbrel are approved for

25 moderate to severe psoriasis, correct?

1      A.    That's correct.

2      Q.    Does Remicade, nonetheless, compete with

3  Humira and Enbrel for the treatment of psoriasis?

4      A.    Absolutely, it does.

5      Q.    Let's focus on just one of the product

6  features for a moment.

7            Is mode of administration important to

8  dermatologists when prescribing biologics for psoriasis?

9      A.    It is important.  And I would say the mode of

10  administration, whether it's subcu or IV is probably

11  more important to the dermatologist than it is to any of

12  the other specialties that we've talked about.

13      Q.    Well, does that mean that dermatologists won't

14  use Remicade?

15      A.    Not at all.  There -- there are other ways

16  that they can prescribe Remicade.  What it means is

17  they -- many dermatologists just choose not no infuse

18  Remicade in their offices for different reasons.

19  But they can always write a prescription for Remicade

20  and have it given by another specialty, like a

21  rheumatologist, they can send them to a hospital to have

22  Remicade administered, or they can send him to some

23  other type of infusion center and have it administered.

24  So they don't have to give it in their office for a

25  patient to get it.

1    Q.   So to finish up in the dermatology area, can

2  you please describe what impact the approval of Humira

3  in psoriasis had on Remicade's business in psoriasis?

4    A.   I think it had a fairly significant impact.

5  Most of the patients that Remicade competes for in

6  psoriasis are patients who have already failed Enbrel.

7  Enbrel is by far and away the drug used most commonly in

8  psoriasis.

9         It used to be, before Humira was approved,

10 that some of those patients, if they failed Enbrel or it

11 didn't work them, they would try Remicade as the next

12 step, because it's such a disabling type of disease.

13        With the introduction of Humira, now there's

14 another product that patients can use before they come

15 to Remicade.  And so it's created a position for

16 Remicade where we're more of a niche product, probably

17 third-line use in most cases, as opposed to second-line

18 use with Humira being introduced.

19    Q.   And I think we've made our way through this

20 scorecard completely, correct?

21    A.   That's correct.

22    Q.   Let's take a step back and look at it as a

23 whole.

24        Is Humira a competitor of Remicade in every

25 single indication that's shown on that chart?

1      A.    I think if you'll look at the checks, you'll

2  see that Humira's probably the closest competitor to

3  Remicade in all the indications where we compete.

4      Q.    And has Humira's approval in each of those

5  indications impacted Remicade's business for each of

6  those indications?

7      A.    It has, yes.

8              MR. MASLOWSKI:  I pass the witness.

9              THE COURT:  All right.  Ladies and

10  Gentlemen, we'll take our morning break.  Be ready to

11  come back in the courtroom at 10:30.

12              Remember my instruction about not

13  discussing the case.  You may leave the courtroom.

14              COURT SECURITY OFFICER:  All rise.

15              (Jury out.)

16              THE COURT:  All right.  Court's in recess

17  until 10:30.

18              (Recess.)

19              COURT SECURITY OFFICER:  All rise.

20              (Jury in.)

21              THE COURT:  Please be seated.

22              Cross-examination.

23              MR. LEE:  May I proceed, Your Honor?

24              THE COURT:  Please.

25                   CROSS-EXAMINATION

1  BY MR. LEE:

2      Q.   Good morning, Mr. Bazemore.

3      A.   Good morning.

4      Q.   Mr. Bazemore, I want to ask you a favor.  I

5  want you to slow down a little bit so that we can make

6  it easier for the reporter.

7           Can you do that?

8      A.   I will.

9      Q.   Okay.  Now, you were here during the opening

10  argument, were you not?

11      A.   I was.

12      Q.   And you heard Ms. Elderkin say that February

13  1994 was a very key date for this jury, correct?

14      A.   Correct.

15      Q.   You didn't join Centocor until 2002, did you?

16      A.   That's correct.

17      Q.   So you actually can't help the jury with what

18  was going on at Centocor in 1994, correct?

19      A.   That's correct.

20      Q.   Or at anytime before 2002, correct?

21      A.   Only from historical knowledge that was passed

22  on to me.

23      Q.   But not from your own personal knowledge,

24  correct?

25      A.   That's correct.

1      Q.    Now, you do have a degree from Georgia in

2   biochemistry, correct?

3      A.    That's correct.

4      Q.    Now, I want to ask you the same questions I've

5   asked every Centocor witness.

6            Have you ever made a fully human

7   anti-TNF-alpha antibody?

8      A.    I have not.

9      Q.    Chimeric?

10     A.    I have not.

11     Q.    A mouse?

12     A.    No.

13     Q.    Any?

14     A.    No.

15     Q.    Never?

16     A.    Never.

17     Q.    Have you ever read the '775 patent?

18     A.    I have not.

19     Q.    Not at all?

20     A.    No.

21     Q.    Now, you agree with me that patients --

22   withdraw.

23           You had a bunch of slides up on the screen

24   that talked about the competition, correct?

25     A.    That's correct.

1       Q.   And you talked about competitors, correct?

2       A.   Correct.

3       Q.   You agree with me that competition is a good

4  thing, isn't it?

5       A.   Yes.

6       Q.   Having competitors is a good thing, correct?

7       A.   Having multiple companies promoting this class

8  of product, which brings benefit to patients is a good

9  thing.

10      Q.   Having patient choice is a good thing,

11 correct?

12      A.   Sure, because not all these drugs work in

13 every individual patient.

14      Q.   Having physician choice is a good thing,

15 correct?

16      A.   Correct.

17      Q.   And the more choices there are, the more

18 products there are on the market, the more choices that

19 physicians and patients have, correct?

20      A.   Correct.  In a disease like this, not every

21 drug works.  That is correct.

22      Q.   Right.  Now, I want to ask just one question

23 quickly about Simponi.

24           You told Centocor's counsel that Simponi is a

25 fully human antibody, correct?

1      A.    It is.

2      Q.    It's administered subcutaneously, correct?

3      A.    That's correct.

4      Q.    But you said it doesn't really make a

5  difference whether it's chimeric or fully human,

6  correct?

7      A.    I said that the FDA doesn't let us promote any

8  advantages or benefits of being fully human.

9      Q.    So if that's true, when you wanted to have a

10 subcutaneous product, why didn't you just take Remicade

11 and get a subcutaneous product approved?

12     A.    I suppose that could have been done.  I'm not

13 responsible for the clinical decisions.

14     Q.    Right.  So when Centocor decided that it

15 wanted to have a subcutaneous product, it developed a

16 fully human antibody rather than using a chimeric,

17 correct?

18     A.    I think the decision for why we chose to

19 develop golimumab was the dosing frequency and the fact

20 that it could be given every four weeks.  That was an

21 advantage.

22     Q.    My question, sir, was, when Centocor decided

23 to develop a subcutaneous product, it chose to develop a

24 fully human antibody, correct?

25     A.    That's correct.

1    Q.   And not a chimeric, correct?

2    A.   That's correct.

3    Q.   And you can't help the jury as to why that

4 decision was made, correct?

5    A.   Well, again, I think part of the reason that

6 that was done was that golimumab was a molecule that

7 could be given every four weeks, which is much less

8 frequent than any of the other subcutaneous products on

9 the market.

10   Q.   Okay.  Now, let's talk about what happened to

11 the market after Humira entered the market, okay?

12   A.   Okay.

13   Q.   By this time, you were at Centocor, correct?

14   A.   That's correct.

15   Q.   And, in fact, you arrived just about the time

16 that Humira arrived, correct?

17   A.   Humira came on the market just about a year

18 after I arrived at Centocor.

19   Q.   And so the jury understands, what happened

20 was, after Humira came on the market, the market

21 actually grew in size, didn't it?

22   A.   That is correct.  The market was already

23 growing in size.

24   Q.   Right.  And when Humira came on, it grew even

25 further, correct?

1      A.    It did continue to grow.

2      Q.    And, in fact, what happened is, as the market

3   grew, Centocor sales of Remicade had yet gotten larger

4   every single year since Humira came on the market,

5   correct?

6      A.    That's true.  That was happening before and

7   after Humira was launched.

8      Q.    All right.  Let's bring up PX425, and it's in

9   the notebook before you at Tab 13, if that's easier for

10  you.

11     A.    Tab 13?

12     Q.    Yes.  But, Mr. Bazemore, I'll also put it on

13  the screen.

14           I want to be sure that everyone understands

15  just what's happened to Centocor's sales of Remicade

16  since Humira entered the market.

17           MR. LEE:  And if we could highlight the

18  sales numbers for 2003/2004.

19           Right.  Right across -- all the way

20  across to 2008, if we could.

21     Q.    (By Mr. Lee) Do you see that first line?

22     A.    I do.

23     Q.    And it's describing Remicade sales in the

24  U.S., correct?

25     A.    That's correct.

1      Q.   So you were 1.4 billion or so in 2003,

2  correct?

3      A.   That is correct.

4      Q.   And you grew to 1.8 billion, correct?

5      A.   That's correct.

6      Q.   Then you grew to 2.065 billion, correct?

7      A.   Correct.

8      Q.   Then to 2.35 billion, correct?

9      A.   That's correct.

10      Q.   2.5 billion, correct?

11      A.   Correct.

12      Q.   And then to 2.8 billion?

13      A.   Correct.

14      Q.   So the sales of Remicade have doubled since

15  Humira entered the market, correct?

16      A.   That is correct.  But that wouldn't explain

17  the reasons --

18      Q.   Is that correct, sir?

19      A.   That is correct.

20      Q.   So your real complaint isn't with your sales.

21  It's that your market share has gotten smaller, correct.

22      A.   That is correct.

23      Q.   Right.  Now, and as your market share got

24  smaller, what Centocor decided to do was to sue Abbott,

25  correct?

1    A.   I don't think those two things are related.

2    Q.   You think they are totally unrelated?

3    A.   I don't think they are related to market

4 share.

5    Q.   Okay.  Now, let's talk about some of the

6 testimony you gave about Remicade and Humira.

7         Now, you said Remicade is administered

8 intravenously, correct?

9    A.   That is correct.

10   Q.   Now, just so we have in mind what that

11 requires -- we're not going to do it here -- but this is

12 the rig that's required when you go into a doctor's

13 office to get it intravenously, correct?

14   A.   For the most part, yes.

15   Q.   And there's usually what's called a crash cart

16 sitting next to it, correct?

17   A.   Not next to it.  In the facility.

18   Q.   Right.  And the crash cart's in case something

19 bad happens when you're getting the IV, correct?

20   A.   That is the requirement for any infusion

21 center.  It has nothing to do with Remicade.

22 To be able to give an infusion of any sort, that's one

23 of the requirements the center has to have.

24   Q.   Right.  Now, let me show you, if I could, what

25 the patient gets for Humira.

