<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   CENTOCOR, ET AL           *     Civil Docket No.
                               *     2:07-CV-139
 4   VS.                       *     Marshall, Texas
                               *
 5                             *     June 24, 2009
     ABBOTT LABORATORIES       *     1:10 P.M.
 6

 7             TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE JUDGE T. JOHN WARD
 8             UNITED STATES DISTRICT JUDGE
                       AND A JURY
 9

10   APPEARANCES:

11   FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                            MS. BARBARA MULLIN
12                          MR. STEVEN MASLOWSKI
                            MS. ANGELA VERRECCHIO
13                          MR. MATTHEW PEARSON
                            Woodcock Washburn
14                          2929 Arch Street, 12th Floor
                            Cira Centre
15                          Philadelphia, PA   19104

16                          MR. RICHARD SAYLES
                            MR. MARK STRACHAN
17                          Sayles Werbner
                            1201 Elm Street
18                          4400 Renaissance Tower
                            Dallas, TX   75270
19

20   APPEARANCES CONTINUED ON NEXT PAGE:

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDITH WERLINGER, CSR
22                          Official Court Reporters
                            100 East Houston, Suite 125
23                          Marshall, TX   75670
                            903/935-3868
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
</pre>

1

2  APPEARANCES CONTINUED:

3

4  FOR THE DEFENDANTS:    MR. WILLIAM LEE
                          MS. AMY WIGMORE
5                         MR. WILLIAM MCELWAIN
                          Wilmer Cutler Pickering Hale
6                              and Dorr
                          1875 Pennsylvania Avenue, N.W.
7                         Washington, DC   20006

8
                          MR. DAVID BECK
9                         Beck Redden & Secrest
                          One Houston Center
10                        1221 McKinney Street
                          Suite 4500
11                        Houston, TX   77010

12
                   *      *      *      *      *      *
13

14
                        P R O C E E D I N G S
15

16             COURT SECURITY OFFICER:  All rise.

17             THE COURT:  Please be seated.

18             All right.  Ms. Mullin.

19      JAMES MARKS, M.D., DEFENDANTS' WITNESS, SWORN

20             CROSS-EXAMINATION (CONTINUED)

21  BY MS. MULLIN:

22      Q.   Dr. Marks, just a few more questions on

23  infringement, then we will move on to another subject,

24  okay?

25      A.   Okay.

1    Q.   So I'm going to ask Mr. Ficocello to pull up

2  Plaintiffs' Exhibit 137 again.

3        These are the studies done by Zehra

4  Kaymakcalan, Dr. Kaymakcalan at Abbott, that Dr. Adams

5  has relied upon in support of his opinions of

6  infringement, right?

7    A.   Yes.

8    Q.   And the studies used cA2 or the antibody in

9  Remicade?

10   A.   That's correct.

11   Q.   And it was competition assays involving

12 Remicade and Humira, right?

13   A.   That's correct.

14   Q.   In one assay, Remicade was labeled; in the

15 other assay, Humira was labeled, right?

16   A.   That's correct.

17   Q.   And those assays showed competition between

18 the two, right?

19   A.   Those assays showed that Humira competes with

20 A2 and that A2 competes with Humira; that's correct.

21   Q.   Okay.

22   A.   Sorry.  With cA2.  I made a mistake; it was

23 cA2, which is the antibody in those studies.

24   Q.   Now, for purposes of your determination of

25 infringement, you're trying to draw a distinction

1  between testing with A2 and cA2, right?

2       A.   That's correct.

3       Q.   You were here yesterday in the courtroom when

4  Mr. Conway, one of Abbott's foremost -- former in-house

5  lawyers, testified by deposition, right?

6       A.   I believe I remember that.

7       Q.   And do you recall that what Mr. Conway said

8  was that on December 15th, 2005, after he had gotten

9  notice of the '775 patent was about to issue, he asked

10 Zehra Kaymakcalan for data for the purpose of rendering

11 legal advice about the Centocor patent, right?

12      A.   I -- I believe that's correct.  I don't

13 recall, but I'm sure you're right.

14      Q.   I'd be happy to bring up the transcript.

15      A.   No, I'm sure that's correct.

16            MS. MULLIN:  Mr. Ficocello, if you would

17 like to -- it's from yesterday morning's testimony,

18 Page 25 of the transcript, beginning at Line 18.

19      Q.   (By Ms. Mullin) So Abbott's in-house patent

20 counsel, on December 15th, asked Ms. Kaymakcalan for

21 data for the purpose of rendering legal advice about the

22 Centocor patent, right?

23      A.   Correct.

24      Q.   And he gave her the patent that was going to

25 issue as the '775 patent, right?

1    A.    Correct.

2              MS. MULLIN:  And if we can keep going a

3    little bit.

4    Q.    (By Ms. Mullin) And the next day, she gave him

5    the technical information that he needed so that he

6    could provide legal advice regarding the Centocor

7    patents, right?

8    A.    That's correct.

9    Q.    So within a couple of weeks, Abbott's in-house

10   counsel was getting legal advice from an outside

11   attorney about the application, right?

12   A.    That's correct.

13   Q.    And then shortly after that, Abbott's in-house

14   patent counsel realized that it was possible that

15   Centocor was going to sue Abbott for infringement of the

16   '775 patent when it issued, right?

17   A.    That's what it says, correct.

18              MS. MULLIN:  You can take that down.  You

19   can blank the screen.

20              Thank you.

21   Q.    (By Ms. Mullin) I want to shift gears now, and

22   I want to talk about written description of enablement.

23   A.    Okay.

24   Q.    I think you gave opinions this morning on

25   written description and enablement based on the 1994

1  patent application -- excuse me -- filed by Centocor,

2  right?

3       A.   That's correct.

4       Q.   So we've been through this before, but there

5  was a series of -- there were a series of applications

6  that were filed leading up to the '775 patent, right?

7       A.   That's correct.

8       Q.   The first one was filed in March of 1991,

9  right?

10       A.   That's correct.

11       Q.   Then there were a whole series of what are

12  called CIP applications filed, right?

13       A.   That's correct.

14       Q.   And what it means to be a CIP application is

15  that there was information either added or subtracted

16  from the previous applications, right?

17       A.   That's correct.

18       Q.   And there was the first CIP application filed

19  in March of 1992.

20       A.   Correct.

21       Q.   And a second CIP filed in September of 1992,

22  right?

23       A.   I believe that -- I would need to look at

24  this.

25                 MS. MULLIN:  All right.  Pull up PX1,

1  please.

2       Q.    (By Ms. Mullin) This will help.  I'm sorry.

3  This is not supposed to be a memory test.

4       A.    There's no way I would remember that.

5       Q.    We'll just do the related patent data.

6             And you see there were CIP applications filed

7  in 1993 as well.

8       A.    Correct.

9       Q.    And then again, there were a few CIP

10 applications filed in February of 1994, right?

11      A.    Correct.

12      Q.    And the February 1994 date is significant,

13 because, although there were further applications

14 leading up to the application that issued as the '775

15 patent, in your opinion, none of the later applications

16 added any information relevant to enablement, right?

17      A.    Excuse me.  What's the question?

18      Q.    Sure.

19            Although after February 1994, there were

20 additional applications filed, right?

21      A.    Correct.

22      Q.    It is your opinion that none of the later

23 applications added any information relevant to

24 enablement, right?

25      A.    That's correct.

1  Q. So just walking up the ladder, it's your

2 opinion that a person of ordinary skill in the art would

3 not be able to make or use human antibodies, based on

4 and at the time that the March 1991 application was

5 filed, right?

6  A. That's correct.

7  Q. And it is your opinion that a person of

8 ordinary skill in the art would not be able to make or

9 use human antibodies, based on and at the time that the

10 March 1992 application was filed, right?

11    MR. LEE:  Your Honor, may we approach?

12    THE COURT:  Yes.

13    (Bench conference.)

14    MR. LEE:  We're in the March 1992

15 application now and enablement, which I thought is where

16 we weren't going to go.  It might be my confusion,

17 but...

18    THE COURT:  Well, I guess she's just

19 trying to confirm that he agreed, that he's of the

20 opinion that none of those earlier applications enabled

21 the patent.

22    Is that what you're doing?

23    MS. MULLIN:  Uh-huh, just up through '94.

24    THE COURT:  Okay.  What's your objection?

25    MR. LEE:  No.  I am unclear and I

1  apologize.

2            MS. MULLIN:  I'm not going to ask him --

3  I know where you're going to.  We're going to go to the

4  '94 application and let him focus on it.

5            MR. LEE:  I just want to make sure we're

6  focused on the same thing.

7            THE COURT:  Well, it looks like to me we

8  could do a catch-all rather than this up-the-ladder

9  thing.

10            MS. MULLIN:  You got it.  I was going

11  to stop at '94.

12            MR. LEE:  I was just confused on it.

13            THE COURT:  Well, what confusion do you

14  have, Mr. Lee?

15            MR. LEE:  I -- I had purposely stayed

16  away from any mentioning of the application before '92,

17  because that's what -- and the question whether they

18  were enabled or not.  But as long as you won't go into

19  anything before '94, we will be okay.

20            MS. MULLIN:  Actually, I think you showed

21  the '91 application on the screen this morning and had

22  your expert talk about it.

23            THE COURT:  My instruction was you stay

24  within his expert report.  His expert report did say

25  none of these applications were enabled, correct?

1          MR. LEE:  True.

2          THE COURT:  Yes.

3          MR. LEE:  And Adams said the opposite,

4  but I'm not going to go there with Adams after Your

5  Honor's ruling.

6          MS. MULLIN:  Nor will I.

7          THE COURT:  Yeah, because Adams says the

8  output, but I ruled the contrary in your favor.

9          MS. MULLIN:  Why is he arguing with me?

10  He won this.

11          THE COURT:  Let's go.

12          (Bench conference concluded.)

13     Q.  (By Ms. Mullin) Excuse the interruption.

14     A.  No problem.

15     Q.  So let me see if I can lump these together.

16  We have the February 4th, 1994 date highlighted here.

17     A.  Yes, we do.

18     Q.  But it is your opinion that none of the

19  applications, up to and including the February 4th, 1994

20  patent application filed by Centocor, enabled a person

21  of ordinary skill in the art to make or use human

22  antibodies based on and at the time that each one of

23  these applications was filed; is that right?

24     A.   Not that met the scope of the claims; that is

25  correct.

1    Q.   And the Patent Office, at least through the

2  applications leading up to February of 1994, agreed with

3  you, right?

4    A.   That is correct.

5         MS. MULLIN:  So let's look at DX766,

6  please.

7    Q.   (By Ms. Mullin) I believe this is the

8  prosecution history for the application filed in

9  September of 1992, right?  And if we can refer to the

10  page designated as ABT01362404.

11         This is an office action, right?

12    A.   Correct.

13    Q.   So this is a paper that when the Patent Office

14  is examining an application in deciding whether or not

15  they should allow it to issue, they can send this to the

16  applicant to tell them what they think of the patent

17  application at that particular point in time, right?

18    A.   That's correct.

19         MS. MULLIN:  And if we can go to page

20  ending 411, 404 up to 411, about midway through the

21  page, go down a few lines.

22    Q.   (By Ms. Mullin) What the Patent Office said

23  about the 1992 Centocor patent applications is that the

24  specification does not teach how to produce chimeric

25  antibodies having less than an entire mouse variable

1  region, right?

2      A.    That's what it says.

3      Q.    What that's really saying is that the

4  specification does not teach or enable how to produce

5  fully human antibodies, for example, right?

6      A.    It says what it says.

7      Q.    Well, a chimeric antibody having less than an

8  entire mouse variable region, in your opinion, could be

9  a fully human antibody, right?

10     A.    Oh, certainly.  It could be, yes.

11     Q.    So this is what the Patent Office told

12  Centocor in 1992, but then Centocor went back to the

13  drawing board and added more information in February of

14  1994 relating to human antibodies, right?

15     A.    There was more information added, correct.

16     Q.    And after that information was added, the next

17  time that Centocor presented claims, submitted claims to

18  the Patent Office asking for the issuance of the patent

19  directed to fully human antibodies, the Patent Office

20  did not reject those claims for lack of enablement; is

21  that right?

22     A.    That's correct.

23     Q.    So before the Patent Office allowed the claims

24  to fully human antibodies to issue, the Patent Office

25  had to determine that they were fully enabled, right?

1        A.    That's correct.

2        Q.    So we've done this a few times, but let's walk

3   through a little bit what was added in February of 1994.

4        A.    Okay.

5        Q.    Let's start actually with what we agree.   I

6   know we're going to disagree about one point, but,

7   again, let's figure out where we agree, okay?

8        A.    Great.

9        Q.    So you would agree with me that there was

10   adequate written description support in February of 1994

11   for a chimeric antibody, right?

12        A.    Yes, I would.

13        Q.    And what that means is that there was adequate

14   written -- written description support for an isolated

15   recombinant anti-TNF-alpha antibody, right?

16        A.    Correct.

17        Q.    And there was adequate written description

18   support for an antibody having a human constant region,

19   right?

20        A.    Correct.

21        Q.    And for an antibody having a human IgG1

22   constant region, right?

23        A.    Correct.

24        Q.    And for an antibody that competitively

25   inhibits binding of A2 to human TNF-alpha, right?

1      A.    Correct.

2      Q.    And for an antibody that binds to a

3  neutralizing epitope of human TNF-alpha in vivo, right?

4      A.    Correct.

5      Q.    And for an antibody having an affinity of at

6  least 1 times 10 to the 8th liter per mole measured as

7  an association constant as determined by Scatchard

8  analysis, right?

9      A.    Correct.

10     Q.    Okay.  So we agree that there is written

11  description support for all of that in February of 1994.

12  And you'd also agree with me that the February 1994

13  applications enabled the things that we've just talked

14  about.

15     A.    That is correct.  Chimeric antibodies,

16  correct.

17     Q.    Having the properties that we've just

18  discussed, right?

19     A.    Correct.

20     Q.    So where we disagree is whether in February of

21  1994, there was written description or enablement to an

22  antibody having a human variable region.

23     A.    Correct.

24     Q.    A human light chain.

25     A.    Correct.

1      Q.    Or a human heavy chain.

2      A.    Correct.

3      Q.    And that's the only place where you feel

4  there's not adequate written description support or

5  enablement in the February 1994 application, right?

6      A.    That's correct.

7      Q.    And these things, the human variable region,

8  the human light chain, and the human heavy chain,

9  they're all traits of a human antibody, right?

10     A.    That's correct.

11     Q.    And in 1994, among the information added to

12 the specification, was a specific reference in the

13 summary of the invention that indicated that anti-TNF

14 antibodies of the invention included human antibodies,

15 right?

16     A.    The words appear.

17              MS. MULLIN:   Could we please bring up the

18 patent at Column 5, Lines 55 through 59?

19     Q.    (By Ms. Mullin) Actually, before we look at

20 this, would you agree with me, Dr. Marks, that all of

21 the applications from 1994 forward and through the

22 issued patent provide adequate written description

23 report and enablement for at least chimeric antibodies

24 having all the elements of the claims, except for those

25 few that we've specifically identified as relating to

1  human antibodies?

2       A.   I would say for chimeric antibodies, yes.

3       Q.   And that would include all of the limitations

4  in the claim, except for the specific human variable

5  region, human light chain, and human heavy chain in

6  certain dependent claims, right?

7       A.   That is correct.

8       Q.   So we've seen this before, but in 1994, in

9  February of 1994, in the summary of the invention, the

10 inventors indicated specifically that their invention

11 included human antibodies, right?

12      A.   The words appear.

13      Q.   So the words appear.

14           And for purposes of written description --

15 because I want to separate that out from enablement --

16 you're looking for a written description of the

17 invention, but to support that, you don't actually have

18 to be in possession, physically in possession of every

19 possible version of the invention, right?

20      A.   Not of every possible version, but they were

21 not in possession of human antibodies.

22      Q.   Well, let's just back up a little bit.  For a

23 written description, and enablement for that matter, the

24 inventors don't need to be in possession, physical

25 possession, or have actually made any version of the

1  invention, right?

2      A.   They need to show that they have the

3  invention.

4      Q.   But having the invention is different than

5  having a physical thing that you've made that represents

6  every version, or what we call embodiment of the

7  invention, right?

8      A.   Correct; not every version.  But it's clear to

9  me that they don't have human antibodies and does not

10  meet the written description requirement.

11      Q.   So if I understand that -- and you understand

12  the written description requirement to meet that,

13  Centocor didn't even need to say the word human

14  antibodies, right?

15      A.   That's correct.

16      Q.   So they didn't need to say it, but in your

17  opinion, when they did say it, you read that as not

18  including human antibodies?

19      A.   They don't meet the description requirement.

20  There is not sufficient detail.

21      Q.   Okay.  But you'll agree with me --

22      A.   I agree with you the words appear.

23      Q.   Okay.  And in February of 1994, we talked

24  about this a little bit, and it appears in Column 18,

25  Lines 48 to 53.

1          MS. MULLIN:  Please go down another line.

2     I'm sorry.  I probably gave you the wrong line numbers.

3          Q.    (By Ms. Mullin) We talked about this, but

4     Centocor added a reference or a citation to an article

5     that you had written in October of 1993, right?

6          A.    That is correct.

7          Q.    And what this paper talks about in making

8     human antibodies against human antigens using phage

9     display, right?

10         A.    Correct, red blood cell antigens.

11         Q.    And also in the February 1994 applications --

12    I think we've seen this before -- Centocor added a

13    section entitled, Structural Analogs of Anti-TNF

14    Antibodies and Anti-TNF Peptides, right?

15         A.    Can you bring that up and highlight it just so

16    I can see it?

17         Q.    Sure.

18              MS. MULLIN:  How about Column 3 -- 33 --

19    I'm sorry -- beginning at Line 7.  And it actually

20    continues over to Column 34, Line 25.  I'm not sure if

21    you can get all of that, but at least the beginning.

22         Q.    (By Ms. Mullin) Okay.  Centocor added this

23    entire section describing structural analogs of anti-TNF

24    antibodies and anti-TNF peptides, right?

25         A.    I think we have the wrong part highlighted.

1    Q.   Okay.  I'm sorry.  I didn't see the

2    highlighting.

3         Okay.  We'll make the question simple.  That

4    section was added in February of 1994, and it describes

5    a way to make structural analogs of anti-TNF antibodies

6    and anti-TNF peptides, right?

7    A.   Excuse me.  Now that I've looked at it, can

8    you ask the question again?  I'm sorry.  I was looking

9    and trying to listen.

10   Q.   Sure.

11        In February of 1994, there was an entire

12   section spanning more than one column, added to the

13   Centocor patent application relating to or describing

14   structural analogs of anti-TNF antibodies and anti-TNF

15   peptides, right?

16   A.   That's correct.

17   Q.   And in your answers that you were giving in

18   response to questions asked by Mr. Lee, you said, I

19   think, one of the problems with this description is that

20   there weren't models available at the time.

21   A.   Correct.

22   Q.   But actually, the structure for an antibody is

23   generally the same for all antibodies, right?

24   A.   If they share the same -- what we call the

25   same fold.  On gross inspection, they share that same

1  general Y-shape, correct.

2     Q.   And what -- what you're saying is there

3  wasn't -- there weren't -- there wasn't enough

4  information to model the interaction between TNF and the

5  antibody, right?

6     A.   In fact, it's worse than that.  There's not

7  even enough information to know what the antibody

8  binding site looks like, let alone model its interaction

9  with TNF-alpha.

10     Q.   Well, years earlier, Eck and Sprang had

11  published an article that give you the exact crystal

12  structure of TNF-alpha, right?

13     A.   I believe that's correct.

14     Q.   And if you look at PX1.

15          MS. MULLIN:  The patent, Page 3, not

16  column -- page -- halfway down on the right-hand column

17  just about, can you find Eck and Sprang?

18     Q.   (By Ms. Mullin) So the Centocor patent

19  actually references the publication that provides the

20  structure or the model of TNF-alpha, right?

21     A.   Yes, it does.

22     Q.   Now, you agree that the portions of the patent

23  specification most susceptible to an interpretation as

24  encompassing fully human antibodies were added in this

25  February 1994 application, right?

1        A.    I'm sorry.  I don't understand the question,

2   most susceptible.

3        Q.    Okay.  I believe that you have your report

4   that you prepared for this case identified as DX317 in

5   your binder.

6        A.    Yes, I do.

7        Q.    And if you look at Paragraph 262, the last

8   sentence, does this refresh your recollection that in

9   your opinion, the portions of the patent most

10  susceptible to an interpretation as encompassing fully

11  human antibodies were added in February of 1994?

12       A.    Yes, that's what I said.

13       Q.    You agree that the February 1994 application

14  is significant for our purposes, right?

15       A.    I am not sure, again, what you mean by the

16  word significant or purposes.  I mean, if you could

17  rephrase the question, I'll answer it.

18       Q.    Now, when you were talking about your general

19  discussion about enablement and the things to consider,

20  you put up something called the Wands factors.

21       A.    Yes.

22       Q.    These are the things you're supposed to look

23  at in considering enablement, right?

24       A.    Correct.

25       Q.    And the first one is the nature of the

1   invention and the breadth of the claims, right?

2       A.    Correct.

3       Q.    And that's talking about breadth of the claims

4   would be how many -- how many particular, in this case

5   antibodies, are being covered by the patent claims,

6   right?

7       A.    That's correct.

8       Q.    And in this case and actually the more

9   antibodies that you cover, the kind of -- the higher the

10  standard is for enablement, right?

11      A.    Correct.

12      Q.    And you have actually, in this case, agreed

13  that there is only one antibody that meets all the

14  elements of the claims at issue here, right?

15      A.    I don't believe so, because there's only one

16  antibody that -- I don't understand the question.

17      Q.    You've identified CDP571, and you contend that

18  that includes all the --

19      A.    Correct.

20      Q.    You have not identified any other antibody,

21  right?

22      A.    That's correct.

23      Q.    And there's also a reference here to working

24  examples and amount of direction or guidance, right?

25      A.    That's correct.

1       Q.    And I think you mentioned -- excuse me -- that

2  there was no suggestion of specific examples relating to

3  fully human antibodies, right?

4       A.    That's correct.

5       Q.    Now, if you're measuring the affinity of two

6  antibodies, you use the same test whether the affinity

7  you're measuring is of a chimeric antibody or a human

8  antibody, right?

9       A.    You could, yes.

10      Q.    And the patent describes affinity testing,

11 right?

12      A.    Yes, it does.

13      Q.    And the patent also describes competition

14 assays, right?

