```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   CENTOCOR, ET AL          *     Civil Docket No.
                              *     2:07-CV-139
 4   VS.                      *     Marshall, Texas
                              *
 5                            *     June 25, 2009
     ABBOTT LABORATORIES      *     8:30 A.M.
 6

 7            TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE JUDGE T. JOHN WARD
 8             UNITED STATES DISTRICT JUDGE
                      AND A JURY
 9

10   APPEARANCES:

11   FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                            MS. BARBARA MULLIN
12                          MR. STEVEN MASLOWSKI
                            MS. ANGELA VERRECCHIO
13                          MR. MATTHEW PEARSON
                            Woodcock Washburn
14                          2929 Arch Street, 12th Floor
                            Cira Centre
15                          Philadelphia, PA   19104

16                          MR. RICHARD SAYLES
                            MR. MARK STRACHAN
17                          Sayles Werbner
                            1201 Elm Street
18                          4400 Renaissance Tower
                            Dallas, TX   75270
19

20   APPEARANCES CONTINUED ON NEXT PAGE:

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDITH WERLINGER, CSR
22                          Official Court Reporters
                            100 East Houston, Suite 125
23                          Marshall, TX   75670
                            903/935-3868
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1

 2   APPEARANCES CONTINUED:

 3

 4   FOR THE DEFENDANTS:    MR. WILLIAM LEE
                            MS. AMY WIGMORE
 5                          MR. WILLIAM MCELWAIN
                            Wilmer Cutler Pickering Hale
 6                               and Dorr
                            1875 Pennsylvania Avenue, N.W.
 7                          Washington, DC   20006

 8
                            MR. DAVID BECK
 9                          Beck Redden & Secrest
                            One Houston Center
10                          1221 McKinney Street
                            Suite 4500
11                          Houston, TX   77010

12
               *       *       *       *       *       *
13

14
                       P R O C E E D I N G S
15

16             COURT SECURITY OFFICER:  All rise.

17             (Jury in.)

18             THE COURT:  Please be seated.

19             Good morning, Ladies and Gentlemen.

20             Thank you for being here timely.

21             Good morning, Counsel.

22             You ready to proceed?

23             MR. MASLOWSKI:  We are, Your Honor.

24             THE COURT:  All right.

25             MR. MALONEY:  May it please the Court.
```

1          THE COURT:  Proceed.

2          MR. MALONEY:  Don't worry; we're not

3  going to go through every single one of those.  I saw

4  the looks on your faces.

5          THE COURT:  For some reason, that was

6  going through my mind.  I thought my conversation

7  yesterday fell on deaf ears.

8          MR. MASLOWSKI:  I think we'll see that

9  those documents, all of those documents, are relevant

10 here.

11    DANIEL SLOTTJE, Ph.D., DEFENDANTS' WITNESS, SWORN

12                 CROSS-EXAMINATION

13 BY MR. MASLOWSKI:

14    Q.   Good morning, Dr. Slottje.

15    A.   Good morning.

16    Q.   We met at your deposition a few months back,

17 correct?

18    A.   Yes.

19    Q.   Now, you are here as a professional witness,

20 correct?

21    A.   Yes.

22    Q.   You do this for a living?

23    A.   Yes.  Partially, yes.  I'm also a professor.

24    Q.   You provide testimony and opinions in patent

25 cases, correct?

1          A.   Yes.

2          Q.   You provide testimony and opinions in

3    trademark cases, correct?

4          A.   I'm sorry.  I didn't hear that.

5          Q.   You provide testimony and opinions in

6    trademark cases, correct?

7          A.   Yes.

8          Q.   You provide testimony and opinions in

9    copyright cases, correct?

10         A.   Yes.

11         Q.   You provide testimony and opinions in trade

12   secret cases, correct?

13         A.   Yes.

14         Q.   You provide testimony and opinions in other

15   types of cases, correct?

16         A.   Yes.

17         Q.   Have any of your opinions ever been wrong?

18         A.   I'm not sure what you mean by that.

19         Q.   Have any of your opinions ever been rejected

20   by a jury?

21         A.   Not that I'm aware of.

22         Q.   Every single one of your opinions has been

23   accepted by every single jury you've been in front of?

24         A.   As far as I know.

25         Q.   Now, this is -- giving testimony and opinions

1   is one of the ways that you make money, correct?

2       A.   Yes.

3       Q.   Did you make more money last year giving

4   opinions than teaching?

5       A.   Yes.

6       Q.   In fact, Dr. Slottje, you're charging $750 an

7   hour for your time in this case; isn't that right?

8       A.   Yes.

9       Q.   Now, Dr. Slottje, you have taken issue with

10  Dr. Gering's damages analysis, correct?

11      A.   Yes.

12      Q.   And as part of that, you've taken issue with

13  Dr. Gering's lost profits analysis, correct?

14      A.   Yes.

15      Q.   And to sum it up, you think he did it wrong,

16  correct?

17      A.   Yes.

18      Q.   And yesterday, you put up a slide where you

19  identified three reasons why you thought he did it

20  incorrectly, right?

21      A.   Correct.

22      Q.   For example, you said that he didn't consider

23  all of the non-infringing alternatives on the market,

24  correct?

25      A.   Correct.

1       Q.   But he was specifically asked whether he

2  considered all the non-infringing alternatives, and he

3  answered that he did.

4            Do you recall that testimony?

5       A.   Yes.

6       Q.   You also said he didn't consider the fact that

7  there were differences in products, and they, therefore,

8  don't compete in the same market segment, correct?

9       A.   Yes.

10      Q.   But Dr. Gering specifically said he did study

11  the differences in the products as well as

12  patient/doctor preferences.

13           Do you recall that?

14      A.   Yes.

15      Q.   And he said he took all of that information

16  into account in his opinion, correct?

17      A.   Yes.

18      Q.   And you also said he didn't consider market

19  growth in his analysis, correct?

20      A.   Right.

21      Q.   But he was specifically asked whether he

22  accounted for the growth in the market, and his answer

23  was absolutely.

24           Do you recall that?

25      A.   Yes.

1    Q.   So you're not saying he completely ignored

2 these issues, are you?

3    A.   No.  I'm saying he did completely ignore those

4 issues.

5    Q.   You're saying he did not ignore those issues,

6 correct?

7    A.   I'm saying he did ignore those issues.

8    Q.   So his answers to the questions that we just

9 went through were not accurate?

10   A.   I don't think so.

11   Q.   Well, let's look at some of those issues.

12        Dr. Gering did what is called a market share

13 analysis, correct?

14   A.   Yes.

15   Q.   And yes or no, the market share rule is based

16 on the simple idea that in the absence of a

17 non-infringing product, sales of the patented product

18 would be divided among the remaining products in the

19 marketplace, according to their market shares.

20        Yes or no?

21   A.   Yes.

22   Q.   And yes or no, in defining the market, in many

23 instances, the patent owner, or the infringer, will have

24 performed its own market analysis, which can often be

25 very useful information in defining the relevant market.

1      Yes or no?

2      A.    Yes.

3      Q.    And one other criticism of Dr. Gering's lost

4  profits analysis that you have is that he calculated the

5  incremental profit margin incorrectly; is that right?

6      A.    Correct.

7      Q.    That analysis involves determining what is a

8  fixed cost as opposed to a variable cost, correct?

9      A.    Yes.

10      Q.    And you said Dr. Gering overstated it by 5

11  percent, correct?

12      A.    Yes.

13      Q.    But when Dr. Gering did his analysis to

14  determine the incremental profit margin, he interviewed

15  the people closest to the Remicade business, like the

16  Chief Financial Officer at Centocor, to understand what

17  would be fixed versus what would be variable, correct?

18      A.    Correct.

19      Q.    And isn't that the way that it is usually

20  done?

21      A.    I would disagree with that.

22      Q.    I'm going to read you something, Dr. Slottje:

23  We have seen damages experts estimate what they deem to

24  be fixed, or some cost, versus what they consider to be

25  a variable cost.  Usually, this estimate is based on

1  interviews with and/or testimony from the key financial

2  personnel at the infringed company.

3         Does that ring a bell, Dr. Slottje?

4     A.   Yes.

5     Q.   Do you know what I'm reading from?

6     A.   Yes.

7     Q.   What is this?

8     A.   It's a book that I was the editor of, but many

9  people contributed to it.

10     Q.   I just asked you what it is.  Right, it's a

11  book?

12     A.   Yes.

13     Q.   And your name is in bold letters on the

14  bottom, correct?

15     A.   Yes.

16     Q.   And the title is Economic Damages in

17  Intellectual Property, correct?

18     A.   Correct.

19     Q.   And intellectual property includes patents,

20  correct?

21     A.   Yes.

22     Q.   And this gold star right here says a hands-on

23  guide to litigation, correct?

24     A.   Yes.

25     Q.   And this is a litigation, correct?

1       A.   Correct.

2       Q.   In that book, it says the usual way to figure

3   out incremental profit margin is to talk to the people

4   closest to the business, correct?

5       A.   No.   That's not what it says.

6       Q.   Let's go back to it, Dr. Slottje.

7            Usually, this estimate -- usually, this

8   estimate is based on interviews with and/or testimony

9   from the key financial personnel at the infringed

10  company.

11           Did I read that correctly?

12      A.   Yes, you read that correctly.

13      Q.   And this book was published before you got

14  involved in this litigation, correct?

15      A.   Yes.

16      Q.   It was published in 2006?

17      A.   Correct.

18      Q.   Dr. Slottje, let's talk about one more of your

19  slides from yesterday.   The only slide with any dollar

20  figures on it that you showed to the jury regarding your

21  damage calculation, started that calculation on the date

22  the lawsuit was filed, correct?

23      A.   Yes.

24      Q.   And April 16th, 2007 was the date the lawsuit

25  was filed, correct?

1       A.    That's my understanding.

2       Q.    But the patent issued from the Patent Office

3  on July 4th, 2006, correct?

4       A.    Yes.

5       Q.    And you've been in Court the last three days,

6  correct?

7       A.    Correct.

8       Q.    And you heard Mr. Scodari from Centocor

9  testify that he told Abbott on numerous occasions that

10  they were infringing, before the patent issued, correct?

11      A.    I don't recall that precise testimony, but I

12  don't disagree with you.

13      Q.    Did you hear Ms. Lubbert, Abbott's corporate

14  representative, testify by video that Abbott was given a

15  copy of the '775 patent application in December 2005,

16  after it was allowed, and Abbott was told by Centocor

17  that that application could affect Humira?

18            Do you remember that testimony?

19      A.    I recall you discussing that testimony during

20  the trial, yes.

21      Q.    And Ken Dow also testified that he had

22  discussions with the patent attorney at Abbott, correct?

23      A.    Yes.

24      Q.    And they discussed issues related to the

25  infringement of the '775 patent, correct?

1       A.    I heard -- I heard Mr. Dow's testimony, yes.

2       Q.    Now, if the jury finds that Abbott had notice

3  of infringement when the patent issued, then the damage

4  calculation starts on July 4th, 2006, correct?

5       A.    I have no opinion on that.  I -- I did a

6  damage calculation for that period, as you know, but I

7  don't have an opinion on as for -- that's not my job to

8  do.

9       Q.    Well, you're a damages expert, correct?

10      A.    Yes.

11      Q.    And if it's determined that Abbott had notice

12  of infringement as of July 4th, 2006, then that's when

13  the damage calculation starts, correct?

14      A.    I was asked to do damage --

15      Q.    Yes or no, Dr. Slottje.

16      A.    I don't know.

17      Q.    Does the damage calculation start when Abbott

18  has notice of the patent?

19      A.    I don't know.

20      Q.    So if it turns out -- are you okay?

21            THE COURT:  Get closer to the microphone.

22            COURTROOM DEPUTY:  Right.

23      Q.    (By Mr. Maslowski) And if the jury finds that

24  Abbott had notice of infringement when the patent

25  issued, if it turns out that that is when the damage

1 calculation starts, then the jury should disregard your

2 damages number, which starts in April of 2007, correct?

3     A.   I did two calculations.  I did a calculation

4 in July of '06, as I talked about, and I did a

5 calculation in April of '07.

6     Q.   But I'm talking about the one you put up on

7 the slide.  That started in April 2007, correct?

8     A.   Correct.

9     Q.   And, Dr. Slottje, let's start with lost

10 profits.

11         Now, it isn't Dr. Gering's opinion that

12 Centocor gets lost profits on all Humira sales since

13 July 2006, correct?

14     A.   Correct.

15     Q.   And it is not Dr. Gering's opinion that

16 Centocor gets lost profits on even half of Humira sales

17 since July 2006, correct?

18     A.   I believe that's correct.

19     Q.   And, in fact, it's not even Dr. Gering's

20 opinion that Centocor gets lost profits on a quarter of

21 Humira sales since July 2006, correct?

22     A.   I would have to look at the number, but I

23 don't disagree with you.  I don't know sitting here.

24     Q.   Let's look at the number.

25             MR. MASLOWSKI:  Joe, can you put up

1  Gering Slide No. 3, please?

2      Q.   (By Mr. Maslowski) Do you recall this slide

3  from Dr. Gering's testimony?

4      A.   Yes.

5      Q.   And the large blue section are the Humira

6  sales that Dr. Gering says Centocor does not get lost

7  profits for, correct?

8      A.   Correct.

9      Q.   And the yellow section is another section that

10 Dr. Gering says Centocor does not get lost profits for

11 those sales either, correct?

12     A.   Which -- which was the second one?  I'm sorry.

13     Q.   The yellow.

14     A.   Correct.

15     Q.   And it's only the little gray slice right

16 there that Dr. Gering says that Centocor gets lost

17 profits for, correct?

18     A.   Correct.

19     Q.   And can you tell from looking at that chart

20 whether that's less than 25 percent of Abbott's overall

21 sales since July 2006?

22     A.   Yes.  Now that I see the slide, yes.

23     Q.   Now, Dr. Gering, you -- strike that.

24          Dr. Slottje, you agree with Dr. Gering that

25 Centocor is entitled to lost profits in Crohn's disease

1    up through the launch of a drug called Cimzia on April

2    22nd, 2008, correct?

3         A.   Yes.

4         Q.   And you provided a report where you calculated

5    the amount of profits that Centocor lost in Crohn's

6    disease from the time the '775 patent issued up until

7    April 21st, 2008, the day before the product launched,

8    correct?

9         A.   Correct.

10        Q.   Dr. Slottje, let's look at your Exhibit 10.1,

11   if we can.  You should have a copy of your report in

12   front of you.

13             MR. MASLOWSKI:  And, Your Honor, his --

14        Q.   (By Mr. Maslowski) It's there; it should be

15   separate.

16             MR. MASLOWSKI:  Does he have a copy of

17   his report?

18        Q.   (By Mr. Maslowski) It's in the front of your

19   binder.  Got it?

20        A.   Yes.

21        Q.   Great.

22    MR. MASLOWSKI:  Your Honor, his report is not an

23   exhibit.  It's not preadmitted.

24             Do I have permission to put it up on the

25   slide or the screen for purposes of cross-examination?

1               THE COURT:  Yes.

2               MR. MASLOWSKI:  Joe, can we put up

3   Exhibit 10.1 from Dr. Slottje's report, please?

4               If we can just blow up the left-hand side

5   of the chart, the lost profits calculation right there.

6       Q.   (By Mr. Maslowski) Now, this is where you

7   calculated the lost profits that are due to Centocor on

8   account of Abbott's infringement, correct?

9       A.   Yes.

10      Q.   Now, up until April 21st, 2008, your lost

11  profits methodology in Crohn's was the same methodology

12  as Dr. Gering's, correct?

13      A.   Correct.

14      Q.   And the first step in your lost profits

15  calculation, for example, was to take out Humira sales

16  in combination with Methotrexate, correct?

17      A.   Correct.

18      Q.   Now, Dr. Slottje, you have criticized

19  Dr. Gering because he didn't take licensed Humira into

20  account when he did his lost profits analysis, correct?

21      A.   Yes.

22      Q.   Can you please point us, in your lost profits

23  calculation, to the exact line where you account for

24  Humira plus Methotrexate as a non-infringing alternative

25  in the but-for world?

1     A.     You're showing the Crohn's, and it's not in

2  Crohn's as I discussed yesterday.

3     Q.     So Dr. Gering's analysis for Crohn's is not

4  inaccurate at all to the extent that he didn't take into

5  account Humira plus Methotrexate as a non-infringing

6  alternative.

7          Is that your opinion?

8     A.     Yes.

9     Q.     Now, Dr. Slottje --

10    A.     Excuse me.  I should make sure that I answer

11  that completely.

12          Up through April of 2008, and then after April

13  of 2008, we do disagree, because there are others

14  available.

15    Q.     Well, let's look at that.  Let's look at where

16  you disagree.  So let's continue to focus on your lost

17  profits analysis in Crohn's.

18          Under your assumption in the but-for world, in

19  2007, 99 percent of bio-naive Crohn's patients would

20  have used Remicade, if Humira was not available,

21  correct?

22    A.     Up through 2008, yes.

23    Q.     Right.  So up through April of 2008, 99

24  percent of patients who had never used a biologic

25  product before -- if Humira wasn't available, 99 percent

1    of those folks would have taken Remicade, correct?

2         A.   They had no other choice.  Correct.

3         Q.   And that's the way it was on April 21st, 2008,

4    correct?

5         A.   Yes.

6         Q.   Then on April 22nd, 2008, Cimzia launches,

7    correct?

