1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                 MARSHALL DIVISION

3   CENTOCOR, ET AL          *    Civil Docket No.
                             *    2:07-CV-139
4   VS.                      *    Marshall, Texas
                             *
5                            *    June 29, 2009
    ABBOTT LABORATORIES      *    8:30 A.M.
6

7         TRANSCRIPT OF TRIAL PROCEEDINGS
      BEFORE THE HONORABLE JUDGE T. JOHN WARD
8          UNITED STATES DISTRICT JUDGE
                   AND A JURY
9

10  APPEARANCES:

11  FOR THE PLAINTIFFS:    MS. DIANNE ELDERKIN
                           MS. BARBARA MULLIN
12                         MR. STEVEN MASLOWSKI
                           MS. ANGELA VERRECCHIO
13                         MR. MATTHEW PEARSON
                           Woodcock Washburn
14                         2929 Arch Street, 12th Floor
                           Cira Centre
15                         Philadelphia, PA   19104

16                         MR. RICHARD SAYLES
                           MR. MARK STRACHAN
17                         Sayles Werbner
                           1201 Elm Street
18                         4400 Renaissance Tower
                           Dallas, TX   75270
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDITH WERLINGER, CSR
22                         Official Court Reporters
                           100 East Houston, Suite 125
23                         Marshall, TX   75670
                           903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)

1

2 <u>APPEARANCES CONTINUED</u>:

3

4 FOR THE DEFENDANTS:    MR. WILLIAM LEE
                        MS. AMY WIGMORE
5                       MR. WILLIAM MCELWAIN
                        Wilmer Cutler Pickering Hale
6                            and Dorr
                        1875 Pennsylvania Avenue, N.W.
7                       Washington, DC   20006

8
                        MR. DAVID BECK
9                       Beck Redden & Secrest
                        One Houston Center
10                      1221 McKinney Street
                        Suite 4500
11                      Houston, TX   77010

12
                *       *       *       *       *       *
13

14                    P R O C E E D I N G S

15              COURT SECURITY OFFICER:  All rise.

16              (Jury in.)

17              THE COURT:  All right.  Please be seated.

18              Good morning, Ladies and Gentlemen.  Hope

19 y'all had a good weekend.

20              Good morning, Counsel.  I spoke to some

21 of you briefly.

22              We will hear final arguments this

23 morning, Ladies and Gentlemen, and I anticipate you will

24 have this case sometime before 11 o'clock this morning

25 by the time we get everybody finished up here.

1             First, we'll hear from the Plaintiff.

2 Ms. Elderkin.

3             MS. ELDERKIN:  May it please the Court,

4 Ladies and Gentlemen.

5             My name is Dianne Elderkin.  As you know,

6 I'm here representing Centocor, and I've never made a

7 human antibody.

8             Now, you heard counsel ask that question

9 of every single Centocor witness who got on the stand,

10 whether they were scientists, a businessman, or a

11 lawyer.  And I want you to know that that is a sideshow.

12             That's not what the issue in this case

13 is.

14             The issue is not who made a human

15 antibody first.  The issue is what I told you last

16 Monday when I first spoke to you.  If somebody uses

17 somebody else's property without permission, they should

18 pay for it.

19             And we've shown you that Humira, Abbott's

20 product, infringes our property, our patent.  And we've

21 shown you that based on the $11 billion worth of sales

22 that Humira has made since our patent issued, fair and

23 reasonable compensation to Centocor is about $2.1

24 billion.

25             Now, you've heard about the invention,

1   that Centocor and NYU inventors made a special kind of

2   antibody, an antibody that binds tightly to TNF so that

3   it can cause less harm in the body, an antibody that

4   competes with A2, the special antibody for binding A2 to

5   TNF, and it binds to a neutralizing epitope.

6               There are two versions of this antibody:

7   A chimeric version and a human version.  Centocor opted

8   to commercialize the chimeric version first.  And you

9   heard from Dr. Ghrayeb and also from Mr. Scodari.

10              They said it wasn't that Centocor

11  couldn't have made a human antibody.  They were a

12  company with limited resources; they were a small

13  company back then; and they had to pick a project.  They

14  picked to make the chimeric antibody and commercialize

15  that.

16              And it was a good bet; it was a ringer,

17  because that product, which they commercialized as

18  Remicade in 1999, has been used for the last 10 years to

19  safely and effectively treat over a million patients.

20              Abbott chose the other version of the

21  invention.  They chose to make a human antibody, their

22  product, Humira.  As we've shown you, that product

23  infringes our patent.

24              Now, before I talk about the particular

25  questions you're going to be asked to decide, I want to

1 remind you about the burdens of proof that you've

2 already heard about several times and you'll hear about

3 later today.

4          For Centocor to prove infringement, to

5 prove that Humira infringes, we have to prove that by

6 the preponderance of the evidence.  We have to persuade

7 you that our claim that it infringes is more likely true

8 than not; that the scales tip ever so slightly in

9 Centocor's favor.

10          For Abbott to prove that the Patent

11 Office got it wrong, that the patent is not valid, they

12 have to prove that by the preponderance of the evidence

13 standard, and that's a stricter standard.  They have to

14 prove that it is -- that you are persuaded that it's

15 highly probable -- highly probable that the Patent

16 Office made a mistake.  And that means the scales tip

17 much more in Abbott's favor than is required for us to

18 show infringement.

19          Now, let me talk a little bit about

20 infringement.  You remember this slide that I showed you

21 in my opening.  This slide sets forth all the parts of

22 our claims, of the four claims that are in issue here.

23          And you remember I told you that the

24 parts that are checked off in red, Abbott doesn't

25 dispute that at all.  They've admitted that Humira has

 1  every single one of those parts of our claim.

 2            The only part that they dispute is the

 3  part with the blue checks.  But we showed you that

 4  Humira does compete with A2 for binding to TNF.  We

 5  showed you several kinds of evidence in that regard.

 6            Remember Dr. -- not doctor -- Ms. Susan

 7  Tam, Centocor's scientist, came and told you about the

 8  tests she did.  This notebook is in evidence, her

 9  notebook, PX854.  You can see the careful work that she

10  did.

11            Dr. Adams, who is standing up to remind

12  you who he is, was here, and he looked at Susan Tam's

13  data.  He talked to her at length about it.  He looked

14  at it.  He said it was impeccable.  And he said that it

15  shows that Humira does compete with A2 for binding to

16  TNF.

17            Dr. Marks also looked at that data.  He

18  had no problems with the quality of the data.  He just

19  said she didn't do the tests the right way.  She did it

20  in the wrong direction.  But he had no evidence, no

21  evidence, no data.  He presented nothing to show you

22  that it would make any difference, that it would make

23  any difference if she had tested the A2 and Humira in a

24  different direction.

25            What did he say?

1              Well, he tried to point you to an

2 article, a Moller article, and tried to convince you

3 that because of this Moller article, it really does

4 matter which direction you do the test in.  And you

5 might remember this slide that Ms. Mullin marked up when

6 she was questioning Dr. Marks.

7              Remember, he admitted that even though he

8 was relying on the Moller article to try to convince you

9 that for some antibodies, it makes a difference which

10 direction -- which direction you test them in, he had to

11 admit that the Moller article does not show an antibody

12 that competes in one direction but not in the other.

13 All Moller talked about on the one hand is an antibody

14 that influences another.  So Moller does not support

15 that position.

16              Even if there were -- even if you were to

17 agree that it makes a difference which direction you

18 test the antibodies in, we have data that shows you that

19 you can test A2 with Humira in either direction, and it

20 shows competition.  And that evidence comes right from

21 Abbott's own files.

22              This is Plaintiffs' Exhibit 137, and it's

23 a study that was done by Dr. Zehra Kaymakcalan, an

24 Abbott scientist, in which she tested competition for

25 Remicade and Humira.

1           Now, that's cA2, not A2, but her tests

2   showed competition in either direction.  And you heard

3   from Dr. Ghrayeb, and you also heard from Dr. Adams that

4   A2 and cA2 have the exact same binding regions; they

5   bind identically.  So if you have a test that shows that

6   cA2 competes, it shows that A2 competes.

7           Abbott's own tests from Dr. Kaymakcalan

8   shows Humira competes no matter which direction you do

9   the test.

10          Now, Abbott might argue no, no, no; you

11  can't go there, Centocor, because you changed your

12  claims in the Patent Office.  Your claims originally

13  said compete with cA2 or A2, but you took that cA2 out.

14          Remember, they didn't ask Dr. Marks about

15  that.  They only asked Dr. Adams about that.  And when

16  he had a chance to look at the file history on

17  questioning from Ms. Mullin, he explained to you that

18  when that change was made at the Patent Office, it was

19  only a matter of paperwork.  It had nothing to do with

20  the Patent Office saying that the binding of cA2 and A2

21  are different things.  It was a matter of paperwork.

22          So when you get to Question No. 1 in the

23  jury's verdict form back in the jury room, we are asking

24  you to answer yes to each of these questions, that we

25  have proven to you by a preponderance of the evidence

1 that Humira infringes each one of the four claims at

2 issue here.

3                Now, Abbott has some excuses, and you've

4 heard about them.  They say the Patent Office made a

5 mistake and never should have issued the patent.  But

6 they have to prove that, again, by clear and convincing

7 evidence.

8                Their first excuse, they say the claims

9 are old.  What's disclosed in these claims was disclosed

10 earlier in the Adair 1992 publication.  But I want you

11 to remember something.  For anticipation, you're going

12 to hear that the earlier reference, the Adair reference,

13 has not only disclosed everything that's in our claims,

14 it has to disclose them arranged in the same way as in

15 our claims.

16                I want you to think about a buffet, and

17 if you had a patent claim that said a plate that has

18 mashed potatoes, meatloaf, and string beans on it is not

19 enough to go for somebody to point to a buffet and say

20 hey, there are masked potatoes, meatloaf, and string

21 beans on that buffet along with a bunch of other things.

22 To anticipate, the plate has to already have the three

23 things on it the same way as arranged in the claim.

24                So what's Abbott saying here?

25                They're looking at that Adair reference,

1   and they're saying that the plate is the CDP571

2   antibody.  But we've got a problem with that.  If you

3   remember, this is the chart that Ms. Mullin marked up

4   when she was questioning Dr. Marks, Abbott's expert.

5   And there's several things that the CDP571 antibody does

6   not have.

7            First of all, the claim requires in the

8   third row there, it has to bind to a neutralizing

9   epitope of human TNF in vivo.  That's the human TNF in

10  the body.  The only test, only test in the Adair

11  reference with CDP571 antibody is in a baboon.  Baboon

12  TNF, Ladies and Gentlemen, not human TNF.

13           For that reason alone, you can decide

14  that the Adair reference does not anticipate.

15           But there's another reason.  Claims 14

16  and 15, which are the particular ones on this slide,

17  require a particular kind of antibody, one that has an

18  IgG1 constant region.  And that's referred there, the

19  first row.  CDP571; it's not IgG1; it's IgG4.

20           There's another problem.  The claims all

21  require, as shown in the second row here, that the

22  antibodies competitively inhibit binding of A2 to

23  TNF-alpha.

24           Now, the Adair reference is completely

25  silent on whether the CDP571 competes with A2.  So

1 Abbott had to do some tests.

2                What did they do?

3                Dr. Marks was here.  He told you about

4 testing that was done by an outfit called Veritas, and

5 the gentleman there who did the testing was Dr. Kincaid.

6                Well, Dr. Kincaid wasn't here for you to

7 see or hear, and his test results are not even in

8 evidence.  There's no notebook in evidence from Dr.

9 Kincaid so you can see how careful his work was.

10                Dr. Marks also said before he came to his

11 opinion about whether there was anticipation, he never

12 even talked to Dr. Kincaid, never even picked up the

13 phone and talked to him.  If he had, he might have heard

14 that there were some problems with Dr. Kincaid's

15 testing.

16                One thing he might have heard was that

17 Dr. Kincaid didn't even do the test himself; his brother

18 did.  And if you remember from the tape, he couldn't

19 even tell us what kind of education his brother had.

20 If he had talked to Dr. Kincaid, he would have realized

21 that there were real flaws in the test.  Remember, Dr.

22 Adams looked at them, and he told you, if one of my

23 graduate students had brought me this work, I would have

24 sent them back to the lab to do it all over again.

25                But maybe the biggest problem we have

1   with the Dr. Kincaid testing is we don't even know what

2   he tested.  We don't even know what he tested.

3                   For the test to be meaningful, it has to

4   be a CDP571 antibody that was available before 1994.

5   You remember that vial that you looked at that was

6   passed around, it had no pre-1994 date on it.  It said

7   2008.

8                   It also said CDP571P up in the corner.

9   We don't know what that is and if that's a different

10  version of an antibody.  And nobody here told you

11  anything about that sample.  You had to hear from -- it

12  from Dr. Adams at the very end of the trial.

13                  One little other bit of information to

14  consider, the Patent Office, they considered the Adair

15  reference.  This is right from the references cited

16  portions on the second page of the patent.  The number

17  is 9,211,383.  That's the number for the Adair

18  reference.

19                  The Patent Office considered it.  If they

20  thought that the Adair reference disclosed the invention

21  of our claims, they couldn't have issued our patent.

22                  Now, you may hear from Mr. Lee that,

23  well, the Patent Office didn't have Dr. Kincaid's

24  testing so how could they have made a full analysis

25  here.

1          Well, the Patent Office didn't have to

2  have Dr. Kincaid's testing to know that baboon TNF isn't

3  human TNF and to know that an IgG4 antibody is not an

4  IgG1 antibody.

5          Abbott simply has not proven, and

6  certainly not by a clear and convincing standard, that

7  the Adair reference anticipates our claims.  But they

8  have another argument.  They say that their own patent,

9  the Salfeld patent, anticipates our claims, but there's

10  something important here for you to remember.  And this

11  goes back to this timeline that we looked at during

12  Mr. Salfeld's testimony and I wrote on it.

13          Abbott's Salfeld patent application was

14  filed in February of 1996.  But remember, we filed a

15  very important patent application two years earlier, in

16  February 1994.

17          Dr. Salfeld's later patent application

18  can only make our patent invalid, can only anticipate

19  our claims, if Abbott is able to prove that our 1994

20  application didn't have a written description of human

21  antibodies and didn't have an enabling description of

22  human antibodies.

23          Again, it's their burden to prove it, to

24  prove that there wasn't enough in that 1994 application.

