## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| CENTOCOR ORTHO BIOTECH, INC. and NEW YORK UNIVERSITY,<br><br>      Plaintiffs and<br>      Counterclaim-Defendants,<br><br>v.<br><br>ABBOTT LABORATORIES, ABBOTT BIORESEARCH CENTER, INC., AND ABBOTT BIOTECHNOLOGY LTD.,<br><br>      Defendants and<br>      Counterclaim-Plaintiffs. | Civil Action No. 2:07CV139<br><br>JURY TRIAL DEMANDED |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR (1) SUPPLEMENTAL DAMAGES, (2) PREJUDGMENT INTEREST, (3) POST-JUDGMENT INTEREST, (4) COSTS, (5) SEVERANCE OF FUTURE DAMAGES AND (6) FINAL JUDGMENT, AND <u>MEMORANDUM IN SUPPORT THEREOF</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

I.    INTRODUCTION ......................................................................................... 1

II.   ARGUMENT ................................................................................................. 2

      A.    Supplemental Damages Should Be Addressed In The Severed Action
            Regarding Prospective Damages. ......................................................... 2

            1.    No Legal Authority Requires That Post-Verdict, Pre-Judgment
                  Damages In A Patent Infringement Action Be Incorporated In
                  The Final Judgment. ................................................................... 2

            2.    Centocor's Failure To Calculate Supplemental Damages
                  Consistent With The Jury Verdict Militates In Favor Of
                  Addressing Damages For The Post-Verdict, Pre-Judgment
                  Period In The Post-Judgment Damages Action. .......................... 4

                  a)   Dr. Gering's Damages Analysis. ...................................... 4

                  b)   The Calculation Of Supplemental Damages Is Not
                       Consistent With The Jury Verdict – Even Assuming
                       The Verdict Dictates The Manner In Which Damages
                       Should Be Awarded Post-Verdict. .................................. 5

      B.    The Methodology Utilized To Calculate Prejudgment Interest
            Overcompensates Centocor Because It Fails To Take Into Account
            The Time At Which Centocor Would Have Received Royalty
            Payments Or Additional Revenues. ..................................................... 7

            1.    The Damages Award Represents The Royalty Payments
                  Centocor Would Have Received From Abbott And Additional
                  Profits Centocor Would Have Earned On Remicade
                  Throughout The Damages Period. .............................................. 8

            2.    Legal Precedent Makes Clear That Prejudgment Interest
                  Should Be Calculated From The Time Centocor Would
                  Actually Have Received A Royalty Payment Or Earned A
                  Profit. ......................................................................................... 8

            3.    Prejudgment Interest Should Be Calculated Based On A
                  Distribution Of Damages Over The Period Of Infringement. ....... 11

      C.    A Final Judgment Consistent With Abbott's Positions Set Forth Above
            Should Be Entered. ............................................................................. 11

III.   CONCLUSION..............................................................................................................13

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc.,* No. C 03-1431
   SBA, 2008 WL 928535 (N.D. Cal. April 4, 2008) ....................................................9

*General Motors Corp. v. Devex Corp.,*
   461 U.S. 648 (1983) ...............................................................................................8

*Hynix Semiconductor Inc. v. Rambus Inc.,*
   609 F. Supp. 2d 951 (N.D. Cal. 2009) ....................................................................3

*Mars, Inc. v. Coin Acceptors, Inc.,*
   513 F. Supp. 2d 128 (D.N.J. 2007) .........................................................................9

*Medtronic Vascular, Inc. v. Boston Scientific Corp.,* No. 2-06-cv-78 (TJW),
   2009 WL 175696 (E.D. Tex. Jan. 23, 2009)........................................................3, 10

*National Instruments Corp. v. Mathworks, Inc.,* No. 2:01-cv-11,
   2003 WL 24049230 (E.D. Tex. June 23, 2003).........................................................3

*Oiness v. Walgreen Co.,*
   88 F.3d 1025 (Fed. Cir. 1996)...............................................................................11

*Primrose Operating Co. v. National American Insurance Co.,*
   382 F.3d 546 (5th Cir. 2004) .................................................................................9

## I.   **INTRODUCTION**

On June 29, 2009, the jury rendered a verdict against Abbott Laboratories, Abbott

Bioresearch Center, Inc. and Abbott Biotechnology Ltd. (collectively "Abbott"), and awarded