1          This is it, right?

2     A.    That's one version.  That's the autoinjector.

3     Q.    Right.  And so instead of this whole rig and

4 the crash cart and going to the doctor's office for a

5 few hours, the Humira patient shoots, if the patient

6 chose this or the physician has chosen this, they take

7 this at home, inject themselves, and be done with it,

8 correct?

9     A.    That's correct.

10    Q.    Now, you said -- I think I got it right --

11 that the Humira patient has to find a vein to inject.

12 They don't do that.

13    A.    No.  That's for Remicade.

14    Q.    Right.  In fact, for Humira, the patient

15 injects themselves in the stomach, and they don't have

16 to find a vein, which makes it easier yet, correct?

17    A.    That is correct.  They inject themselves.

18    Q.    Now, you talked about preferences for

19 different types of administration, correct?

20    A.    Yes.

21    Q.    You talked about perceptions of safety,

22 correct?

23    A.    Correct.

24    Q.    I want to look with you at a few documents

25 that describe actually what Centocor has said itself

1    about these issues.

2          Turn, if you would, to Tab 1, which is PX695.

3                MR. LEE:  Which is in evidence, Your

4    Honor.

5                If I could have PX695, Page 28 on the

6    screen.

7          Q.   (By Mr. Lee) Now, just so we're clear, this is

8    a Centocor document, correct?

9          A.   It appears so, yes.

10         Q.   It's dated January 18th, 2007, correct?

11         A.   That's correct.

12         Q.   And Centocor says:  Each mode of

13   administration carries difficulties that influence

14   patient preference, correct?

15         A.   Correct.

16         Q.   And then for injection preference, it says 63

17   percent, correct?

18         A.   On the slide, that's what it says.

19         Q.   On this Centocor slide, that's what it says,

20   correct?

21         A.   I'm saying on the Centocor slide, because the

22   source of the data is the Annals of the Rheumatic

23   Diseases, so we're just reproducing data.

24         Q.   Okay.  And that's the data that you reproduced

25   for your internal use, correct?

1       A.    No.   Actually, we field our own market

2   research directly with patients and physicians to

3   understand perceptions.

4           This is a secondary source from a study that

5   was fielded by the Annals of the Rheumatic Diseases.

6       Q.    Right.   Someone who's independent, correct?

7       A.    Correct.

8       Q.    Who has no interest in coloring the conditions

9   in the market, correct?

10      A.    That's true.   You could argue we have no

11  interest in coloring divisions.   If it affects our

12  marketing strategy, we would want it to be accurate.

13      Q.    Mr. Bazemore, my question was, the Annals of

14  the Rheumatic Diseases, they have no bias, prejudice, or

15  otherwise, correct?

16      A.    I assume not.

17      Q.    Right.   And their determination or their

18  finding, which you've reproduced in your slide, is 63

19  percent prefer subcutaneous, correct?

20      A.    Correct.

21      Q.    And at that time, that would be Humira, in

22  2007, correct?

23      A.    Correct.

24      Q.    And 21 percent prefer IV, correct?

25      A.    Correct.

1      Q.    Now, this isn't the only time there's a

2  Centocor document that talks about how many people

3  prefer subcutaneous, correct?

4           Turn to PX257.  Do you have it?

5      A.    Which tab is that?

6      Q.    Tab 2.

7               MR. LEE:  Also in evidence, Your Honor.

8  And could I have Page 49 from this January 30, 2008

9  document on the screen?

10     Q.    (By Mr. Lee) Do you have that before you?

11     A.    I do, yes.

12     Q.    Now, it says rheums.  You know what that is,

13  don't you?

14     A.    Rheumatologists.

15     Q.    Right.  Rheums report that 67 percent of their

16  patients prefer subcutaneous injection as a method of

17  administration versus 21 percent that prefer IV,

18  correct?

19     A.    Correct.

20     Q.    Now, this is Centocor's own data, correct?

21     A.    Correct.

22     Q.    And it's consistent with the Annals data that

23  I just showed you a minute ago, correct?

24     A.    In a different disease state.

25     Q.    Right.  But 67 percent, correct?

1              And for those people, those folks in that 67

2    percent who preferred the subcutaneous in 2008, the

3    product available to them was Humira, correct?

4         A.    As well as etanercept.

5         Q.    Now, let's talk about safety.  You talked a

6    little bit about safety, and you talked quite a bit

7    about what the FDA will allow you to say and not to say,

8    correct?

9         A.    That's correct.

10        Q.    But you know that there are perceptions of

11   safety on the part of patients, correct?

12        A.    We don't track the patients' perceptions as

13   much as we track the physicians' perceptions.

14        Q.    Fair enough.  So you track the physicians'

15   perceptions of safety because they are important,

16   correct?

17        A.    That is correct.

18        Q.    Now, you know that one of the concerns is that

19   chimeric antibodies can cause an allergic response in

20   humans, do you not?

21        A.    All antibodies can cause an allergic response

22   in humans.

23        Q.    But chimeric in particular can cause greater

24   immune responses than human, correct?

25        A.    The FDA doesn't allow us to talk about

1  differences in terms of the antibody response between

2  the products.

3       Q.   Well, let's see what Centocor itself said.

4            MR. LEE:   Could I have DX67, which is in

5  evidence, which is --

6       A.   Tab number?

7       Q.   (By Mr. Lee) Yes.  I'm sorry.  Tab No. 15.

8            Do you have it before you?  Tell me when you

9  get there.

10      A.   Okay.

11      Q.   Now, you see this document, which is

12  authorized by John Ghrayeb.  You know who he is?

13      A.   I do.

14      Q.   The jury heard from him yesterday, correct?

15      A.   Correct.

16      Q.   Let's turn to Page 4, and let's see what the

17  Centocor internal documents say.

18           Human antibody program, now you know that

19  refers to Simponi, correct?

20      A.   That is correct.

21      Q.   And that refers to something that was started

22  in 1997, correct?

23      A.   Correct.

24      Q.   Now, one of the major issues, real or

25  perceived, of chimeric or humanized monoclonal

1  antibodies, is the potential for immunogenicity that

2  could limit their chronic use.

3          In theory, totally human monoclonal antibodies

4  should result in elimination of immune response, real or

5  perceived.

6          Have I read that correctly?

7      A.   That is what this document says.

8      Q.   That's Dr. Ghrayeb, right?

9      A.   Yes.

10     Q.   The head of the project is saying it.

11     A.   He's saying that, in theory, a theory which

12  has never panned out, which is why the FDA doesn't allow

13  us to promote differences on immunogenicity.

14     Q.   Well, let's see what Centocor's own documents

15  say about how it panned out.

16             MR. LEE:   Could we have PX254?

17     Q.   (By Mr. Lee) Which is Tab 3 in your notebook

18  again.

19          This is a PhysianPulse report, correct?

20     A.   Uh-huh.

21     Q.   Do you have it?

22     A.   I do.

23     Q.   Okay.  And if we could turn to Page 36.

24          Now, there's a complicated chart here, but I'm

25  going to ask you about the conclusions that are reported

1    by Centocor.

2           Now, this is a document that Centocor

3    generated internally, correct?

4        A.    That's correct.

5        Q.    And it generated it for its own use, correct?

6        A.    We generate this in coordination with a market

7    research vendor, yes.

8        Q.    And it's important that it be truthful and

9    accurate, because you're relying upon the data to

10   make business decisions, correct?

11       A.    That is correct.

12       Q.    So at the top of Page 36, what does it say?

13   Remicade's mean performance rating on overall safety has

14   declined significantly in this wave compared to the last

15   wave.

16           Have I read that correctly?

17       A.    You have.

18       Q.    And then if I go to the bottom underneath the

19   charts, the conclusion from the charts:  Enbrel and

20   Humira continue to be rated significantly higher than

21   all other therapies on overall safety.

22           Remicade continues to be perceived as

23   significantly safer than Orencia and Rituxan based on

24   mean ratings, correct?

25       A.    That's what it says, yes.

1    Q.   And that's what you reported internally,

2  correct?

3    A.   That is correct.

4    Q.   Now, that's not the only time that that was

5  reported.

6         Turn to Tab 4 to DX526, another Centocor

7  internal document.

8         Tell me when you get there.

9    A.   Which page?

10   Q.   Tab 4 first, and then I'm going to go to Page

11 53, Mr. Bazemore.

12        Do you have that before you?

13   A.   May I make one comment on the previous slide

14 before we go to this one?

15   Q.   Sure.

16   A.   So if you can back up to the previous slide,

17 I'd just like to comment a moment further, because one

18 of the points that you made is --

19   Q.   Your counsel will have an opportunity to ask

20 you additional questions.  I thought you had a comment

21 on the slide I was showing you, but, look, we'll go

22 back.

23        What's the comment you would like to make?

24   A.   The comment I would like to make is to the

25 title.  You're right.  It does refer to the fact that

the overall safety for Remicade declined.  I'll just

note that overall safety during the period that we're

talking about here for all products declined, not just

Remicade, over that period.

Q.   Okay.

A.   And I'll also comment on the data.  This is

2006.

THE COURT:  Now, wait a minute.  We're

going to stop the commenting.  We've got some time

limits.  You just need to answer the question.  We're

going to proceed by question and answer, okay?

THE WITNESS:  Okay.

Q.   (By Mr. Lee) Now, let's go back to 256 (sic),

Page 53.

A.   Okay.  I'm there.

Q.   Do you have it before you?

A.   I do.

Q.   And this is a 2007 document at the bottom,

correct?

A.   Actually, the date is different from the

title.  I think it may be an auto-correct date.  The

title on the first page says December 2005.

Q.   Right.  Whichever it is, the title of the

document says:  Major Drawbacks to Remicade Use Are IV

Infusions and Safety Concerns, correct?

1    A.   That is correct.

2    Q.   And then what you report internally is:

3 Safety concerns cited for Remicade are infusion

4 reactions and infrequent but potentially serious

5 infections, TB, tumors, correct?

6    A.   That is correct.  And those are risks for all

7 products.

8    Q.   Okay.  I just asked you what it said.  That's

9 what it said, correct?

10   A.   It does.

11   Q.   And TB is tuberculosis, correct?

12   A.   Correct.

13   Q.   Now, you mentioned Exhibit 261, which is at

14 Tab 5, and you actually testified about 261 during your

15 direct testimony today, did you not?

16   A.   I did.

17   Q.   Now, this one is dated February 3, 2009,

18 correct?

19   A.   Correct.

20   Q.   So it's just a few months ago, correct?

21   A.   Yes.

22   Q.   And you asked the jury to look at Page 9.

23        Let's look at Page 20.  Do you have Page 20

24 before you?