15      A.    Yes, it does.

16      Q.    And you would use the same competition assay

17 regardless of whether the antibody is chimeric or human

18 or mouse?

19      A.    Yes, you could.

20      Q.    And there are also a number of neutralization

21 assays that are described in the patent.  And, again,

22 those assays apply, at least some of them apply, whether

23 you're talking about a mouse antibody, a chimeric

24 antibody, or a fully human antibody, right?

25      A.    That's correct.

1      Q.    And enablement is not based solely on the

2 examples in a patent, right?

3      A.    That's correct.

4      Q.    And enablement does not require the inventors

5 to make, much less commercialize, every possible

6 variation of a product that might be within the scope of

7 the claims to their invention, right?

8      A.    That's correct.

9      Q.    Now, I'm going to jump down to

10 experimentation, because then we're going to come back

11 to Item 3.

12     A.    Okay.

13     Q.    In terms of experimentation, you recognize an

14 invention can be enabled, even if a person is skilled in

15 the art would have to do some experimentation, right?

16     A.    Absolutely.

17     Q.    The experimentation just can't be undue,

18 right?

19     A.    Correct.

20     Q.    And what is undue experimentation is measured

21 by what's usual in the field, right?

22     A.    Correct.

23     Q.    And in this field, as Dr. Salfeld testified

24 yesterday, and you may have also mentioned this morning,

25 taking years of very hard work to develop something is

1  not unusual, right?

2      A.   In the particular instances here, it would be

3  unusual.  It also required multiple inventive steps as

4  well as a lot of hard, hard work.

5      Q.   I'm not sure -- I may have missed the answer.

6      A.   Okay.  I'm sorry.

7      Q.   But you and Dr. Salfeld have both testified

8  that in this field, years of hard work to develop

9  something is not unusual, right?

10      A.   It can take years of hard work to develop

11  something in this field correct.

12      Q.   And it's not unusual for it to take that long,

13  right?

14      A.   Correct.

15      Q.   And Item 4 also talks about the relative skill

16  of those in the art, right?

17      A.   Yes, it does.

18      Q.   Because enablement is judged based on someone

19  who comes into the field with the knowledge of someone

20  of skill in the art, right?

21      A.   Correct.

22      Q.   And in this case, that's actually pretty high,

23  right?

24      A.   I think the level of skill of antibody

25  engineers is reasonably high.  It's a very technical --

1   yes, correct.

2       Q.   So that actually means that they come in with

3   a level of -- or a high level and understanding of

4   everything in the field that's published and available,

5   right?

6       A.   I would say that's not true.  They would

7   have -- for some technologies, they might have very

8   little actual experience, but, overall, their level of

9   education and experience is high, yes.

10      Q.   Now, I'd like to talk to you about what was

11  available in February of 1994, and this is the state of

12  the art, right?

13      A.   Okay.

14      Q.   And I think you mentioned that in 1992, you

15  were able to generate fully human anti-TNF-alpha

16  antibodies, right?

17      A.   For clarification, do you mean meeting the

18  scope of the claims, or just any old TNF antibodies?

19      Q.   The question was simply, by 1992, you were

20  able to generate fully human anti-TNF-alpha antibodies,

21  right?

22      A.   Yes, but not meeting the scope of the claims.

23      Q.   We'll get to that.

24      A.   Okay.  I'm sorry.  Anticipation.

25              THE COURT:  It would help the Court so I

1  wouldn't have to get involved in y'all's exchange if

2  you'd just answer the question.  I don't want to be

3  involved any more than I have to.

4            THE WITNESS:  Yes, Your Honor.

5       Q.   (By Ms. Mullin) And when you did that in 1992,

6  you were actually a student working towards your Ph.D.,

7  right?

8       A.    That is correct.

9       Q.    And the genetic material that you used to make

10 your fully human anti-TNF-alpha antibodies came from

11 human volunteers, right?

12      A.    That is correct.

13      Q.    That's what you were subscribing in this slide

14 earlier, right?

15      A.    That is correct.

16      Q.    You took blood samples from humans, and then

17 isolated the DNA, right?

18      A.    That is correct.

19      Q.    And the DNA you isolated included the gene

20 that encoded the heavy chair variable region and the

21 light chain variable region of the antibody, right?

22      A.    That is correct.

23      Q.    And you used phage display to express the

24 portion of the antibody that binds to the antigen,

25 right?

1      A.    That is correct.

2      Q.    And when you used phage display, which is one

3  of the methods that you identified this morning as a way

4  to make human antibodies, you did that in 1992 before

5  you had your Ph.D., correct?

6      A.    That's correct.  This is work I did as part of

7  my Ph.D.

8      Q.    And that was before February of 1994, right?

9      A.    Yes, it was.

10     Q.    And in the same timeframe, or at least before

11 February of 1994, you were not the only one or the only

12 group to isolate human antibodies against TNF-alpha,

13 right?

14     A.    That's correct.

15     Q.    For example, Dr. Casali -- we heard from him

16 this morning -- was able to isolate human antibodies

17 against TNF-alpha using a different technique; this one,

18 right?

19     A.    That's correct.

20     Q.    That's Dr. Casali.

21           And he did this in the 1992 to 1993 timeframe,

22 right?

23     A.    That's correct.

24           MS. MULLIN:  I should have done that one

25 with a different color.

1          Q.    (By Ms. Mullin) Okay.   And I don't think this

2   came out this morning, but Dr. Casali was at NYU, but he

3   was not affiliated with the group at NYU that worked

4   with Centocor to develop the invention at issue here,

5   right?

6          A.    I believe that is correct.

7          Q.    So he was a separate, independent group

8   working on these things?

9          A.    Correct.

10         Q.    And what Dr. Casali used was Epstein-Barr

11   virus or EBV, right?

12         A.    That's correct.

13         Q.    That's not something you've ever used in your

14   work, right?

15         A.    Correct.

16         Q.    And he was able to isolate human antibodies

17   against TNF, right?

18         A.    That's correct.

19         Q.    Now, I think you and Dr. Salfeld have

20   characterized Dr. Casali's work as -- have characterized

21   it as being a failure, right?

22         A.    That's correct.

23         Q.    And you said that's because the affinity or

24   having the ability to bind and stick to the antibody was

25   too low on these antibodies generated by Dr. Casali,

1 right?

2     A.   And they were non-neutralizing, so correct.

3     Q.   Well, the non-neutralizing part is often

4 linked to the inability to bind or stick tightly to the

5 antigen, right?

6     A.   It can be.

7     Q.   And we call that the affinity of the antibody

8 to the antigen, right?

9     A.   Yes, we do.

10     Q.   And the issue that you have with Dr. Casali's

11 antibodies is that they were a low-affinity antibody,

12 right?

13     A.   And they were non-neutralizing.

14     Q.   Okay.  But, again, the non-neutralizing could

15 come with a higher affinity, right?

16     A.   It could.

17     Q.   And we know from an article that you published

18 in August of 1992 that there were techniques available

19 to affinity-mature, or increase, the affinity of the

20 antibody, right?

21     A.   Yes, there were.

22     Q.   And Dr. Casali's contract actually expired in

23 1993.

24     A.   I believe that's correct.

25     Q.   And that was before anyone tried to

1  affinity-mature his antibodies to see if they might be

2  able to get them up to a high enough affinity to

3  neutralize, right?

4      A.   I'm not aware that anyone tried to

5  affinity-mature his antibodies.

6      Q.   So as far as you know, no one ever tried to do

7  what was known in the art to make those antibodies

8  neutralizing, high-affinity antibodies, right?

9      A.   That was not known in the art, how to do that.

10     Q.   Well, it was disclosed in your article.

11     A.   Well, what we disclosed in the article were

12 potential ways to increase the affinity of antibodies

13 using phage display.  And we had no idea -- and we

14 provided examples, but we had no idea how widely

15 applicable this was nor the degree to which we would be

16 able to increase the affinity.

17     Q.   You published on it in August of 1992, isn't

18 that right, Dr. Marks?

19     A.   Can you pull that up for me?

20     Q.   Sure.  If you'd like to see Plaintiffs'

21 Exhibit 324.

22          And if you'd actually like to refer to your

23 deposition as well.

24     A.   I'll look at 324.

25              THE COURT:  Well, do you want him to look

1  at his deposition?

2      Q.   (By Ms. Mullin) I would like for you to look

3  at your deposition as well.  It may save you from trying

4  to reread the article now.

5      A.   Okay.  Great.

6      Q.   If you'd like to look at Page 255, beginning

7  at Line 20.

8              THE COURT:  Is this the April deposition?

9              MS. MULLIN:  This is the April

10 deposition, so this was just a few months ago.

11     A.   All right.  What line?

12     Q.   (By Ms. Mullin) Page 255, Line 20.

13          If you look at Page 254, you can see that I

14 was asking you a series of questions about Plaintiffs'

15 Exhibit 324.

16     A.   Correct.

17     Q.   This is the article that you published in

18 August of 1992, right?

19     A.   Let me just go back and --

20     Q.   You can refer to your deposition.  How about

21 if I do it this way, Dr. Marks.

22     A.   I am referring to my deposition.

23     Q.   Okay.  Beginning at Line 15 on Page 254.

24              QUESTION:  Is this an article that was

25 published in August of 1992?

 1                ANSWER:  It is.

 2                QUESTION:  And it describes your use of

 3  filamentous phage to produce antibodies?

 4                ANSWER:  It does.

 5      A.   Yes, but I published a number of papers, so if

 6  you can direct me back which specific paper this is.

 7      Q.   This is PX324.  And if you can refer to your

 8  deposition at Page 255, Line 20.

 9      A.   Got it.

10      Q.   I asked you the question:  And then referring

11  again to the article that I've just placed in front of

12  you that's marked Plaintiffs' Exhibit 324 --

13                You answered:  Uh-huh.

14                QUESTION:  -- this publication also

15  indicates that you can affinity-mature.

16                And that means increase the affinity, right?

17      A.   Correct.

18      Q.   By chain-shuffling and/or mutagenesis, right?

19      A.   Correct.

20      Q.   And it describes -- and you explained that it

21  describes a route by which the technology can be applied

22  to increase the affinity of antibodies by

23  chain-shuffling and/or mutagenesis, right?

24      A.   Correct.

25      Q.   Okay.  And that was published in August of

1  '92, right?

2       A.   That's correct.

3       Q.   Okay.  I'm going to go a little out of order,

4  because we already have this up here.

5            But the transgenic mice technology, that was

6  something that was in existence, even if not fully

7  developed, as early as 1992, right?

8       A.   I believe that's correct.

9       Q.   It's actually one of the things that Abbott or

10 its predecessor, BASF, considered, right?

11      A.   That's correct.

12      Q.   And by 1994, there were publications issuing

13 that were detailing the production of fully human

14 antibodies from transgenic mice, right?

15      A.   That's correct.

16      Q.   And you understand that for purposes of

17 enablement, only one of these three methods needs to

18 enable the production of fully human antibodies by

19 February of 1994, right?

20      A.   That's correct.

21      Q.   So let's talk a little bit about Humira

22 development.

23      A.   Okay.

24      Q.   I think you referenced that earlier, and I'm

25 jumping around a bit, so here's the warning I'm shifting

1  gears.

2      A.    You're keeping me on my toes.

3      Q.    Okay.  We've already talked about your

4  development of anti-TNF-alpha antibodies in 1991.  Now

5  we've talked about Dr. Casali's development antibodies

6  in 1992 and '93, right?

7      A.    Correct.

8      Q.    And when the relationship between BASF and

9  Casali ended in 1993, Abbott then engaged in a

10 relationship with CAT, or Cambridge Antibody Technology,

11 to work on the Humira project, right?

12     A.    That's correct.

13     Q.    And at the time that Abbott did this in 1993,

14 Dr. Salfeld recognized that the approach by CAT was a

15 proven technology, right?

16     A.    Is that what he said?  I don't know.

17     Q.    Okay.  We can refer to Plaintiffs' Exhibit 78.

18 I'm sorry.  That's my --

19            And I think if you look at the -- kind of

20 bottom of the first proof of concept.

21     A.    Is it on -- is it on that first page?

22     Q.    It is on the first page, so we're going to

23 bring it to you and make it a little bigger.

24     A.    Okay.  That will help.  I can see it here,

25 too.

1          MS. MULLIN:  I'm sorry.  You've blocked

2  the top of that, Mr. Ficocello.

3      Q.   (By Ms. Mullin) But this was actually a memo

4  that was written by Dr. -- or a report that was written

5  by Dr. Salfeld in September of 1992, right?

6      A.   Correct.

7      Q.   And he gave some testimony about this

8  yesterday as well, right?

9      A.   Yes, he did.

10     Q.   And when in 1992 Dr. Salfeld was talking about

11 the CAT technology, one of the things he said was that

12 CAT has long-standing experience with their approach,

13 right?

14     A.   That's what it says, yes.

15     Q.   And it also indicates that CAT had --

16          MS. MULLIN:  I think we need to go down a

17 little bit further, Mr. Ficocello.

18     Q.   (By Ms. Mullin) Had a very large library,

19 human and heavy -- human, heavy, and light chain library

20 available to it, right?

21     A.   That's what it says, yes.

22     Q.   And if you turn to Page 2 of the same

23 document --

24     A.   Yes.

25     Q.   -- when Dr. --

1      A.    Yes.

2      Q.    Under the title, Humanization of Murine

3 Antibodies.

4      A.    Yes.

5      Q.    When Dr. Salfeld was describing the state of

6 this technology in 1992, he knew that CAT had already

7 successfully humanized murine antibodies.

8            If you go down a few lines.

9            CAT has successful humanized murine

10 antibodies.

11     A.    Correct.  That's what it says.

12     Q.    And they were able to keep and even improve

13 the binding affinities, right?

14     A.    Correct.  That's what it says.

15     Q.    In fact, this was 1992, but CAT had started to

16 advertise in 1991 that it was offering technology that

17 could be used to turn mouse antibodies into human

18 antibodies, right?

19     A.    That is correct.

20     Q.    They were advertising in prestigious

21 scientific journals, right?

22     A.    Yes.

23     Q.    So after this 1992 evaluation between March

24 and July of 1993, CAT actually started to use its

25 antibody gene library in phage display technology for

1  Humira, right?

2      A.   That's correct.

3      Q.   Okay.  Since we've seen enough of my writing,

4  I've asked for some help.

5           I want to talk about Humira development, and

6  what happened was that in March and July of 1993, CAT

7  started using its antibody gene library and phage

8  display technology for the Humira project, right?

9      A.   That is correct.

10      Q.   So phage display was the first step in the

11  development of Humira, right?

12      A.   Correct.

13      Q.   It took less than six months before the first

14  human antibody binding fragment had been made, right?

15      A.   That is correct.

16      Q.   And one of the antibody binding fragments that

17  they focused on was a fragment designated 4SE3, right?

18      A.   Correct.

19      Q.   And the process of getting from the mouse

20  antibody to 4SE3 was a process of guided selection,

21  right?

22      A.   I believe that's correct, yes.

23      Q.   If you would like to refer to your deposition

24  at Page 292.

25      A.   Thank you.

1      Q.    Beginning at Line 4 to 7, the process of

2  getting from MAK195 to 4SE3 was a process of guided

3  selection, right?

4      A.    Correct.

5      Q.    So we have the first two steps so far in

6  making Humira, right?

7      A.    Correct.

8      Q.    And guided selection is actually a specific

9  type of chain-shuffling, right?

10     A.    Yes, it is.

11     Q.    Okay.  So we'll include that.

12           And then the next step in making Humira in the

13  spring and early summer of 1994 was a series of affinity

14  maturations, right?

15     A.    That's correct.

16     Q.    That's our next step, and through those

17  affinity maturations, 4SE3 became 2SD4, right?

18     A.    That's correct.

19     Q.    Now, this is a year into the project, about a

20  year into the project that it took to get to this point,

21  right?

22     A.    I believe that's correct, yes.

23     Q.    And the affinity of the human anti-TNF

24  antibody that existed at that time was about 3 times 10

25  to the 9th, right?

1      A.    I believe that's correct, yes.

2      Q.    And that's greater than 1 times 10 to the 8th,

3  right?

4      A.    Yes, it is.

5      Q.    Okay.  So after that, for Humira, they

6  actually went through an additional step, and that was

7  off-rate selection, right?

8      A.    That's correct.

9      Q.    So going from 2SD4 to D2E7, that was off-rate

10  selection, right?

11      A.    That's correct.

12      Q.    So we've walked through the steps for

13  developing Humira, right?

14      A.    Yes, we have.

15      Q.    Okay.  Then I ask you to turn, please, to

16  PX446.

17            Do you have that in front of you, Dr. Marks?

18      A.    Not yet.  There are a lot of pages.

19      Q.    Just let me know when you're ready.

20      A.    Okay.

21      Q.    This is an article that --

22      A.    I must have -- did you say PX or DX?

23      Q.    PX.  I'm sorry.  Plaintiffs' Exhibit 446.

24      A.    Okay.  I'm sorry.  I got 445.

25            Yes.

 1      Q.   This is an article that describes human

 2 anti-self antigens with high-specificity from phage

 3 display libraries, right?

 4      A.   Human anti-self antibodies, correct.

 5      Q.   From phage display libraries, right?

 6      A.   Correct.

 7      Q.   And this was published in February of 1993,

 8 right?

 9      A.   Correct.

10           MS. MULLIN:  And if you go to the last

11 pages of this reference -- keep going until you get to

12 the list of references.

13           See the list of references?

14           I think that might continue on as well.

15      Q.   (By Ms. Mullin) In scientific articles,

16 there's generally a list of references at the end of the

17 article, right?

18      A.   That's correct.

19      Q.   And they identify the other publications or

20 information that's available that's relevant to what

21 they're doing, right?

22      A.   Correct.

23      Q.   And it supports what they're doing and that

24 what they're doing is --

25      A.   That's one of the things it does, yes.

1      Q.   Okay.  And in this case for this article that

2  was published in February of 1993, we have the last page

3  up.  All of these are references that obviously had to

4  exist before February of 1993, right?

5      A.   Correct.

6      Q.   Okay.  If you could turn, then, to Defendants'

7  Exhibit 376.

8      A.   Yes.

9      Q.   This is a published application, right?

10      A.   Yes, it is.

11      Q.   And this discloses guided selection technique,

12  right?

13      A.   Yes, it does.

14      Q.   And this was published in April of 1993,

15  right?

16      A.   That's correct.

17      Q.   Okay.  It's an application, not an article, so

18  it doesn't have the same list of references at the back,

19  right?

20      A.   That's correct.

21      Q.   Okay.  If you could turn, then, to PX324.

22      A.   Okay.

23      Q.   You recognize this as an article -- it's

24  actually authored by you -- that talks about

25  chain-shuffling, right?

1        A.   Yes, it is.  It's a review article.

2        Q.   Okay.  And this was published in August of

3   1992, right?

4        A.   Correct.

5        Q.   And this article also talks about techniques

6   of affinity maturation, right?

7        A.   Yes, it does.

8        Q.   Again, I'm not going to look at it, but at the

9   end of this, there are pages of references listed as

10   relating to what's described here.

11        A.   That's right.

12        Q.   And they were all publications that were

13   available to everyone in the field as of the time that

14   you published this article, right?

15        A.   Yes, they were.

16        Q.   Okay.  If you can turn, then, to DX, that's

17   Defendants' Exhibit 419.

18        A.   I'm sorry.  DX what?  419?

19        Q.   419.

20        A.   Yes.

21        Q.   This is another article that talks about

22   affinity maturation of antibodies from a phage library,

23   right?

24        A.   Yes, it is.

25        Q.   And it was also published in April of 1992,

1  right?

2        A.    That's correct.

3        Q.    And it includes that whole list of references

4  at the back, right?

5        A.    It has a lot of references at the back.

6        Q.    Okay.  So let's go to Defendants' Exhibit 425,

7  please.

8        A.    Yes.

9        Q.    This article specifically discusses off-rate

10 selection, right?

11       A.    Yes, it does.

12       Q.    And this was published in August of 1992,

13 right?

14       A.    That's correct.

15       Q.    And this is another article that includes a

16 whole list of references that are at the back, right?

17       A.    That's correct.

18       Q.    Okay.  So we just walked through this, but

19 let's see if we can bring it together a little.

20             These are the five steps that were used to

21 make Humira, right?

22       A.    That's correct.

23       Q.    And as we've indicated, every one of these

24 steps was described in articles, patent applications, or

25 other publications that were available to everybody

1  working in the field as of February 4th of 1994, right?

2      A.   That's correct.

3      Q.   Okay.  Okay.  Can we move on then?  And if I

4  can ask you to take a look at Plaintiffs' Exhibit 325.

5      A.   Yes.

6      Q.   This is actually a book, right?

7      A.   Yes, it is.

8      Q.   And you wrote a chapter in this book?

9      A.   Yes, I did.

10     Q.   And it's a book on antibody engineering.

11     A.   That's correct.

12     Q.   And the particular chapter you wrote explains

13  how you make antibodies using phage display techniques,

14  right?

15     A.   Uh-huh.

16          MS. MULLIN:  If we can turn to the first

17  page of the chapter.

18     Q.   (By Ms. Mullin) You wrote this, right?

19     A.   Yes, I did.

20     Q.   And it explains phage display, right?

21     A.   Yes, it does.

22     Q.   And it explains how you can use the techniques

23  to affinity-mature or increase antibody affinity, right?

24     A.   Yes, it does.

25     Q.   And this chapter was actually published in

1  1995, right?

2      A.   That's -- I believe that's correct, yes.

3      Q.   So in 1995, you could have looked at anything

4  or identified anything prior to that time as supporting

5  the description of these techniques that you were

6  providing, right?

7      A.   Excuse me.  I missed part of the question.

8      Q.   Sure.

9           In 1995, everything out there had been

10  published was available to you, right?

11     A.   To consider to put in this chapter?

12     Q.   Yes.

13     A.   Yes.

14     Q.   Okay.  Well then, let's look at the end of the

15  chapter.

16          MS. MULLIN:  And I think maybe we've

17  already highlighted this to help, Mr. Ficocello.

18     Q.   (By Ms. Mullin) At the end of your chapter, in

19  1995, when you had everything available to you, you

20  listed 54 references in support of your description of

21  the techniques available for making human antibodies,

22  right?

23     A.   That's correct.

24     Q.   And every one of those references was dated in

25  1993 or before, correct?

1        A.    I'll take your word on that.  I can't recall

2   the references I used in 1995, and I haven't looked

3   through this to look and see if that's correct.

4   Probably correct.

5        Q.    Okay.  So you wouldn't be surprised if

6   everything that you identified as relevant to your

7   description had been published in 1993 or earlier,

8   right?