8         A.   Yes.

9         Q.   And in your lost profits analysis, on the day

10   Cimzia launches, the very day it launches, 0 percent of

11   Humira's bio-naive patients would have used Remicade, if

12   Humira was not available, correct?

13        A.   No.

14        Q.   Let me ask it a different way.

15             On April 21st, 2008, under your analysis,

16   there is sufficient data for you to determine that

17   Centocor would have lost sales on 99 percent of Humira

18   sales to bio-naive patients, correct?

19        A.   On the date prior to the launch?

20        Q.   Yes.

21        A.   I agree.

22        Q.   And then the very next day, after Cimzia

23   launches, under your analysis, there is insufficient

24   data for you to make a determination that Centocor's

25   entitled to anything more than 0 percent of Humira's

1  sales to bio-naive patients, correct?

2      A.   That's not how I did the analysis, but I would

3  agree with the conclusion.

4      Q.   What percent of bio-naive patients, in your

5  analysis, does Centocor get for Remicade sales on April

6  22nd, 2008?

7      A.   I don't know.  That's why I didn't give them

8  any lost profits.

9      Q.   So you gave them zero, correct?

10      A.   Correct, because I don't know.

11      Q.   Now, Dr. Gering has stated that he was able to

12  analyze the data to determine the amount of lost profits

13  that Remicade would have had for these diseases,

14  including Crohn's, correct?

15      A.   Yes.

16      Q.   Now, let's go back to May 2008, right after

17  Cimzia launches, and take a look at your lost profits

18  calculation.

19          Now, the only choices in Crohn's, the day

20  after Cimzia launches, are Remicade and Cimzia, correct?

21      A.   Yes.

22      Q.   Did you review market share data in this case,

23  Dr. Slottje?

24      A.   Yes.

25      Q.   Do you recall Mr. Bazemore's testimony where

1  he pointed out that Cimzia ended 2008 with a market

2  share of 2 percent?

3      A.   Yes.

4          MR. MASLOWSKI:  In fact, let's put up

5  Mr. Bazemore's slide showing market shares for Crohn's

6  disease, if we could.

7      Q.   (By Mr. Maslowski) So that little black sliver

8  is Cimzia's market share, correct?

9      A.   Yes.

10     Q.   At the end of 2008, they had 2.1 percent,

11 correct?

12     A.   Correct.

13     Q.   So according to your lost profits analysis,

14 Remicade did not get one additional sale in Crohn's,

15 after the launch of the product that's shown in that

16 little black sliver on that pie chart, correct?

17     A.   My opinion is not that they wouldn't.  My

18 opinion is I don't know how much.

19     Q.   So why didn't you give Remicade one?

20     A.   Because it would be guessing, and I'm not

21 supposed to do that.

22     Q.   You can't tell from looking at market share

23 data like this, for example, where Remicade is preferred

24 in the actual marketplace, 75 to 2, that Remicade would

25 have had just one more sale?

1       A.    I'm sure they would have, but I don't know

2  what happened to those Humira sales.   That's the

3  problem.

4       Q.    But you didn't give them one; you didn't give

5  them one single sale, correct?

6       A.    I didn't know how many to give them, so I

7  didn't give them -- them a reasonable royalty.

8       Q.    And the same is true for all of the other

9  indications that we looked at, correct?

10      A.    That's correct.

11      Q.    And RA, PsA, AS, psoriasis, you didn't give

12 one single additional sale of Remicade to Centocor in

13 the but-for world without infringing Humira on the

14 market, correct?

15      A.    I didn't know how many to give them.   I agree

16 with that.

17      Q.    So you didn't even give them one?

18      A.    Correct.

19      Q.    Now, you were here in the Court when His Honor

20 stated on the first day, when he was speaking to the

21 jury, that a valid U.S. patent gives the patent owner

22 the right, for up to 20 years from the date that the

23 patent application was filed, to prevent others from

24 making, using, offering to sell, or selling the patented

25 invention within the United States.

1          Do you remember that?

2     A.   Yes.

3     Q.   So it's infringement to make, to use, or to

4 sell, correct?

5     A.   That's my understanding.

6     Q.   Now, with that in mind, Dr. Slottje, I would

7 like to focus on your contention that Humira plus

8 Methotrexate is an allegedly non-infringing alternative

9 in the but-for world.

10          Now, the but-for world is not a real world,

11 correct?

12     A.   Correct.

13     Q.   It's a world that an economist like you may

14 create to calculate lost profit damages, correct?

15     A.   Correct.

16     Q.   Dr. Slottje, yes or no, may an economist who

17 is analyzing a lost profit patent damages construct a

18 but-for world which allows for infringement?

19     A.   No.

20     Q.   So let's focus on one single syringe of Humira

21 in the but-for world, okay?  Just one.

22          January 1st, 2008, Abbott makes one syringe of

23 Humira.  Do you have that syringe in mind?

24     A.   Yes.

25     Q.   Yes or no, is Abbott's manufacture of that

1  syringe of Humira in the but-for world an infringement?

2      A.   I don't know.

3              MS. WIGMORE:   Your Honor, I have an

4  objection.

5              THE COURT:   Pardon?

6              MS. WIGMORE:   I'm objecting to the extent

7  he's arguing that licensed sales are not infringed.

8              THE COURT:   Overruled.

9      Q.   (By Mr. Maslowski) Your answer was you don't

10 know?

11     A.   I don't know.

12     Q.   Let's follow that same vial of Humira, the

13 same syringe of Humira.

14         Abbott is probably going to sell it to a

15 pharmacy, correct?

16     A.   That's one way that it can be distributed,

17 yes.

18     Q.   So when Abbott sells that syringe of Humira to

19 a pharmacy, is that an act of infringement?

20     A.   I don't know.

21     Q.   Now, if a patient goes to the pharmacy and

22 picks up that syringe of Humira, takes it home, injects

23 themselves, and has never used Methotrexate ever, is

24 that an infringement of Centocor's patent in the but-for

25 world?

1    A.   If they didn't pay on it, yes, I presume that

2  is, under the assumptions that we're talking about.

3    Q.   So if a syringe of Humira is made by Abbott,

4  it's sold by Abbott, and it's used by a patient at home

5  without Methotrexate, that whole use is infringing; is

6  that right?

7    A.   That's my understanding.

8    Q.   But it's your opinion that Abbott would have

9  continued to make and sell Humira for use in combination

10  with Methotrexate in the but-for world, correct?

11    A.   My opinion is -- my understanding is it was

12  available with Methotrexate; it was licensed, if it was,

13  that is a non-infringing alternative that needs to be

14  taken into account.

15    Q.   You told me that there can be no infringement

16  in the but-for world, correct?

17    A.   That's my understanding.

18    Q.   We just walked through one syringe of Humira

19  from start to finish, and that was an infringement,

20  correct?

21    A.   You described monotherapy use, and I would

22  agree.

23    Q.   But in your but-for world, it's your opinion

24  that patients and physicians would have been able to

25  continue to use Humira as a monotherapy, correct?

1        A.    No.

2        Q.    Dr. Slottje, can you please turn to your

3   report on Page 6?

4              MR. MASLOWSKI:  We can publish this,

5   correct, Your Honor?

6              Joe, Dr. Slottje's report, Page 6.  Or I

7   can just read it.

8        Q.    (By Mr. Maslowski) Look at the very last

9   sentence on Page 6.

10             MR. MASLOWSKI:  Joe, just go ahead and

11  take it down.

12             There we go.  If you can focus in on the

13  last paragraph of that page and the beginning of the

14  next page.

15       Q.    (By Mr. Maslowski) Dr. Slottje, are you

16  looking at the last sentence on Page 6?

17       A.    Yes.

18       Q.    It says:  In a but-for world, Abbott would

19  have continued to sell Humira for licensed uses, i.e.,

20  co-administration with Methotrexate, even after issuance

21  of the '775 patent, correct?

22       A.    Yes.

23       Q.    The next sentence says:  Moreover, physicians

24  and patients would have been able to continue

25  prescribing or using Humira for all of these

1  indications, regardless of whether or not their uses

2  fell under licensed sales of Humira.

3         That's what you wrote, correct?

4     A.   Yes.  And I agree with that.

5     Q.   So you are allowing a syringe of Humira to be

6  made, to be sold, and to be used by a patient without

7  Methotrexate, correct?

8     A.   No.  That's not what I did.  What I said is

9  what a doctor can actually do in reality, but that's not

10 what I assumed in my but-for world.

11    Q.   But you have to create a but-for world that

12 does not allow infringement, correct?

13    A.   And I did.

14    Q.   Dr. Slottje, let me read it again.

15         Physicians and patients would have been able

16 to continue prescribing or using Humira for all of these

17 indications, regardless -- regardless of whether or not

18 their uses fell under licensed sales of Humira.

19         You wrote that correct, sir?

20    A.   It's true.

21    Q.   And it's true, Dr. Slottje, that you never

22 analyzed a but-for world that doesn't include Humira

23 plus Methotrexate as a non-infringing alternative,

24 correct?

25    A.   Correct.

1      Q.   Now, Dr. Slottje, you say lost profits is

2 inappropriate here, because there's insufficient data

3 for you to conclude that Remicade would have lost sales,

4 correct?

5      A.   I don't know how many sales they would have

6 lost.

7      Q.   You say there's insufficient data, correct?

8      A.   Right.

9      Q.   Do you recall Mr. Bazemore testifying about

10 the amount of analysis that Centocor does to study the

11 market?

12      A.   Yes.

13      Q.   He said they study doctor and patient

14 prescribing choices in the biologic market, correct?

15      A.   Correct.

16      Q.   Do you recall seeing a huge amount of data

17 from Abbott providing similar information?

18      A.   Yes.

19      Q.   There were studies, correct?

20      A.   Correct.

21      Q.   Do you recall Dr. Gering testifying that he

22 analyzed a couple of hundred thousand pages of documents

23 to support his analysis?

24      A.   Yes.

25      Q.   In fact, the parties exchanged over 3 million

1  documents in this case that you had access to, correct?

2      A.   Correct.

3      Q.   And in your report, you actually list out just

4  the page numbers of the documents that you looked at,

5  and that alone fills up 49 pages, correct?

6      A.   Correct.

7      Q.   Now, Dr. Slottje, did you actually look at

8  those documents?

9      A.   I looked at a number of them, yes.

10     Q.   Did you study them in detail?

11     A.   A number of them, yes.

12     Q.   Did you attempt to understand the way doctors

13  and patients use Remicade?

14     A.   Yes.

15     Q.   And based on that understanding, for example,

16  it's your opinion that Centocor's not entitled to lost

17  profits in RA, correct?

18     A.   Correct.

19     Q.   And when you performed your lost profits

20  analysis, was it important to understand the percentage

21  of times that doctors and patients preferred Humira over

22  Remicade?

23     A.   Yes.

24     Q.   And was it important to your analysis to

25  understand the percentage of times that doctors and

1  patients preferred Remicade over Humira and Enbrel?

2       A.   Yes.

3       Q.   And that would be first-line use, correct?

4       A.   I don't agree with that.

5       Q.   You don't agree that -- well, was it

6  important for you to understand the amount of times

7  that Remicade was used as a first-line treatment?

8       A.   I -- I looked at that, and I didn't recall the

9  exact percentages, but first -- when you say

10 first-line --

11      Q.   Dr. Slottje --

12      A.   I'm sorry.

13      Q.   The Judge has informed us of the rules,

14 correct?

15      A.   Yes.

16      Q.   And you do this quite often, correct?

17      A.   I have testified before.

18      Q.   So you just need to answer my questions,

19 correct?

20      A.   Okay.  I'm sorry.  I was trying to.

21      Q.   Now, I took your deposition in this case a

22 couple of months ago, correct?

23      A.   Yes.

24      Q.   And I asked you at your deposition whether you

25 had seen any data that showed that Remicade was used as

1  a first-line biologic in RA, correct?

2       A.   Yes.

3       Q.   And your answer to that question was you

4  hadn't seen any data, and you, in fact, said I might be

5  surprised by that; I'm not saying it doesn't happen, but

6  I'd be surprised by that.

7            Do you recall that?

8       A.   Yes.

9       Q.   Dr. Slottje, were you surprised when

10 Mr. Bazemore put up on the screen on Tuesday data

11 showing that Remicade is used as a first-line biologic

12 in RA?

13      A.   No.

14      Q.   Let's take a quick look at that data.

15           MR. MASLOWSKI:  If we can have

16 Exhibit 251, please.

17      Q.   (By Mr. Maslowski) This is one of the studies

18 that Mr. Bazemore discussed, right?

19      A.   Yes.

20      Q.   It's one of the studies that you've considered

21 as part of your opinion, correct?

22      A.   Correct.

23           MR. MASLOWSKI:  If we can go to Page 21,

24 please.

25      Q.   (By Mr. Maslowski) Do you recall this slide in

1 particular?

2     A.   Yes.

3     Q.   Mr. Bazemore testified about it on Tuesday,

4 correct?

5     A.   Yes.

6     Q.   And he pointed out to the jury how this data

7 right here shows that Remicade had first-line use in RA,

8 correct?

9     A.   Yes.

10     Q.   And it's your opinion in this case that

11 subcutaneous products compete with other subcutaneous

12 products, correct?

13     A.   Yes.

14     Q.   And Enbrel and Humira are both subcutaneous

15 products, correct?

16     A.   Yes.

17     Q.   So if subcutaneous products only compete with

18 other subcutaneous products, and Enbrel is not working

19 for me, and that's the first -- the first drug I've ever

20 used, the first biologic, my next choice should be

21 Humira, correct?

22     A.   Yes.

23     Q.   Dr. Slottje, were you here when Mr. Bazemore

24 explained that this data shows exactly the opposite?

25     A.   I don't recall him saying that, but I'm not

1    disagreeing with you.

2        Q.   Do you see the large green -- actually, let's

3    make it a little simpler.

4                MR. MASLOWSKI:  Joe, yeah, if you can

5    blow up the first six bars, please, all the way down to

6    the words, Enbrel, Remicade, Humira.

7        Q.   (By Mr. Maslowski) So we have two bars,

8    Enbrel; two bars, Remicade; two bars, Humira, correct?

9                MR. MASLOWSKI:  Can the jury see the bars

10   okay?

11               No?  Okay.  Let's move it.

12               Thank you.  And I'll need your help when

13   we need to use that again.

14               Now the Judge probably can't see.

15               THE COURT:  That's all right.  It's a

16   little tight in here.

17               Just continue on.

18               MR. SAYLES:  I'll help you back there.

19               MR. MASLOWSKI:  I appreciate that.

20       Q.   (By Mr. Maslowski) So you indicated that if I

21   was using Enbrel, and in your opinion, subcutaneous

22   products only compete with other subcutaneous products,

23   then my second choice is going to be Humira, correct?

24       A.   Correct.

25       Q.   This data, however, shows completely the

1   opposite here, doesn't it?

2          It shows that Remicade gets first-line use.

3   Some patients right out of the box for RA, they want to

4   use Remicade.

5          Is that what this data shows?

6      A.   Yes.

7      Q.   And it also shows that Remicade gets what's

8   called second-line use, correct?

9      A.   Yes.

10     Q.   And second-line use means I've either used

11  Enbrel or I've used Humira, one of the subcutaneous

12  products; I failed that product, or for some reason I

13  want to switch off that product.

14         And my second choice was not a subcutaneous

15  product; it was Remicade, right?

16     A.   I don't disagree with that.

17     Q.   That's what that data shows, correct?

18     A.   It's more complicated than that, but I don't

19  disagree with that.

20     Q.   And this is the type of data you did not

21  recall seeing at your deposition when I took it two

22  months ago, because it shows first-line use by Remicade,

23  correct?

24     A.   I don't recall seeing it, yes, that's true.

25     Q.   Now, there haven't been any Abbott marketing

1  employees that have come into this Court to tell the

2  jury that Mr. Bazemore was wrong, correct?

3      A.   I don't recall of that happening, no.

4      Q.   Well, there haven't been any marketing folks

5  that have sat in the seat that you're in right now and,

6  for example, explained how Mr. Bazemore's scorecard of

7  all the competitors was incorrect, right?

8      A.   I agree with most of what Mr. Bazemore said.

9      Q.   And there's been no Abbott folks that have

10 come in and explained how Mr. Bazemore's pie charts were

11 wrong, correct?

12     A.   I don't think so.

13     Q.   Well, since we haven't had the chance to hear

14 from any Abbott marketing folks on this, let's take a

15 look at Abbott's documents to see who Abbott says it

16 competes with.

17          Now, Dr. Slottje, it's your opinion that

18 Remicade and Humira don't compete, since they are not

19 substantially product -- substantially similar products

20 in the same market segments, correct?

21     A.   That's not my opinion.

22     Q.   That's not your opinion?

23     A.   No.

24     Q.   What is your opinion with respect to

25 substantially similar products in the same market

1  segments?

2      Are Remicade and Humira substantially similar

3  products that compete in the same market segment?

4      A.   It depends.

5      Q.   And how does it depend?

6      A.   It depends on what indication you're talking

7  about.

8      Q.   Let's talk about RA.  In RA, are Remicade and

9  Humira substantially similar products that compete in

10  the same market segments?

11      A.   I don't believe so.

12      Q.   And this is RA data, right?

13      A.   This doesn't say that, but I'll take your word

14  for it.

15          MR. MASLOWSKI:  Can we go back to the

16  first page just so we can be sure?  All the way back to

17  the first page.

18      Q.   (By Mr. Maslowski) Remicade, rheumatoid

19  arthritis performance tracking, correct?

20      A.   Correct.

21      Q.   Now, Dr. Slottje, by saying that they're not

22  substantially similar products, you're basically saying

23  that they're viewed as different, correct?