25  It's not our burden to prove otherwise.

1                Let's talk a little bit about written

2      description.  Now, you've heard an awful lot of

3      witnesses talking about who made human antibodies first,

4      who made them at all.  And, again, that is not the issue

5      here.

6                Abbott is not asserting that they have a

7      prior invention defense.  The only issue is whether, in

8      our '94 application, we had a written description and

9      enabling disclosure.

10                Now, Abbott says in that 1994 application

11      we didn't describe our invention of human antibodies.

12      And, Ladies and Gentlemen, I ask:  What are they talking

13      about?

14                You remember Dr. Ghrayeb, our inventor,

15      pointed -- pointed you to this.  Right in the summary of

16      the invention of our patent, right where it's the

17      summary of the invention, he talked about the types of

18      antibodies include chimeric and human antibodies.  And

19      that was in the 1994 application.

20                But we do more than just use the words

21      human antibodies.  We also disclose the structure of the

22      antibodies.  Here in Column 18 -- and Dr. Ghrayeb

23      pointed you to this -- we talk about the human TNF

24      variable region.  Remember, that's part of the structure

25      of the antibody, the top of the Y.  This was added in

1  1994 as well.

2          In Column 19, there's more reference to

3  the structure of the antibodies, talking about the heavy

4  and light chain antigen-binding regions, the top of the

5  Y, and the CH and CL regions.  That's the heavy and

6  light constant regions for human antibodies.  It's all

7  right there in Column 19.

8          And that, too, was in the 1994

9  application.

10          The patent does more than just discuss

11  the structures.  It talks about the properties of the

12  antibodies, that they bind to TNF, that they bind to a

13  neutralizing epitope; they compete with A2, that they

14  have high affinity.  Those are the types of properties

15  one uses in this vehicle to describe properties with

16  antibodies.

17          And the patent talks about how to use the

18  antibodies.  Remember, it discloses about how to use

19  them for rheumatoid arthritis, for Crohn's disease.  It

20  says how you can administer them.  It says among the

21  ways you can administer them, IV or subcutaneous.  Both

22  are right there in the patent.

23          Don't be distracted by any discussion

24  about possession of the invention when it comes to the

25  written description requirement.  It's not necessary

1  that our inventors have actually possessed physically

2  human antibodies.

3              What's necessary is that they have

4  possessed the idea, the invention.  And when you look at

5  the patent application, as Dr. Ghrayeb explained it, you

6  will see that we clearly did possess that invention.

7  It couldn't be clearer.

8              The next requirement is enablement.  That

9  1994 application also has -- must be enabling.  And this

10  is an important instruction that you will hear, and I

11  want you to pay attention to this so that when you're

12  considering whether the patent satisfies the enablement

13  requirement, keep in mind that patents are written for

14  persons of skill in the field of the invention, not for

15  you and me.  For persons who already have skill in this

16  field.  And we've heard that's a high level of skill.

17  They have a Ph.D., several years of experience.

18              Because of that, the patent does not need

19  to expressly state information that skilled persons

20  would be likely to know or could obtain.  You don't have

21  to put volumes of encyclopedias into this application.

22  The people who read it bring to it what they already

23  know from being skilled people in the art.  And that's

24  an important thing to keep in mind.

25              Now, we did disclose things in the patent

1  application about making human antibodies.  You

2  remember, Dr. Ghrayeb pointed to this passage in

3  Column 18 where he cites the Marks 1993 article.  You

4  remember that was the article where Dr. Marks disclosed

5  human variable regions to self-antigens like TNF could

6  be made.

7              And Dr. Ghrayeb said that was -- that was

8  important.  That convinced him and his co-inventors that

9  this was technology that could be used to make human

10 antibodies, so they wanted to put it in their patent

11 here.

12             He also explained Columns 33 and 34, a

13 rather lengthy discussion about making structural

14 analogs of antibodies.  And this is what he described as

15 a type of an affinity maturation technology where you

16 can take the antibody that you have and make some

17 specific changes in the amino acid building blocks in

18 the binding region to make it bind even better.

19             This was also in the 1994 patent

20 application.  And they say right here, as I've

21 highlighted:  Using this information, one of ordinary

22 skill in the art would know how to make these structural

23 analogs, would know how to make antibodies to bind even

24 better.

25             But you don't have to look just at what's

1  in our patent.  Look at what's in Abbott's own

2  experience is, as of 1994, because, remember, not

3  everything has to be in the patent.

4           Remember that Abbott or BASF, its

5  precursor, was looking for technology and they were

6  looking at the technology of CAT, Cambridge Antibody

7  Technology, to work with them on human -- making human

8  antibodies.

9           You remember that CAT, by 1991 already,

10  was advertising in prestigious science journals that

11  they could use -- they had technology that could be used

12  to take your mouse antibody and make a human antibody.

13  They were telling you it was available.

14           Dr. Salfeld, when he analyzed CAT's

15  technology in 1992, he wrote a memo.  You'll remember

16  seeing that.  He said it was proven technology, that

17  they had long-standing experience with their technology,

18  that CAT's library of human genes was very, very large,

19  and it was a proven source of anti-TNF antibodies.

20           You might remember this slide.

21           Ms. Mullin went over this with Dr. Marks.

22  It discloses five types of technology that Abbott used

23  to make Humira:  Phage display, guided selection, chain

24  shuffling, affinity maturation, and off-rate selection.

25  And there's a question and answer I want to read to you,

1 because it's very important what Dr. Marks said when she

2 questioned him.

3                    She said:  These are the five steps that

4 were used to make Humira, right?

5                    ANSWER:  That's correct.

6                    QUESTION:  And as we've indicated, every

7 one of these steps was described in articles, patent

8 applications, or other publications that were available

9 to everybody working in the field as of February 4,

10 1994, right?

11                    ANSWER:  That's correct.

12                    Ladies and Gentlemen, the pieces are all

13 there.

14                    This is something even more.  You

15 remember, Dr. Marks wrote a chapter in a book on making

16 human antibodies.  Now, that chapter didn't publish

17 until 1995, but as Ms. Mullin pointed out, every single

18 reference that he cites predated 1994.

19                    Again, the pieces that you need to make

20 human antibodies, all the techniques were out there in

21 the literature.

22                    One more bit of evidence, that it was not

23 necessary to do undue experimentation to come up with a

24 human antibody.  It's Abbott's own experience.

25                    You remember I made this notation on the

1  timeline slide when I was questioning Dr. Salfeld.  They

2  started working with CAT in 1993 on this joint project.

3              And by 1994, they already had the

4  antibody they called 2SD4.  And that was a really good

5  antibody.  It had high affinity, as high as our claims

6  require.  It was neutralizing, just as our claims

7  require.  So within only a year, they had an antibody

8  that was as good as what our claims required.

9              Now, they went on and they made it even

10  better.  They spent another year to make it even better,

11  to make Humira.  But I want to remind you of something

12  that Judge Ward told you during Dr. Marks' testimony.

13              I'm going to read it:

14              Ladies and Gentlemen, I want to clear up

15  one little matter for you.  With respect to this

16  question on enablement, which the witness has been

17  testifying about, I want you to know that enablement --

18  enablement does not require in a matter to meet the

19  lofty standards for success in the commercial

20  marketplace; that is, in the case of a drug, which we're

21  talking about here, and treatment, it's not required

22  that it be commercially viable or have any particular

23  therapeutic use.

24              To the extent that either directly or

25  indirectly Dr. Marks' testimony has suggested such,

1  that's incorrect.  And you should disregard that part of

2  the testimony.

3            So any testimony that you heard about how

4  hard it was to come up with Humira, you're instructed to

5  disregard that.

6            Ladies and Gentlemen, in 1994, Centocor's

7  patent application clearly provided a written

8  description and enabling disclosure for human

9  antibodies.  So Abbott cannot argue that its 1996

10 Salfeld patent application, or the patent that issued on

11 it, is somehow prior art and renders our claims invalid.

12            But even if you wanted to take that next

13 step, even if you weren't so sure about our 1994

14 application, there was not a single witness who sat

15 here, not a single Abbott witness who sat here and went

16 through the Salfeld 1996 patent for you and showed you

17 where it meets every single element in our claim.  Not a

18 single witness.

19            Now, you may hear some argument from

20 Abbott's lawyers about that, but, remember, argument is

21 not evidence.  You've been told that.  There was no

22 witness discussing that.

23            So when you get back in the jury room and

24 you're looking at this question of validity, Question

25 No. 2, we ask you to answer no to every single question.

1              And, again, it's a little

2    counterintuitive.  We ask you to read the instructions

3    on this form very, very carefully.  A no answer is an

4    answer for Centocor; it's an answer for the patent,

5    because the question is whether Abbott met its burden of

6    proving invalidity.  So we ask that you answer no to

7    those questions.

8              Now, we've discussed infringement.  We've

9    told you that the evidence shows that Humira infringes,

10   but there's also an issue about willful infringement.

11   Abbott's infringement has been willful.  You remember

12   that Mr. Scodari, our first witness, told you that he

13   continuously told his counterpart, Mr. Dempsey, that

14   Abbott infringed the patent, that Humira infringed the

15   patent.  He told him continuously from the time that the

16   claims were first allowed until the lawsuit.

17             You saw the videotape of Mr. Conway,

18   Abbott's in-house lawyer, and he told you that he knew

19   that there was a chance they might be sued.  You heard

20   him talk about an Abbott document that talks about an

21   aggressive risk management strategy that Abbott had for

22   obtaining freedom to operate in this field.

23             Ladies and Gentlemen, Abbott went into

24   this with their eyes wide open.  They knew there was a

25   risk.  Their infringement is willful.  And when you get

1  back in the jury room, we ask that you answer Number --

2  Question No. 3 yes, that Centocor has proven by clear

3  and convincing evidence not only that Humira infringes

4  but that infringement is willful.

5            Last question for you will be damages.

6            Now, you remember there was an awful lot

7  of discussion about competition, who competes with what.

8            And Mr. Bazemore, a Centocor marketing

9  executive that was here, testified for the better part

10  of an hour.  And he told you all about the market and

11  what products compete and what patients think what of

12  what products.

13            You didn't hear a single Abbott witness

14  talk about that.  It was only Mr. Bazemore.

15            And Mr. Gering, Dr. Gering, our damages

16  expert, then spoke told you and he told you about his

17  damages analysis where he considered everything that

18  Mr. Bazemore said.  He considered what were patients'

19  preferences, what were the perceptions of the product in

20  the marketplace.  He considered the fact that the market

21  had grown.  He considered non-infringing substitutes.

22  And he put that altogether to try to understand how many

23  sales Centocor --

24            THE COURT:  You've used 25 minutes.

25            MS. ELDERKIN:  Thank you.

1          How many sales Centocor would have made.

2  He said only one in five sales would have gone to

3  Centocor.  And based on that, he said the lost profits

4  number should be 1 billion, 168 thousand -- 168 million,

5  466,000.  That's the number you might want to write

6  down, Ladies and Gentlemen.  Remember, it's a big number

7  and it's got three commas.  That's the lost profits.

8          He said that we also should get a

9  15-percent royalty on the other sales that Abbott's made

10  where we don't get lost profits.  He said it should be

11  15 percent, because these are highly profitable products

12  and because that's only a little bit more than the

13  industry average of 11.6 for a profitable product like

14  this that are already launched.

15          His reasonable royalty number is $1

16  billion, 8 million, 256 thousand.  And when you add that

17  up, it's about $2.1 billion.

18          Ladies and Gentlemen, I'm going to sit

19  down now.  We're going to hear from Abbott, and then

20  you're going to -- Mr. Sayles and I will have a chance

21  to respond.

22          We really appreciate your patience and

23  your attention.  Thank you.

24                THE COURT:  Please.

25                MR. LEE:  May it please the Court.

1                    Ladies and Gentlemen of the Jury, let me

2    begin our closing where we ended our opening, by

3    thanking you for your time and attention.

4                    My bet is that you feel like you've been

5    drinking water from a firehose for the last four days,

6    and we know that is what it feels like.

7                    We also know that your jury service has

8    imposed real burdens upon you.  And we know that we have

9    thrown a lot of complicated information your way.

10                   But this case is important.  It is

11   important to Abbott.

12                   It is important to Dr. Salfeld, who has

13   sat here through the trial.

14                   It is important to the patients who have

15   taken Humira, the tens of thousands of patients who have

16   taken Humira since it went on the market and have been

17   benefited from its advance.

18                   And it is important to every single

19   company who competes in the marketplace on the basis of

20   invention, innovation, price, quantity, and quality.

21                   Now, in our opening statement a week ago,

22   we asked you this question.  We asked you whether

23   Centocor really was here to prove to you that we

24   infringed a patent, patent claims, and that they are

25   entitled to billions of dollars in damages, or whether,

1 in fact, what was really going on was that Centocor was

2 here to make up in the courtroom for their inability to

3 compete in the marketplace.

4              Now is the time to answer that question.

5 Now is the time to bring what His Honor said is your

6 collective wisdom and your collective good judgment to

7 bear on the questions before you.

8              Now, this case, to be sure, involves two

9 very sophisticated companies, two very sophisticated

10 companies that have brought important drugs to the

11 marketplace.  Both companies have helped thousands of

12 people.  And that's a good thing.

13              But you now have learned, and

14 Ms. Elderkin conceded, that the companies went about it

15 completely differently.  They took different paths and

16 they went in different directions, and they came up with

17 different products.

18              Centocor started with a mouse antibody,

19 and I put up the chronology so you can follow, because

20 the chronology answers many of the questions His Honor

21 is going to pose to you.

22              Centocor started with a mouse antibody

23 but then decided that they would need to improve on it.

24 They would have to make it more human in order for it to

25 work with patients.

1              Now, Mr. Scodari, someone who was a

2 former president of their pharmaceutical division, told

3 you that at the time Centocor was in dire straits.  They

4 had tried to come up with an antibody in the early '80s.

5 It had failed.  They were on the brink of failure.

6 So what did they do?

7              Well, Dr. Knight, one of the inventors,

8 testified they decided to develop a TNF -- TNF-alpha

9 antibody, but they decided to pursue not a fully human

10 antibody but a chimeric antibody.

11              Why?

12              It was more predictable, and it was

13 simpler.

14              Now their decision has paid off.  They

15 developed Remicade.  It is a fine product.  It has been

16 successful.  They have made billions of dollars.  They

17 have gotten patents for it.

18              No one is trying to take that away from

19 them.  You haven't heard a word about our trying to take

20 away claims that cover chimeric antibodies, patents that

21 cover chimeric antibodies, or their billions and

22 billions of dollars of sales.