Centocor and New York University (collectively "Centocor") lost profits and reasonable royalty

damages totaling to approximately $1.67 billion through the time of trial.  Centocor now asks

this Court to award it in excess of an additional $580 million in supplemental damages and

prejudgment interest.  But Centocor cannot justify its inflated damages calculation, and the sum

awarded in the final judgment in this action should be substantially lower:

- Dr. Gering, Centocor's damages expert, has *arbitrarily* selected data relating to a small portion of the damages awarded and estimated damages between the time of the jury verdict and entry of judgment.  Although Abbott does not concede that the jury's methodology necessarily controls an award for post-verdict damages,[1] even if it did, the parties could *accurately* assess damages for this period in the separate action that both parties agree should be the vehicle for calculating damages, if any, that would be owed for the period after judgment in the event the judgment is affirmed on appeal. The Court should therefore deny Centocor's motion for supplemental damages at this time.

- Centocor's methodology for determining prejudgment interest, which involves calculating interest as though the entire $1.67 billion award was due on the first day of the nearly three-year long period of infringement, grossly inflates the amount required to compensate Centocor for the lost use of its money.  Instead, interest should be calculated based on the dates Centocor would have actually received royalty payments from Abbott and earned additional profits from Remicade sales had Abbott not infringed the '775 patent.  This error alone has inflated Centocor's request for interest by *over $120 million*.

Rather than the total monetary award advocated by Centocor, Abbott submits that (1) the

amount of post-verdict damages should be addressed in the separate action relating to post-

judgment damages and (2) prejudgment interest should be calculated using the ninety (90) day

commercial paper rate and distributing damages over the period from July 4, 2006 through June

---

[1]     The "facts" that implicitly underlie the jury's damages award are necessarily tied to specific times and market conditions.  Even if those facts were deemed established, they are not directly relevant to an award of damages for different time periods.  Thus, principles of res judicata have little or no applicability to the award of future damages.

2009 in accordance with Abbott's sales of Humira. Thus, the proper amount awarded in this

Court's final judgment should be $1,721,533,156, which consists of damages awarded through

the time of the verdict and prejudgment interest calculated thereon (through December 17, 2009).

Declaration of Daniel J. Slottje ¶ 9 ("Slottje Decl.") (Ex. 1).[2]

## II.    ARGUMENT

### A.    Supplemental Damages Should Be Addressed In The Severed Action Regarding Prospective Damages.

Abbott does not dispute that, if the jury verdict is affirmed on appeal, Centocor is entitled

to seek and obtain damages on account of non-licensed Humira sales (*i.e.*, Humira not used in

combination with methotrexate) that Abbott has made since the time of the verdict. It is clearly

not necessary, however, that the final judgment rendered in this action include damages for the

period between the verdict and entry of judgment. Although Centocor represents that its request

for supplemental damages is consistent with the jury verdict, Dr. Gering's calculations merely

***approximate*** damages during this period and are ***not consistent*** with the methodology underlying

the jury verdict, assuming it even applies. In light of the fact that post-judgment damages will be

addressed in a separate action, damages for the period between the verdict and entry of judgment

should also be addressed in the separate action.

### 1.    No Legal Authority Requires That Post-Verdict, Pre-Judgment Damages In A Patent Infringement Action Be Incorporated In The Final Judgment.

Centocor has pointed to no legal authority requiring that supplemental damages be

awarded in this, as opposed to a separate, action. In at least one case, this Court has recognized

that damages for the post-verdict, pre-judgment period can be addressed in a separate suit. In

---

[2]    Information regarding the total monetary award to be included in a final judgment entered on any day after December 17 is included in Section II.C of this Opposition and discussed further in the attached Declaration of Daniel J. Slottje.

*Medtronic Vascular, Inc. v. Boston Scientific Corp.*, this Court severed the plaintiff's continuing cause of action for *post-verdict – not post-judgment – infringement*. No. 2-06-cv-78 (TJW), 2009 WL 175696, at *1 (E.D. Tex. Jan. 23, 2009) (Ex. 2). This was the case even though judgment did not enter until nearly eight months after the jury's verdict. Jury Verdict, May 27, 2008 (Dkt No. 213) (Ex. 3); Final Judgment, Jan. 23, 2009 (Dkt No. 284) (Ex. 4). *See also Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 961 (N.D. Cal. 2009) (observing that a patentee not awarded supplemental damages "could file another complaint alleging infringement occurring after the time period tried in the first case").