25   A.   I do, yes.

1       Q.   And Page 20 says:   The percentage of MDs

2   considering safety/side effects as a barrier to usage of

3   Remicade is significantly greater compared to Humira.

4            Have I read that correctly?

5       A.   Yes.

6       Q.   And that was your finding earlier this year,

7   correct?

8       A.   That is correct.   That's what the chart shows.

9       Q.   Right.   And all of the findings I've just

10  reviewed on these six or seven internal documents were

11  accurate reports of the data that you had received,

12  correct?

13      A.   That is correct.

14      Q.   Now, let's talk about the markets a little bit

15  just briefly, each of the markets that you've addressed.

16  One which you discussed in the middle was called -- in

17  the middle of your chart was the rheumatology diseases,

18  correct?

19      A.   That is correct.

20      Q.   And you described a class of drugs called

21  DMARDs, D-M-A-R-D-S, correct?

22      A.   Yes.

23      Q.   One of the DMARDs is Methotrexate, correct?

24      A.   Correct.

25      Q.   Now, Methotrexate is a really, really powerful

1   drug, isn't it?

2        A.   It is an immune-suppressing drug like the

3   anti-TNFs, yes.  So that would make it a powerful drug.

4        Q.   And it's used to treat things like cancer, is

5   it not?

6        A.   That was how it was introduced into the

7   market.

8        Q.   Right.  Because it kills cells, correct?

9        A.   Suppresses the body's immune system.

10       Q.   Right.  And it can have significant side

11  effects, correct?

12       A.   It can.

13       Q.   And they can be pretty miserable side effects,

14  correct?

15       A.   Correct.

16       Q.   Now, for rheumatoid arthritis, the label says

17  Remicade has to be used with Methotrexate, correct?

18       A.   That is the label.

19       Q.   But for Humira, the label says you don't have

20  to use it with Methotrexate, correct?

21       A.   That is correct.

22       Q.   So patients want a choice, and if they don't

23  want to use this powerful, cancer-killing drug, Remicade

24  would be the label that they would go to, correct?

25       A.   I'm sorry.  Repeat the question.

1      Q.    Sure.

2            If I had a patient who didn't want to take

3   Methotrexate --

4      A.    Uh-huh.

5      Q.    Do you have that in mind?

6      A.    Yes.

7      Q.    Then -- and they wanted to comply with the FDA

8   label.

9            Do you have that in mind?

10     A.    Yes.

11     Q.    Then they would want Humira, correct?

12     A.    I thought -- because you said Remicade the

13  first time.

14           Yes.

15     Q.    Okay.

16     A.    Humira might be a drug that they would choose

17  if they couldn't tolerate --

18     Q.    Rather than Remicade, correct?

19     A.    That's true, although physicians do use

20  Remicade without Methotrexate.

21     Q.    Yeah, but that's what you call off-label use,

22  correct?

23     A.    Correct.

24     Q.    And you would never promote that, correct?

25     A.    We can't promote it that way.

1      Q.   It would be illegal, correct?

2      A.   That's correct.

3      Q.   Okay.  Now, let's talk about on-label use.

4  If a patient wants on-label use without Methotrexate,

5  Humira is the choice, correct?

6      A.   Humira or Enbrel either one are both indicated

7  that way.

8      Q.   Right.  Enbrel, similarly, doesn't require the

9  use of Methotrexate, correct?

10     A.   That's correct.

11     Q.   And you agree that having that patient choice,

12 that choice of being able to take the drug without this

13 powerful drug, is a good thing, correct?

14     A.   If that were the only factor driving the

15 decision, that would be an important consideration.

16     Q.   And until Humira came on the marketplace,

17 patients didn't have that choice, did they?

18     A.   No.  They had that choice with Enbrel.  And as

19 I said, they already wrote Remicade off-label in some

20 cases.

21     Q.   So until Humira and Enbrel came on the

22 marketplace, patients didn't have that choice, correct?

23     A.   Correct.

24     Q.   Now, let's talk about dermatology briefly.

25          Now, you said that Remicade is approved for

1  severe psoriasis, correct?

2      A.    That's right.

3      Q.    Humira is promoted for moderate psoriasis,

4  correct?

5      A.    That is correct.

6      Q.    So they overlap a little bit, correct?

7      A.    That's right.

8      Q.    But for Remicade, if you want to use it for

9  severe psoriasis, you still need to go a doctor's office

10  and get hooked up to this (indicates), don't you?

11      A.    You would, even a dermatologist's office, or

12  they would send you somewhere else for the infusion.

13      Q.    Now, the truth of the matter is there are a

14  lot of barriers to having dermatologists' offices that

15  have this rig all hooked up, aren't there?

16      A.    That's true.  In fact, I've already testified

17  that dermatologists were more reluctant to put in-office

18  infusions in their offices than the other specialties.

19      Q.    Yeah.  And the reason you know that is, you've

20  actually studied that at Centocor.  You had someone

21  evaluate that for you, correct?

22      A.    That's right.

23      Q.    And if you'd turn to Tab 9, which is DX519.

24      A.    Okay.

25      Q.    Do you have that before you?

1     A.   I do.

2     Q.   Now, DX519 is a study that you hired a

3  consulting firm to do for Centocor, correct?

4     A.   That's right.

5     Q.   And one of the things you wanted to find out

6  is what are the barriers for people using Remicade,

7  correct?

8     A.   That's right.

9     Q.   And they came back and told you Remicade has

10  some real disadvantages compared to Humira, for

11  instance, which is administered at home subcutaneously,

12  correct?

13     A.   Is there a specific page that you're asking me

14  about?

15     Q.   Page 35.

16          And what the findings were, on Page 35, are

17  the following:  Most physicians believe that in-office

18  infusion centers are beyond the scope of the typical

19  dermatology practice.

20          Do you see that?

21     A.   I do.

22     Q.   Now, an infusion center is what's required to

23  take Remicade, correct?

24     A.   That is correct.

25     Q.   And the reasons are, the need for a separate

1  infusion area, correct?

2      A.   That's correct.

3      Q.   If we skip down to the bottom:  The cost

4  of/need to store infusion paraphernalia, correct?

5      A.   Correct.

6      Q.   If you go to the next slide.

7           The requirement of certification for advanced

8  life-saving.  That refers to the crash cart, correct?

9      A.   Correct.

10      Q.   The hours needed to infuse, correct?

11      A.   Uh-huh.  That's correct.

12      Q.   The necessity of a nurse, correct?

13      A.   Right, which ties back to the first of having

14  someone certified in advanced life-saving.

15      Q.   Fair enough.

16           And all of these factors result in

17  self-administered subcutaneous administration being

18  preferred by most dermatology patients, correct?

19      A.   Most dermatologists choose not to put infusion

20  facilities in their office.

21      Q.   And without Humira, at least before a couple

22  of months ago, a patient's choice would be to go to the

23  office, go through all this, get hooked up and get

24  Remicade, correct?

25           Is that right?

1      A.   Correct.

2      Q.   Okay.  Now, just a couple of questions about

3  the gastroenterology market.

4           You also said that in this market, Remicade

5  and Humira compete, correct?

6      A.   That's correct.

7      Q.   Now, it's true, is it not, that there are some

8  patients where Remicade just doesn't work?  Correct?

9      A.   There are some patients that all of the

10  products don't work.  That's correct.

11      Q.   Right.  They're called Remicade-failure

12  patients, correct?

13      A.   True.

14      Q.   The fact of the matter is, many of the sales

15  of Humira have been made, for instance, in the area of

16  Crohn's disease, for patients who took Remicade and it

17  failed, correct?

18      A.   That is true, particularly when Humira was

19  first approved.

20      Q.   And you described the very and really

21  difficult symptoms and painful aspects of Crohn's

22  disease, did you not?

23      A.   I did.

24      Q.   So before Humira came on the market, those

25  folks for whom Remicade didn't work were left without

1  anything, weren't they?

2      A.    Some of them would -- after cycling off, would

3  come back on to Remicade, and they actually responded.

4      Q.    And some didn't, correct?

5      A.    And some didn't.

6      Q.    And Humira is what has made it possible for

7  those folks, right?  For those folks to have a relief

8  from the symptom and a relief from the disease, correct?

9      A.    That's true.

10     Q.    Now, it's true, is it not, that -- let me go

11 to your fully human antibody product that you

12 discussed --

13     A.    Okay.

14     Q.    -- with me just a few minutes ago.

15           It was approved on May 19th, 2009, correct?

16     A.    It was approved in April of 2009.

17     Q.    Okay.  Fair enough.

18           And you brought it to market, correct?

19     A.    True.

20     Q.    And you told us that it's doing well, correct?

21     A.    It's hard to tell yet, but it seems to be.

22     Q.    And you said Remicade's still doing well,

23 correct?

24     A.    That is right.

25     Q.    Now, Centocor spent over $300 million in

1    developing that fully human antibody, didn't they?

2        A.    That sounds about right.  I don't know the

3    actual number.

4        Q.    All right.  Well, look at DX531, which is

5    Tab 12, and let's turn to Page 39.

6              This is another -- let me stop on the cover

7    page.

8        A.    Okay.

9        Q.    So the jury knows, on the cover page, there's

10   a reference to CNTO148.  That's Simponi, correct?

11       A.    Correct.

12       Q.    Turn, if you would now, to Page 39.

13       A.    Okay.

14       Q.    CNTO148, Cost Estimates, Overview of Buy-In,

15   Initial and Short-Term Ongoing.

16             There's an estimate of costs through 2004 of

17   146 million, correct?

18       A.    That's right.

19       Q.    And then forecast for 2005 and 2006 of

20   approximately another 158 million, correct?

21       A.    Correct.

22       Q.    That totals over 300 million, correct?

23       A.    Uh-huh.

24       Q.    You have to give an audible answer for the

25   reporter.

1    A.    Yes.

2    Q.    Now, if I were to have Simponi here, it would

3 look a lot like this, wouldn't it?

4    A.    It would look fairly similar.  It's in an

5 autoinjector and a pre-filled syringe.

6    Q.    Right.  Rather than having a full rig to be

7 hooked up to, Simponi looks like a single product with a

8 syringe inside that the patient can use, correct?

9    A.    That's correct.

10   Q.    Now, sir, you told us earlier today about the

11 competition in all the different markets, and I think

12 you told the jury that Humira's products, which are

13 subcutaneous, correct?

14   A.    That's correct.

15   Q.    Compete directly with the products of

16 Remicade, which are IV, correct?

17   A.    That's right.

18   Q.    But isn't it true that Johnson & Johnson just

19 told its shareholders a few months ago that Simponi is

20 going to be in the subcutaneous market where you don't

21 compete today?

22   A.    I think I've already testified that there are

23 a portion of patients who prefer subcutaneous that

24 Remicade -- if that's their absolute preference that

25 Remicade wouldn't compete.

1          THE COURT:  Listen to his question.

2          MR. LEE:  Right.

3          THE COURT:  He asked you a question about

4   whether or not you knew that Johnson & Johnson had told

5   their shareholders something.