9        A.    1993 or earlier?

10             That's probably correct.  That's correct.

11        Q.    And I know it's not referenced actually in

12   your list of references, but in February of 1994, the

13   Winter Lab published results confirming that higher

14   affinity antibodies could be isolated directly from a

15   phage display library, including antibody fragments

16   binding human TNF-alpha, right?

17        A.    Can you refer me to that reference, please?

18        Q.    Sure.

19        A.    Can you just show me what you're reading from?

20        Q.    Sure.  If you can refer to your report, your

21   validity report, at Paragraph 157.  I'll let that

22   refresh your recollection, and then I'll ask the

23   question again.

24        A.    What -- what exhibit is that?  I'm sorry.

25        Q.    Exhibit 317.

1      A.   And where do you want?

2      Q.   Paragraph 157.

3      A.   I'm sorry.  Did you say --

4      Q.   If you'll just read Paragraph 157 of the

5   report that you prepared for this case on validity, and

6   read it to yourself, then I'm going to ask you a

7   question.

8      A.   It's taking me a while to get there.  There's

9   a lot to move around up here.

10      Q.   I'm sorry.  I have you jumping around.

11      A.   So --

12      Q.   In the Defendants' exhibit binder --

13      A.   Correct.

14      Q.   -- Exhibit 317.

15      A.   Correct.

16      Q.   That's the report that you wrote.

17      A.   Yes, it is.

18      Q.   And if you'd refer to Paragraph 157 and read

19   it to yourself for a minute.

20           Are you ready for a question?

21      A.   Yes, I'm ready for the question.

22      Q.   In February of 1994, the same time that

23   Centocor filed its patent application --

24      A.   Yes.

25      Q.   -- the Winter Lab also published results

 1  confirming that higher affinity antibodies could be

 2  isolated directly from a phage display library including

 3  antibody fragments binding to human TNF-alpha, right?

 4       A.   That's what it says, correct.

 5       Q.   Okay.  Now, you understand that enablement is

 6  not based simply on what's written in the patent

 7  application, right?

 8       A.   Correct.

 9       Q.   It is based on everything that's available to

10  someone of ordinary skill in the art, right?

11       A.   Correct.

12       Q.   And that would include everything we've talked

13  about, except for actually your book chapter.

14       A.   Correct.

15       Q.   So all of that information, including the 54

16  references that support what you're describing in your

17  book chapter, would have been available to somebody of

18  ordinary skill in the art in February of 1994?

19       A.   Correct.

20       Q.   And they could have used that information,

21  right?

22       A.   They certainly could have used that

23  information, correct.

24       Q.   In fact, the February 1994 Centocor patent

25  application explicitly said that the antibodies of the

1  invention could be produced by recombinant techniques

2  known in the art, right?

3       A.   That's what it says, correct.

4       Q.   So just so I'm clear, a person of ordinary

5  skill in the art with all of the information in front of

6  them, including all of these articles that we've

7  discussed, the 54 references in your chapter, given all

8  of that, it is still your opinion that a person of

9  ordinary skill in the art could not make -- or would not

10  be enabled to make human antibodies as claimed based on

11  the February 1994 application, right?

12       A.   That's correct.

13       Q.   Okay.  Actually, in your opinion, somebody of

14  ordinary skill in the art would not be able to make or

15  use human antibodies even as late as July of 2002,

16  right?

17       A.   Not without undue experimentation, that's

18  correct.

19       Q.   So you're saying that even as of July of 2002,

20  when you had made human anti-TNF antibodies a decade

21  earlier, that someone of ordinary skill in the art could

22  not have done that 10 years later, right?

23       A.   This is very technically challenging

24  technology.  That's correct.  That's what I -- that's

25  what I said.

1      Q.   So I'm going to go back and clean up a little

2  bit, and then we'll move on to another subject.

3           There's two more things that I'd like to talk

4  about in connection with the 1994 application.

5           The 1994 application did actually disclose a

6  human variable region, right?

7      A.   Excuse me?

8      Q.   The 1994 Centocor patent application actually

9  expressly disclosed human variable regions, right?

10     A.   It uses the word.  It doesn't describe them.

11     Q.   Okay.  You'll agree with me that the February

12 1994 application says human variable regions.

13     A.   Yes.

14     Q.   And you'll agree with me that the 1994

15 February application filed by Centocor also expressly

16 refers to human IgG1 constant regions, right?

17     A.   Yes, it does.

18     Q.   Okay.  Okay.  We're going to shift gears.

19 Warning.

20     A.   That doesn't help much with the two big

21 binders, but...

22     Q.   Okay.  Well, I'm going to talk now about Adair

23 1992, which is DX361.

24     A.   Okay.

25     Q.   So if you want to find that before we start,

1   that's --

2        A.   Pardon.  DX3 --

3        Q.   361.  And then you won't have to shuffle.

4        A.   I have it.

5        Q.   Okay.  I think you just misspoke, but when you

6   testified about this earlier today, you said that this

7   was a patent that issued in July of 1992, but that's not

8   right.

9        A.   No, that's not correct.  It was published in

10  July 9 of 1992.

11       Q.   Right.  It's actually an application that was

12  published in July of 1992?

13       A.   That's correct.

14       Q.   Okay.  It had not issued as a patent?

15       A.   No, it had not.

16       Q.   Okay.  And this is one of the references that

17  you said -- or this is the reference that you say

18  anticipates the asserted claims in this case, right?

19       A.   That's correct.

20       Q.   Now, you know that this reference was actually

21  considered by the Patent & Trademark Office before they

22  allowed the '775 patent to issue, right?

23       A.   I believe that's correct.

24            MS. MULLIN:  Can we pull up PX1, please.

25       Q.   (By Ms. Mullin) This is the patent, and on

1  Page 2, toward the bottom of the list, there's a

2  reference there to W09211383.  It's actually sixth from

3  the bottom.  92 slash --

4       A.   Got it.

5       Q.   There you go.  That's the Adair 1992

6  application, right?

7       A.   Yes, it is.

8       Q.   So that was one of the -- one of the things

9  that the Patent & Trademark Office expressly considered

10  before it allowed the '775 patent to issue, right?

11       A.   Yes, it was.

12       Q.   And so the Patent & Trademark Office

13  considered whether the Adair reference anticipated the

14  asserted claims in this case and determined that it did

15  not before it allowed the '775 patent to issue, right?

16       A.   I don't know what the Patent Office did, but

17  they read -- they read -- they considered the patent,

18  yes.

19       Q.   Okay.  So they considered -- not the patent.

20  They considered the --

21       A.   The application.  Sorry.

22       Q.   Okay.  So to be clear, the Patent & Trademark

23  Office considered this Adair 1992 reference and

24  determined that the '775 patent claims could issue.

25       A.   Correct.

1      Q.   And you understand, for purposes of your

2  anticipation analysis that every single element of the

3  asserted claims have to be present in Adair, right?

4      A.   That's correct.

5      Q.   If there is even a single element of the claim

6  that is missing from Adair, then there is no

7  anticipation, right?

8      A.   That's correct.

9      Q.   I think you actually used two of these charts

10  with Mr. Le, but I'm going to refer to one of them, and

11  we'll just talk about the difference, okay?

12      A.   Okay.

13      Q.   So Claims 2 and 3 are identical to Claims 14

14  and 15, except that the latter claims specify that the

15  human constant region is an IgG1 constant region, right?

16      A.   That's correct.

17      Q.   So if we just refer to Claims 13, 14, and 15

18  here, we have all of the elements that are at issue

19  here, right?

20      A.   Correct.

21      Q.   Okay.  So let's look at the first one.

22  Claims -- Claim 13 and then 14 and 15 require that the

23  antibody has a human IgG1 constant region, right?

24      A.   Correct.

25      Q.   CDP571 does not have a human IgG1, right?

1       A.    CDP571 has an IgG4 constant region.

2       Q.    And Adair actually says that IgG4-type

3   antibodies are used when the antibody is intended for

4   blocking TNF activity, right?

5       A.    That's what it says.

6       Q.    And the asserted patent claims also require

7   that the claimed antibody binds to a neutralizing

8   epitope of human TNF-alpha in vivo, right?

9       A.    That's right.

10      Q.    And now, what this is talking about, in vivo

11  means in the body, right?

12      A.    That's correct.

13      Q.    So it's talking about binding to human

14  TNF-alpha in a human body, right?

15      A.    It says that it binds to a neutralizing

16  epitope of human TNF-alpha in vivo, correct.

17      Q.    Okay.  So just for shorthand, we'll assume

18  that it's a neutralizing epitope, but it has to be a

19  neutralizing epitope in the human body with human

20  TNF-alpha, right?

21      A.    No.  I believe it has to bind to a

22  neutralizing epitope of human TNF-alpha in vivo, which

23  means in an animal.  So it could be human TNF-alpha in

24  another animal besides a human.

25      Q.    Okay.  Well, the only studies done with CDP571

1 that are reported in Adair were done in a baboon, right?

2     A.   That's correct.

3     Q.   And that used baboon TNF-alpha, right?

4     A.   The baboon would have -- would have baboon

5 TNF-alpha, not human TNF-alpha.  They are essentially

6 the same in sequence.

7     Q.   Did Adair 1992 report any testing of CDP571 in

8 a human person for binding to human TNF-alpha in vivo?

9     A.   In a human, no.

10     Q.   Did they do any in vivo assays to demonstrate

11 that human TNF-alpha is neutralized in vivo by CDP571?

12     A.   In humans?  Is the question in humans?

13     Q.   Is there anything disclosed in the Adair

14 reference, any test, testing, neutralizing human

15 TNF-alpha in vivo?

16     A.   Yes.  There are tests looking at

17 neutralizing -- oh, they're not neutralizing human

18 TNF-alpha; in humans.

19     Q.   Okay.  And, in fact, the tests that were done

20 with CDP571 in the baboons were done with an antibody

21 that had an IgG4 constant region, right?

22     A.   That's correct.

23     Q.   And the same is true for the affinity

24 measurements.  They were the affinity measurements of an

25 antibody of an IgG4 constant region, right?

1        A.    That's correct.

2        Q.    So then let's talk a little bit about the

3   competitively inhibits limitation.

4        A.    Okay.

5        Q.    You said that you relied on testing done by an

6   independent laboratory.

7        A.    That's correct.

8        Q.    And the person who -- or the laboratory is run

9   by a gentleman by the name of Dr. Kincaid?

10       A.    That's correct.

11       Q.    That's Randall Kincaid, right?

12       A.    That's correct.

13       Q.    And that testing was done in the last six

14   months or so, right?

15       A.    I believe that's correct, yes.

16       Q.    And I think your counsel asked you this, but

17   you understand that your burden here is to prove

18   anticipation by clear and convincing evidence, right?

19       A.    That's correct.

20       Q.    So when you were giving your opinions on

21   invalidity, you understood that those opinions had to be

22   based on clear and convincing evidence, right?

23       A.    Yes, I did.

24       Q.    But before forming your opinions, you never

25   even talked to Randall Kincaid about the testing done in

1 his laboratory, right?

2     A.   That's correct.

3     Q.   And Dr. Kincaid -- that's Randall Kincaid --

4 he didn't actually do most of the tests himself, right?

5     A.   He did not physically -- that's correct.

6     Q.   Most of the tests were carried out by his

7 brother, Barry Kincaid, or his office assistant, Brenda

8 Capelik, right?

9     A.   That's correct.  I actually don't know what

10 her title was, but those are the two people that did the

11 testing.

12     Q.   And when you relied upon the test done by

13 Barry Kincaid -- and I think you said this is the kind

14 of test that you would normally rely on, right?

15     A.   Correct.

16     Q.   When you relied upon the test done by Barry

17 Kincaid to reach your conclusions, you did not know what

18 kind of education or informal training Barry Kincaid

19 might have that could qualify him to do that kind of

20 testing, right?

21     A.   That's correct.

22     Q.   And the same is true for Brenda Capelik.  She

23 was responsible for some of the testing.

24     A.   That's correct.

25     Q.   And the tests that were done in Dr. Kincaid's

1  laboratory that you relied upon were competitive ELISA

2  assays, right?

3      A.   Correct.

4      Q.   But when you were reaching your conclusions,

5  you did not know if Randall or Barry Kincaid or Brenda

6  or anyone else at Veritas had ever done a competitive

7  ELISA assay before they did the one that you relied on,

8  right?

9      A.   That's correct.

10     Q.   And, in fact, you reviewed Dr. Kincaid's

11  deposition, correct?

12     A.   Yes, I did.

13     Q.   And what he said during his deposition was

14  that he did not recall having ever previously done the

15  kind of competitive ELISA that he was asked to do by the

16  Abbott attorneys, right?

17     A.   That's what he said, that's correct.

18     Q.   Now, in terms of the procedure that was used

19  for the testing that you relied upon --

20     A.   Yes.

21     Q.   -- you told me during your deposition that you

22  were under the impression that Randall Kincaid was

23  heavily involved in developing that protocol, right?

24     A.   That's probably what I said, yes.

25     Q.   But that's not true, right?

1    A.   I -- I don't actually know to this day who

2  actually contributed what part to that protocol.

3    Q.   Well, what Dr. Kincaid said during his

4  deposition -- if you'd like to see a copy, we can

5  certainly bring one up -- was that it was actually one

6  of the Abbott attorneys, Henry Wixon, who prepared the

7  protocol, who came up with the procedures for the test

8  and gave it to him to perform, right?

9    A.   Yes.   That's what he said.

10    Q.   And the protocol that they gave him required

11  him to biotinylate the A2 for the assays, right?

12    A.   That's correct.

13    Q.   And that means that you're actually modifying,

14  you're adding molecules to the A2, right?

15    A.   That's correct.

16    Q.   You're adding biotin to molecules, right?

17    A.   That's correct.

18    Q.   And it was definitely not your idea to

19  biotinylate the A2, right?

20    A.   I played no role in the development of the

21  protocol.

22    Q.   And we're talking about A2, and that is a

23  murine antibody, correct?

24    A.   Correct.

25    Q.   It is not a chimeric antibody, right?

1      A.   No, it is not.

2      Q.   But you know from reading Dr. Kincaid's

3 deposition transcript that there may have been an error

4 or a mixup with the sample that he thought was A2,

5 right?

6      A.   I believe that was in the report, and he

7 clarified it in his deposition.

8      Q.   So when he was preparing the report that you

9 relied upon that talked about the testing that he had

10 done, what he indicated was that the A2 he used was a

11 chimeric antibody, right?

12     A.   That it may have been, and then he corrected

13 it in his deposition.

14     Q.   He corrected it in his deposition?

15     A.   That he was working -- that he believed he was

16 working with a mouse antibody.

17     Q.   But he didn't say that -- he didn't correct in

18 his deposition the report prepared at the time that he

19 was doing the test that he indicated, contemporaneously

20 with doing the test, that he thought he was using an

21 antibody that was not A2, right?

22     A.   He didn't change his written report.  He

23 corrected what he said in his report --

24     Q.   Okay.

25     A.   -- at his deposition.

1     Q.    So there were things that you could have done

2  or Dr. Kincaid could have done to make sure that he had

3  the right sample, that he was actually testing A2,

4  right?

5     A.    Correct.

6     Q.    So he could have, for example, tested the

7  affinity?

8     A.    He could have.

9     Q.    And we know the affinity of A2 is from the

10 patent, right?

11    A.    Yes, we do.

12    Q.    And we know what the neutralization activities

13 are from the patent, right?

14    A.    Yes, we do.

15    Q.    So he could have tested those things to see if

16 the sample that he might have mixed up was actually A2,

17 right?

18    A.    That's correct.

19    Q.    And the sequence information is also available

20 in the patent.  I think you pointed it out.  So he could

21 have also verified that way that he hadn't mixed up the

22 sample, right?

23    A.    Yes, he could have.

24    Q.    And for the CDP571 sample that he used, that

25 sample was more than 15 years old, right?

1      A.   That's correct.

2      Q.   And actually, it had an expiration date of

3 September 1994.

4      A.   That's correct.

5      Q.   And he could have done tests to see if what

6 he had that he thought was the CD -- or the

7 characteristics of the CDP571 sample that he had,

8 right?

9      A.   He did.

10      Q.   Or he could have done things like the affinity

11 measurements that are described in the Adair reference,

12 right?

13      A.   He could have.

14      Q.   He could have tried to mimic the

15 neutralization activities that were described in the

16 Adair reference, right?

17      A.   He could have.

18      Q.   And if he had done those things, he would have

19 known if what he had had the same functional

20 characteristics as the antibody that's described in the

21 Adair 1992 reference, right?

22      A.   That's correct.

23      Q.   But he didn't do that, right?

24      A.   No, he did not.

25      Q.   Okay.  So you rely on the tests done in

1  Dr. Kinkaid's laboratory as providing clear and

2  convincing evidence that CDP571 competes with A2

3  regarding to TNF-alpha, right?

4      A.   Yes, I do.

5      Q.   Now, Dr. Kincaid has said that you cannot rely

6  on these tests for that purpose, right?

7      A.   No, he did not.

8              MS. MULLIN:  Could you please hand...

9              MR. LEE:  May we approach, Your Honor?

10              THE COURT:  Yes.

11              (Bench conference.)

12              MR. LEE:  I guess I want to make sure

13  this is a portion of his deposition transcript where he

14  gave the errata sheet -- they gave an errata sheet after

15  Your Honor rendered your claim interpretation.  Can we

16  just make sure he has both of them up there?

17              MS. MULLIN:  Sure.

18              MR. LEE:  Okay.

19              MS. MULLIN:  I'll make sure that he does.

20              MR. LEE:  Okay.

21              THE COURT:  Okay.

22              (Bench conference concluded.)

23              MS. ELDERKIN:  May I?

24              THE COURT:  Please do.

25              THE WITNESS:  Thank you.

1      Q.    (By Ms. Mullin) Dr. Marks, can I refer you,

2  please, to Dr. Kincaid's deposition transcript at Page

3  251, Line 13?

4      A.    Yes.

5      Q.    You considered Dr. Kincaid's deposition before

6  you gave your opinions in this case, didn't you?

7      A.    Yes, I did.

8      Q.    And Dr. Kincaid was the one who had the test

9  done in his laboratory under his direction, right?

10     A.    That's correct.

11     Q.    And what Dr. Kincaid said during his

12  deposition, when he was under oath, beginning at Line

13  13:  So if I understand correctly -- this was the

14  question:  If I understand correctly, you have not given

15  conclusions in any part of your report about whether any

16  two antibodies compete with each other for binding to

17  TNF-alpha; is that correct?

18     A.    Correct.

19     Q.    The answer that Dr. Kincaid gave was, Compete,

20  no, because it's not an appropriate assay, in my

21  opinion, for competition, right?

22     A.    That's correct.  That's what he said.

23     Q.    And if you can refer, then, to Page 253 of Dr.

24  Kincaid's deposition.

25     A.    Yes.

1    Q.   He was asked a question, beginning at Line 5

2  and going through Line 11 with the answer, he was asked

3  the question:  So sitting here today, you have not

4  formed an opinion as to whether any of these antibodies

5  compete with each other for binding to TNF-alpha; is

6  that right?

7            ANSWER:  I believe I indicated that I

8  don't believe this.  The collected data that I have

9  lends itself to evaluating competitive binding.

10    A.   Correct.  That's what it says.

11    Q.   Now, this was the testimony that Dr. Kincaid

12  gave when he was under oath on April 2nd, 2009, right?

13    A.   Correct.

14    Q.   And I -- I don't have it in front of me, but

15  you're going to have to help me, because what was just

16  handed to you at the request of your counsel was a sheet

17  that was provided after Dr. Kincaid's deposition, right?

18    A.   Correct.  That was his opportunity to correct

19  errors in the deposition, correct.

20    Q.   Right.  So what he said under oath on April

21  2nd, 2009, was what we just read, right?

22    A.   That's correct.

23    Q.   And then a few weeks later, he changed his

24  answers to those two questions, right?

25    A.   That's correct.

1    Q.   So instead of saying, Compete, no, because

2 it's not an appropriate assay, in my opinion, for

3 competition -- and that was in response to the question

4 as to whether he drew any conclusion that A2 antibodies

5 compete together --

6    A.   Correct.

7    Q.   -- he changed it to:  Compete for the same

8 epitope, no, because it's not an appropriate assay, in

9 my opinion, for competition for the same epitope, right?

10    A.   That's correct.

11    Q.   So he changed -- and he changed his other

12 answer similarly, right?

13    A.   That's correct.

14    Q.   So after the deposition, after he was no

15 longer under oath --

16              MR. LEE:  Well, I object, Your Honor.

17 The errata sheet --

18              THE COURT:  I sustain the objection.

19              A witness has an opportunity to change

20 any answers, and they're considered under the same oath

21 as -- legally, under the same oath as at the time the

22 deposition was given.

23              Let's move on.

24    Q.   (By Ms. Mullin) You know that Abbott is not

25 bringing Dr. Kincaid here to testify, right?

1      A.   I believe that's correct.

2      Q.   So the jury can't hear Dr. Kincaid's opinion

3  in person, right?

4      A.   That's correct.

5      Q.   Okay.  You've given a number of opinions here

6  today as a person of ordinary skill in the art, right?

7      A.   Yes, I have.

8      Q.   Okay.

9      A.   I've given a number of opinions here today as

10  an expert witness.  Excuse me.

11      Q.   Okay.  So that's a distinction, right?

12      A.   Yes, it is.

13      Q.   Let's go through that a little bit.

14           You have provided a definition of a person of

15  ordinary skill in the art, right?

16      A.   Correct.

17      Q.   This is the definition that you provided,

18  right?

19      A.   Correct.

20      Q.   Okay.  And that would be someone who was

21  qualified to evaluate, consider, and give opinions about

22  matters within the '775 patent, right?

23      A.   That person is not an expert; that's a person

24  of ordinary skill in the art.  That's what this -- the

25  standard that would be -- one would be held to for

1  enablement.

2      Q.    Okay.

3      A.    I didn't understand the question, I guess.

4      Q.    That's okay.

5            A patent specification in the claims are

6  written for somebody that we call a person of ordinary

7  skill in the art, right?

8      A.    Correct.

9      Q.    So it's a fictional -- it's a fictional

10  person, but it's somebody who comes there with all -- I

11  know you're a real person, but it's somebody who -- the

12  idea is that they come forward with all the information,

13  like the things we've been talking about today, right?

14     A.    That's correct.

15     Q.    And you have defined a person of ordinary

16  skill in the art to have a Ph.D. degree or equivalent

17  experience, right?

18     A.    Correct.

19     Q.    In molecular biology or a related discipline,

20  right?