24      A.   I didn't hear the question.  One more time,

25  please.

1    Q.   Sure.

2         By saying that they are not substantially

3    similar products, you're basically saying that they're

4    viewed as different, correct?

5    A.   The second time I didn't catch their what is

6    different?

7    Q.   Sure.

8         By saying they're not substantially similar

9    products, you're saying they're different, such as they

10   don't compete, correct?

11   A.   I'm saying that they have differences in the

12   eyes of consumers, and I think that's right.

13   Q.   Let's take a look and see what Abbott has to

14   say about whether or not Humira and Remicade are viewed

15   as different.

16             MR. MASLOWSKI:  Can we have PX216,

17   please?  If you can blow up the top.

18   Q.   (By Mr. Maslowski) PX216 is an e-mail dated

19   May 7th, 2007, correct?

20   A.   Correct.

21             MR. MASLOWSKI:  If we can go to the

22   attachment.  I think it's two pages, three pages back.

23   Right there.

24   Q.   (By Mr. Maslowski) So attached to the e-mail

25   is a 2007 strategic plan, Humira, rheumatology, correct?

1    A.    Correct.

2    Q.    And RA is in rheumatology, correct?

3    A.    Correct.

4              MR. MASLOWSKI:  If we can turn to the

5    page ending in 903.

6              And if we can blow up the middle -- the

7    title, Humira's Strengths, Weaknesses, Opportunities,

8    Threats.

9    Q.    (By Mr. Maslowski) Do you see that section in

10   the document?

11   A.    Yes.

12             MR. MASLOWSKI:  Now, if we can blow up

13   the second paragraph underneath that section, please.

14   Q.    (By Mr. Maslowski) Do you see that section?

15   The first sentence says:  Humira's biggest weakness is

16   the rheums' perception that there is no difference among

17   the biologics.

18             Did I read that correctly?

19   A.    Yes.

20   Q.    Let's look at the tactical plan for 2007,

21   which is also included in this document.

22             MR. MASLOWSKI:  Can you please turn to

23   the page ending in 924?

24   Q.    (By Mr. Maslowski) Do you see at the top,

25   2007, Rheumatology Tactical Marketing Plan?

1      A.    Yes.

2              MR. MASLOWSKI:   And if we can blow up

3  underneath that.

4              Keep going.   One more bullet point.

5  There we go.

6      Q.    (By Mr. Maslowski) So it says:   2007 will be a

7  very critical year for Humira.   An additional $250

8  million in sales in rheumatology indications is

9  expected.   This growth is challenged by a number of

10  issues.

11             Let's look at the third bullet point.

12             Differentiation among the TNF therapies

13  continues to be non-existent, especially within RA.

14             Did I read that correctly?

15     A.    Yes.

16     Q.    Dr. Slottje, let's cut to the chase.

17             Remicade is a competitor of Humira in every

18  indication that we've been talking about here in this

19  courtroom; isn't that right?

20     A.    I don't agree with that.

21     Q.    Dr. Slottje, Remicade is a main competitor of

22  Humira, isn't it?

23     A.    It is absolutely a main competitor of Humira,

24  but I don't agree in every market segment that that's

25  true.

 1      Q.   And you don't agree that they're main

 2 competitors, for example, in RA, correct?

 3      A.   Correct.

 4              MR. MASLOWSKI:  Joe, can we please have

 5 Exhibit 577?

 6              Can you just blow up the slide for us

 7 there?

 8      Q.   (By Mr. Maslowski) It says:  Humira's

 9 Strategic Plan 2007-Overview, correct?

10      A.   Correct.

11      Q.   And it says:  Overview for J. Tyree, correct?

12      A.   Correct.

13      Q.   That is Jim Tyree, the Executive Vice

14 President of Pharmaceuticals at Abbott, correct?

15      A.   Correct.

16      Q.   Date of the document is November 2006,

17 correct?

18      A.   Yes.

19      Q.   After the '775 patent issues?

20      A.   Correct.

21              MR. MASLOWSKI:  Can we please turn to the

22 page with the last three numbers, 777?

23      Q.   (By Mr. Maslowski) Title of the slide:

24 Humira's Competitors Today, correct?

25      A.   Yes.

1      Q.    What indications is Humira approved for at the

2  time this slide was created as shown by the chart on the

3  right?

4      A.    RA, AS, PsA.

5      Q.    That's all of the rheumatology indications,

6  correct?

7      A.    Yes.

8      Q.    Now, let's focus on the first bullet point,

9  Dr. Slottje.  Actually, let's be clear.

10          This is an Abbott document, correct?  This is

11 not a Centocor document?

12     A.    Correct.

13     Q.    The first bullet point says:  Main biologic

14 competitors today both are TNF blockers, correct?

15     A.    Correct.

16     Q.    And Remicade is one of the two main biologic

17 competitors identified, correct?

18     A.    Correct.

19             MR. MASLOWSKI:  Can we have Exhibit 294,

20 please?

21     Q.    (By Mr. Maslowski) Here's another

22 presentation, Dr. Slottje, this is from Scott Luce,

23 Divisional Vice President in Immunology, correct?

24     A.    Correct.

25     Q.    Dated October 2007, correct?

1      A.   Yes.

2           MR. MASLOWSKI:  Let's turn to Page 13 of

3  the exhibit, please.

4           If you can blow it up a little bit.

5      Q.   (By Mr. Maslowski) At the top, it says:

6  Competitive Market, correct?

7      A.   Correct.

8      Q.   This actually looks a little bit similar to

9  Mr. Bazemore's chart, doesn't it?

10          A list of different products, a list of

11 different areas:  Rheumatology, dermatology,

12 gastroenterology, correct?

13     A.   Correct.

14     Q.   Now, under competitive market, Dr. Slottje, in

15 rheumatology, it lists Remicade as a competitor,

16 correct?

17     A.   Yes.

18     Q.   And under dermatology, it lists Remicade as a

19 competitor, correct?

20     A.   Correct.

21     Q.   And under gastroenterology, it lists Remicade

22 as a competitor, correct?

23     A.   Yes.

24     Q.   Yes or no, Dr. Slottje, Humira has gained

25 market share since 2006 in the indications it is

1  approved for?

2      A.   I believe that's correct.

3      Q.   And when Humira took market share, it took it

4  directly from its main competitor, Remicade; isn't that

5  right?

6      A.   I disagree with that.

7      Q.   Let's see what Abbott has to say about where

8  its market share came from.

9              MR. MASLOWSKI:  Can we have PX107,

10 please?

11     Q.   (By Mr. Maslowski) It's another presentation a

12 little bit hard to read.

13          It says:  Working together we can make a

14 difference.

15          Underneath it says -- it's from Cheryl

16 Lubbert, Divisional Vice President at Abbott.

17              MR. MASLOWSKI:  There we go.  We can

18 actually see that.

19     Q.   (By Mr. Maslowski) Can you see that,

20 Dr. Slottje?

21     A.   I can't read it, but I believe you.

22     Q.   It says:  Cheryl Lubbert, Divisional Vice

23 President, Immunology, and the date is April 2008,

24 correct?

25     A.   I assume it's correct, yes.

1          MR. MASLOWSKI:  Could we turn to the page

2  ending in 740, please?

3               If you can blow up the whole slide with

4  the notes.

5     Q.   (By Mr. Maslowski) The slide is titled:

6  Immunology:  Biologic Market Share Overall Competitive

7  TRx Share.

8               Did I read that correctly?

9     A.   Yes.

10    Q.   And the biologic market includes rheumatology,

11 dermatology, gastroenterology, correct?

12    A.   Correct.

13    Q.   And just so the jury knows, TRx stands for

14 total prescription share, correct?

15    A.   TRx stands for prescriptions.

16    Q.   Total prescriptions, the T is total?

17    A.   Yes.

18    Q.   Do you see the note section under this slide?

19    A.   Yes.

20          MR. MASLOWSKI:  Can we focus on the last

21 sentence in the notes, please?

22    Q.   (By Mr. Maslowski) It states:  We continue to

23 take share from Remicade, which I like to see, but we

24 need to bust the Enbrel stranglehold, correct?

25    A.   That's what it says.

1    Q.   It doesn't say we continue to take market

2   share by growing the market, does it?

3    A.   It says what it says.

4    Q.   It doesn't say we continue to take market

5   share by growing the market, does it?

6    A.   No.

7    Q.   And it doesn't say we continue to take share

8   from Enbrel, correct?

9    A.   No.

10    Q.   It says we continue to take share from

11   Remicade, which Ms. Lubbert liked to see, correct?

12    A.   Yes.

13    Q.   Now, Dr. Slottje, when we looked at your book

14   this morning, the book said that in defining a market

15   for the lost profits analysis, the infringer will have

16   performed its own market analysis, which can often be

17   very useful information in defining the relevant market,

18   correct?

19    A.   Yes.

20    Q.   And all the Abbott documents we just looked at

21   identified Remicade and Humira as competitors, correct?

22    A.   Yes.

23    Q.   In fact, at least one of them identified

24   Remicade as one of two main competitors, correct?

25    A.   Yes.

1      Q.   Now, let's look at some more of what your book

2  calls very useful information to determine the proper

3  market.

4           Do you see those two huge binders that are

5  next to you there, sir?

6      A.   Yes.

7      Q.   If you could just open up the first one, the

8  one that is marked probably Volume 1 and take a look at

9  the first document that's in there.

10     A.   It's Volume 2.

11     Q.   Why don't you look -- we can look at Volume 2;

12 we can look at Volume 1; we can look at whatever you

13 want to look at.

14           Why don't you look at Volume 2, since that's

15 the one you have.

16     A.   Okay.

17     Q.   Actually, no, I'm ready to put up Volume 1, so

18 why don't we go to Volume 1.  But we can look at

19 whatever you want to look at.

20           Actually, let's go back to Volume 2.  You're

21 in charge.  Let's go back to Volume 2.  We'll go back to

22 Volume 2.

23           Go ahead; open it up.

24           Do you have Volume 2 or Volume 1?

25     A.   Whichever you want me to look at.

1      Q.   Well, Dr. Slottje, let me explain to you first

2 what are in those binders.

3           I went through and collected every single

4 Abbott market research monthly report that I could find

5 from June 2006 through the end of 2008, and I put them

6 all into those binders in date order.

7           Do you want to look through to confirm that,

8 or will you take my word for it?

9      A.   I'll take your word for it.

10     Q.   And you've seen those Abbott market research

11 monthly reports before, correct?

12     A.   Yes.

13     Q.   And the reports are used to gauge performance

14 at Abbott, correct?

15     A.   I'm sure that's one use of them, yes.

16     Q.   Well, let's bring up one of the market

17 research monthly reports.

18               MR. MASLOWSKI:  Let's go to PX630.

19 If we can blow up the slide.

20     Q.   (By Mr. Maslowski) So this is a market

21 research monthly report, correct?

22     A.   Yes.

23     Q.   June 2006, which is right before the '775

24 patent issued, correct?

25     A.   Correct.

1          MR. MASLOWSKI:  Let's go to Page 3.

2      Q.   (By Mr. Maslowski) Do you see the table of

3  contents?

4      A.   Yes.

5      Q.   It identifies biologic market, rheumatology

6  market, dermatology market, gastroenterology market,

7  correct?

8      A.   Yes.

9          MR. MASLOWSKI:  Can we go to the page

10 ending in 337, please?

11     Q.   (By Mr. Maslowski) Here is where they show the

12 overall biologic market, correct?

13         The slide says:  BDMARD, Overall Market Share.

14         Do you see that?

15     A.   Yes.

16     Q.   And BDMARD means biologic DMARD, the

17 biologics, correct?

18     A.   Correct.

19     Q.   Dr. Slottje, do you see at the bottom where

20 they identified the products that they're looking at?

21     A.   Yes.

22     Q.   It's Humira, Enbrel, Kineret, Remicade,

23 correct?  And then some others?

24     A.   Yes.

25              MR. MASLOWSKI:  If we can go to page --

1  the page ending in 350.

2            If you can blow it up.

3      Q.   (By Mr. Maslowski) This is where the Abbott

4  market research monthly report is looking at the

5  rheumatology market share, correct?

6      A.   Yes.

7      Q.   And at the bottom, it lists the products that

8  they're analyzing, correct?

9      A.   Yes.

10     Q.   Humira, Enbrel, Kineret, Remicade, correct?

11     A.   With others, yes.

12            MR. MASLOWSKI:  If we can go to the slide

13  ending in 374.

14     Q.   (By Mr. Maslowski) This is the

15  gastroenterology market, correct?

16     A.   Yes.

17     Q.   And the products identified are Humira,

18  Enbrel, Remicade, correct?

19     A.   Yes.

20     Q.   Now, in June 2006, Remicade wasn't approved in

21  dermatology yet, correct?

22     A.   I believe that's correct.

23     Q.   So let's jump ahead a year or so and see how

24  Abbott is looking at all of these markets as well as the

25  dermatology market.

1          MR. MASLOWSKI:  Can we have PX579,

2   please?

3               Blow it up.

4      Q.   (By Mr. Maslowski) Same market research

5   monthly report, correct?

6      A.   It's a different report, but it's the same

7   thing, yes.

8      Q.   Same format, different timeframe, correct?

9      A.   Correct.

10      Q.   One year later?

11      A.   Yes.

12          MR. MASLOWSKI:  Let's go to the page

13   ending in 276, please.

14      Q.   (By Mr. Maslowski) Overall biologic market

15   again, correct, Dr. Slottje?

16      A.   Yes.

17      Q.   Products at the bottom again.  Remicade is

18   there, correct?

19      A.   Correct.

20          MR. MASLOWSKI:  Let's go to the page

21   ending in 283.

22      Q.   (By Mr. Maslowski) Rheumatology market,

23   Remicade again identified on the chart, correct?

24      A.   Correct.

25          MR. MASLOWSKI:  Let's go to the page

1  ending in 290.

2      Q.   (By Mr. Maslowski) Dermatology market this

3  time, correct?

4      A.   Yes.

5      Q.   Remicade identified again, correct?

6      A.   Yes.

7           MR. MASLOWSKI:  Let's go to the page

8  ending in 297.

9      Q.   (By Mr. Maslowski) This time the gastro

10  market; again Remicade identified on the chart, correct?

11      A.   Correct.

12      Q.   Dr. Slottje, I will represent to you that

13  every single one of those reports that are in those

14  binders compares Humira's performance to Remicade's in

15  the biologic market, the gastro market, the rheumatology

16  market, and after late 2006, when Remicade was approved

17  in dermatology, it compares it in dermatology as well.

18           Are you willing to take my word for that, or

19  would you like to look at another one?

20      A.   I'll take your word for it.

21      Q.   So, sir, are you really asking the jury to

22  believe that Remicade and Humira do not compete

23  head-to-head in the same market in every single

24  indication, when month after month after month Abbott

25  looks at the biologic market, the gastro market, the

1  dermatology market, the rheumatology market, and

2  includes Remicade as a competitor every single time?

3      A.   Is there a question?  I'm sorry.

4      Q.   I was asking you -- we can move on, sir.  I

5  don't think we need to talk about those documents

6  anymore.

7           Let's move to your reasonable royalty

8  analysis.

9           Before we get started, let's talk briefly

10  about your opinion that there should be separate

11  royalties in the U.S. versus outside the U.S.

12           That's your opinion, correct?

13      A.   Yes.

14      Q.   Do you know if Centocor has patents covering

15  anti-TNF-alpha antibodies outside the United States?

16      A.   I know I've looked at that.  I don't recall it

17  sitting here.

18      Q.   So did you analyze whether Humira would

19  infringe those Centocor patents outside of the United

20  States, if it moved its manufacturing outside of the

21  United States?

22      A.   I did look at that.

23      Q.   You did?

24      A.   Yes.

25      Q.   And did you determine that Abbott would not

1  infringe any of Centocor's patents outside of the United

2  States by moving its manufacturing facilities outside

3  the United States?

4       A.   Well, I didn't assume that, because I still

5  assume they would be paying a royalty on sales outside

6  the U.S.

7       Q.   You didn't do that analysis, correct, sir?

8       A.   I did do it.  That's why I took into

9  account -- you're talking about a royalty for sales

10  outside the United States.

11       Q.   You took into account -- you looked at all of

12  Centocor's patents and determined that Abbott would not

13  infringe by moving its manufacturing facilities outside

14  the United States.

15            Is that what you're telling me?

16       A.   No.  I'm telling you that I understood that

17  they sold outside the U.S. and that if they did,

18  obviously they would have to pay royalties on those

19  sales under certain conditions, and one of which would

20  be you just described.

21       Q.   Yes or no, sir, did you look at all of

22  Centocor's patents and separately determine that Abbott

23  would not infringe every single one of those patents

24  outside the United States?

25            Yes or no?

1      A.    I don't recall the precise analysis that was

2  done.

3      Q.    Did you do it or not, yes or no?

4      A.    I took it into account.  I've already said

5  that.

6      Q.    Did you do the analysis by looking at every

7  single Centocor patent outside the United States in

8  determining if Abbott would infringe?

9            Yes or no?

10     A.    I don't know.

11     Q.    Now, Dr. Slottje, the hypothetical negotiation

12 between Centocor and Abbott relates to one of Centocor's

13 issued patents, correct?

14     A.    Yes.

15     Q.    And it's a United States patent, correct?

16     A.    Yes.

17     Q.    And when Centocor and Abbott sat down for the

18 hypothetical negotiation, the parties assume that

19 Centocor's patent is valid, enforceable, and infringed,

20 correct?