23              All you've heard about is we're content

24 to compete with Remicade in the marketplace.

25              But you've also heard that Remicade has

1  limitations.  It's not a fully human antibody.  It's

2  about 25 percent mouse.

3              Remicade has to be infused in a doctor's

4  office with that rig that's over in the corner that I

5  asked Mr. Bazemore about.  It has to be administered

6  with a nurse present and a crash cart present, and that

7  takes time and effort and expense.

8              For rheumatoid arthritis, Remicade

9  requires co-administration with Methotrexate, that very,

10 very powerful anticancer drug.

11             But you now know, looking at the top half

12 of this timeline, that Centocor wasn't the only company

13 working on an anti-TNF antibody.  Abbott was as well.

14 Abbott had a completely independent project.

15             Ask yourselves:  Did you hear a shred of

16 evidence that Abbott copied Remicade?

17             Did you hear a shred of evidence that

18 Abbott had Remicade in its hands when it developed its

19 antibody?

20             No.  Instead what you heard is that in

21 1986, an Abbott scientist, Dr. Moller, developed a mouse

22 antibody to TNF, long before Centocor had its first

23 antibody.

24             But like Centocor, Abbott said we know we

25 got to make something better.  We've got to make

1  something better.

2              What did they decide to do?

3              Well, you heard from Dr. Salfeld about

4  what he and his team of scientists wanted to do.  And

5  I'm going to put some of the testimony you actually

6  heard on the screen.  And I'm going to show you that

7  testimony against the instructions as we move forward.

8              And what did Dr. Salfeld tell you he

9  wanted to do?  We wanted to do something that had never

10  been done before.

11              Now, it took several years for

12  Dr. Salfeld and his team to be successful.  There were

13  failures before there were successes.  There was hard

14  work and investment, too.

15              Now, let me say parenthetically here for

16  a second.  Ms. Elderkin mentioned the Judge's

17  instruction that having to have a commercially viable or

18  a therapeutic antibody wasn't the standard.  He never

19  said that the work that was required to develop a fully

20  human antibody in the lab wasn't relevant.

21              Now, in the summer of 1995, you know that

22  antibody -- that Abbott was successful.  On New Year's

23  Eve 2002, Humira received FDA approval, and it's now

24  been used to treat thousands of patients.

25              Now, Humira has advantages over Remicade.

1   It is fully human.  It has no mouse parts.  It can be

2   injected by the patient at home.  It doesn't have to be

3   used with Methotrexate.

4                   And we have seen -- no matter what the

5   FDA says or either of us can say, we have seen from

6   Centocor's own documents -- and this is Plaintiffs'

7   Exhibit 261.

8                   We've seen from their own documents that

9   they say that physicians and patients view Humira as

10  significantly safer than Remicade.

11                  Does that matter?

12                  Well, sure.  What patients and doctors

13  think counts.  That's why Dr. Scodari described Humira,

14  on my cross-examination, as a dramatic innovation.  That

15  is why Abbott's Humira won the Galien Prize, the Nobel

16  Prize, for pharmaceuticals.  That is why one of the

17  people on the committee, who wanted to give this award

18  to Abbott, was Dr. Vilcek, one of their inventors.

19                  Now, you also know now that Abbott

20  applied for an application on Humira in February of

21  1996, and that patent issued in 2000.

22                  Think about that, Ladies and Gentlemen.

23  That is six years before Centocor applied for the patent

24  in this case, and the patent issued two years before

25  Centocor applied for the patent in this case.

1            You also know that it wasn't until a year

2   later, a year after Abbott had filed for its patent,

3   that Centocor even started to develop this fully human

4   antibody.

5            Ask yourselves -- Ms. Elderkin is here in

6   Court telling you that they had it in 1984.  They had

7   the idea; they knew how to do it; it was all out there.

8   They didn't start until 1997, and they weren't

9   successful until 1998.

10           Now, despite this chronology, which is

11  undisputed, Centocor is trying to take credit for the

12  invention of the idea of a fully human antibody.  Well,

13  you met Dr. Salfeld, and you heard his testimony.  He

14  wouldn't even take credit for this invention himself.

15  It was always my team, my colleagues, my friends.

16           But now Centocor wants to take credit for

17  that invention.  Use your common sense and collective

18  wisdom.  Does that make sense?

19           Ask yourself this:  Dr. Salfeld came to

20  you, got up on that stand, and subjected himself to the

21  crucible of cross-examination.  And then he sat there

22  with you through the rest of the trial to tell you about

23  what he had done.

24           Centocor called one inventor of its six,

25  Dr. Ghrayeb, who didn't even do the work reflected in

1  the patents.  And he came and he left, and the other

2  five never showed up.

3              If you were an inventor on a patent that

4  you thought entitled someone to $2 billion and you knew

5  the validity was being challenged, do you think you

6  would show up in Court and defend it?

7              The only testimony you heard from them,

8  which I'll come to in a minute, we showed you.

9              Now, a patent is a very, very powerful

10 thing.  If it's valid, then it entitles you to

11 something.  But a patent has limits.  A patent only

12 entitles someone to recover damages if you have a valid

13 invention to prove infringe.  You have to have had the

14 invention.  It's not enough to wish that you had it or

15 to hope you had it.

16             And, in fact, you're going to hear from

17 His Honor's instructions that a wish and a plan to have

18 something is not enough.  Wishing it and saying it don't

19 make it so.

20             Now, we suggest that the timeline would

21 answer some very important questions and it has.  If you

22 look at the timeline and the development of the

23 different products, you will see that a mouse antibody

24 is different from a chimeric antibody is different from

25 a human antibody.

1          Dr. Marks told you, based upon 20 years

2    in the field, that a fully human antibody has become the

3    Holy Grail, and it's become the Holy Grail for reasons

4    that would be fully understandable to all of us who are

5    not scientists, including you and me.

6          Now, Centocor has spent a lot of time

7    telling you don't worry, they're not different.  Well,

8    you know from their own documents that patients and

9    doctors think that they are.

10          But more importantly, let's look at what

11   Centocor did.  If they are really not different, why did

12   Centocor, in 1997, decide to develop a fully human

13   antibody?

14          Why did they decide to bring a fully

15   human antibody to market in 2009?  Why?

16          Because they're different, and they know

17   it.

18          Now, the second thing the chronology

19   demonstrates is this:  Centocor has suggested to you

20   that we're the people who identified TNF-alpha as a

21   therapeutic target.  Well, you know from His Honor's

22   instructions that therapeutic has nothing to do with the

23   case.

24          But more importantly, you know that

25   Abbott had identified TNF as the target.  Abbott had

1  developed the antibody way back in 1996.  And you know

2  from Dr. Kamen's testimony, which you saw on the video,

3  that Abbott was already working on a fully human

4  antibody before public information about Remicade became

5  available.

6           Now, developing -- the third thing the

7  chronology shows is developing a human antibody was

8  really hard work.  You know that Centocor tried to do it

9  and failed.  You know that when Abbott started to do it,

10 it worked with Dr. Pablo Casali at New York University,

11 one of the great scientists, and they failed.

12          You know that when Dr. Marks tried to do

13 it in this period, one of the leading phage display

14 people in the world, he was unsuccessful.  Only by

15 combining, only by combining the cutting-edge technology

16 of phage display were Dr. Salfeld and his colleagues

17 able to create Humira.

18          You saw him testify.  You ask yourselves

19 whether that chart that Ms. Mullin did where the things

20 were out there, created a recipe that any scientist in

21 the world could follow.

22          You ask yourself, if that's all true, how

23 come Centocor didn't get started for another three or

24 four years?

25          Now, what are the questions the Court is

1  going to ask you?  There are going to be four, and they

2  are going to be on validity, which is Question 2;

3  infringement, willfulness, and damages.

4           I'm going to now use the remaining

5  portion of my time to address validity.  Mr. Beck is

6  going to talk to you about Questions 1 and 3 and 4.

7           Now, let's turn to validity.  Our

8  judicial system, as I said in my opening, makes you a

9  really critical part of this process.  The reason that

10  we can come before you, before a Judge that's been

11  appointed by a President of the United States, is

12  because you are the first people who get to hear the

13  whole story.  You are the first people who get to hear

14  Abbott's side of the story.  The Patent Office did not,

15  could not.

16           And all of the information I'm going to

17  go through in the next 15 minutes, for the most part, 99

18  percent of it was not available to the Patent Office.

19  And if it had been, I would suggest to you there would

20  have been a different decision at the Patent Office.

21  But that's not what matters.  What matters is that you

22  do get to hear it.  You do get to decide it.  We do get

23  an opportunity to tell you our side of the story.

24           Now, let's be very clear.  There are four

25  patent claims at issue in this case.  2, 3, 14, and 15.

1   Here is the really surprising thing:  Those claims don't

2   cover a chimeric antibody.  Dr. Adams admitted that.

3   They don't cover cA2.  They only cover, so it says,

4   Centocor, a fully human antibody.

5                Now, let's look at the verdict form on

6   the issue of validity, and I'm going to put Question 2

7   on the screen.

8                Now, as you may recall from Dr. Marks'

9   testimony, Abbott has three different reasons why this

10  patent is invalid.  Three different reasons.  And

11  they're not excuses.  These are requirements that

12  Centocor failed to comply with, requirements of our

13  patent law.

14               And the first -- they are enablement,

15  written description, and prior art.  They are all

16  independent.  But to be clear, we are asking you to find

17  the claims invalid for each of these independent

18  reasons.

19               Second, all of the claims rise and fall

20  together.  There have been no independent arguments made

21  to you distinguishing Claims 2, 3, 14, and 15, for

22  instance, on any of these bases.

23               Now, let's put up the '775 patent on the

24  screen.

25               There is no dispute the application was

1  filed in July -- on July 18th, 2002.  But that's not the

2  key date for this patent, as Ms. Elderkin has just told

3  you.  Why?  Because we were out there in 1996.

4            So what did they say?  Well, we had it

5  back in 1994.  We had the invention in February 1994.

6            Now, His Honor is going to instruct you,

7  for that to be true, Centocor has to -- Centocor was

8  required to enable and have an adequate written

9  description as of February 1994.

10            And the overwhelming evidence is going to

11  demonstrate that those weren't true.  The simple fact is

12  that if you focus on February 1994, Centocor hadn't done

13  it, didn't have the idea, didn't describe how to do it.

14  It didn't do anything.

15            It may today wish it had, but you're

16  going to see from the testimony of Dr. Ghrayeb that they

17  didn't even intend it back then.

18            So let me look at -- let's look at the

19  enablement question.  This is the first question.  We do

20  have the burden of demonstrating this by clear and

21  convincing evidence, and we believe that we have.

22            Now, Judge Ward is going to give you

23  instructions on written description, and I'm going to

24  put up a portion of what he's going to tell you.  And

25  these are critically important.

1    The first is that the written description

2 requirement set forth in the patent must disclose

3 sufficient information to enable one of skill in the art

4 in the field of the invention to make and use the

5 claimed invention.  The full scope of the invention must

6 be enabled.

7    Do you remember the proverb I talked

8 about in my opening?  It's not enough to give a man a

9 fish so he can eat for a day.  You have to teach him how

10 to fish?  Well, that's what this is about.

11    Let's turn to the next page of His

12 Honor's instructions.

13    A written description is enabling so long

14 as undue experimentation is not needed to make or use

15 the invention.  And what you'll hear when you listen to

16 the Judge is what follows.

17    The next sentence has the eight Wands

18 factors.  Do you remember Dr. Marks took you through

19 those eight factors -- they were grouped in groups of

20 four -- and said here's why the patent's not enabled?

21    The Judge is going to explicitly instruct

22 you, as a matter of law, to apply those.  Dr. Marks was

23 the only witness who testified about those.  Dr. Adams

24 didn't say a word.

25    Now, let's talk about what the enablement

1 question -- the proof that would answer that.

2           Dr. Marks testified clearly and without

3 contradiction that none of the applications, from '94

4 all the way leading to the '775 patent, were enabled.

5 None of them.

6           He walked through the eight Wands factors

7 and showed you why they were not enabled.  And the most

8 striking thing is, Centocor did not offer you any

9 witness to contradict this.

10          Dr. Adams, who had never worked with

11 anti-TNF-alpha antibodies, never in his life, didn't

12 utter a single word to contradict Dr. Marks on this

13 issue.  Why not?  He could not contradict him.  He would

14 not, because he knew what Dr. Marks was saying was

15 right.

16          That alone is sufficient to satisfy

17 Abbott's burden of proof.  But in addition to Dr. Marks'

18 testimony on this have-you-taught-someone-to-fish issue,

19 let's look at some other evidence before you.

20          The '775 patent has 28 examples.  They're

21 in your notebook.  They're hard to understand, but I can

22 tell you this:  There's not a single one that describes

23 a fully human antibody.

24          There's not a single one that tells you

25 how to make a fully human antibody.  There's not a

1  single one that tells you how to use a fully human

2  antibody.  There is no indication that they had on

3  possession of the idea.

4              We know that Dr. Knight, an inventor on

5  the '775 patent, who we had to present to you, testified

6  that if you're going to make a fully human antibody and

7  you had the '775 application, quote, so do you think

8  inventive steps would be required to actually -- in

9  actually doing that?

10             I think so.

11             Well, how can it be that they taught

12 people how to fish in 1994, but there would be an

13 invention required in order for people to do so?

14             Now, you also know this from Dr. Ghrayeb,

15 who did come to testify.  To get its patent, Centocor

16 told the Patent Office that there were problems with

17 fully human antibodies.  They told them there were

18 problems.

19             And I asked Dr. Ghrayeb:  So you told

20 them there were problems.  Did you offer them any

21 solutions?

22             And he said -- and here's the question

23 and the answer.

24             QUESTION:  You don't describe any

25 solutions to the problems, do you?

1              ANSWER:  Not to my knowledge, no.

2              So, Ladies and Gentlemen, use your common

3 sense.  If they had the invention in February 1994, what

4 are they doing telling the Patent Office that there are

5 problems, and what are they doing telling the Patent

6 Office about problems as to which there is no solution?

7              Now, Ms. Mullin did put up that chart and

8 went through the steps that Dr. Salfeld and his team

9 followed to make their invention.  You heard Dr. Salfeld

10 testify that as soon as ECQ had 1, 2, 3, 4, 5 -- does it

11 seem as if ECQ is going to the prior art and picking out

12 this and this and this?  It's not.

13             You know three key things:  Except for

14 Dr. Marks' paper, none of this was mentioned in the

15 patent.