Moreover, declining to award supplemental damages in this action *would not* result in a windfall to Abbott. In its brief, Centocor quotes language from *National Instruments Corp. v. Mathworks, Inc.* to suggest that it will go without compensation for Abbott's infringement during the post-verdict, pre-judgment period if this Court does not award supplemental damages. (Centocor Br. at 3.) But there is an important distinction between *National Instruments* and the case at hand. There, this Court considered the infringer's argument that the patentee had waived its right to collect supplemental damages and determined that the infringer would receive a windfall if the court accepted this argument. *Nat'l Instruments*, No. 2:01-cv-11, 2003 WL 24049230, at *4 (E.D. Tex. June 23, 2003) (Ex. 5). Here, Abbott does not contend that Centocor is precluded from recovering damages from the post-verdict, pre-judgment period, but merely asserts that those damages should be assessed as a part of the separate action relating to post-judgment infringement in the event the jury verdict is ultimately sustained. *See Hynix Semiconductor*, 609 F. Supp. 2d at 961 (noting that "[f]ailure to award [supplemental] damages may not necessarily create a 'windfall' for the infringer" because of the patentee's ability to

recover damages in a second action).  Thus, if Centocor finally prevails, it will be compensated

for post-verdict, pre-judgment infringement, and Abbott will not enjoy any windfall.

> **2.** **Centocor's Failure To Calculate Supplemental Damages Consistent With The Jury Verdict Militates In Favor Of Addressing Damages For The Post-Verdict, Pre-Judgment Period In The Post-Judgment Damages Action.**

As Centocor notes, the jury wholly accepted the analysis and calculations Dr. Gering put

forth at trial to quantify its lost profits and reduced his suggested royalty rate by half.  (Centocor

Br. at 2.)  Centocor purportedly seeks supplemental damages "consistent with the jury's verdict."

(*Id.* at 4.)  While Abbott does not agree that the jury's methodology necessarily governs an

award of damages for post-verdict infringement, even if it did, the methodology Centocor

proposes for awarding supplemental damages is an arbitrary and oversimplified calculation that

ignores the complexities of the biologics market underlying the jury verdict and the evidence

introduced at trial.  To determine damages for the post-verdict, pre-judgment period in a manner

truly consistent with the jury verdict, these damages would have to be addressed in the action

relating to ongoing damages in light of the applicable market conditions during the relevant time

period.

> **a)** **Dr. Gering's Damages Analysis.**

At trial, Dr. Gering explained his "fairly complicated" market share analysis and lost

profits calculations in detail.  (Trial Tr. 171:6-181:5, June 23, 2009 (Ex. 6).)  For each of *five*

*indications* and for each of *four relevant time periods,*[3] Dr. Gering undertook a many-step

analysis – including assigning Humira patients to groups depending on whether they failed a

particular biologic anti-TNF therapy before taking Humira and determining what percentage of

each of these groups would have taken Remicade if Humira had not been available – to arrive at

---

[3] The five indications are rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, psoriasis and Crohn's disease.  The four relevant time periods are post-July 4, 2006, 2007, 2008 and the first half of 2009.

an adjusted market share for Remicade. (*Id.* at 171:18-174:12; Gering Demonstratives at 11 (Ex. 7).)  As Dr. Gering explained, the results varied from indication to indication and from year to year, resulting in adjusted market shares ranging from 11-69% depending on the time period and indication.  *See* Gering Demonstratives at 12 (Ex. 7); Trial Tr. 175:21-177:7 (Ex. 6).  To determine lost profits payable to Centocor, Dr. Gering applied these adjusted market shares to sales of Humira in the relevant indication and during the relevant time period, and then multiplied by the incremental profit margin.  (Trial Tr. 177:8-179:4 (Ex. 6).)

As should be apparent from Dr. Gering's explanation of his analysis, the profits Centocor would have made in the but-for world are entirely dependent on a number of factors that can vary significantly at different points in time based on Humira's and Remicade's performance in the market.  Such factors include the distribution of non-licensed Humira sales across indications, the distribution of sales across Dr. Gering's patient source categories, and the percentage of patients within a patient source category that would have used Humira in the but-for world.  Necessarily, the proportion of sales on which Centocor is entitled to recover lost profits to sales on which it can only recover a reasonable royalty varies from time period to time period depending on these factors, as well.  All of these factors are potentially subject to factual dispute and would require discovery and trial, in the event the parties could not agree between themselves on the correct number.