6          Are you aware of an annual report or some

7   publication that they released about this?  That's the

8   question.

9      A.   I am aware of the statement.

10     Q.   (By Mr. Lee) Right.  Let's look at the

11  statement, which is in evidence, Defendant's Exhibit

12  877, which is at Tab 10, Page 4.

13         And I'm going to blow up a paragraph.

14         MR. LEE:  Could we blow up the fourth

15  paragraph from the bottom, beginning with Simponi, and

16  highlight it?

17     Q.   (By Mr. Lee) Now, you've seen this report

18  before, have you not?

19     A.   I have.

20     Q.   And this is a discussion with analysts in the

21  marketplace about just what Simponi is going to be,

22  correct?

23     A.   That's correct.

24     Q.   And it describes Simponi as subcutaneous,

25  correct?

1      A.    Correct.

2      Q.    And you know Remicade is not, correct?

3      A.    That's right.

4      Q.    And so what the stockholders want to know

5  is, are these two, subcutaneous and IV, going to

6  compete, correct?

7      A.    I assume so.

8      Q.    All right.  And today, you have talked to us

9  all about that competition between subcutaneous and IV,

10  have you not?

11      A.    I have.

12      Q.    All right.  Let's go to Page 5 and see what

13  Johnson & Johnson said to the marketplace.

14            Sheri McCoy, do you know who she is?

15      A.    I do, yes.

16      Q.    She's the Worldwide Chairman of Johnson &

17  Johnson's pharmaceutical groups, correct?

18      A.    That's correct.

19      Q.    And what does she say?

20            MR. LEE:  Could I have the sentence that

21  begins:  Where we see the opportunity?

22            Let's blow up the paragraph and highlight

23  the sentence.

24      Q.    (By Mr. Lee) Where we see the opportunity for

25  Simponi is to go into the subcu market, where we don't

1  compete today, correct?

2       A.   I see that.

3       Q.   So you spent an hour and 20 minutes today

4  trying to convince us that there is direct, head-to-head

5  competition in the subcu market, correct?

6       A.   That's correct, there is.

7       Q.   But your Worldwide Chairman told the

8  marketplace the opposite just a few weeks ago, correct?

9       A.   That's the gist of her statement.  I would

10 like to explain, if I could.

11      Q.   No need.

12                MR. LEE:  Thank you, Your Honor.

13                THE COURT:  Redirect.

14                MR. MASLOWSKI:  Joe, can we please have

15 DX877 back up?

16                  REDIRECT EXAMINATION

17 BY MR. MASLOWSKI:

18      Q.   Now, Mr. Bazemore, you were just asked a

19 question about this exhibit; isn't that right?

20      A.   That's right.

21      Q.   And particular statements by Sheri McCoy,

22 correct?

23      A.   That's correct.

24                MR. MASLOWSKI:  Joe, if you can please go

25 to Page 5 and highlight the question -- just highlight

1  the answer, Ms. McCoy's answer near the bottom, the

2  fourth paragraph up.

3      Q.   (By Mr. Maslowski) Now, you've reviewed this

4  transcript before today, correct?

5      A.   I have, yes.

6      Q.   And you were here for Mr. Lee's opening

7  statement, correct?

8      A.   I was.

9      Q.   And during his opening statement, he pointed

10  the jury to the same sentence that he pointed you to,

11  correct?

12      A.   That's correct.

13      Q.   Take a look at the last sentence of

14  Ms. McCoy's answer, if you would.

15          MR. MASLOWSKI:   Joe, can you highlight

16  that, please?

17      Q.   (By Mr. Maslowski) Have you had a chance to

18  review this entire answer, including the last sentence?

19      A.   I have.

20      Q.   And taking the whole answer in context, what

21  does it tell you about the way Remicade and Humira

22  compete in this business?

23      A.   Well, I think it's consistent with my previous

24  testimony.  And this further elaborates that it lets us

25  compete more directly with a competitive set in that

1   space.

2          I've said before that there are patients who

3   clearly have a preference for subcutaneous products.  I

4   think the data that I cited shows that -- the other data

5   that we just described shows that.

6          In the cases where everything else is equal,

7   and this is an important consideration, because

8   everything else isn't always equal -- but if everything

9   else is equal between products, some patients will opt

10  for a subcutaneous product over an intravenously

11  administered product.

12         So having a product for those patients is an

13  important thing for us as a customer, but that doesn't

14  mean that they are clearly in defined markets, as I've

15  shown before in the slides that we just showed.

16         There are some patients who don't have a

17  strong preference for one or the other, and other

18  factors are more important to them than the form of

19  administration.

20     Q.   Now, with respect to this last sentence, she

21  says at the very end:  Certain -- I understand this is a

22  transcription error -- but certain anti-TNFs will be up

23  after that as well as going more directly with the

24  competitive set in that space.

25         Can you focus specifically on the last

1   sentence and tell us what you understand that to mean?

2       A.    And I understand -- my understanding of that

3   is these are patients who may have already failed one

4   other TNF, which is the second of the populations of

5   patients that I described as being important.  Those who

6   have already been treated with one anti-TNF, their

7   physician is trying to help them understand which is the

8   best for the next drug.

9           And in this case, we did a study specifically

10  in this patient population, those who have previously

11  been treated with one biologic, and showed that Simponi

12  works very well in that patient population.

13          So that's a study that will let us compete

14  more effectively for that type of patient, someone who

15  may have already failed Humira, who may have already

16  failed Remicade or Enbrel.

17      Q.    Now, once you've had the opportunity to

18  consider Ms. McCoy's full answer, is she telling the

19  investing public Remicade does not compete at all with

20  subcutaneous products?

21      A.    I think what she's telling the public here --

22  the answer to that question is no.

23          I think what she's telling the public is, that

24  with both products, we can more specifically address all

25  the patient needs across these disease states than we

1  could with any one single product.

2      Q.    Now, let's switch gears for a second.

3            A couple of times Mr. Lee made reference to a

4  crash cart.  Do you recall that?

5      A.    I do, yes.

6      Q.    And he indicated that's a requirement for an

7  infusion of Remicade, correct?

8      A.    It's a requirement for having an infusion

9  facility for any purpose, infusing any kind of drug,

10  whether it be Remicade or anything else.

11      Q.    So it's a requirement not just for anti-TNF

12  infusion drugs; it's any infusion drugs, correct?

13      A.    That's correct.

14      Q.    Now, do you have an understanding of why the

15  crash cart would be present for the infusion?

16      A.    Well, because patients who are infused with

17  particular drugs can oftentimes have a severe

18  injection -- or infusion reaction that can have an

19  anaphylactic-type reaction.

20            It's very mild -- or it's very rare.  It

21  rarely occurs, but in the event that it would happen,

22  you would want to be prepared to be able to deal with

23  it.  And that's part of the reason that it's an

24  advantage of having an infusion.  You're there with a

25  nurse and a physician should that happen.

1      Q.   You mentioned an anaphylactic response.  Just

2 briefly, what is that?

3      A.   An anaphylactic response is just a severe

4 allergic reaction.  Any time you put something into the

5 body that's not normal in the body, the body can react

6 to it in a severe way, in an allergic way.

7           It's when your throat can swell; your face can

8 start to swell; you can have a hard time breathing.

9      Q.   Are you aware of patients experiencing an

10 anaphylactic response when taking Humira?

11      A.   Both products' labels state that anaphylaxis

12 is a potential side effect.

13      Q.   What happens if a patient experiences an

14 anaphylactic response when taking Humira at home?

15      A.   Then, I would imagine, you would hope that

16 there's someone there who can get them to an emergency

17 room or call for an ambulance.

18      Q.   So at least in those instances, it might be a

19 benefit to actually have a healthcare professional or

20 some equipment close by; is that right?

21      A.   That's right.  And that's why the requirement

22 for a crash cart.

23      Q.   Now, Mr. Lee also asked you some questions

24 about dermatological use for Remicade.

25      A.   Uh-huh.

1      Q.    And he pointed out that derms do not prefer to

2  do the infusions in their office, correct?

3      A.    They typically aren't as likely to want to do

4  infusions in their office as the rheumatologists or the

5  gastroenterologists.

6      Q.    But that doesn't mean dermatologists don't

7  prescribe Remicade, correct?

8      A.    No.  In fact, of the audience that we called

9  on, we estimate that over half of the dermatologists

10  write Remicade.  They prescribe it in their patients.

11  They just do not give it in their office.

12      Q.    Then what happens to that patient, once he

13  receives a prescription for Remicade from his

14  dermatologist?  What does he do?

15      A.    The dermatologist would refer them to another

16  specialty who does infuse.  He could send them to a

17  rheumatologist's office or to a gastroenterologist's

18  office.  He could send them to a hospital or any other

19  kind of infusing clinic to get the drug.

20      Q.    Switching gears again, Mr. Lee asked you some

21  questions about Remicade's use with Methotrexate,

22  correct?

23      A.    That's right.

24      Q.    And Centocor doesn't make Methotrexate; is

25  that right?

1      A.     No.   Methotrexate is made by a number of other

2   companies.   You can buy it generically.

3      Q.     Does Centocor actually sell Remicade together

4   with Methotrexate?

5      A.     No.   They are separate products.   They are

6   packaged and sold separately by different companies.

7      Q.     And the only -- the only label that Remicade

8   has indicated for use with Remicade is RA, correct?

9      A.     That's correct.

10     Q.     And Remicade is, nonetheless, used quite a bit

11  for RA without Methotrexate, right?

12     A.     Our tracking data suggests about 15 to 20

13  percent of use is without Methotrexate.

14     Q.     Now, Mr. Lee indicated that Methotrexate is a

15  pretty powerful drug; is that right?

16     A.     That's correct.   That's what he said.

17     Q.     And he indicated there can be some issues with

18  taking Methotrexate; is that right?

19     A.     There can be side effects; there can be

20  adverse reactions that occur with Methotrexate.

21     Q.     If that's the case, why would any patient want

22  to take any of these anti-TNF products together with

23  Methotrexate?

24     A.     Because as I -- I think I indicated earlier,

25  clinical trials that have been done with all of these

1  biologic agents, both with and without Methotrexate,

2  suggest that they're all more effective when given with

3  Methotrexate as compared to when they're given alone.

4  The exception is Remicade, which was never studied as a

5  monotherapy, and that is the reason that Remicade

6  doesn't have the label for monotherapy.  It was just

7  never studied that way.