21     A.    Correct.

22     Q.    Including a few years of experience in the

23  field of antibody technology, right?

24     A.    Correct.

25     Q.    So the experience part that's required to be a

1 person of ordinary skill in the art is experience in the

2 field of antibody technology, right?

3     A.   Correct.

4     Q.   So now I'm going to borrow some of Mr. Lee's

5 questions.

6         You have not identified the person of ordinary

7 skill in the art in your definition as someone who has

8 isolated an anti-TNF-alpha antibody, right?

9     A.   That's correct.

10     Q.   You have not identified the person of ordinary

11 skill in the art to be required to have isolated a mouse

12 antibody, a chimeric antibody, or a fully human

13 antibody, right?

14     A.   That's correct.

15     Q.   It's kind of like the quarterback.  They may

16 never actually play in the position of wide receiver,

17 but they still know exactly the route that the wide

18 receiver is going to run on every play, right?

19     A.   And they never run it as well as the guy who's

20 supposed to be in there.

21     Q.   Okay.  Well, let's go back, though, because

22 you've made a distinction between an expert and a person

23 of ordinary skill in the art.

24         You understand that the opinion on enablement

25 has to come from someone of ordinary skill in the art,

1  right?

2      A.    I understand that the requirement is that a

3  person of ordinary skill in the art would be able to

4  read the patent and know that they have invent -- or

5  know how to make the invention, correct.

6      Q.    So that's the person who judges whether or not

7  there's enablement, the person of ordinary skill in the

8  art, right?

9      A.    No.   I think that's the person that -- for

10  whom the patent needs to be enabled, the person that

11  needs to make a -- to know that they have it, to know

12  that it works.

13      Q.    So in February of 1994, you did not consider

14  yourself to be a person of ordinary skill in the art,

15  right?

16      A.    February of 1994.   I was just thinking.

17            So by that definition, I would not meet the --

18  sorry.

19            By that definition, I would be a person of

20  ordinary skill in the art, by that definition.

21      Q.    Okay.   Would you like to refer to your

22  deposition at Page 25, Line 12?

23      A.    Sorry.   Which deposition?

24      Q.    Your April deposition, just a few months ago.

25      A.    So then where to go in that?

1      Q.    Sure.  Page 12.  I'm sorry.  That's the wrong

2 page.  Page 25.

3      A.    Yes.

4      Q.    What you told me during your deposition, that

5 by the time you got your Ph.D. in 1992, you stopped

6 being a person of ordinary skill in the art, right?

7      A.    That's what I said.

8      Q.    That's what you said during your deposition,

9 right?

10     A.    That's correct.

11     Q.    Okay.  By the time you got your Ph.D., you

12 considered yourself to be a world renowned expert?

13     A.    In some aspects of the technologies, yes.

14     Q.    And that opinion continues through today,

15 right?

16     A.    That's correct.

17     Q.    So we can't separate what opinions you gave

18 today as a person of ordinary skill in the art as

19 opposed to a person of extraordinary skill in the art;

20 is that right?

21     A.    Yes, we can.

22     Q.    I'm sorry.  Could you refer to your deposition

23 at Page 300?

24     A.    Yes.

25     Q.    Beginning at Line 13.

1     A.    Yes.

2     Q.    At your deposition, I asked you the following

3  question:  Dr. Marks, to follow up, when you were giving

4  your declarations or your expert reports in this

5  matter -- and that's the subject matter that we've been

6  describing today, right?

7     A.    That's correct.

8     Q.    -- were you preparing then both as a person of

9  ordinary skill in the art and also a person of

10 extraordinary skill in the art?

11              ANSWER:  I don't see how the two would be

12 separable since both are contained within me.

13              QUESTION:  So how will we separate out

14 which of these opinions will be held by a person of

15 ordinary skill in the art as opposed to a person of

16 extraordinary skill in the art?

17              ANSWER:  You'd have to ask someone who is

18 an ordinary -- person of ordinary skill in the art.

19    A.    That's what I said.

20    Q.    And just to be clear, I think you mentioned

21 during your direct testimony, you have received at least

22 $2.7 million based on sales of Humira, right?

23    A.    That's correct.

24    Q.    And you're going to continue to receive

25 $20,000 or so a year for the next few years?

1          A.    That's correct.

2          Q.    As long as Humira continues to be sold, right?

3          A.    Correct.

4          Q.    And that is actually in addition to what

5    you're being paid to be an expert in this litigation,

6    right?

7          A.    Yes, it is.

8          Q.    Okay.

9                MS. MULLIN:  Pass the witness, Your

10   Honor.

11               THE COURT:  Mr. Lee?

12               MR. LEE:  Thank you, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MR. LEE:

15         Q.    Good afternoon, Dr. Marks.

16         A.    Good afternoon.

17         Q.    Let's start from the end and work back.

18   There was some discussion between Ms. Mullin and you

19   about persons of ordinary skill in the art and expert

20   witnesses.

21               Do you remember that?

22         A.    Yes, I do.

23         Q.    And you said that for the purposes of this

24   trial, you are an expert witness.

25         A.    That is correct.  I am appearing as an expert

1  witness.

2      Q.    And are you testifying as to what would have

3  been known or disclosed to one of ordinary skill in the

4  art?

5      A.    Yes, I am.

6      Q.    So as an expert witness who's giving an

7  opinion as to what one of ordinary skill in the art

8  would know or not know?

9      A.    That's correct.

10      Q.    Okay.  And is that the function that you're

11  performing?

12      A.    Yes, it is.

13      Q.    Now, there was some question about the testing

14  by Dr. Kincaid.  Is the Veritas Laboratory a reputable

15  laboratory?

16      A.    Yes, it is.

17      Q.    Did you review the protocol?

18      A.    Yes, I did.

19      Q.    Did you review the results?

20      A.    Yes, I did.

21      Q.    Now, you were asked a question about the

22  sample being one from September 1994.  Do you remember

23  that?

24      A.    Yes, I do.

25      Q.    And we're focused on the 1994 period here,

1  correct?

2      A.   That's correct.

3      Q.   With an old sample, what's the most likely

4  effect?  Are you going to see more inhibition or less?

5      A.   You would see less inhibition.

6      Q.   And with this old sample, what did you see?

7      A.   We saw complete inhibition.

8      Q.   Satisfying --

9      A.   Complete competition.

10      Q.   Now --

11      A.   We saw that it competes with A2 -- completely

12  competes or almost completely competes with A2 for

13  binding with TNF.

14      Q.   Now, there was some question and answer about

15  Dr. Kincaid's testimony, and His Honor mentioned that

16  witnesses have opportunities to read their depositions

17  after they're taken.

18          You remember that?

19      A.   Correct, I do.

20      Q.   And just so we all understand, what happens

21  is, you sat in a room with Ms. Mullin for a couple of

22  days, correct?

23      A.   I only sat -- well, I sat there for a whole

24  day twice.

25      Q.   Right.  And a reporter was taking down

1  everything that everybody said just as the court

2  reporter is today, correct?

3       A.   That's correct.

4       Q.   And the rules that govern the proceedings in

5  this Court say, after all that occurs, a transcript is

6  given to the witness, correct?

7       A.   That's correct.

8       Q.   The witness can read it.

9       A.   That's correct.

10      Q.   And the witness can make corrections.

11      A.   That's correct.

12      Q.   And you did that, correct?

13      A.   Yes, I did.

14      Q.   And Centocor's witnesses did that, correct?

15      A.   I assume they did.

16      Q.   All right.  Now, let's go to the Adair

17  publication.

18           Now, to break the issues down, there was

19  enablement, written description, and Adair, correct?

20      A.   Correct.

21      Q.   And Adair was the basis for which opinion of

22  yours?

23      A.   Anticipation.

24      Q.   Now, Ms. Mullin asked you about some

25  differences, IgG4 versus IgG1.

1      A.   Correct.

2      Q.   Did Dr. Adams, in his expert report, identify

3  any of those as differences between Adair and the

4  claims?

5      A.   No, he did not.

6      Q.   Now, what Ms. Mullin did is, she read you a

7  portion of the Adair patent application about IgG4.

8           Do you remember that?

9      A.   I do.

10           MR. LEE:  Could I have Defendant's

11  Exhibit 3661, please, on the screen, Page 27.

12      Q.   (By Mr. Lee) I'm not sure if it's in your

13  notebook or not, but I'm going to put it on the screen.

14      A.   It is.

15      Q.   Would you turn to Page 27?

16      A.   I have.

17           MR. LEE:  Now, could we have the last

18  sentence of the first full paragraph blown up?

19      Q.   (By Mr. Lee) Do you see the sentence that

20  begins, It will be appreciated?

21      A.   Yes, I do.

22      Q.   Would you read that to the jury and then

23  explain to the jury what that says about IgG1, which is

24  explicitly referred to in the claim.

25      A.   So this sentence says, It will be appreciated,

however, that human constant region domains of other

types and isotypes, for example, IgG1, IgG2, and IgG3,

could also have been used without significantly altering

the procedures described.

Q.  Now, this specifically mentions IgG1, correct?

A.  Yes, it does.

Q.  And did you consider that in forming your

opinion of anticipation?

A.  Yes, I did.

Q.  Ms. Mullin asked you whether -- well, said,

well, the Patent Office had Adair, and it allowed the

patent to issue, correct?

A.  That's correct.

Q.  And you know from your own experience that the

patent prosecution procedure is a private one between

the applicant and the Patent Office, correct?

A.  That's correct.

Q.  Did -- when the Patent Office considered

Adair, were there any tests of any kind on competitive

inhibitions between Adair and A2?

A.  No.

Q.  So that the information that would be needed

to determine whether Adair anticipated or not was not

before the Patent Office.

A.  That's correct.

1      Q.   Did you have that information that the Patent

2  Office didn't have?

3      A.   Yes, I did.

4      Q.   All right.  Now, let me go to --

5           MR. LEE:  Do I hit the bottom button to

6  use the ELMO?

7           COURTROOM DEPUTY:  Cam doc.

8           MR. LEE:  Got it.  Thank you.

9      Q.   (By Mr. Lee) Let me put on the screen -- try

10  to put on the screen the chart that Ms. Mullin did.  And

11  I think the suggestion was that there was all of this

12  information out there, correct?

13      A.   Correct.

14      Q.   And one of ordinary skill in the art could

15  have just put it all together.

16      A.   Correct.

17      Q.   And that Dr. Salfeld should have put it all

18  together.

19      A.   Correct.

20      Q.   Well, let's -- let's go through this.

21           Are the words guided selection mentioned

22  anywhere in the patent?

23      A.   No, they're not.

24      Q.   Are the words chain shuffling mentioned

25  anywhere in the patent?

1        A.    No, they're not.

2        Q.    Are the words affinity maturation mentioned

3   anywhere in the patent?

4        A.    No, they're not.

5        Q.    Are the words off-rate selection mentioned

6   anywhere in the patent?

7        A.    No, they are not.

8        Q.    And if you look at the references she cited,

9   DX4 -- 376, 324, 324 (sic), and 425, did the patent

10  mention any of those references?

11       A.    No, it did not.

12       Q.    There was one reference the patent did

13  mention, and that's DX446?

14       A.    That's correct.

15       Q.    Whose publication is that?

16       A.    Mine.

17       Q.    And it's based upon work you were doing,

18  correct?

19       A.    That's correct.

20       Q.    So tell the Ladies and Gentlemen of the jury,

21  when you were working in the field, when Dr. Salfeld was

22  working in the field in 1991, 1992, and 1993, was this

23  as simple as just taking four or five concepts that had

24  been written about and putting them in the right order?

25       A.    No, it was not.

1    Q.    What was it instead?

2    A.    It was to -- as you heard from Dr. Salfeld, in

3  order to deploy these technologies -- use these

4  technologies, based on the available publications in the

5  field, it really would take experts working a long

6  period of time doing much, much hard work, what would be

7  defined as undue experimentation.

8    Q.    And for the people who were successful in the

9  field of making fully human antibodies within the scope

10  of the claims, did it require hard work, plus

11  innovation?

12    A.    Yes, it did, significant amounts of

13  innovation.

14    Q.    And how do you know that?

15    A.    I know that from reading the work that they

16  have done, and I know that because I was actively

17  involved in the field, discovering the technology.

18    Q.    Now, Ms. Mullin asked you some questions at

19  the end attributed to a variation of mine, and it was

20  assume the person of ordinary skill in the art, correct?

21    A.    Correct.

22    Q.    Would they have made a murine antibody?  Do

23  you remember that?

24    A.    Yes.

25    Q.    Would they have made a fully human antibody?

1  A. Yes.

2  Q. The question is not whether they had this

3 person of ordinary skill in the art; was there enough in

4 the patent to teach them how to do it, correct?

5  A. Correct.

6  Q. And in your view, if you take all of these 53

7 references, all of this information that's on the screen

8 right now, would this person of ordinary skill in the

9 art have been able to make a fully human antibody,

10 falling within the scope of the claims, based upon the

11 disclosure of the specification and whatever else they

12 had?

13  A. No, absolutely not.

14  Q. And why not?

15  A. Because it would have required undue

16 experimentation.  As -- I mean, I hate to repeat myself,

17 but these were very early stage technologies with a lot

18 of innovation required on an ongoing basis, and there

19 just wasn't enough disclosed in these early

20 publications.

21   There were other things that needed to be

22 invented.  We needed to learn how to increase the

23 library size.  We needed to do -- we needed to learn how

24 to do a much better job of affinity maturation.

25   We needed to learn -- as Dr. Salfeld

1  described, when you do affinity maturation, how to find

2  the very rare needles in that haystack.  You still have

3  to find the antibodies.

4          So there was just a lot of additional

5  innovation that was required.

6      Q.   Now, you were referred to your 1992

7  publication concerning affinity maturation?

8      A.   Correct.

9      Q.   And I think the question to you was, well, why

10 couldn't you just take that and use it with Dr. Casali's

11 B-cells, correct?

12     A.   Correct.

13     Q.   Would you explain to the jury why you can't

14 take a work in phage display and just turn it over into

15 Dr. Casali's pioneering work on B-cells?

16     A.   So the biggest problem would have been, there

17 were no neutralizing antibodies there so that even if

18 you could have affinity matured them, it wouldn't have

19 mattered.  You could have made the affinity as high as

20 you wanted to make it, and it wouldn't matter if it

21 doesn't bind to the right place.

22         Human -- humans and human B-cells would not

23 want to make antibodies that would neutralize their

24 whole -- their TNF in their bodies.  And the reason is,

25 we need TNF to wake up our immune system.

1          So, generally speaking, those antibodies do

2    not exist in our bodies.  So they probably weren't

3    there.

4          Even if they were there, we did not know at

5    the time how to take antibodies of such low affinity and

6    increase their affinity hundreds of times to get to

7    antibodies that would meet the scope of the claims.

8        Q.   All right.  And just to put us all in context,

9    when you were doing this work was back in the early '90s

10   when there wasn't even e-mail, voice mail, faxes, right?

11       A.   We might have had some rudimentary type of

12   e-mail.  I -- I can't recall what electronic -- I can

13   tell you it was really hard to write a paper at that

14   time because of the computing power available.

15       Q.   Now, we're talking about this issue of --

16   these issues of enablement and written description, and

17   Ms. Mullin asked you, well, you understand that it's not

18   required that the inventors disclose every possible

19   variation in a commercial product.

20          Do you remember that?

21       A.   I remember that.

22       Q.   In your understanding, that's not required

23   correct?

24       A.   That's correct.

25       Q.   Would it have been helpful to you if the

1 inventors had disclosed a single example of making a

2 fully human antibody within the scope of the claims?

3      A.    It would have been very important.

4      Q.    Now, as you discussed enablement and written

5 description, there was a mention of something called a

6 CHO cell?

7      A.    Correct.

8      Q.    A Chinese hamster ovary cell?

9      A.    That's correct.

10      Q.    Would you explain to the jury just what that

11 is and how it's used in the process of producing a fully

12 human antibody?

13      A.    So you can think of Chinese hamster ovary

14 cells as factories.  They have turned out to be very

15 good cells to make antibodies in.  And so one can make

16 mouse antibodies in hamster cells, chimeric, humanized,

17 or human.

18           So in the case of Humira, it is made in

19 Chinese hamster ovary cells, because that's the standard

20 manufacturing platform that the industry uses.

21           However, for safety reasons, the FDA requires

22 that many purification steps be employed to ensure that

23 there are no hamster proteins or hamster DNA or even

24 other types of DNA in the drug product, and then they

25 require the companies to show them, by very extensive

1  testing, that there are no hamster parts in the product.

2            MR. LEE:  Can I have Claims 1 and 2 of

3  the '775 patent on the screen?

4      Q.  (By Mr. Lee) Now, again, I'm focusing --

5            MR. LEE:  That's great.  Thank you.

6      Q.  (By Mr. Lee) Again, I'm focusing on the

7  written description and enablement issues.

8      Do you have those in mind?

9      A.  Yes, I do.

10      Q.  And this is part of the bargain with the

11  Patent Office.  If you want a patent, you have to give

12  enough information to provide a written description and

13  enable, correct?

14      A.  Correct.

15      Q.  Now, looking at Claims 1 and 2, Ms. Mullin

16  asked you whether different parts of it were satisfied

17  by a chimeric antibody.

18      Do you remember that?

19      A.  Yes, I do.

20      Q.  And then said -- and there's a few places

21  where it mentions human, and you think that they're not

22  enabled or described as required, correct?

23      A.  Correct.

24      Q.  If you look at Claim 2 --

25      A.  Yes.

1      Q.    -- which includes all of Claim 1, does it

2    require a humanized antibody?

3      A.    Yes, it does.

4      Q.    And is it a human or humanized antibody that

5    has all the elements of 1 and 2?

6      A.    Yes.

7      Q.    You can't take some elements from a chimeric

8    and some elements from a human, can you?

9      A.    No, you can't.

10     Q.    All right.  So you want to find out if the

11   chimeric is enabled, you look at Claims 1 and 2 and

12   figure out if that chimeric has all of it, correct?

13     A.    Correct.

14     Q.    But for fully human, what do you do?

15     A.    You do the same thing.  You would look at all

16   of the elements of the claim and see that that antibody

17   met all of the elements of the claim.

18     Q.    Do you have your expert report that Ms. Mullin

19   read -- asked you to read from?  And this would be your

20   initial report.

21     A.    What's the exhibit number?

22     Q.    I'm not sure.

23            MS. MULLIN:  It's PX317.

24            MR. LEE:  PX317.  Thank you.

25     A.    Got it.

1      Q.   (By Mr. Lee) Now, Ms. Mullin asked you to turn

2  to Page -- Paragraph 262, and she read you a portion.

3           Tell me when you're there.

4      A.   I'm there.

5      Q.   And she read you a portion of Paragraph 262?

6      A.   Yes.

7      Q.   This concerns the written description

8  requirement?

9      A.   I believe that's correct.

10      Q.   Would you go down to Paragraph -- to Paragraph

11  264, just a few lines down from where she read and read

12  to the jury what your conclusion was on written

13  description.

14                MS. MULLIN:  Objection, Your Honor.

15                MR. LEE:  I'm just trying to put in

16  context the portion that she read.

17                THE COURT:  Well, it's your objection.

18  If he wants to explain his answer, he can explain his

19  answer.  He can't read her -- that's for

20  cross-examination, counsel.

21                MR. LEE:  Fair enough.

22      Q.   (By Mr. Lee) Would you explain to the jury the

23  context of the most susceptible language that Ms. Mullin

24  read to you?

25      A.   So what I meant was that the language that

1  most -- that could most support claims to human

2  antibodies were in the most recent patent, the February

3  1994 patent.  That's what I meant.

4      Q.    And with all that language considered, what

5  conclusion did you reach?

6      A.    That there's not an adequate written

7  description.

8      Q.    Now, Ms. Mullin asked you about the fact that

9  the PTO, the Patent Office, looked at the '94

10  application and later applications and allowed the '775

11  patent.

12         Do you remember that?

13      A.    That's correct.  I remember that.

14      Q.    And you've reviewed the file history?

15      A.    Yes, I have.

16      Q.    Now, in the file history, was the Patent

17  Office told about Centocor's test on the fully human

18  antibody 7.T.1?

19      A.    I don't recall actually.

20      Q.    Were they told about the Casali test?

21      A.    I believe -- one of the earlier applications,

22  I believe so.

23      Q.    Were they told about Dr. Le's testimony

24  concerning what work he had done?

25      A.    His testimony?

1      Q.    Yes.

2      A.    No.  No.

3      Q.    Were they told about the work that you had

4   done in 1991 where you had been tried -- you tried

5   and had been unsuccessful?

6      A.    No.

7      Q.    Were they told about Dr. Salfeld's work?

8      A.    No.

9      Q.    Were they told about Dr. Ghrayeb's testimony

10  that Centocor had no solutions for the problems

11  identified in the application for fully human

12  antibodies?

13     A.    No, they were not.

14     Q.    None of that was before the Patent Office when

15  it made its decision, correct?

16     A.    Correct.

17              MR. LEE:  Nothing further, Your Honor.

18              THE COURT:  Ms. Mullin, anything further?

19              MS. MULLIN:  Nothing further.  Thank you,

20  Your Honor.

21              THE COURT:  All right.  You may step

22  down.

23              THE WITNESS:  Thank you, Your Honor.

24              THE COURT:  All right.  Who will be your

25  next witness?

1           MR. LEE:  Your Honor, we're going to play

2  now two video clips, one of Dr. Le and one of

3  Dr. Vilcek.  The first is about 15 minutes long, so

4  maybe we could do the first and then take the recess.

5           THE COURT:  Do the first, and then we'll

6  take a break.

7           MR. LEE:  All right.

8           THE COURT:  How is that going to be

9  charged?  You going to help me out there?

10           MR. LEE:  Yeah.  13 minutes and 17

11  seconds to us; 2 minutes and 16 seconds to Centocor.

12           THE COURT:  All right.  Thank you.

13           MR. LEE:  And actually -- well, let me

14  get a little light here.  The first one is actually

15  Dr. Knight.  I misspoke.  It's Dr. Knight and Dr.

16  Vilcek.  We saw Dr. Le already.

17           THE COURT:  Okay.

18           MR. LEE:  And the total is about 13

19  minutes.  You can charge it all to us.

20           THE COURT:  Oh, easy to get along with.

21  Must not mean anything to -- okay.

22           Do you need to read an introduction or

23  not?