21     A.    That's my understanding.

22     Q.    All other things being equal, wouldn't the

23 royalty rate in a negotiation where the patent must be

24 assumed to be infringed, valid, and enforceable,

25 wouldn't that be higher than a similar negotiation where

1   that assumption does not have to be made?

2        A.   I don't agree with that.

3        Q.   You don't agree that it's likely that that

4   rate would be a little bit higher than a negotiation

5   where the patent must be assumed to be infringed, as

6   opposed in one where it doesn't need to be assumed it's

7   infringed?

8        A.   No.

9        Q.   Now, when Centocor and Abbott sat down for the

10  hypothetical negotiation, it was clear to both parties

11  that they were competitors, correct?

12       A.   Yes.

13       Q.   And if the parties in a negotiation compete,

14  then the rate will likely be higher, correct?

15       A.   Yes.

16            MR. MASLOWSKI:  And actually, if I can

17  have Mr. Sayles' help again.

18       Q.   (By Mr. Maslowski) Keep track of what we're

19  talking about.  This is Centocor, Abbott, hypo, and you

20  said there's one U.S. patent, correct?

21       A.   Yes.

22       Q.   And you said the parties were competitors,

23  correct?

24       A.   Yes.

25       Q.   And you said that would likely drive the rate

1  up, correct?

2      A.   Everything else equal.

3      Q.   And at the time of the hypothetical

4  negotiation, Humira was launched, correct?

5      A.   Yes.

6      Q.   And that would likely drive the rate up,

7  correct?

8      A.   I don't agree with that.

9      Q.   Dr. Slottje, can you please turn to your

10 deposition at Page 289.

11     A.   Okay.

12     Q.   And launched means that the product is --

13 before we get to your deposition, launched means the

14 product's out of development, right?  It's actually

15 launched.

16     A.   Okay.

17     Q.   Do you agree with that?

18     A.   Yes.

19     Q.   Please turn to Page 289, Line 4.

20          QUESTION:  The further along in the

21 development process the technology -- the further along

22 in the development process the technology is, the higher

23 the rate is likely to be, correct?

24          ANSWER:  Correct.

25          Did I ask you that question, and did you give

1  me that answer at your deposition?

2      A.   And I agree with it.

3      Q.   And so if the product actually launched, it's

4  at end of the development process, correct?

5      A.   That's a different question than this one.

6      Q.   Dr. Slottje, that's a different question?

7      A.   Yes.

8      Q.   Is the rate likely going to be higher if the

9  product is at the end of development as compared to the

10 beginning of development?

11     A.   Yes.

12     Q.   And when Centocor and Abbott sat down for the

13 hypothetical negotiation, Humira was a commercially

14 successful product in the market, correct?

15     A.   Correct.

16     Q.   And the more commercially successful the

17 product is that is subject to the hypothetical

18 negotiation, the higher the rate is likely to be,

19 correct?

20     A.   I would agree with that.

21     Q.   And when Centocor and Abbott sat down for the

22 hypothetical negotiation, Abbott had absolutely no way

23 to design around Centocor's patent, correct?

24     A.   I believe I assumed no design-around, that's

25 correct.

1      Q.   Did Abbott have a design-around at the time of

2  the hypothetical negotiation?

3      A.   I don't believe so.

4      Q.   Yes or no?

5      A.   I think I said no.

6      Q.   And if there's no design-around available,

7  then the agreed upon royalty rate in the hypothetical

8  negotiation is going to be higher, correct?

9      A.   Again, everything else equal, I would agree

10  with that.

11      Q.   Dr. Slottje, all of these circumstances --

12          MR. MASLOWSKI:  I'm sorry.  Is it okay if

13  I move a little bit out here?

14          THE COURT:  That's all right.

15          MR. MASLOWSKI:  My heart just stopped.

16          THE COURT:  Just keep moving.  That's --

17          MR. MASLOWSKI:  Okay.

18      Q.   (By Mr. Maslowski) Moving here, the rate is

19  2.25 percent, correct?

20      A.   Yes.

21      Q.   Now, let's look at some of the other

22  agreements the parties have on products, such as

23  Remicade and Humira, to see how reasonable your number

24  is.

25          As part of determining your rate, you looked

1  at the parties' agreements, correct?

2      A.   Yes.

3

4

5



**REDACTED BY ORDER OF THE COURT**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      Q.   And at the time of that agreement, the product

24  was not launched.  It was still in development, correct?

25      A.   Correct.

```
1        Q.    And so the product, obviously, wasn't
2   successful.  It wasn't even launched, correct?
3        A.    Correct.
4
5
6
7        Q.    Put a question mark there.
8              So we have two agreements.  One is the
9   hypothetical that you've come up with at a rate of 2.25.
10  This is an actual agreement that the parties -- Abbott
11  had related to Humira, correct?
12       A.    Correct.
13       Q.    This says the rate should go up; these all say
14  the rate should go down.
15
16
17
18
19
20
21
22
23
24
25
```



REDACTED BY ORDER OF THE COURT

1   ■ ■   ■ ■ ■   ■ ■ ■   ■ ■ ■   ■ ■   ■ ■ ■   ■ ■ ■

2   ■

3   **REDACTED BY ORDER OF THE COURT**

4       Q.   Let's look at another agreement that you said

5   was relevant.

6            It's your opinion that the most relevant

7   agreement to the hypothetical negotiation is a

8   Centocor/Abbott agreement of 2002, correct?

9       A.   Correct.

10      Q.   And the Abbott/Centocor deal in 2002 was a

11  cross-license, correct?

12      A.   It has a cross-license component, yes.

13      Q.   Abbott got a license to the Kennedy patents?

14      A.   Correct.

15      Q.   Centocor got a license to the Salfeld patents,

16  correct?

17      A.   Correct.

18      Q.   But the hypothetical negotiation you're

19  looking at is not a -- it's not a cross-license, is it?

20      A.   Correct.

21      Q.   Abbott's not giving Centocor a license under

22  anything in the hypothetical negotiation, correct?

23      A.   Correct.

24      Q.   So the jury's not being asked to determine

25  what the royalty rate would be -- actually I should move

1  on from that.

2          Now, the question in a hypothetical

3  negotiation, again, is how much Abbott would agree to

4  pay for a license to Centocor's '775 patent, correct?

5      A.   Correct.

6      Q.   Now, even though Centocor -- the

7  Centocor/Abbott agreement in 2002 was a cross-license,

8  let's, nonetheless, look and see what Centocor received

9  in value from Abbott's part of that transaction.

10          Now, Abbott pays -- as part of that deal,

11  Abbott pays a 2 percent royalty, right?

12     A.   Correct.

13     Q.   And Centocor gets exactly zero of that

14  royalty, correct?

15     A.   Correct.

16     Q.   It goes to the Kennedy Institute?

17     A.   Correct.

18     Q.   So the only thing that Centocor got, as part

19  of the Centocor/Abbott sublicense or cross-license in

20  2002 was the Salfeld patent license, correct?

21     A.   Correct.

22     Q.   And the Salfeld patent license covers Simponi,

23  correct?

24     A.   It covers whatever the cross-license states it

25  covers.

1    Q.   Do you recall testimony in here that Centocor

2  needed the Salfeld patent license for Simponi?

3    A.   I do recall that testimony.

4    Q.   And you saw Dr. Gering testify the projections

5  for Simponi were from $1.9 billion in 2002 to $5.6

6  billion in early 2006, correct?

7    A.   Yes.

8    Q.   Now, you're also aware of Abbott valuing the

9  Salfeld sublicense -- or the Salfeld license that

10 Centocor got as part of that deal, correct?

11   A.   No.

12   Q.   Do you recall me asking you about some

13 documents, about the value of the Salfeld patent license

14 at your deposition?

15   A.   Yes.

16   Q.   Well, let's take a look at PX465.  This is one

17 of the documents that I asked you about at your

18 deposition, correct?

19   A.   Yes.

20   Q.   It's an Abbott e-mail?

21   A.   Yes.

22   Q.   I'd like to look at the attachment.

23        MR. MASLOWSKI:  If we can go to the last

24 page.  Next page.  And if we can focus on the fifth and

25 sixth bullet points.  The -- actually, if we can just go

1 to the sixth bullet point.  Just go to the sixth bullet

2 point.  We've seen this already.

3       Q.    (By Mr. Maslowski) It says J&J failed to

4 recall that they received, in exchange for a license to

5 the Kennedy patent, a license to the Salfeld human TNF

6 patent '382.

7             Did I read that correctly?

8       A.    Yes.

9       Q.    We, Abbott, have estimated that J&J derived

10 $1.6 billion in value.  Net present value of margin for

11 CNTO-148, which is Simponi, correct?

12      A.    I disagree with that.

13      Q.    You disagree that CNTO-148 is Simponi?

14      A.    I disagree that Abbott said that.  A

15 particular person working at Abbott said that.

16      Q.    Let me just ask the question again.  Does the

17 e-mail say, We -- and we're talking about Abbott,

18 correct?

19      A.    I don't think so.

20      Q.    It's an Abbott document.

21      A.    I know.

22      Q.    And it says, We have estimated that J&J

23 derived $1.6 billion in value from the Salfeld human TNF

24 patent.

25             Does the document say that?  Yes or no.

1      A.   Yes.

2      Q.   And just to be clear, the Salfeld license was

3  the only thing that Centocor got out of the

4  Abbott/Centocor deal in 2002, correct?

5      A.   Correct.

6           MR. MASLOWSKI:  Joe, can you put up

7  PX464, please.

8      Q.   (By Mr. Maslowski) You've seen this document

9  before, correct?

10     A.   Yes.

11     Q.   PX 464 is titled Biopharmaceutical Royalty

12  Rates and Deal Terms Report, correct?

13     A.   Yes.

14     Q.   And it's from the Licensing Executives

15  Society, correct?

16     A.   Yes.

17     Q.   You've heard of the LES, the Licensing

18  Executive Society, correct?

19     A.   Yes.

20     Q.   This is not an Abbott study, correct?

21     A.   Correct.

22     Q.   It's not an Centocor study, correct?

23     A.   Correct.

24          MR. MASLOWSKI:  Can we go to Page 26 of

25  the report, please.

1    Q.    (By Mr. Maslowski) And the title of the slide

2  is Fixed Royalties, Average Royalty by Stage of

3  Development, correct?

4    A.    Yes.

5    Q.    And let's look at the three stages of

6  development identified in the graph that is shown.

7          There are three stages, correct?

8              MR. MASLOWSKI:   If we can highlight Group

9  1, Group 2, and Group 5 there at the bottom.

10   Q.    (By Mr. Maslowski) The first one is

11  preclinical, correct?

12   A.    Yes.

13   Q.    That means the product's not launched?

14   A.    That's my understanding.

15   Q.    And the next one is pre-POC, and that means

16  pre-proof-of-concept, correct?

17   A.    Correct.

18   Q.    That means the product's not launched?

19   A.    Correct.

20   Q.    And the last one says launched, and that means

21  the product's launched, correct?

22   A.    Correct.

23   Q.    And so what we're looking at here are average

24  royalty rates for each of these stages of development,

25  from royalty -- actual royalty agreements from

1   pharmaceutical companies that LES studied correct?

2       A.    Correct.

3               MR. MASLOWSKI:  If we can just blow up

4   the chart itself.

5       Q.    (By Mr. Maslowski) And, Dr. Slottje, you told

6   me Group 1 and Group 2 relate to products that are not

7   launched, correct?

8       A.    That's my understanding.

9

10

11                  **REDACTED BY ORDER OF THE COURT**

12

13

14

15

16

17

18

19

20

21

22      Q.    Now, just to put us in context, again, we're

23  not talking, in the hypothetical negotiation, about

24  something going on in Group 1 or Group 2; we're talking

25  about a hypothetical negotiation that relates to a

1  launched product, which is the last bar, correct?

2      A.    I would agree with you, that we are talking

3  about a launched product or a product very close to --

4  yeah, it's a launched product.

5      Q.    And the average royalty rate for

6  pharmaceutical products shown in this study is -- for

7  launched products is 11.6 percent, correct?

8      A.    In that study, yes.

9      Q.    Now, Dr. Slottje, you've worked on a lot of

10  pharmaceutical cases, correct?

11     A.    Yes.

12     Q.    In fact, you've worked on dozens of them,

13  correct?

14     A.    Yes.

15     Q.    In the dozens of pharmaceutical cases you've

16  worked on, you've never given an opinion that the

17  appropriate royalty rate for a launched product is 11.6

18  percent, correct?

19     A.    I've never given a study that was anywhere

20  near that high, is what I told you.

21     Q.    And in the dozens of pharmaceutical cases

22  you've worked on, it's never been your opinion that the

23  appropriate royalty rate was 4.6 percent, correct?

24     A.    That's correct.

25     Q.    And in the dozens of pharmaceutical cases

1 you've worked on, you've never even opined that the

2 appropriate royalty rate is 4.3 percent, correct?

3     A.    Correct.

4     Q.    In fact, the highest royalty rate you've ever

5 opined is correct is 2.25 percent, correct?

6     A.    Yes.

7     Q.    Dr. Slottje, I'd like to do a calculation with

8 your help.

9         And I actually have a calculator here, if you

10 want to check my numbers, but I want you to go to your

11 Exhibit 10.1, if we can.

12     A.    Okay.

13     Q.    Are you there?

14     A.    Yes.

15     Q.    So instead of using the royalty rate that you

16 think is appropriate, I'd like to do nothing other -- or

17 I'd like to do nothing but change the royalty rate from

18 2.25 percent to 11.6 percent.

19         We'll keep everything else in your lost

20 profits analysis the same.  The only thing we're going

21 to do is change the royalty rate from 2.25 percent to

22 11.6 percent.

23         Can you help me with that calculation?

24         So the first thing -- why don't we start with

25 the royalties first.

1      A.    Have you already done it?  Because I'll take

2   your word for it.

3      Q.    Yeah.  I just want to make sure that I did it

4   correctly.

5      A.    Okay.

6      Q.    So the way I would do it, right, is to go to

7   your royalty based number in the U.S.?

8      A.    Yes.

9      Q.    And that's 3.14 billion?

10      A.    Yes.

11      Q.    And I would add that to the royalty base for

12   outside the United States, correct?

13      A.    Yes.

14      Q.    And I'd get to a number of a royalty base of

15   about 7.25 billion, correct?

16      A.    Yes.

17      Q.    And that's the number we need to multiply by

18   11.6 percent, correct?

19      A.    Yes.

20      Q.    And I did that calculation, and it came out to

21   $841 million.

22            Does that sound about right?

23      A.    Yes.

24      Q.    And then we also still need to add that back

25   to your lost profits number, which is $124 million

1  correct?

2      A.    Yes.

3      Q.    And that gives us a total of $965 million,

4  correct?

5      A.    I'll take your word for it.

6      Q.    So if the jury believes all of your opinions

7  with respect to lost profits and decides that the

8  appropriate royalty rate to use is just the average

9  that's shown in this study for launched products, the

10 damages that it should award to Centocor should be

11 almost a billion dollars, correct?

12     A.    That's the -- for the jury.  And, of course --

13              MR. MASLOWSKI:  If we can put up

14 Dr. Gering's summary slide.

15     Q.    (By Mr. Maslowski) And, of course, if the jury

16 disregards your opinion entirely and follows

17 Dr. Gering's analysis, then it should award

18 approximately $2.17 billion, correct?

19     A.    That's, again, up to the jury.

20     Q.    And Dr. Gering's analysis was based on his

21 opinion that Humira and Remicade competed in

22 rheumatology, gastroenterology, and dermatology,

23 correct?

24     A.    Correct.

25     Q.    And, again, we haven't heard from any Abbott

1  witnesses on the subject of what products compete with

2  other products, have we?

3      A.   Well, you can -- you've heard from Abbott's

4  documents.

5      Q.   We did hear from Abbott's documents, didn't

6  we, Dr. Slottje?

7      A.   Yes.

8      Q.   And there are three big binders of documents

9  sitting next to you that we looked at as part of this

10 analysis; isn't that correct?

11     A.   Yes.

12     Q.   And if the jury is to adopt your analysis, the

13 jury, essentially, has to ignore the Abbott documents

14 sitting in those binders; isn't that right, sir?

15     A.   I disagree.

16            MR. MASLOWSKI:  Nothing further.  I pass

17 the witness.

18            MR. BECK:  May I move this, Your Honor?

19            THE COURT:  Unless she wants to use it.

20            MR. BECK:  Leave it where it is, Your

21 Honor.

22            THE COURT:  Just had to say something,

23 Mr. Beck?  You hadn't said enough this morning?

24            MS. WIGMORE:  I think I'll take you up on

25 your help, though.

1          <u>REDIRECT EXAMINATION</u>

2  <u>BY MS. WIGMORE:</u>

3      Q.    Good morning, Professor Slottje.

4      A.    Good morning.

5      Q.    I think we'll start with the charts, though.

6  I can ask for Mr. Beck's help to get it out of the way.

7

8

9              **REDACTED BY ORDER OF THE COURT**

10

11

12

13

14      Q.    And what is the low end?

15      A.    .35 percent.

16      Q.    And you testified yesterday that the agreement

17  that was most important in your analysis was the

18  agreement between Abbott and Centocor.

19              Do you recall that?

20      A.    Yes.

21      Q.    And if we walk through the charts here that

22  Mr. Maslowski prepared, did that agreement involve a

23  U.S. patent?

24      A.    Yes.

25      Q.    Did that agreement involve a competitor?

1      A.    Yes.

2      Q.    Did that agreement involve a product at the

3  end of development?