16             You also know that as to the things that

17 were mentioned, Dr. Marks testified unequivocally,

18 unequivocally, that it would require undue

19 experimentation and hard work to do it.

20             You also know this:  When Centocor got

21 started in 1997, did they go back and follow this recipe

22 that they claim was out there in 1994 for anybody in the

23 field?  No.  Their own conduct demonstrates that what

24 they're telling you today is wrong.

25             Now, you may remember that I did ask

several witnesses whether they had ever made an anti-TNF
antibody at any time.  I know none of you have; neither
have I, okay?  Neither has Ms. Elderkin.  But we're
talking about what people would have done back in
February of 1994.

If the question was, what would have been
required to make a cell phone back in 1994, wouldn't you
want to hear from someone who had tried to make a cell
phone?

Well, that's why that list of questions
is important.  And let me show you a list of the
witnesses who were called to testify.

Here is a list of witnesses who Centocor
called to testify.  Not one of them, not even
Dr. Ghrayeb testified that they had made an
anti-TNF-alpha antibody, not one.

If you're asking for $2.2 billion because
you invented a fully human antibody, don't you think you
would bring someone who had done it?  Don't you think
you would bring someone who said, in 1994, I had the
idea?

Now, Abbott, on the other hand, offered
you testimony from several scientists.  Every single one
of them, including the inventors, including the
inventors of the '775 patent, who we offered, had made a

1  fully human antibody or a murine antibody or a chimeric

2  antibody, and every single one of them, their testimony

3  supported Abbott's position, not Centocor.

4                There is a reason these folks were

5  brought to you by video by us.  It's because their

6  testimony supports Abbott's position.  It's testimony

7  the Patent Office never had and never could have had.

8                Now, Abbott -- Centocor has criticized

9  Abbott for not bringing marketing people.  I guess that

10  means folks like Mr. Scodari, who you'll recall never

11  had read the patent; Mr. Bazemore, who didn't arrive

12  till 2002; or Mr. Dow, the patent lawyer who actually

13  filed the 2002 patent application.

14                Well, this case is about science.  It's

15  about scientists.  It's about invention.  It's not about

16  marketing.  It's not about lawyers giving notice to each

17  other.  It's about science.

18                And look at the lineup.  Bring your

19  common sense and good judgment to bear on who brought

20  you people who knew what was going on.

21                Now, let me move to written description,

22  the second issue.  We do have the burden of proving this

23  by clear and convincing evidence, and we have.

24                Actually, let me go back and show you one

25  demonstrative on the question of the burden of proof.

1          Remember the Judge talked to you about

2   the scales of justice?  We didn't put Lady Justice up

3   there, because it's a little too complicated.

4          Here is the proof:  Marks, Le, Vilcek,

5   Knight, Salfeld, Casali.  And on the other side,

6   Dr. Ghrayeb.

7          See this empty chair?  I put that empty

8   chair there because that's the chair that Dr. Adams was

9   sitting in.  He sat this one out.  He gave you no

10  evidence on this issue.

11         Now let's go to written description, and

12  you're going to find the same thing.  And I want to go

13  to the Judge's instruction.

14         You heard Ms. Elderkin, just a minute

15  ago, say that it doesn't matter when the inventors were

16  in possession of the invention.

17         Here's what the Judge is going to charge

18  you with:  The purpose of this written description

19  requirement is to make sure that the patent describes

20  the technology it seeks to claim as an invention and to

21  demonstrate that the inventor was in possession of the

22  invention at the time the application for the patent was

23  filed, even though the claims may have been changed or

24  new claims added during the prosecution.

25         Now let's turn to that second paragraph.

1                    THE COURT:  You've used 25 minutes.

2                    MR. LEE:   Okay.   Thank you, Your Honor.

3   An adequate written description describes -- requires a

4   precise definition, such as by structure, formula,

5   chemical name, or physical properties, not a mere wish

6   or plan for obtaining the claimed invention.  Not a mere

7   wish or a plan.

8                    Now, you don't have to have physical

9   possession, but you have to have possession of the idea.

10  And as a matter of common sense, if you have the thing,

11  it's much more likely you have the idea.  If you can't

12  make the thing, it's a lot less likely you have the

13  idea.

14                   So let's look at what the witnesses said.

15  First, there was Dr. Le, their inventor, who we called.

16  We asked him the question, quote, And you never had

17  possession of a fully human antibody to TNF, that's

18  correct?  That's correct?

19                   ANSWER:  That's correct.

20                   So consider the Judge's charge and

21  consider this testimony.

22                   And what did Dr. Ghrayeb tell you when he

23  was live here?  He told you that it was never their

24  intention to make a human antibody.  Never their

25  intention to make a human antibody.

1    So how does it happen, if you never had

2  the intention, that you never do it, you never tell

3  anybody how to do it, you don't get started for five

4  years, and you want a jury to award $2.2 billion in

5  damages against someone because you now say you had the

6  idea in 1994?

7    It wasn't just Dr. Ghrayeb.  Remember the

8  1991 application.  Remember the problems they described

9  with a fully human antibody.

10    It wasn't just one witness, Dr. Ghrayeb,

11  who said they hadn't overcome the problems.  On the

12  written description issue, let's look at what Dr. Vilcek

13  said.

14    No, I did not come up with a way to --

15  ways to overcome these obstacles.

16    In light of these problems, they

17  identified the problems; they identified no solutions.

18    Now, for sure, Ms. Elderkin took

19  Dr. Ghrayeb through portions of the specification and

20  said, does it say this; does it say that?

21    Were human antibodies there?

22    Yes.

23    Did anybody get on the stand and tell you

24  that was enough to disclose that one of ordinary skill

25  in the art had the invention?  No.

1              Let me show you again a slide

2  demonstrating the proof on both sides.

3              Dr. Marks, the original application,

4  Dr. Vilcek, Dr. Le, Dr. Knight.

5              On the other side, just Dr. Ghrayeb, who

6  gave you no opinions and then came and left.

7              And in the chair, Dr. Adams.  He sat this

8  one out, too.  He said not a word, not a word about

9  written description.

10              Now, Ms. Elderkin put up the phrase human

11  antibodies in the summary.  The word is there.  Patent

12  lawyers put it in in 2002.

13              But you now know from the Judge's -- Your

14  Honor's instructions, that's not enough.  You have to

15  have more than that, more than a wish or a plan.

16              Now, lastly, before I yield the floor to

17  Mr. Beck, let me talk about anticipation.  That's the

18  third independent reason these claims are invalid.

19              We do have the burden of proving it by

20  clear and convincing evidence.  The answer to each of

21  these questions, we suggest, should be yes.

22              Now, you're going to hear, when the Judge

23  charges you, about two pieces of prior art.  One is the

24  Salfeld patent.  That's the patent at issue.  It was

25  filed for in 1996, was issued in 2000, two years before

1 the 2002 application.

2          Centocor doesn't even claim that that

3 patent -- that their patent application fell on that

4 filing date.  How could they?  What they say is, we're

5 going to go back to 1994.

6          Now, we've talked about all the problems

7 with 1994, but they got one other problem.  And that one

8 other problem is that someone had done it before, the

9 Adair patent, clearly and convincingly.

10          And let me say these things to you:

11          First, on these issues that Ms. Elderkin

12 went into, IgG1, IgG4, baboon, human, just take a look

13 at Pages 9, 22, 27, and 361.  They will tell you exactly

14 the opposite of what she just said.

15          But you don't need to agonize over them,

16 because when I asked Dr. Adams, Did you suggest that

17 anything was missing from Adair, other than competitive

18 innovation, he said no.  This is an 11th hour lawyer's

19 effort to find differences.

20          And what is interesting, all of a sudden,

21 baboon and human are really different for the prior art,

22 but mouse and human aren't so different when you compare

23 our products.

24          Now, the one place we disagree on is the

25 competitive inhibition.  The PTO did not have the test

1 results Dr. Marks had.  He sat up there; he told you he

2 reviewed the protocol; he reviewed the test results;

3 they were reliable.

4         Most importantly, they were run in the

5 right direction.  Did you ever hear Ms. Elderkin suggest

6 they weren't run in the right direction?

7         And he said that the fact the sample was

8 old, the fact the sample was old only was an indication

9 that the test results were more reliable.

10         But you don't have to wonder whether

11 those test results showed competitive inhibition,

12 because on cross-examination -- this is one issue that

13 Dr. Adams did get on the stand and testify about -- I

14 asked him this question:

15         QUESTION:  You saw the data points you've

16 described that showed some competition, correct?

17         ANSWER:  Correct.

18         So he concedes that the test shows what

19 Dr. Adams says it showed.

20         Now, did Dr. Adams prepare his own test

21 results?  No.

22         We gave him a sample of CDP571.  What did

23 he do with it?  He kept it in a refrigerator, and then

24 he put it in his pocket, and he brought it to Court.

25         Now, Ladies and Gentlemen, ask yourself

1  this:  If you were suing someone for $2.2 billion, if

2  somebody had given you a sample that said, we've tested

3  it, and it shows that it was out there before, and it

4  makes your patent valid, would you run around with it in

5  your pocket?

6           Or would you test it -- would you test it

7  for a miniscule amount of dollars?  Why wouldn't you

8  test it?  Well, the inference is because you're

9  concerned about the result.

10           One last point to be clear, and then I'll

11  yield the floor to my colleague.  All this business

12  about the Adair testing has nothing to do with written

13  description or enablement.  It only relates to

14  anticipation.

15           It has nothing to do with whether, in

16  1994, they had the invention; they taught the invention;

17  one of ordinary skill would have known how to make the

18  invention.

19           With that, you'll hear from me no more,

20  and I would yield the floor to Mr. Beck.

21           MR. BECK:  May it please the Court.

22           THE COURT:  Mr. Beck.

23           MR. BECK:  Ladies and Gentlemen, when you

24  put on those little white badges, you became a very

25  important part of our history.  You became a very

 1 important part of our heritage.  And you are the last in

 2 a long line of people who have sat in a jury box very

 3 similar to the one that you're sitting in today.

 4              And the reason for that is because the

 5 people that formed our country over 275 years ago wanted

 6 people like you to help us resolve disputes.  And in

 7 Texas, not quite as long, but over 150 years ago, the

 8 people that formed our state wanted people like you to

 9 help us resolve disputes.

10              Judge Ward is going to tell you, I

11 expect, in a few minutes, that you are the exclusive

12 judges of the facts.  You are going to be the exclusive

13 determiners as to what is credible or not.

14              And the Judge is going to use the word

15 credibility.  The way I look at the word credibility, it

16 means, who do you believe?  Who do you believe from all

17 of these witnesses in this case?

18              You can reject every witness, if you

19 want; you can take bits and pieces of witnesses'

20 testimony, because you believe some parts and not

21 others.  And that's your exclusive right, and nobody can

22 take that away from you.

23              Now, we brought you a number of

24 witnesses, but two of them I want to mention to you.  We

25 brought you Dr. Salfeld, who is an absolutely brilliant

1 scientist. I thank goodness he decided to be a

2 scientist and not a farmer. But I tell you one thing,

3 if he had been a farmer, he would have been a darned

4 good farmer.

5 And the question that you've got to ask

6 yourself when you're resolving this credibility issue

7 is, do you believe Dr. Salfeld?

8 Because to rule for them, you've got to

9 reject, basically, what Dr. Salfeld told you, all of the

10 things that Mr. Lee just went through, how hard it was,

11 how it took four to four and a half years to come up

12 with this invention that he came up with and he wouldn't

13 even take credit for it.

14 I mean, you saw how modest he was. I've

15 never met a person who accomplished so much but yet was

16 so modest. You've got to decide whether you believe him

17 or not.

18 And we brought you Dr. Marks, another

19 brilliant scientist. But, you know, Dr. Marks was a

20 little bit different than others, because he's a medical

21 doctor as well, and he sees patients. He not only works

22 in the laboratory, but he works in the real world where

23 you and I live.

24 And his testimony, I would respectfully

25 submit to you, should carry a little bit more weight,

1 because he's got a foot in both worlds:  The scientific

2 theoretical world and the real world in which we all

3 live.

4 You've got to decide whether you believe

5 him when he said there's no infringement here.  And he

6 gave you the reasons why there was no infringement.

7 That's what the Judge means when he says you determine

8 the credibility of the witnesses and you determine who

9 you're going to believe.

10 Now, I want to go back to Question 1,

11 which is the infringement issue.  The first question the

12 Judge asked you is whether or not our client, Abbott,

13 infringes the '775 patent.

14 Well, as the Judge tells you, they've got the burden.

15 Centocor has the burden of proof.  If they do not

16 satisfy their burden, then basically the Court is

17 instructing you, you've got to find for Abbott in the

18 case.

19 If you believe that the evidence is

20 absolutely even; I don't know; I just -- I can't make a

21 decision; it's even; well, if it's even, under the

22 instructions and the burden of proof, then you must find

23 for Abbott in this case.

24 Now, with respect to infringement, you've

25 got -- for there to be infringement in this case, Ladies

1  and Gentlemen, they must be able to prove by a

2  preponderance of the evidence that Humira competitively

3  inhibits the binding of A2 to TNF-alpha.

4          How do you prove that?  You prove it by

5  testing.  Everybody agrees you prove it by testing.

6  Well, what evidence of testing did Centocor present in

7  this case?

8          They first asked one of their long-time

9  employees, Ms. Tam, to run some tests.  And you remember

10  she had to run them twice, because there was some

11  problems or mistakes that were made the first time that

12  she ran the tests.

13         She's on and off the witness stand pretty

14  quickly, and then they bring in Dr. Adams, who is going

15  to explain to you what the significance was of Ms. Tam's

16  the test.  Well, Ms. Tam's tests were done more than a

17  year before Dr. Adams was even hired.

18         Dr. Adams, as you well know, is fully

19  capable of running these tests himself.  He is fully

20  aware that there are independent laboratories out there

21  that can run these tests.

22         Well, Dr. Adams, did you run such a test?

23         No.

24         Well, did you get an independent lab to

25  run these tests so we can prove -- so you can absolutely

1  establish this competitive binding?

2              No, didn't do that either.  Didn't do

3  that either.

4              So there has to be testing.  He didn't

5  run the tests, didn't get anybody else to run the tests,

6  but somehow they're coming in and saying that you should

7  somehow just kind of on a leap of faith believe that

8  there was competitive binding.

9              But ask yourself, if he didn't run the

10 tests, and he could have, and an independent lab could

11 run the tests, and we know they could have, why do you

12 suppose he didn't do it?  Why do you suppose he didn't

13 get an independent lab to do it?