**b)**       **The Calculation Of Supplemental Damages Is Not Consistent With The Jury Verdict – Even Assuming The Verdict Dictates The Manner In Which Damages Should Be Awarded Post-Verdict.**

Dr. Gering is surely aware that the results of his lost profits analysis – which the jury adopted in its entirety – are impacted by the specific market conditions in the relevant time period.  Despite this, Dr. Gering has arbitrarily chosen the market conditions associated with the

second quarter of 2009 and applied those to Abbott's sales of Humira during the third quarter 2009 to calculate supplemental damages on a daily basis going forward. *See* Centocor Br., Ex. 5, Decl. of Richard J. Gering, Ph.D. ¶¶ 9-10, 12 (explaining that the daily supplemental damages amount is arrived at by multiplying (1) the average of lost profits and reasonable royalty damages awarded per dollar for non-licensed Humira sold in the second quarter of 2009 - $0.1894 per dollar – by (2) the average daily sales of non-licensed Humira during the third quarter of 2009).

Centocor contends that Dr. Gering's methodology is consistent with the jury verdict, but his method grossly oversimplifies what the jury found to be an acceptable way to analyze the market and award damages – namely, Dr Gering's own complex breakdown and analysis of the biologic anti-TNF market. Neither Centocor nor Dr. Gering explains why the supplemental damages approach Dr. Gering has selected is valid. He could just as arbitrarily have averaged the damages awarded per dollar of non-licensed Humira sold during the first *and* second quarters of 2009. Had he done so, he would have determined that the average damages paid per dollar of infringing Humira sales was $0.1820, and daily supplemental damages should be $2,327,224 rather than $2,421,848. *See* Slottje Decl. ¶¶ 6.a-6.c (Ex. 1). Moreover, because final non-licensed Humira sales numbers and data relevant to his adjusted market share analysis were available through only April 2009 when Dr. Gering submitted updated damages calculations prior to trial, his calculations for the second quarter 2009 were in large part based on estimates. *See* Letter from Dr. Richard Gering to Steven D. Maslowski, Esquire, June 15, 2009 (Ex. 8). Dr. Gering's use of his damages calculations relating to the second quarter of 2009 as *the sole basis* for the average damages awarded per dollar of non-licensed Humira sold is therefore especially unreasonable since those calculations were already based on estimates rather than fact.

Even if the jury's methodology for awarding damages governs how damages for post-verdict infringement should be awarded, Centocor's proposed methodology for calculating supplemental damages is not consistent with the jury's adoption of Dr. Gering's adjusted market share analysis to determine the amount of lost profits (and, thereby, the amount of Humira sales subject to a reasonable royalty).  In light of the fact that Abbott and Centocor already intend to address post-judgment damages in a separate action, the parties should also address post-verdict, pre-judgment damages in that separate action.  Abbott therefore respectfully requests that this Court decline to award Centocor supplemental damages at the present time.

**B.      The Methodology Utilized To Calculate Prejudgment Interest Overcompensates Centocor Because It Fails To Take Into Account The Time At Which Centocor Would Have Received Royalty Payments Or Additional Revenues.**

With respect to Centocor's request for prejudgment interest, Abbott takes issue only with Centocor's request that prejudgment interest be calculated as though the entire $1.67 billion damages award was due on the day the '775 patent issued.  As Centocor argues in its opening brief, "the purpose of prejudgment interest . . . is to ensure that the patent owner is placed in *as good a position* as he would have been."  (Centocor Br. at 4-5, *quoting Electro Sci. Indus. v. Gen. Scanning, Inc.*, 247 F.3d 1341, 1354 (Fed. Cir. 2001) (emphasis added)).  But calculating prejudgment interest as Centocor proposes would put Centocor in *a better position* than it would otherwise have been.  Had Abbott not infringed, Centocor would have earned additional monies on various dates from July 4, 2006 through June 2009 – not just on the date the '775 patent issued.  Calculating prejudgment interest as though the entire amount of the verdict was due on July 4, 2006 would therefore overcompensate Centocor for the lost use of its money.  Instead, prejudgment interest should be calculated on damages distributed on the dates Centocor would have actually received those monies.