8       Q.   And just to be clear, there's nothing improper

9  about a doctor prescribing Remicade for RA without

10  Methotrexate, correct?

11      A.   No.  In fact, I think the physician's judgment

12  would be if the patient has previously tried

13  Methotrexate and it didn't work, there's no ethical

14  reason to continue Methotrexate.  Or if the patient were

15  having an adverse reaction or experience on

16  Methotrexate, it would make sense that you would

17  discontinue the drug.

18      Q.   Now, you were also asked some questions about

19  the perceived safety of Remicade.

20           Do you recall that?

21      A.   I do.

22      Q.   Again, are you aware of any data that actually

23  shows that Remicade is less safe than Humira?

24      A.   Again, I'll go back to my earlier answer to

25  show that in a way that is meaningful.  You would

1  actually have to do a head-to-head study and show that

2  there are difference.  And there have been no

3  head-to-head studies conducted between these drugs.

4  The labels, which is what the FDA allows us to say when

5  we talk to doctors and patients about the drugs, all

6  essentially say the same things.  The same types of

7  adverse reactions that you see with one are always

8  contained in the labels for the other.

9      Q.   And Mr. Lee seemed to be suggesting that

10  doctors and patients just don't like Remicade because

11  it's unsafe.

12          Do you recall that?

13      A.   I do recall that.

14      Q.   Is that really the case?

15      A.   It's not the case.  And as I said, Remicade

16  has actually been used in more patients than either of

17  the other biologics.  I think that would not be the

18  case.

19          There have been a number of products that have

20  been removed from the market because they were unsafe,

21  like Raptiva and others.  And, again, that would be an

22  action that the FDA would take if in any way Remicade

23  was an unsafe drug to give these patients.

24      Q.   In fact, you put up Remicade sales numbers,

25  and those were pretty substantial sales numbers, right?

1      A.    Yes.

2      Q.    That indicates to you that the market actually

3  likes Remicade?

4      A.    Yes.   That's the most frequently prescribed

5  biologic.  I would say yes.

6      Q.    It has never been pulled off the market by the

7  FDA, right?

8      A.    No.  In fact, over -- part of the reason that

9  you see the growth in sales that Mr. Lee pointed to over

10  all of those years is that we went from about three

11  indications, three approved indications when I joined

12  Centocor, the year where we started, to about 15

13  indications.

14        So not only have they not pulled it from the

15  market, they have continued to approve new indications

16  year after year.

17      Q.    How many patients have used Remicade since it

18  was launched?

19      A.    It's hard to estimate, but our guess is

20  somewhere around 1.2 million patients.

21      Q.    And in all of those indications that we have

22  listed on our score card, what product is Remicade's

23  primary competitor for those indications?

24      A.    I would say if you look across the board in

25  all the therapeutic areas, Humira clearly is the one

1  that competes most directly with us in each of the three

2  therapeutic areas.

3          Q.   Thank you.

4                    MR. MASLOWSKI:  Nothing further.  Pass

5  the witness.

6                    MR. LEE:  I have a few questions, Your

7  Honor.

8                    THE COURT:  All right.

9                    REDIRECT EXAMINATION

10 BY MR. LEE:

11         Q.   Mr. Bazemore, you just told your counsel you

12 understood that I was suggesting that Remicade was an

13 unsafe product.

14         A.   He was on -- he was asking in reference -- I

15 think he was asking in reference to a quote.  I was just

16 commenting on that.

17         Q.   In fact, you were here for the opening,

18 correct?

19         A.   I was.

20         Q.   And you heard me say that Remicade's a great

21 product; no one wants to take that away from you,

22 correct?

23         A.   Correct.

24         Q.   And no one is trying to, are they?

25         A.   I don't think so.

1    Q.   Right.  What I was talking about is

2 Plaintiffs' Exhibit 261, which you showed the jury, at

3 Page 20, about what you were reporting to yourself about

4 safety concerns, correct?

5    A.   That's correct.

6    Q.   And just so the jury's clear, you can't take a

7 single patient, like Mr. Beck here, and put both

8 Remicade and Humira in him to see which one is working

9 better, correct?

10    A.   No.  That's true.

11    Q.   That's what you don't want to do, correct?

12    A.   That's correct.

13    Q.   So what you've collected is the best available

14 data absent that, and the documents I went over with you

15 are just what Centocor was saying to itself, correct?

16    A.   That's correct.

17             MR. LEE:  Nothing further.  Thank you,

18 Your Honor.

19             MR. MASLOWSKI:  Nothing further, Your

20 Honor.

21             THE COURT:  All right.  You may step

22 down.

23             MR. MASLOWSKI:  May the witness be

24 excused, Your Honor?

25             MR. LEE:  Yes, Your Honor.

1              THE COURT:  All right.  You're excused.

2  You may step down.

3              Who will be your next witness?

4              MR. SAYLES:  May it please the Court.  At

5  this time, we'd call Dr. Rebecca Hoffman by deposition.

6  This one lasts a minute and 41 seconds.

7              I'll tell you before we play it, and I

8  will read the agreed-upon introduction, if it please the

9  Court.

10             Members of the Jury, you will now hear

11 portions of the deposition testimony of Dr. Rebecca

12 Hoffman.  Dr. Hoffman received her undergraduate degree

13 in microbiology from the University of Illinois in 1979.

14 She then received her medical degree from Rush Medical

15 College in 1984.  She's worked for Abbott since 1998.

16 Until very recently, she served as the Divisional Vice

17 President for Abbott's Immunology Group and was

18 responsible for the clinical development of Humira.

19             Dr. Hoffman testified at her deposition

20 as a corporate representative on Abbott's behalf on

21 topics related to the research and development of

22 Humira.

23             (Video playing.)

24             QUESTION:  What do you call the

25 immunologic response that patients can experience when

1 receiving Humira?

2           ANSWER:  So there's different kinds of

3 immunologic responses that they could have.  They could

4 have, say, an allergic reaction to the medication, which

5 would be an immunologic response.

6           They can also develop antibodies against

7 the Humira, which would be considered an immunologic

8 response.  Those are two examples.

9           QUESTION:  But Abbott is not allowed to

10 advertise the allegation that its immunogenicity is

11 better than Remicade's, correct?

12           ANSWER:  That is correct.

13           QUESTION:  And the FDA actually precludes

14 Abbott from making that claim, correct?

15           ANSWER:  I know in the label it states

16 that the different methodologies cannot be compared.

17           QUESTION:  And that label had to be

18 approved by the FDA, correct?

19           ANSWER:  Yes.

20           QUESTION:  Have you done any types of

21 tests at all with respect to Humira's immunogenicity?

22           ANSWER:  So our clinical trials did test

23 immunogenicity in patients that weren't in the trials.

24           QUESTION:  Do you know why Remicade is

25 administered via IV infusion?

1              ANSWER:  No, I don't.

2              QUESTION:  Does the fact that it's a

3    chimeric have anything to do with the fact that it's

4    IV-administered?

5              MS. MAJOR:  Objection.

6              ANSWER:  Not that I know of.

7              QUESTION:  And similarly, the fact that

8    Humira is a human antibody has nothing to do with the

9    fact that it's administered via subcutaneous

10   administration as opposed to IV infusion, correct?

11             ANSWER:  That's correct.

12             (End of video clip.)

13             THE COURT:  What do we have next,

14   Mr. Sayles?

15             MR. SAYLES:  May it please the Court.

16             Before we call our damage expert witness,

17   Dr. Gering, I have several stipulations that relate to

18   the issue of damages that I'd like to read at this time.

19             THE COURT:  Okay.

20             MR. SAYLES:  Stipulation No. 12:

21   Abbott's U.S. Humira sales by indication and through

22   April 2009 are reflected in Plaintiffs' Exhibit 109,

23   Plaintiffs' Exhibit 686, and Defendants' Exhibit 895.

24             13:  Abbott's international Humira sales

25   through April 2009 are reflected on Plaintiffs'

1   Exhibit 116, Plaintiffs' Exhibit 846, Plaintiff's

2   Exhibit 285, Defendants' Exhibit 893, and Defendants'

3   Exhibit 894.

4             14:  Remicade profit and loss statements

5   for the United States are reflected at Plaintiffs'

6   Exhibit 731 and Plaintiffs' Exhibit 841.

7             15:  Centocor profit and loss statements

8   for the United States are reflected at Plaintiffs'

9   Exhibit 842, 843, 844, and Plaintiffs' Exhibit 860.

10             16:  Humira profit and loss statements

11   for the United States are reflected at Plaintiffs'

12   Exhibit 111, Plaintiffs' Exhibit 690, Plaintiffs'

13   Exhibit 112, Plaintiffs' Exhibit 113, Plaintiffs'

14   Exhibit 114, Plaintiffs' Exhibit 110, and Plaintiffs'

15   Exhibit 847.

16             17:  Humira profit and loss statements

17   for outside the United States are reflected at

18   Plaintiffs' Exhibit 674, Plaintiffs' Exhibit 675, and

19   Plaintiffs' Exhibit 673.

20            At this time, we would call Dr. Richard

21   Gering.

22            THE COURT:  All right.

23            COURTROOM DEPUTY:  Raise your right hand,

24   please.

25            (Witness sworn.)

1    RICHARD GERING, Ph.D., PLAINTIFFS' WITNESS, SWORN

2                    DIRECT EXAMINATION

3  BY MR. SAYLES:

4     Q.   Tell the ladies and gentlemen of the jury your

5  name, please.

6     A.   My name is Richard Gering.

7     Q.   And tell us a little bit about yourself.

8     A.   I was born in Capetown, South Africa.  I met a

9  girl from Philadelphia, and we now live in Philadelphia

10 and have two boys, a 16-year-old and a 14-year-old.

11    Q.   Have you been retained on behalf of the

12 Plaintiffs to analyze the available data and come here

13 to express opinions on the economic damages that have

14 been sustained in this case?

15    A.   I have.

16    Q.   How are you currently employed?

17    A.   I'm a principal at Parente Randolph, which is

18 an accounting and consulting firm.

19    Q.   Can you explain to the jury what your work is,

20 what you do?

21    A.   I quantify economic damages in cases like

22 this, and I do economic analysis where I do strategic

23 and pricing analyses.

24         For example, when a competitor is introducing

25 a new product, I would do an economic analysis of that.

1    Q.   Do you have specific experience in quantifying

2  damages in patent cases, like the one now in trial?

3    A.   I do.

4    Q.   Approximately how many other patent cases have

5  you been involved in where you've analyzed data?

6    A.   More than a hundred.

7    Q.   Have you been accepted in federal court

8  previously to testify as an expert and give opinions on

9  economic damages?

10    A.   I have.

11    Q.   Have you been accepted in a Texas federal

12  court on the issue of economic damages?

13    A.   I have, in Lufkin, Texas.

14    Q.   Would you explain your educational background

15  to the jury, please?