24           MR. LEE:  It's two minutes less, so we'll

25  get to the break two minutes quicker.

```
 1                  THE COURT:  Okay.  Did you have any kind
 2  of introduction?
 3                  MR. LEE:  Yes.
 4                  Ladies and Gentlemen of the Jury, now you
 5  will hear the testimony of Dr. David Knight,
 6  K-N-I-G-H-T.  Dr. Knight is a scientist at Centocor and
 7  is one of the inventors of the '775 patent.
 8                  Dr. Knight testified at his deposition as
 9  a corporate representative on behalf of Centocor on
10  certain topics relating to work regarding the '775
11  patent.
12                  (Video playing.)
13                  QUESTION:  At any point before that
14  project that you've just described, did you personally
15  have any involvement in attempting to make a fully human
16  antibody?
17                  ANSWER:  I did not.
18                  QUESTION:  To your knowledge, did anyone
19  else at Centocor?
20                  ANSWER:  I'm not absolutely certain about
21  that.
22                  QUESTION:  Well, in the human antibody
23  program, was Centocor seeking to make a fully human
24  antibody?
25                  ANSWER:  We did not characterize the
```

1  antibodies we were trying to make as fully human

2  antibodies.

3               QUESTION:  Why not?

4               ANSWER:  We didn't use that term.  I'm

5  not even sure, to my recollection, that fully human was

6  a commonly used term back then.

7               QUESTION:  Have you ever used that term?

8               ANSWER:  Have I ever used that term?

9  Probably.

10               QUESTION:  What does it mean to you?

11               ANSWER:  To me personally, it means an

12  antibody with -- whose amino acid sequence is very

13  highly homologous or identical to a -- an authentic

14  human antibody as compared to databases of authentic

15  human antibodies.

16               QUESTION:  Is -- okay.  Let's start with

17  you.

18               At any time before 1998, were you

19  involved in making any fully human TNF-alpha antibody?

20               ANSWER:  No.

21               QUESTION:  And to the best of your

22  knowledge, were any of the other named inventors

23  involved in making any fully human anti-TNF-alpha

24  antibody before 1998?

25               ANSWER:  Well, there was discussion about

1  doing so.  If the question is, was it physically

2  constructed, my answer for myself is no.  I have no

3  knowledge of whether they were doing that or not.

4              QUESTION:  Let's talk about the

5  discussion you mentioned.  What discussion about that

6  subject occurred?

7              ANSWER:  Well, as part of what I

8  previously referred to as the human antibody program,

9  there was often discussion about what targets ought to

10 be considered for that program.

11             QUESTION:  And what specifically was

12 discussed about making a fully human anti-TNF-alpha

13 antibody?

14             ANSWER:  I wasn't involved in those

15 discussions to know the details of it.

16             QUESTION:  Were any of these --

17             ANSWER:  I know that it was -- it was on

18 a -- you know, on the radar screen, as were many other

19 targets.

20             QUESTION:  Were any of these named

21 inventors, to the best of your knowledge, involved in

22 any of those discussions?

23             ANSWER:  I can't say for sure.

24             QUESTION:  So you can't give me any

25 examples of such discussions sitting here today; is that

1  right?

2                  ANSWER:  I can't give you specific

3  examples of discussions, no.

4                  QUESTION:  So looking at this list of

5  inventors, to the best of your knowledge, did any of

6  these people, including yourself, come up with the idea

7  of making a fully human anti-TNF-alpha antibody?

8                  ANSWER:  Well, I guess I would say that

9  that was always considered to be a possibility for the

10 program, for an anti-TNF antibody program.

11                 QUESTION:  Now, I want to focus just on

12 this list of named inventors.

13                 Of those named inventors, who, if anyone,

14 came up with the idea of making a fully human

15 anti-TNF-alpha antibody?

16                 ANSWER:  I can't tell you who

17 specifically came up with the idea.

18                 QUESTION:  It wasn't you; is that right?

19                 ANSWER:  I recognized that that is a

20 potential route to an anti-TNF antibody.  I believe that

21 I had had discussions with various people, again,

22 probably 18 years ago, about what -- what a good route

23 would be.

24                 So the concept of us making a human

25 anti-TNF antibody was brought forth.  I don't remember

1  who brought it up.

2              QUESTION:  You made a chimeric

3  anti-TNF-alpha antibody, correct?

4              ANSWER:  Yes.  I directed that, yes.

5              QUESTION:  So it had a murine variable

6  region, right?

7              ANSWER:  It did.

8              QUESTION:  And a human constant region,

9  right?

10             ANSWER:  It does.

11             QUESTION:  At what point, if ever, did

12 you make an anti-TNF-alpha antibody that contained both

13 a human variable region and a human constant region?

14             ANSWER:  Well, you're -- you're assuming

15 that I did, and you asked me this question previously.

16             QUESTION:  And the answer is that you

17 never did that; is that right?

18             ANSWER:  No, that's not the answer.

19             QUESTION:  What is the answer?

20             ANSWER:  The answer is, I directed some

21 work along those lines later in the 1990s.

22             QUESTION:  After 1998, correct?

23             ANSWER:  In 1998 or after.

24             QUESTION:  I want to focus just on the

25 work reflected in this patent, the '775.

1                      At what point, if ever, before these

2  claims were filed in the context of this project, did

3  you make an anti-TNF-alpha antibody that had a human

4  constant region and a human variable region?

5                      ANSWER:  Again, the timeframe being 1991?

6                      QUESTION:  Any of the work that is

7  reflected in the '775 or '239 patent.

8                      ANSWER:  So I did not -- I did not make a

9  human anti-TNF antibody in that timeframe.

10                     QUESTION:  And you're not aware of anyone

11 else who did in the context of the work reflected in the

12 '775 and '239 patents, correct?

13                     ANSWER:  That anyone that's an inventor

14 there or anyone -- I mean, anyone in the world?

15                     QUESTION:  Anyone involved in this

16 project in any way.

17                     ANSWER:  Not to my knowledge.

18                     QUESTION:  How long did it take to make

19 the humanized anti-TNF-alpha antibody?

20                     ANSWER:  I don't recall specifically how

21 long.  I think I mentioned before that it took several

22 months.  That's my recollection.

23                     QUESTION:  Were you able to use known

24 techniques in order to make the fully -- to make the

25 humanized anti-TNF-alpha antibody?

1          ANSWER:  Yeah.  I mean, we used

2   techniques that were readily available.

3          QUESTION:  What is your understanding of

4   the word inventive?

5          ANSWER:  Well, in general, it would be

6   having an idea that hadn't, to your knowledge, been done

7   before and had a useful purpose.

8          QUESTION:  And in your view, was there

9   anything inventive about the humanized anti-TNF-alpha

10  antibody that Ms. Trinh made?

11         ANSWER:  Well, in my view, it was not

12  obvious that that would work.  And, again, this is -- we

13  did this as a technology demonstration to see whether it

14  would work, and so I think it was inventive to try that

15  and demonstrate that one could do that with an anti-TNF

16  antibody.

17         QUESTION:  As of the date of that

18  project, had you made any fully human anti-TNF-alpha

19  antibodies?

20         ANSWER:  Well, to the extent of my

21  recollection about the timing of the antibody we're

22  discussing, then the answer would be no.

23         QUESTION:  So would you agree that as of

24  that time, something inventive would have been required

25  to make a fully human anti-TNF-alpha antibody?

1        ANSWER:  I don't know.  I'm trying to

2  recall my thoughts at the time.  So I would -- I guess I

3  would say it would be not inventing new techniques but

4  applying techniques to generate something that was

5  inventive.

6        QUESTION:  So do you think inventive

7  steps would be required in actually doing that?

8        ANSWER:  I think so.

9        QUESTION:  Now, when you undertook this

10  project to create a TNF-alpha antibody, did you consider

11  using the transgenic mouse technology, the human

12  antibody transgenic mice?

13        ANSWER:  When we were considering how to

14  do it was, I believe, before the technology was

15  available to us.

16        QUESTION:  When you were -- when you

17  undertook the project to create the high affinity

18  TNF-alpha antibody in the late '80s or early '90s, did

19  you consider using phage display to do that?

20        ANSWER:  Yes, that was an option that was

21  considered.

22        QUESTION:  And why did you not pursue

23  that option?

24        ANSWER:  Well, one reason I can think of

25  is that we, at that time, did not have the people with

1  expertise in that particular technology at Centocor.

2  There were external companies that specialized in phage

3  display of antibodies and discovering antibodies.  We --

4  the option was considered to make an agreement with an

5  external phage company, and we decided not to go that

6  route.

7              QUESTION:  Why not?

8              ANSWER:  Well, partly because we didn't

9  have the expertise; partly because it would be expensive

10  to do it with an external partner and pay not only to do

11  it but, presumably, royalties on any product to that --

12  whatever the company would be.

13              And we felt that making a chimeric

14  antibody could be done in-house relatively quickly and

15  give us the kind of quality that we wanted in a

16  therapeutic.

17              QUESTION:  So given that you ended up

18  paying royalties to NYU for their role in the ultimate

19  creation of cA2, why did you choose that over the phage

20  display approach?

21              ANSWER:  I think we've been over this.  I

22  think it was a more rapid and predictable method.  We

23  didn't know what the final cost was going to be for any

24  of these technologies until you actually go ahead and do

25  it or make an agreement.

1          So we felt that -- that our approach was

2   the best one, given our timing requirements and

3   resources.

4          QUESTION:  And at the time, you couldn't

5   reasonably expect that making a high affinity

6   anti-TNF-alpha antibody with phage display would be

7   successful, correct?

8          ANSWER:  Well, you said that.  I don't

9   think I said that.

10          QUESTION:  Is that true, or is that not

11  true?

12          ANSWER:  At that -- at that time, I would

13  say that the phage display technology was not as fully

14  developed as hybridoma technology.

15          I -- and we, at Centocor, did not have

16  internal experience with phage display, and so we

17  couldn't say for sure how reproducible it was.  It was

18  more of an unknown to us, because we hadn't -- we didn't

19  have the internal capabilities.

20          QUESTION:  Had you reduced to practice

21  the alleged invention of fully human anti-TNF-alpha

22  antibodies at any point in time prior to 1998?

23          ANSWER:  No.  I think -- I think I've

24  answered that question previously.

25          QUESTION:  And did you do anything to

```
 1   attempt to do that between 1991 and 1998?

 2              ANSWER:  We had -- we had no effort to

 3   make -- make them -- make those antibodies during that

 4   timeframe.

 5              (End of video clip.)

 6              THE COURT:  Is that it?

 7              MR. LEE:  That concludes it, Your Honor.

 8              THE COURT:  Okay.  Can I have the lights,

 9   please.

10              All right, Ladies and Gentlemen.  We'll

11   take an afternoon break.  Be ready to come back in the

12   courtroom at 3:30, 3:30.

13              Do not discuss the case.  Have a nice

14   break.  I'll see you at 3:30.

15              COURT SECURITY OFFICER:  All rise.

16              (Jury out.)

17              THE COURT:  All right.  Court's in recess

18   until 3:30.  I'd like to see counsel at the bench.

19   Court's in recess.

20              (Bench conference.)

21              THE COURT:  All right.  What's y'all's

22   best guess timing-wise?  I want to try to tell the jury

23   something this afternoon, I believe, if we're going to

24   get through early tomorrow.  The way we're going, you

25   know, I want to know if I need to stay here till 5:30
```

1    today.

2                    MR. LEE:  We have one additional clip to

3    show.  It's about 15 minutes, and then we're going to

4    put Mr. Slottje on, about 45, 50 minutes on direct, he's

5    the damage guy, and then we'll rest.

6                    THE COURT:  After his cross-examination.

7                    MR. LEE:  After his cross-examination.

8                    THE COURT:  Well, we might be able to

9    finish that, and then we'll start rebuttal maybe.

10                   How long -- how much time are you going

11   to need for rebuttal?

12                   MS. ELDERKIN:  We have one videotape.

13   It's about 10 minutes.  And we'll have at least

14   Dr. Adams for maybe half an hour, maximum.  And we

15   haven't decided if there's going to be -- we're going to

16   talk about it at the break.

17                   THE COURT:  Well, let me tell you, you've

18   got three and a half hours.

19                   MS. ELDERKIN:  Right.  We certainly won't

20   use three and a half hours, Your Honor.  I would expect

21   we would be through in the morning.

22                   THE COURT:  You think you'll probably be

23   resting late this afternoon?

24                   MR. LEE:  Yeah, I think so, Your Honor.

25                   THE COURT:  All right.

1              MS. ELDERKIN:  I'm not sure I --

2              THE COURT:  Well, I'm going to tell them

3  that maybe we'll -- I'll tell them -- it's always better

4  if I tell them something, that maybe I'll let them go by

5  2:30 tomorrow, and then if we get through at noon

6  tomorrow, well, they'll be happy with all of us.

7              I'm not running for reelection.  I

8  wouldn't get far.  So, anyway, I like to at least not

9  put y'all in a bad light, is what I'm trying not to do.

10  Because if I tell them noon and then we keep them till

11  3:00, they're going to be mad at y'all, not me.

12              MR. LEE:  Right.  Right.

13              MS. ELDERKIN:  No way we'll go past that.

14              THE COURT:  So I'll tell them 2:30

15  tomorrow, 3:00, something like that.

16              Okay.  All right.

17              MS. MULLIN:  Thank you, Your Honor.

18              (Bench conference concluded.)

19              (Recess.)

20              COURT SECURITY OFFICER:  All rise.

21              (Jury in.)

22              THE COURT:  Please be seated.

23              All right.  Deposition.

24              MR. LEE:  Last deposition, Your Honor.

25              It's Dr. Vilcek, and you can charge the

1  time to us.

2                    THE COURT:  Okay.  What's the total?

3                    MR. LEE:  Total of 11 minutes and 40

4  seconds.

5                    THE COURT:  Okay.

6                    MR. LEE:  Ladies and Gentlemen, the next

7  video clip will be the testimony of Dr. Jan Vilcek,

8  V-I-L -- I'm sorry -- V-I-L-C-E-K.  Dr. Vilcek is a

9  scientist at New York University and is one of the

10  inventors on the '775 patent.

11                    Dr. Vilcek testified at his deposition as

12  a corporate representative for New York University on

13  certain topics relating to the '775 patent.

14                    (Video playing.)

15                    QUESTION:  Does the 1991 -- the March of

16  1991 application tell us how to make a human

17  anti-TNF-alpha antibody?

18                    ANSWER:  I don't recall that it would

19  specifically do that.  No.

20                    QUESTION:  You have the March of 1991

21  application before you.  That's DX7.  Can you turn,

22  please, to Page 9 of the application?  It's marked Page

23  9 on the bottom center.

24                    I want to direct your attention to

25  Line 5.  The first sentence in that paragraph reads:

1  The development of human mABs that could circumvent the

2  above problems has encountered a number of obstacles.

3                   Do you see that?

4                   ANSWER:  Yes.

5                   QUESTION:  And did you review that

6  statement before this application was filed?

7                   ANSWER:  I don't remember.  No.

8                   QUESTION:  Was that a true statement as

9  of March 18th of 1991?

10                  ANSWER:  I think so.  Yes.

11                  QUESTION:  Now, the next sentence says:

12  Because human spleen cell donors are rare, human

13  mAB-producing cell lines are typically obtained from

14  human peripheral B-cells immortalized by infection with

15  Epstein-Barr virus, EBV.

16                  Was that a true statement as of March

17  18th, 1991?

18                  ANSWER:  Yes, I believe so.

19                  QUESTION:  The next two sentences say:

20  Such cells may not be useful for scale-up and production

21  of human pharmaceuticals.  Furthermore, the presence of

22  human viral genetic information in such EBV immortalized

23  human antibody-producing cell lines may be a barrier to

24  their safe use.

25                  Were those true statements as of March

1  18th of 1991?

2          ANSWER:  That, I think, was the

3  prevailing opinion, so, yes, they were correct.

4          QUESTION:  Now, the next two sentences

5  say:  In addition, since human TNF has evolved in the

6  face of the human immune response, key antigenic

7  epitopes may not be recognized by the human immune

8  system.  Such antigens would not be expected to elicit

9  useful immune responses in man.

10          Were those statements accurate as of

11  March 18th, 1991?

12          ANSWER:  Well, these were -- these --

13  these statements, I think, summarized, again, the

14  prevailing view at that time.  The -- the first sentence

15  says:  Key antigenic epitopes may not be recognized.

16  They don't say they are never recognized.

17          QUESTION:  Now, you would agree that this

18  paragraph describes obstacles in creating human

19  antibodies, correct?

20          ANSWER:  Well, some of the obstacles.

21  Yes.

22          QUESTION:  Were there others that aren't

23  referenced here?

24          ANSWER:  Probably.

25          QUESTION:  What were they?

1                    ANSWER:  Well, again, I -- I don't

2    recall, but I'm sure that this is not an exhaustive

3    listing of all the problems.

4                    QUESTION:  Does this application tell us

5    how to overcome those problems in developing human

6    antibodies?

7                    ANSWER:  As I said, I have not reviewed

8    the whole application very carefully, so I'm not sure.

9                    QUESTION:  Well, just based on your own

10   understanding as of March of 1991, had you come up with

11   a way to overcome those problems?

12                   ANSWER:  No.  I did not.

13                   QUESTION:  And to the best of your

14   knowledge, had any of the other named inventors on the

15   '775 and '239 patents come up with a way to solve those

16   problems as of March, 1991?

17                   ANSWER:  I don't know.

18                   QUESTION:  Not to your knowledge?

19                   ANSWER:  Not to my knowledge.

20                   QUESTION:  And was there ever a point

21   before the '775 patent application was filed in July of

22   2002, when you had come up with a way to overcome those

23   problems?

24                   ANSWER:  I don't recall, and I believe

25   that -- no, I did not come up with a way to -- ways to

 1  overcome these -- these obstacles.

 2             QUESTION:  And to the best of your

 3  knowledge, had any of the other named inventors on the

 4  '775 and '239 patents come up with a way to overcome

 5  these obstacles at any time before July 18th of 2002?

 6             ANSWER:  I don't know, but I'm not aware

 7  of such efforts.

 8             QUESTION:  So not to your knowledge,

 9  correct?

10             ANSWER:  Yes.

11             QUESTION:  So I'm going to have this

12  document marked as Exhibit 112.

13             This is an article by Achim Moller and

14  others.

15             ANSWER:  Right.

16             QUESTION:  -- headed, Monoclonal

17  Antibodies to Human Tumor Necrosis Factor-Alpha In Vitro

18  and In Vivo Application.

19             Do you see that?

20             ANSWER:  Yes.

21             QUESTION:  And this article is dated

22  1990.  Do you see that?

23             ANSWER:  Yes.

24             QUESTION:  And if you turn to the second

25  page of this article, if you -- do you see in the first

1  line there's a reference to mAB 195?

2             ANSWER:  Right.

3             QUESTION:  Have you reviewed this article

4  before?

5             ANSWER:  So until -- if you had asked me

6  two days ago do I know anything about monoclonal

7  antibody 195, or mAB 195, I would have said, no, that

8  doesn't mean anything.

9             And we reviewed this with counsel, and

10  what I do recall -- and, you know, this is my memory,

11  independent of -- of the information that we reviewed

12  with counsel -- that I knew about Achim Moller's

13  antibody.  And at one time I looked at this article and

14  found the information of some interest.

15             So that's the -- and I -- I did remember

16  it, because I remembered that they tested some

17  properties of the antibodies and they -- they were of

18  some interest.

19             QUESTION:  I'm going to put before you

20  what's been previously marked as Defendants' Exhibit 28.

21             Let me know when you've had a chance to

22  look at that.

23             ANSWER:  Okay.

24             QUESTION:  Now, this is a letter from you

25  to Scott Siegel dated August 15th of 1990, correct?

1              ANSWER:  Yes.

2              QUESTION:  And this letter was written

3  before the priority application for the '775 and the

4  '239 patents was filed in March of 1991, correct?

5              ANSWER:  Yes.

6              QUESTION:  If you turn to the second

7  page, that's your signature, correct?

8              ANSWER:  Yes.

9              QUESTION:  And Peter Dadonna and Junming

10  Le are copied on this letter, correct?

11              ANSWER:  Yes.

12              QUESTION:  And those are two other named

13  inventors on the patents that are being asserted in this

14  case, correct?

15              ANSWER:  Yes.

16              QUESTION:  Now, turning your attention to

17  the first page of the letter, third paragraph, the first

18  sentence, and it straddles over onto the next page,

19  reads:  Based on our demonstration that mAB A2

20  neutralized chimp TNF, but failed to neutralize TNF

21  produced in adherent cells of cynomolgus, rhesus, or

22  baboons, it appears that mAB A2 resembles an antibody

23  described by Moller, et al, parenthesis, cytokine 2, 162

24  to 169, 1990, a copy of which I sent you about two weeks

25  ago.

1                      Do you see that?

2                      ANSWER:  Yes.

3                      QUESTION:  And you're referring back to

4    the letter we just looked at, correct?

5                      ANSWER:  Yes.

6                      QUESTION:  And that -- that also refers

7    to the Moller article that we looked at, which is

8    Exhibit -- Defendant 112, correct?

9                      ANSWER:  Yes.

10                     QUESTION:  Why were you bringing this to

11   the attention of Dr. Siegel and Dr. Dadonna and Dr. Le?

12                     ANSWER:  I thought it was interesting.

13                     QUESTION:  Why is that?

14                     ANSWER:  Because, as I said, the -- the

15   neutralization of TNF produced in different animal

16   species by the Moller antibody was similar to what we

17   found for A2.

18                     QUESTION:  The next sentence says:  Do

19   you think it would be worthwhile to request a sample of

20   the antibody described by Moller, et al, in order to

21   compare it side-by-side with mAB A2?

22                     Do you see that?

23                     ANSWER:  Yes.

24                     QUESTION:  Did anyone respond to that

25   question?

1          ANSWER:  I have no recollection of seeing

2  a response.

3          QUESTION:  Did you ever request the

4  Moller antibody?

5          ANSWER:  I don't remember that I would

6  have requested it, and I think I probably would remember

7  if I did.  But I can only say I have no recollection of

8  requesting it.

9          QUESTION:  Was any testing done by NYU of

10  the Moller antibody?

11          And I'm talking about MAK195, in case

12  it's unclear.

13          ANSWER:  There is no record or

14  information that NYU would have done any testing --

15  that -- that I am aware of.

16          (End of video clip.)

17          MR. LEE:  Your Honor, Ms. Wigmore will

18  present our next witness.

19          THE COURT:  Who will be -- who will it

20  be?

21          MS. WIGMORE:  Daniel Slottje.

22          THE COURT:  Come around.

23          COURTROOM DEPUTY:  Raise your right hand.

24          (Witness sworn.)