4      A.    Yes.

5      Q.    Did that involve a product that was successful

6  in clinical trials?

7      A.    Yes.

8      Q.    And did that product involve a Methotrexate

9  combination with the TNF as a design-around in light of

10  the label that Abbott was getting?

11     A.    No.

12     Q.    And what was the rate of that agreement?

13     A.    2 percent.

14     Q.    And do you recall testifying about the

15  cross-license from Abbott to Centocor?

16     A.    Yes.

17     Q.    That's the agreement that involves CNTO-148 or

18  what we now know as Simponi?

19     A.    Yes.

20     Q.    Does that agreement -- and they provided

21  testimony a few days ago and we saw the document here

22  today about the value of that license to Centocor.

23          Do you recall that?

24     A.    Yes.

25     Q.    And what is the rate that Centocor pays in

1  that agreement, assuming that there's no benefit to

2  Abbott from the Kennedy patent?

3      A.   2 percent.

4      Q.   And what rate do both Abbott and Centocor pay

5  to the Kennedy Institute for Humira and Remicade

6  respectively?

7      A.   2 percent.

8      Q.   And how do all of those agreements bear on

9  your opinions concerning a reasonable royalty?

10     A.   They're very important, because they're

11 between the exact same parties over the same products.

12     ▉

13 ▉▉▉▉▉▉         **REDACTED BY ORDER OF THE COURT**

14     A.   They're very much more like the present

15 situation.

16     Q.   Now, do you recall Mr. Maslowski showing you

17 some documents using the term competes or competitors?

18     A.   Yes.

19     Q.   If you assume that Remicade and Humira are

20 competitors, are there other competitors in the

21 rheumatology and dermatology market?

22     A.   Yes.

23     Q.   Does the lost profits analysis require you to

24 allocate human -- Humira monotherapy sales among all of

25 those competitors?

1    A.    Yes.

2    Q.    And were you able to do so to a reasonable

3 degree of certainty for those therapeutic areas?

4    A.    No.

5    Q.    Why not?

6    A.    Because as we talked about, even though

7 they're all competitors in the biologic market, they're

8 not competitors in a particular market segment.  And the

9 simplest example of that is he talked about

10 gastroenterology and Crohn's disease.

11        Even though we know that Remicade and Enbrel

12 are competitors in the biologic market, Enbrel can't

13 even used for Crohn's disease -- I'm sorry -- can't be

14 used under FDA approval for Crohn's disease.

15        So they're clearly not competitors in that

16 particular market segment.

17    Q.    And even within the RA and the dermatology

18 segments, do you have to consider the differences when

19 you allocate sales?

20    A.    Yes.

21    Q.    Now, do you recall being asked about your

22 alternative calculations based on a different notice

23 date?

24    A.    Yes.

25    Q.    And did you perform calculations assuming a

1 notice date of July 4th of 2006, as opposed to April

2 16th of 2007?

3      A.   Yes, I did.

4      Q.   And I just want to walk through those briefly.

5           If you assume that it's the earlier notice

6 date, by what amount would that increase your opinion

7 concerning the lost profits award, if any, in this case?

8      A.   The lost profits, if I -- you assume that it

9 goes back to July, it would go up slightly.

10      Q.   And if you -- and if you need to refresh

11 yourself by looking at Exhibit 10.1 of your report, can

12 you just tell us by how much it would go up if the

13 notice date is July 4th of 2006?

14      A.   If you took my number that was -- you may

15 recall was $209 million, if you included lost profits

16 and reasonable royalties, and you took that back to July

17 of 2006, that number would increase to $246 million.

18      Q.   And that's for the total lost profits and

19 reasonable royalty?

20      A.   Both of them, yes.

21      Q.   And if you break it down, how much would the

22 lost profits itself go up by if you use that notice

23 date?

24      A.   That I'll have to look up.

25      Q.   And if you look at Section 10.1 that

1 Mr. Maslowski referred to.

2     A.    That number would be -- what would lost

3 profits go up?  I'm sorry.

4     Q.    Yes.

5     A.    The total number would be $124 million.

6     Q.    And so what would the difference be between

7 what you gave yesterday and the July 4th date?

8     A.    It would be several million higher.

9     Q.    Okay.  And is the same true with respect to

10 the reasonable royalty?

11     A.    Yes.

12     Q.    Now we've been talking about some big numbers

13 here, Professor Slottje, and I want to make sure we're

14 clear.

15          And you understand that Abbott's position is

16 that it is not infringing the '775 patent and that the

17 patent is invalid.

18          Do you understand that?

19     A.    Yes.

20     Q.    And if either one of those things is true,

21 what amount of damages is appropriate?

22     A.    Zero.

23               MS. WIGMORE:  Thank you, Dr. Slottje.

24               MR. MASLOWSKI:  Nothing further, Your

25 Honor.

```
 1                    THE COURT:  Who's going to be the
 2   Defense's next witness?  Y'all have any further
 3   witnesses?
 4                    MR. BECK:  No.
 5                    MR. LEE:  Your Honor, Abbott rests.
 6                    THE COURT:  You rest.  Okay.
 7                    Ladies and Gentlemen, there's a couple of
 8   matters the Court needs to take up.  We'll take an early
 9   morning break, and we'll come back -- we've got some
10   more testimony, but we're looking forward to my
11   prediction being better than maybe what I did.  I mean,
12   in actuality, being better than what I predicted
13   yesterday.
14                    So we'll take a morning break, and I'll
15   take up some legal matters.  Be ready to come back in
16   the courtroom at 10:15, 10:15.  You may leave the
17   courtroom at this time.
18                    COURT SECURITY OFFICER:  All rise.
19                    (Jury out.)
20                    THE COURT:  Please be seated.
21                    Dr. Slottje, you testified in a series of
22   cases over in front of Judge -- some cases in front of
23   Judge Davis?
24                    THE WITNESS:  Yes.
25                    THE COURT:  What cases?
```

```
 1              THE WITNESS:  I believe the Orion case.

 2              THE COURT:  Well, you told this jury that

 3  no one had ever rejected any of your opinions.  Are you

 4  saying the jury in the Orion case adopted your opinion?

 5              THE WITNESS:  I'm sorry, Your Honor.  I

 6  thought that was meaning it was -- I didn't take the

 7  question that way, Your Honor.

 8              THE COURT:  Well, that was expressly the

 9  question.  I was going to say, you might ought to review

10  your testimony and the results next time before you

11  appear before me, because I'm liable to talk to you in

12  front of the jury about that.

13              THE WITNESS:  I'm sorry, Your Honor.

14              THE COURT:  All right.  You're excused.

15              THE WITNESS:  Thank you.

16              THE COURT:  All right.  We will take

17  motions from the Plaintiff at this point.

18              MS. ELDERKIN:  Your Honor, Plaintiffs

19  move for judgment as a matter of law on a number of

20  issues, some of which I'll address rather quickly.

21              There's no -- there has been no evidence

22  that the patent-in-suit, the claims in suit, are

23  obvious, so we would ask for judgment of

24  non-obviousness.

25              There's been no evidence that the
```

1   asserted claims are anticipated by the Le 1992 patent.

2   We would ask for judgment on that.

3                  With respect to enablement and written

4   description, the witnesses' testimony -- or all of the

5   evidence from Dr. Marks yesterday was focused precisely

6   on whether the 1994 application provided written

7   description and enablement support, not the '775 patent.

8                  So we would say that there is no evidence

9   from which a reasonable jury can conclude that the

10  issued patent does not meet those requirements, and we

11  would ask for judgment on that.

12                 We ask for judgment that the Salfeld 1996

13  patent, which is in evidence, but about which no

14  anticipation testimony was provided by Dr. Marks.  We

15  would ask for judgment that that does not anticipate.

16                 The Salfeld patent -- there is evidence

17  that the Salfeld patent discloses Humira.  Abbott bears

18  the burden to prove anticipation by clear and convincing

19  evidence.  Their witness has stated that Humira is

20  not -- does not fall within our claims.

21                 Abbott did not present any testimony that

22  Salfeld 1996 anticipates, and we believe that this falls

23  under the category of Your Honor's statement that there

24  are not going to be any alternative opinions.

25                 We believe what they're going to say is,

1  well -- they're going to argue, well, if you find that

2  Humira infringes, then Salfeld 1996 anticipates.

3              We would ask for judgment on that.

4              Finally, the one I'd like to just talk

5  about in a little bit more in detail is anticipation by

6  Adair.

7              Adair is the patent that discloses the

8  CDP571 antibody.  There's been a lot of testimony about

9  that.

10             And we have a number of reasons why we

11 believe no juror could reason -- no reasonable juror

12 could find anticipation, including that the competition

13 tests are not credible, that the CDP antibody does not

14 have an IgG1 constant region, as called for in the

15 claims, but there is one point specifically that we'd

16 like Your Honor to consider, and we can -- we've

17 prepared a brief memorandum that we'd be happy to hand

18 you a courtesy copy of.

19             THE COURT:  Okay.

20             MS. ELDERKIN:  You may recall from the

21 testimony that one of the elements in every one of the

22 four asserted claims is that the claimed antibody

23 must -- must -- let me refresh my recollection now --

24 oh, okay.  The claimed antibody must bind to a

25 neutralizing epitope of human TNF in vivo.  That's

1 required in all of the claims.

2                    The only in vivo studies in the Adair

3 patent of CDP571 were in a baboon.

4                    And Dr. Marks squarely admitted on his

5 cross-examination, as stated in the -- our memo here,

6 when he was asked:  Did Adair 1992 report any testing of

7 CDP571 in a human person for binding to human TNF-alpha

8 in vivo in a human?

9                    ANSWER:  No.

10                    QUESTION:  Is there anything disclosed in

11 the Adair reference, any tests, testing, neutralizing

12 human TNF-alpha in vivo?

13                    He said:  Yes, there are tests looking at

14 neutralizing -- oh, they're not neutralizing human

15 TNF-alpha in humans.

16                    So there is no evidence in the record on

17 that element, and we would ask for judgment that the

18 Adair reference does not anticipate the asserted claims.

19                    Thank you.

20                    THE COURT:  Mr. Lee?

21                    MR. LEE:  Your Honor, let me take the

22 last first.

23                    While Dr. Marks gave that testimony on

24 cross, at Exhibit -- the Adair reference, the 1992

25 reference, which is in evidence, at Page 22 -- oh, I'm

1   sorry -- at Page 9, the reference itself says, quote,

2   The recombinant antibody molecules of the invention are

3   preferably TNF neutralizing, i.e. capable of recuing or

4   inhibiting a biological activity of human anti-TNF-alpha

5   as measured by an in vitro or an in vivo test.

6            At Page 22:  The invention also provides

7   methods of therapy and diagnosis comprising and

8   administering an effective amount of recombinant or

9   humanized antibody, according to the invention, to a

10   human or animal subject.

11            So what you have, Your Honor, is, on

12   direct, he testified that each and every element was

13   present.

14            He testified that Dr. Adams did not

15   dispute that there was any element missing, except

16   competitive inhibition, and the Adair reference itself,

17   which is in evidence, at Pages 9, 22, 24, and 25 answer

18   the question that Ms. Elderkin has raised.

19            Now, to the extent there's inconsistency

20   between what they elicited on cross and the exhibit,

21   that's for the jury to decide.

22            But Adair, the only element that

23   Dr. Adams identified as missing was competitive

24   inhibition.  That's the subject of the Veritas test.

25   That is, like the other test, Your Honor, an issue for

1  the jury.

2                  As to the Le reference, we heard, Your

3  Honor -- the 1992 Le PCT application, we didn't offer

4  any proof on that.  I think that's resolved by Your

5  Honor's rulings at the side-bar.

6                  THE COURT:  That's a result that there

7  was no opinions offered in your expert report on that.

8  That's why.

9                  You know, I have not judicially estopped

10  you from doing anything.  I've done that -- I've made

11  that clear, I thought.

12                  MR. LEE:  Right.

13                  THE COURT:  Because there was no opinion.

14                  MR. LEE:  Well, Your Honor, I -- at least

15  as I -- maybe I can -- and I apologize if I'm having

16  trouble picking this up.

17                  We had tried to suggest, Your Honor, that

18  we had the alternative opinions, and you said you're

19  precluded from the alternative opinions, so we didn't

20  offer them.

21                  THE COURT:  You were precluded from the

22  alternative opinion because it was not included in the

23  expert report that was disclosed in accordance with this

24  rule.

25                  MR. LEE:  Well, Your Honor, and that is

1 where I'm confused.  That -- this makes -- but we did

2 disclose the alternative opinion in the expert report.

3 I think I can show it to Your Honor, but it's --

4             THE COURT:  Well, nobody has shown it to

5 me up to this point.

6             MR. LEE:  I think -- I think we cited it

7 to Your Honor in our brief.  But maybe -- I'll go on to

8 the other issues and come back to it.  Is that all

9 right?  Just -- just so that we're clear for the record

10 on what happened to Le.

11            THE COURT:  Well, I don't -- when you

12 said it was an alternative opinion, I didn't think it

13 was cited in the brief of the report, was it?

14            It wasn't -- it was just -- well, I

15 didn't feel like it was sufficiently described in the

16 report to be offered as an opinion.

17            MR. LEE:  If I could get it, Your Honor,

18 and then -- maybe I'll go to the other issues and come

19 back to it.  Is that okay?

20            Okay.  So I -- we talked about Adair.

21            On obviousness, we have not asked Your

22 Honor for any instructions on obviousness.  The case is

23 going to the jury as an anticipation case.

24            On this question of the Salfeld patent

25 and the 1996 application, Your Honor's instructions have

1  the 1996 Salfeld patent as 102(e) and 102(b), prior art

2  in both the patent and a publication.

3              THE COURT:  As a publication.

4              MR. LEE:  Yes.  And one thing, Your

5  Honor, that I think is -- should be clear is that when a

6  party accuses you of infringing a patent by making a

7  product, if the product or -- the product itself or a

8  patent for a product or a publication is out there

9  before, the -- you can't -- they can't have it both

10 ways.  You can't claim that the product infringes, and,

11 by the way, it doesn't anticipate.

12             And the Federal Circuit has so held at

13 least four times, but in Ocean Innovations, which is at

14 2005 U.S. Appellate Lexis 17775; in Vanmoor, which is at

15 201 Fed 3rd 1363; at Evans Cooling, which is at 125 Fed

16 3rd 1448, in those three, the Court made just precisely

17 that point.

18             If the product that you're accusing of

19 infringing is on the market before then, either you're

20 not infringing or it's invalid.  You can't have it both

21 ways.

22             So we have, as prior art in Your Honor's

23 instructions, the Salfeld patent.  The last claims the

24 patent described D2E7, which is Humira, and the jury's

25 entitled to consider that.

1          And a verdict that would say the priority

2 date is 2002 that the product infringes, but the patent

3 is still valid would be an inconsistent verdict, and I

4 think we're entitled -- we should be able to have the

5 jury resolve that issue.

6          So I think we've -- I've addressed all of

7 the issues that Ms. Elderkin has raised.

8          Can I just get a minute to --

9          THE COURT:  Well, I'm inclined to deny

10 the motions, unless you need something else from me.

11          MR. LEE:  I don't.

12          Do you -- Your Honor, on this Le thing,

13 we're not going to -- it's not going to affect the

14 evidence.  Can I take a look, and then when we talk

15 later, talk about it to the extent there's any --

16          THE COURT:  That will be fine.

17          MR. LEE:  Okay.

18          THE COURT:  Now, how long do you think we

19 got on rebuttal?

20          MS. ELDERKIN:  We have a video clip that

21 will be about 10 minutes, and then our direct of

22 Dr. Adams may be 15 minutes.

23          THE COURT:  We're going to be through

24 before noon?

25          MS. ELDERKIN:  Yes, Your Honor.

 1                    THE COURT:  Okay.  Well, maybe they won't

 2  be too upset about having to come back Monday.  They get

 3  the afternoon off.

 4                    All right.  We'll take that up...

 5                    COURT SECURITY OFFICER:  All rise.

 6                    (Recess.)

 7                    COURT SECURITY OFFICER:  All rise.

 8                    (Jury in.)

 9                    THE COURT:  Please be seated.

10                    All right.  Who will be your first

11  witness, Mr. Sayles?

12                    MR. SAYLES:  May it please the Court.

13                    At this time, we would call Dr. Randall

14  Kincaid.  On this particular deposition -- and I don't

15  believe he's present, so we're going to call him by

16  deposition -- I'm going to do a bit of a more formal

17  introduction, but it will only take a minute.

18                    This is the deposition of Randall

19  Lawrence Kincaid, Washington, D.C., Thursday, April 2nd,

20  2009.

21                    All right.  Proceedings.

22                    The videographer at Page 6:  The video

23  deposition is being taken in accordance with the Federal

24  Rules of Civil Procedure on April the 2nd, 2009, at

25  approximately 10:16 a.m.

1                    Line 16:  Will the attorneys present

2 please identify themselves and who they represent.

3                    Mr. Pearson:  Matthew Pearson, along with

4 Diane Elderkin.  We represent the Plaintiffs, Centocor

5 and NYU.

6                    Mr. Oyole:  Jacob Oyloe.  I represent

7 Abbott, as well as the witness.

8                    Ladies and Gentlemen, Dr. Kincaid

9 received his undergraduate degree in biological sciences

10 in 1972 from Stanford University and his Ph.D. in

11 pharmacology in 1977 from Stanford University School of

12 Medicine.

13                    Dr. Kincaid owns a company called Veritas

14 that provides biotechnology consulting and services.