14             Well, as Dr. Marks testified, with

15 respect to the tests that Centocor actually did run, he

16 says direction matters.  The way you run the test, the

17 direction you run them really matters.

18             And the evidence is undisputed that

19 neither Ms. Tam nor Dr. Adams nor anyone else on behalf

20 of Centocor ever ran a test in the right direction to

21 establish and prove by a preponderance of the evidence

22 that there was this competitive inhibition and therefore

23 infringement.

24             Well, why does direction matter?  You

25 remember Dr. Marks showed you those animations?  He

1 showed you two animations that shows you what happens

2 when antibodies compete.

3           And Dr. Marks specifically showed that an

4 antibody might compete in one direction with another

5 antibody but not in the other direction.

6           And he also told you about that 1990, Dr.

7 Moller's publication that related to Abbott's mouse

8 antibody A2.  This is his publication.

9           Well, let's show what Dr. Moller said

10 back in 1990 about this competitive inhibition.  And you

11 see that MAK195, which is the mouse antibody that he was

12 working with, does not compete with mAB 114, but mAB 114

13 does compete with MAK195.

14           THE COURT:  Five minutes.

15           MR. BECK:  In other words, the

16 directions, the directions do matter in this case.

17           Now, the testimony is undisputed that

18 Centocor could have run this extra test for what

19 Dr. Adams called a miniscule amount, but he never did.

20           Why do you suppose that is?  If they were

21 planning on suing our client for over $2 billion, don't

22 you think they would have spent some thousands of

23 dollars to run the proper test to show what they were

24 alleging in the case?

25           They have Dr. Moller's article.  They had

1  that graph.  Do you suppose that they didn't do it,

2  Ladies and Gentlemen, because they were a little bit

3  afraid of what that test might show?

4          Do you believe that they suspected, after

5  reading Dr. Moller's article, that if they run the test,

6  it's not going to show what they want it to show?

7          So what do they do?  They say, well,

8  okay.  We're going to go ahead and run some tests using

9  cA2.  Not A2, cA2.

10          If we can put the claims up, please.

11          The problem with that is, is their patent

12  refers to A2.  It talks about competitively inhibits

13  binding of A2.

14          And what is particularly unfair about

15  what they're trying to do, Ladies and Gentlemen, is the

16  fact that cA2 was initially mentioned in their patent

17  application, and when the Patent Office rejected their

18  application, they struck cA2.

19          So, basically, what they're trying to do

20  is to use a test with something that was dropped out of

21  their patent application and therefore their patent.

22          Dr. Adams was asked about that, and it

23  was like a deer in the headlights when this was called

24  to his attention.  And he finally said, well, you know,

25  I don't remember whether I considered that or not.

1              Well, today they're telling you, well,

2 this is just paperwork.  Well, Ladies and Gentlemen, the

3 paperwork happens to be their patent application, and

4 their paperwork happens to be the patent, which is what

5 the basis of this whole lawsuit is about here.

6              Now let me turn to willful infringement.

7              Obviously, if there's no infringement,

8 there can be no willful infringement.

9              Judge Ward defines willful infringement

10 as reckless disregard, among other things.  To me, that

11 means overwhelming evidence by a clear and convincing --

12 clear and convincing means to me overwhelming evidence.

13 Is there overwhelming evidence that somehow we acted

14 recklessly?

15              Well, is it reckless to defend yourself

16 when you believe you're right?

17              Is it reckless to defend yourself when

18 the other side says, Wait a minute; we've got tests that

19 show you, Abbott, you're wrong, and we say, well, why

20 don't you show us the test and let's look at them?

21              Is it reckless when they refuse to do it,

22 and we say, well, look, we're going to defend ourselves;

23 we don't believe you're right; we believe your patent is

24 invalid?

25              That's not reckless conduct, Ladies and

1  Gentlemen.  That's reasonable conduct.  It's the

2  reasonable conduct of a company that is not going to

3  give in to something that they do not believe is right.

4                    Now, let me turn to damages real fast.

5                    These two damage experts were like two

6  ships passing in the night.  And you may be thinking,

7  God, is there anything these two agree upon?  And the

8  answer is yes.

9                    They agreed -- they agreed that if

10  there's no infringement, the answer is zero to damages.

11  And they also agree that if there's -- if the patent is

12  invalid, there are no damages in this case.

13                    And, Ladies and Gentlemen, we

14  respectfully submit that the answer to the damage issue

15  is zero.

16                    Now, this is the last time I get to say

17  anything, and it's killing me, but it's the last time I

18  get to say anything.

19                    When you-all go back in the jury room,

20  you're going to know they get up and get a chance to say

21  something after this.

22                    When you go back and the questions they

23  raise, ask yourselves, what would Beck or Lee have said

24  if they had a couple of more minutes to respond to that?

25  Ask yourself what we would have responded had we had the

1  opportunity, under our system, to do that.

2             These people compete.  No question about

3  it.  They've got a good product.  They're making

4  billions of dollars.  Our client makes a good product,

5  and they're doing pretty well, too.

6             THE COURT:  One minute.

7             MR. BECK:  Let these people go back to

8  the marketplace and compete on price and product and

9  innovation.  If they do that, we all benefit.

10             Thank you.

11             MS. ELDERKIN:  May I have a second, Your

12  Honor, to make sure my technology is right?

13             THE COURT:  Sure.

14             COURTROOM DEPUTY:  The other way.  That's

15  it.

16             MS. ELDERKIN:  I just wanted to make sure

17  I can do that.

18             Thank you very much.

19             Ladies and Gentlemen, Mr. Beck talked

20  about credibility, and credibility is very important.  I

21  want to point out a few things that Mr. Lee said and

22  what he didn't say.

23             He said, why wasn't Dr. Ghrayeb here?  If

24  he cared so much, why wasn't he here in the courtroom

25  after he testified?

1           Mr. Lee knows that Mr. Ghrayeb hasn't

2  been excused by the Court yet.  He wasn't permitted to

3  sit here and listen to the testimony.  That's why he

4  wasn't here.

5           Mr. Lee put up a question and answer on

6  the screen from Dr. Ghrayeb's testimony.  The question

7  said something about it not being his intention to make

8  a human antibody.

9           What he didn't show you was the testimony

10 a few lines later when I asked him:  I want to make sure

11 the jury understands.  You said it wasn't your intention

12 to make a human antibody.  Are you referring to what you

13 were doing in the lab then?

14           ANSWER:  Yes.

15           QUESTION:  Are you saying that was not

16 part of your invention?

17           ANSWER:  No, I'm not saying that.

18           He was talking about what he was

19 focusing on -- focusing in at the lab at the time with

20 the limited resources of the company.  They were

21 focusing on making a human antibody -- I mean, a

22 chimeric antibody.

23           So, of course, he wasn't intending to

24 make a human antibody at that time.

25           Mr. -- Mr. Lee also put up some testimony

1  from Dr. Adams having to do with the competition testing

2  on Adair.  He put up testimony and he said -- where Dr.

3  Adams said, there are a couple of points that definitely

4  suggest competition in the second assay.  And he did say

5  that.

6          What Mr. Lee didn't show you was the very

7  next question and answer where he was -- where Dr. Adams

8  was asked:  So then wouldn't you conclude from those

9  that there's competition in the assay?

10          And he answered:  No.

11          Because at those points in the assay, at

12  the points where the assay suggest competition, the

13  control antibody that was used in the assays was giving

14  results that suggested that the assay was unreliable at

15  that point.

16          So keep in mind credibility when you're

17  back there deliberating, Ladies and Gentlemen.

18          A few other things I want to point to

19  before Mr. Sayles gets up.  The instruction on written

20  description, I told you they don't have to have physical

21  possession.  It's possession of the idea.

22          When you listen to the instructions,

23  you're not going to hear a word about any necessity for

24  them having physical possession of the invention.

25          Let me just point to one demonstrative

1  that Mr. Lee used.  Let me point to a few things on

2  this.

3            He was talking about testimony from

4  different witnesses on whether they had made human

5  antibodies.  Well, it's no surprise that Dr. Le and

6  Dr. Vilcek said they hadn't made human antibodies.

7  If you remember Dr. Ghrayeb said, their role in this

8  invention was to make the mouse antibodies.

9            Dr. Knight, you remember Dr. Ghrayeb said

10 Dr. Knight worked for him.  He took instructions from

11 Dr. Ghrayeb, and Dr. Ghrayeb didn't put him on a project

12 to make human antibodies.  They were focusing on making

13 cA2.

14            Dr. Marks, remember all his testimony

15 about all his publications in the field that all put

16 together the pieces for making human antibodies.

17            Now, they say, where was their expert?

18 Why didn't we have an expert opine on this, give you an

19 opinion?

20            You didn't need to hear another expert

21 opinion.  Dr. Marks, who's gotten $2.7 million from

22 Abbott for sales of Humira, do you think we needed to

23 put another expert on that?

24            You have all the facts that you heard,

25 but there are some additional facts that aren't shown on

1  this slide, one is the Patent Office.

2              The Patent Office allowed these claims,

3  and they did so in full knowledge of what Centocor was

4  claiming that they covered.

5              This is from the prosecution history

6  for the '775 patent.  Before it issued, Centocor made

7  sure that the Examiner understood that the claims in

8  this case embodied commercial products on the market

9  such as Remicade and Humira.

10             The Patent Office knew that these

11  claims -- that Centocor certainly intended that they

12  were going to cover human antibodies like Humira, and

13  the Patent Office allowed the claims.

14             But you don't have to listen to us again

15  on what was available in 2004 for making human

16  antibodies.  The allusive Zehra Kaymakcalan, whose name

17  you've heard a lot, this is an Abbott document that she

18  wrote in 2007 where she was talking about the discovery

19  of Humira.

20             And she said what was available, what

21  were the techniques for making human antibodies in 1993,

22  all the ones our witnesses talked about, including using

23  phage display.

24             There are a lot of things that aren't on

25  this demonstration, a lot of evidence that points to the

1  fact that there was an enabling disclosure and a written

2  description of human antibodies in our patent

3  application in 1994, and this issued by the Patent

4  Office.

5            I'm going to turn it over now to

6  Mr. Sayles.

7            MR. SAYLES:  May it please the Court,

8  Counsel, Ladies and Gentlemen of the Jury.

9            Here comes the caboose.  I have just a

10  few minutes remaining, and I want to use a proverb

11  that's different from the one that Mr. Lee has used

12  several times.

13            The Old Testament prophet Isaiah said:

14  Come, let us reason together, and that's what I want to

15  do with you.

16            You were asked a minute ago by Mr. Beck

17  to ask yourself in the jury room, what would Mr. Beck

18  say, what would Mr. Lee say to these various arguments

19  that are raised.

20            Ladies and Gentlemen, that is not what

21  you should do.  That is not the test.

22            What you should do in the jury room is to

23  be guided by the evidence.  The evidence answers the

24  questions here, not these excellent lawyers.

25            I could answer the questions, but not

1 because I'm such a clever lawyer, but because they're in

2 the evidence.  You should use the Judge's instructions

3 as your anchor when you go into the jury room.

4          And Judge Ward told you at the beginning

5 of this case that you have the most important tool to

6 take with you to the jury room, and that's your good

7 common sense and experience.

8          When he said that, I began to think about

9 it, and I added up your ages, and there's over 500 years

10 of life experience and common sense right there in that

11 jury box.  And we'll rely on that and the Judge's

12 instructions and the evidence to answer these questions.

13          The first issue I want to address for you

14 is this -- the issue, Question No. 1, of infringement.

15          Would you give me the Judge's Instruction

16 No. 1, please?

17          As that's coming up here, I want to tell

18 you, there are a couple of things that have been

19 mentioned that are not consistent with the Court's

20 charge.

21          One is, Mr. Lee continued to compare the

22 Humira product, the accused product, to Remicade.

23 When you read these instructions, you will see that

24 you're to compare the accused product to the claims in

25 the patent, not to the accused product.  Do not be

1 misled.

2          In addition, the Court instructs you that

3 the fact that Abbott obtained its own patents on Humira

4 is not relevant to the issue of infringement.

5          Now, I want to go to this question, which

6 I submit to you this is the excuses, the defenses that

7 Mr. Lee talked about.  And I'm going to put this up

8 here, because having been down this path a few times,

9 I've learned that this question is tricky a little bit

10 to answer because of the way it's phrased.

11          The question here is not one of validity,

12 but it is one of invalidity.

13          Do you find that Abbott has proven by

14 clear and convincing evidence that the claims are

15 invalid for the following reasons?

16          Now, the reason it's written that way is,

17 right now, this -- these claims in this suit are valid.

18 They are presumed valid.  That's in the Judge's

19 instruction.  And it's because the Patent & Trademark

20 Office has experienced and qualified examiners who look

21 at these patents before they issue and look at these

22 elements of enablement, written description, and prior

23 art.

24          Mr. Lee would have you believe that the

25 Patent & Trademark Office made not one, two but four

1  mistakes.  They have two items of prior art that they

2  refer to here, that the Patent & Trademark Office made

3  four mistakes in issuing this patent, to overcome the

4  presumption of validity.

5              The answer to this question is no.  No

6  means the claims are not invalid.  You see it's a little

7  bit of a double negative, but the answer is no to all of

8  these.

9              Now, let me move to the issue of

10  willfulness, and here I want to invoke your common sense

11  for a moment.

12              You heard throughout this trial from the

13  very beginning that Abbott came in here and said that

14  they didn't have any notice about this patent.  That's

15  their beginning position.

16              Well, let's take a look at what Joe

17  Scodari said, that he testified to.

18              No. 8, please, Joe.

19              Joe Scodari said, when he was asked, and

20  there was lots of testimony about this, that he had

21  discussions with his counterpart, Mr. Dempsey.  We're

22  talking about high-level executives, as you'll recall,

23  discussing this with one another, and the people that

24  worked with them, Mr. Heyman, on behalf of Centocor,

25  Mr. Poulos, on behalf of Abbott, were discussing this

1  very issue about the allowed patent claims before the

2  patent actually issued in July.

3              So not only did they have notice of the

4  patent, they had notice of the patent and discussion of

5  the patent prior to it even issuing.

6              What could be better?

7              But to come into Court and claim they

8  don't have notice of the patent and notice that Centocor

9  said that they infringed?

10              Now, remember, Mr. Scodari had

11  discussions with his counterpart, Mr. Dempsey, for a

12  period of 15 or 16 months, before, at, and after the

13  issuance of the patent.