1.  **The Damages Award Represents The Royalty Payments Centocor Would Have Received From Abbott And Additional Profits Centocor Would Have Earned On Remicade Throughout The Damages Period.**

The jury's damages award was clearly tied to Abbott's total non-licensed Humira sales made from issuance of the '775 patent on July 4, 2006 through June 2009 and reflects an understanding that Centocor would have collected these damages over time. (Trial Tr. 158:1-159:16 (Ex. 6); Gering Demonstratives at 3 (Ex. 7).)   In his testimony, Dr. Gering explained specifically how he calculated the profits Centocor would have reaped if infringing Humira had not been available *in a given year*. (Trial Tr. 171:18-179:4 (Ex. 6).)   In addition, Dr. Gering explained to the jury that his reasonable royalty damages number was based on the total non-licensed Humira sales on which Centocor was not entitled to lost profits multiplied by the suggested rate of 15%, (Trial Tr. 32:5-19, June 23, 2009 (Ex. 9)), rather than the value Abbott and Centocor might have assigned the patent in a negotiation to determine an upfront, lump-sum fee for Abbott to license the '775 patent.   While the jury apparently chose to halve Dr. Gering's suggested royalty rate, nothing in the jury's verdict suggests that it rejected the concept of Abbott paying royalties based on its sales over time.   It is therefore apparent that the jury verdict compensated Centocor for money it would have collected at various points throughout the period of infringement.

2.  **Legal Precedent Makes Clear That Prejudgment Interest Should Be Calculated From The Time Centocor Would Actually Have Received A Royalty Payment Or Earned A Profit.**

In reviewing the prejudgment interest a district court had awarded in a patent infringement case, the Supreme Court observed:

> An award of interest *from the time that the royalty payments would have been received* . . . serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment.

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-656 (1983) (emphasis added).  The

Court went on to uphold the award of prejudgment interest where the lower court had

"determined what the annual royalties payments would have been, and calculated prejudgment

interest on each payment from the time it would have become due." *Id.* at 651, 658.  Following

*General Motors*, courts generally award prejudgment interest from the time infringement begins,

based on when payments would have been due.[4]  Prejudgment interest in this case should

therefore be calculated from the time at which Centocor would have collected royalty payments

from Abbott or reaped additional profits on Remicade sales.

Awarding prejudgment interest based on the distribution of damages over time is entirely

consistent with the Fifth Circuit's ruling in *Primrose Operating Co. v. Nat'l American Ins. Co.*,

382 F.3d 546 (5th Cir. 2004).  In *Primrose*, the court analyzed how to calculate prejudgment

interest where the defendant had breached its contractual obligation to plaintiffs in a prior

lawsuit.  The district court had awarded prejudgment interest on the total amount of damages

from the date the defendant initially refused to defend plaintiffs.  *Id.* at 564.  On appeal,

defendant asserted that prejudgment interest should instead be calculated based on when the

plaintiffs paid their attorneys' bills.  *Id.*  After reviewing Texas prejudgment interest law, the

Fifth Circuit ruled that "prejudgment interest should be assessed against [defendant] ***based on***

***the dates Plaintiffs paid each bill for attorney's fees*** rather than the date [defendant] refused to

defend Plaintiffs." *Id.* at 565 (emphasis added).  The court went on to explain: "Plaintiffs did not

---

[4]      *See, e.g.*, *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL
928535, at *4 (N.D. Cal. April 4, 2008) (rejecting calculation of prejudgment interest using "pre-yearly accrual
methodology, which artificially assumes that the damages occurred at the beginning of each year") (Ex. 10) *and*
Fresenius' Opposition to Baxter's Motion for an Award of Damages Including Prejudgment Interest, 2008 WL
460295, at 3 (Jan. 15, 2008) (explaining that the alternative approach "closely track[ed] [defendant's] historical . . .
sales, with all royalty payments accruing less than a month after the sales were actually made") (Ex. 11); *Mars, Inc.
v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 138 (D.N.J. 2007) (denying request to preclude recovery of
prejudgment interest for period between court's finding that patent was not infringed and reconsideration and
reversal of that finding because "royalty payments ***would have been received*** from the time of infringement,
regardless of subsequent litigation events") (emphasis added).

lose the use of their money until they paid their attorney's fees.  Granting Plaintiffs prejudgment interest accruing at a date any earlier than when they actually paid such fees would overcompensate them, punish [defendant], and not accurately reflect Plaintiffs' damages." *Id.* at 566.