16    A.   I have a Bachelor of Commerce from the

17  University of Natal in South Africa.  And then I have a

18  Master's and a Ph.D. from the University of Maryland.

19  And I also have a CLP, which is a certified licensing

20  professional designation, and that's given out by the

21  Licensing Executive Society.

22    Q.   Have you held previous positions where you did

23  work similar to the type of work that was required to

24  ready yourself to give opinions in this case?

25    A.   Yes.  While I was getting my Ph.D., I did some

1 economic modeling teaching while I was getting my Ph.D.

2 Then I worked at an economic consulting firm.

3 And then in 1992, I started working at

4 PriceWaterhouseCoopers, and I did the same kind of work

5 as I'm doing today.  And I moved to Parente in 2002.

6     Q.   Do you currently teach?

7     A.   I do.  I'm an adjunct lecturer at the

8 Villanova University Law School, which is just outside

9 of Philadelphia, and I teach economic damages there,

10 including patent damages, to those students.

11           MR. SAYLES:  I'd like to show the jury

12 Plaintiffs' Exhibit 466, which is in evidence, Your

13 Honor.

14     Q.   (By Mr. Sayles) And is this your CV or your

15 resume?

16     A.   Yes, it is.

17     Q.   And does it more fully describe some of your

18 background and the credentials that you hold?

19     A.   It does.

20     Q.   I want to turn to the lectures and

21 presentations and the publications and presentations.

22 There's quite a list there.

23           Have you given lectures to professional

24 societies and professional groups?

25     A.   Yes, I have, to intellectual property law

1  groups, as well as to the American Institute of

2  Certified Public Accountants, to their national

3  conference.

4      Q.   And have you written papers and articles for

5  publication?

6      A.   Yes.  I've written on both quantifying

7  reasonable royalty damages and lost profit damages in

8  patent cases and in other kinds of cases.

9      Q.   Have you written on the very subjects that

10  you've been asked to evaluate in this case and express

11  opinions to this jury about?

12      A.   I have.

13      Q.   I'm going to ask you some questions about your

14  opinions on damages, Dr. Gering, in a few minutes, and

15  whenever you're expressing your opinion, I'm going to

16  ask you to confine yourself to reasonable probability

17  and not guesswork or speculation.

18          Will you do that?

19      A.   I will.

20      Q.   All right.  Let's focus specifically on the

21  work you did for this case.  I want to speed things

22  along, because we respect everyone's time, but I'd like

23  the jury to know if you did your homework.

24          Can you tell us what you did to prepare for

25  this case, please?

1      A.   I can.  I looked at Abbott and Centocor

2   strategic and marketing plans, very similar to the ones

3   that were just shown up on the screen the last hour;

4   surveys and studies of opinions and perceptions by

5   doctors, in some cases, by payors and some cases by

6   customers.

7           I looked at financial sales data,

8   profitability data, cost data.  I also met with and

9   interviewed 17 different Centocor employees in the

10  manufacturing, licensing, medical affairs, competitive

11  analysis, market research.

12          I reviewed depositions and expert reports from

13  the other side.

14          I had access to a database of over 3 million

15  documents.  I did not look at 3 million documents.  I

16  looked at probably 2 or 300,000 different documents

17  myself and my team that were related to the areas that

18  my opinion is related to.

19     Q.   Were you permitted access to confidential

20  documents of both Abbott and Centocor as permitted by

21  the Court's order regarding confidentiality in this

22  case?

23     A.   Yes.  So, for example, I could -- I could look

24  at the market perceptions or research both by Abbott, as

25  well as Centocor, and I could account for both of that

1    in my analysis.

2        Q.   Did you have any assistance in reviewing all

3    of this material and getting ready for your testimony

4    here today?

5        A.   I did.  I worked -- three people worked under

6    my direction on this project.

7        Q.   Is your pay or your compensation in any way

8    contingent on the outcome of this case?

9        A.   No, it's not.

10       Q.   Is it typical in a case like this for you and

11   experts in your field to make certain assumptions?

12       A.   Yes, it is.

13       Q.   And did you make some assumptions in this case

14   for purposes of your analysis?

15       A.   Yes, I did.  I assumed that sales of Humira

16   were infringing Centocor's '775 patent.

17            I was also aware that an arbitrator had ruled

18   with respect to certain sales of Humira that are used

19   with Methotrexate and that the arbitrator had quantified

20   those percentages, and I had -- and I took those

21   percentages, and I accounted for them in my

22   calculations.

23       Q.   Before we go into the details of your

24   opinions, let's get them out.

25            Have you performed a professional opinion as

1  to the amount of damages suffered by the Plaintiffs in

2  this case as a result of infringing Humira?

3      A.   Yes, I have.

4           MR. SAYLES:   And could we see Slide 2?

5      Q.   (By Mr. Sayles) And I'll ask you if this

6  summarizes the damages that you have determined in this

7  case?

8      A.   Yes, it does.  And it's -- and there are two

9  different types of damages.

10          The first one is damages in the form of what's

11 called lost profits, and that number is 1,168,466,000.

12          And then on those sales that are not in the

13 lost profits calculation, I quantified what's called a

14 reasonable royalty, and those numbers are 1,008,256,000

15 so that the total damages that I have quantified are

16 2,176,722,000.

17     Q.   Dr. Gering, you've mentioned two different

18 categories of damages here.  Are these two separate

19 categories?

20     A.   Yes, they are.

21     Q.   Is there any double dipping here?

22     A.   No, there is not.

23     Q.   And the first that you mentioned is lost

24 profits.  Can you please describe to the jury what you

25 mean by lost profits?

1     A.   Yes.  So, again, I've assumed that Humira

2   infringes, and I'm saying that if there was no

3   infringing Humira on the market, Centocor would have

4   more -- have made more sales of Remicade -- sold more

5   sales of Remicade.

6          And I've quantified that number, and then I've

7   subtracted out the cost of making those sales to arrive

8   at what's called the profits that Centocor would have

9   made on those additional sales had infringing Humira not

10  been on the market.

11    Q.   And the second category of damages that you

12  mentioned that we have here is a reasonable royalty.

13  Before we dig into this, just tell us generally, what is

14  a reasonable royalty?

15    A.   So not -- not all of the infringing sales in

16  my analysis would have resulted in additional sales of

17  Remicade.  Only about one in five.

18          And so the other infringing sales of Humira, I

19  quantify reasonable royalty.  And what that is, is if

20  Abbott and Centocor had sat down and had a negotiation,

21  Abbott would have paid a license fee to Centocor so that

22  they could make and sell Humira and use the '775 patent

23  and that technology.

24          And that -- that's called the reasonable

25  royalty analysis.

1      Q.   In your analysis here, is July the 4th of 2006

2  an important date?

3      A.   Yes, it is.   July --

4      Q.   What's the significance?

5      A.   July 4th, 2006, that is the date that the

6  patent was issued, and so that is the starting date of

7  all my damages calculations.   I don't calculate any

8  damages before July 2006.

9      Q.   Now, before we go through your lost profits

10  analysis in more detail, did you prepare a slide that

11  quantifies Abbott's sales of Humira since July of 2006?

12     A.   Yes, I did.

13     Q.   And can we take a look at that, please.

14     A.   Yes.

15     Q.   Would you explain this.

16     A.   I will.

17          If you look at the title, it says the total

18  sales of Humira, and that's worldwide, from July '06

19  through June of '09 are $11.2 billion.   And I've broken

20  that up into three major groups.

21          The first group is the yellow slice, which is

22  $2.9 billion of Humira sales, and those are sales of

23  Humira that are used with Methotrexate, sometimes called

24  the co-administered sales.

25          Those are the sales that are a result of the

1  arbitrator's ruling.  The arbitrator gave us various

2  percentages, and using those percentages, I've

3  quantified the sales and removed the sales.

4          So you can see in the box that there are no

5  damages associated with those $2.9 billion in sales.

6          In the next smaller wedge is 1.6 billion in

7  the lost profit analysis.  And that's where my analysis

8  shows that in my opinion, if infringing Humira was not

9  on the market, Remicade would have made those sales.

10 And Remicade, in my opinion, is, therefore, titled to

11 the profits it lost on those sales.

12         And then the last section, the $6.7 billion,

13 those are the remaining infringing Humira sales where

14 I'm saying Remicade would have not made additional

15 sales.  And those would be subject to this negotiation

16 where Abbott would pay a license fee to Remicade.

17    Q.   No double counting between lost profits and

18 reasonable royalty?

19    A.   Correct.

20    Q.   And you took out the arbitrator's award?

21    A.   Correct.

22    Q.   All right.  Let's move to lost profits, and

23 let's talk about the lost profits analysis.

24         Can you explain to this jury how you

25 calculated lost profits in this case?

1      A.   I can.  I went through an analysis that really

2 is sort of a four-prong test.  It's sometimes called the

3 Panduit case after a case of that same name.

4           And it goes through and basically asks and

5 answers four questions that one performs in order to

6 determine and quantify the lost profits amount.

7           And I have a slide that walks through those

8 questions.

9      Q.   All right.  And before we get there, did you

10 consider the market in which these products compete?

11      A.   I did.  I looked at the biologic market in the

12 United States where these products compete, and I

13 summarized -- I think this morning you've seen a lot of

14 information on the biologic market, but I have a brief

15 summary just to show some of the sales information and

16 who the major products are in that market.

17      Q.   Is this the summary of that?

18      A.   Yes, it is.  And so --

19      Q.   Would you explain it?

20      A.   -- this summarizes sales in the biologics

21 market.  It looks like at 2006, the market's about $8

22 billion in total sales, and it grows every year.

23 In 2008, it's over 12 billion, and the expectation in

24 2009 is that it will be over 14 billion.

25           And you can see that there are three products

1   that comprise over 95 percent in the early years, and at

2   the end of the time period, about 95 percent of the

3   market.   It's Humira, it's Remicade, and it's Enbrel.

4           You can see that they're color-coded.   There's

5   also a little purple sliver at the top, and those are

6   the other products in the market.   There are about four

7   or five products in '06.   I believe there now may be

8   eight products in '08 and '09 that comprise that purple

9   sliver at the top.

10          So, again, the market is characterized by

11  these three products:   Humira, Enbrel, and Remicade.

12      Q.   Are there specific factors that you look at to

13  analyze lost profits in a case such as this one?

14      A.   Yes, there are.   As I said, you go through the

15  four-prong Panduit test, and I did that.

16          In my opinion --

17      Q.   Can you explain -- can you explain those?

18      A.   I'll give the questions in more of a form of

19  the answer.

20      Q.   I'd like you to explain those factors that you

21  went through and considered in connection with the lost

22  profits analysis so the jury has that background.

23      A.   Okay.   So the first issue I looked at is

24  demand.   And in my opinion, there is demand for the

25  products covered by the patent.   In this case, that

1  would be Humira.  And the patent is the '775 patent.  So

2  there is demand for Humira that uses the '775 patent.