25  <u>DANIEL SLOTTJE, Ph.D., DEFENDANTS' WITNESS, SWORN</u>

```
 1                    DIRECT EXAMINATION

 2   BY MS. WIGMORE:

 3        Q.    Good afternoon, Mr. Slottje.

 4        A.    Good afternoon.

 5        Q.    Would you please introduce yourself.

 6        A.    My name is Daniel Slottje.

 7        Q.    Where do you live?

 8        A.    I live in Dallas, Texas.

 9        Q.    And where do you work?

10        A.    I actually have two jobs.  I'm a professor of

11   economics at Southern Methodist University in Dallas,

12   and I work for a consulting firm called FTI Consulting.

13        Q.    What types of services does FTI provide?

14        A.    We do financial management and litigation

15   support consulting.

16        Q.    Would you please describe your educational

17   background?

18        A.    Sure.  I have a Master's -- I have a

19   Bachelor's degree in economics from Clemson University

20   and a Ph.D. in economics from Texas A&M University.

21        Q.    Have you --

22        A.    And my voice was fine, but I seem to have lost

23   it, so I think I'll just grab a little water here.

24   I'm sorry.

25        Q.    Take your time.
```

1          Have you published in your field, Dr. Slottje?

2     A.   Yes, I have.

3     Q.   And approximately, how many publications do

4 you have?

5     A.   I've published 150 articles and books.

6     Q.   What do those publications address generally?

7     A.   Generally, they deal with different economics

8 and econometric issues, including intellectual property,

9 law and economics, and microeconomics.

10    Q.   Do you have any previous experience in

11 calculating damages in a patent case?

12    A.   Yes, I have.

13    Q.   Can you describe to us the breadth of your

14 experience in that area?

15    A.   I've been doing damages in patent cases since

16 at least 1991.

17    Q.   Now, you've told us that you're also a

18 professor at SMU.

19    A.   Yes.

20    Q.   What types of classes have you taught?

21    A.   I've taught courses in law economics,

22 econometrics, and microeconomics.

23    Q.   For how long have you been a professor at SMU?

24    A.   For 25 years.

25    Q.   Now, I would like to pull up what's been

1   marked and preadmitted as DX467.  It's also Tab 1 in

2   your binder, if you prefer a hard copy.

3          Could you identify that for us, please?

4      A.   It's called my academic CV or curriculum CV.

5      Q.   What do you mean by your academic CV?

6      A.   It lists the publications that I just

7   mentioned, the books and articles that I've written, as

8   well as my academic positions.

9      Q.   Now, do you also have a professional CV for

10  your consulting work?

11     A.   Yes.

12          MS. WIGMORE:  And if we could pull up

13  DX853, which is also preadmitted.

14     Q.   (By Ms. Wigmore) Could you identify this for

15  us, please, Professor Slottje?

16     A.   That is a record of my professional experience

17  as a consultant.

18     Q.   Taken together, are DX467 and DX853 accurate

19  and complete summaries of your professional experience?

20     A.   Yes.

21     Q.   Professor Slottje, have you been retained as

22  an expert in this case?

23     A.   Yes, I have.

24     Q.   By which party?

25     A.   By Abbott.

1     Q.   Are you charging for your time spent on

2  working on this case?

3     A.   Yes, I am.

4     Q.   Is any -- is any portion of your compensation

5  dependent on your opinions or the outcome of this case?

6     A.   No.

7     Q.   Did anyone from FTI assist you in your work on

8  this matter?

9     A.   Yes.

10    Q.   Approximately how many people?

11    A.   Six people.

12    Q.   Now, what were you asked to do in this case?

13    A.   I had two primary tasks.  I was asked to look

14 at the analysis that was done by the opposing expert,

15 and I was asked to arrive at my own independent economic

16 damage analysis.

17    Q.   Now, you mentioned you were asked to analyze

18 the opinions of the opposing expert.

19         Are you referring to Dr. Gering who testified

20 here yesterday?

21    A.   Yes.

22    Q.   What materials did you consider in performing

23 those tasks?

24    A.   I looked at Dr. Gering's expert report and the

25 underlying documents that he provided in support of his

1  report.

2          I also looked at hundreds of thousands, or my

3  team, of pages from the case.  I looked at independent,

4  third-party information about the market.

5          I read various depositions in the case.  I

6  also talked to various individuals at Abbott.

7      Q.   Dr. Gering showed us a slide yesterday about

8  some various types of information he considered.

9          Did you consider similar materials in your

10  work on this case?

11      A.   Yes, I did.

12      Q.   Now, have you been in the courtroom for the

13  testimony that's been provided so far in this case?

14      A.   Yes, I have.

15      Q.   And you were here for the testimony of

16  Dr. Gering yesterday?

17      A.   Yes.

18      Q.   You mentioned that one of your tasks was to

19  evaluate damages.

20          Did you apply any assumptions in making that

21  analysis?

22      A.   Yes, I did.

23      Q.   What were those assumptions?

24      A.   I assumed that the patents were valid and

25  infringed.

1    Q.   Have you formed any opinions on your own with

2 respect to the issue of infringement or the issue of

3 validity?

4    A.   No, I have not.

5    Q.   You've just assumed that the patent's valid

6 and infringed in order to assess the damages issue; is

7 that right?

8    A.   That's correct.

9    Q.   Now, were you here when Dr. Gering testified

10 that Centocor and NYU should receive over a billion

11 dollars in lost profits?

12    A.   Yes.

13    Q.   Do you agree with Dr. Gering?

14    A.   No, I don't.

15    Q.   Did you conduct your own analysis of what lost

16 profits, if any, should be awarded, if the '775 patent

17 is valid and infringed?

18    A.   Yes, I have.

19    Q.   We'll come back to the details shortly, but

20 could you just briefly summarize for us your general

21 opinion as to what, if any, lost profits should be

22 recovered, if the '775 patent is valid and infringed?

23    A.   If lost profits are awarded, it's my opinion

24 they should only be awarded on the Crohn's disease

25 indication and only up through April of 2008.

1      Q.   Now, in what areas did Dr. Gering suggest that

2  lost profits should be awarded?

3      A.   He suggested there's -- you heard discussions

4  previously about three major areas.  Crohn's is part of

5  gastroenterology.  You also heard him talk about

6  rheumatology and dermatology.

7           I don't believe it's appropriate to award lost

8  profits in either rheumatology or dermatology.

9      Q.   And we'll come back in a moment to the reasons

10 for your opinion.

11          But were you also here when Dr. Gering gave

12 the opinion that Centocor and NYU should get an

13 additional $1 billion in damages in the form of a

14 reasonable royalty at a 15-percent rate?

15     A.   Yes.

16     Q.   Do you agree with Dr. Gering's opinion

17 concerning damages in the form of a reasonable royalty?

18     A.   No, I don't.

19     Q.   Could you briefly summarize for us your

20 opinion concerning a reasonable royalty that would be

21 appropriate, if the '775 patent is valid and infringed?

22     A.   My opinion, a reasonable royalty would be 2.25

23 percent on U.S. sales, and 1.25 percent on sales outside

24 the United States.

25     Q.   Now, let's turn to the details of the opinions

1  you've just summarized for us, starting with lost

2  profits.

3          We heard Dr. Gering describe yesterday a

4  four-factor test for assessing lost profits.  He

5  referred to it as the Panduit Test.

6          Do you recall that?

7      A.    Yes.

8      Q.    Did you apply the same four Panduit Factors in

9  your damages analysis?

10      A.    Yes, I did.

11      Q.    And did you consider each of those four

12  factors in reaching your conclusion?

13      A.    I went through every one of them one by one.

14      Q.    Could you just describe for us generally your

15  understanding of the purpose of the lost profits

16  analysis?

17      A.    My understanding of going through a lost

18  profits analysis and going through those four factors is

19  determining whether the party that has had their product

20  allegedly infringed, had the infringement not occurred,

21  would they have actually made sales.

22          And you go through those four factors to

23  determine if it's appropriate to award lost profits

24  based on every one of those.  And if any one of those

25  you fail, my understanding is then you're not awarded

1  lost profits.

2      Q.   And you referred to a party who's had a

3  product infringed.  Do you mean had its patent

4  infringed?

5      A.   Yes.

6      Q.   Now, we've heard testimony about the but-for

7  world.

8           Can you remind us what a but-for world is?

9      A.   In undergoing that exercise where you're

10 trying to figure out what the but-for -- what would

11 happen -- it's kind of a complicated process.

12          If you're going to go back and suggest but for

13 the infringement the -- the party that owns the patent,

14 in this case Centocor, and the product that we're

15 talking about, specifically here is Remicade, whether

16 there had been more sales of Remicade but for the

17 alleged infringement of -- by Abbott, and specifically

18 Humira.

19          So what we have to do is be able to go back in

20 time and try to figure out what would the market have

21 looked like back in 2006 specifically, or 2007.  But

22 with respect to what the market would have looked like,

23 if the amount of Humira that's alleged to have been

24 infringed, is taken off the market.

25          It's kind of a complicated thing to do,

1 because you have to go back and figure out a number of

2 things.  But that's really -- the but-for world means,

3 what does the market look like but for the fact that

4 Humira, that is alleged to be infringed, has to be taken

5 off.

6     Q.   So you assume that the infringing product, if

7 you're assuming that's Humira, is not in the market and

8 assess what would have happened to the sales that Humira

9 had; is that right?

10    A.   Yes.

11    Q.   Now, you testified earlier that you disagreed

12 with Dr. Gering's lost profits analysis.

13         Did you work with us in preparing some slides

14 to assist you in explaining your opinions?

15    A.   Yes, I did.

16    Q.   If you could turn to the first slide, which is

17 DDX52.

18         Could you please identify your three main

19 areas of disagreement with Dr. Gering?

20    A.   The first -- the first bullet point there,

21 what I'm trying to say there is, again, when we're

22 talking about for this but-for world, licensed Humira is

23 a valid, non-infringing alternative.

24         And it's a little confusing, because, again,

25 we're going back and we're taking the infringed -- the

1  allegedly infringed Humira off the market and we're

2  trying to figure out what those patients would have

3  done, we have to recall that there is still licensed

4  Humira that's available to them.

5         And that's the first thing that I believe that

6  Dr. Gering failed to do, is he failed to account for the

7  fact that licensed Humira would have been available in

8  the but-for world as a non-infringing alternative.

9     Q.   And we'll come back to that one in more

10 detail, but what was your second main area of

11 disagreement?

12    A.   I also believe that there are differences in

13 the products.  You've heard a lot of discussion about

14 that the last couple of days, and that these differences

15 in the products have implications for different market

16 segments as well.

17        And just by -- just like in the but-for world,

18 you have to take into account the fact that there may be

19 non-infringing alternatives.

20        You also have to take into account, if these

21 products are different, then it may not necessarily

22 follow that Remicade would have automatically made more

23 sales, if they're not in the same market segment and

24 they're perceived by some consumers, patients, and

25 doctors as being different products.

1    Q.   What is your third main area of disagreement

2  with Dr. Gering concerning lost profits?

3    A.   I also don't believe that Dr. Gering took into

4  account the fact that by virtue of the fact that Humira

5  was on the market in 2006.  You also have heard a

6  significant amount of evidence and testimony talking

7  about the market growing.

8         So if you're going to go back and figure out

9  again what -- how many lost sales and how many lost

10  profits Remicade would have had, you have to take into

11  account, if Humira helped grow the market, you've got to

12  adjust back for the fact that they wouldn't have been

13  there to grow the market.

14         And those are the three main areas.

15    Q.   Now, let's go in a little bit more detail,

16  starting with the first area.

17         What is a non-infringing alternative?

18    A.   A non-infringing alternative would have been a

19  particular drug that would have, back in the but-for

20  world -- again, if you think about it, that all of the

21  patients that were taking infringing Humira and are no

22  longer allowed to do that, what choices would they have

23  had, if infringing Humira was not on the market.

24         Non-infringing means what choices would they

25  have had that would not have infringed Centocor's

1  patent.

2      Q.    And are there other choices on the market

3  besides Remicade in the various categories that you've

4  mentioned?

5      A.    Yes.

6      Q.    And you're suggesting that licensed Humira

7  should have been considered as one of those; is that

8  correct?

9      A.    That's what I believe, yes.

10      Q.    Now, we've been talking about licensed Humira,

11  and there was a bit of testimony yesterday about that,

12  but I want to make sure that we understand what you're

13  referring to.

14          What activities, with respect to Humira, are

15  licensed?

16      A.    My understanding is that when Humira is taken

17  in combination with Methotrexate -- and you've also

18  heard that referred to as being co-administered -- that

19  that is what we're calling licensed Humira.

20      Q.    Are you familiar with the term monotherapy?

21      A.    Yes.

22      Q.    How is the term monotherapy used in relation

23  to Humira?

24      A.    Again, my understanding is that if Humira is

25  taken by itself and it's not taken with another drug,

1  specifically here, not with Methotrexate, then that's

2  called monotherapy.

3      Q.   And is that licensed or not licensed?

4      A.   It's not.

5      Q.   Turning to the next slide, which is DDX53, can

6  you just summarize for us what the license means with

7  respect to Humira in the but-for world?

8      A.   Again, when we're going back and we're trying

9  to determine what the world would have looked like if

10  there had been no alleged infringement, we have to take

11  not licensed, or monotherapy Humira, out of the

12  equation.  We have to take that off the market and

13  figure out what those patients would have done, if that

14  wasn't there.

15          But licensed Humira still would be -- still

16  would be there.

17      Q.   Now, we heard some testimony yesterday about

18  arbitrator rulings.

19          Is it your understanding that this license was

20  determined by an arbitrator?

21      A.   Yes.

22      Q.   And that the scope of the license was also

23  decided by an arbitrator; is that right?

24      A.   That's my understanding.

25      Q.   Did the arbitrator address any issues with

1  respect to the validity or infringement of the '775

2  patent?

3      A.   It's my understanding it did not.

4      Q.   That's an issue that the ladies and gentlemen

5  of the jury will be deciding; is that correct?

6      A.   That's right.

7      Q.   Now, have you reviewed the arbitration awards?

8      A.   Yes.

9      Q.   And you have an understanding of the license

10  and its scope?

11      A.   Yes.

12      Q.   Now, if we could turn to the next slide, how

13  should licensed Humira be considered in the lost profits

14  analysis?

15      A.   Licensed Humira should be considered again, as

16  we just mentioned, as a viable, available,

17  non-infringing alternative in our but-for world.

18      Q.   And in terms of the first item here, excluding

19  it from the damages base, what does that refer to?

20      A.   I'm sorry.

21          What that means is that when you're trying to

22  determine what the damage base is, you have to subtract

23  out the licensed Humira, because it's not going to be

24  subject to damages.

25      Q.   So the first step is to take it out of the

1  damages base so that there will be no damages on

2  licensed sales; is that correct?

3      A.   Yes.

4      Q.   And what is the next step?

5      A.   The next step is to take into account as a

6  non-infringing alternative, that I just mentioned.

7      Q.   Now, you mentioned that you and Dr. Gering

8  have a disagreement with respect to licensed Humira.

9  You mentioned that you have excluded it from the damages

10  base.

11          Has Dr. Gering done the same thing?

12      A.   Yes, he has.

13      Q.   So if we turn to the next slide, that shows

14  that you've both accounted for that in the damages base.

15          So what is your disagreement with Dr. Gering

16  concerning licensed Humira?

17      A.   Again, when we go back in time to 2006 and

18  we're trying to figure out what those patients are going

19  to do and they are no longer able to take the infringing

20  Humira, my belief is that those patients have the choice

21  of taking Humira with Methotrexate.

22          In Dr. Gering's analysis, he did not take into

23  account the fact that non-infringing alternative or

24  licensed Humira would still be available.  So we

25  disagree about that.

1      Q.   So if we could turn to the next slide.

2           There's a difference between the two of you in

3   terms of addressing Humira as a non-infringing

4   alternative.

5      A.   Correct.

6      Q.   Dr. Gering testified that he did take into

7   account licensed Humira by excluding it from the damages

8   base.

9           Is that enough?

10     A.   That accounts for taking it out of the base

11  that he's going to start to calculate his damages on,

12  but that doesn't take into account the fact that when we

13  have to figure out what these patients would do in our

14  but-for world, that the licensed Humira is still

15  available.

16          So it's kind of complicated, because he

17  subtracted it out of the base that he's going to

18  calculate his lost profits on.  He does that right.  But

19  then he doesn't take into account the fact that in our

20  but-for world that still is a viable or reasonable

21  non-infringing alternative available to -- thinking of

22  those people that were -- that were on Humira, taking it

23  by itself, or as monotherapy.

24     Q.   We heard testimony from Dr. Gering about

25  reallocating market share in the but-for world.

1          What does that mean?

2     A.    My understanding of what Dr. Gering did is he

3 looked at what the world actually looked like.  He would

4 look -- let's -- you've heard discussions about

5 Enbrel -- there's another drug called Enbrel.

6          He looked basically at shares of the various

7 drugs, what they actually were, but it's important to

8 remember what they actually were with all Humira in the

9 market.

10          And then he said, now let's pretend that we

11 take infringing Humira away, and then let's take those

12 same market shares that actually existed when all Humira

13 was still there, and we'll reallocate adjusting for

14 those.

15          He also does take out -- he takes out

16 something called Remicade failures.  So he does do an

17 adjustment.  But he doesn't do the adjustment that we're

18 talking about here, accounting for the fact that there

19 still is a viable, non-infringing alternative left,

20 which is licensed Humira.

21     Q.    And what portion of the market did Dr. Gering

22 reallocate to licensed Humira in his analysis?

23     A.    None.

24     Q.    What effect did that have on his lost profits

25 analysis?

1    A.   Well, once again, if you think about it, if he

2  is assuming that all of those -- all of the sales of the

3  infringing Humira are simply going to go to the parties

4  that are left and he doesn't take into account the fact

5  that some of those -- we'll call them monotherapy or

6  infringing Humira sales -- would have gone to

7  non-infringing Humira, then he's overstating his damage

8  numbers.

9    Q.   Let's turn to the second main difference that

10  you had with Dr. Gering, and that related to differences

11  in products in the market segments.

12          If you could turn to Slide DX57 -- DDX57.

13          Could you explain for us, please, your opinion

14  concerning the differences between Humira and Remicade

15  that Dr. Gering had failed to consider?

16    A.   Once again, you've heard a lot of discussion

17  over the last couple of days talking about the fact that

18  these products, Humira and Remicade, have differences.

19  They're different types of antibodies.

20          You've heard discussions that Humira is

21  basically what's called a fully human antibody.  You've

22  heard discussions that Remicade is what's called a

23  chimeric antibody.

24          And there are other implications with respect

25  to patients' perceptions of things based on the fact

1 that they are different types of antibodies.

2     Q.   Now, you mentioned implications in terms of

3 patient perceptions.

4          Have you reviewed materials addressing

5 perceptions of safety as between Remicade and Humira?

6     A.   Yes.

7     Q.   And we saw many of those yesterday, and I

8 don't intend to go through all of the exhibits again.

9          But what impact did those exhibits addressing

10 perceptions of safety as between Humira and Remicade

11 have on your lost profits analysis?

12    A.   Once again, they just suggest that there may

13 be differences in the -- in the perception of consumers

14 and how they view -- how they view the products.

15         Some may view them as different products, and

16 that has certain implications for how we divide up

17 things in that but-for world again.

18    Q.   Now, you're familiar with a product known as

19 Simponi?

20    A.   Yes.

21    Q.   And that's also known as golimumab?

22    A.   Yes.

23    Q.   Can you remind us, please, what is Simponi or

24 golimumab?

25    A.   My understanding is that's a product that's

1   been approved recently that's also produced by Centocor

2   that is a fully human antibody that also gets injected.

3       Q.   And what impact, if any, did that have on your

4   analysis of the market for lost profits purposes?

5       A.   Well, once again, it's more -- it's more data

6   that I've seen that suggest that individuals in these --

7   that use these drugs to distinguish between them.

8       Q.   So if a patient is taking a human antibody and

9   we're assessing that patient's preferences in the

10  but-for world, should that be considered the type of

11  antibody they're currently taking?

12      A.   Yes.

13      Q.   Now, turning to the next slide, you

14  mentioned -- let's move back; the next bullet on

15  actually the prior slide.

16          The next difference that you mentioned was the

17  modes of administration.

18      A.   Yes.

19      Q.   We've heard a lot of testimony about that, so

20  I don't intend to go through all of those documents

21  again.

22          But could you just describe for us generally

23  what is the difference between Remicade and Humira with

24  respect to this issue?

25      A.   You've heard that Remicade is infused, and

1  Humira is injected.  And I know you've heard that and

2  heard that, so...

3      Q.   And what impact does that have on the lost

4  profit analysis?

5      A.   Well, it can have an important impact, because

6  the fact that people that use -- that have a preference

7  for an injection in this but-for world that were on

8  Humira.

9          So we know that they actually already showed

10 they have a preference for an injected drug.  It doesn't

11 follow that they might not want to go to an infused

12 drug.

13     Q.   And the last difference that you identified

14 here is differences in FDA approval.

15         What does that refer to?

16     A.   We also heard a lot of discussion about the

17 fact that different drugs for different indications have

18 different approvals, such as -- as a simple example, you

19 heard that Remicade, when you're talking about

20 rheumatology, specifically RA, has to be administered

21 the way the FDA approves it, used in conjunction or

22 combination with Methotrexate, whereas Humira can be

23 administered either with or without Methotrexate.

24         So depending on which indication you are

25 talking about, what therapy you're talking about, that

1  has -- that has implications for FDA approval.

2         Once again, in our but-for world, when we're

3  trying to figure out what's going to happen to those

4  Humira-infringed sales, that's something else that we

5  should take into account.

6     Q.   Now, did Dr. Gering take into account any of

7  these three main differences between Humira and Remicade

8  in constructing his but-for world?

9     A.   No.

10    Q.   And he mentioned that he reallocated market

11  share.

12         Why did that not account for these

13  differences?

14    A.   Because, again, as we talked about a few

15  minutes ago, because you look at what actually happened

16  in the world, if you know what the market shares look

17  like, when all Humira is there, meaning that all the

18  Humira users that we know are patients that were

19  taking -- who liked getting an injection or chose to get

20  an injection, who chose to use monotherapy Humira, and

21  then we have to decide and figure out and imagine what's

22  going to happen in our but-for world, where will those

23  patients go?

24         What choices would those patients make?

25         And if those patients have strong preferences

1 as well as the fact that they know that certain other

2 drugs, Humira with Methotrexate, is available, is it

3 likely that they would switch to another biologic,

4 Remicade, which also has to be used with Methotrexate.

5        So all of these things together make it very

6 problematic to try to figure out what exactly would

7 happen in this but-for world.  If we can't figure that

8 out, if we have to guess, you don't get lost profits.