15                    Dr. Kincaid was hired by Abbott to

16 perform competition testing of certain antibodies in

17 this litigation.

18                    And, Your Honor, this runs 10 minutes,

19 and we can charge it all to us.

20                    THE COURT:  Okay.

21                    (Video playing.)

22                    QUESTION:  What is Veritas?

23                    ANSWER:  It is a company that is -- that

24 provides biotechnology consulting and services and

25 development of technology.

1          QUESTION:  How many staff members are
2  there at Veritas?
3          ANSWER:  Currently, two.
4          QUESTION:  Who are they?
5          ANSWER:  Myself and my brother.
6          QUESTION:  Is your brother Barry Kincaid?
7          ANSWER:  He is.
8          QUESTION:  So Barry Kincaid, the other
9  staff person at Veritas, can you tell me about his
10  education, starting with college?
11          ANSWER:  To be honest, I don't know what
12  his educational background is.
13          QUESTION:  Okay.  When were you first
14  contacted about this lawsuit?
15          ANSWER:  I believe it was last spring.
16          QUESTION:  Do you know what month?
17          ANSWER:  I would guess it would be in
18  late April or early May, but I honestly don't recall.
19          QUESTION:  It was definitely in 2008, the
20  year 2008?
21          ANSWER:  Yes.
22          QUESTION:  Who contacted you?
23          ANSWER:  I was contacted by Henry Wixon.
24          QUESTION:  Which assays did he ask you to
25  carry out?

1          ANSWER:  The purification and antibodies,

2   their characterization, growth of hybridomas, and assays

3   involving ELISA.

4          If you're asking about the initial

5   discussions, it was a fairly broad discussion.

6          QUESTION:  So at some point, did Henry

7   Wixon provide you with the protocols for you to carry

8   out the things that you had put in your proposal?

9          ANSWER:  We obtained a general protocol

10  for carrying out the initial evaluation of a so-called

11  competitive ELISA.  I believe that's one of the

12  documents that you have in -- in your possession.

13          QUESTION:  So you received that protocol

14  from Henry Wixon; is that right?

15          ANSWER:  Yes.

16          QUESTION:  What is a competitive ELISA?

17          ANSWER:  Well, competitive ELISA is used

18  in many different ways, unfortunately.

19          QUESTION:  How was it used in this case?

20          ANSWER:  In this case, the term is used

21  to indicate that an antibody can -- which can bind to a

22  target, can be inhibited or displaced by another

23  antibody in that well.

24          And some have chosen to use the term

25  competitive.  Unfortunately, the literature has another

1 class of what is called competitive ELISA that is

2 unrelated to this.

3                 So it's a source of some confusion as a

4 term, but because that was the name of the protocol that

5 was given to us, that is how we referred to this.

6                 QUESTION:  The competitive ELISA assay

7 that you were asked to do, is that something that you

8 had done in your work at Veritas prior to this?

9                 ANSWER:  I don't recall having done this

10 type of an ELISA.  We have developed assays that are

11 very close to this but not specifically this particular

12 type of a stepwise procedure.

13                 QUESTION:  Do you recognize the name

14 James Marks?

15                 ANSWER:  I cannot be certain.  It may be

16 the individual to whom I sent the CDP571, but I cannot

17 be certain.

18                 QUESTION:  Is James Marks somebody that

19 you have spoken to about this report?

20                 ANSWER:  About this report, no.

21                 QUESTION:  So to your knowledge, you

22 haven't spoken to James Marks?

23                 ANSWER:  About this report?

24                 QUESTION:  Or about anything.

25                 ANSWER:  I am not certain that I spoke

1 with someone named James Marks.  I do recall having

2 spoken to somebody after having shipped CDP571.

3                QUESTION:  And so to your knowledge, you

4 haven't spoken to James Marks about this report; is that

5 correct?

6                ANSWER:  That's correct.

7                QUESTION:  You have not?

8                ANSWER:  About this report, that is

9 correct.

10                QUESTION:  Were all of the competitive

11 ELISA assays done by Barry Kincaid?

12                ANSWER:  Yes.

13                QUESTION:  And they were all done in this

14 same procedure; is that right?

15                ANSWER:  Procedure --

16                QUESTION:  The same protocol was used?

17                ANSWER:  Yes.

18                QUESTION:  And the data was generated

19 with the same instrument?

20                ANSWER:  Yes.

21                QUESTION:  And recorded in the same way?

22                ANSWER:  Yes.

23                QUESTION:  Did you observe him doing

24 these experiments or is your --

25                ANSWER:  Yes.

1          QUESTION:  You observed him doing each of

2   these experiments?

3          ANSWER:  In many cases, yes.  I didn't

4   look over his shoulder in each case.

5          QUESTION:  So for some, you saw him doing

6   the experiment, and others, you're relying on the

7   recording of the data in his notebook; is that right?

8          ANSWER:  Absolutely.

9          QUESTION:  So we talked about that you

10  purify the antibodies, looked at them on SDS-PAGE Gels,

11  tested them in a direct ELISA for binding the TNF; is

12  that correct?

13         ANSWER:  Yes.

14         QUESTION:  Sometimes performed Western

15  Blots; is that correct?

16         ANSWER:  Yes.

17         QUESTION:  But not always?

18         ANSWER:  Correct.

19         QUESTION:  And did the competitive ELISA

20  experiments that we were just talking about that Barry

21  Kincaid conducted; is that right?

22         ANSWER:  Yes.

23         QUESTION:  Does that cover all of the

24  different experiments you did with the antibodies that

25  you tested that are described in your report?

1          ANSWER:  I believe so.

2          QUESTION:  Did you ever measure the

3    affinity of any of the antibodies for TNF-alpha?

4          ANSWER:  I didn't really have an

5    effective assay, I believe, for that purpose.

6          QUESTION:  So you don't measure the

7    affinity; is that right?

8          ANSWER:  I didn't have an assay, so I

9    couldn't measure the affinity.

10          The affinity descriptions, some of them

11   that I've read, relied on a similar type of solid-phase

12   assay, and I'm not comfortable using that as a

13   measurement of affinity.

14          QUESTION:  Did you measure it any other

15   way?

16          ANSWER:  No.  I didn't have another

17   method.

18          QUESTION:  Did you sequence the proteins

19   that you had purified, amino acid sequencing?

20          ANSWER:  No.

21          QUESTION:  Did you ever sequence the

22   genes that were producing the antibodies that would have

23   been in the cells that you had received?

24          ANSWER:  You mean that I would have

25   generated a nucleic acid sequence from genomic DNA and

1  then sequenced it?

2              QUESTION:  Yes.

3              ANSWER:  No.

4              QUESTION:  Did you ever test any of the

5  antibodies in a neutralization assay; neutralizing the

6  cytotoxic activity of TNF, for example?

7              ANSWER:  I was never asked to do any of

8  those things.

9              QUESTION:  So if -- if I understand

10 correctly, you haven't given conclusions in any part of

11 your report about whether any two antibodies compete

12 with each other for binding to TNF-alpha; is that

13 correct?

14             ANSWER:  Compete, no, because it's not an

15 appropriate assay, in my opinion, for competition.

16             QUESTION:  So sitting here today, you

17 haven't formed an opinion as to whether any of these

18 antibodies compete with each other for binding to

19 TNF-alpha; is that right?

20             ANSWER:  I -- I believe I indicated that

21 I don't believe this -- the collected data that I have

22 lends itself to evaluating competitive binding.

23             (End of video clip.)

24             THE COURT:  Is that the end of the

25 deposition?

1          MR. SAYLES:  That concludes our proffer

2  of it at this time.

3          THE COURT:  Okay.  Does the Defendant

4  have any proffer, another proffer?

5          MR. LEE:  Ask if we can offer the

6  corrections to the transcript?

7          MR. SAYLES:  That's up to you.

8          MR. LEE:  Sure.  I'll do it.  Can I have

9  it?

10         MR. SAYLES:  Yes.

11         MR. LEE:  I thought we worked that out.

12  I'm sorry, Your Honor.

13         MR. SAYLES:  Well, I'll be glad to do it

14  for you.

15         MR. LEE:  May I proceed, Your Honor?

16         THE COURT:  Yes.

17         MR. LEE:  Centocor and Abbott have agreed

18  to Exhibit 861, which are the corrections that His Honor

19  referred to yesterday that were made by the witness.

20  And at Page 251, the --

21         MR. SAYLES:  Excuse me, Your Honor.

22  I'm sorry to interrupt you, Mr. Lee.

23         Your Honor, I object to that.  We didn't

24  agree to the corrections.  We agreed that Exhibit 861

25  shows the corrections the witness made.  We don't agree

1    to them.

2                    MR. LEE:  That's fair enough.  We agreed

3    that we would make this exhibit available to the jury --

4                    THE COURT:  Okay.

5                    MR. LEE:  -- okay?

6                    And this will be available, but at

7    Page 251, the clarify -- the reason for the errata,

8    which is the name at the top of the page is,

9    Clarification:  Compete, no, because it's not an

10   appropriate assay, in my opinion, for competition is

11   changed to compete for the same epitope, no, because

12   it's not an appropriate assay, in my opinion, for

13   competition to the same epitope.

14                    And two pages later, again, under

15   clarification:  Competitive binding is changed to

16   competitive binding for the same epitope.

17                    MR. SAYLES:  May it please the Court.

18   You can keep the clock --

19                    THE COURT:  That's number what?

20                    MR. SAYLES:  It's Plaintiffs' Exhibit

21   861.

22                    THE COURT:  Okay.  This one is 861?

23                    MR. SAYLES:  Yes, sir.

24                    COURTROOM DEPUTY:  It's not on the list.

25                    THE COURT:  All right.  It's received.

1          MR. SAYLES:  Your Honor, just a few more
2   items from this deposition.
3          Page 2:  Randall Lawrence Kincaid, the
4   witness, was called for examination by counsel for the
5   Plaintiffs pursuant to notice commencing at 10:16 a.m.
6   at the law offices of Wilmer-Hale, 1875 Pennsylvania
7   Avenue, Northwest Washington, D.C.
8          Page 3:  Appearances:  Matthew Pearson
9   and Diane Elderkin, Woodcock Washburn, Philadelphia,
10  Pennsylvania.
11         On behalf of the Defendants, Jacob Oyloe,
12  Wilmer, Cutler, Pickering, Hale & Dorr, Washington, D.C.
13         And then, Your Honor, if I may, I would
14  like to publish a portion of 861 and just point out a
15  few items.
16         THE COURT:  Okay.  Of the exhibit?
17         MR. SAYLES:  Yes.  I just want to read
18  them.
19         THE COURT:  Read them.  Okay.
20         MR. SAYLES:  Yes, sir.
21         Plaintiff's 861 is a letter from the
22  deposition service that recorded the deposition at which
23  the attorneys appeared.  It's dated April 30, 2009.
24  It was sent to Woodcock Washburn on May the 5th --
25  received by them on May 5th, 2009, relating to the

1  deposition of April the 2nd of Randall Kincaid.

2           It indicates the deposition transcript

3  has been reviewed by the witness.  Attached are the

4  corrections/changes.

5           And then attached in the errata sheet,

6  the reason for the change given that Mr. Lee read a

7  moment ago -- I will not reread it -- is, quote,

8  clarification, end quote, and that is true for each

9  change that he read.  Quote, clarification, end quote.

10 It was signed before a Notary Public by Randall Kincaid

11 on the 25th day of April, 2009.

12           The original deposition that concluded on

13 April the 2nd, 2009, at 6:30 p.m. was also signed by

14 Randall Kincaid and included in that transmittal.

15           That concludes our proffer of this

16 deposition and Plaintiff's Exhibit 861.

17           THE COURT:  Do you have another witness

18 now?

19           MS. MULLIN:  Yes.  If it please the

20 Court, the Plaintiff would call Dr. Adams.

21           THE COURT:  Okay.

22           MR. BECK:  Your Honor, was 861 admitted?

23           THE COURT:  Yes.

24           MR. BECK:  Thank you.

25           THE COURT:  It's received into evidence.

1          THE WITNESS:  Do I need to be sworn?

2          THE COURT:  No.  You're -- do you

3  understand you're still under oath?

4          THE WITNESS:  Yes, I do.  Thank you.

5          THE COURT:  Okay.  Come around.

6          MS. MULLIN:  I'm sorry.  I'm having some

7  difficulty getting the ELMO to work.  Oh, I've got it.

8          GREGORY ADAMS, PLAINTIFFS' WITNESS, SWORN

9                  DIRECT EXAMINATION

10 BY MS. MULLIN:

11     Q.   Good morning, Dr. Adams.

12     A.   Good morning.

13     Q.   Were you here in the courtroom when -- wrong

14 way.  Sorry.

15     A.   Okay.  Right there.

16     Q.   There we go.  Let's try that.

17          Okay.  When Mr. Lee asked Dr. Marks his

18 opinions about various elements of the Adair 1992

19 publication?

20     A.   Yes, I was.

21     Q.   And do you recall that then I went through

22 some of the elements with Dr. Marks as well?

23     A.   Yes.

24     Q.   Okay.  I'm going to ask you today to focus on

25 one element, okay?  And that's the competitively

1  inhibits one, okay?

2       A.   Okay.

3       Q.   So I'm going to ask you to focus on the

4  competitively inhibits element, okay?

5       A.   Okay.

6       Q.   Okay.  In your opinion, was the testing that

7  Dr. Marks relied upon for this element reliable or

8  conclusive on the issue of competition?

9       A.   No.

10      Q.   Why not?

11      A.   Well, there were a number of reasons, and they

12  relate to the antibodies that were used, the test

13  protocols, and the data that resulted from the tests.

14      Q.   Can we start first with the issue of the

15  antibodies?

16      A.   Yes.

17      Q.   What's the -- what's the issue with that?

18      A.   So Dr. Kincaid was testing a number of

19  anti-TNF-alpha antibodies at the time.  There were a

20  number of antibodies in his laboratory.

21           And at one point, he was concerned that the

22  antibody that he calls A2 -- or he actually says it

23  behaves like a chimeric antibody.  And we all know that

24  the antibody A2 is a mouse antibody, so it shouldn't

25  behave like a chimeric antibody.

1          And I know that he actually, after the fact,

2 went back and said he was mistaken, but I -- I'm still

3 concerned that that's not the antibody he thought it

4 was.

5     Q.   Were there tests that could have been done in

6 order to confirm that what he thought was A2 was

7 actually A2 that he was using in his tests?

8     A.   Yes.  Yes.  He could have -- he could have

9 tested the affinity for -- of the antibody he thought

10 was A2 for TNF-alpha.

11          He could have tested whether or not it

12 neutralized TNF-alpha in the assays we've been talking

13 about the last few days.

14          He also could have sequenced the antibody to

15 determine if it was, in fact, A2.

16     Q.   Have you also considered the protocol that was

17 used in the testing done in Dr. Kincaid's laboratory?

18     A.   Yes.  I have some serious concerns about the

19 protocol.

20     Q.   Okay.  So assume, though, that he did

21 correctly identify the antibody A2, so what he was using

22 was A2.  Just assume that.  Was the protocol he used

23 appropriate for testing competition?

24     A.   So assuming that the antibody is correct, the

25 protocol, first off, was provided to him by an attorney.

1  Not by a scientist, but by an attorney.

2          The protocol calls for a modification of the

3  antibody, to put a tag on it so you can trace it through

4  the test, and that's fine.  It calls for modifying it

5  with something called biotin and under conditions that

6  were so harsh that it damaged a significant majority of

7  the antibody that was -- that he was using.

8      Q.   So is adding biotin something that should

9  never be done for assays?

10     A.   No, that's not what I'm saying.  In fact, you

11 can biotinylate -- it's a common practice to put biotin

12 on an antibody as a tracer or a marker.

13         The problem is that you're obligated then to

14 look at the biotin on the antibody and make sure it

15 behaves the way it's supposed to behave.  And there's

16 tests that you can do to do that.

17     Q.   Okay.  If you could please turn, then, to

18 what's been marked as Defendant's Exhibit 284.

19             MS. MULLIN:  And maybe we can bring that

20 up on the screen as well.

21     Q.   (By Ms. Mullin) Do you recognize this,

22 Dr. Adams?

23     A.   Yes.  This is a manual that's common in many

24 antibody laboratories.

25     Q.   Okay.  If you could turn to Page 340 then.

1        MS. MULLIN:  Maybe we can bring that up

2   on the screen.  And make it a little bigger.  Thank you.

3        A.   Okay.

4        Q.   (By Ms. Mullin) What's being described here?

5        A.   So this is the general use of biotin labeling

6   of antibodies for assays, and it talks about how biotin

7   is commercially available and that it's a sensitive

8   detection method.

9        Q.   So in short terms, it's telling you you can

10  use biotin as a label, right?

11       A.   Exactly.  Just like I said, you can use biotin

12  to measure what's happening with an antibody.

13             MS. MULLIN:  Can we turn then to the next

14  page, Page 341?  Just down to about No. 3 or so.  There

15  we go.

16       Q.   (By Ms. Mullin) What else does the Harlow

17  manual tell you about using biotin in assays?

18       A.   So it talks to you about -- you put biotin --

19  when you're putting biotin on an antibody, you often put

20  it on lysings.

21             And what it tells you is that -- if you go

22  down toward the end of the first paragraph --

23  biotinylation with the succinimide ester will lower or

24  destroy the activity of the protein and other -- if it

25  does, other methods of labeling should be tried.

1          And it also --

2      Q.   I'm sorry.  I just want to make sure -- I

3  think you misspoke.

4          It's an if sentence, not an absolute sentence,

5  right?