14              And if that weren't enough, Mr. Conway,

15  Lawyer Conway -- No. 6, please.

16              Lawyer Conway for Abbott got involved,

17  and he asked the scientist, Zehra Kaymakcalan, as you've

18  heard about, for some technical information.  And he got

19  it the very next day.

20              Let's look at No. 4.

21              He got the information he needed.  Now,

22  how did he get the information he needed to see if there

23  was infringement of these claims one day later?

24              The answer is right here on this exhibit

25  that it already had been done back in July.  This is

1  dated July 1st, 2005.  And you'll recall that these

2  discussions were in December of 2005.

3                    And in this report, which is in evidence,

4  you'll see at the time that Abbott was being charged

5  with infringement, and they did testing and they asked

6  their scientists for tests, they did tests on cA2, not

7  A2; cA2.

8                    It was good enough for them then; it

9  ought to be good enough for them in Court.  They test

10  the same way.  You heard the evidence of that.

11                    Then if that weren't enough, Lawyer

12  Conway testified that as of February 2006, he knew that

13  they would likely be sued when this patent issued.

14                    No notice?  How can that be?

15                    Let's take a look at Cheryl Lubbert.  She

16  was a Divisional Vice President for Abbott, and she

17  testified, I think, about as directly as you can

18  testify:  When did Abbott first become aware of

19  Exhibit 1, the patent?  And it gives the patent number.

20  That's would be when it issued.

21                    Her testimony was:  We were aware of it

22  when it issued.

23                    So they were aware of the patent before

24  it came out as a patent.  When they were allowed claims,

25  they were aware of it, according to her.  And she was a

1  corporate representative the day it issued.

2              And then finally, on this issue of

3  willfulness, which your answer should be yes to, I want

4  you to look at -- call up No. 3, please.

5              This is a document that you heard

6  Attorney Conway testifying about in his -- the internal

7  risk management strategy that was being followed by

8  Abbott.  And if you just take a look at that, it talks

9  about they're going to target certain drugs, and they're

10  going to go after them.

11              And in some cases will seek a license,

12  but if they can't get a license, they're going to use an

13  aggressive business IP strategy in risk management.  You

14  know what that says, folks?

15              That says we'll play hardball to get the

16  drugs that we want.

17              And even down here below, it says we may

18  not proceed if the target includes a large company with

19  litigation resources.  In other words, we'll pick on the

20  little guys, but we'd better leave the big guys alone.

21              Well, in this case, they got sued and

22  they got sued by a company that, fortunately, has the

23  resources --

24              THE COURT:  Five minutes.

25              MR. SAYLES:  -- to stand up against them,

1  and that's what we're doing here.

2           Their infringement was willful, and they

3  should have to answer for it on the damages.

4           And I want to turn to the damages.  Now,

5  you've got Dr. Slottje on the one hand, and that's their

6  damages expert.  And you've got Dr. Gering on the other

7  hand.

8           Credibility is the issue, I believe.

9           Dr. Gering was not attacked or assailed

10  in any material way.

11           Dr. Slottje got on the witness stand, and

12  Dr. Slottje tried to make you believe that Humira and

13  Remicade do not compete in the same market.  Do not

14  compete.  And that was the reason for his low, low, low

15  numbers.

16           Well, what is the most telling piece of

17  evidence about that?

18           I'll show you what it is.

19           May I walk right over here for just a

20  second, Your Honor?

21           THE COURT:  All right.

22           MR. SAYLES:  You see these three

23  notebooks?  These were the notebooks that Mr. Maslowski

24  put up on the chair for Dr. Slottje to look at and ask

25  him to pick any one.

1              What are those?

2              Those are marketing documents of Abbott.

3              What do they show?

4              They show that Humira and Remicade

5  compete in the same indications, in the same market, and

6  they show it every single month during the period that

7  we're interested in in this case.

8              That's why Mr. Maslowski said just pick

9  one.  It didn't matter which one he picked.

10              And I'll tell you something else.  That's

11  why Abbott did not bring down here a marketing witness,

12  because, you know, if a witness has written a chapter in

13  a book, they might be able to eat that.  If they have

14  written an article, they might have to deal with that,

15  and it might be shown that they have inconsistencies.

16  But a marketing person could not take that witness stand

17  and withstand cross-examination where a claim is made

18  that these products do not compete time after time.

19              Now, let me go to the damage numbers

20  here.  You've heard the damage numbers.  The lost

21  profits is 1 billion, 168 million, 466 dollars (sic).

22              The reasonable royalty, let me tell you

23  why a 15-percent reasonable royalty is reasonable.  And

24  that's 1 billion, 8 million, 256 thousand dollars.

25  The reason that that is a reasonable royalty is the

1 industry average for a launched product is 11.6 percent.

2 And if we've learned anything about this case during the

3 trial of this case, this case is anything but average.

4 　　　　　Humira is the largest product and most

5 successful product that Abbott has ever sold, so there's

6 nothing average about it at all.  The product was

7 launched at the time negotiations would take place.  You

8 heard that.  That happens.  The industry numbers show

9 that that happens.

10 　　　　　So they would have paid a higher than an

11 average royalty rate, and that's how that number is

12 justifiable and reasonable.

13 　　　　　Now, in a moment, I'm going to sit down,

14 but I want to tell you something.  These damages that

15 I've just gone over with you represent a fair amount of

16 compensation.  That's what they represent.

17 　　　　　Are they large?

18 　　　　　To be sure, they are.  But the sales here

19 are large, and that's why it is so.

20 　　　　　There are no punitive damages or extra

21 damages in here.  They are lost profits and reasonable

22 royalties.  These numbers represent a full measure of

23 justice.  We ask you for a full measure of justice.

24 Anything less, anything less than a full measure of

25 justice, you see, includes partial injustice.  If you

1  have less than full justice, you have partial injustice.

2          THE COURT:  One minute.

3          MR. SAYLES:  It's full justice.

4          So when you go back into the jury room,

5  what we ask you to do -- and this is a complicated case

6  in the science, but your common sense will guide you,

7  and your common sense will come through.

8          Today -- today you are the most powerful

9  group in Marshall Texas, the state of Texas, and perhaps

10  in America.  It is only here where we entrust our juries

11  to make decisions like these, these important decisions.

12          Ms. Elderkin and I, and our whole team,

13  have had a tremendous obligation to our client in

14  bringing you this case.  We have now discharged our

15  burden and our obligation to our client.

16          We now give you the responsibility that

17  you have to bring back a verdict that is grounded in the

18  evidence, based on the Court's charge, and blessed by

19  your conscience.

20          THE COURT:  Thank you, Mr. Sayles.

21          Ladies and Gentlemen, it will take me

22  about 45 minutes to read this charge.  I think you ought

23  to take a break.

24          So I tell you what, let's be ready to

25  come back in at 10:25.  We'll get in there a little

1 after 11:00. But let's take a break. This is too long

2 to stay in here for another 45 minutes. So I'll see you

3 back at 10:25.

4             COURT SECURITY OFFICER: All rise.

5             (Jury out.)

6             THE COURT: Counsel, I've got some

7 question about this -- or condition on Question No. 3,

8 so I'm going to look at it again. I may ask you to step

9 in chambers here in about ten minutes. I want to look

10 at it.

11             (Recess.)

12             (Jury out.)

13             THE COURT: All right. Please be seated.

14             We have a request from the Plaintiff?

15             MS. ELDERKIN: Yes, Your Honor.

16 Plaintiff renews its JMOL motion on the anticipation by

17 the Adair patent. As we had pointed out previously,

18 there's been no evidence. No Abbott witness has ever

19 compared --

20             MR. SAYLES: Salfeld. Salfeld.

21             MS. ELDERKIN: Salfeld. I'm so sorry.

22 The Salfeld patent.

23             No witness ever compared the disclosure

24 of the Salfeld patent to the claims, and there was not

25 even any argument today even tying in the position that

1  the Salfeld patent anticipates.

2              So we don't believe it should go to the

3  jury, and we request our -- renew our request for motion

4  as a judgment of law, that it's not -- does not

5  anticipate.

6              THE COURT:  Mr. Lee, where is the

7  evidence that the jury would be entitled to follow on an

8  element-by-element comparison of the Salfeld patent?

9              MR. LEE:  It's the Salfeld patent itself,

10  Your Honor.  And I argued it specifically.  I said that

11  Your Honor would identify Salfeld as prior art, that its

12  filing date was 1996, and it was 2000 and that if it --

13  and I said that if it -- if it infringes, it

14  anticipates.  It can't be both ways.  I argued that

15  specifically today.

16              THE COURT:  I know you argued that.  I

17  disagree with Ms. Elderkin on whether you argued it, but

18  what evidence was there of -- from an expert that

19  compared the -- element by element of the patent to the

20  asserted claims?

21              MR. LEE:  Your Honor, it was -- this is

22  the same argument that we had with Your Honor before at

23  the JMOL.

24              And we cited three cases that I don't

25  have in front of me right now, where the Court of

1  Appeals has said that if the product that's accused of

2  infringing is prior art, then the patent's invalid, and

3  you don't need that element-by-element comparison.

4  And that was specifically what we said.

5             THE COURT:  Okay.  I deny the motion.

6             Bring them in.

7             (Jury in.)

8             THE COURT:  Please be seated, Ladies and

9  Gentlemen.

10             Members of the Jury, you have heard the

11  evidence that's been presented by the parties in this

12  case, and now you've heard the argument of the

13  respective attorneys in support of their positions.

14             It is now my duty to give you the charge

15  in the case.  It will be an oral charge, and I am giving

16  it to you in an effort to assist you in your

17  deliberations in deciding the issues which you must

18  decide in order to reach a fair and impartial verdict in

19  this case.

20             Perhaps this function of the Court is the

21  most important one that the Court performs in the trial

22  of the case, so I do ask that you pay close attention to

23  my remarks.

24             You will remember that last Monday at the

25  beginning of the trial, I gave you some general

1  instructions and definitions.  Rather than repeat them

2  all at this time, I will ask you to recall them in

3  deciding the facts and issues which you are to decide.

4          As I instructed you at the beginning of

5  the trial, you are the exclusive judges of the facts,

6  the credibility of the evidence, and the weight to be

7  given the testimony of the witnesses who testified.

8  You are to perform this duty without bias or prejudice

9  to any party.  The law does not permit jurors to be

10  governed by sympathy or prejudice.

11          A corporation and all other persons are

12  equal before the law and must be treated as equals in a

13  court of justice.

14          The Court and the parties expect that you

15  will carefully and impartially consider all of the

16  evidence, follow the law as I will give it to you, and

17  reach a just verdict.

18          I instruct you that all persons,

19  including the Plaintiffs and Defendants in this case,

20  stand equal before the law and are to be dealt with as

21  equals in this court.  The law is no respecter of

22  persons.

23          I'm going to now briefly review the

24  contention of the parties and then give you some

25  additional instructions and definitions that will guide

1  you in deciding the issues of facts that you must

2  resolve in this case.

3            The Plaintiffs contend that the

4  Defendants infringe certain claims of U.S. Patent

5  No. 7,070,775, (that is, the '775 patent).

6            The claims alleged to be infringed are

7  Claims 2, 3, 14, and 15 of the '775 patent.  I will

8  refer to these claims as the asserted claims and to the

9  patent as the patent-in-suit.

10            The product alleged to infringe the '775

11  patent is Abbott's product, Humira.  The Plaintiffs

12  contend that they are entitled to damages caused by the

13  infringement.

14            The Plaintiffs also contend that the

15  Defendants' infringement was willful.

16            The Defendants deny that they have

17  infringed the asserted claims of the patent-in-suit and

18  also argue that all asserted claims of the

19  patent-in-suit are invalid.

20            Now, the Plaintiffs bear the burden of

21  proof by a preponderance of the evidence that the

22  Defendants infringe the asserted claims of the

23  patent-in-suit.

24            When a party has the burden of proof by a

25  preponderance of the evidence, it means that you must be

1  persuaded by the evidence that the claim or affirmative

2  defense is more likely true than not true.

3            Now, the Defendants bear the burden of

4  proof by clear and convincing evidence that the asserted

5  claims of the patent are invalid.

6            Clear and convincing evidence is a more

7  exacting standard than proof by a preponderance of the

8  evidence, which only requires that the parties claim be

9  more likely true than not true.

10           When a party has the burden of proving

11 any claim or defense by clear and convincing evidence,

12 it means the party must persuade you that it is highly

13 probable that the facts are as that party contends.

14 Never -- nevertheless, the clear and convincing standard

15 is not as high as the burden of proof applied in a

16 criminal case, which is beyond a reasonable doubt.

17           Now I'm going to give you some further

18 instructions that, hopefully, will help you in answering

19 the questions to follow.

20           First, with respect to claim

21 interpretation, to decide the questions of infringement

22 and validity, you must first understand what the claims

23 of the patent cover; that is, what they prevent anyone

24 else from doing.  This is called claim construction or

25 claim interpretation.

1    It is my duty under the law to interpret

2 what the words in the patent claims mean.  I have made

3 my determination.  I will instruct you accordingly.  You

4 must apply the meaning that I am about to give you to

5 both your decisions on infringement and validity.

6 I will now instruct you how those words are to be

7 construed and understood when deciding the issues of

8 infringement and validity in this case.

9    Now, you have been provided with written

10 copies of the patent-in-suit and copies of the claim

11 definitions, and you should use them during your

12 deliberations.

13    With respect to the '775 patent:

14    The term anti-TNF-alpha means an

15 immunoglobulin protein that binds to TNF-alpha.

16    The term human variable region means a

17 variable region that is encoded by a gene derived from

18 human DNA.

19    The term human light chain means light

20 chain encoded by a gene derived from human DNA.

21    The term human heavy chain means heavy

22 chain encoded by a gene derived from human DNA.

23    The term competitively inhibits binding

24 of A2 (that is, ATCC Accession No. PTA-7045) to human

25 TNF-alpha means competes with A2 (that is, ATCC

1  Accession No. PTA-7045) for binding to human TNF-alpha.

2              The term binds to a neutralizing epitope

3  of TNF-alpha in vivo with an affinity of at least 1

4  times 10 to the 8th liter per mole measured as an

5  association constant (that is, Ka) as determined by

6  Scatchard analysis means results in a loss of biological

7  activity when it binds to human TNF-alpha in vivo and

8  associates (that is, binds) with human TNF-alpha with

9  affinity of at least 1 times 10 to the 8th liter per

10 mole as calculated using a method for data analysis

11 known as a -- as a Scatchard analysis.