 *Similarly, Centocor did not lose the use of $1.67 billion on the first day Abbott's infringement began.*  Centocor lost the use of its money on the dates throughout the nearly three-year period covered by the jury verdict on which Abbott should have made royalty payments to Centocor and the dates on which Centocor would have earned additional profits from its Remicade sales.  Accordingly, prejudgment interest should be calculated based on a distribution of damages over the period from July 4, 2006 through June 2009.

 The two cases Centocor cites in support of its methodology are distinguishable:  neither involved an award of lost profits.  *See Medtronic*, 2009 WL 175696, at *2 (Ex. 2); *Saffran v. Boston Scientific Corp.*, No. 2-05-cv-547 (TJW), at 1 (E.D. Tex. April 22, 2008) (Dkt. No. 193) (Ex. 12).  *By definition, a lost profits award compensates a patentee for the profits it loses throughout the period of infringement - not at the outset of the infringement.*  There is no precedent supporting Centocor's proposed use of this method for calculating prejudgment interest on lost profits, and treating the entire lost profits award as payable on the first day of infringement is particularly improper.[5]

 Moreover, calculation of prejudgment interest as though Abbott owed Centocor all $1.67 billion in damages on July 4, 2006 would result in an award that overcompensates Centocor and is punitive to Abbott.  Centocor would receive more than *an additional $120 million* if prejudgment interest were calculated using its proposed methodology (producing over $170

---

[5]    As discussed above, because the reasonable royalty award incorporates the notion that Abbott would make periodic royalty payments to Centocor based on its actual sales of Humira during the relevant period, prejudgment interest on the reasonable royalty damages should also not be calculated as though all royalties were due on July 4, 2006.

million in prejudgment interest on verdict damages through December 1, 2009, *see* Gering Decl.

¶ 16) rather than using a methodology consistent with a distribution of damages over time in

accordance with Abbott's sales (producing approximately $49 million in prejudgment interest on

verdict damages through December 17, 2009, *see* Slottje Decl. Table 2 (Ex. 1)).  Because

"[p]rejudgment interest has no punitive, but only compensatory, purposes," *Oiness v. Walgreen*

*Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996), calculating prejudgment interest using Centocor's

proposed methodology would be inappropriate.

> **3.    Prejudgment Interest Should Be Calculated Based On A Distribution Of Damages Over The Period Of Infringement.**

Abbott does not take issue with Centocor's request that the Court set the average ninety

(90) day commercial paper rate as the prejudgment interest rate in this case.  As detailed in the

attached declaration of Professor Daniel Slottje, using this rate and – consistent with Dr.

Gering's alternative prejudgment interest methodologies – applying the mid-period convention

on damages distributed throughout the time period, prejudgment interest due on the jury verdict

from July 2006 through December 17, 2009 is $48,939,156.  Slottje Decl. ¶¶ 7.a-7.b and Table 2

(Ex. 1).  Additional prejudgment interest on the jury verdict for each day thereafter would be

approximately $7,156.  *Id.* at ¶ 7.c.[6]

> **C.    A Final Judgment Consistent With Abbott's Positions Set Forth Above Should Be Entered.**

Once damages for the post-verdict, pre-judgment period are shifted to the separate action

for post-judgment damages, the monetary award to be rendered in the Court's final judgment in

---

[6]      In a footnote, Centocor suggests that the methodology it advocates the Court use is reasonable because the total prejudgment interest would fall between (1) prejudgment interest calculated based on distributing damages over time, using the prime rate, and (2) prejudgment interest calculated based on distributing damages over time, using Johnson & Johnson's 9% weighted average cost of capital.  (Centocor Br. at 6 n.1.)  Given that only Centocor and New York University have standing to recover damages for infringement of the '775 patent, the weighted average cost of capital of Centocor's corporate parent is ***entirely irrelevant*** to determining adequate compensation for infringement.

this action consists of only (1) the amount of the verdict and (2) prejudgment interest thereon. For ease of reference, Abbott provides the following chart to demonstrate the amount due to Centocor assuming entry of judgment on any day from December 17, 2009 through January 31, 2010 (Slottje Decl. ¶¶ 9-10 and Table 4):[7]