3       The second thing I looked at is called

4  non-infringing alternatives.  One has to look at what

5  the world would look like if there was no infringing

6  Humira sales.

7       And, in my opinion, one can look at that

8  market and one can determine what Centocor's market

9  share would be in the market after removing the

10  infringing sales.

11       And I say I do that in each indication.

12  Because as you've heard, there's rheumatology,

13  gastroenterology, and dermatology, and within that,

14  there are a number of other diseases.

15       And they're all slightly different.  The

16  analysis is conceptually the same, but the numbers in

17  that are slightly different.  So you have to look at it

18  by indication.

19       The third thing I looked at and reached an

20  opinion on is if Centocor would have been able to sell

21  more Remicade, which I find, did they have the ability

22  to make more Remicade, and did they have ability to sell

23  more Remicade?  Did they have the manufacturing and

24  marketing capacity?

25       And, again, I looked at various documents,

1  spoke to various people, and I found that they did.

2      And then the last part of the test is, can you

3  do the quantification?  Can you calculate the profits

4  that Centocor would have made on those Remicade sales

5  that it should have made without infringing Humira.

6      Q.   And with respect to those factors, would you

7  explain the basis of your opinion, please.

8      A.   Yes.  I looked at various information.  I

9  spoke to various people.  And then what I did was, I

10  worked through each individual fact in order to quantify

11  my lost profits.

12      So the first thing I looked at, for example,

13  was, was there demand?  And in my opinion, there was

14  demand.

15      Q.   All right.  Would you take a look at the

16  Humira sales in your damage analysis and explain to the

17  ladies and gentlemen of the jury how this ties in?

18      A.   This shows sales of Humira, but this time it

19  shows it by timeframe.

20      If you look from 2003 through half of 2006,

21  you can see that sales are growing.  They're all in a

22  white box, because, again, those are before July 2006,

23  so they're not in the damage period.

24      The green bars are the sales of Humira that

25  are in the damages period.

1          And then the little blue bars at the top,

2    those are the sales of Humira when they are used with

3    Methotrexate, which, again, according to the arbitrator

4    ruling, I've quantified, accounted for, and taken them

5    out.

6          So what you can see is there clearly is demand

7    for Humira.  That's a tremendous number of sales.  In

8    2008, for example, 4 1/2 dollars in sales.  Those sales

9    are growing.

10          And again, my assumption is that Humira is

11    infringing, and therefore, that it uses Centocor's '775

12    patent.  So there is -- there is demand.

13     Q.    And did you review Remicade and Humira to

14    determine if they compete in the same market?

15     A.    I did.

16     Q.    And what is your opinion in that regard?

17     A.    In my opinion, they do -- they do compete in

18    the same market.

19          Again, I looked at physician preferences.  I

20    looked at market share information.  I looked at various

21    studies.  We've seen some of the studies this morning.

22    I've looked at the same studies or the same type of

23    studies, maybe different versions of them.  Africa has

24    very similar studies.

25          I also spoke to various people in marketing.

1  I spoke to Mr. Bazemore, for example, and various people

2  that report to him, and then to medical affairs.

3        And by analyzing that, I was able to determine

4  that they are perceived similarly.  There are some

5  differences, but they're perceived similarly.  And once

6  Humira came on the market, it did compete with and take

7  sales from Remicade.

8        Q.   And based on your review of the documents

9  available from both Abbott and Centocor, do Humira and

10 Remicade become viewed as comparable by doctors and

11 patients?

12       A.   Yes.

13       Q.   And if you would, tell the ladies and

14 gentlemen of the jury, what leads you to conclude that

15 these two products do compete with each other in the

16 same market?

17       A.   Again, it's the type of information I looked

18 at -- and I have some examples of that information --

19 that, in my opinion, does lead me to conclude.

20       So this is a -- this is a document from

21 Abbott.  It's a similar type of document -- you've seen

22 earlier ones -- from Centocor.  It's an October '07

23 document.  It's from Scott Luce, who's the Vice

24 President of Abbott Immunology.

25       And it clearly says at the bottom, In

1  gastroenterology, which is mainly Crohn's disease, we've

2  talked about, we currently have one competitor,

3  Remicade.  As you can see, we have been taking share

4  from Remicade.

5         If you look at the chart, you see that

6  Remicade's share was about 95, 97 percent, and then it

7  starts dipping down, and the Abbott share of Humira goes

8  up.  And that's around early '07, which is when Humira

9  gets approval in the gastroenterology field for Crohn's

10 disease.

11        So clearly, sales, as reflected by market

12 share, decreased and went from -- patient share went

13 from Remicade to Humira.

14        Now, in truth, both companies are increasing

15 sales over that time period, but the distribution in the

16 market is moving from Remicade to Humira.

17        So that's one example.  I looked at also other

18 examples where Remicade was compared to Humira by both

19 companies.

20        So the first bullet point at the top is an

21 Abbott marketing document that says Humira, Enbrel, and

22 Remicade -- again, those are the big three -- are ranked

23 similarly with respect to rheum perception -- and rheum

24 perception would be doctors, rheumatologists -- of

25 overall product performance.

1          So there are many ways that you can look at --

2    or that doctors look at how products are used and

3    performed and why they use it.  This is a top-line view

4    of the overall product performance.  They ranked the

5    three very similarly.

6          The second document is a -- is a Centocor

7    document, and I believe that we just saw that one

8    recently or another page of it, and it says here,

9    "Remicade, Enbrel, and Humira continue to be perceived

10   as similar on most efficacy attributes."

11          And, again, this is a study of physicians'

12   perceptions on what they think about the products.

13          Let me back up to No. 7, and I want to ask you

14   just a couple of questions about this.

15          First of all, there's an ABT number here, and

16   that indicates that this is an Abbott document; is that

17   right?

18     A.    That is correct.

19     Q.    And although we've got the logo down here --

20   that's been added on -- this is one of the confidential

21   documents to which you were given access.

22     A.    Yes.  And if you look on the actual slide, I

23   guess sort of in the bottom right, you see the A and

24   Abbott, which Abbott typically has on its...

25     Q.    And these underlined words in red, the -- not

1  the underlining, but the words are on the document of

2  Abbott; is that right?

3      A.   Correct.  They're often called speaker notes.

4  A person presents a slide, and then they write at the

5  bottom of the slide notes to help themselves give a

6  presentation to their audience.

7          So, obviously, Mr. Luce or somebody on his

8  staff present -- wrote those notes in in order to

9  explain the slide.

10     Q.   All right.  This is an example.  Did you see

11 very many documents internally from Abbott that

12 indicated that their product, Humira, competed with

13 Remicade?

14     A.   Absolutely.

15     Q.   All right.  Let's go to No. 9.  Is this

16 another example of an Abbott document about its

17 competition with Remicade?

18     A.   Yes.  And this is a document from January of

19 '08.  Again, it's focused on Crohn's, and it's part of a

20 slide deck that talks about -- this part is talking

21 about looking ahead.  What's going to happen in 2008,

22 what Abbott wants to happen, what it expects to happen.

23 And it wants to grow its market share, and it wants to

24 do it in three ways.

25          So if you look on the right-hand side, there

1 are three bullet points, and if you start at the bottom

2 bullet point, it says maintain current patient base.

3 So Abbott is saying, in order to grow our share, the

4 first thing we need to do is maintain current patient

5 base.  And that's sort of that bottom line where the --

6 where the -- let me try with this.  So that line is to

7 maintain current patient base.

8           The next thing, it says, take share from

9 Remicade, and that's to get the chart up to that point.

10 And the last thing it says, expand the biologic market.

11 You can't see it very clearly, but there's another line

12 that sort of takes you up to about there.

13           And so what they're saying is, we want to grow

14 the market, we want to grow our share in the market, we

15 want to grow our sales, and we're going to do it by

16 keeping our patients, by taking share from Remicade, and

17 by expanding the market.

18           And expanding the market typically is both

19 growing the market, but it's also taking all those

20 Remicade failures, people who have tried Remicade and

21 Remicade is not working for whatever reason.  So that's

22 part of expanding the market.

23           And if you look at the sales data, like I did,

24 at the end of 2008, they did achieve their goal, which

25 they say in the starburst that they thought was totally

1    achievable, and indeed, it was.

2        Q.    All right.  If you would now, take a look at

3    Slide No. 10 and tell us what Plaintiffs' Exhibit 666,

4    another Abbott document, shows.

5             And by the way, the arrows are our addition to

6    the document.

7        A.    That is correct.  I marked this slide with

8    Enbrel, Remicade, and Humira, which -- because it's not

9    that easy to -- I didn't find it that easy to read the

10   slide, so that's why I did it.

11            And Abbott's point in the slide is, it's

12   looking at Humira total U.S. market share, so across all

13   the indications, all the disease categories.  And it's

14   saying that Humira is advancing its position amongst the

15   entrenched competition.  That would be Enbrel and

16   Remicade.

17            And you can fairly clearly see that certainly

18   from '04, '05, the Remicade line is going down, and it

19   looks like the Humira line is going up by a similar

20   amount.  Enbrel is also coming down slightly.

21            So that's also, in my mind, evidence not only

22   that people thought that they were similar but that they

23   actually competed.  Because once chimera came in the

24   market, you can see that share moved, sales moved, new

25   patients moved from Remicade to Humira.

1      Q.    Abbott document?

2      A.    Yes.

3      Q.    Showing that they considered Remicade one of

4  the entrenched competition?

5      A.    Correct.

6      Q.    Now, after you determined that Humira and

7  Remicade competed in the same market, what did you do?

8      A.    So I have all this information that they do

9  compete.  So now I have to quantify that information.  I

10  have to quantify what the sales of Remicade would be in

11  a world where I have to take out the infringing Humira.

12          So how many -- how many of those Humira sales

13  would Remicade have achieved?

14          And again, I have to do that by indication and

15  by year.  And I did that by looking at, again, data and

16  share data and sales data and perception data from both

17  Abbott and Centocor and combining that information.

18     Q.    Would you take RA as an example and walk the

19  ladies and gentlemen of the jury through how you went

20  about adjusting the market share analysis.

21     A.    I will.

22          So the slide at the top -- let me give you the

23  conclusion, and then I'll walk you through how I did it,

24  because it's fairly complicated.

25          I'm saying that Remicade's adjusted market

1  share of Humira in the United States for RA in 2008 is

2  39 percent.

3          So what I mean is, if you took out infringing

4  RA, then 39 out of every hundred patients that would

5  have gone to Humira instead would have gone to Remicade.