9    Q.    This is all quite theoretical.  So why don't

10 we walk through some examples and see the implications.

11        First of all, you've been talking about market

12 segments and approvals.  How is the biologics market

13 divided in terms of diseases or disease categories?

14        If you would turn to the next slide.

15    A.    Once again, you've heard discussion about

16 this.  It's divided between rheumatology, dermatology,

17 and gastroenterology.

18    Q.    And what I would like to do is to just take

19 some examples within those categories, starting with

20 rheumatology.

21        Now, what is the biggest indication in the

22 rheumatology market segment?

23    A.    Rheumatoid -- rheumatoid arthritis.

24    Q.    If we could turn to the next slide.

25        Now, what -- we heard Dr. Bazemore testify

1 yesterday about the various product approvals and

2 choices, and we won't go over all of that again, but if

3 you could describe for us generally what options are

4 available to a patient who wants to take a biologic for

5 rheumatoid arthritis, if Humira monotherapy is not on

6 the market.

7     A.   Depending on the time period, what this

8 indicates is the patient that was taking mono --

9 monotherapy Humira was trying to decide where to go to

10 next -- Enbrel, Remicade, Kineret, licensed Humira,

11 Orencia, Rituxan, and then later on, Simponi and

12 Cimzia -- would have been available.

13     Q.   Now, Simponi and Cimzia were just very

14 recently approved; is that correct?

15     A.   Yes.

16     Q.   So did you consider those as part of your lost

17 profits analysis?

18     A.   Well, I considered them in the sense that

19 there -- this is just an example to you.  Obviously,

20 depending on the timeframe, those little circles might

21 not be there, but, yes, I took them into account.

22     Q.   So the market varies over time and the choices

23 available might vary over time?

24     A.   Yes.

25     Q.   Now, let's take an example, if we could turn

1    to the next slide.

2          You mentioned that the mode of administration

3    is an important difference between Humira and Remicade.

4          If a patient is taking Humira monotherapy in

5    the existing world and that choice is no longer

6    available, what options would that patient have, if he

7    or she wants to still take an injectable as opposed to

8    an IV therapy?

9       A.    Enbrel, Kineret, licensed Humira, Simponi and

10   Cimzia, and that's why those are in yellow, to show that

11   those are choices.  If a patient that prefers to have

12   the drug injected, those would be choices they would

13   have back in our but-for world.

14      Q.    Now, did Dr. Gering take those choices into

15   account when he did his lost profits analysis for

16   rheumatology?

17      A.    No.

18      Q.    What did he do instead?

19      A.    He -- as we've already discussed, he basically

20   mechanically divided up the market, based on what actual

21   market shares were as of the time of the actual time

22   with Humira in the market.

23      Q.    He did not consider a patient's potential

24   preference for an injectable alternative?

25      A.    No.

1    Q.    Now, if we could turn to the next slide.

2          You've talked about Methotrexate and the

3    difference and approval between Remicade and Humira.

4          Let's take another example.

5          If a patient is taking Humira monotherapy in

6    the existing world but wants to continue to take a

7    therapy without Methotrexate, what options would he or

8    she have in the but-for world?

9    A.    Enbrel, Kineret, Orencia, and Cimzia.

10   Q.    Would Remicade be an option?

11   A.    No.

12   Q.    And just going back to the past slide -- the

13   previous slide for one moment.

14         If that patient who wants an injectable

15   alternative has to choose, would Remicade be an option

16   for that patient?

17   A.    No.

18   Q.    Okay.  Turning back to the Methotrexate slide.

19         In terms of Methotrexate, we heard testimony

20   from Mr. Bazemore about the side effects of

21   Methotrexate.

22         Are you familiar with that?

23   A.    Yes.

24   Q.    And how does that bear on the patient

25   preferences in this market?

1    A.    Well, the whole point is that it may have an

2 effect.  And if we don't know what the overall effect

3 is, then it's something that we need to take into

4 account, because it can impact how we reallocate or

5 adjust what's going to happen in our but-for world.  And

6 it's something that bothers some patients.

7        Q.    You heard some testimony from Dr. Gering about

8 off-label sales.

9              Do you recall that?

10    A.    Yes.

11       Q.    What is an off-label sale?

12    A.    My understanding is an off-label sale means

13 that you can take a drug -- a doctor can prescribe a

14 drug to you, even though it's not approved by the FDI

15 (sic) for that particular use.  He can still -- he or

16 she can still do that.

17       Q.    Now, is it legal for a company to market a

18 product for an off-label purpose?

19    A.    No.

20       Q.    How did Dr. Gering take off-label sales into

21 account in his lost profits analysis?

22    A.    He assumed that a significant number of

23 patients that were taking monotherapy Humira would have

24 taken Remicade off-label.

25       Q.    Did he provide any basis for that assumption?

1      A.   No.

2      Q.   Let's turn to the next slide.

3           Now what if a patient who's currently taking

4  Humira wants to take both an injectable therapy and a

5  therapy without Methotrexate in the but-for world?

6      A.   That patient would face choices of Enbrel,

7  Kineret, and Cimzia.

8      Q.   Would Remicade be a option for that patient?

9      A.   No.

10     Q.   Again, did Dr. Gering consider any of these

11 differences when he constructed his but-for world for

12 lost profits?

13     A.   He did not take them into account in his

14 ultimate calculations.

15     Q.   We've talked about the rheumatology area.  Now

16 let's spend just a little bit of time on dermatology.

17          Are there any differences between Remicade and

18 Humira in terms of their approvals for psoriasis, which

19 is the biggest indication in the dermatology market?

20     A.   My recollection is that Humira is approved by

21 the FDA for moderate to severe psoriasis, whereas I

22 believe that Remicade is approved for severe psoriasis.

23     Q.   And we've heard about the difference between

24 the IV administration and the injectable.

25          What, if any, significance does that have in

1 the dermatology market segment specifically?

2     A.   Well, you've heard discussion about that, too.

3 Dermatologists don't like to mess around with that thing

4 over there.  They don't like giving people IVs in their

5 offices.  They don't like having the crash cart that

6 they have to have.

7          And it has an effect, then, on the physician's

8 preferences with respect to using IVs.

9     Q.   Now, turning to Slide 63, what options are

10 available today for a biologic in the psoriasis market?

11     A.   Today?

12     Q.   Yes.

13     A.   Is it Amevive?

14          During the entire time period -- I can't say

15 that one -- but I think it's Amevive, Raptiva, Enbrel,

16 Remicade, and licensed Humira.

17     Q.   Now, is Raptiva still available on the market?

18     A.   No.

19     Q.   Was it available during any portion of the

20 damages period?

21     A.   Most of this damage period that we're talking

22 about it, it was available, but it's not right now.

23     Q.   Let's take another example, turning to

24 Slide 64.

25          If a patient is taking Humira monotherapy for

1  psoriasis and wants to continue with an injectable

2  alternative, what options would he or she have in the

3  but-for world?

4      A.    If we're talking about back in 2006 and 2007,

5  Raptiva, Enbrel, and licensed Humira, again, licensed

6  Humira.

7      Q.    And at some point, Raptiva became unavailable;

8  is that right?

9      A.    Yes.

10     Q.    Would Remicade be an option for that patient?

11     A.    No.

12          MS. WIGMORE:  Let's turn to the next

13  slide.

14     Q.    (By Ms. Wigmore) Now, you mentioned the

15  difference in approval between Remicade and Humira in

16  terms of moderate psoriasis.  And specifically, you

17  mentioned that only Humira is approved for moderate.

18          Do you recall that testimony?

19     A.    Yes.

20     Q.    Let's assume a patient is taking Humira

21  monotherapy for moderate psoriasis in the existing world

22  and wants to continue with an approved therapy for

23  moderate psoriasis in the but-for world.

24          What options would that patient have?

25     A.    Amevive, Raptiva earlier on, Enbrel, and

1 licensed Humira.

2      Q.    And did Dr. Gering consider those preferences

3 and what impact they would have on the market?

4      A.    No.

5      Q.    All right.

6                MS. WIGMORE:   Let's turn to the next

7 slide.

8      Q.    (By Mr. Wigmore) This just shows if a patient

9 wants both, an injectable and an approved alternative

10 for moderate therapy (sic), what options would be

11 available in the but-for world?

12     A.    Raptiva, Enbrel, and licensed Humira.

13     Q.    Would Remicade be an option?

14     A.    No.

15     Q.    Now let's spend a few moments on the

16 gastroenterology market, which is the third of the

17 market segments that we've been discussing.

18                If we could turn to the next slide.

19                Now what options were available on the market

20 for Crohn's disease at various points in time during the

21 damages period?

22     A.    Remicade, a very limited amount of licensed

23 Humira, a drug called -- I can't say that.

24     Q.    Tysabri?

25     A.    That one.  Tysabri and Cimzia.

 1      Q.    Okay.  You mentioned a limited amount of

 2  licensed Humira.

 3            Why do you see that?

 4      A.    Because it wasn't used very much with

 5  Methotrexate to treat Crohn's disease.

 6      Q.    So did you consider licensed Humira as an

 7  alternative in the but-for world for the Crohn's disease

 8  indication?

 9      A.    I did not in my ultimate analysis.

10      Q.    Let's turn to now to Tysabri.

11            Did you consider that as a non-infringing

12  alternative in your but-for world for Crohn's disease?

13      A.    No, because it's a really nasty drug, and it

14  does nasty things to people.  I did not.

15      Q.    So if a patient is taking --

16      A.    That's my understanding.  I don't want to get

17  sued by them.

18      Q.    If a patient's taking Humira monotherapy today

19  and wants to continue with a biologic, what options

20  would that patient have in the but-for world?

21      A.    In the but-for world, those patients would

22  have been -- depending on the time, they would have had

23  either Remicade for much of the period, and that would

24  have been it, or they would have had Cimzia later on

25  after April of 2008.

1    Q.   Now, you mentioned that Cimzia launched in

2  April of 2008.

3         What type of biologic is Cimzia in terms of

4  its mode of administration?

5    A.   Cimzia is also an injectable drug.

6    Q.   As opposed to Remicade which is an IV drug?

7    A.   Yes.

8    Q.   Now, how does that, the launch of Cimzia, bear

9  on the lost profits analysis for Crohn's disease and

10 gastroenterology?

11   A.   The reason it bears on it and the reason that

12 all of these different things we're talking about are

13 important is because my job is to try to figure out

14 where those infringed or monotherapy Humira sales are

15 going to go.

16        And if I can't do that, if I don't have the

17 data or the information to do that without guessing,

18 then I say I can't do it without guessing, and then you

19 don't get lost profits.

20        You still get a reasonable royalty on those

21 sales, but it's not appropriate to give somebody lost

22 profits if we're not sure how that market would -- what

23 that market would look like, where those sales would go

24 in the but-for world.

25        So at least from -- if we're talking about

1  July of 2006 through April of 2008, the only choice

2  those folks would have had is to go from monotherapy

3  Humira to Remicade.

4          So I think it is reasonable to give them lost

5  profits on those Remicade sales, because they didn't

6  have any choice.

7          But after April of 2008, Cimzia is a viable,

8  non-infringing alternative.  It happens to also be an

9  injectable drug.  So just from a common-sense

10 perspective, people that are taking -- currently taking

11 Humira, which is injectable, can now take Cimzia, which

12 is injectable.

13          MS. WIGMORE:  Well, let's turn to the

14 next slide.

15     Q.   (By Ms. Wigmore) And we talked about licensed

16 Humira not being used in this market, so let's move on

17 to DX70.

18          MS. WIGMORE:  Let's move back.  I'm

19 sorry.  We don't have the right slide.  Let's go back to

20 the one on the gastroenterology market.

21     Q.   (By Ms. Wigmore) So explain for us, please,

22 how did the availability of these alternatives bear on

23 your opinions concerning lost profits and what did you

24 conclude?

25     A.   Well, I concluded in that every one of these

1 indications of therapeutic groups, that there's a

2 segmented market, and it's just not clear where those

3 Humira sales would have gone, that I can't determine

4 that without guessing, so only in Crohn's disease do I

5 believe it would be appropriate to award lost profits.

6     Q.   Now, you mentioned that Dr. Gering did not

7 adequately consider these other available alternatives

8 in his but-for world.

9         Would it be possible in the rheumatology and

10 dermatology segments to create a but-for world that did

11 adequately account for them?

12     A.   You don't have the data to do it.  If you

13 don't have the data to do it, then it's not -- I don't

14 believe it's appropriate to do it, because you would

15 have to guess.

16     Q.   Now, turning back to our original slide, DX52,

17 we talked about some main differences with Dr. Gering,

18 and we've walked through the first two.

19         Can you describe for us, please, the third

20 area of disagreement which relates to market growth?

21     A.   Market growth is what I was talking about a

22 little earlier.  You've all heard testimony that

23 suggested that this market has increased over time.

24         And, again, if we're going to go back and try

25 to figure out what would have happened, where would

1 these -- what would have happened in terms of the

2 but-for world, how many additional sales would Remicade

3 have made, we have to adjust for the fact that one of

4 the reasons the market grew was because Humira was on

5 the market.

6     Q.   Now, we heard testimony yesterday about the

7 fact that the market did grow over time, and I just want

8 to turn to DX194, which is a slide that Mr. Beck showed

9 to Dr. Gering.

10         MS. WIGMORE:  And if we could turn to the

11 page that Dr. Gering was shown during his

12 cross-examination.

13     Q.   (By Ms. Wigmore) Now, this is a slide that

14 shows market growth in 2005.

15         Do you see that?

16     A.   Yes.

17     Q.   And do you recall that the market growth was

18 attributed, in part at least, to the entrance of Humira

19 on the market?

20     A.   Yes.

21     Q.   Now, what impact should that have had on the

22 lost profits analysis?

23     A.   Again, if Dr. Gering is going to try to

24 construct what the world would have looked like without

25 licensed Humira, then he should also take into account

1 the fact that the market grew and benefited from Humira

2 being in the market and adjusted it downward.  And he

3 didn't do that.

4          MS. WIGMORE:  And if we can now turn to

5 Page 16 of DX194.

6     Q.   (By Ms. Wigmore) Could you just read the top

7 line on that slide, please?

8     A.   Biologic class penetration among RA patients

9 increased in the first quarter of 2006 and reached a new

10 all-time high, driven primarily by Humira.

11     Q.   Now, what, if anything, did Dr. Gering do to

12 account for that in his but-for world?

13     A.   The calculation of damages I've seen, he

14 didn't do anything.

15     Q.   Now, we've heard testimony that Remicade's

16 market share has gone down since Humira was launched.

17 What is the relationship between market share and market

18 growth?

19     A.   Market share tells you what percentage of the

20 market you have, but it doesn't tell you anything about

21 how many sales you have.

22          So it's very conceivable that even though your

23 share of the market may decline, if your sales go up,

24 meaning the whole pie gets bigger, that's a pretty good

25 thing.

1      Q.   Now, what has happened to Remicade's sales

2  since Humira was launched on the market?

3      A.   They've gone up every year.

4           MS. WIGMORE:  Let's turn to the next

5  slide.  This is DDX70.

6      Q.   (By Ms. Wigmore) Can you explain what's shown

7  on this slide?

8      A.   This -- this slide shows that if you look at

9  the time, roughly at the beginning of 2003 when Humira

10 launched, Remicade's sales worldwide were about $1.7

11 billion.

12          After it launched, you can see every year it

13 went up.  That's why that line is positively sloped, and

14 you can see in 2008, they were almost $2 billion higher

15 than they were in back in 2003.

16     Q.   Now, we've seen some slides about statements,

17 indicating that Humira was taking market share from --

18 that Humira was taking market share from Remicade.

19 Do you recall seeing those during the witness

20 examinations you watched?

21     A.   Yes.

22     Q.   Were those documents relating to the

23 gastroenterology market?

24     A.   Most of them were.

25     Q.   And how did you account for that in your lost

1  profits analysis?

2     A.   Well, again, I have -- in my analysis, I have

3  included and awarded lost profits in gastroenterology

4  simply with respect to Crohn's.

5     Q.   I just want to recap your overall opinions

6  concerning lost profits.

7          Based on your analysis of the but-for world,

8  considering all these differences we've been through,

9  what, if any, areas do you believe -- in which of these

10  areas do you believe lost profits would be appropriate,

11  if the '775 patent is valid and infringed?

12     A.   For Crohn's disease and from the period up to

13  April of 2008.

14     Q.   And aside from your opinion as to the

15  indications in which lost profits should be available,

16  do you have any other disagreements with Dr. Gering

17  concerning lost profits?

18     A.   Yes.   To calculate lost profits, you have to

19  take how many sales a company makes or how many sales of

20  products that they make.

21          You have to determine, again -- if we're

22  trying to determine lost profits on sales that weren't

23  made, but would have been made in this but-for world,

24  you have to figure out, all right, if they had sold an

25  additional dollar of the product, how much of that

1  additional dollar would have been profit.

2          So you have to take out what's called

3  incremental expenses or marginal -- you've heard the

4  term marginal cost or incremental expenses.

5          And Dr. Gering and I disagree on how you

6  calculate what that incremental profit rate would be or

7  how you would subtract out those incremental expenses

8  for each additional dollar of sales.

9      Q.   Just to back up for a minute, Dr. Gering

10  showed us how he calculated lost profits.

11          Do you recall that?

12      A.   Yes.

13      Q.   He started with the sales that were subject to

14  lost profits, correct?

15      A.   Yes.

16      Q.   And then he multiplied that by an incremental

17  profit margin.

18      A.   Yes.

19      Q.   To come up with a lost profits number.

20      A.   Right.

21      Q.   Now, the disagreement you have with him that

22  you were just describing relates to that margin that you

23  multiple by to reach the dollar amount --

24      A.   Yes.

25      Q.   -- is that right?

1          And you indicated that you don't think he's

2     properly accounted for costs related to the product; is

3     that right?

4          A.   Yes.

5          Q.   How has he failed to do that appropriately?

6          A.   I looked at the actual data from Centocor with

7     respect to their sales and their expenses, and then I

8     let the data tell me how much, using some statistical

9     methods, how much additional expenses would be based on

10    additional sales.

11         My understanding of what Dr. Gering did is he

12    actually talked to people at the company, and they kind

13    of eyeballed and told him they thought this expense

14    would vary, this expense would vary, as opposed to

15    looking at the data themselves and let the data tell you

16    what would happen.

17         Q.   So if you do it in the more precise way that

18    you've described, what impact does that have on the lost

19    profits analysis?

20         A.   The incremental expense number would be 5

21    percent higher, meaning the incremental profit numbers

22    that he calculated would be 5 percent lower.

23         Q.   Now, he gave us a lost profits number of

24    roughly $1 billion.

25         What is 5 percent of that amount?

1     A.    I think it's 50 million.  I didn't calculate

2  that, but I think that's right.

3     Q.    So there's a significant impact of this error?

4     A.    Yes.

5     Q.    I want to turn now to your opinions concerning

6  a reasonable royalty.

7          Now, if you can just explain for us when a

8  reasonable royalty would be available as opposed to lost

9  profits.

10    A.    If you find that the product is infringed,

11 then -- and you don't worry about lost profits, then

12 on all sales that are made of the infringed product,

13 you get a reasonable royalty.

14    Q.    So if lost profits are not available based on

15 the reasons you've described, then you would award a

16 reasonable royalty?

17    A.    Yes.

18    Q.    Now, what if lost profits are awarded on

19 certain indications or sales?

20    A.    Well, in our example, I believe that lost

21 profits are appropriate for Crohn's disease, but all the

22 other sales that were made, Centocor -- I'm sorry --

23 Abbott would still pay a reasonable royalty on those.

24          The key thing is you want to make sure that

25 you are not double counting.  You either get a

1  reasonable royalty or you get a lost profit, but you

2  don't get both.

3      Q.   Now, did you hear Dr. Gering's testimony

4  regarding the royalty rate he believes is appropriate?

5      A.   Yes.

6      Q.   What is that rate?

7      A.   15 percent.

8      Q.   Do you agree with Dr. Gering's testimony that

9  a 15 percent royalty rate is appropriate?

10     A.   I do not agree with that.

11     Q.   Have you done your own reasonable royalty

12  analysis for purposes of this case?

13     A.   Yes, I have.

14     Q.   And what method did you use to determine a

15  reasonable royalty?

16     A.   I went through -- you heard it described.

17          It's called the Georgia-Pacific factors --

18  Georgia-Pacific analysis.

19          It's nothing more than looking at economic

20  factors that you would expect would help you determine

21  the price of a particular good.  Here, the price is to

22  use someone else's intellectual property.

23     Q.   And let's turn briefly to DDX71.  Are these

24  the 15 specific Georgia-Pacific factors?

25     A.   Yes.

1  Q. And, again, we won't belabor them by going

2 through them each in detail, but could you tell us

3 whether or not you applied each of these factors in your

4 analysis?

5  A. I looked at every one of them.

6  Q. And when you did that, were there any

7 particular factors where you and Dr. Gering differed

8 most significantly in terms of your analysis?

9  A. Yes.

10  Q. And what were those?

11  A. Those would be Factor 2, which would be the

12 rates that Abbott pays in other licenses; and then in

13 Factor 15, the hypothetical negotiation.  Those are the

14 major areas of disagreement between us.

15  Q. And just backing up, the Georgia-Pacific

16 analysis, as Dr. Gering told us, assumes there is this

17 hypothetical negotiation.  What is that?

18  A. Once again, just like we have an imaginary

19 but-for world, we also have to pretend that if these

20 parties were locked in a room and they were forced to

21 stay in that room until they reached an agreement, and

22 using all the economic information that they had at the

23 time, what would have been a royalty that they would

24 have reached where both parties would have found it fair

25 and reasonable.

1          That's what the hypothetical negotiation is

2  intended to do.

3      Q.    And on what date did the hypothetical

4  negotiation occur for purposes of the reasonable royalty

5  analysis?

6      A.    Right around July 4th of 2006.

7      Q.    And is that the date that the '775 patent

8  issued?

9      A.    Yes.

10     Q.    Do you and Dr. Gering agree on that date?

11     A.    We do agree on that date.

12     Q.    Let's turn briefly to your analysis of Factor

13  2.  Explain for us what Factor 2 covers.

14     A.    Factor 2 covers -- one of the things, if you

15  were locked in this room together, that you would look

16  at, if I was -- if you were Centocor, and I was Abbott,

17  I would know what actual rates I had paid to others to

18  use on -- on this same product or in similar technology.