6      A.   Yes.  I'm sorry.  If --

7      Q.   That's okay.

8      A.   If a free amino acid group forms a portion of

9  the protein that is essential for activity.  I missed

10 reading that part.

11         So if the biotin is coming on a part of the

12 antibody when the antibody interacts with the target

13 antigen, the protein, TNF-alpha in this case, it will

14 damage the antibody such that it cannot function, and

15 you should, therefore, try a different tag instead of

16 biotin, is what this is saying.

17         And then at the bottom here in, Paragraph No.

18 3 -- I think it's labeled No. 3 -- they actually talk

19 about a wide range of biotin that should be tried with

20 the antibody.

21         So you try it under a different range of

22 conditions, and then you test it to see if it's

23 functional to make sure that you're using the right

24 amount of Biotin for the antibodies so that you can

25 trace it without damaging it.

1    Q.   Speak very slowly.

2    A.   I'm sorry.

3    Q.   In your opinion, are the competition tests

4 that Dr. Marks referred to in his testimony that used

5 biotin labeled A2 reliable?

6    A.   No, they're not reliable.  They -- yeah.

7 They're not.

8    Q.   Now --

9         MS. MULLIN:  You can take that off the

10 screen.

11   Q.   (By Ms. Mullin) One of the other antibodies

12 that was used in the testing Dr. Kincaid indicated was

13 CDP571, right?

14   A.   That's correct.

15   Q.   Was that labeled with biotin?

16   A.   No.  That was not biotin labeled.

17   Q.   So that antibody was fine.

18   A.   That -- it should have been fine, yes.

19   Q.   Okay.  Well, if you can turn to DX450.

20        MS. MULLIN:  Do you have that and can you

21 bring that up on the screen?  That's Defendant's Exhibit

22 450.  And if you could blow up the top portion.

23   Q.   (By Ms. Mullin) Now, you said the antibody

24 should be fine in terms of not having a biotin label,

25 but what does this indicate about the antibody sample

1   that Dr. Kincaid indicated was CDP571?

2       A.   Okay.   So this is the example that Dr. Kincaid

3   says he tested, and the real key here is that this is a

4   very, very old antibody.   It was made -- it says right

5   up there -- on the 2nd of March, 1993, and then it says

6   an expiration date of September 2nd, 1994.

7           So the certificate of analysis that, in fact,

8   my understanding is, was provided to Dr. Kincaid by the

9   attorneys, it didn't come with the antibody when he

10  received it from shipment.   This was provided separately

11  from the antibody.

12          The certificate of analysis says the antibody

13  had expired back in 1994, more than 14 years before he

14  tested this antibody.

15      Q.   Why does that matter, or why could it matter?

16      A.   It can matter, because there's a lot of things

17  that can happen to an antibody over long-term storage.

18  It can be degraded, which means it can be chewed up.

19  Pieces can come off.

20          It can aggregate.   It can clump.   And if an

21  antibody aggregates or clumps, it's going to behave

22  differently in these competitive binding assays than it

23  would if it was a pure single antibody.

24      Q.   Did Dr. Kincaid's laboratory do any testing to

25  see whether there was any degrading or aggregating of

1  the sample?

2      A.   They tested to see if there was any degrading

3  of the antibody, and they showed, in fact, that there

4  was no degrading of the antibody.  The antibody had not

5  degraded over the 14 years.

6          But when they test -- actually, they didn't

7  test for aggregation.  They just tested for degrading.

8  So there was no testing for aggregation.

9      Q.   So how do we know whether aggregation would

10  have affected the data that was generated?

11      A.   We don't know.  Aggregation, if effective --

12  once again, it would make the antibody bigger, and it

13  would be more likely to compete.  And we don't know if

14  it aggregated or not, and they could have tested for

15  that.

16      Q.   So setting aside what you said about the

17  antibodies used in the testing and what you said about

18  the procedure now, if you could assume that the data

19  generated from the test was reliable, do you agree with

20  Dr. Marks' conclusion about what the results show?

21      A.   No, I do not.

22      Q.   Why?

23      A.   Well, there were two sets of tests that were

24  done.

25          The first set of tests Dr. Kincaid performed

1  with the antibody he's calling A2 that was biotinylated

2  showed no competition between A2 and the CDP571

3  antibody.  There was none.

4          So he went back and modified the conditions of

5  the assay a little bit and performed the test again.

6      Q.   And when he performed the test again, did it

7  affect -- well, what parts -- what did he modify in

8  particular?

9      A.   So he -- he did a couple of things.  He

10  changed the concentration of the -- but the key thing

11  is, he knew -- he used a new preparation of biotinylated

12  A2.  And so that was a good first step.

13          But when he -- when you look at the quality of

14  the biotinylated A2 that he used in the second assay,

15  there's still -- a significant majority of the

16  biotinylated A2 is damaged and unable to function.

17      Q.   So is there any indication at all in the

18  second competition assay with the modified procedure

19  that would support Dr. Marks' opinion that there's

20  competition?

21      A.   There are a couple of points that definitely

22  suggest competition in the second assay, yes.

23      Q.   So then wouldn't you conclude from those that

24  there is competition in the assay?

25      A.   No.  Because at those points in the assay, at

1  the points where the assay suggests competition, the

2  control antibody that was used in the assay was giving

3  results that suggest to me that the assay was unreliable

4  at that point.

5        We put control antibodies in assays because we

6  know how the control antibody should behave in an assay.

7  If the control antibody is not behaving the way it's

8  supposed to behave in the assay, the assay is

9  unreliable, and you cannot base any conclusions on those

10  results.

11     Q.   Dr. Adams, in your normal job

12  responsibilities, do you have experience reviewing other

13  scientists' work?

14     A.   Yes, I do.

15     Q.   In what context?

16     A.   So I think I mentioned before, I'm a reviewer

17  for dozens of scientific journals.  I'm a grant reviewer

18  for the National Cancer Institute, for the Department of

19  Defense.  I've been a reviewer for the American Cancer

20  Society, to name others.

21        I supervise students, technicians, post docs,

22  and other scientists in my laboratory.

23     Q.   So if you were reviewing the same information,

24  the same data in one of those capacities, what would you

25  do?

1      A.   I would reject it.  If it was my student, I

2 would send them back to the bench and tell him to do it

3 again right.

4           If it was for publication in a journal, I

5 would reject the publication, because it's unreliable.

6      Q.   So to summarize, what is your opinion about

7 the competitive ELISA assays performed in Dr. Kincaid's

8 laboratory with respect to the reliability of the method

9 and data generated?

10     A.   It's unreliable.

11     Q.   So then what is your opinion about whether

12 Adair 1992 anticipates the asserted claims of the '775

13 patent?

14     A.   In my opinion, it does not anticipate.

15     Q.   Thank you.

16           MS. MULLIN:  Pass the witness, Your

17 Honor.

18           THE COURT:  Take the slide down first.

19 Take the slide down first.  Ask this operator over here.

20 Now, there we go.  Now see if you can't do it now.

21 There we go.

22           MR. LEE:  We'll try to do it the

23 old-fashioned way.

24           THE COURT:  Okay.  You've got the ELMO.

25           MR. LEE:  All right.  May I proceed, Your

 1  Honor?

 2                    THE COURT:  Please do.

 3                    CROSS-EXAMINATION

 4  BY MR. LEE:

 5      Q.   Good morning, Dr. Adams.

 6      A.   Good morning.

 7      Q.   You sat here during Dr. Marks' testimony on

 8  all of the invalidity issues, correct?

 9      A.   That is correct.

10      Q.   And I asked you -- when I cross-examined you

11  earlier, you were testifying about infringement,

12  correct?

13      A.   That is correct.

14      Q.   And now you're here to talk about validity,

15  correct?

16      A.   That is my understanding.

17      Q.   And the only issue that you've given an

18  opinion on is Adair and anticipation, correct?

19      A.   That is correct.

20      Q.   And that's the limit of your opinions for this

21  trial, correct?

22      A.   In the testimony I've given this morning, yes.

23      Q.   Right.  Now, you and Dr. Marks disagree on the

24  importance of the Veritas test, correct?

25      A.   That is correct.

1        Q.   But you have known Dr. Marks for many years,

2   have you not?

3        A.   Yes, I have.

4        Q.   You know him as one of the real pioneers in

5   the field of phage display, correct?

6        A.   He is a pioneer in phage display, and he's

7   a long-term collaborator of mine.

8        Q.   Right.

9        A.   Yes.

10       Q.   In fact, your relationship goes all the way

11  back to 1994 of import here on in this case?

12       A.   If not before actually.

13       Q.   And in 1994, you wanted to learn about phage

14  display, so you asked Dr. Marks if you could come to his

15  laboratory and study under him, correct?

16       A.   That is correct.

17       Q.   And he said sure, come and study under me,

18  correct?

19       A.   He's a friend, yes.

20       Q.   Yes.  He's a good friend and a good colleague,

21  correct?

22       A.   That is correct.

23       Q.   For whom you have enormous respect?

24       A.   I think we respect each other, yes.

25       Q.   Now, let's go to the only invalidity opinion

1  you brought, and that's about the Adair 1992 reference.

2         Do you have that in mind?

3     A.   Yes, I do.

4     Q.   Now, for reference to anticipate the, it has

5  to have each and every limitation of the claim, correct?

6     A.   That is correct.

7     Q.   And you sat there while Dr. Marks went through

8  the different elements of Claim 2, Claim 3, Claim 14,

9  and Claim 15, correct?

10    A.   Right.

11    Q.   You gave a report in this case, correct?

12    A.   That is correct.

13    Q.   You addressed Adair specifically, correct?

14    A.   That is correct.

15    Q.   And you only identified one limitation, of all

16 of them, on which you and Dr. Marks disagree, correct?

17    A.   I believe you're correct.  I -- I -- I think

18 so.  I mean, it was focusing on competition.

19    Q.   Right.

20    A.   Is what we focused on, yes.

21    Q.   But Dr. Marks submitted a report that says

22 Adair has all of the elements of the claim, correct?

23    A.   I think you're correct.

24    Q.   And then you responded, and you say, well, I

25 disagree on one, and it's the competitive inhibition

1 limitation, correct?

2      A.   Correct.

3      Q.   Now, you just told the Ladies and Gentlemen of

4 the jury that one of the tests run by Veritas actually

5 had some data points that showed competition, correct?

6      A.   There were two data points, correct.

7      Q.   Now, let's be sure the jury understands how

8 these tests came apart -- about.

9           You know from the opening that February 1994

10 is an important date, correct?

11      A.   Correct.

12      Q.   And if you want to have something that's prior

13 art, you need to go back before February of 1994 for

14 that purpose, correct?

15      A.   That is my understanding, yes.

16      Q.   So you know that what happened is Abbott went

17 and found a sample of this antibody, CDP571, that

18 actually was in existence before 1994, correct?

19      A.   That's what I was told, yes.

20      Q.   And it got a sample, and what it did with it

21 is, it gave half of it -- or a portion to Veritas and

22 the other half to you, correct?

23      A.   I don't know.

24      Q.   You don't know that Centocor was given half of

25 the sample?

1    A.    I don't know that that was that -- that

2  sample.

3    Q.    Okay.  But you know that you got a portion of

4  CDP571, correct?

5    A.    Of CDP571 from before 1994?

6    Q.    Yes.

7    A.    No, I don't know that.

8    Q.    Did you know that Centocor -- withdrawn.

9         When we received the sample copy from

10 Celltech -- that's where it came from, correct?

11   A.    That's correct.

12   Q.    Did you know that Centocor asked for a portion

13 of the sample?

14   A.    Yes.

15   Q.    You knew that it was available to you for

16 testing, correct?

17   A.    I didn't know it was available to me

18 personally for testing, but it was available -- the

19 sample that was sent was available to Centocor for

20 testing, yes.

21   Q.    Right.  And where is that sample today?

22   A.    I have it.

23   Q.    Right.  Setting in your refrigerator, isn't

24 it?

25   A.    No.  Actually, I have it with me here today.

1    Q.   Okay.  And tell the Ladies and Gentlemen of

2 the jury, when did you receive the sample?

3    A.   It would have been late last year.

4 Probably -- I think it was December, but I'm not

5 certain.  It was somewhere in that timeframe.

6    Q.   Now, Dr. Adams, when you saw the Veritas

7 tests -- you saw them, correct?

8    A.   That's correct.

9    Q.   You saw Dr. Marks' analysis of them, correct?

10    A.   That's correct.

11    Q.   You saw the data points you've described that

12 showed some competition, correct?

13    A.   Correct.

14    Q.   You said, well, what I would like to have is a

15 third test that would show me whether that, in fact, was

16 competition, correct?

17    A.   That's correct.

18    Q.   And having given that opinion, you left the

19 sample that was given to you by us untested, correct?

20    A.   That's correct.

21    Q.   Now, you understand from the opening that --

22 and even from the examination this morning, that

23 Centocor is seeking $2.2 billion in damages, correct?

24    A.   Correct.

25    Q.   It would have cost about $10,000 to do the

1 test, which would have enabled you to confirm whether

2 Dr. Marks' analysis was correct, right?

3    A.    Correct.

4    Q.    You didn't do it, correct?

5    A.    Correct.

6    Q.    Because you weren't asked to do it?

7    A.    That's correct.

8              MR. LEE:  Nothing further, Your Honor.

9              MS. MULLIN:  A few questions, Your Honor?

10             THE COURT:  Yes.

11             MS. MULLIN:  -- if I may?

12                   REDIRECT EXAMINATION

BY MS. MULLIN:

14    Q.    Dr. Adams, Mr. Lee just asked you some

15 questions about a sample that you received.

16             Can you describe your understanding of how the

17 sample that you have relates to Dr. Kincaid's testing?

18    A.    I would be happy to.

19             So the sample -- Dr. Kincaid received a sample

20 from Celltech, which is correct in the -- but he also

21 received a certificate of analysis talking about an

22 antibody that was produced in 1993 and expired in 1994.

23 And we saw that on the screen.

24             The tube that Dr. Kincaid tested and then sent

25 on to me personally that I have in my possession says

1  nothing about 1993 or 1994.  It says October, I think,

2  it's 20th or something, 2008 on it.  Not 1994, not 1993.

3  The sample also says that CDP571P, which is a different

4  designation than the designation on the certificate of

5  analysis.  I don't know what the P means in CDP571P.

6  It might mean that it's modified.  It might mean that

7  it's a different subset that's been produced many years

8  later.

9           The date 2008 on the sample adds to that level

10  of concern, so I don't know what he tested.

11      Q.   So what information do we have, if any, that

12  suggests that whatever was -- whatever was tested by

13  Veritas Lab, that they thought was CDP571 actually has

14  any relationship to some compound, CDP571, that might

15  have existed back in 1992 or '93 or '94?

16      A.   None.

17               MS. MULLIN:  Nothing further, Your Honor.

18               THE COURT:  All right.

19               MR. LEE:  Just a couple, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. LEE:

22      Q.   Dr. Adams, the sample came from Celltech,

23  correct?

24      A.   It says that on the label, yes.

25      Q.   Celltech was a creator of CDP571, correct?

1        A.    That is correct.

2        Q.    Celltech took the license from Adair under the

3   Adair patent, correct?

4        A.    That is my understanding.

5        Q.    And the sample was dated before February 1994,

6   correct?

7        A.    No.   The sample is dated 2008.

8        Q.    No.   Actually, I'm going to come to that.

9   The 2008 date is the date on which the sample was

10  shipped to us by Celltech as a result of discovery in

11  this case, wasn't it?

12       A.    That is the date it was shipped, yes.

13                  MR. LEE:  Nothing further, Your Honor.

14                  THE COURT:  Anything further?

15                  MS. MULLIN:  Permission to mark the

16  sample and offer it into evidence, Your Honor?

17                  THE COURT:  Any objection?

18                  MR. LEE:  May we approach, Your Honor?

19                  THE COURT:  Okay.

20                  (Bench conference.)

21                  MR. LEE:  This is a sample that's not

22  premarked or preadmitted.  It wasn't tested.

23                  And what good is that going to be for the

24  jury?

25                  THE COURT:  Well, we'll let them see what

1  y'all have been talking about, because I don't know.

2                 MR. LEE:  Well, I haven't seen it, so

3  could we at least see it since it's --

4                 THE COURT:  Well, sure.

5                 MS. MULLIN:  Should I -- I'd like to --

6  should I mark it, and can the witness put it on the ELMO

7  and show it to the jury?

8                 THE COURT:  No.  First thing you do is

9  mark it.

10                 MS. MULLIN:  Okay.

11                 THE COURT:  And give it to Mr. Lee, and

12  then if he has any objection.

13                 So get the sample and let's mark it.

14                 MS. MULLIN:  Okay.  Thank you, Your

15  Honor.

16                 (End of bench conference.)

17                 THE COURT:  Do you have a label there?

18                 COURTROOM DEPUTY:  She's got it.

19                 THE COURT:  Somebody has an exhibit

20  label.

21                 THE WITNESS:  It's in bubble wrapping,

22  because I didn't want it to break in my pocket.

23  I can take it out.

24                 THE COURT:  Yes, take it out.

25                 (Sample marked.)

1            THE WITNESS:  She will give it to you.

2            MS. MULLIN:  Thank you.

3            MR. LEE:  May we approach, Your Honor?

4            THE COURT:  Yes.

5            (Bench conference.)

6            MR. LEE:  Your Honor, there was -- for

7    the sample that we had tested, if you recall, there was

8    an authenticating declaration to deal with the

9    authentication issues.

10            We didn't offer that, because all we were

11   offering was the test sample, if we were going to offer

12   anything at all.