12             The term neutralizing epitope means a

13 portion of TNF-alpha which, when bound by an antibody,

14 results in a loss of biologic activity of TNF-alpha.

15 The term recombinant means encoded by DNA made with

16 recombinant DNA technology; for example, encoded by a

17 gene that was split by splicing DNA.

18             All other claim terms have their plain

19 and ordinary meanings as they would be understood by a

20 person of ordinary skill in the art.

21             Fortunately, you have a copy of those

22 definitions that I have just read to you in your

23 notebook.

24             Now, with respect to determining

25 infringement, once a patent is issued, the owner of the

1  patent has a right to exclude others from making, using,

2  or selling the patented invention throughout the United

3  States for a term of 20 years.

4              Thus, infringement occurs when a person,

5  without the owner's permission, makes, uses, or sells a

6  patented invention anywhere in the United States while

7  the patent is in force.

8              To determine whether there is an

9  infringement, you must compare the allegedly infringing

10  product with the scope of the patent claims as I have

11  defined them for you.

12              Now, in order to infringe a patent claim,

13  a product must include each and every limitation of the

14  claim.  In determining whether Abbott infringes

15  Centocor's asserted claim, you must determine whether

16  Humira contains each and every limitation recited in a

17  claim.

18              A claim limitation is present if it

19  exists in Humira just as it is described in the claim

20  language, either as I have explained that language to

21  you or if I did not explain it, as it would be

22  understood by one of skill in the art.

23              If such a product omits even a single

24  limitation, then you must find that the claim is not

25  infringed.  You must consider each of the claims

1  separately.

2          If you find that each and every

3  limitation of a patented claim is found in Humira, then

4  the claim is infringed even if Humira may be more or

5  less efficient or may include additional features or

6  functions not found in the claims.

7          The fact that Abbott may have obtained

8  patents on its product is not relevant to Centocor's

9  claim of patent infringement.

10          Now, about dependent claims.  My

11  instruction on infringement so far have related to

12  independent claims.

13          However, all of the claims in suit -- all

14  of the claims in suit, Claims 2, 3, 14, and 15 of the

15  '775 patent, are dependent claims.

16          Dependent claims includes each of the

17  limitations of the independent claim from which it

18  depends, plus additional elements.

19          For the claims in this case, Dependent

20  Claims 2 and 3 depend from Claim 1, and Dependent

21  Claims 14 and 15 depend from Claim 13.

22          Therefore, for Dependent Claims 2 or 3 to

23  be infringed, all of the elements of Independent Claim 1

24  must also be present in the accused product.

25          Likewise, for the Dependent Claims 14

1  or 15 to be infringed, you must find that all of the

2  elements of Independent Claim 13 are present in the

3  accused product.

4          With respect to willful infringement, the

5  Plaintiffs claim that the Defendants infringe their

6  patent willfully.

7          Although you must determine whether the

8  Defendants' infringement was willful, this determination

9  will not affect the amount of damages, if any, that you

10  assess.  The purpose of your determination is to assist

11  the Court in making decisions that I will -- that it

12  will have to make.

13          The Plaintiffs must prove willfulness by

14  clear and convincing evidence.  To prove willful

15  infringement, the Plaintiffs must first prove that the

16  Defendants infringed a valid claim of the Plaintiffs'

17  patent.  The requirements for proving infringement were

18  discussed in my prior instructions.

19          The fact that you may have determined

20  that the Defendants were wrong and the patent is

21  infringed does not mean that the Defendants'

22  infringement was willful.

23          To prove willful infringement, the

24  Plaintiffs must prove that it is highly probable that

25  the Defendants acted with reckless disregard of the

1 claims of the Plaintiffs' patent.

2          To demonstrate such reckless disregard,

3 the Plaintiffs must satisfy a two-part test.

4          The first part of the test is objective.

5 The Plaintiffs must prove that the Defendants acted,

6 despite an objectively high likelihood that its actions

7 constitute -- constituted infringement of a valid

8 patent.

9          The state of mind of the Defendants is

10 not relevant to this inquiry.  You should focus on

11 whether a reasonable person in the position of the

12 Defendants -- the Defendants, after learning of the

13 patent, could have reasonably believed that it did not

14 infringe or that the patent was invalid.

15          If a reasonable person in the position of

16 the Defendants could not have held such a belief, then

17 you need to consider the second part of the test.

18          The second part of the test looks to the

19 Defendants' state of mind.  If you find that the

20 Defendants proceeded in the face of an unjustifiably

21 high risk, then you must determine whether that risk was

22 known or obvious to the Defendants.

23          The Plaintiff -- Plaintiffs must prove

24 that the Defendants actually knew or it was so obvious

25 that the Defendants should have known that its actions

1  constituted infringement of a valid patent.

2            In deciding whether the Defendants

3  satisfied the second part of the test, you could -- you

4  should consider all of the facts surrounding the alleged

5  infringement, including but not limited to the

6  following:

7            No. 1.  Whether the Defendants, when they

8  learned of the patent, investigated the scope of the

9  patent and formed a good-faith belief that the patent

10 was invalid or that it was not infringed before the

11 Defendants started or continued in a possible infringing

12 activity;

13           No. 2.  Whether the Defendants

14 intentionally copied without a -- without a reasonable

15 basis, a product covered by the patent, as distinguished

16 from trying to design around the patent by designing a

17 product that the Defendants believed did not infringe

18 the patent;

19           No. 3.  Whether the Defendants had a

20 substantial defense to infringement and reasonably

21 believed that the defense would be successful in

22 litigation;

23           And finally, No. 4.  Whether the

24 Defendants tried to cover up their infringement.

25           Now, none of these factors is

determinative, and the list of factors is not an exhaustive list of things you should consider.  Your determination of willfulness should incorporate the totality of the circumstances.

With respect to validity, now, Abbott contends that the asserted claims of the patent-in-suit are invalid.

A patent issued by the United States Patent Office is presumed to be valid.  In order to rebut this presumption, Abbott must establish by clear and convincing evidence that an asserted claim of the patent-in-suit is not valid for each claim of a patent is presumed valid regardless of the status of any other claim in the patent.

I will now instruct you on the invalidity issues that you have to decide in this case.  You may consider the following invalidity defenses and no other. First, with respect to the date of invention and priority date.

Many of the validity issues refer to the date the invention -- the date the inventor made the invention or the date the application was filed.  These are called the, quote, date of invention or, quote, filing date.

I will now instruct you how to determine

1 these dates.

2          Under the patent laws, the date of the

3 invention is generally the date that the patent

4 application was filed.  This is also referred to as a

5 constructive reduction to practice.

6          Inventors, however, are permitted to file

7 multiple applications in a series that are directed to

8 the same subject matters.

9          In these circumstances, inventors may

10 attempt to assert an earlier constructive reduction to

11 practice by relying on the application filed before the

12 application that actually matured into the patent.  This

13 is called claimed priority to an earlier filed

14 application.

15          The series of patent applications

16 involved in this case were filed between 1991 and 2002.

17          The '775 patent issued directly from an

18 application that was filed on July the 18th, 2002.

19          Therefore, the latest possible date of

20 the invention is July 18th, 2002.

21          Now, you are instructed that for purposes

22 of this case, Centocor may attempt to claim priority

23 only to the application filed on or after February 4,

24 1994.

25          I will refer to the applications filed on

1  or after February 4, 1994, as priority applications and

2  the date on which the applications were filed as a

3  priority date.

4          To provide an earlier date of invention,

5  a priority application must satisfy the written

6  description and enablement requirements.  In a moment, I

7  will give you further instruction concerning these

8  requirements.

9          Centocor contends that the priority

10  application satisfies -- satisfies these requirements

11  and does provide the earlier date of invention.  Abbott

12  disagrees.

13          Abbott bears the burden of proof, by

14  clear and convincing evidence, that the priority

15  applications do not satisfy the written description and

16  enablement requirements.

17          It will be your job to determine the

18  application to which Centocor may claim priority by

19  applying my instructions on written description and

20  enablement.

21          First, with respect to enablement, the

22  written description set forth in a patent must disclose

23  sufficient information to enable one skilled in the

24  field of invention to make and use the claimed

25  invention.

1          The full scope of the claimed invention

2  must be enabled.  This requirement is known as the

3  enablement requirement.

4          Abbott contends that the priority

5  applications do not satisfy the enablement requirement

6  because the written description in those written

7  applications does not enable the asserted claims in the

8  '775 patent.

9          If you find that a priority application

10 does not enable the asserted claims, the application

11 cannot be used to support a priority date.

12         Abbott also contends that the written

13 description of the '775 patent does not enable the

14 asserted claims.  If the claims of a patent are not

15 enabled, they are not valid.

16         In considering whether written

17 description of a patent satisfies the enablement

18 requirement, you must keep in mind that patents are

19 written for persons of skill in the field of the

20 invention.

21         Thus, a patent need not expressly state

22 information that skilled persons would be likely to know

23 or could obtain.

24         Abbott bears the burden of establishing

25 lack of enablement by clear and convincing evidence.

1            A written description is enabling so long

2   as undue experimentation is not needed to make or use

3   the invention.

4            The fact that some experimentation may be

5   required for a skilled person to make or use the claimed

6   invention does not mean that a patent's written

7   description fails to meet the enablement requirement.

8            Factors that you should -- that you may

9   consider in determining whether the written description

10  would require undue experimentation include:

11            (1) the quantity of the experimentation

12  necessary;

13            (2) the amount of direction or guidance

14  disclosed in the patent;

15            (3) the presence or absence of working

16  examples in the patent;

17            (4) the nature of the invention;

18            (5) the state of the prior art;

19            (6) the relative skill of those in the

20  art;

21            (7) the predictability of the art;

22            And (8) the breadth of the claims.

23            With respect to written description,

24  Abbott also contends that the priority applications in

25  the '775 patent do not contain an adequate written

1   description of the claimed invention.

2           The purpose of this written description

3   requirement is to make sure that a patent describes the

4   technology it seeks to claim as an invention and to

5   demonstrate that the inventor was in possession of the

6   invention at the time of the application where the

7   patent was filed, even though the claims may have been

8   changed or new claims added during the prosecution of

9   the application.

10          The written description requirement is

11  satisfied if a person of ordinary skill in the field

12  reading the patent application as originally filed would

13  recognize that the patent application described the

14  invention as claimed, even though the description may

15  not use the exact words found in the claim.

16          An adequate written description requires

17  a precise definition, such as by structure, formula,

18  chemical name, or physical properties, not a mere wish

19  or plan for obtaining the claimed chemical invention.

20  It is not necessary that each and every aspect of the

21  claim be discussed, as long as a person of ordinary

22  skill would understand that the missing aspect is

23  necessarily implied in the patent application as

24  originally filed.

25          If you find by clear and convincing

1  evidence that a priority application does not contain a

2  adequate written description of the invention, then

3  Centocor cannot rely on the priority date of that

4  application.

5           If you find that the '775 patent does not

6  contain an adequate written description of the claimed

7  invention, then you should render a verdict for the

8  Defendants.

9           With respect to prior art, now,

10  generally, under the patent laws, a person is

11  entitled to a patent only if the invention claimed in

12  the patent is new and non-obvious in light of what

13  came before.  That which came before the invention is

14  referred to as prior art.

15           Abbott is relying on various items of

16  prior art.  Abbott must prove by clear and convincing

17  evidence that these items are prior art.  In order to do

18  so, Abbott must prove that the items fall within one or

19  more of the different categories of prior art recognized

20  by the patent laws.

21           These categories include anything that

22  was patented or described in a printed publication

23  anywhere in the world before the inventor made the

24  invention or more than one year before the application

25  to which Centocor can claim priority was filed.

1                 With respect to anticipation, a person

2 cannot obtain a patent on an invention if someone else

3 has already made the same invention.  In other words,

4 the invention must be new.

5                 If an invention is not new, we say it was

6 anticipated by the prior art.  An invention that is

7 anticipated by the prior art is not entitled to patent

8 protection.

9                 A party challenging the validity of a

10 patent must prove anticipation by the clear and

11 convincing evidence standard.

12                 For a patent claim to be anticipated by

13 the prior art, each and every limitation of the claim

14 must be present within a single item of prior art and

15 must be arranged or combined in the same way as in the

16 claim.

17                 In analyzing this issue, do not focus on

18 any features shown in the written description that are

19 not asserted -- that are not included in the asserted

20 claims.  You may not find that the prior art anticipates

21 a patent claim by combining two or more items of prior

22 art.

23                 A printed publication or patent will not

24 be an anticipation unless it contains a description of

25 the invention covered by the patent claims that is

1  sufficiently detailed to teach a skilled person how to

2  make and use the invention without undue

3  experimentation.

4          That means that a person skilled in the

5  field of invention reading the printed publication or

6  patent would be able to make and use the invention using

7  only an amount of experimentation that is appropriate

8  for the complexity of the field of the invention and for

9  the level of expertise and knowledge of persons skilled

10  in that field.

11          In deciding whether or not a single item

12  of prior art anticipates a patent claim, you should

13  consider that which is expressly stated or present in

14  the item of prior art and also that which is inherently

15  present.

16          Now, something is inherent in an item of

17  prior art if it is a natural result that flows from the

18  disclosure in the prior art.

19          Inherency, however, may not be

20  established by probabilities or possibilities.  The mere

21  fact that a certain thing may result from a given set of

22  circumstances is not sufficient to show inherency.

23  If you find that Abbott has provided clear and

24  convincing evidence that any claims asserted against it

25  are anticipated by prior art, then you must find that

1  those claims are invalid.

2              With respect to printed publications,

3  Abbott contends that the asserted claims are anticipated

4  because of the disclosures and prior printed

5  publication.

6              Abbott contends that Claims 2, 3, 14, and

7  15 of the '775 patent are anticipated by the Adair 1992

8  European patent application and United States Patent No.

9  6,090,382.  That's the Salfeld patent.

10             Printed publications from anywhere in the

11 world are prior art if the printed applications were

12 published either before the inventor made the claimed

13 invention or more than one year before the earliest

14 application to which you find Centocor may claim

15 priority.

16             If a printed publication was published

17 more than one year before the application to which the

18 Plaintiffs can claim priority was filed, then that

19 publication will be prior art, regardless of the date of

20 invention for the patent claims.  The date of invention

21 is irrelevant to this category of prior art.

22             A printed publication will not be an

23 anticipation unless it contains a description of the

24 invention covered by the patent claims that is

25 sufficiently detailed to teach a person of ordinary

1  skill in the art how to make and use the invention

2  without undue experimentation.