**Table 4: Total Verdict Damages with Prejudgment Interest from December 17, 2009 through January 31, 2010**

| Judgment Date | Total Verdict Damages | Total Interest on Verdict Damages | Total Verdict Damages + Interest |
|---|---|---|---|
| 12/17/2009 | $ 1,672,594,000 | $ 48,939,156 | $ 1,721,533,156 |
| 12/18/2009 | $ 1,672,594,000 | $ 48,946,312 | $ 1,721,540,312 |
| 12/19/2009 | $ 1,672,594,000 | $ 48,953,468 | $ 1,721,547,468 |
| 12/20/2009 | $ 1,672,594,000 | $ 48,960,624 | $ 1,721,554,624 |
| 12/21/2009 | $ 1,672,594,000 | $ 48,967,780 | $ 1,721,561,780 |
| 12/22/2009 | $ 1,672,594,000 | $ 48,974,936 | $ 1,721,568,936 |
| 12/23/2009 | $ 1,672,594,000 | $ 48,982,092 | $ 1,721,576,092 |
| 12/24/2009 | $ 1,672,594,000 | $ 48,989,248 | $ 1,721,583,248 |
| 12/25/2009 | $ 1,672,594,000 | $ 48,996,404 | $ 1,721,590,404 |
| 12/26/2009 | $ 1,672,594,000 | $ 49,003,560 | $ 1,721,597,560 |
| 12/27/2009 | $ 1,672,594,000 | $ 49,010,716 | $ 1,721,604,716 |
| 12/28/2009 | $ 1,672,594,000 | $ 49,017,873 | $ 1,721,611,873 |
| 12/29/2009 | $ 1,672,594,000 | $ 49,025,029 | $ 1,721,619,029 |
| 12/30/2009 | $ 1,672,594,000 | $ 49,032,185 | $ 1,721,626,185 |
| 12/31/2009 | $ 1,672,594,000 | $ 49,039,341 | $ 1,721,633,341 |
| 1/1/2010 | $ 1,672,594,000 | $ 49,046,497 | $ 1,721,640,497 |
| 1/2/2010 | $ 1,672,594,000 | $ 49,053,653 | $ 1,721,647,653 |
| 1/3/2010 | $ 1,672,594,000 | $ 49,060,809 | $ 1,721,654,809 |
| 1/4/2010 | $ 1,672,594,000 | $ 49,067,965 | $ 1,721,661,965 |
| 1/5/2010 | $ 1,672,594,000 | $ 49,075,121 | $ 1,721,669,121 |
| 1/6/2010 | $ 1,672,594,000 | $ 49,082,277 | $ 1,721,676,277 |
| 1/7/2010 | $ 1,672,594,000 | $ 49,089,433 | $ 1,721,683,433 |
| 1/8/2010 | $ 1,672,594,000 | $ 49,096,589 | $ 1,721,690,589 |
| 1/9/2010 | $ 1,672,594,000 | $ 49,103,745 | $ 1,721,697,745 |
| 1/10/2010 | $ 1,672,594,000 | $ 49,110,901 | $ 1,721,704,901 |
| 1/11/2010 | $ 1,672,594,000 | $ 49,118,057 | $ 1,721,712,057 |
| 1/12/2010 | $ 1,672,594,000 | $ 49,125,213 | $ 1,721,719,213 |
| 1/13/2010 | $ 1,672,594,000 | $ 49,132,369 | $ 1,721,726,369 |
| 1/14/2010 | $ 1,672,594,000 | $ 49,139,525 | $ 1,721,733,525 |
| 1/15/2010 | $ 1,672,594,000 | $ 49,146,681 | $ 1,721,740,681 |
| 1/16/2010 | $ 1,672,594,000 | $ 49,153,837 | $ 1,721,747,837 |
| 1/17/2010 | $ 1,672,594,000 | $ 49,160,993 | $ 1,721,754,993 |

---

[7]     In the event the Court grants Centocor's motion with respect to supplemental damages, a similar chart setting forth the total monetary award to be included in the final judgment is provided at ¶¶ 11-12 and Tables 5 and 6 of Professor Slottje's declaration.