6  And the other patients, the other 61 patients, would

7  have gone somewhere else.  They would have not used

8  Remicade.

9          So I started with the total sales of Humira in

10  RA in the United States in 2008, and the first thing is,

11  I removed the Humira sales that are used with

12  Methotrexate.

13          Remember, that's the way that the arbitrator

14  told us how to calculate those numbers.  So they're

15  excluded.  They're not in any of the damages

16  calculations.

17          The third thing you have to do is you have to

18  understand how the patient got to Humira.  We've heard

19  first line and second line and biologically naive, and

20  that's what I'm addressing here.

21          Saying some of those patients --

22              THE WITNESS:  If you would just back one

23  up.

24      A.    Some of these patients had tried Remicade and

25  it had failed, 11 percent.  Some of them had tried

1 Enbrel and had failed.  And some of them, 69 percent,

2 Humira was the very first biologic that they tried.  So

3 you have to understand that.

4        Then if you go one step further -- so if a

5 patient has tried Remicade and it hasn't worked for

6 whatever reason, I'm saying that even if you remove

7 infringing Humira, that doctor would not put that

8 patient back on to Remicade.  It's tried; it's failed.

9 So Remicade gets zero of that share.

10       If they've tried Enbrel, whatever reason the

11 doctor's taken the patient off Enbrel, if there's no

12 bringing Humira on the market, it's not going to go back

13 to Enbrel for the same reasons.  It's tried -- they've

14 tried Enbrel; it's failed.  And I'm saying that Remicade

15 gets about 90 percent of those sales.

16       There are some other products in the market,

17 as we saw, less than 5 percent, so Remicade gets about

18 90 percent of that.

19       The third group is the biologically naive.  So

20 they -- Humira was their very first choice.  There is no

21 infringing Humira.  They can now choose Enbrel, they can

22 now choose Remicade, or they can choose some of those

23 other products that are smaller percentages.

24       If you look at the data, the vast majority of

25 those patients would go to Enbrel.  That's what happened

1  in the real world.  That's what would happen if you take

2  out infringing Humira.

3          And so Remicade only gets 30 percent of those

4  biologically naive, and 70 percent go to other places.

5          So when you put it all together, you have

6  zero; you have 90 percent of 20, which is 18; you have

7  30 percent of 69, which is 21; and you add it together.

8          And what I'm saying is the adjusted market

9  share, in other words, Remicade's share of the market in

10  RA in the U.S., after extracting the infringing Humira

11  and after accounting for the arbitrator's ruling, is 39

12  percent.

13      Q.  (By Mr. Sayles) Now, Dr. Gering, let me be

14  clear about something.  You understand that in this

15  case, there is no effort being sought to remove Humira

16  from the market in actual fact.

17      A.  That's correct.  This is a -- what a damages

18  person does is an analysis to say, let's assume that

19  there is no infringing Humira.  What would doctors have

20  prescribed and what would patients have used?

21          In the real world, obviously, there is Humira.

22  And in the real world, nobody is seeking to take Humira

23  off the market.  This is -- this is solely for the

24  purposes of calculating what the world would have looked

25  like had Humira not been there infringing.

1          So it's not what is actually going on in the

2    sense that Humira is actually being sold today.

3        Q.   It's just necessary for a proper analysis of

4    lost profits.

5        A.   Correct.

6        Q.   Now, just a couple of questions about this,

7    and then we'll move on to the summary.

8             Under previously Remicade and the

9    reallocation, you have Remicade share zero.

10       A.   I do.

11       Q.   Why is that?

12       A.   Again, that's because for that segment of the

13   RA market, a patient had already tried Remicade before

14   coming to Humira, and for whatever reason, the doctor

15   had taken the patient off Remicade.

16            Then my understanding is, once you've tried

17   one of these products and you've been -- and they've

18   been taken -- you've been taken off that product,

19   doctors typically do not put you back on the product.

20   You try something else.

21       Q.   Did you go through an analysis of the market

22   share for each indication?  We've just talked about RA.

23       A.   I did.  And the next slide will show those

24   numbers.

25       Q.   Well, let's go to that.  But can we -- can we

1  get you to verify that, in fact, you went through a

2  detailed analysis, and this is a summary of each of the

3  additional areas or indications where these drugs are

4  utilized.

5      A.    Absolutely.  I did the same analysis -- for

6  example, in RA, we walked through 2008; the same

7  analysis for RA for '07 and '06; and then I did the

8  exact same analysis for the other four indications, AS,

9  PsA, PS, and CD.

10         And you can see that the numbers are

11  different.  There's some slight differences in which

12  products are on the market.  There's slight differences

13  in how they're perceived, how they're used, how they're

14  prescribed, what their actual sales are.

15         So, for example, we know in PS, it is a

16  dermatological condition, and we know that Remicade does

17  not compete as effectively with dermatologists.  Some

18  dermatologists have a reticence to use it, their

19  perceptions about maybe its safety or their perceptions

20  maybe about wanting to use an IV product.

21         And so in '08, I'm only asking for 11 percent

22  of the infringing Humira sales in my lost profits.

23         And if you look at Crohn's disease, for

24  example, where there are much fewer competitors, my

25  market share number is much higher.  It's 69 percent,

1 for example, in 2008.

2          So the analysis is inherently the same; the

3 types of documents were the same; but the numbers are

4 different.  And that's why you have to do the analysis

5 by indication.

6     Q.    And you've done that.

7     A.    I did.

8     Q.    All right.  And if we do a lost profits

9 calculation, again taking rheumatoid arthritis as the

10 example, can you explain to the jury how you did that?

11    A.    Yes, I can.

12         So this is the last part of the four-pronged

13 Panduit test to actually calculate lost profits.

14 I also looked, obviously, at the manufacturing and the

15 marketing ability.

16         This is one of the few areas that both experts

17 on both sides agreed upon, that Centocor did have the

18 ability to make the property and did have the ability to

19 sell the products.  There was no real dispute there.  I

20 did -- obviously, did the analysis, but there was no

21 dispute there.

22         So what we do here is we start off with the

23 infringing sales of Humira in RA.  We then have to

24 understand, but for the infringement, how many of those

25 sales would Remicade have made.  And so that's the

1   market share analysis that we just did.

2          When you -- after you do that, that will

3   determine how many sales Remicade would have made; in

4   other words, what they lost due to the infringement.

5   And then the last step is, you have to turn that revenue

6   number, that sales number into a profit number.  So you

7   have to look at the profitability of the product.  You

8   have to take out the cost of making it, the cost of

9   selling it.

10         Centocor pays some monies to other companies

11  and other institutions to use various other parts of

12  their intellectual property, so you have to do an

13  analysis to see what are the profits.

14         So that shows conceptually what I did, and if

15  you advance the slide, that puts the numbers in place.

16         So what I'm saying is, there are 1,991,000,000

17  sales in the United States of Humira in the Remicade

18  indication.

19         Now, that number is after taking out, already

20  removing, $1-1/2 billion of sales in the United States

21  of Remicade with Methotrexate in the RA market.

22         I'm saying, if infringing Humira was not on

23  the market, Remicade would have made 791 million of

24  those almost 2 billion in sales.  And the profits that

25  they would have made on those sales would have been

1  582,946,000, so that would be for RA.

2      Q.   All right.  And did you do a similar analysis

3  for each indication?

4      A.   I did.

5      Q.   And I noticed that the incremental profit

6  margin here is different for each year.  Tell the ladies

7  and gentlemen of the jury why these numbers are

8  different from year to year.

9      A.   Well, the analysis is based on the actual

10  profit and loss statements for -- it's my watch; I'm

11  going to try to stop it -- for Remicade.  And I believe

12  that Mr. Sayles read in the documents that are related

13  to that profit and loss statement.

14          So I looked at them specifically by year.

15  They're slightly different every year.  I spoke to the

16  Chief Financial Officer of Centocor, and I spoke to

17  three people that worked with that -- with the Chief

18  Financial Officer about various aspects, for example,

19  the cost of making the product, promotional costs of the

20  product, other licensing revenue that they pay on the

21  product.

22          So it's different by every year.  The

23  analysis, again, is similar.

24      Q.   All right.  Let me ask you, now, is this

25  number over on the right-hand corner the number for lost

1    profits in rheumatoid arthritis?

2        A.    Yes, it is.

3        Q.    Let's take a look at No. 14.  Did you go

4    through a similar analysis that you just told the jury

5    about in each and every indication?

6        A.    I did.  And as you saw before, the market

7    share numbers are slightly different, the sales

8    numbers -- Humira sales are absolutely different.  They

9    start at slightly different time periods whenever Humira

10   got on the market, but it's the same analysis.

11           So when you add up the lost profits in all the

12   different indications, it's 1,168,466,000.  So that's

13   the lost profits in the United States by indication.

14       Q.    And is that your professional opinion of the

15   lost profits that have been sustained in this case by

16   the Plaintiffs?

17       A.    It is.

18       Q.    Now, let's -- let's move to the next slide,

19   and I'd like you to explain to the jury what this lost

20   profits number represents in terms of the overall sales.

21       A.    Well, again, we've seen this slide before.

22           What we've been talking about is the $1.6

23   billion in sales, additional sales, that Remicade would

24   have made in a world in which there was no infringing

25   Humira, according to my analysis.  And we've quantified

1   the profits on those sales of 1,168,000,000.

2         So, again, that's just -- that's that segment.

3   And then the next area to address is the reasonable

4   royalty on the remaining sales that, again, I've assumed

5   to infringe and that are subject to my analysis.

6      Q.   All right.

7         THE COURT:  I think we'll move to the

8   reasonable royalty after lunch.

9         MR. SAYLES:  All right.  Very well.

10        THE COURT:  Ladies and Gentlemen, we'll

11   take a lunch break until 1:15.  Be ready to come back in

12   the courtroom at 1:15.

13        Remember my instructions about not

14   discussing the case among yourselves.  Have a nice

15   lunch, and I'll see you back here.

16        COURT SECURITY OFFICER:  All rise.

17        (Jury out.)

18        THE COURT:  I can remember when we used

19   to get excited when the damage figure was a million,

20   Mr. Beck.

21        MR. BECK:  It's the B that's getting to

22   me, Your Honor.

23        THE COURT:  I understand.

24        (Recess.)

25        *     *     *     *     *

1

2

3                      <u>CERTIFICATION</u>

4

5          I HEREBY CERTIFY that the foregoing is a

6  true and correct transcript from the stenographic notes

7  of the proceedings in the above-entitled matter to the

8  best of my ability.

9

10

11

12  /s/_____          _____
    SUSAN SIMMONS, CSR                Date
13  Official Court Reporter
    State of Texas No.:  267
14  Expiration Date:  12/31/10

15

16

17  /s/_____          _____
    JUDITH WERLINGER, CSR            Date
18  Deputy Official Court Reporter
    State of Texas No.:  731
19  Expiration Date  12/31/10

20

21

22

23

24

25