19  So the rates that Abbott paid on other licenses, what I

20  would be focusing on is what I'm paying others to use

21  this, if that's -- if that's the case.  If it's not that

22  case, then we go to Plan B.

23          But in this particular lawsuit, Plan A is --

24  we can do that, because we have a number of licenses

25  where Abbott has actually taken licenses on the same

1  product, Humira.

2      Q.    And did you consider those agreements -- those

3  agreements between Abbott and other parties concerning

4  Humira?

5      A.    Yes.

6      Q.    How many of those licenses did you rely on in

7  your analysis?

8      A.    I looked at four different licenses.

9      Q.    And what is the range of royalty rates in this

10  group of agreements?

11      A.    It's less than 1 percent, .35, which is a

12  third of 1 percent, up to about 4-1/2 percent.

13      Q.    So the lowest is .35 percent, and the highest

14  is 4-1/2 percent?

15      A.    Yes.

16      Q.    How does that compare to Dr. Gering's 15-

17  percent royalty rate?

18      A.    Well, they're, obviously, much lower than Dr.

19  Gering's 15 percent.

20      Q.    Now, why did you focus on those four

21  agreements in particular?

22      A.    Because, again, those are -- those are

23  agreements that cover the same product.  Abbott is

24  already paying someone else, different parties,

25  royalties on this very product.  And to me, nothing can

1  be more relevant than the actual product itself in this

2  particular case.

3      Q.   Now, of the four agreements relating to

4  Humira, do you consider any one of them particularly

5  relevant?

6      A.   Yes.

7      Q.   And what was that?

8      A.   That's the agreement between the same parties:

9  Centocor and Abbott.  They already have a license for

10  the same product, Humira.

11          MS. WIGMORE:  Let's turn to DDX221, which

12  is already in evidence.

13      Q.   (By Ms. Wigmore) Is this that agreement?

14      A.   Yes.

15      Q.   And what is the date of this agreement?

16      A.   December 23rd, 2002.

17      Q.   And you mentioned the parties are Centocor and

18  Abbott; is that right?

19      A.   Yes.

20      Q.   When did this agreement take place in relation

21  to the launch of Humira on the market in the U.S.?

22      A.   Very, very close to the time that Humira

23  actually launched.  It was right after it.

24      Q.   Now, you talked earlier about licensed Humira

25  and an arbitration.  Do you have an understanding as to

1  how this agreement relates to the licensed Humira we've

2  been discussing?

3      A.    This license covers -- this is the license

4  that essentially accounts for the license -- what's

5  called the licenseD Humira, the Humira taken with

6  Methotrexate.

7      Q.    And what is the scope of this license?

8      A.    The scope of it?

9      Q.    It covers like licensed Humira, which is

10  Humira with Methotrexate?

11      A.    With Methotrexate.

12      Q.    Okay.  And was there another agreement that

13  was entered into at the same time?  We heard some

14  testimony about that yesterday.

15      A.    Yes.

16      Q.    Before we move to that agreement, what is the

17  royalty rate specified in this agreement between Abbott

18  and Centocor concerning licensed Humira?

19      A.    I think that there's -- I don't think there's

20  disagreement between us.  The actual royalty rate that

21  was paid is 2 percent.

22          It's a little -- it's higher in the agreement,

23  but 2 percent is the actual rate, because what this

24  agreement accounts for is the fact that, as we already

25  said, Humira is paying royalties to other parties.  And

1  since they were paying to other parties, they offset it

2  or lowered this one, so it's 2 percent.

3      Q.   So they started with a 4 percent rate, but

4  offset other royalty payments by 2 percent to arrive at

5  a 2 percent effective rate --

6      A.   Yes.

7      Q.   -- is that right?

8          Now, we were talking about another agreement

9  that was entered at the same time.

10         MS. WIGMORE:  And if we could turn to

11  DX220, which is preadmitted.

12     Q.   (By Ms. Wigmore) Is this that other agreement?

13     A.   Yes.

14     Q.   And this is a license from Abbott to Centocor;

15  is that right?

16     A.   Yes.

17     Q.   And is there a particular -- if you look at

18  the Section B on that first page, do you see the

19  reference there to CNTO-148?

20     A.   Yes.

21     Q.   What is CNTO-148?

22     A.   That is the product that you've heard referred

23  to as golimumab and also finally in the market as

24  Simponi or Simponi (pronouncing).

25     Q.   So this is an agreement that applies to what

1  became Simponi?

2      A.   Yes.

3      Q.   What is the -- were you here yesterday when

4  Dr. Gering talked about the value that would have been

5  assigned to this agreement by Centocor?

6      A.   Yes.

7      Q.   And what -- remind us what he said about that.

8      A.   There's a number of different documents kind

9  of flying around that suggests that the various parties

10 put a great deal of value on it.  There's numbers in the

11 billions.  There's other numbers that suggest a smaller

12 amount.  But at the end of the day, the actual agreement

13 says 2 percent.

14            MS. WIGMORE:  Let's turn to Section 2.01

15 of the agreement.  If we could highlight that.

16     Q.   (By Ms. Wigmore) Is this the part of the

17 agreement that -- where the royalty terms are described?

18     A.   Yes.

19            MS. WIGMORE:  And if you turn toward the

20 bottom of that paragraph and if we could highlight the

21 last couple of sentences.

22     Q.   (By Ms. Wigmore) Can you just explain for us

23 what royalty rate is established in this agreement?

24     A.   The licensee's license under this agreement

25 will be a royalty license at a rate of 2 percent of the

1  licensee's net rate.

2     Q.   Now, are there situations in which there's no

3  royalty?

4     A.   Yes.  If there happened to be sales that are

5  covered by the other license that we talked about

6  earlier, going the other way, then there would no --

7  there would be no royalty.

8          But if it's not covered in a particular

9  country, then there would be a 2 percent royalty rate

10  going from -- in this case, from Centocor to Abbott,

11  instead of from Abbott to Centocor.

12     Q.   And how did the 2 percent rate that's set

13  forth both in the Centocor-to-Abbott agreement and the

14  Abbott-to-Centocor agreement impact your reasonable

15  royalty analysis?

16     A.   Well, it's very important, because it's also

17  consistent with both of these parties licensing with

18  other parties.

19          So if we look at that 2 percent -- those 2

20  percent rates, which, again, is between these two actual

21  parties over this actual product, it's very consistent

22  with what Abbott did with other licensees over Humira,

23  and it's also consistent with what Centocor did with

24  Remicade.

25     Q.   Now, we heard testimony yesterday from

1 Dr. Gering about the agreements he focused on in his

2 reasonable royalty analysis.

3          Do you agree that those agreements were

4 appropriate to focus on for that purpose?

5      A.   I do not.

6      Q.   Why not?

7      A.   Well, as an example, he puts a lot of focus on

8 this agreement you heard referred to as the Cordis

9 agreement.  The Cordis agreement has a very, very high

10 rate of 26 percent.  The Cordis agreement also covers

11 heart stents.

12          So if you're trying to make a decision, which

13 one do you think you should be looking at or the

14 parties, when they're locked in this room, are going to

15 rely on, would you rely on one that talks about heart

16 stents, or would you talk about one with respect to the

17 actual products that are the same -- very same products

18 that the parties are talking about when they're locked

19 in this room in 2006?

20      Q.   Now, the Cordis agreement you mentioned is the

21 one that had the three rates, but the highest was 26

22 percent?

23      A.   Yeah.  Goes from 3 to 15 to 26.

24      Q.   Aside from that 26 percent, did any of the

25 other agreements that Dr. Gering focused on have

1    anything approaching the 15 percent rate he selected?

2        A.   No.   They were all less than 10.   I think they

3    were 10 or -- there may have been one 12, but they were

4    all less -- most of them were significantly less than --

5        Q.   Now --

6        A.   -- 15.

7        Q.   I'm sorry.

8             Let's turn now to your analysis of Factor 15

9    of the Georgia-Pacific analysis.

10            MS. WIGMORE:   If we could just go back

11   briefly to the factors.

12       Q.   (By Ms. Wigmore) Factor 15 is the hypothetical

13   negotiation, generally.   Could you describe what's

14   involved in the analysis of Factor 15?

15       A.   Factor 15 is where you take into account all

16   of the information that you think is important in all

17   these other factors, and you put it all together, and

18   you try to figure out, when they would have unlocked

19   that door, what would they have walked out with?   What

20   would be the rate they would have agreed on that they

21   both considered reasonable?

22            MS. WIGMORE:   If we could turn, please,

23   to DDX72.

24       Q.   (By Ms. Wigmore) Does this describe the way

25   you approached your analysis of Factor 15?

1       A.    Yes.

2       Q.    And could you explain for us, please, what

3  factors impacted your analysis of that factor.

4       A.    I've already talked with you about why I think

5  an actual license between these same parties would be

6  very informative of what -- in 2002, they actually did

7  this.

8            And I think that's informative of what they

9  would have done when they got locked in that room in

10 2006.  The royalty range that Humira is actually paying,

11 as we already discussed, is less than 1 percent to

12 4-1/2.

13           In addition, I also mentioned to you

14 something -- you heard -- I think you heard someone else

15 discuss it as well, the idea of a royalty stack.

16           The royalty stack takes into account the fact

17 that in this particular case, you know that Humira -- or

18 Abbott is already paying royalties to a number of other

19 parties.

20           In fact, there are six other parties that have

21 intellectual property that Abbott has licensed on its

22 product, Humira.  And if you add those all up together,

23 those other six parties are charging Abbott a total

24 price of 16 to 17 percent as a royalty rate.

25       Q.    And how does that bear on the reasonable

1  royalty analysis?

2      A.   Well, it's very important, because if they're

3  paying six other parties a total of 16 to 17 percent,

4  how reasonable would it be to expect that they would pay

5  another party 15 percent, which is almost as high as

6  they're paying all the other six parties together?  It

7  just doesn't make sense to me as an economist.

8      Q.   And did you also look at the royalty stack on

9  Remicade?

10     A.   I did.

11     Q.   And how did that bear on your analysis?

12     A.   Again, Remicade -- Centocor is also paying

13  royalties.  And remember, they're locked in that room,

14  too.  They know that they're paying their licensing

15  partners between 11 and 14 percent.  Five different

16  parties, they're paying between 11 and 14 percent.

17  So when you look at both of those things, obviously,

18  this rate that's been suggested of 15 percent is higher

19  than the total royalty stack that Centocor is paying on

20  Remicade, as well as almost as high as what Humira is

21  paying on -- sorry -- what Abbott is paying on Humira,

22  and it doesn't make sense.

23     Q.   Now let's turn to the last factor you

24  mentioned in here, research and development cost.  Can

25  you describe, first of all, what those are and then how

1  they bear on your analysis.

2      A.    One of the suggestions that was made by

3  Dr. Gering is that he looked at Humira's profit margin,

4  and he said they make a big profit margin of 47 percent,

5  and they could take 15 percent of that.

6          And you saw that dollar bill thing he had,

7  and --

8      Q.    And we can actually pull that up, if I could

9  just interrupt.  We can show you that slide that we saw

10  from Dr. Gering yesterday.

11     A.    Okay.

12     Q.    Did you agree with this allocation?

13     A.    Absolutely not.

14     Q.    Why not?

15     A.    Because what he's failing to take into account

16  is that 47 percent -- you've also heard -- you heard, I

17  think, Mr. Scodari talk about -- and others talk about

18  how risky these drugs are.  It's very -- and the

19  scientists talked -- all the scientists have talked

20  about that all of these drugs, they can spend 400 to

21  $600 million on a drug, and it fails.

22          That's a lot of money.  So how can they do

23  that?  How can they afford to pay even, you know, 400,

24  $600 million and have it fail?

25          Well, the reason you can do that is because,

1 on products that do well, you take the profits you make

2 on these products, and you're able to fund the other

3 research to bring other drugs to help other people and

4 other -- you know, other diseases.

5        So it's important to understand that those

6 profits in part are going to be used towards all these

7 drugs that fail.

8    Q.   Now, did this breakdown that Dr. Gering

9 provided, his suggestion that it will be $32 of profit

10 on every hundred dollars of sales that would be impacted

11 by his damages analysis, did that analysis take into

12 account research and development costs for Humira?

13    A.   No.   Research -- you heard -- I think you

14 heard one of the scientists talk about the fact that his

15 estimate was it was over a billion dollars that had been

16 used.   I've seen estimates as high as $2 billion on what

17 has gone into the research and development of Humira

18 that you also heard has helped so many patients.

19    Q.   If you take into account those R&D costs, how

20 would that impact this percentage of profit that would

21 be impacted by the damages award Dr. Gering is

22 proposing?

23    A.   Well, the return that they would get would be

24 much lower, and their ability to compete in the industry

25 would be much lower.

1     Q.   And let's talk about that a little bit more.

2  What impact would it have on Abbott to require a

3  significant portion of their profitability to be spent

4  on -- on a damage award?

5     A.   Well, again, it would affect their ability to

6  invest in other drugs.  It would cause competition in

7  the markets to change and decline.  It would cause the

8  number of new drugs that they were able to go -- to

9  start developing to decline.

10     Q.   And is that relevant to the --

11     A.   So it could affect competition, and it could

12  affect innovation.

13     Q.   Is that relevant in a reasonable royalty

14  analysis?

15     A.   Yes.

16          MS. WIGMORE:  Now, let's go back to the

17  previous slide, DX72.

18     Q.   (By Ms. Wigmore) Based on your analysis of

19  these factors, what did you conclude about a reasonable

20  royalty should the '775 patent be found valid and

21  infringed?

22     A.   The 2.25 percent would be a reasonable

23  royalty.

24     Q.   And is that for the United States sales?

25     A.   Yes.

1    Q.   You also mentioned you have a different rate

2  for sales outside the United States.  What rate is that?

3    A.   1.25 percent.

4    Q.   Can you explain for us why it is that you have

5  two different rates, one for U.S. sales and one for

6  sales outside the U.S.?

7    A.   There's a little -- there's a little nuance, a

8  little -- it's an interesting fact that in order to get

9  a royalty, you have to make, use, and sell the stuff in

10  the United States, if you're going to get a royalty

11  payment in the United --

12              THE COURT:  It's not make and; it's make

13  or use.

14              THE WITNESS:  I apologize, Your Honor.

15              THE COURT:  Okay.  You're starting to get

16  over in the area where I tell them, okay?  That's the

17  law.

18              THE WITNESS:  I'm sorry, Your Honor.

19              THE COURT:  It's make or use.

20              THE WITNESS:  I'm sorry, Your Honor.

21              THE COURT:  Thank you.

22    A.   So my understanding is, if it is made outside

23  the United States and -- and whatever His Honor just

24  said, then you don't pay a royalty in the U.S., is my

25  understanding of that.

1          So one way in a negotiation is that you could

2     suggest that you make them outside the U.S., and they

3     would have the option to do that.  And that's why I

4     suggested the lower rate.

5          Q.   (By Ms. Wigmore) So just to clarify some

6     assumptions here, there are sales of Humira, as you

7     understand, that are made outside the U.S., the sales.

8          A.   Yes.

9          Q.   And right now those sales are actually -- the

10    product's made in the U.S.; is that right?

11         A.   Right.

12         Q.   And what did you -- what did you analyze in

13    terms of manufacturing options for those sales as part

14    of your reasonable royalty analysis?

15         A.   They could have been made outside the U.S.

16         Q.   Okay.  And did you consider the cost that

17    would be involved in changing manufacturing as part of

18    that assessment?

19         A.   Yes.

20         Q.   And what did you conclude?

21         A.   That it would -- could be economically

22    feasible to do so.

23         Q.   And so that explains why the rate for outside

24    the U.S. sales is lower than the rate for U.S. sales?

25         A.   Yes.

1    Q.   Now, did Dr. Gering factor in the possibility

2  of overseas manufacturing for these international sales

3  in his analysis?

4    A.   Not that I'm aware of.

5    Q.   And would that be something the parties would

6  consider as part of the reasonable royalty negotiation?

7    A.   Yes.

8    Q.   Now, let's just summarize where we are.

9  You understand that there's a dispute in this case as to

10  when Centocor provided notice to Abbott of its alleged

11  infringement of the '775 patent.

12    A.   Yes.

13    Q.   And do you understand it's Abbott's position

14  that damages, if any, should run from April 16th of

15  2007, the date on which the complaint was filed?

16    A.   Yes.

17    Q.   Do you understand it's Centocor's position

18  that damages, if any, should run from the date the

19  patent was issued on July 4th of 2006?

20    A.   Yes.

21    Q.   Do you have any opinion as to which of those

22  dates is appropriate?

23    A.   I do not.

24    Q.   And have you provided calculations based

25  alternatively on either date?

1    A.    Yes.

2    Q.    Now --

3          MS. WIGMORE:   If we could turn to the

4 next slide.

5    Q.    (By Ms. Wigmore) Based on the opinions you've

6 described about what lost profits should be available

7 and what royalty rates should apply -- be applied, what

8 did you conclude would be the appropriate damages if the

9 '775 patent is found to be valid and infringed?

10   A.    Lost profits of $108,295,000.   Reasonable

11 royalties on those sales that are not covered by lost

12 profits of 100,852,000 for a total of lost profit and

13 reasonable royalty of $209,147,000.

14   Q.    And with respect to those numbers, which of

15 the two notice dates that we just discussed did you

16 apply?

17   A.    This one is the April 16, 2007.

18   Q.    Now, if the jury were to conclude that no lost

19 profits are recoverable, but instead, all damages should

20 be in the form of a reasonable royalty, what would the

21 total amount be, assuming the April 16th of 2007

22 starting date?

23   A.    104,385,000.

24   Q.    Now, you mentioned that you had done

25 alternative calculations assuming a July 4th, 2006

1  starting date?

2       A.   Yes.

3       Q.   If that date's adopted, how would that impact

4  the amounts that we see here?

5       A.   They would be higher.

6       Q.   Now, I just want to clarify something.

7  Now, you mentioned that these are your damages

8  calculations.  Do you have an opinion as to whether

9  Abbott actually owes this amount?

10      A.   No.

11      Q.   If Humira does not infringe the '775 patent,

12 what amount of damages would be appropriate?

13      A.   Zero.

14      Q.   And if Humira -- if the '775 patent is

15 invalid, what amount of damages would be appropriate?

16      A.   Zero.

17      Q.   Thank you.

18           MS. WIGMORE:  I have no further

19 questions.  I pass the witness.

20           THE COURT:  Who's going to do this

21 cross-exam?

22           MR. MASLOWSKI:  Steven Maslowski for

23 Centocor, Your Honor.

24           THE COURT:  Well, I don't want to

25 disappoint you, Counsel, but have a seat.

1          We're going to do this in the morning,

2    Ladies and Gentlemen.  I don't want to disappoint

3    anybody, but I don't know how long it will take, but

4    you've had a pretty full day of it.

5          Let me talk to you a little bit about our

6    schedule before I release you for the day.

7          Based on my -- by this time tomorrow --

8    by this time tomorrow, we're going to be through with

9    the evidence for sure, and hopefully, a little -- about

10   the time of the afternoon break, I should be able to

11   release you to come back.

12         And as you'll recall, as I told you,

13   we're not going to work on this case on Friday due to

14   other commitments.

15         So, hopefully, we'll finish up sometime

16   between 3:00 and 5:00 tomorrow afternoon, and then

17   you'll come back on Monday.  And I'll finalize the

18   charge before I leave tomorrow afternoon, and we'll have

19   everything ready to go first thing Monday morning.

20   So that's the plan, to, hopefully, get out of here at

21   least an hour and a half early tomorrow afternoon, I

22   think you can -- unless somebody -- I'm going to visit

23   with the lawyers this afternoon and see if I can't

24   convince them that 3:30 would be a good time to go home

25   tomorrow.

1                    And so you can keep that in mind, and I

2  will see you in the morning.  It's real important to

3  keep an open mind.  You still haven't heard all the

4  evidence in the case.  You're going to hear

5  cross-examination of this witness, and then I believe

6  we'll have some rebuttal testimony, and then we'll be

7  through.

8                    So we need to wait until we hear all the

9  evidence before you start making up your mind.

10  Do not discuss this case with anyone.  Do not do any

11  research.  Do not talk to anyone about the case.  Keep

12  those instructions.

13                    Have a nice evening, drive safely, and

14  I'll see you in the morning at 8:30.

15                    COURT SECURITY OFFICER:  All rise.

16                    (Jury out.)

17                    THE COURT:  You can step down.

18                    Court is in recess.  I'll see counsel up

19  here for just a moment.

20                    (Bench conference.)

21                    THE COURT:  Okay.  Give me about 10

22  minutes, and I'll see y'all in chambers, and we'll visit

23  about the Court's Charge.

24                    MR. SAYLES:  Yes.

25                    THE COURT:  And we'll get that done.

1  And Mr. -- how long -- how long is cross going to last

2  on this witness?  I guess we ought to have -- you got

3  any estimates there?

4  MS. ELDERKIN:  I'm sure no more than an

5  hour.  I would think probably less than that.  An hour

6  at the most.

7  THE COURT:  Okay.  Well, I'm trying to

8  make heroes out of all of you, so...

9  MR. BECK:  And how long for rebuttal are

10  you talking about?

11  MS. ELDERKIN:  I actually think we could

12  be finished by lunch.

13  THE COURT:  Yeah.  That's what I'm

14  hoping.  That's really what I'm hoping.  I'm trying to

15  make heroes out of you.  I may have some comments about

16  you and Mr. Sayles individually.

17  I really feel bad, Mr. Gillam.  I haven't

18  said anything to this jury about you.

19  MR. GILLAM:  Your Honor, with all the

20  discussion about age, I'm just waiting for Mr. Williams

21  and Mr. Beck to fall out, and then I'll be here in the

22  wings to take care of them.

23  THE COURT:  Okay.  Who's going to take

24  care of me?  I mean, we're awful close in age.

25  All right.  I'll see y'all in just a few

1   minutes.  Give me about 10 minutes.

2                   (Court adjourned.)

3                   *       *       *       *       *

4

5

6                   CERTIFICATION

7

8           I HEREBY CERTIFY that the foregoing is a

9   true and correct transcript from the stenographic notes

10  of the proceedings in the above-entitled matter to the

11  best of my ability.

12

13

14

15  /s/_____            _____

    SUSAN SIMMONS, CSR                  Date
16  Official Court Reporter
    State of Texas No.:  267
17  Expiration Date:  12/31/10

18

19

20  /s/_____             _____

    JUDITH WERLINGER, CSR               Date
21  Deputy Official Court Reporter
    State of Texas No.:  731
22  Expiration Date  12/31/10

23

24

25