13            With that in mind -- and this was not on

14   the list before Judge Everingham.  Judge Everingham said

15   that he was excluding the authenticating declaration for

16   our portion of the sample.

17            If this is going to go in, which we

18   haven't gotten notice of before.  This is the first time

19   we've heard that they were going to offer this.

20            Then the authenticating declaration for

21   our sample, we would ask go in as well.

22            THE COURT:  The declaration you said?

23            MR. LEE:  Yes.  It's a declaration under

24   802.

25            MS. MULLIN:  Your Honor, there's a lot of

1  information about that correction.  If I may explain the

2  circumstances, Your Honor.

3              The sample was subpoenaed during the

4  course of discovery, along with -- along not only with a

5  request for the sample but also a notice of deposition

6  that they could authenticate the sample.

7              Abbott chose not to take the deposition

8  during discovery.  After discovery was over, about a

9  week later, we got a declaration from somebody in

10 England, who purported to describe the circumstances

11 under which the sample had been stored, that the

12 practices -- it was not contemporaneously with the

13 sending of the sample, so it's not contemporaneous

14 authentication.

15             THE COURT:  I'm not going to allow the

16 authentication as a declaration.

17             Your expert has testified that the

18 information he -- he relied on that information.  And it

19 would be self-serving.  I'm not going to allow -- I'm

20 going to allow him to see the sample.

21             I mean, y'all all testified about what it

22 said or didn't say.  Your man testified that he relied

23 on it; he says it's not reliable.  I'm going to -- I'm

24 going to -- your objection is overruled.

25             I am allowing -- and I'm sustaining your

1   objection to the declaration.  I don't see that that's

2   an issue at this point.

3                    MR. LEE:  Okay.

4                    MS. MULLIN:  Thank you, Your Honor.

5                    THE COURT:  Do you have any further

6   objection?

7                    MR. LEE:  No.

8                    MS. MULLIN:  Can I have permission to

9   have him hand this to the jury?

10                    THE COURT:  Pardon?

11                    MS. MULLIN:  Can he hand this to the

12   jury, the vial?

13                    THE COURT:  Just offer it into evidence

14   and request to publish it.

15                    MS. MULLIN:  Okay.  Thank you.

16                    (End of bench conference.)

17    MS. MULLIN:  At this time, Your Honor, Plaintiffs offer

18   Plaintiffs' Exhibit 862 into evidence.

19                    THE COURT:  The Court will --

20                    MR. LEE:  No objection, Your Honor.

21                    THE COURT:  Yeah, I will admit it over

22   the objection of the Defendant.

23                    MS. MULLIN:  All right.  May we publish

24   it to the jury, Your Honor?

25                    THE COURT:  Yes.

1     Q.   (By Ms. Mullin) And, Dr. Adams, since you've

2   had a little more time to look at it, where does the

3   designation CDP571 appear on the -- 571P -- excuse me --

4   appear on the vial?

5     A.   If I recall correctly, it's the lot number.

6   It's just below and to the right of the lot number,

7   which is a separate sticky, and the P is right after

8   CDP571.

9               MS. MULLIN:  Thank you, Your Honor.

10  Nothing further.

11              THE COURT:  Anything further?

12              MR. LEE:  Nothing further.

13              THE COURT:  All right.  You may step

14  down, Doctor.

15              THE WITNESS:  Thank you.

16              THE COURT:  Plaintiffs have anything

17  further?

18              MR. SAYLES:  May it please the Court.

19  At this time, the Plaintiff rests its rebuttal case.

20              THE COURT:  Close?

21              MR. SAYLES:  Plaintiff closes.

22              THE COURT:  Defendant?

23              MR. BECK:  Your Honor, we may have one

24  matter we need to talk with the Court about before -- we

25  have no further witnesses.

```
 1                    THE COURT:  All right.  Is this a lengthy
 2  discussion?
 3                    MR. BECK:  No, sir.
 4                    THE COURT:  Okay.  Come up here.
 5                    MR. BECK:  It's for guidance from the
 6  Court.
 7  (Bench conference.)
 8                    MR. LEE:  I just want an answer to the
 9  question they left hanging about whether we had
10  identified the portion of the --
11                    MR. BECK:  Expert's report.
12                    MR. LEE:  -- expert's report that had the
13  contingent opinions.  And this is a copy of our brief,
14  Your Honor, on the judicial estoppel motion, which
15  refers to '184.  This is a copy of the report.
16  And I apologize.  It's my confusion, but I had thought
17  that we had let Your Honor know that we had these
18  contingent opinions, the if opinions, as you might --
19                    THE COURT:  Yes.  But I'm saying the if
20  never existed.  The condition for those to come
21  admissible never existed.  I excluded that.
22                    MR. LEE:  Right.
23                    THE COURT:  And I have precluded them
24  from doing anything that would establish that.
25                    MR. LEE:  Yes.
```

1          MR. BECK:  Let me just be blunt about

2   what the concern is.  You've clearly made a ruling.  The

3   question we've been struggling with is, do we make a

4   proffer of evidence; and if we do, does the Court wish

5   us to do it now or do that later?

6          THE COURT:  It's not necessary.

7          MR. BECK:  We don't want to slow the

8   process down.

9          THE COURT:  I'm just trying to get the

10  jury out of here.

11         MR. BECK:  Right, right.

12         THE COURT:  No.  I'll exclude for the

13  reasons I've previously stated as clearly as I could.

14  But that's what I tried to tell y'all yesterday.  I'm

15  going to let you take whatever time you need to make any

16  proffer to protect the record.

17         MR. BECK:  That's all we need.

18         MR. LEE:  That's all we need.

19         THE COURT:  I'm not trying to sandbag

20  you.  That's what he does to me.

21         MR. BECK:  No.

22         THE COURT:  I learned that from him.

23         MR. LEE:  I'm the one who was confused

24  about that.

25         MR. BECK:  I said, look, we've got to

1   approach the judge and tell him what we're going to do.

2           THE COURT:  I learned it from him.  I'll

3   tell you some stories about what he does to people on

4   the other side.

5           MR. LEE:  Thank you.

6   (End of bench conference.)

7           THE COURT:  All right.  Does the

8   Defendant have anything further?

9           MR. LEE:  No, Your Honor.

10          THE COURT:  Defendant close?

11          MR. LEE:  Defendant closes.

12          THE COURT:  All right.  It's not 3:30,

13  but the Court has got several legal matters I've got to

14  take up, and I've got to get the Court's Charge

15  prepared.

16  I might could get it ready by 3:30 and we could keep you

17  here tonight, but I don't think -- I think what we'll do

18  is what we've talked about doing.  And that is break

19  now, let me release you till Monday morning at 8:30, at

20  which time we will take -- we will have the closing

21  arguments of the parties.

22  That's going to take as much as an hour and a half a

23  side, and it will take about 45 minutes for me to read

24  the Charge, based on what I believe it's going to look

25  like.  Then you will start deliberating somewhere then.

1    I guess that's pretty close.  A little after 11:00;
2    we'll probably take one break in there.  So before lunch
3    anyway.
4    What I want to discuss and let you be thinking about,
5    your deliberations -- you'll be allowed to deliberate,
6    you know, as long as the Court thinks, which could spill
7    over into Tuesday.
8    What I wanted you to think about, and y'all decide among
9    yourselves, if you're not able to reach a verdict by
10   about 5:30 or so on Monday, the Court will be willing to
11   stay with you into the evening, if you thought you could
12   reach a verdict.
13   But at the same time, if somebody's tired and wants to
14   go home, y'all need to think about that before you come
15   back as to how long you want to stay on Monday.
16   I've got permission from Mrs. Ward to -- I can stay as
17   long as I need to, because it's my job.  If it was
18   something else, I might have to have special permission.
19   So y'all be thinking about that.
20   But you don't need to make up -- don't be making up your
21   mind in this case of who you think ought to win or lose
22   this case, because you have not yet heard their
23   argument.
24   The Court likes to think that -- and I will tell you
25   that probably the most important function of the Court

1  is the final charge that I give you after argument.  And

2  you should not be making up your mind until you've heard

3  what I'm going to tell you about what the law is, who

4  has the burden of proof on certain issues, and those

5  kinds of things, because it could make a substantial

6  difference from time -- I like to think that what I do

7  on the law has something to do with the outcome.

8  So please don't make up your mind and keep an open mind

9  till the end of the case.  And then when you go to

10  deliberate, that will be the time to start discussing

11  it.

12  Don't let anybody discuss it with you.  Don't do any

13  research.  Don't get on the internet.  Don't read any

14  newspapers papers.  Don't listen to any news stories.

15  And should anyone contact you about this case, you

16  should immediately report it to the Court.

17  I tell you, I don't anticipate that happening.  I've

18  been doing this for 42 years almost, and I've never had

19  that happen with 30 years as a judge and as a lawyer,

20  and I don't think it will happen in this case.  But I

21  caution -- I always caution jurors, because that's part

22  of my job.

23  So I don't mean to indicate to you that I think it will

24  happen, just the opposite.

25  So with that final instruction, have a nice weekend,

1  drive safely, and stay out of the heat.  No heat

2  strokes, okay?

3  See you Monday morning.

4           COURT SECURITY OFFICER:  All rise for the

5  jury.

6  (Jury recessed.)

7           THE COURT:  I misspoke.  An hour and a

8  half total, not an hour and a half per side.

9  Don't get excited, Mr. Sayles.  Just calm down.

10          MR. SAYLES:  I was going to lay low.

11          THE COURT:  Yeah, lay low.

12 All right.  The Court -- be seated.

13 All right.  Have you got -- have you given somebody --

14          LAW CLERK:  They have it.

15          THE COURT:  With the change in the

16 verdict form?

17          LAW CLERK:  Yes, sir.

18          THE COURT:  It's dangerous, I guess, for

19 the Court to sleep overnight, because I made some

20 changes I said I probably wasn't going to make on the

21 verdict form, and I didn't make as much of a change as I

22 might have indicated that I was going to make in the

23 Charge itself.

24 I felt like the change to the verdict form -- but what I

25 thought, since we're all here, about 11:45, if you want

1    to, we can have a final -- we'll have one more informal

2    jury conference.  And if you can convince me in there

3    that I need to make a change, I will listen to you.

4    Then we'll come -- if you like, we'll work a little bit

5    past 12:00 and go ahead and get the final objections so

6    you can make your plans to do whatever you're going to

7    do in the meantime.

8    But a couple of things when we're in chambers, we'll

9    talk about the times for jury arguments as far as what

10   the Court -- about dividing.

11   Now then, can we do the -- at 12:00, when we come back

12   at 11:45, or do you want to make your proffer now?

13                MR. LEE:  We can do it then.  I think I

14   have to renew our JMOL, and I can make the proffer at

15   that time, okay?

16                THE COURT:  Okay.  Does that work with

17   everybody?

18                MS. ELDERKIN:  Yes, Your Honor.

19                THE COURT:  Well, maybe you think -- why

20   don't we get together in chambers at 11:30 with the

21   changes.  I didn't do much -- I changed some things, but

22   I'm sure that the heartburn level is still a certain --

23   same where it was.

24                (Recess.)

25                (Jury out.)

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Please be seated.

3          Okay.  We'll have some motions from the

4  Plaintiff.

5          MS. ELDERKIN:  Your Honor, Plaintiff

6  renews its motion for judgment as a matter of law on

7  obviousness and anticipation by early 1992; enablement,

8  written description, anticipation by Salfeld '96; and

9  anticipation by Adair incorporating, by reference, the

10  arguments I made earlier.

11          Thank you.

12          THE COURT:  And of course, I'm not

13  submitting obviousness, but I'm going to deny those

14  JMOLs.  They may be one and the same.  I never have

15  convinced myself.

16          Mr. Lee for the Defendant.

17          MR. LEE:  Your Honor, we would renew our

18  JMOL motions on infringement, willful infringement, and

19  damages, which Your Honor has previously considered.

20          We would move JMOL for anticipation.

21  Actually, let me back up.

22          We move for JMOL for invalidity for three

23  different reasons.

24          One for written description, particularly

25  because the evidence is closed.  There was no testimony

1  from Dr. Adams on the written description issue at all.

2           On enablement, we have the same situation

3  where there is no testimony from Dr. Adams or any other

4  witness at all.

5           And then on Adair, we would move JMOL on

6  the basis that there's no real dispute as to the

7  claims -- whether Adair satisfies each and every element

8  of the claims.

9           And then lastly, I would renew the motion

10 on notice that Your Honor has previously denied.

11           THE COURT:  Okay.  All right.  The

12 motions are denied.

13           Now we need to take up proffer of

14 evidence?

15           MR. LEE:  The only proffer is this, Your

16 Honor:  I think I've got it now.  We would proffer

17 the -- as follows:  We would have had Dr. Adams testify

18 to that which is indicated in his expert report at 184,

19 which is, if Le 1992 were enabled, he would have

20 testified that it would have satisfied each and every

21 limitation of the claims.

22           THE COURT:  I exclude that because I gave

23 you the benefit of a ruling that did not allow him to

24 testify that way.  So the if was never a condition that

25 ever existed.

1           MR. LEE:  Thank you, Your Honor.

2           THE COURT:  Do you have anything, Ms. --

3           MS. ELDERKIN:  No, Your Honor.  Thank

4 you.

5           THE COURT:  All right.  We'll take

6 objections to the charge and the verdict form from the

7 Plaintiffs.

8           MS. ELDERKIN:  No objections, Your Honor.

9           THE COURT:  Okay.  From the Defendant?

10          MR. LEE:  Your Honor, the only -- just

11 two things.

12          Our objection to the charge, the verdict

13 form at Page 6 and the introduction to Questions 5 and

14 6.  We believe it would be most appropriate to have them

15 answer only if the claims were found to be valid and

16 infringed.

17          THE COURT:  Well, I just -- that's-- you

18 know, in the new verdict form, we grouped them.  You

19 want -- we numbered -- these numbers were changed.

20          Here.  He may have not have seen this.

21 Just get the number right.

22          MR. LEE:  So it would be Page 4, Your

23 Honor.  The introduction to Questions 3 and 4, we

24 believe should be answered if the jury answered yes to

25 both questions -- if it found the claims were both

1 infringed and invalid.

2          And the only other thing we have, Your

3 Honor, is just to renew the contentions we made during

4 the Markman process, to preserve them, given Your

5 Honor's charge on the claims.

6          THE COURT:  Well, I believe I'll stay

7 with my original Markman ruling.  I probably -- I have

8 some better understanding now than I did, but I'll stay

9 with what I got.  Thank you.

10          Anything further?

11          MR. LEE:  Nothing further Your Honor.

12          THE COURT:  Anything further you need

13 from the Plaintiff?

14          MS. ELDERKIN:  No, Your Honor.

15          THE COURT:  Defendant, do you have

16 anything further at all?

17          MR. LEE:  Nothing, Your Honor.

18          THE COURT:  Mr. Beck, you've said very

19 little this morning.

20          MR. BECK:  It's always Monday, Your

21 Honor.

22          THE COURT:  Okay.  I'll see y'all Monday

23 at -- have you got -- have y'all got an agreement, as

24 far as exchanging exhibits for -- if you're going to use

25 any additional demonstratives during closing arguments,

1  or have y'all got that worked out?

2           MS. ELDERKIN:  Judge, we don't have an

3  agreement.  I'm sure we can come to one.

4           MR. BECK:  Yeah.  Your Honor, I think we

5  will have some additional demonstratives, I suspect they

6  will, and we'll work together as we have before the

7  trial.

8           THE COURT:  Well, I'll be here at 8:00

9  o'clock on Monday morning to work out any final

10  problems.

11           The Court -- you know, anything that is

12  in evidence, you don't need to work out an agreement.

13  It's in evidence.  You can refer to anything that's in

14  evidence.

15           Demonstratives that have been used

16  without an objection, they can be referred to.  If

17  you've got new demonstrative exhibits, that's what you

18  need to make sure you've conferred on, and I'll be here,

19  as I said, at 8:00.

20           MR. BECK:  Judge, just two quick

21  questions.

22           Since you'll be giving them the charge

23  after the opening statement, does the Court have any

24  objections if we put up on the screen --

25           THE COURT:  No.

1          MR. BECK:  -- what we anticipate the

2   Court will ask?

3          THE COURT:  You don't even have to -- you

4   don't even have to be that careful.  You can just say

5   the Court is going -- has furnished us with a copy of

6   his remarks.

7          MR. BECK:  And the second thing -- I

8   don't remember -- does the Court give them a physical

9   copy of the charge to take back?

10          THE COURT:  No.

11          MR. BECK:  I didn't think so.

12          THE COURT:  I give them -- the only thing

13   I give them are the questions, all right?

14          All right.  I'll see you -- well, I guess

15   I'll see several of you tomorrow and all of you Monday.

16          COURT SECURITY OFFICER:  All rise.

17          (Court adjourned.)

18          *      *      *      *

19

20

21

22

23

24

25

1
2
3
4
5                         CERTIFICATION

6

7              I HEREBY CERTIFY that the foregoing is a

8    true and correct transcript from the stenographic notes

9    of the proceedings in the above-entitled matter to the

10   best of my ability.

11

12

13

14   /s/_____              _____
     SUSAN SIMMONS, CSR                       Date
15   Official Court Reporter
     State of Texas No.:  267
16   Expiration Date:  12/31/10

17

18

19   /s/_____                  _____
     JUDITH WERLINGER, CSR                    Date
20   Deputy Official Court Reporter
     State of Texas No.:   731
21   Expiration Date  12/31/10

22

23

24

25