3           That means that a person of ordinary

4  skill in the field of the invention reading the printed

5  publication would be able to make and use the invention

6  using -- using only an amount of experimentation that is

7  appropriate for the complexity of the field of invention

8  and for the level of expertise and knowledge of persons

9  of ordinary skill in that field.

10          With respect to damages, I will now

11 instruct you as to the calculation of the damages should

12 you find that the Plaintiffs have met their burden on

13 any of their claims.

14          If you find that the Defendants have

15 infringed any of the claims of the Plaintiffs' patent

16 and that these claims are valid, then you should

17 consider the amount of money the Plaintiffs should

18 receive as damages.

19          The Plaintiffs have the burden of proving

20 by a preponderance of the evidence the amount of damages

21 caused by the Defendants' infringement.

22          Now, even though I am instructing you on

23 how you should measure damages, this should not be taken

24 to mean that I believe that the Defendants have

25 infringed.  These are issues for you to resolve under

1 the instructions I have given you.

2        I am instructing you on damages only so

3 that you will have guidance should you decide that the

4 Plaintiffs are entitled to recover.

5        The amount of damages Plaintiffs can

6 recover is limited to those acts of infringement by the

7 Defendants that occurred after the Plaintiffs gave the

8 Defendants notice that they infringed the '775 patent.

9 Notice means that the Plaintiffs communicated to the

10 Defendants a specific charge of infringement of the '775

11 patent by Humira.  This notice is effective as of the

12 date given.

13        The Plaintiffs contend that the

14 Defendants had notice of infringement from the date the

15 '775 patent issued, July 4, 2006.

16        The Defendants contend that they had

17 notice on the date that the lawsuit was filed, April

18 16th, 2007.

19        The Plaintiffs have the burden of

20 establishing by a preponderance of the evidence the date

21 on which the Defendants received notice of infringement.

22 Your job is to calculate damages from the date you find

23 the Defendants received notice.

24        At the latest, the Defendants received

25 notice of infringement on the date the suit was filed.

1   You should not award damages for any infringement by the

2   Defendants occurring before they first received notice

3   of the '775 patent.

4              Now, in addition, you're instructed that

5   as a result of an agreement entered into in 2000 between

6   Centocor and Abbott, it has been determined that Abbott

7   has a license to the '775 patent with respect to Humira

8   that qualifies as a co-administration product.

9              Co-administration product means Humira

10  that is actually used in combination with Methotrexate

11  in the United States, and Humira used as an adjunctive

12  therapy to Methotrexate in certain EU countries.

13  As a result of this license, Abbott is authorized to

14  make, use, and sell Humira qualifying as a

15  co-administration product, and no damages may be awarded

16  for such conduct.

17             Now, the existence of this license is not

18  relevant to the issues of infringement or validity of

19  the patents-in-suit.  It is only -- it is relevant only

20  to the issue of damages.

21             The Plaintiffs are asking for two types

22  of damages for the alleged patent infringement in this

23  case.

24             The first type of patent damages is lost

25  profits.  Briefly, lost profits compensate the patent

owner for the additional profits that it would have been
if the accused infringer had not infringed.

You may hear this referred to as the
but-for test.  I will discuss lost profits in more
detail shortly.

The second type of patent damages is
called reasonable royalty.  I will also discuss
reasonable royalty later in more detail.

Generally, a reasonable royalty is
defined by the patent laws as the reasonable amount that
someone wanting to use the patented invention should
expect to pay to the patent owner and the patent owner
should expect to receive.

A reasonable royalty is the minimum
amount of damages that a patent owner may recover.
With respect to lost profits, I will first instruct you
about lost profit damages.

Simply stated, lost profit damages are
the profits the Plaintiffs lost because of the
infringement.  They are not the profits the Defendants
made.

The Plaintiffs have the burden to show
that it was more probable than not that they would have
made additional profits if the Defendants had not
infringed.

The Plaintiffs may receive damages for lost profits only on those products that compete with the Defendants' products that you find to infringe.

The Plaintiffs may not receive lost profit damages for other products or services that might be sold along with the competing products for convenience or business advantage but that are not functionally part of the competing product.

You must also consider whether or not, if the Defendants' infringing product was not available, some or all of the people who bought from the Defendants would have bought a different non-infringing product from the Defendants or from somebody else rather than buy from the Plaintiffs.

In deciding whether or not people who bought from the Defendants would have bought a non-infringing product, you should consider whether or not there was such a demand for the patented aspect of the infringing product that the purchasers would not have bought a non-infringing product.

If you find infringement, you may consider demand for the accused product to be a demand for the patented invention.

It is not necessary for the Plaintiffs to prove that the Plaintiffs and the Defendants were the

1  only two suppliers in the market in order for the

2  Plaintiffs to demonstrate entitlement to lost profits.

3  If the realities of the marketplace are such that

4  non-infringing substitutes were available from suppliers

5  who would have made some but not all of the sales were

6  made by the Defendants, then the Plaintiffs may be

7  entitled to the lost profits on a portion of the

8  infringing sales.

9            The burden is on the Plaintiffs, however,

10  to show a reasonable probability that they would have

11  sold that portion if the Defendants' product had never

12  existed.

13            If the Plaintiffs have proved that they

14  lost profits due to infringement by the Defendants, then

15  you are to find an amount of profits that it lost.

16  The Plaintiffs must prove the amount of lost -- their

17  profit loss by a -- to a reasonable probability.  The

18  amount of lost profit damages should not include amounts

19  that are merely speculation.

20            With respect to reasonable royalty,

21  Plaintiffs are also asking damages in the amount of a

22  reasonable royalty.

23            A royalty is the amount of money a

24  licensee pays to a patent owner for each article the

25  licensee makes or uses or sells under the patent.

1          A reasonable royalty is the amount of

2  money a willing patent owner and a willing prospective

3  licensee would have agreed upon at the time of the

4  infringement for a license to make the invention.

5          In making your determination of the

6  amount of a reasonable royalty, it is important that you

7  focus on the time period when the infringer first

8  infringed the patent and the facts that existed at that

9  time.

10          Your determination does not depend on the

11  actual willingness of the parties to this lawsuit to

12  engage in such negotiations.  Your focus should be on

13  what the parties' expectations would have been had they

14  entered negotiations for royalties at the time of the

15  infringing activity.

16          The infringer's actual profits may or may

17  not bear on the reasonableness of an award based upon a

18  reasonable royalty.

19          In determining a reasonable royalty, you

20  should consider all the facts known and available to the

21  parties at the time the infringement began.

22          Some of the kinds of factors that you may

23  consider in making your determination are:

24          (1) whether the patent holder had an

25  established royalty for the invention; the absence of --

1  in the absence of such a licensing history, any royalty

2  arrangements that were generally used and recognized in

3  the particular industry at that time;

4              (2) the nature of the commercial

5  relationship between the patent owner and the licensee,

6  such us whether they were competitors or whether their

7  relationship was that of an inventor and a promoter;

8              (3) the established profitability of the

9  patented product, its commercial success, and its

10  popularity at the time;

11              (4) whether the patent holder had an

12  established policy of granting licenses or retaining the

13  patented invention as an exclusive right or whether the

14  patent owner had a policy of granting licenses under

15  special conditions designed to preserve his monopoly;

16              (5) the size of the anticipated marketed

17  invention at the time the infringement began;

18              (6) the duration of the patent and of the

19  license, as well as the terms and scope of the license

20  such as whether it was exclusive or nonexclusive or

21  subject to territorial restrictions;

22              (7) the rates paid by the licensee for

23  the use of other patents comparable to the Plaintiffs'

24  patent;

25              (8) whether the licensees' sales of the

patented invention promote sales of its other products

and whether the invention generates sales to the

inventor of his non-patented items;

(9) the utility and advantages of the

patent property over the old modes or devices, if any,

that had been used for working out similar results;

(10) the extent to which the infringer

used the invention and any evidence probative of the

value of such use;

(11) the portion of the profits in the

particular business that are customarily attributable to

the use of the invention or analogous invention;

(12) the portion of the profits that

should be credited to the invention as distinguished

from non-patented elements, the manufacturing process,

business risks, or significant fixtures -- features or

improvements added by the infringer;

(13) the opinion and testimony of

qualified experts and of the patent holder;

And (14) any other factors which, in your

mind, would have increased or decreased the royalty the

infringer would have been willing to pay and the patent

owner would have been willing to accept acting as

normally prudent business people.

You must not award the Plaintiffs more

1  damages that are adequate to compensate for the

2  infringement nor shall you include any additional amount

3  for the purpose of punishing the Defendants or setting

4  an example.

5           You must not consider the Plaintiffs'

6  allegation of willfulness in considering the damages or

7  take into account any evidence relating to those

8  damages.  Consideration of willfulness is entirely

9  separate from the question of damages.

10          You may not increase damages because you

11 find willfulness or decrease because you did not find

12 willfulness, nor may you include damages that are

13 speculative, damages that are only possible, or damages

14 that are based on guesswork.

15          Nothing that I may have said or done

16 during the course of this trial is intended to indicate

17 any view of mine as to which party should or should not

18 win this case.

19          As I instructed you previously, the jury

20 is the sole judge of the credibility of the testimony

21 and the weight to be given the evidence.

22          Now, these instructions are given to you

23 as a whole.  You are not to single out one instruction

24 alone as stating the law, but you must consider the

25 instructions as a whole.

1          You have heard all of the evidence in the

2   case.  You have heard the argument of counsel.  The

3   Court has given you the charge in this case.

4          In just a few moments, you will retire to

5   the jury room, select one of your members to act as

6   foreperson, and begin performing the function for which

7   you have been chosen and for which you have been

8   impaneled in accordance with the oath that you took as

9   jurors.

10          You will remember at the beginning of the

11  trial and throughout this trial, I have admonished you

12  not to discuss the case with each other until it was

13  submitted to you.

14          Well, now is the time for you to begin

15  your discussions, and you certainly may express an

16  opinion from the evidence that you have heard and use

17  any reasonable means to persuade other members of the

18  jury to your convictions and to your honest opinion.

19          You are to reach a verdict which speaks

20  the truth and which does justice to all parties without

21  favor, bias, or prejudice in any particular, either for

22  or against any party to this lawsuit.

23          In the course of your deliberations, do

24  not hesitate to re-examine your own views and change

25  your opinion, if convinced it is erroneous.

1        But do not surrender your honest

2  conviction as to the weight or effect of the evidence

3  solely because of the opinion of your fellow jurors or

4  for the mere purpose of returning your verdict.

5            Now, the verdict must represent the

6  considered judgment of each juror.  In order to return a

7  verdict, it is necessary that each juror agree thereto.

8  Your verdict must be unanimous.

9            As soon as you made the -- or have

10  reached your verdict, you will let this fact be known to

11  the officer.

12            Mr. Potts, you staying with them?

13            COURT SECURITY OFFICER:  I will be, Your

14  Honor.

15            THE COURT:  Mr. Bill Potts, your CSO, and

16  he will report to the Court.

17            Now, your verdict is going to be in the

18  form of questions for you to answer.  You will take

19  these questions to the jury room, and when you have

20  reached a unanimous agreement as to your verdict, you

21  will have your foreperson fill in, sign, and date the

22  form, then advise Mr. Potts, your security officer, that

23  you've reached a verdict.

24            During your deliberations, you may have

25  any of the exhibits which have been offered into

1 evidence, and the Court will send them to you upon

2 written request.

3                    If you desire further instructions, your

4 foreperson may make this known in writing, and the Court

5 will try to comply with your request.

6                    All communications with the Court must be

7 in writing, but at no time should you indicate to the

8 Court or to anyone else how the jury is divided in

9 answering any particular question.

10                    Any notes that you have taken during this

11 trial are only aids to your memory.  If your memory

12 should differ from your notes, then you should rely on

13 your memory and not on the notes.  The notes are not

14 evidence.

15                    A juror who has not taken notes should

16 rely on his or her independent recollection of the

17 evidence and should not be unduly influenced by the

18 notes of other jurors.

19                    Notes are not entitled to any greater

20 weight than the recollection or impression of each juror

21 concerning the testimony.

22                    You are now in charge of when you take

23 your breaks, when you take your lunch break.  I think

24 you understand by now that I generally take lunch around

25 12 o'clock.

1               So if you want to send me a note, I

2  probably won't be here from 12:00 to 1:00.

3               At this time, I'm going to hand the

4  questions to Mr. Potts, your security officer.  If

5  you'll follow him into the jury room and commence your

6  deliberations in accordance with my instructions.

7  I'm about to hand you the charge.

8               COURT SECURITY OFFICER:  All rise for the

9  jury.

10              (Jury out.)

11              THE COURT:  Please be seated.

12              It's been called to my attention that in

13  reading the -- what -- the defined terms, that I left

14  off one phrase, that one time I did not say at least 1

15  times 10 to the 8th liter per mole.  They've got that in

16  writing.

17              You want me to call it back in here and

18  read it to them again?  Anything from the Plaintiff?

19              MS. ELDERKIN:  There's no need, Your

20  Honor.

21              MR. LEE:  No, Your Honor.

22              THE COURT:  Okay.  Anything from the

23  Plaintiff at this time?

24              MR. SAYLES:  Nothing at this time, Your

25  Honor.

1          THE COURT:  And from the Defendant?

2          MR. BECK:  Nothing, Your Honor.  As I

3   understand it, the Court has excused me because of

4   another matter tomorrow morning?

5          THE COURT:  What time did you need to

6   leave?

7          MR. BECK:  Hopefully, right after lunch.

8          THE COURT:  Hopefully.  Mr. Beck, you can

9   leave anytime you want to.

10          MR. BECK:  Thank you, sir.

11          THE COURT:  Stop counsel -- get your

12   group together -- if you're leaving, get the group

13   together and come in before you leave.  I'll have

14   something to say to you, I'm sure, off the record.

15   Court's in recess pending a verdict.

16          (Recess.)

17          *       *       *       *       *

18

19

20

21

22

23

24

25

1

2

3                              CERTIFICATION

4

5              I HEREBY CERTIFY that the foregoing is a

6   true and correct transcript from the stenographic notes

7   of the proceedings in the above-entitled matter to the

8   best of my ability.

9

10

11

12   /s/_____          _____
     SUSAN SIMMONS, CSR                     Date
13   Official Court Reporter
     State of Texas No.:  267
14   Expiration Date:  12/31/10

15

16

17   /s/_____          _____
     JUDITH WERLINGER, CSR                Date
18   Deputy Official Court Reporter
     State of Texas No.:  731
19   Expiration Date  12/31/10

20

21

22

23

24

25