| 1/18/2010 | $ | 1,672,594,000 | $ | 49,168,149 | $ | 1,721,762,149 |
| 1/19/2010 | $ | 1,672,594,000 | $ | 49,175,305 | $ | 1,721,769,305 |
| 1/20/2010 | $ | 1,672,594,000 | $ | 49,182,461 | $ | 1,721,776,461 |
| 1/21/2010 | $ | 1,672,594,000 | $ | 49,189,617 | $ | 1,721,783,617 |
| 1/22/2010 | $ | 1,672,594,000 | $ | 49,196,773 | $ | 1,721,790,773 |
| 1/23/2010 | $ | 1,672,594,000 | $ | 49,203,929 | $ | 1,721,797,929 |
| 1/24/2010 | $ | 1,672,594,000 | $ | 49,211,085 | $ | 1,721,805,085 |
| 1/25/2010 | $ | 1,672,594,000 | $ | 49,218,241 | $ | 1,721,812,241 |
| 1/26/2010 | $ | 1,672,594,000 | $ | 49,225,397 | $ | 1,721,819,397 |
| 1/27/2010 | $ | 1,672,594,000 | $ | 49,232,553 | $ | 1,721,826,553 |
| 1/28/2010 | $ | 1,672,594,000 | $ | 49,239,710 | $ | 1,721,833,710 |
| 1/29/2010 | $ | 1,672,594,000 | $ | 49,246,866 | $ | 1,721,840,866 |
| 1/30/2010 | $ | 1,672,594,000 | $ | 49,254,022 | $ | 1,721,848,022 |
| 1/31/2010 | $ | 1,672,594,000 | $ | 49,261,178 | $ | 1,721,855,178 |

## III.   **CONCLUSION**

For the reasons set forth above, Abbott respectfully requests that the Court (1) deny Centocor's motion with respect to supplemental damages and (2) award prejudgment interest based on the ninety (90) day commercial paper rate and distribution of damages over the period from July 4, 2006 through June 2009.

13

Dated: December 17, 2009

By: /s/ David J. Beck

David J. Beck

Texas Bar No. 00000070
Beck, Redden & Secrest, L.L.P.
One Houston Center
1221 McKinney St., Suite 4500
Houston, TX.  77010
(713) 951-3700
(713) 951-3720 (Fax)
dbeck@brsfirm.com
Email: dbeck@brsfirm.com

ATTORNEY-IN-CHARGE FOR DEFENDANTS AND
COUNTERCLAIM-PLAINTIFFS ABBOTT
LABORATORIES, ABBOTT BIORESEARCH CENTER,
INC., AND ABBOTT BIOTECHNOLOGY LTD.

*Of Counsel*:

Michael E. Richardson
State Bar No. 24002838
BECK, REDDEN & SECREST, L.L.P.
1221 McKinney St., Suite 4500
Houston, Texas  77010-2010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720
Email:  mrichardson@brsfirm.com

William F. Lee (admitted *pro hac vice*)
Anne McLaughlin (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000
Facsimile: (617) 526-5000
Email:  william.lee@wilmerhale.com
Email:  anne.mclaughlin@wilmerhale.com

William G. McElwain (admitted *pro hac vice*)
Amy Kreiger Wigmore (admitted *pro hac vice*)
Jamaica P. Szeliga (admitted *pro hac vice*)
Amanda L. Major (admitted *pro hac vice*)
Jacob S. Oyloe (admitted *pro hac vice*)
Ali Hassan Shah (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile: (202) 663-6363
Email:  william.mcelwain@wilmerhale.com
Email: amy.wigmore@wilmerhale.com
Email: jamaica.szeliga@wilmerhale.com
Email: amanda.major@wilmerhale.com
Email: jacob.oyloe@wilmerhale.com
Email: ali.shah@wilmerhale.com

Eric P. Martin (admitted *pro hac vice*)
ABBOTT LABORATORIES
Dept. 324, Bldg. AP6A-1,100
Abbott Park Road
Abbott Park, Illinois 60064-6008
Telephone:  (847) 938-3887
Facsimile:  (847) 938-6235
Email:  eric.martin@abbott.com

### CERTIFICATE OF SERVICE

I hereby certify that counsel of record, who are deemed to have consented to electronic service in the above-referenced case, are being served this 17th day of December, 2009 with a copy of the above-document via the court's CM/ECF System per Local Rule CV-5(a)(3).

/s/ Michael E. Richardson
Michael E. Richardson

15